IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

| | | |
|---|---|---|
| ASPEN NETWORKS, INC., | )( | |
| PLAINTIFF, | )( | CIVIL ACTION NO. |
| | )( | 2:23-CV-557-RWS |
| VS. | )( | MARSHALL, TEXAS |
| | )( | |
| CELLCO PARTNERSHIP D/B/A | )( | |
| VERIZON WIRELESS, | )( | JUNE 12, 2026 |
| DEFENDANT. | )( | 8:49 A.M. |

---

TRANSCRIPT OF JURY TRIAL

BEFORE THE HONORABLE ROBERT W. SCHROEDER III,

UNITED STATES DISTRICT JUDGE, AND A JURY

VOLUME 1, PAGES 1 THROUGH 217

---

FOR THE PLAINTIFF:

Mr. Barry J. Herman
Ms. Julie Giardina
Womble Bond Dickinson (US) LLP
100 Light Street
26th Floor
Baltimore, MD 21202

Mr. Preston H. Heard
Ms. Christine H. Dupriest
Mr. John G. Perry
Mr. Jace D. Williams
Womble Bond Dickinson (US) LLP
1331 Spring Street NW
Suite 1400
Atlanta, GA 30309

Mr. Fabio E. Marino
Womble Bond Dickinson (US) LLP
1279 Oakmead Parkway
Suite 200
Sunnyvale, CA 94085

FOR THE PLAINTIFF: Mr. Eric H. Findlay
Findlay Craft, PC
7270 Crosswater Avenue
Suite B
Tyler, TX 75703

FOR THE DEFENDANT: Mr. Deron R. Dacus
The Dacus Firm, PC
821 ESE Loop 323
Suite 430
Tyler, TX 75701

Mr. Kevin P. Anderson
Ms. Elissa Sanford
Duane Morris LLP
901 New York Avenue NW
Suite 700 East
Washington, DC 20001

Mr. Matthew C. Gaudet
Mr. Glenn D. Richeson
Mr. John R. Gibson
Mr. Matthew S. Yungwirth
Duane Morris LLP
1075 Peachtree Street NE
Suite 1700
Atlanta, GA 30309

Mr. Aleksander J. Goranin
Mr. John Hillman
Mr. Robert M. Palumbos
Ms. Brianna M. Vinci
Duane Morris LLP
30 South 17th Street
Philadelphia, PA 19103

Ms. Holly E. Engelmann
Duane Morris LLP
Terrace 7
2801 Via Fortuna
Suite 200
Austin, TX 78746

COURT REPORTER: Ms. Shelly Holmes, CSR, TCRR
Official Court Reporter
Honorable Robert W. Schroeder III
United States District Judge
Eastern District of Texas
Texarkana Division
500 North State Line Avenue
Texarkana, TX 75501
shelly_holmes@txed.uscourts.gov

(Proceedings recorded by mechanical stenography, transcript produced on a CAT system.)

P R O C E E D I N G S

(In-chambers conference.)

THE COURT: Let's go on the record. It's about 8:45.

If counsel for the parties would please state their appearances for the record, beginning with the Plaintiff.

MR. FINDLAY: Eric Findlay and Barry Herman on behalf of the Plaintiff, Aspen, Your Honor.

MR. DACUS: Deron Dacus and Kevin Anderson on behalf of the Defendant, Verizon.

THE COURT: All right. Good morning, all.

We -- as I think I said, we're back in chambers. The jury has been qualified -- the panel has been qualified, and we should be good to begin voir dire in just a moment. You all should have received a couple of final rulings on the remaining MILs, I think, that needed to be resolved.

To the extent there are any exhibit objections or deposition designation objections that you all have for next week, we can handle those this afternoon after the jury is dismissed.

You all have our trial procedures order. We will enforce the provisions of that order. As explained in that

order, the parties do need to notify us of any written motions or objections related to exhibits or demonstratives the night before by 8:15. We've modified our normal schedule a little bit just to, I think, make this process a little easier on everybody.

MR. DACUS: Understood.

THE COURT: So we would ask that you do that by 8:15 the night before. Let us know of any written motions or objections. The parties are requested to email Mr. Hopkins by 8:15 briefly summarizing the issue, attaching relevant documents by that time, as well.

The written motion or objection needs to be filed on the docket and responses to those motions or objections filed and emailed by 9:00 p.m. with each party's position statement for all of the issues of no more than a thousand words.

Deposition designation objections need to be filed and sent to Mr. Hopkins by 8:15 p.m. two nights before the deponent's testimony is to be offered.

The email and the filing should include the objected to testimony and a concise summary of the objections. Responses, again, are due by 9:00 p.m., with the same word count applying.

Please don't file or email late. If there -- if you are running a few minutes behind or if there is no

dispute, please email Mr. Hopkins so that he can let us all know if a trial dispute needs to be handled in the morning before we start.

We do plan to be here on the record no later than 8:30 every morning ready to go to the extent there are any overnight disputes.

Voir dire this morning, 30 minutes per side. We do have 30 panelists in total. We're seating eight jurors this morning. Each side will have three peremptory strikes. That means we can have no more than 16 jurors stricken for cause or hardship. I think that's more than an adequate number.

I typically handle hardships at the very end after all of voir dire has been completed so that we know, you know, how many cause strikes there are and how much flexibility I'm going to have on hardship requests.

You all should have picked up your questionnaires yesterday. There are some last minute questionnaires that are on counsel table out in the courtroom, along with a seating chart.

We -- I think -- I think there was a slight difference in the parties' positions about how far we should go today. I think the thing that makes the most sense is for us to get the jury seated, do preliminary instructions, and then do openings. And then at the end of

the day -- and then we will conclude with that and begin with the Plaintiff's first witness on Monday morning.

I do expect us to maybe have a little longer day and get a little more time off the clock on Monday, Tuesday, and Wednesday of next week, so we will plan to start promptly at 9:00 o'clock, maybe go to 5:30 every day. We will be strict about our breaks. So a 15-minute break will be a 15-minute break. An hour for lunch will be an hour for lunch.

I think if we are disciplined about that, we can get this to the jury on Thursday. That's my intention.

Any part -- either party know of any reason that can't be accomplished?

MR. DACUS: No, Your Honor.

MR. FINDLAY: No, Your Honor.

THE COURT: I intend to tell the jury we expect to get this to them for their consideration by Thursday of next week. Obviously, whatever they do with it after that is up to them. But we'll have it to them to begin deliberations by Thursday of next week.

Opening statements this afternoon, 30 minutes per side. Direct and cross, 11 hours per side. 45 minutes for closings.

I know you all are aware that my view is arguing objections while the jury is in the box or waiting

downstairs will be charged against the parties' trial time.

Typically, I think, my practice is to split that time. I think there are occasions where the objection is just either completely unfounded or otherwise, you know, sort of just not made in good faith, then I'm going to assign all of the time to one side or the other, but the normal practice is it's evenly split.

There were some minor disputes on the preliminary instructions. I don't know that we need to go through that right now, but I will tell you where I came out after we get the jury selected.

Is there any reason any of the disputes in preliminary instructions need to be discussed before voir dire?

MR. DACUS: No, Your Honor.

MR. HERMAN: No, Your Honor.

THE COURT: Okay. Let me tell you very briefly what I'm going to tell them in my voir dire summary of the case, which is what we took from the jury instructions that you all proposed. I'm going to read it to you briefly. I just want to make sure you don't have any problem with it.

Ladies and gentlemen of the panel, I want to tell you briefly about the case. The parties in this case are Plaintiff, Aspen Networks, Inc., and Defendant, Cellco Partnership d/b/a Verizon Wireless. This is a patent

infringement case. The Plaintiff, Aspen, contends that the Defendant, Verizon, is infringing the patent it has asserted in this case. Specifically, Aspen contends that Verizon's Voice over Wi-Fi Calling Service infringes Claims 1, 2, 6, 15, 16, and 20 of U.S. Patent No. 8,009,554. Aspen contends that as a result of Verizon's alleged infringement of the asserted claims, Aspen is entitled to monetary damages. Verizon denies that it has any liability for infringing the asserted patent. Verizon also contends that the asserted patents are not infringed and/or invalid and that Aspen is not entitled to any money damages.

Any concerns about that by either side?

MR. HERMAN: No, Your Honor.

MR. ANDERSON: Your Honor, you said patents, implying that there's multiple ones. It's a minor thing.

MR. FINDLAY: Good catch, Kevin.

MR. ANDERSON: At the very end. It was at the very, very end.

THE COURT: Well, I misspoke because it's not plural as written.

MR. ANDERSON: Okay. Okay. I'm sorry, Your Honor.

THE COURT: It was plural as read, but not as written so --

MR. ANDERSON: I'm sorry, Your Honor.

THE COURT: Okay. Good.

Let's see, you all have filed your final instructions, the verdict form. We'll take a good look at that. We will plan on doing an informal charge conference, to the extent it makes sense or is necessary, sometime on Wednesday after the jury is excused. If there are significant disputes at that point, we -- I think you all know my practice. If it's -- if it would be productive for us to sit down and go through it sort of line by line, we will do that. If I feel like I can make the decision and I've understood your positions, I'll go ahead and make that decision, share it with you all, and then on Thursday morning before we do closings and instructions, obviously you'll have ample opportunity to put any remaining objections to the instructions on the record at that time.

You all should continue to meet and confer. As the evidence comes out during the course of the week and if changes are necessary to the instructions or the verdict form, please try to work those out, if possible.

Let's see, any other housekeeping matters to discuss?

MR. FINDLAY: Not from the Plaintiff, Your Honor.

MR. DACUS: Not from us, Your Honor.

THE COURT: Any other pretrial issues that we need to talk about?

MR. DACUS: No, Your Honor.
MR. FINDLAY: No, Your Honor.
THE COURT: Okay. We'll see you out there in just a minute.
MR. DACUS: Do we have the ability to go in there and get the seating chart?
THE COURT: Yes.
(Recess.)
09:04:38 (Venire panel in.)
09:04:38 COURT SECURITY OFFICER: All rise.
09:11:48 THE COURT: Please be seated.
09:11:48 Ms. Combs, if you would call the case for us.
09:11:54 COURTROOM DEPUTY: Cause No. 2:23-CV-557, Aspen 09:11:59 Networks, Inc. versus Cellco Partnership d/b/a Verizon 09:12:02 Wireless.
09:12:02 THE COURT: Is the Plaintiff ready to proceed?
09:12:04 MR. FINDLAY: Good morning. We are, Your Honor.
09:12:06 THE COURT: All right. Is the Defendant ready to 09:12:09 proceed?
09:12:09 MR. DACUS: Good morning, Your Honor. Yes, Deron 09:12:12 Dacus on behalf of Verizon, and we are ready to proceed.
09:12:15 THE COURT: All right.
09:12:16 MR. DACUS: Thank you.
09:12:16 THE COURT: Good morning, ladies and gentlemen of 09:12:18 the panel. I want to thank you for being here. I want to

09:12:21 welcome you to jury service in the Eastern District of Texas. My name is Trey Schroeder. I am a United States District Judge in the Eastern District.

09:12:35 You have already met some of our Court personnel this morning. I want to introduce the members of my courtroom staff.

09:12:44 Our courtroom deputy is Ms. Shedera Combs seated to my left. Our court reporter, Ms. Shelly Holmes. Our -- to my right. Law clerks, to my far left, Mr. Collin Hopkins, Andrew Schneider, and Alessandra Gualtieri. Our Court Security Officer this morning is Mr. Jeff Savage. He will be through -- with us throughout the trial, and I think Jared Goecke will also be another CSO assisting us throughout the trial.

09:13:25 As I said, I'm Trey Schroeder. I'm a United States District Judge in the Eastern District of Texas. I live in Texarkana. I assist Judge Gilstrap with part of the Marshall docket here. And I also help out with the Sherman docket.

09:13:39 I, as I said, live in Texarkana where I was born and grew up. I practiced law for about 14 years. I've been on the bench 11 years now. I went to college in Missouri and in Arkansas, and I graduated from law school in Washington D.C.

09:14:00 Before I practiced law, I worked for the

09:14:04 Government for a couple of years, and I worked as a law
09:14:09 clerk for a federal appellate judge for a couple of years.
09:14:12 I'm married with two children, two daughters who
09:14:16 have graduated from college. One is gainfully employed now
09:14:19 I'm proud to say, and the other just finished her first
09:14:23 year in law school.
09:14:24 I'm telling you these things about myself because
09:14:27 in just a few minutes, I'm going to ask you to tell us all
09:14:31 a little bit about yourself, and I think you are as
09:14:34 entitled to know as much about me as we're about to learn
09:14:37 about you.
09:14:37 We are here today to begin the trial of a civil
09:14:42 case, and I want to first thank you for your service here
09:14:45 today. You're playing a pivotal role in our system of
09:14:52 justice, and I hope that you will consider it an honor to
09:14:54 serve in this role because that is what it is.
09:14:58 By asking you to be here, by asking you to
09:15:00 potentially serve as a juror in this matter, of course, we
09:15:05 are asking you to be away from your jobs, your families,
09:15:09 your other responsibilities. For those of you with
09:15:13 children at home, I know how hectic your lives are, and the
09:15:16 same goes for those of you who may be a caregiver for a
09:15:20 family member or a friend. By asking you to be here and by
09:15:26 asking you to serve as a juror in this case, we are
09:15:28 creating a significant intrusion in your lives, but the

09:15:32 reason that we do that is we have important work that will
09:15:37 not get done without a jury.

09:15:39 I've tried more than 60 cases as a judge, and I
09:15:43 believe that your experience as a juror, if you are
09:15:45 selected to serve, will depend in large part on what your
09:15:49 initial frame of mind is.

09:15:51 With that said, I want to give you a little bit of
09:15:55 background and context about the role of the jury in our
09:16:00 system of government.

09:16:02 The Constitution begins with the words We the
09:16:06 People, and in its most inclusion form, it invites the
09:16:11 people to join in the creation and the administration of
09:16:14 government. Those words recognize that the power of
09:16:19 government comes from the people. And just as the right to
09:16:23 vote ensures the people's ultimate control in the
09:16:26 legislative and executive branch -- branches, a jury trial
09:16:32 is meant to ensure that the people's control in the
09:16:37 judiciary.

09:16:38 Jury service is also an opportunity for you as an
09:16:43 ordinary citizen to help administer justice, and your
09:16:48 participation in this process improves the quality of
09:16:53 justice. As any member of the community who is involved in
09:16:58 jury service completes their service, they play a pivotal
09:17:04 role in the democracy that is described by and organized by
09:17:12 our Constitution.

09:17:13 No doubt many of your parents served on juries, 09:17:18 probably some of your grandparents did, as well. Many 09:17:21 members of my family have served as jurors over the years, 09:17:26 including my own parents and grandparents.

09:17:28 The tradition of jury trials in our country 09:17:31 stretches back many, many generations from today. All the 09:17:37 way back to 1776 and even beyond that. So, yes, I do 09:17:43 understand, we all understand that it is a convenience -- 09:17:48 an inconvenience at some level for jurors to serve, but I 09:17:53 hope that you will understand it is much more than that.

09:17:57 I firmly believe that jury service is one of the 09:18:01 most important forms of public service you as a citizen can 09:18:06 render to your country. Of course, the highest form of 09:18:11 public service centers around those young men and women who 09:18:15 serve in the armed forces and who put their lives on the 09:18:20 line every day to guarantee for all of us the rights and 09:18:24 the freedoms that we enjoy as Americans.

09:18:26 Those young men and women don't get to decide 09:18:32 where it is they are going. They go where their country 09:18:36 asks them to go when their country asks them to. And so in 09:18:41 a way, by being here today and by participating as you are 09:18:45 and by serving on the jury if you are selected to do so, 09:18:50 you, too, are doing what your country is asking you to do, 09:18:55 as well.

09:18:55 Jury service is a chance, perhaps not to repay the

09:19:02 debt that we owe to our country, but at least to
09:19:05 acknowledge it in a way and to honor it and to recognize
09:19:09 it. And so I hope that you will think about your time here
09:19:13 today serving on this panel and on the jury, if you're
09:19:17 selected, perhaps in a little different light, as an
09:19:22 opportunity for you to serve your country by seeking to do
09:19:29 justice between these two parties.

09:19:31 I want to tell you briefly a little bit about this
09:19:35 case. The parties in the case are the Plaintiff, Aspen
09:19:40 Networks, Inc., and the Defendant, Cellco Partnership,
09:19:44 doing business as Verizon Wireless, also referred to simply
09:19:49 as Verizon.

09:19:50 This is a patent infringement case. The Plaintiff
09:19:55 contends that the Defendant is infringing the patent it has
09:20:01 asserted in this case. Specifically, the Plaintiff
09:20:05 contends that the Defendant's Voice over Wi-Fi Calling
09:20:12 Service infringes Claims 1, 2, 6, 15, 16, and 20 of U.S.
09:20:22 Patent No. 8,009,554. Aspen contends that as a result of
09:20:28 Verizon's alleged infringement of the asserted claims that
09:20:34 Aspen is entitled to monetary damages.

09:20:37 Verizon denies that it has any liability for
09:20:42 infringing the asserted patent. Verizon contends that the
09:20:47 asserted claims are not infringed and/or are invalid and
09:20:54 that Aspen is not entitled to any money damages.

09:20:57 I and the parties will have much more to say about

09:21:01 what the case involves, but for now, I wanted you to have a
09:21:06 little bit of basic knowledge of what the case is about.

09:21:08 Once jury selection is completed today, we will
09:21:16 break for lunch. And when we come back, we will begin the
09:21:20 first part of the trial. So those of you who are selected
09:21:26 to serve as jurors will need to be available this
09:21:30 afternoon.

09:21:31 We will recess, of course, for the weekend. And
09:21:34 on Monday morning, we will be back here to begin with the
09:21:38 presentation of the Plaintiff's case-in-chief.

09:21:42 Once the Plaintiffs have presented all of their
09:21:46 evidence, the Defendant will have an opportunity to present
09:21:50 its evidence.

09:21:53 At the conclusion of all of the evidence, I will
09:21:55 instruct you on the law that you will be required to follow
09:21:59 during your deliberations. And then after that, the
09:22:02 parties will present their closing arguments to you.

09:22:05 And then after all of that has been accomplished,
09:22:10 you will return to the jury room for the final time to
09:22:17 begin your deliberations.

09:22:20 I anticipate, including today, that the
09:22:25 presentation of the case will take about five days, and so
09:22:29 beginning this afternoon and continuing on Monday morning.
09:22:35 I fully expect that presentation of all of the evidence
09:22:38 will be concluded by Thursday morning, and so I expect, and

09:22:44 the parties agree with this, that we will get the case to
09:22:47 the jury sometime on Thursday afternoon for its
09:22:54 deliberations.

09:22:55 So those of you who are selected to serve as
09:22:58 jurors in this case will need to be available during all of
09:23:02 that time. If any of you have any prepaid vacation plan
09:23:08 that you've already bought non-refundable tickets for or
09:23:12 you have a surgery that is scheduled during this week --
09:23:15 this next coming week or anything that is serious enough to
09:23:19 make it very difficult for you to serve, then I need for
09:23:23 you to identify yourself at this time.

09:23:26 If there's anybody on the panel who has those type
09:23:29 of reasons that they could not serve, if you would, please
09:23:33 raise your hand for me at this time.

09:23:36 All right. Let's see on the first row,
09:23:46 Mr. Ybanez; is that right? Juror No. 3?

09:23:49 We'll discuss the particular circumstances at the
09:23:51 conclusion of the morning, but I just wanted kind of a
09:23:56 number of -- of the people who are potentially excusable
09:24:04 because of a hardship.

09:24:07 Mr. Ybanez.

09:24:10 Anyone else in the front row? Ms. Mitchell?

09:24:14 All right. The second row, raise your hand again.

09:24:21 Ms. Preuninger?

09:24:24 PROSPECTIVE JUROR: Preuninger.

09:24:32 THE COURT: Ms. Preuninger.
09:24:33 All right. Anyone else in the second row?
09:24:35 Okay. In the gallery -- oh, No. 13, Ms. Grosso?
09:24:39 All right. Anyone else?
09:24:42 First row of the gallery, anyone?
09:24:45 Second row of the gallery?
09:24:47 Let's see, Ms. Dorgan?
09:24:53 All right. Anyone else in the gallery?
09:24:56 All right. Very good.
09:24:57 Okay. I've kind of given you an overview of what 09:25:05 is going to happen over the next several days, but what we 09:25:11 are doing right now, the beginning of the first stage of 09:25:14 the trial is what we call voir dire examination of the 09:25:17 panel, and that is where the Court and the attorneys are 09:25:20 going to be asking you some questions to help us evaluate 09:25:23 you as a potential juror.
09:25:27 When the parties address you this morning, they're 09:25:29 going to be asking you various -- various questions, and I 09:25:34 want you to understand, they're not seeking to be nosy or 09:25:38 inquire unduly into your personal or private affairs. They 09:25:43 are entitled to ask questions to secure a fair and 09:25:47 impartial jury.
09:25:48 I don't know if it will happen today, but 09:25:51 sometimes panel members are asked a question that they 09:25:54 really don't want to talk about in front of the whole

09:25:57 panel. And if you have any hesitations about giving a
09:26:01 complete answer to something that you consider private, you
09:26:04 just need to tell us that, and I'll give you an opportunity
09:26:07 to answer that question outside the presence of the other
09:26:11 panel members.

09:26:12 The most important thing this morning is for each
09:26:16 of you to give full, complete, and truthful answers to all
09:26:19 of the questions that are asked. There are no wrong
09:26:23 answers, as long as your response is full, complete, and
09:26:27 truthful.

09:26:27 After all of the questions have been asked this
09:26:31 morning, each side will then be allowed to strike a certain
09:26:36 number of jurors, and the first eight panel members will
09:26:41 become our eight jurors.

09:26:43 And as I said just a few minutes ago, after the
09:26:47 jury is selected, I'm going to provide some limited
09:26:51 preliminary jury instructions this afternoon, and then the
09:26:55 parties are going to have a chance to present their opening
09:26:59 statements to you, and then we will recess for the day and
09:27:07 over the weekend.

09:27:07 We will begin with the presentation of the
09:27:09 evidence on Monday morning. And after the conclusion of
09:27:14 all of the evidence, I will instruct you on the law that
09:27:17 you must follow during your deliberations, and then the
09:27:21 parties will present their closing arguments to you, and

09:27:25 then finally you will begin your deliberations.
09:27:27 Now, what we're doing right now is called voir
09:27:30 dire. And the purpose of that is to enable me to determine
09:27:37 whether any prospective juror should be excused from jury
09:27:43 service either by the Court, for what we call cause, or by
09:27:48 the parties -- counsel for the parties, by way of what's
09:27:53 called a peremptory challenge, which is a challenge for
09:27:56 which no reason need be given.
09:27:58 Voir dire is actually an old French phrase, and it
09:28:03 means to speak the truth. And I know that you will speak
09:28:06 the truth this morning as you answer the questions that I
09:28:10 ask and the parties ask. Please listen carefully to the
09:28:14 questions and don't be timid about speaking up if they
09:28:18 apply to you.
09:28:19 Each of you has a list of questions, and I'm going
09:28:22 to ask you to go through all of those, and we have a
09:28:30 microphone that Mr. Savage will pass around. We're going
09:28:33 to start with Panel Member 1 -- is it Dinan?
09:28:40 PROSPECTIVE JUROR: Dinan.
09:28:42 THE COURT: And so Ms. Dinan, if you would stand
09:28:44 up and tell us who you are and where you live, a little bit
09:28:47 about yourself, and you can just follow along that list if
09:28:49 you want to. There is a bonus question that's not on that
09:28:56 list at the very end, if you'll tell us something about --
09:29:00 something interesting about yourself, what you like to do

09:29:02 in free time -- with your free time or what your hobbies
09:29:05 are, something like that.

09:29:06 PROSPECTIVE JUROR: Okay.

09:29:07 THE COURT: All right.

09:29:07 PROSPECTIVE JUROR: I'm Kirsten Dinan. I'm from
09:29:11 Big Sandy. I'm married to Matthew Dinan. We have five
09:29:15 children. I'm the assistant director for the Angel Academy
09:29:18 which is a private preschool in Longview. I've only worked
09:29:21 there for one year. I graduated high school. My husband
09:29:26 is a car hauler for U.S. Auto Logistics. He's worked there
09:29:32 for 10 years. I have never served on a jury, and I have
09:29:35 five children, so I don't have hobbies of my own.

09:29:38 THE COURT: No hobbies at all?

09:29:40 PROSPECTIVE JUROR: I read.

09:29:41 THE COURT: Okay. What do you like to read?

09:29:43 PROSPECTIVE JUROR: Historical fiction.

09:29:45 THE COURT: Okay. All right. Very good. Thank
09:29:48 you.

09:29:49 Next panel member, Ms. Mitchell.

09:29:53 PROSPECTIVE JUROR: My name is Karla Mitchell.
09:29:56 I'm a Marshall native. I've just moved back three years
09:30:01 ago from Tyler. I went to school at Tyler Junior College.
09:30:05 I'm a licensed vocational nurse. I work in Shreveport,
09:30:09 though. I have three children. I have a son who is in
09:30:13 Poland right now. He's in the Army. So I have two other

09:30:19 kids. My other daughter is a medical assistant. And I
09:30:23 have another son who is trying to figure things out right
09:30:26 now. I'm divorced twice. Oops. Let's see, what else? No
09:30:34 prior jury service. And I'm also a Verizon Wireless
09:30:39 current customer. So yeah.

09:30:41 THE COURT: Okay. They may want to ask you about
09:30:44 that. What about something interesting about yourself,
09:30:47 something you do in your free time or a hobby?

09:30:51 PROSPECTIVE JUROR: No real hobbies, nothing.

09:30:52 THE COURT: No? Okay. Thank you, Ms. Mitchell.

09:30:56 PROSPECTIVE JUROR: Uh-huh.

09:30:57 THE COURT: Pronounce your last name.

09:30:58 PROSPECTIVE JUROR: Smith. No, it's Ybanez.

09:31:03 THE COURT: We got a comedian on the panel.

09:31:06 Mr. Ybanez.

09:31:07 PROSPECTIVE JUROR: Yes. I live in Waskom, Texas.
09:31:10 My wife -- spouse is Cheryl Ybanez. She is a travel nurse.
09:31:16 We have four children. I am a singer/song writer, and I do
09:31:22 part-time maintenance at my apartments. My educational
09:31:26 background is GED. I've never served on a jury. And
09:31:34 something interesting about myself is, I don't know. I
09:31:40 like to read, watch TV, and play music. That's about it.

09:31:46 THE COURT: All right. Thank you.

09:31:47 Ms. Cadenhead.

09:31:49 PROSPECTIVE JUROR: That's me. My name is Jill

09:31:52 Cadenhead. I live in Karnack for the last three years.
09:31:56 Before that in Waskom for a long time. My husband's name
09:31:59 is Scott Cadenhead. He works for GR Energy doing wireline
09:32:06 out in the oilfield. I don't work. I'm a homemaker.
09:32:12 Previously I worked for Sam's Club and Family Dollar and
09:32:16 stuff like that doing management and stuff like that.
09:32:20 Educational background, a high school diploma. My husband
09:32:26 has worked for GR for 10 years. And I have served on a
09:32:33 little bitty jury in a criminal case just traffic.

09:32:37 THE COURT: Okay. How long ago was that?

09:32:40 PROSPECTIVE JUROR: Oh, 10, 15 years ago,
09:32:42 something like that.

09:32:43 THE COURT: Okay.

09:32:43 PROSPECTIVE JUROR: Yeah.

09:32:45 THE COURT: Something interesting about yourself.

09:32:47 PROSPECTIVE JUROR: Reading, cooking, baking, yep.

09:32:50 THE COURT: Very good.

09:32:51 PROSPECTIVE JUROR: Thank you.

09:32:52 THE COURT: Ms. Fuquay.

09:32:54 PROSPECTIVE JUROR: Yes. Melinda Fuquay. I'm
09:32:56 from Jefferson, Texas. I have two children. I work for
09:32:59 East Texas Professional Credit Union. I'm a bank manager.
09:33:03 I've worked there 14 years. I have a college degree,
09:33:07 bachelor's degree. My spouse is Shawn Fuquay. He owns
09:33:14 Blackburn Syrup and Jelly plant. We've owned that for

09:33:17 about 30 years. No prior jury service.
09:33:20 THE COURT: Okay. Something interesting.
09:33:24 PROSPECTIVE JUROR: Something interesting, I like
09:33:25 physical and health. So I've completed a Spartan race and
09:33:29 a Tough Mudder race.
09:33:31 THE COURT: And a what?
09:33:32 PROSPECTIVE JUROR: Tough Mudder race.
09:33:34 THE COURT: Okay. Okay. Thank you.
09:33:36 Mr. Northcutt.
09:33:38 PROSPECTIVE JUROR: Yes, sir. My name is Cody
09:33:41 Northcutt. I live in Hughes Springs. I have no
09:33:43 significant other. I'm not in a relationship. I have no
09:33:46 children. I previously worked at an O'Reilly Auto Parts
09:33:51 store for a few months before I decided to quit and help
09:33:55 out my dad. So I'm currently employed with my father for
09:33:59 his carpentry. And I've only been doing that for the past
09:34:03 two to three months. I graduated Hughes Springs High
09:34:06 School in 2019, and I did some college at a Northeast Texas
09:34:10 Community College, and I did not graduate. But I was
09:34:13 briefly studying law, focusing more on rehabilitation and
09:34:19 correctional facilities than law enforcement. But then I
09:34:23 eventually transitioned to psychology. And I've worked
09:34:36 at -- excuse me, I've worked no prior jury service. This
09:34:40 will be the first time.
09:34:42 THE COURT: Your bonus question answer? Something

09:34:47 interesting about yourself?

09:34:48 PROSPECTIVE JUROR: That is a good question. I
09:34:53 also like to read. I prefer fantasy books, though. I like
09:34:57 to read Lord of the Rings. It's an old book, I know. I
09:35:00 enjoy it.

09:35:01 THE COURT: An oldie but goody.

09:35:03 PROSPECTIVE JUROR: Oldie but goody, yes, sir.

09:35:05 THE COURT: All right. Thank you, sir.

09:35:08 Ms. Burger.

09:35:10 PROSPECTIVE JUROR: My name is Shelby Burger, just
09:35:13 like the food. I live here in Marshall. My husband is
09:35:16 Cameron Burger. We have three boys, a nine-year-old and
09:35:21 five-year-old identical twins. I am currently an adjunct
09:35:26 professor for ETBU. I just finished six years of full time
09:35:29 as the certification officer and an assistant professor in
09:35:34 the school of education there. I have a bachelor's from
09:35:38 Baylor and a master's from Dallas Baptist. My husband
09:35:43 started a new job in January as the director of outdoor
09:35:46 pursuits and lake at Freestone Lake & Golf in Fairfield.
09:35:52 And I have no prior jury service. And a fun fact, my
09:35:58 husband was the bass fishing coach for ETBU for 10 years,
09:35:58 so if you would have told me 14 years ago that I would know
09:36:04 as much about bass fishing as I do, I would laugh at you.
09:36:08 But I don't -- I don't fish. I like the boat, but I don't
09:36:12 fish.

09:36:13 THE COURT: Thank you. Thanks a lot.
09:36:15 Ms. Burns-Rangel?
09:36:25 PROSPECTIVE JUROR: Yes.
09:36:25 THE COURT: Good morning.
09:36:26 PROSPECTIVE JUROR: Good morning. My name is 09:36:28 Carmen Burns-Rangel. Yes, I did hyphenate that. My 09:36:33 spouse's name is James Rangel. I have three boys. The 09:36:39 oldest is in the Netherlands, the middle is in Florida, and 09:36:42 the youngest is in New Hampshire. I moved out here two 09:36:47 years ago from California. My -- I'm retired. My previous 09:36:56 employment was Southwest Mobile Homes. We sold 09:36:59 manufactured homes. My husband was a crane operator with 09:37:04 the Navy base in Seal Beach, California. My education, I 09:37:12 have some college. And my spouse, he worked there for, I 09:37:20 don't know, 40 years. Let me see, and this -- I have never 09:37:28 been selected as a jury -- to serve as a juror. And let me 09:37:34 see, fun fact -- no, a bonus question, I love to cook and 09:37:42 bake, and I love to do crafts.
09:37:44 THE COURT: All right.
09:37:45 PROSPECTIVE JUROR: Thank you.
09:37:45 THE COURT: Thank you.
09:37:47 Ms. Lindley.
09:37:48 PROSPECTIVE JUROR: Yes. My name is Clara 09:37:51 Lindley. I live in Pittsburg. I was born and raised 09:37:54 there. I am not married, but I do have a boyfriend, and

09:37:56 his name is Benton. I do not have any kids. I currently
09:38:00 work at Pittsburg Elementary where I am a fourth grade math
09:38:04 teacher. I've worked there -- I'm going into my third
09:38:08 year. For education, I have a bachelor's in ag business
09:38:12 with a minor in finance which I obtained at Texas A&M
09:38:17 Commerce. Benton has worked for Priefert Complex Designs
09:38:21 in Mt. Pleasant, Texas, for over 10 years, and he works
09:38:24 there as an engineer. I have not served like as - on a
09:38:29 traditional jury, but I did grand jury about a year ago.

09:38:33 THE COURT: And where was that exactly?

09:38:35 PROSPECTIVE JUROR: In Camp County.

09:38:36 THE COURT: Okay.

09:38:37 PROSPECTIVE JUROR: Oh, fun fact, I like to do
09:38:40 crafts and painting and particularly window painting.

09:38:42 THE COURT: All right. Thank you.

09:38:46 PROSPECTIVE JUROR: My name is Elizabeth
09:38:48 Preuninger. My husband's name is Trey Preuninger. We have
09:38:53 two girls, 16 and 13. I am a day care teacher for Stepping
09:39:02 Stone in Kilgore. I've been there for about three years.
09:39:06 I graduated from White Oak High School. My husband works
09:39:10 at Ironclad Environmentals, oilfield. He's been there for
09:39:15 seven years. And I've never done a jury. And my hobby is
09:39:19 making car freshies.

09:39:23 THE COURT: Making what?

09:39:24 PROSPECTIVE JUROR: Car freshies.

09:39:25 THE COURT: Which is what?

09:39:27 PROSPECTIVE JUROR: It's like the freshies you buy, like, to put in your car, make your car smell good.

09:39:33 THE COURT: Okay.

09:39:34 PROSPECTIVE JUROR: They're pretty popular.

09:39:36 THE COURT: All right. Very good. Good for you.

09:39:37 PROSPECTIVE JUROR: My name is Chris Sandefur. I live in Hughes Springs. My wife's name is Miranda Sandefur. We have no kids. I currently work at the Marion County Central Appraisal District, working as a deeds clerk, but I am currently training to become a real estate appraiser. I have graduated high school, and I've taken some classes through TWAO to become an appraiser. My wife currently works at Catfish Village. Oh, I've worked at the appraisal district for two and a half years. And she's worked at the Catfish Village for only a few months now. I have no prior jury service. This is my first experience. And I'm not very interesting. I play video games and collect monopoly boards.

09:40:20 THE COURT: Thank you. Thank you.

09:40:22 PROSPECTIVE JUROR: Good morning.

09:40:23 THE COURT: Good morning.

09:40:24 PROSPECTIVE JUROR: My name is Leslie Nunn. My husband is Roger Nunn. We live in Gilmer. And he -- I have one child. She works from home. I am retired, but

09:40:35 prior to that, I was a self-employed healthcare consultant. Before that, I was a healthcare executive. I have been a registered nurse for 49 years.

THE COURT: Okay.

PROSPECTIVE JUROR: And I have an associate's degree in nursing, a bachelor's in nursing, I was board certified in my specialty, and I have a master's in business. My husband works for Texas Eastman, and he's been there 52 years. So I'm real proud of that, that he still works full time. I have prior jury duty service on a DWI case and a murder case. And a fun fact about me is I -- we own a horse farm, and I went from the board room to a farm worker when I retired.

THE COURT: Tell me a little bit about -- more about your jury service, two cases. How long ago were those and where were they?

PROSPECTIVE JUROR: The murder case was in Rusk County, and it was probably 30 years ago.

THE COURT: All right.

PROSPECTIVE JUROR: The DWI case was probably five to seven years ago in Upshur County.

THE COURT: And did the jury in both of those cases reach a verdict?

PROSPECTIVE JUROR: The first one reached a -- the murder case reached a verdict. The DWI settled prior to.

09:41:59 THE COURT: Okay. All right. Thank you very much, Ms. Nunn.
09:42:03 Ms. Grosso.
09:42:04 PROSPECTIVE JUROR: My name is Mary Grosso.
09:42:07 THE COURT: Grosso.
09:42:08 PROSPECTIVE JUROR: My husband is Tony Grosso. I have no children. I work at Pilot Travel Centers in Tyler, Texas. I've worked there for 11 years.
09:42:24 THE COURT: Can you speak up a little for us?
09:42:26 PROSPECTIVE JUROR: Sorry, I'm really shy.
09:42:28 THE COURT: That's all right. Nobody in here will bite, I promise.
09:42:31 PROSPECTIVE JUROR: Let's see, previous employment, I haven't worked anywhere else. Prior service, I have not served on a jury. Interesting stuff, listen to music.
09:42:51 THE COURT: All right. Thank you.
09:42:56 Good morning.
09:42:57 PROSPECTIVE JUROR: Good morning. My name is Sharon Smith. I live here in Marshall, Texas. My spouse's name is Leo Smith. I have two children, and he has five. Together we have seven children. I -- my place of employment, I'm a retired teacher after 30 years, but now I'm working at Wiley University in the Residential Life. I've worked at Wiley for eight years. My educational

09:43:27 background, I have a college degree, BS. My spouse's employment type, he's a construction -- construction worker, and he's been working there over 40 years. Prior jury service none. I love sports. I just love to play -- be watching any type of sports.

THE COURT: Who is your favorite team?

PROSPECTIVE JUROR: My -- the Spurs.

THE COURT: Uh-oh. Okay. Thank you.

All right. Let's see, Ms. Reece? Good morning.

PROSPECTIVE JUROR: Good morning. My name is Reagan. I live in Diana. I'm not married. I don't have kids. I'm only 20. I'm in school right now to become a teacher. I work at Cheddar's right now saving up for college. Let's see, I've never been on jury duty. And a fun fact is I got to run in the Boston Marathon for my graduation present trip, yeah.

THE COURT: Oh, wow.

PROSPECTIVE JUROR: Yeah.

THE COURT: This year?

PROSPECTIVE JUROR: No, 2024.

THE COURT: Okay.

PROSPECTIVE JUROR: Yeah, it was fun.

THE COURT: That's great.

PROSPECTIVE JUROR: Any more questions?

THE COURT: No, thank you.

09:44:45 PROSPECTIVE JUROR: My name is Krimson Hall. I
09:44:49 live in Daingerfield, Texas. My husband's name is Ronnie
09:44:53 Hall. We have no children. I'm self-employed. I just
09:44:55 clean houses on the side. I've been doing it for two
09:44:58 years. I have a high school diploma. My husband works at
09:45:03 Your Choice Disposal as a trash truck driver. He's been
09:45:07 doing that for almost four years. I have no prior jury
09:45:12 service. A fun fact about me is when I'm not cleaning or
09:45:16 cooking, I'm in the church house trying to reach lost
09:45:21 souls.

09:45:22 THE COURT: Trying to do what?

09:45:24 PROSPECTIVE JUROR: Reach lost souls.

09:45:25 THE COURT: All right. Good for you.

09:45:26 Mr. Turner, good morning.

09:45:28 PROSPECTIVE JUROR: My name is Reginald Turner. I
09:45:32 live here in Marshall. My significant other is Regina
09:45:36 King. Together we have three kids -- three children, they
09:45:40 grown. And I work for the Prysmian Group and we build
09:45:45 power lines. I've worked there one year on the 17th of
09:45:48 this month. And my educational background is high school,
09:45:52 some college. And my significant other's employment is at
09:46:00 Goodwill. She's been there two years. And I have had
09:46:03 prior jury service in this courtroom -- well, one of these
09:46:07 courtrooms, and it was Microsoft versus Google or something
09:46:13 like that, and it was probably 11 years ago.

09:46:17 THE COURT: All right. Did that jury reach a verdict?

09:46:20

09:46:21 PROSPECTIVE JUROR: The parties settled.

09:46:23 THE COURT: During your trial?

09:46:25 PROSPECTIVE JUROR: Yes, sir.

09:46:25 THE COURT: All right.

09:46:26 PROSPECTIVE JUROR: And then an interesting fact is I had four flight lessons from a B52 pilot.

09:46:28

09:46:35 THE COURT: Oh, wow. All right. Thank you.

09:46:40 Ms. Coats.

09:46:41 PROSPECTIVE JUROR: Hi. My name is Teresa Coats. My very recent husband's name is Kenny Johnson. We eloped, so shhh, nobody knows.

09:46:45

09:46:53

09:46:57 THE COURT: How recent?

09:46:58 PROSPECTIVE JUROR: Just a few months, yeah.

09:47:00 THE COURT: All right. Congratulations.

09:47:02 PROSPECTIVE JUROR: I have two grown children, and I work for a financial advisor, and I've been doing that for 10 years. I have some college, and Kenny has worked -- he's an IT support for medical equipment, company called Intelas, and he's been there for 20 years. I have prior jury service here in Harrison County. It was a civil case, neighbors' dispute, property damage type situation, and we did find her guilty. Fun fact about me is I am an avid scuba diver.

09:47:03

09:47:07

09:47:15

09:47:21

09:47:25

09:47:33

09:47:36

09:47:43

09:47:44 THE COURT: Avid scuba diver, all right. Thank
09:47:48 you.
09:47:48 Mr. Watts.
09:47:49 PROSPECTIVE JUROR: Yes. My name is Terrell
09:47:53 Watts. My spouse is Rachel. We've been married 20
09:47:56 something years I guess this year. We have two grown
09:47:59 daughters. One lives in Jacksonville, Florida. One lives
09:48:04 in Minden, Louisiana. Three grandchildren. One due in
09:48:09 September of this year for four. And let's see, my place
09:48:14 of employment, I work for a company called John H Carter.
09:48:20 Been there 28 years. Background is I have an associate's
09:48:25 of applied science from a technical college. My spouse is
09:48:29 retired. She worked as an office manager for a waste
09:48:34 management company. She was there probably 10 years before
09:48:37 she retired. And no prior jury service.
09:48:41 THE COURT: Okay. Fun fact about yourself?
09:48:44 PROSPECTIVE JUROR: Oh, probably that I collect
09:48:48 cookbooks and love garage saling.
09:48:54 THE COURT: All right. Thank you.
09:48:56 Ms. Dorgan.
09:48:57 PROSPECTIVE JUROR: Yes. I'm Laura Dorgan. I
09:49:01 live in Jefferson, Texas. I have three children. My
09:49:03 oldest is 30. My youngest just turned 16. I work as a
09:49:06 travel nurse at UT Tyler currently. My significant other
09:49:11 is Ryan, and he is -- works for KV Power as a general

09:49:17 foreman. Let's see here, I've been a nurse for 20 years. I have not ever served on a jury. I went through a three and a half year court battle with my youngest child, which was horrible that I had a jury trial for.

THE COURT: So was -- can you just briefly tell me was that a criminal proceeding or a civil proceeding?

PROSPECTIVE JUROR: No, it was a child -- child custody.

THE COURT: Child custody matter?

PROSPECTIVE JUROR: Yes, yes, it was personal.

THE COURT: I'm sorry?

PROSPECTIVE JUROR: It was -- it was -- I was on this side.

THE COURT: Okay.

PROSPECTIVE JUROR: So I had a jury -- I had a jury for my trial.

THE COURT: Understood. Okay.

PROSPECTIVE JUROR: And I don't know if it's a fun fact, but it's a blessed fact but I have been a cancer survivor for three years.

THE COURT: Congratulations.

Ms. Lambert.

PROSPECTIVE JUROR: Hi. I'm Cody Lambert. I live in Longview, Texas. I'm divorced. I have three adult children. I work for Hallsville High School. I'm a dual

09:50:24 credit proctor. I've been there seven years. I graduated
09:50:29 high school. I have not had any prior jury duty service.
09:50:35 A fun fact about me is I love rock and roll history, and I
09:50:39 can beat anybody with Beatles trivia. I can.

09:50:45 THE COURT: Okay. All right. Ms. Calhoun.

09:50:52 PROSPECTIVE JUROR: My name is Lairisa Calhoun.
09:50:55 I'm from Queen City. I'm married to Kevin Calhoun. We
09:50:55 have a blended family of five children. I work for A1
09:50:59 National Liquids. We haul -- pump grease traps and
09:51:05 septics. And I have been there four years. Previously I
09:51:08 was at a bank, a loan assistant. I have some college. My
09:51:13 husband is retired from the oilfield and now works with me.
09:51:18 He is the office manager, or babysitter he calls it, of all
09:51:23 the guys. I have had jury in Cass County. It was a
09:51:33 criminal and a -- it was found guilty. And a fun fact, I
09:51:38 have seven grandchildren and a pet pig.

09:51:40 THE COURT: A pet pig?

09:51:42 PROSPECTIVE JUROR: He's 10.

09:51:43 THE COURT: Does he have a name.

09:51:45 PROSPECTIVE JUROR: Bacon.

09:51:46 THE COURT: Bacon. Well named.

09:51:47 And your jury service in Cass County, how long ago
09:51:51 was that?

09:51:52 PROSPECTIVE JUROR: It was two years.

09:51:52 THE COURT: Two?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: Okay. Thank you.

PROSPECTIVE JUROR: My name is Alan Thompson. I live in Gilmer. Have lived there my whole life.

THE COURT: Can I ask you to hold your microphone up there? Yeah.

PROSPECTIVE JUROR: My wife's name is Amber Thompson. We have two kids together. I work at a hunting and fishing club. I've worked there 17 years. High school background. My wife works -- she's a teacher at a school. She's been there about five years. No prior jury service. And I like to fish and ride ATVs.

THE COURT: All right. Thank you.

Ms. Hendrix.

PROSPECTIVE JUROR: I'm Stephania Hendrix from Gilmer, Texas. My husband is Jay Hendrix. I have two children, 26 and 29. I work for Upshur County for the treasurer for 18 years. I had one year of college. My husband works for Nine Energy Services as an oilfield supervisor. And I served on a jury when I was, like, 18. I do not remember what it was about at all.

THE COURT: All right.

PROSPECTIVE JUROR: Long time ago. My hobby is my grandson who is four, and I have a baby girl on the way, too.

09:53:15 THE COURT: All right. Thank you, ma'am.
09:53:18 PROSPECTIVE JUROR: My name is Paul Avila. My wife is Pinky Avila. We're refugees from California. Been here in Big Sandy for three years now. We're both retired.
09:53:34 THE COURT: I'm sorry?
09:53:36 PROSPECTIVE JUROR: We're both retired.
09:53:37 THE COURT: Okay. Can you hold the mic a little closer to your mic -- I mean, to your mouth? Thank you.
09:53:42 PROSPECTIVE JUROR: I was a graphic designer. She was a CVICU nurse supervisor. Never done jury duty. Interesting -- being retired, you have no more time.
09:54:03 THE COURT: Thank you, sir.
09:54:04 PROSPECTIVE JUROR: I'm Kyleen Hunter. I live in Waskom, Texas. I'm currently trying to relocate to Overton because I recently got married, like, two months ago. We had -- my husband's name is Cody Quinalty. We have two children together. And I currently work at Greater East Texas Community Action Program in the Longview office. I am the office manager, a case manager, and the eligibility -- eligibility specialist for energy assistance program. We help our most vulnerable population in about 20 counties. So I've been there for a year and a half. Before that, I was at a Head Start in Atlanta, Texas as their eligibility specialist. I have a bachelor's in social work. And my husband works for WTI Transport and

09:55:04 does flatbed. He's been there for a few months. My prior
09:55:12 jury service was here in Marshall, Texas. It was a
09:55:15 criminal case, and we did reach a verdict.
09:55:17 THE COURT: How long ago was that?
09:55:18 PROSPECTIVE JUROR: About 10 years ago.
09:55:20 THE COURT: All right.
09:55:21 PROSPECTIVE JUROR: And fun fact about me is in my
09:55:25 spare time I like to come up with projects for my husband
09:55:28 to do in the house and --
09:55:31 THE COURT: Does he appreciate that.
09:55:32 PROSPECTIVE JUROR: Not really.
09:55:33 THE COURT: Thank you.
09:55:33 Ms. Jefferson?
09:55:35 PROSPECTIVE JUROR: Yes, I am Shambria Jefferson.
09:55:39 I live in Gilmer. I do not have a spouse or significant
09:55:42 other. I have one child, a little boy. He's seven years
09:55:46 old. He'll be eight not this Monday but next Monday. I am
09:55:51 a registered nurse. I work for Christus Home Care. I've
09:55:56 been there for about four months. I've been a nurse for 10
09:56:02 years. Educational background, I graduated from Pittsburg
09:56:06 High School. I have an associate's of science degree and
09:56:09 also an associate's of applied science degree. And I have
09:56:17 no prior jury service. Fun fact is I'm a soccer mom
09:56:24 because I don't have time for anything else.
09:56:26 THE COURT: Understood.

09:56:28 PROSPECTIVE JUROR: My name is Jimmy Everitt. I live in Jefferson. That's my address, but I actually live on Caddo Lake. My spouse is Angela Everitt. We have two grown boys, and we have three grandchildren. I work at Caliber Collision. I'm actually the general manager of the one here in Marshall. I've been with Caliber for about three and a half years. Been in that line of work for 25-plus years. High school diploma with some college. Criminal justice. My wife, she runs a medical clinic. She's the office manager. She's been there for a little over a year, but they're actually good friends of ours. They own the clinic. We've known them for 20-plus years. Prior jury service, I served in Marion County about two years ago on a murder trial where we did reach a verdict. Fun fact about me, we live on Caddo. We like to entertain. There's always a party going on around my house.

09:57:35 THE COURT: All right. Thank you, sir.

09:57:41 PROSPECTIVE JUROR: My name is Marcus Hill. My wife is Robin Hill. My wife works for Copeland Insurance. She's been there about seven years. I work as a forklift operation -- operator. And I've been there about 13 years out of Newly Weds in Mt. Pleasant. I've never been on a jury. I just recently received my sponsorship to go into the academy for peace officer training. So I'm pretty proud about that right there.

09:58:10 THE COURT: Congratulations.

09:58:11 PROSPECTIVE JUROR: Thank you. And fun fact about me, like to travel and bowl. My, uh, attention is what I love.

09:58:18 THE COURT: All right. Thanks.

09:58:21 PROSPECTIVE JUROR: My name is Stefan Smith. My wife, we've been married 37 years. Her name is Dee. And I work for Johnson Controls as a field service technician. My wife owns a hair salon. We have a daughter. She's an RN. She's 36. And I have two 18 year old boys, they're twins, and I'm proud to say that they're Eagle Scouts.

09:58:52 THE COURT: Congratulations.

09:58:52 PROSPECTIVE JUROR: Yep. And no prior jury service. And an interesting fact about me is I'm a stargazer. I have a telescope, an eight-inch telescope, and I try to catch what I can and --

09:59:08 THE COURT: Did you see the three planets the other night?

09:59:11 PROSPECTIVE JUROR: Yes, I did.

09:59:12 THE COURT: All right. Excellent. Thanks.

09:59:15 Okay. Great. Great crowd. Great -- great answers.

09:59:23 I am now going to give counsel for both parties an opportunity to introduce themselves, introduce their clients, introduce the people who are at their table with

09:59:38 them, and any -- introduce or identify any witnesses who
09:59:46 will be testifying during their cases. And as they come
09:59:53 forward individually to do that, ladies and gentlemen of
09:59:55 the panel, I want you to be thinking about a couple of
09:59:58 different questions. Do you know any of those people,
10:00:01 either the attorneys or the witnesses? Have you had any
10:00:04 kind of relationship, either a business relationship or a
10:00:08 social relationship with them? Have you ever been
10:00:12 represented by them or members of their law firm? Any
10:00:17 connection at all, you go to church with them, anything
10:00:20 like that.
10:00:20 So at this time, I'll ask Mr. Findlay, on behalf
10:00:24 of the Plaintiff to come forward and identify himself, his
10:00:29 clients, introduce the other members of his team, and to
10:00:32 identify the Plaintiff's witnesses.
10:00:35 MR. FINDLAY: Thank you, Your Honor.
10:00:35 Good morning, ladies and gentlemen. As His Honor
10:00:38 said my name is Eric Findlay. I'm proud to represent the
10:00:41 Plaintiff in this case, Aspen Networks. I'll tell you a
10:00:45 little bit more about myself later on. I'm from Tyler.
10:00:48 I'd like to introduce to you the folks that are at counsel
10:00:50 table with me. First, Mr. Barry Herman is our lead trial
10:00:54 lawyer. Next is our corporate representative and the
10:00:57 inventor on the '554 patent, Mr. Bill Chin. He'll be
10:01:01 testifying to you later this week, probably on Monday

10:01:03 morning.

10:01:04 Thank you, Mr. Chin.

10:01:06 Ms. Christi Dupriest. Mr. Fabio Marino. And
10:01:12 Mr. Preston Heard.

10:01:14 The witnesses, Your Honor, that I think we will
10:01:16 have, ladies and gentlemen, in addition to Mr. Chin are a
10:01:21 Mr. Robin Mavunkel, a Dr. Izhak Rubin, a Mr. Justin Blok,
10:01:27 and a John Minor.

10:01:29 Those are the witnesses we'll have, Your Honor,
10:01:31 and that's our team.

10:01:33 THE COURT: All right. Thank you very much,
10:01:35 Mr. Findlay.

10:01:35 MR. FINDLAY: Thank you.

10:01:36 THE COURT: So ladies and gentlemen of the panel,
10:01:37 does anyone know Mr. Findlay or anyone else at counsel
10:01:43 table or any of the other folks he identified or introduced
10:01:50 as witnesses on behalf of the Plaintiff? Do any of you
10:01:54 know any of the people introduced by Mr. Findlay,
10:01:59 Mr. Findlay himself, or any of the Plaintiff's witnesses?

10:02:02 I take it by your silence, no one does.

10:02:05 Okay. On behalf of the Defendant, Mr. Dacus?

10:02:13 MR. DACUS: Thank you, Your Honor.

10:02:14 Good morning, everyone. I'm Deron Dacus. Like
10:02:17 some of you, I grew up over in Gilmer, but I've lived in
10:02:21 Tyler for about 30 years now.

This is Bob Faber, Bob Faber is from Verizon. He'll be one of our witnesses in this lawsuit. Also with us is Matt Gaudet and Kevin Anderson. They're part of our legal team, and they'll also be helping me try this lawsuit. You'll hear from them. They're with the law firm of Duane Morris.

And then as far as witnesses in the case, you'll hear from Mr. Faber. We have an expert witness on the technology side, Dr. Mark Mahon. And then also another expert witness, Mr. Doug Ellis.

And those are the folks on our side, Your Honor.

THE COURT: Thank you, Mr. Dacus.

MR. DACUS: Thank you.

THE COURT: Ladies and gentlemen of the panel, same questions with respect to Mr. Dacus and the people he introduced here in the courtroom and identified as witnesses. Do you know any of them, have any relationship at all with them, go to church with them, ever been represented by any of them or members of their firms?

All right. I take it by your silence, you do not.

Let me ask you a general question about the people who identified some prior jury service on your part, and I want to differentiate this question from people who might have had some previous involvement themselves or with a family member in some type of a legal matter. Someone

10:03:53 mentioned that earlier, Ms. Dorgan, I think. We'll
10:03:57 probably want to ask some additional questions about that,
10:03:59 and I will have some additional questions for you about any
10:04:02 involvement you or a family member or a close personal
10:04:05 friend have had in our judicial system before.

10:04:10 This question relates to prior jury service, and a
10:04:14 number of you all responded to that by saying you had
10:04:18 served on various juries in the past, a murder case, a
10:04:23 property dispute, some in state court, a former federal
10:04:28 court juror in a patent case.

10:04:32 My question is very general. For all of you who
10:04:35 have had some prior jury service, whether it was in the
10:04:40 recent past or in the distant past, was there anything
10:04:46 about your personal experience as a juror in that previous
10:04:50 matter that would somehow affect or impact your ability to
10:04:55 serve in this case and to be fair and impartial to both
10:05:01 sides before you've heard any of the evidence, before
10:05:04 you've heard any of the legal instructions that I will give
10:05:07 you about the law? Is there anything about your prior jury
10:05:13 service that you feel like could somehow impact or affect
10:05:18 your ability to be fair and impartial to both sides in this
10:05:23 case? Does anybody have any concerns about that related to
10:05:28 prior jury service?

10:05:29 Okay. I take it by your silence, you do not.

10:05:34 Now, second question is the one I just alluded to.

10:05:39 I need to know a little bit about any kind of matter that
10:05:44 any of you have been involved in, either yourself or a
10:05:49 family member or a close personal friend in any type of a
10:05:55 civil case or a criminal case in our judicial system. We
10:06:01 don't have to talk about any of the details. Just tell me
10:06:07 briefly what it is. You know, if you had a close family
10:06:10 friend who was a victim of a crime, just tell us that
10:06:16 briefly. If you had a family member who went to prison 10
10:06:20 years ago, just tell us that briefly.

10:06:22 The categories are Plaintiff or a Defendant in
10:06:28 some type of a civil matter or a criminal matter or a
10:06:34 witness or victim in a civil matter or a criminal matter.

10:06:39 So if you've got any kind of experience like that,
10:06:46 just tell us briefly about it.

10:06:47 Anyone on the first row -- row have any kind of
10:06:51 experience like that?

10:06:54 Yes, sir, Mr. Ybanez?

10:06:56 PROSPECTIVE JUROR: Yes, sir. I guess it was
10:06:58 about --

10:06:58 THE COURT: Mr. Ybanez, if you would wait for
10:07:00 Mr. Savage to -- yeah.

10:07:02 PROSPECTIVE JUROR: Sorry about that. It was
10:07:04 probably about 25 years ago. I'm not sure. My half
10:07:08 brother, which I didn't know I had, came to live with us,
10:07:12 and he was going through a lot of stuff, and I don't know

10:07:14 any details of it. But anyway, he ended up stealing my car
10:07:20 and crossing state lines with it, and he got caught, and we
10:07:25 had to go to court for that.
10:07:27 I didn't testify or anything, but I had to be
10:07:30 present.
10:07:31 THE COURT: Sure.
10:07:31 PROSPECTIVE JUROR: And he got 30 years for that.
10:07:33 THE COURT: Okay. Anything about that experience
10:07:36 in your past that might affect your ability to be fair and
10:07:41 impartial in this civil case?
10:07:42 PROSPECTIVE JUROR: No. They're unrelated really
10:07:45 as far as types of -- I mean, it wouldn't...
10:07:49 THE COURT: I think so, too. Okay. Thank you.
10:07:52 PROSPECTIVE JUROR: Yes, sir.
10:07:52 THE COURT: Anyone else in the first row?
10:07:54 Second row of the jury box, anyone have any of
10:07:59 those experiences?
10:08:00 Okay. First row in the gallery?
10:08:07 Yes, ma'am.
10:08:07 PROSPECTIVE JUROR: I don't know if this --
10:08:09 THE COURT: Ms. Hall?
10:08:10 PROSPECTIVE JUROR: Yes. My husband's been to
10:08:12 prison long before we met, so I don't know if that counts.
10:08:16 THE COURT: Okay. Just tell us -- can you tell us
10:08:19 just very briefly about that.

10:08:20 PROSPECTIVE JUROR: For evading arrest when he was, like, 17.

10:08:23 THE COURT: Okay. Long time ago?

10:08:25 PROSPECTIVE JUROR: Yeah.

10:08:25 THE COURT: Wouldn't affect your ability --

10:08:25 PROSPECTIVE JUROR: No.

10:08:27 THE COURT: -- to be a fair and impartial juror in this case, would it?

10:08:31 PROSPECTIVE JUROR: No, sir.

10:08:31 THE COURT: Okay. Thank you, ma'am.

10:08:33 Ms. Coats?

10:08:34 PROSPECTIVE JUROR: Yes. Twice in the past, I've had to give witness statements. One was in high school. We had an accidental shooting in the school parking lot.

10:08:46 THE COURT: All right.

10:08:48 PROSPECTIVE JUROR: And then about 15 years ago, I also gave a deposition for a gentleman who cheated in a fishing tournament that I was working, and I was the one who caught him, and I had to give a statement on that.

10:09:05 THE COURT: Okay.

10:09:07 PROSPECTIVE JUROR: And he was a police officer.

10:09:10 THE COURT: Okay.

10:09:11 PROSPECTIVE JUROR: So I felt really bad about it, but it wouldn't affect me.

10:09:15 THE COURT: Well, it's fishing. You know, let me

10:09:19 ask you this, is there anything about that that would
10:09:22 affect your ability to be fair and impartial in this case?
10:09:24 PROSPECTIVE JUROR: No.
10:09:25 THE COURT: Okay.
10:09:26 PROSPECTIVE JUROR: If I see something wrong, I
10:09:27 say it.
10:09:28 THE COURT: All right. Fair enough. Thank you,
10:09:30 ma'am.
10:09:30 Anyone else in the gallery at all? Second row?
10:09:36 Third row? Last row?
10:09:38 Yes, sir. On the last row, Mr. Smith?
10:09:40 PROSPECTIVE JUROR: Yes, sir. I had a close
10:09:44 family member that had a financial judgment against them
10:09:48 because they had a business that failed, and it's been in
10:09:54 the past, and they were structured a repayment plan or
10:09:58 something like that, so it's not going to affect me.
10:10:01 THE COURT: Thank you.
10:10:06 All right. Very good. All right. My next
10:10:08 question is sort of a general question. If you're selected
10:10:10 as a juror in this case, will you be able to render a
10:10:14 verdict that is solely based on the evidence that's
10:10:18 presented at the trial and in the context of the law that I
10:10:22 give you in my instructions, disregarding any other ideas
10:10:26 or notions or beliefs about the law that you may have
10:10:30 encountered in reaching your verdict?

10:10:33 Is there anyone who believes they would have any
10:10:38 trouble at all rendering a verdict solely based on the
10:10:42 evidence that's presented in this case and the law that I
10:10:46 give you in the instructions, disregarding any other ideas
10:10:51 you might have about the law in reaching that verdict?
10:10:55 I take it by your silence, no one would.
10:10:57 Okay. If you're selected to be a juror in this
10:11:03 case, one of the things that I'm going to instruct you
10:11:08 about your own conduct is that you cannot discuss the case
10:11:12 with anyone until the very end of the trial. So that
10:11:18 includes your fellow jurors, your family members, your
10:11:22 friends, anyone else. You cannot discuss anything about
10:11:26 the case until the very end when you begin your
10:11:30 deliberations.
10:11:31 So that means in addition to not having any
10:11:37 face-to-face discussions with fellow jurors or anyone else,
10:11:41 you cannot communicate about the case with anyone in any
10:11:46 way, whether in writing or through an email or texting or
10:11:51 blogging or commenting or on a social media website like
10:11:57 Twitter or Facebook or Instagram or LinkedIn or YouTube or
10:12:02 WhatsApp or Snapchat or anything else. There's a long
10:12:05 list. And it's really important, and I'll give you more
10:12:10 information in a little bit about why it is so important.
10:12:13 But if for any reason you feel like you can't
10:12:20 follow that instruction about not communicating with anyone

10:12:26 about the case, then you can't let yourself become a member of the jury. Is there anybody on the panel who feels like they would not be able to comply with that restriction?

10:12:39 I take it by your silence no one has that concern.

10:12:43 The second thing I'm going to ask you to do is not to conduct any type of independent or personal research or investigation regarding any matter in the case. So you can't use your cell phone or a tablet or a computer or any other device to do any kind of research or investigation regarding the case, the matters in the case, the witnesses, the attorneys, the parties, anything else. You can't go home at the end of the day and Google the parties or the case or do any type of independent investigation.

10:13:20 If on the odd chance you inadvertently run across any information about the case accidentally, while browsing the Internet or on your social media feeds, you must ignore it. And the reason for that is you have to base the decisions that you're going to make in this case solely on the -- what you hear and see in this courtroom from that witness stand, from the deposition testimony that will be presented to you, and from the documents that are admitted into evidence.

10:13:53 So if anyone has any concerns or feels that they cannot follow that instruction, you also cannot let yourself become a member of this jury.

10:14:05 Is there anyone who feels like they would have any trouble at all complying with that restriction?

10:14:11 I take it by your silence no one has that concern.

10:14:15 Is there any reason any of you feel like you could not sit on this jury and render a fair verdict based on the evidence that is presented to you and in the context of the instructions that I give you about the law?

10:14:40 Okay. I want to draw your attention very briefly to something that's called the burden of proof. The parties may want to ask you about the burden of proof, and in this case, the jury's going to be called upon to apply two different burdens of proof. One is called preponderance of the evidence, and one is called clear and convincing evidence.

10:15:13 And when responding to the parties' questions, if they have any about the burden of proof, I want to instruct you that when a party has the burden of proof on any claim or affirmative defense by what we call preponderance of the evidence, it means that the jury must be persuaded by the credible or believable evidence that the claim or affirmative defense is more probably true than not true. Sometimes this is talked about as being the greater weight and degree of the credible testimony.

10:15:47 At the close of the case next week, I will submit questions to the jury, and you'll have to answer those

10:15:55 questions by applying these different burdens of proof.
10:15:59 With respect to preponderance of the evidence, I want you
10:16:03 to imagine a set of scales, and if the scales tip slightly
10:16:08 in favor of one answer with a greater weight and degree of
10:16:14 credible testimony, then that is your answer when the
10:16:18 burden of proof is by a preponderance of the evidence.

10:16:22 On the other hand, if the party has the burden of
10:16:27 proving a defense by what we call clear and convincing
10:16:30 evidence, that means that you have an abiding conviction,
10:16:30 that the truth of the parties' contentions are highly
10:16:42 probable. And that is a higher standard of proof than
10:16:45 preponderance of the evidence. So if you'll imagine those
10:16:47 same set of scales, they have to be tipped more heavily in
10:16:51 favor of the party who has that burden of proof.

10:16:53 Now, neither of these burdens of proof is to be
10:16:56 confused with the burden of proof that is applied in a
10:17:00 criminal case, and you've heard it before on television,
10:17:05 proof beyond a reasonable doubt. That does not apply in
10:17:10 this case or any civil case. So do not confuse either
10:17:16 preponderance of the evidence or clear and convincing
10:17:17 evidence with beyond a reasonable doubt.

10:17:22 And I'm just giving you these instructions in case
10:17:26 the parties want to ask you about your willingness to apply
10:17:29 those burdens of proof in this case to the evidence that
10:17:33 you hear during the course of the trial.

All right. We've been going about an hour and 20 minutes. I think now would be a good time for a short break. So we will take a 10-minute break to use the restroom, get a drink of water. Feel free to visit about whatever you all want to visit about in the few minutes you have together. Don't visit about the case or what you've heard so far, and we'll get you back into the courtroom, and once we've done that, the parties will have a few minutes to ask you some questions, and then they will make their selections, and we will have a jury picked.

So we'll be in recess about 10 minutes.

COURT SECURITY OFFICER: All rise.

(Venire panel out.)

THE COURT: All right. We'll be in recess for 10 minutes.

(Recess.)

(Venire panel in.)

COURT SECURITY OFFICER: All rise.

THE COURT: All right. Please be seated.

Okay. The parties, ladies and gentlemen of the panel, are now going to have an opportunity to ask you some questions. As a reminder, there are no wrong answers. As long as your answer is a truthful response to the question that is asked, then that's the right answer.

The lawyers and their clients are entitled to the

10:30:17 information to be gained through these questions, and as I
10:30:19 mentioned at the outset, they're not here to pry unduly
10:30:24 into your private affairs or to be nosy. They are here to
10:30:31 gather information for the purpose of selecting a fair and
10:30:33 impartial jury.
10:30:34 If for some reason I don't think they're entitled
10:30:37 to ask a question, I will certainly let them know that.
10:30:42 But these are good lawyers, and they know the rules of the
10:30:48 court, and as I said, if you have any hesitancy at all
10:30:51 about asking a question that you consider private, just
10:30:54 raise your hand and say you'd like to visit with the judge
10:30:58 outside the presence of everybody else, and we can
10:31:01 certainly do that at the very end.
10:31:03 All right. I'll now allow counsel for the
10:31:06 Plaintiff to voir dire the jury.
10:31:11 MR. FINDLAY: Thank you, Your Honor.
10:31:12 Could I have a five-minute warning, Your Honor?
10:31:18 THE COURT: Yes.
10:31:20 MR. FINDLAY: Good morning again, ladies and
10:31:25 gentlemen. I'll reintroduce myself. My name is Eric
10:31:28 Findlay. Proud to represent Aspen. I'll be one of the
10:31:33 lawyers bringing you the case this week.
10:31:35 I want to start off by giving you about as big a
10:31:39 sincere thank you as we can give. As the judge mentioned,
10:31:43 we realize that we're asking a lot of y'all to be here.

10:31:45 You've got kids you need to be taking care of, jobs you
10:31:48 need to be taking care of, family members you need to be
10:31:53 taking care of, and we greatly appreciate your willingness
10:31:56 to sacrifice your time to be here for us. Without y'all
10:31:59 here, as Judge Schroeder said, the system doesn't work.
10:32:02 You, the people, make it possible. So I want to thank you
10:32:06 very much for your service here regardless of what happens
10:32:09 in the case and regardless of which of you eight get seated
10:32:15 in the jury.

10:32:16 I can't get into the evidence right now. I can't
10:32:18 argue the case right now, but I can tell you a little bit
10:32:21 about what the case is about from our standpoint.
10:32:23 Judge Schroeder mentioned it a little bit. It's a patent
10:32:26 infringement case. It's about this patent, United States
10:32:33 Patent '554. Those are the three numbers. That's how we
10:32:36 refer to it. The lead inventor on this patent is Mr. Bill
10:32:39 Chin, who you met previously, and you'll hear him testify,
10:32:42 I think, on Monday.

10:32:43 And it's our position that this patent solved a
10:32:46 critical problem in the telecommunications industry, that
10:32:50 it figured out a way when you had a call on one network and
10:32:54 one signal that got too weak or dropped or got lost, it
10:32:58 would switch it over seamlessly to another network that had
10:33:02 a stronger signal. And it's our position that the
10:33:06 Defendant, Verizon, is infringing this patent, is using

that patented method and process without our permission through what you heard the Court talk about, its Voice over Wi-Fi system or its Wi-Fi Calling System.

And we'll present evidence to you through the experts, through Mr. Chin, that that's our position in the case.

And then as the judge also mentioned, we'll be asking for monetary damages, and we'll talk about that a little more later.

I'll start off after the little introduction telling you a little bit more about myself. Live and work in Tyler. Been there forever. Married 35 years now. Two grown boys. Both live over in Dallas. Happy to say they are gainfully employed, and they are finally out of our bank account, and live on their own bank account. And one just a few months ago gave us our first grandchild -- grandbaby. So we're thrilled with that granddaughter. We're very blessed.

And from a career side, I have been blessed to be doing these cases in this court around the Eastern District of Texas and other areas in Texas for almost -- it's scary to think, almost 30 years now. So that's a little bit about me.

The judge had us introduce both sides. I do want to make sure, just because Mr. Dacus who grew up in Gilmer,

10:34:26 he lives over where I do in Tyler now, as he said. Does
10:34:30 anybody recognize Mr. Dacus at all or recognize his name in
10:34:34 any way?

10:34:35 One other person I did want to raise. His wife
10:34:39 practices with him, as well. Her name is Shannon Dacus.
10:34:43 Anybody recognize Ms. Dacus's name? Great. Thank you for
10:34:47 that.

10:34:47 Before you got here today, before you heard what
10:34:51 this case was about, by a show of hands, who had heard of
10:34:56 Wi-Fi Calling or Voice over Wi-Fi Service or capability?
10:35:00 Okay. I see a lot of people.

10:35:01 Another question. Just show of hands, who thinks
10:35:07 they've used that, they've used Voice over Internet to make
10:35:11 a telephone call, to make a voice call, they've used a
10:35:16 Wi-Fi signal instead of just a cell signal? Okay. A
10:35:19 fair -- good amount.

10:35:20 Let me ask this question. Who in their homes only
10:35:23 has a cell phone, no land lines anymore on the phones?
10:35:27 Okay. I think everybody is going the same way these days.
10:35:30 It's funny how if you're this age, you grew up in the '70s
10:35:35 and '80s, it's unthinkable. I think we dropped our land
10:35:39 line phones -- it's got to be 10 years ago.

10:35:42 And does everybody here have the same experience,
10:35:44 from time to time, of being in a house or being in a
10:35:46 building and all of a sudden you're, like, where is my

10:35:50 cellular signal, it's gotten weak because I'm inside, I'm
10:35:54 not outside where the tower can get to me? Okay.
10:35:57 And so you're going to hear a lot more about that.
10:35:59 And, again, it's not time for me to get into the evidence,
10:36:02 but those are some of the factors that really led to this
10:36:06 patent, ladies and gentlemen, and you'll hear a lot more
10:36:09 about it.
10:36:10 Talk a little bit about Verizon. Somebody -- I
10:36:13 think, Juror No. 2, you mentioned that -- Ms. Mitchell,
10:36:17 that you're a Verizon customer. I know a lot of y'all in
10:36:20 the questionnaires indicated you're Verizon customers.
10:36:24 Let me stop and give another quick word of thank
10:36:27 you, and I know I speak on behalf of Verizon, as well. We
10:36:29 asked you a lot of questions in those questionnaires. When
10:36:34 we were going through them again -- when I was going
10:36:36 through them again last night to prepare for this, I'm
10:36:40 like, oh, my gosh, we gave them four pages, I think 50
10:36:42 something questions and checkmarks to make. Y'all
10:36:45 obviously spent a lot of time doing that, and we really
10:36:49 greatly appreciate it.
10:36:51 But in the questionnaire, you'll recall towards
10:36:53 the end, there was -- did you know anything about Verizon?
10:36:58 And I'll tell you in looking at your responses, they were
10:37:00 kind of all over the board. A lot of people said I like
10:37:03 Verizon. I have them. They're good, strong signal. Some

10:37:06 folks said, I don't like Verizon for various reasons. I
10:37:11 don't think they have a good signal. I switched to
10:37:14 somebody else. Back and forth like that, which is natural
10:37:16 for cellular service, I think.

10:37:18 Let me ask you this question, though. For the
10:37:21 folks -- by a show of hands, who generally has a positive
10:37:26 impression or positive thoughts about the company Verizon
10:37:29 and the services they provide? Can I see a show of hands?

10:37:34 So No. 2, Ms. Mitchell; No. 5, Ms. Fuquay.

10:37:40 Anybody else on the front row?

10:37:42 Mr. Northcutt, No. 6.

10:37:45 In the back row, I think Ms. Nunn, did you raise
10:37:48 your hand? Thank you. Mr. Sandefur raised your hand.

10:37:52 Anybody else in the second row there, we've got
10:37:55 Juror No. 21, which is Ms. Lambert; is that right? Juror
10:38:01 No. 22, Ms. Calhoun. Thank you. Then behind y'all, Juror
10:38:06 No. 26, Ms. Hunter, do you have your hand raised?

10:38:10 Anybody else?

10:38:11 And Mr. Everitt, okay.

10:38:14 Thank you all.

10:38:16 To those people who just raised your hand, should
10:38:19 that make me nervous? And you probably know what I mean by
10:38:23 that. Should I think, oh, gosh, if they have a positive
10:38:27 attitude about Verizon, maybe Verizon's going to start
10:38:30 ahead a little bit in the lawsuit. Maybe my client Aspen

and Mr. Chin are going to be disadvantaged. Should I be worried about that? Does anybody think I should be worried about that?

I didn't think -- to be honest with you, I didn't think so either, but you can understand that I wanted to figure that one out.

Throughout the morning, the time the judge has given us to ask these questions, I'll be picking on some of you individually, and I don't want that to -- I don't want you to be upset with me. As the judge said, we're just trying to find information to get the right jurors for this case. And I will tell you in doing this for decades, invariably, a lot of people will sometimes sit there and think you know what, if I just don't say anything, I won't get on the jury. I'm just going to be quiet like a church mouse, not whisper anything, not talk. I'm not going to raise my hand. I'll tell you, ladies and gentlemen, nine times out of 10 it's those exact folks that end up on the jury because we kind of forgot about them. We forgot they were there and then you see them on the jury, and say that person never said a thing. So I would encourage you to get a conversation going if you can. And with all that, Ms. Cadenhead, can I pick on you to start? Wait for the court security officer.

THE COURT: If you'll stand up for us,

10:39:45 Ms. Cadenhead.
10:39:46 MR. FINDLAY: In the questionnaire, there was a question if you recall about patents, and the answer you gave was your sister-in-law has worked for a lawyer that has tried this kind of case, do you recall that answer?
10:39:59 PROSPECTIVE JUROR: Yes.
10:39:59 MR. FINDLAY: Is your sister-in-law Nicole Cadenhead?
10:40:05 PROSPECTIVE JUROR: Yes.
10:40:05 MR. FINDLAY: I'm that lawyer that she works for. I'm that guy. I hope she said very nice things about me.
10:40:09 PROSPECTIVE JUROR: She did.
10:40:10 MR. FINDLAY: She does not work for me anymore.
10:40:12 PROSPECTIVE JUROR: Right.
10:40:13 MR. FINDLAY: She left, I think, maybe three, four years ago. She actually -- she actually works for a federal judge over in Tyler, Judge Barker, are you aware of that?
10:40:23 PROSPECTIVE JUROR: Yes, sir.
10:40:23 MR. FINDLAY: So the fact that your sister-in-law Nicole Cadenhead worked for me years ago, does that start me at an advantage? Are you going to be fair to Verizon?
10:40:34 PROSPECTIVE JUROR: I didn't even know who she worked for, I just knew she worked for a patent lawyer in Tyler. That's as far as I knew so I have no idea. It

10:40:40 doesn't affect me.

10:40:40 MR. FINDLAY: I saw that, and I thought I think she's talking about me, so I needed to come clean with that. But let me ask you another question, and this is more on the Verizon side of things. You also said in there that your brother-in-law, Nicole's husband, Jason, works for Verizon, doesn't he?

10:40:57 PROSPECTIVE JUROR: That's correct.

10:40:58 MR. FINDLAY: Okay. Does that --

10:41:00 PROSPECTIVE JUROR: For 25 years.

10:41:01 MR. FINDLAY: Yeah. 25 years.

10:41:01 PROSPECTIVE JUROR: Or more.

10:41:01 MR. FINDLAY: Long time.

10:41:02 PROSPECTIVE JUROR: Yeah.

10:41:03 MR. FINDLAY: Should that make me nervous?

10:41:05 PROSPECTIVE JUROR: I don't even know what he does for Verizon besides I think he works for the lines and the towers and stuff like that. So I don't have opinion either way. I'm kind of neutral on that.

10:41:15 MR. FINDLAY: Okay. And I appreciate that answer. So do you think, though, the fact that your brother-in-law works for Verizon, is that in any way -- you know, if it were a close call in the case or if you were trying to decide which side --

10:41:29 PROSPECTIVE JUROR: Maybe.

10:41:30 MR. FINDLAY: -- you believed --
10:41:32 PROSPECTIVE JUROR: It would be a maybe.
10:41:33 MR. FINDLAY: Maybe?
10:41:35 PROSPECTIVE JUROR: Yeah.
10:41:36 MR. FINDLAY: Do you think maybe you'd be a better juror in a case where Verizon was not a Defendant since he works for Verizon?
10:41:44 PROSPECTIVE JUROR: I really couldn't say.
10:41:45 MR. FINDLAY: Okay. Would you follow the law as the judge instructed it to you?
10:41:49 PROSPECTIVE JUROR: Absolutely. Absolutely.
10:41:50 MR. FINDLAY: Okay. And do both sides start at the same point at the beginning of the race if you will.
10:41:57 PROSPECTIVE JUROR: Oh, absolutely. Yes.
10:41:58 MR. FINDLAY: Okay. Thank you, ma'am, very much.
10:42:01 Talk about something a little bit different, but it was a question in your questionnaire. Accents. And we asked that question because our technical expert that you'll hear a lot more about and he'll testify either Monday or Tuesday of next week is a gentleman called Dr. Izhak Rubin. He is a brilliant, in my mind, I'm biased a little bit, distinguished professor in electrical and computer engineering at University of California. He's done a lot of amazing work with the government, security clearances, that sort of thing.

But he was born and raised in Israel. He's a United States citizen. He's been here I think since the '70s or '80s. And he does have an accent. I will tell you he thinks I have an accent. So it kind of goes -- that's a double-edged sword if you will, it goes both ways. And then Mr. Marino who I introduced earlier, American citizen, of course, but he grew up in Italy, born and raised in Italy, and he has what my wife thinks are those great Italian accents but it's an accent, nonetheless.

In the questionnaire we asked about that, and Mr. -- No. 3, Ybanez, did I pronounce that correctly?

PROSPECTIVE JUROR: Uh-huh.

MR. FINDLAY: Can you stand up for me, please, sir. You said had some strong feelings about people with accents, do you recall that in your answer?

PROSPECTIVE JUROR: Oh, I might have misunderstood that.

MR. FINDLAY: Okay.

PROSPECTIVE JUROR: I thought it said do -- do I -- is it -- am I okay with people with accents, and I wrote yes.

MR. FINDLAY: Okay.

PROSPECTIVE JUROR: What was the question?

MR. FINDLAY: The question was -- and, you know, I kind of wondered if that might be --

10:43:40 PROSPECTIVE JUROR: Because half my family has accents.

10:43:44 MR. FINDLAY: Don't be offended. When I saw your last name, I thought, well, you know, so the question is No. 41: Do you have any strong opinions or thoughts regarding non-native English speakers with noticeable accents, and you said yes.

10:44:01 PROSPECTIVE JUROR: Oh, I probably misunderstood that as do I have a problem with anybody with accents -- I mean, do I not have a problem with anybody with accents, and I was like, well, no, I don't have any problems with anybody like that --

10:44:09 MR. FINDLAY: Okay.

10:44:09 PROSPECTIVE JUROR: Yeah, that's -- oh, I am so sorry.

10:44:12 MR. FINDLAY: No, no, not at all.

10:44:13 PROSPECTIVE JUROR: I'm so embarrassed.

10:44:15 MR. FINDLAY: No, please don't be. I'm glad you clarified. Can I ask you a couple of other questions?

10:44:21 PROSPECTIVE JUROR: Sure.

10:44:21 MR. FINDLAY: Also in the questionnaire, I'm not sure if you recall, you said about patents that certain ideas should be public property. Do you recall making that comment?

10:44:28 PROSPECTIVE JUROR: Yes.

10:44:28 MR. FINDLAY: Can you share that with us a little bit? What were you thinking or talking about?
10:44:33 PROSPECTIVE JUROR: Just maybe, you know, some can go a little too far with being nit picky, I would believe, about, you know, this idea or that idea, especially, like, take the engine that got invented that was running on water. You know, that should have been, you know, everybody's, you know, I think would have made the world a lot better, stuff like that.
10:45:00 MR. FINDLAY: Are you in some way skeptical of patents? Is that a fair thing to say?
10:45:06 PROSPECTIVE JUROR: No. I wouldn't say that, no. I wouldn't say skeptical.
10:45:10 MR. FINDLAY: You watched the patent video --
10:45:10 PROSPECTIVE JUROR: Yes.
10:45:12 MR. FINDLAY: -- this morning, right?
10:45:13 PROSPECTIVE JUROR: Uh-huh.
10:45:13 MR. FINDLAY: Did you learn something about the patent process through that video?
10:45:17 PROSPECTIVE JUROR: Yeah. More than I thought I knew, yeah.
10:45:19 MR. FINDLAY: Was there anything in that that concerned you about, you know, how you get a patent, the grant of a patent, it lasts for about 20 years?
10:45:28 PROSPECTIVE JUROR: I didn't know that there was a

10:45:29 20-year time limit, and how long it took to get a patent
10:45:33 was surprising to me.
10:45:34 MR. FINDLAY: Okay. That it takes -- is it fair,
10:45:37 I don't want to put words in your mouth, that the video
10:45:37 showed it takes a lot of work, years --
10:45:37 PROSPECTIVE JUROR: Yes.
10:45:39 MR. FINDLAY: -- sometimes to get a patent.
10:45:40 PROSPECTIVE JUROR: Yes, uh-huh.
10:45:41 MR. FINDLAY: Could you follow the Court's
10:45:43 instructions about deciding whether there was infringement
10:45:45 or invalidity, you think?
10:45:48 PROSPECTIVE JUROR: Oh, absolutely, yes.
10:45:49 MR. FINDLAY: Okay. Thank you, sir. You can sit
10:45:51 down.
10:45:52 Let me talk to Juror No. 16, Ms. Hall. Thank you,
10:45:59 ma'am.
10:45:59 To that Question No. 41 on accents, you answered
10:46:05 yes, as well. So I want to clarify if you read the
10:46:09 question right. If you did and you did check yes, can you
10:46:13 tell us why you checked yes?
10:46:15 PROSPECTIVE JUROR: I did check yes. I don't
10:46:16 think it's more like a strong feeling. I didn't realize it
10:46:20 was just accents. Like, I don't have a problem with
10:46:22 someone having an accent, but I feel like if you've been
10:46:25 here for 10-plus years and me and you couldn't have a

10:46:29 conversation, then there's a problem.

10:46:30 MR. FINDLAY: I would tell you, and that's a good 10:46:31 point. Both, obviously, Mr. Marino and Dr. Rubin are as 10:46:34 fluent in English as you or I are. It's just --

10:46:36 PROSPECTIVE JUROR: I don't have a -- no.

10:46:37 MR. FINDLAY: There's just an accent to it.

10:46:39 PROSPECTIVE JUROR: Yeah.

10:46:40 MR. FINDLAY: Okay. Can I ask you another 10:46:41 question?

10:46:41 PROSPECTIVE JUROR: Yes.

10:46:41 MR. FINDLAY: In your -- also in that 10:46:43 questionnaire, Question No. 39 was about lawsuits to some 10:46:47 extent. And you said, and I completely respect this, 10:46:50 ma'am, that lawsuits were against your religion.

10:46:53 PROSPECTIVE JUROR: Yes.

10:46:54 MR. FINDLAY: Any lawsuit?

10:46:57 PROSPECTIVE JUROR: It's just, I go to a 10:46:59 Pentecostal church, and they just feel strongly against it. 10:47:03 It's not going to affect the way that I -- I mean, I'm 10:47:05 here, and I'm going to do what I need to do for the people 10:47:07 and serve. So, I mean, I won't --

10:47:10 MR. FINDLAY: But so, you understand I represent 10:47:12 the Plaintiff in this case?

10:47:13 PROSPECTIVE JUROR: Uh-huh.

10:47:13 MR. FINDLAY: And we're the ones that brought the

10:47:15 lawsuit?

10:47:16 PROSPECTIVE JUROR: Yeah.

10:47:16 MR. FINDLAY: You came down here to federal court. 10:47:18 We filed a complaint for patent infringement because we 10:47:21 think they're using our property. The Defendant is 10:47:25 Verizon. But do you just think there's something 10:47:29 inherently improper because of your religious beliefs, 10:47:33 which I totally understand, about us asserting our rights 10:47:36 in that way? About us filing a lawsuit?

10:47:40 PROSPECTIVE JUROR: No. Obviously I'm new to 10:47:43 Pentecostal so like I'm still learning the religion and 10:47:46 everything, it's just I won't go suing somebody. I don't 10:47:49 have a problem with -- you do what you got to do.

10:47:51 MR. FINDLAY: Okay. All right. Let me ask you 10:47:54 this, do you live on any sort of acreage?

10:47:58 PROSPECTIVE JUROR: Yes.

10:47:59 MR. FINDLAY: How many acres do you have?

10:48:01 PROSPECTIVE JUROR: 1.7.

10:48:02 MR. FINDLAY: Okay. Has anybody ever trespassed 10:48:04 on that land?

10:48:05 PROSPECTIVE JUROR: No.

10:48:06 MR. FINDLAY: Okay. If somebody did, would you do 10:48:10 something about it? If somebody came on that property, I 10:48:13 don't know if you have trees, but if somebody came on that 10:48:16 property and cut some trees down and took them away and

10:48:19 sold them for money and you found out about it, would you
10:48:22 try to do something to make that right or --
10:48:25 PROSPECTIVE JUROR: Honestly, yes, I think so.
10:48:27 MR. FINDLAY: What do you think you would do?
10:48:29 PROSPECTIVE JUROR: I mean I would try to handle
10:48:30 it in the most Christian-like way I could first, and then
10:48:35 after that, yeah, it would probably go into the law.
10:48:37 MR. FINDLAY: So you would agree with me there's
10:48:37 nothing wrong with somebody sticking up for their legal
10:48:39 rights if they feel they have to.
10:48:39 PROSPECTIVE JUROR: Definitely not, definitely
10:48:41 not.
10:48:41 MR. FINDLAY: Okay. That's great. Thank you so
10:48:42 much. I appreciate your time.
10:48:44 On that question about lawsuits, we had -- are
10:48:50 there too many lawsuits, and, of course, there were a lot
10:48:53 of people that raised their hands. Way too many lawsuits.
10:48:53 There were some people who said I think the number is
10:48:56 reasonable. There was somebody that actually said there
10:48:58 were too few lawsuits. Here's a question I -- or a
10:49:02 statement I think we can all agree on. I'd like a show of
10:49:05 hands if you agree with this statement. No one likes and
10:49:09 we all dislike frivolous lawsuits. Can I get a show of
10:49:13 hands with that?
10:49:14 And I think when I talk to jurors in these

10:49:18 circumstances and when we're done with trial, the one that
10:49:20 comes up all the time is that McDonald's hot coffee in the
10:49:25 drive-thru. I see people nodding their heads. Where I
10:49:27 think most people would agree, yeah, that's a frivolous
10:49:30 lawsuit. That's silly. I think you can tell already,
10:49:34 though, folks by being here what you've been through so far
10:49:37 this morning, the patent video, Judge Schroeder, this is
10:49:40 not one of those sorts of lawsuits. Judge Schroeder has
10:49:43 ways of dealing with those lawsuits long before they get to
10:49:46 this point. So I just wanted to make that clarified or
10:49:52 clear.

10:49:52 The question after that about lawsuit -- number of
10:49:56 lawsuits was about damages, and same thing, some people
10:49:59 said damage verdicts are too high. Some people said
10:50:04 they're too low. Some people said they're reasonable. I'm
10:50:07 going to be really upfront and blunt with y'all. We are
10:50:10 asking for monetary damages because we think this invention
10:50:14 is being used by Verizon without our permission. And we're
10:50:20 going to ask for a lot of money damages. The number is
10:50:24 going to be around $200 million. And I saw Juror No. 6, I
10:50:27 saw your eyebrows go up. And that is a fair human reaction
10:50:31 to that.

10:50:32 We believe, of course, Verizon disagrees with
10:50:35 this, I want to be clear. We believe that the evidence
10:50:38 will show, specifically Verizon's own documents will show

10:50:40 that that number is justified. We believe it will show it's justified because of how important this technology was, the benefits it brought to Verizon, how much money it saved them, et cetera.

10:50:53 But there's some people who I ask that sort of question to, and they'll say you know what, Mr. Findlay, I don't care what you show me, there is no way I'm going to award that much money. And that is a completely reasonable, appropriate opinion to have, but you can understand it's an opinion that I would want to know about on my side.

10:51:14 Does anybody feel that way? It just -- Mr. Findlay, I'm going to be honest, it doesn't matter how much evidence you show me, there is no way I'm going to consider a damages award that's that high?

10:51:25 Okay. And I will tell you, Verizon, again, I want to be fair and upfront, they disagree with that. They'll have a gentleman who I think will talk to you, Mr. Ellis, that you heard Mr. Dacus introduce, and I think he's going to put that number much lower, like 10, 12, $13 million, something like that. But there's no one here that has such a strong opinion that regardless of the evidence, they wouldn't consider something close to $200 million?

10:51:55 Yes, ma'am, juror -- yeah, Ms. Nunn. Could you wait one second? I appreciate --

10:52:01 THE COURT: Can you stand up for me, Ms. Nunn?

10:52:03 PROSPECTIVE JUROR: I will.

10:52:03 $200 million is probably more than I could imagine.

10:52:10 MR. FINDLAY: I agree.

10:52:11 PROSPECTIVE JUROR: I think it depends on how much financial advantage Verizon allegedly received based on what the payout would be.

10:52:25 MR. FINDLAY: Okay. I couldn't agree more with your statement, and I think it sounds like you would wait to see the evidence and weigh the evidence with an open mind. Is that fair?

10:52:35 PROSPECTIVE JUROR: Right. Right.

10:52:37 MR. FINDLAY: Does everyone else agree with Ms. Nunn that they would weigh the evidence with an open mind and then come to their own conclusion? Because at the end of the day the eight of you that are sitting there it's your decision to make. We'll tell you what we think the evidence shows, Verizon is going to tell you what the evidence -- what they think the evidence shows, and then it's your call.

10:52:53 Thank you very much.

10:52:54 We had some questions in the questionnaire on patents.

10:53:01 And if I could pick on Juror No. 28. I don't

10:53:05 think we'll get to you, Mr. Everitt, but if I could ask you
10:53:08 a question. And when I say I don't think we can get to
10:53:16 y'all, I don't mean to be rude, but the way the Court does
10:53:20 this, chances are -- sometimes the people way in the back,
10:53:24 you're safe. You probably don't have much of a chance of
10:53:27 getting put up here to one of the eight. But I don't want
10:53:30 to ignore you folks because you took the time to be here.
10:53:33 You filled out those questionnaires.

10:53:34 Mr. Everitt, I think you said you had a friend
10:53:37 that had sold a patent; is that right?

10:53:39 PROSPECTIVE JUROR: Correct.

10:53:39 MR. FINDLAY: Can you tell us about that a little
10:53:41 bit?

10:53:42 PROSPECTIVE JUROR: He had a brick company, and he
10:53:43 invented a new way to make bricks.

10:53:47 MR. FINDLAY: Do you recall anything about it,
10:53:49 what the --

10:53:49 PROSPECTIVE JUROR: I looked at the patent one
10:53:51 time, but it's been years ago.

10:53:52 MR. FINDLAY: So was that -- it was a method or a
10:53:53 process to make a different kind of brick?

10:53:56 PROSPECTIVE JUROR: Correct.

10:53:56 MR. FINDLAY: Okay. Do you know who he sold it
10:53:58 to, just out of curiosity?

10:54:01 PROSPECTIVE JUROR: I do not.

10:54:02 MR. FINDLAY: Did he sell it for a significant sum of money? Do you know?

10:54:06 PROSPECTIVE JUROR: I don't know what the sale amount was. It was a small brick company, and he sold the company and all.

10:54:12 MR. FINDLAY: All right. Thank you. Can I ask you another question?

10:54:15 PROSPECTIVE JUROR: Sure.

10:54:15 MR. FINDLAY: I think you indicated you had been sued as a Defendant in a civil case; is that right?

10:54:19 PROSPECTIVE JUROR: Correct.

10:54:19 MR. FINDLAY: I don't want to pry into your -- into your private business, and so if you don't feel comfortable talking about it, we could talk about it at the bench maybe, but can you -- do you feel comfortable sharing a little bit what that was about?

10:54:32 PROSPECTIVE JUROR: I had a company that went south, and it was just some money owed to a couple of different people --

10:54:36 MR. FINDLAY: Okay.

10:54:37 PROSPECTIVE JUROR: - and they sued for it.

10:54:38 MR. FINDLAY: Did that leave a bad taste in your mouth about the legal system in general?

10:54:43 PROSPECTIVE JUROR: No. I had a real good attorney, and we settled out of court.

10:54:48 MR. FINDLAY: Good. Good. Where did that take place?

10:54:50 PROSPECTIVE JUROR: One case was filed in Marion County.

10:54:56 MR. FINDLAY: Okay. All right. Does that, since you were a Defendant in that case, do you think, does that make you lean any towards the Defendant in this case, Verizon?

10:55:07 PROSPECTIVE JUROR: Not at all.

10:55:07 MR. FINDLAY: Okay. Thank you, Mr. Everitt, very much. I appreciate it.

10:55:12 PROSPECTIVE JUROR: Welcome.

10:55:13 MR. FINDLAY: Can we come back to the box here, sir, Mr. Northcutt, No. 6?

10:55:21 PROSPECTIVE JUROR: Yes, sir.

10:55:22 MR. FINDLAY: Thank you, sir. You put in your questionnaire, I think there should be a limit on how long patents should last. Do you remember that?

10:55:28 PROSPECTIVE JUROR: Yes, sir, I do.

10:55:29 MR. FINDLAY: I think that question was answered for you when you watched that video this morning.

10:55:33 PROSPECTIVE JUROR: It was, yes, sir.

10:55:33 MR. FINDLAY: Okay.

10:55:37 PROSPECTIVE JUROR: I didn't understand what patents were at the time. I apologize.

10:55:41 MR. FINDLAY: No apology required or necessary. But the patent video said, and I think you'll hear the law in this case is that it's usually about 20 years. Do you remember?

10:55:48 PROSPECTIVE JUROR: Yes, sir, I do.

10:55:49 MR. FINDLAY: Does that number bother you? Do you think it should be more, should be less, or you accept the law?

10:55:55 PROSPECTIVE JUROR: I accept the law, yes, sir.

10:55:56 MR. FINDLAY: Okay. Is there -- thank you very much, Mr. Northcutt. You can hand back the microphone.

10:56:02 THE COURT: Mr. Findlay, you have five minutes left.

10:56:06 MR. FINDLAY: Thank you, Judge.

10:56:06 On that question, folks, is there anybody else who somehow has a problem with the length that a patent lasts? And what that means is I think you saw from the video that the patent is yours for 20 years, and you can stop people from using it without your permission. After the 20 years, it's open to the public, which is the whole kind of process and deal we make with inventors. And this patent has not expired. The '554 patent is still within that 20-year lifespan.

10:56:35 You're going to hear questions -- you're going to hear evidence in this case about some other companies, and

10:56:43 specifically you're going to hear evidence in this case
10:56:47 about some of the other carriers, I think, AT&T, T-Mobile,
10:56:52 Sprint, folks you've heard of. And you'll be hearing about
10:56:56 their Voice over Wi-Fi systems or that they were offering
10:56:59 Voice over Wi-Fi systems.
10:57:01 And the reason I raise this is simply because the
10:57:04 only Defendant in our case here is Verizon. That's the --
10:57:08 the only questions you're going to be asked are going to be
10:57:12 infringement and invalidity and damages about Verizon. No
10:57:15 other companies are involved in this case at all.
10:57:19 So my question is because you might be hearing
10:57:23 about other companies and their Voice over Wi-Fi systems,
10:57:27 is that going to make it difficult for anybody to just put
10:57:31 that out of your minds and focus on Verizon in this case?
10:57:34 I'm seeing shaking of the heads. Okay. Thank you
10:57:38 for that.
10:57:38 Ms. Lindley, Juror No. 9, can I visit with you
10:57:47 real quickly?
10:57:49 You indicated you had a lot of experience and
10:57:54 training in telecommunications.
10:57:56 PROSPECTIVE JUROR: Yes, just -- I have a history
10:57:59 working in banks. So I wouldn't say super, like, a great
10:58:03 deal of experience, but just basically in customer service.
10:58:06 MR. FINDLAY: Anything related to, like, cell
10:58:10 networks or --

10:58:11 PROSPECTIVE JUROR: No.
10:58:11 MR. FINDLAY: -- Internet communications?
10:58:13 PROSPECTIVE JUROR: No.
10:58:14 MR. FINDLAY: Okay. Thank you, ma'am.
10:58:15 Ms. Fuquay, did I say that again correctly?
10:58:24 PROSPECTIVE JUROR: Yes.
10:58:25 MR. FINDLAY: In your questionnaire, you mentioned that your daughter is a lawyer?
10:58:29 PROSPECTIVE JUROR: Yes.
10:58:30 MR. FINDLAY: And where does she work?
10:58:31 PROSPECTIVE JUROR: In Tyler.
10:58:32 MR. FINDLAY: I was wondering because you said Parker law firm. There are -- does she work for Chad Parker or Todd Parker?
10:58:39 PROSPECTIVE JUROR: Todd.
10:58:40 MR. FINDLAY: Todd. Okay. I know -- Todd and I are neighbors.
10:58:42 Does the fact that she works for Todd Parker affect your --
10:58:46 PROSPECTIVE JUROR: No.
10:58:46 MR. FINDLAY: -- you know, make one person start ahead or behind in this case?
10:58:50 PROSPECTIVE JUROR: No, not at all.
10:58:51 MR. FINDLAY: Okay. Thank you, ma'am.
10:58:53 Some -- we've got a couple minutes left. Some

10:59:05 inventions are physical products. Some patents cover
10:59:08 things like a physical product. The best example might be
10:59:11 Thomas Edison's light bulb. We all remember that.
10:59:11 Mr. Everitt was telling us about his friend that
10:59:15 sold a patent, and it sounded to me like that was more of a
10:59:17 method or process patent. He came up with an invention
10:59:20 that the government said that's new, that's novel, and they
10:59:23 gave him a patent on it, but it was more of a process.
10:59:26 That's the kind of patent that this is, too. It's
10:59:29 not a physical product you can hold in your hands, but it's
10:59:32 this process or method that, it's our position, was new and
10:59:36 novel that allowed you to seamlessly transfer a call from
10:59:40 one signal to another.
10:59:41 Does anybody think, you know what, a patent should
10:59:43 only be on a product, not a process? Does anybody have any
10:59:47 concerns about that?
10:59:47 Folks, I think that Judge is going to tell me I'm
10:59:52 done in a second here. Last question is, is there anything
10:59:57 anybody is thinking of there that I wish he would have
11:00:00 asked me this question, there's something they would really
11:00:03 like to know about me or my beliefs or my experiences?
11:00:06 Anybody have anything like that they would like to share?
11:00:09 No. Ladies and gentlemen thank you so much again
11:00:14 for your time. It's an unconditional thank you. Whatever
11:00:18 happens in this case, we appreciate you being here. We

11:00:19 look forward to presenting this case to the eight of you
11:00:22 that are selected.

11:00:22 Your Honor, thank you very much.

11:00:24 THE COURT: Thank you, Mr. Findlay.

11:00:25 At this time, the Defendant may voir dire the
11:00:29 jury.

11:00:34 MR. DACUS: Thank you, Your Honor.

11:00:35 Your Honor, would you let me know when I have five
11:00:37 minutes remaining?

11:00:38 THE COURT: I sure will, yes.

11:00:40 MR. DACUS: Thank you so much.

11:00:40 Good morning. As I said earlier, I'm Deron Dacus.
11:00:52 And it's really my privilege to represent Verizon in this
11:00:55 case. I want to start by saying on behalf of Mr. Faber and
11:00:59 all the men and women who work at Verizon, a very sincere
11:01:03 thank you. It's not lost on us at all. You got jobs to be
11:01:07 at, kids to tend to, a thousand things to do. And what I
11:01:12 know they want me to say to you is we would not be here if
11:01:16 this case was not important. It is. It's very important
11:01:19 to Verizon as a business. And we wouldn't have you here if
11:01:25 it wasn't.

11:01:25 This is not the time for me to talk about the
11:01:30 evidence in the case, but the judge allows us to say just a
11:01:34 couple of things in just a couple of minutes, so I want to
11:01:38 do that, basically to kind of set the record straight.

11:01:41 Verizon is here because it does not and has not
11:01:46 ever used this '54 patent that the lawyer held up and
11:01:52 showed to you.
11:01:52 And I heard him say that perhaps we would tell you
11:01:58 that we owe them only a few million dollars. It'll be very
11:02:03 clear from us that we don't owe them anything because we
11:02:06 have never used this patent.
11:02:09 I think the evidence will be clear to you that
11:02:11 when this Wi-Fi Calling that Verizon has was designed, it
11:02:17 was designed solely in-house by Verizon without any
11:02:21 knowledge of this '554 patent. And the way it was
11:02:25 designed, as Mr. Faber will describe to you, in fact, is in
11:02:30 a way that makes this '554 patent basically irrelevant, or
11:02:35 certainly not useful to the way that Verizon has set up its
11:02:39 system.
11:02:39 Now, Aspen has the burden of proof. They brought
11:02:43 this lawsuit. They sort of picked the fight, so to speak.
11:02:46 They have the burden of proof to show you that there is
11:02:50 infringement. But what I'll tell you upfront, and then
11:02:52 I'll be quiet about the evidence, is we'll show you that we
11:02:55 don't use this thing, and we'll show you why. I think if
11:02:59 you sit on this jury, it'll be clear at the end of five
11:03:03 days why we don't use it.
11:03:05 The purpose of this 30 minutes is for me to hear
11:03:09 from you. So that's what I want to do. To be fair, since

11:03:13 everyone sort of introduced themselves, I probably should
11:03:15 do so likewise so that you know who's asking you questions.
11:03:19 I wish I could tell you that the story I'm about
11:03:22 to tell is interesting enough that somebody is going to
11:03:24 write a book or make a movie about it. They're not. I
11:03:28 grew up in Gilmer, like some of y'all. Graduated from
11:03:32 Gilmer High School. Was fortunate enough to get a baseball
11:03:35 scholarship and go to Texas A&M. Was fortunate enough to
11:03:38 get a degree.
11:03:39 Then went to law school at Baylor where I met my
11:03:43 wife who was also a law student to whom I've now been
11:03:46 married for 31 years. We have two kids, 28-year-old,
11:03:50 25-year-old. They're out in the world making their way.
11:03:53 Neither have a significant other, neither are married, so I
11:03:56 don't have any grandkids. So I'm always very jealous when
11:03:59 I hear people stand up and smile and say what do you do
11:04:02 with your time? I spend it with my grandkids. I'm ready
11:04:05 to say that. And I tell my kids all the time, and they
11:04:09 just kind of shuffle away.
11:04:10 But that's who I am, and that -- that's who's
11:04:16 talking to you when I'm asking you questions.
11:04:18 Here's where I want to start today, and I'll tell
11:04:21 you that what the judge said is I'm not going to pry into
11:04:25 your personal business. So when I ask you this question,
11:04:27 if you think, oh, man, what's this guy about to ask me.

11:04:31 I'm not going to ask you any details. But here's what I
11:04:34 want to know, and I get a lot of hands on this generally.
11:04:36 Who here, just in your everyday life, not in a courtroom,
11:04:40 not in a legal setting, has been falsely accused of doing
11:04:44 something? Just in your everyday life. Lots of folks,
11:04:48 right?
11:04:48 Let me -- let me ask you, Ms. Mitchell, if I
11:04:56 could. That's No. 2. Remember I said I'm not going to ask
11:05:02 you any details. I think the judge will probably want you
11:05:06 to stand up.
11:05:07 PROSPECTIVE JUROR: I'm sorry.
11:05:07 THE COURT: Thank you.
11:05:08 MR. DACUS: So how did that make you feel,
11:05:11 Ms. Mitchell, when you got falsely accused?
11:05:12 PROSPECTIVE JUROR: Well, at first, you have to,
11:05:15 you know, consider the source. Especially if it's someone
11:05:17 who knows me, and you should know my character. But if
11:05:20 it's someone who doesn't know me and they've accused me of
11:05:24 something, then go on with whatever you're thinking.
11:05:27 MR. DACUS: Have you ever had that experience that
11:05:30 it's real easy for somebody to just point the finger at you
11:05:32 and accuse you of something --
11:05:32 PROSPECTIVE JUROR: Yeah, because it's normally
11:05:33 projection on them, but --
11:05:35 MR. DACUS: Right. And is your experience that

11:05:39 it's kind of difficult to get people to, after you've been
11:05:43 accused, it's difficult to get folks to take the time and
11:05:45 sit down and listen to your side of the story.
11:05:47 PROSPECTIVE JUROR: Yeah.
11:05:48 MR. DACUS: Have you had that experience?
11:05:49 PROSPECTIVE JUROR: Oh, yeah. You just don't
11:05:51 explain.
11:05:51 MR. DACUS: Right.
11:05:53 PROSPECTIVE JUROR: Yeah.
11:05:54 MR. DACUS: But we're going to explain. So here's
11:05:58 what I want to know from you. Did you feel like you had
11:06:00 the right to defend yourself?
11:06:02 PROSPECTIVE JUROR: Yeah, but I didn't need to
11:06:04 because I know I wasn't wrong.
11:06:05 MR. DACUS: But you had the right to, right?
11:06:07 PROSPECTIVE JUROR: Right. Right.
11:06:09 MR. DACUS: You understand the situation here is
11:06:11 these folks sitting at this table, they filed this lawsuit.
11:06:15 And as you'll learn, we knew nothing about this patent.
11:06:19 They didn't talk to us about it before, they just filed the
11:06:22 lawsuit. You agree we have the right to defend ourselves?
11:06:25 PROSPECTIVE JUROR: Of course.
11:06:26 MR. DACUS: Okay. Do you understand, and I'm
11:06:30 asking do you understand, anybody can file a lawsuit.
11:06:33 There's no requirement, right?

11:06:34 PROSPECTIVE JUROR: Right, correct.
11:06:35 MR. DACUS: Anybody can ask for whatever amount of
11:06:38 money they want. We don't have any control over that.
11:06:41 PROSPECTIVE JUROR: Uh-huh.
11:06:42 MR. DACUS: Do you fault us in any way --
11:06:43 PROSPECTIVE JUROR: No.
11:06:44 MR. DACUS: -- for coming to the courthouse and
11:06:46 taking the time to defend ourselves?
11:06:48 PROSPECTIVE JUROR: No, especially if you're not
11:06:50 using it, no.
11:06:51 MR. DACUS: Okay. All right. That's what I need
11:06:52 to know. Thank you very much, ma'am.
11:06:55 PROSPECTIVE JUROR: No problem.
11:06:56 MR. DACUS: So that's my question to everybody,
11:06:58 generally. If you're sitting there and you're saying, man,
11:07:03 I don't know, Verizon come in here, taking the time, taking
11:07:05 up my time to defend themselves. Does anybody have an
11:07:10 issue with that at all?
11:07:11 Okay. Who raised their hand and said they'd been
11:07:15 falsely accused? More people did.
11:07:17 Juror No. 9, Ms. Lindley. Can I ask her?
11:07:24 Have you had that same experience, Ms. Lindley,
11:07:26 where it's real easy for folks to point their finger at you
11:07:30 but, I mean, it's real hard to get people to take the time
11:07:33 to listen to you.

11:07:35 PROSPECTIVE JUROR: Yes, I have.
11:07:36 MR. DACUS: And you understand that's the position that Verizon is in here. We need eight folks who will sit, listen to the evidence, and make a decision. You fault us in any way for defending ourselves?
11:07:46 PROSPECTIVE JUROR: No, sir.
11:07:47 MR. DACUS: Okay. Did you defend yourself?
11:07:50 PROSPECTIVE JUROR: Yes, sir.
11:07:51 MR. DACUS: Okay. Thank you very much, ma'am.
11:07:55 Let me ask one other question, and I hope they're all important, but I think this one is real important.
11:08:03 So what can happen in these kinds of lawsuits, and I don't know if it will here or not, but there's some indication that it might, is no surprise to anyone, Verizon is a pretty big company. We got lots of folks, right? Aspen, as you'll hear, they're not a big company.
11:08:22 So what can happen in these things is lawyers on the Aspen side can sort of put up this David and Goliath type of case. So my question to you is, as you sit there just knowing who you are, do you think you're the kind of person that might lean towards the smaller company as opposed to the big company, even a little bit? Is anybody in that camp at all?
11:08:55 Okay. Let me -- let me ask Ms. Reece. I don't think we've heard from you. That's Juror No. 15. Good

11:09:15 morning, Ms. Reece.
11:09:16 PROSPECTIVE JUROR: Good morning.
11:09:18 MR. DACUS: You understand the situation here,
11:09:21 right?
11:09:22 PROSPECTIVE JUROR: Yes.
11:09:22 MR. DACUS: Is it a surprise to you that Verizon
11:09:24 is a fairly big company?
11:09:26 PROSPECTIVE JUROR: No.
11:09:27 MR. DACUS: And I assume you don't know anything
11:09:30 about Aspen?
11:09:31 PROSPECTIVE JUROR: Yeah, I've never heard of it,
11:09:33 no.
11:09:33 MR. DACUS: So are you telling me that if you sit
11:09:35 on this jury, you'll just judge it based on the facts, not
11:09:39 based on who's big or who's small, you'll agree to do that.
11:09:43 PROSPECTIVE JUROR: Yes, sir.
11:09:44 MR. DACUS: Okay. I want to ask you one thing
11:09:46 while I have you standing up, Ms. Reece. You put on your
11:09:50 survey that you are tech savvy. Do you remember checking
11:09:53 that?
11:09:53 PROSPECTIVE JUROR: Yes.
11:09:54 MR. DACUS: Can you tell me about that?
11:09:57 PROSPECTIVE JUROR: My mom works with computers
11:09:57 and stuff like that. I worked at a bank for a little bit.
11:09:59 So kind of the same thing she said. I'm good with my

11:10:02 phone, I guess.
11:10:03 MR. DACUS: I see. So as part of your work at the
11:10:05 bank, you used computers?
11:10:07 PROSPECTIVE JUROR: Yes.
11:10:08 MR. DACUS: And like most people who don't have as
11:10:10 much gray hair as I am, you're pretty good with these
11:10:14 phones?
11:10:18 PROSPECTIVE JUROR: Yes, sir.
11:10:19 MR. DACUS: All right. Thank you, ma'am.
11:10:20 I just want to be, as I said, I think this
11:10:23 question is important. I mean, the goal here is to get
11:10:26 eight people who sit in a jury box, listen to the evidence,
11:10:26 and just make a call on the evidence, not based on who's
11:10:30 big, who's small, or anything other than the evidence.
11:10:34 Anybody say, you know, I kind of lean towards the underdog
11:10:37 even just a little bit?
11:10:40 There we go. I knew I'd finally get a hand.
11:10:46 Ms. Cadenhead, tell me about that.
11:10:48 PROSPECTIVE JUROR: I've just, I've always been
11:10:50 the underdog, so I kind of feel like I lean towards it.
11:10:55 MR. DACUS: Yep.
11:10:56 PROSPECTIVE JUROR: I don't want to lie about it,
11:10:57 so --
11:10:58 MR. DACUS: No, ma'am. And that's what we're
11:10:59 asking, right? We all come here with whatever our human

11:11:02 experiences are, right? Our backgrounds. So that's what
11:11:05 we're trying to find out.
11:11:06 And so the real question is there's nothing wrong
11:11:09 with having that background or even having that feeling.
11:11:14 The question is are you going to be fair and impartial if
11:11:18 you sit on this jury?
11:11:19 PROSPECTIVE JUROR: Yes. I'm going to look at the
11:11:21 evidence.
11:11:21 MR. DACUS: Okay. Now, your sister-in-law worked
11:11:23 for the other lawyer. Did you see me puckering up over
11:11:28 there?
11:11:28 PROSPECTIVE JUROR: I didn't look. I didn't
11:11:34 evenly know who she worked for whenever she worked for him.
11:11:37 That's all I can tell you.
11:11:39 MR. DACUS: So in these trials I need to go home
11:11:42 and try to sleep at night. Are you telling me that I can
11:11:45 go home and sleep soundly even knowing that your
11:11:48 sister-in-law worked for Mr. Findlay?
11:11:52 PROSPECTIVE JUROR: Yes, sir.
11:11:52 MR. DACUS: Okay. I appreciate very much you
11:11:54 being candid with us. Thank you.
11:11:56 PROSPECTIVE JUROR: Yes, sir.
11:12:05 MR. DACUS: Let me -- Ms. Dinan, No. 1, Juror No.
11:12:08 1. Am I pronouncing that correctly, ma'am?
11:12:11 PROSPECTIVE JUROR: Dinan.

11:12:12 MR. DACUS: Ms. Dinan. Thank you so much. I will not make that mistake again. Ms. Dinan, I was actually listening very closely to when y'all gave your answers, and I thought I heard you say you had five kids.

11:12:21 PROSPECTIVE JUROR: I do.

11:12:22 MR. DACUS: Five kids. Now, do those kids, do they ever get in little squabbles? I won't call it fights, but --

11:12:29 PROSPECTIVE JUROR: Daily.

11:12:32 MR. DACUS: Daily. That's how my house was, so that's what I want to know.

11:12:36 Now, here's my questions to you. When those kids get caught having a little fight or a little squabble, have you ever noticed that those kids run directly, as fast as they can, to mom to try to tell their story first?

11:12:47 PROSPECTIVE JUROR: Yeah, sure.

11:12:49 MR. DACUS: Because I don't know what it is, but something in us says, man, I need to get my story out first --

11:12:56 PROSPECTIVE JUROR: Sure.

11:12:57 MR. DACUS: -- as if somebody is going to believe us because we tell it first, right? Now, my guess is you're a really good mother.

11:13:04 PROSPECTIVE JUROR: Thank you.

11:13:05 MR. DACUS: Are you?

11:13:05 PROSPECTIVE JUROR: I am.
11:13:05 MR. DACUS: So when that first kid runs to you and tells you his story, do you just accept it as gospel and believe it?
11:13:09 PROSPECTIVE JUROR: No.
11:13:10 MR. DACUS: What do you do?
11:13:11 PROSPECTIVE JUROR: We actually have a rule in our house that we don't talk one-on-one. So if two children are squabbling, they both have to come to me, and we have to discuss it in a group of three.
11:13:20 MR. DACUS: You get both sides of the story?
11:13:22 PROSPECTIVE JUROR: Absolutely.
11:13:23 MR. DACUS: Do you know why I'm asking you these silly questions?
11:13:25 PROSPECTIVE JUROR: Because you would like me to get both sides of the story.
11:13:29 MR. DACUS: And you know what happens in these lawsuits? These people filed this lawsuit.
11:13:31 PROSPECTIVE JUROR: Right.
11:13:33 MR. DACUS: They picked this fight. They get to go first because of it. I don't get to set the rules.
11:13:38 So as they said, they'll start talking on Monday, they'll put up witnesses Monday and Tuesday. I'll probably have to sit there until Wednesday before I finally get to put Mr. Faber on to say how this thing actually works.

11:13:51 So my question to you, and I'm being a little funny about this, but it's actually very serious. Will you agree, just like you do being a good mother, to hear both sides of the story before you make a decision?

11:14:02 PROSPECTIVE JUROR: Of course.

11:14:04 MR. DACUS: Okay. That's what I need to know. Thank you, ma'am.

11:14:06 And so that's the question to everyone. Does anyone? Let me know. Does anyone think you'd have a problem listening to both sides of the evidence before you make a decision, because they're going to get to go for a while, two days, before we ever get to put on the first witness. Anybody have a problem waiting to make a decision?

11:14:27 Okay. Great. Thank you.

11:14:29 Let me talk to you a little bit about Verizon. I think everybody in their questionnaire said you certainly know who Verizon is. That's confirmed this morning. Mr. Findlay asked you some questions about Verizon. And I agree with him, there are lots of folks that said they loved Verizon service, loved Verizon, and then there's a few people who said maybe not so much.

11:14:55 Verizon serves millions of people. It comes as no shock and no surprise to anybody here, when you serve millions of people, you do not make them all happy. So

that's what I need to know, and that's what Verizon needs to know. Is there somebody sitting out there who said, you know what, I had a negative or a poor experience with either Verizon's service or dealing with their people. Is anybody in that camp? And please be honest.

Okay. Yes, sir. Mr. Ybanez, did I pronounce that correctly, sir?

PROSPECTIVE JUROR: Yes, you did.

MR. DACUS: Thank you.

PROSPECTIVE JUROR: A problem with the company itself? Probably not. It was probably just a bad customer service representative I had several years ago.

MR. DACUS: Okay. So you called up Verizon customer service?

PROSPECTIVE JUROR: Yeah, and they were just not very nice.

MR. DACUS: Okay. Well --

PROSPECTIVE JUROR: But the company itself, probably not, no.

MR. DACUS: And you know what my next question is, is that experience going to, in any way, make you lean towards the Plaintiff because you had that one negative experience with customer service?

PROSPECTIVE JUROR: No, and it was years ago anyway, so...

11:16:10 MR. DACUS: Okay. If you sit on this jury, you'll listen to the evidence, and you'll just make a call based on the evidence you hear in this courtroom; is that fair?

11:16:19 PROSPECTIVE JUROR: Absolutely, yes.

11:16:20 MR. DACUS: While I have you up, Mr. Ybanez, I got a couple of other questions for you. You said you're a singer and song writer.

11:16:27 PROSPECTIVE JUROR: Yes, sir.

11:16:27 MR. DACUS: What kind of music do you write?

11:16:30 PROSPECTIVE JUROR: Mostly like rock or country. I'm all over the map. Christian.

11:16:35 MR. DACUS: All right.

11:16:36 PROSPECTIVE JUROR: I've been a singer and song writer probably 30 years now, 35 years.

11:16:41 MR. DACUS: So here's my question. In that realm, a lot of people, well, I don't know if a lot of people, but some people have their stuff copyrighted.

11:16:48 PROSPECTIVE JUROR: Uh-huh.

11:16:48 MR. DACUS: Are you familiar with copyrights?

11:16:50 PROSPECTIVE JUROR: Yes.

11:16:51 MR. DACUS: Have you ever had your songs or anything copyrighted?

11:16:56 PROSPECTIVE JUROR: Yes. I have a song that's copywritten and I've got a couple more that I want to do also.

11:16:57 MR. DACUS: Okay. So here's my question to you. 11:16:59 Copyright is a sort of a type of intellectual property. 11:17:04 It's not sort of, it is a type of intellectual property 11:17:05 similar to a patent. You understand that? Does the fact 11:17:09 that you've been involved and actually have a copyright, 11:17:12 does that make you favor or lean towards the Plaintiff in 11:17:16 this case who has a patent in any way?

11:17:18 PROSPECTIVE JUROR: No, because, I mean, they may 11:17:22 be similar, but in my mind, they're really not. But, you 11:17:26 know, after watching the video, I found out that they're 11:17:28 probably more similar than I thought they were.

11:17:31 MR. DACUS: Right.

11:17:32 PROSPECTIVE JUROR: But, you know, it's -- it 11:17:34 seems like it's two different things because I thought a 11:17:36 patent was like a physical, you know, you invent something 11:17:39 that is an engine or something like that and an idea was 11:17:43 more of a copyright thing. I didn't know that a patent 11:17:46 could be an idea also. So I actually learned that today.

11:17:49 MR. DACUS: Regardless of how we define copyright 11:17:52 and patent, you're going to sit on this jury and make a 11:17:56 decision based on the evidence and facts that you hear 11:17:59 here, is that fine?

11:18:01 PROSPECTIVE JUROR: Uh-huh, yes.

11:18:02 MR. DACUS: Okay. Thank you, sir.

11:18:03 I've got some help over here.

11:18:14 Ms. Grosso, did you raise your hand?
11:18:17 PROSPECTIVE JUROR: Yes, sir.
11:18:18 MR. DACUS: Ma'am?
11:18:19 PROSPECTIVE JUROR: Yes.
11:18:21 MR. DACUS: You did. Okay.
11:18:22 PROSPECTIVE JUROR: Yes.
11:18:22 THE COURT: Can you stand up, Ms. Grosso?
11:18:24 MR. DACUS: Ms. Grosso, were you raising your hand to say that you had a negative experience with Verizon?
11:18:30 PROSPECTIVE JUROR: Yes, sir.
11:18:31 MR. DACUS: Do you want to tell me about that?
11:18:33 PROSPECTIVE JUROR: It was just customer service.
11:18:35 MR. DACUS: Okay. And is there anything about that experience if you wind up as one of the eight jurors on this case that would make you lean towards the Plaintiff in any way?
11:18:43 PROSPECTIVE JUROR: No, sir.
11:18:44 MR. DACUS: You're telling me you'll set that aside, you'll make a decision based on what you hear in this courtroom?
11:18:50 PROSPECTIVE JUROR: Yes, sir.
11:18:50 MR. DACUS: Okay. Thank you very much, ma'am.
11:18:53 PROSPECTIVE JUROR: You're welcome.
11:18:54 MR. DACUS: Just to cover the waterfront, to make sure nobody else has any experience with Verizon that we

11:19:01 need to talk about, right?
11:19:04 Okay. Some of you raised your hand, and I want to
11:19:10 make sure we talk more about this, that you think -- you
11:19:12 believe you have actually used Wi-Fi Calling. Who raised
11:19:16 their hand to say they think they've used Wi-Fi Calling?
11:19:21 Let me make a note here. 1, 4, 6, 11. Anybody else?
11:19:31 Anybody on that first row? 16 and 17.
11:19:39 And I'll tell you what, I'm going to stop there
11:19:41 with 17. In part, here's why. As Mr. Findlay said, if
11:19:46 you're past 18, you're probably fairly safe. You're
11:19:51 probably in good shape. I don't know if that upsets you or
11:19:54 makes you happy, but it's just a fact. And what I want to
11:19:58 do here is be efficient with people's time.
11:20:01 Yes, ma'am?
11:20:03 PROSPECTIVE JUROR: What is --
11:20:04 MR. DACUS: Wi-Fi Calling?
11:20:05 THE COURT: Ms. Dorgan, could you wait for the
11:20:08 microphone? I think maybe she's just asking for a
11:20:11 definition.
11:20:11 MR. DACUS: Yes.
11:20:13 PROSPECTIVE JUROR: I was just asking if you would
11:20:15 just explain what it -- what the Voice over Wi-Fi Calling
11:20:18 is.
11:20:19 MR. DACUS: Yes, ma'am. And that's exactly where
11:20:20 I was going actually --

11:20:21 PROSPECTIVE JUROR: Okay.
11:20:22 MR. DACUS: -- is because some people think
11:20:24 they're making a Wi-Fi call when they're really not. And
11:20:27 now is not the time to give a full explanation, but this
11:20:30 Wi-Fi Calling is when you're actually speaking by voice,
11:20:32 and you're doing it over the Wi-Fi network rather than over
11:20:35 a cellular network. Okay.
11:20:39 And so everybody who raised their hand, I assume
11:20:42 has actually done that.
11:20:44 Let's see, let me -- No. 11, Mr. Sandefur, let me
11:20:51 ask him about that.
11:20:54 So, Mr. Sandefur, you've actually had
11:20:57 conversations over Wi-Fi?
11:21:00 PROSPECTIVE JUROR: Yes, sir. The office building
11:21:02 I work in has absolutely no reception, and only way I can
11:21:05 do it is through the Wi-Fi.
11:21:07 MR. DACUS: Through the Wi-Fi. All right.
11:21:11 That's -- so I guess my question is what kind of phone do
11:21:17 you have?
11:21:17 PROSPECTIVE JUROR: I have a Galaxy.
11:21:21 MR. DACUS: Okay. And did you -- did you notice
11:21:22 in that Galaxy that -- did you actually have to go into
11:21:25 that phone and turn Wi-Fi Calling on in the phone?
11:21:29 PROSPECTIVE JUROR: Yes, sir, I did.
11:21:30 MR. DACUS: In other words, when you buy the

11:21:32 phone, did you notice that it was off by default?

11:21:34 PROSPECTIVE JUROR: Yes, sir. I figured that out
11:21:36 my first day.

11:21:37 MR. DACUS: Okay. And that's what you'll hear in
11:21:39 the course of evidence here, that Wi-Fi Calling in a
11:21:43 Verizon phone is actually off by default when you get the
11:21:46 phone.

11:21:46 What did you have to do to go and turn it on?

11:21:50 PROSPECTIVE JUROR: My brother actually told me
11:21:52 about it, and I just went into settings and searched the
11:21:55 Wi-Fi Calling and just click on.

11:21:58 MR. DACUS: Okay. Do you know whether or not that
11:22:01 phone would actually switch back and forth between Wi-Fi
11:22:06 Calling and cellular, depending on which signal was
11:22:09 stronger?

11:22:10 PROSPECTIVE JUROR: I'm honestly not sure.

11:22:13 MR. DACUS: Understood. Understood. I wouldn't
11:22:15 expect you to, but I just wanted to make sure.

11:22:17 Who else had their hand up? Let's see, you might
11:22:21 hand it to Juror No. 11. Oh, that's you.

11:22:24 No. 10, Ms. Preuninger. Ms. Preuninger, you've
11:22:29 used Wi-Fi Calling?

11:22:31 PROSPECTIVE JUROR: Yes.

11:22:31 MR. DACUS: And what kind of phone do you have,
11:22:33 ma'am?

11:22:33 PROSPECTIVE JUROR: I have an iPhone.
11:22:35 MR. DACUS: Okay. So Apple phone. And who is
11:22:37 your provider? Do you know?
11:22:40 PROSPECTIVE JUROR: AT&T.
11:22:41 MR. DACUS: AT&T. And do you remember that in
11:22:43 that iPhone where AT&T is the provider, that you actually
11:22:47 have to go in there and turn the Wi-Fi Calling on?
11:22:51 PROSPECTIVE JUROR: Yes.
11:22:51 MR. DACUS: Okay. And so you took the time to do
11:22:53 that?
11:22:53 PROSPECTIVE JUROR: Yeah. I live in Gladewater,
11:22:56 and the neighborhood that I live in has no service, so we
11:22:59 have to use Wi-Fi.
11:23:00 MR. DACUS: Okay. So AT&T has no service in the
11:23:03 Gladewater --
11:23:04 PROSPECTIVE JUROR: Not on North Street, no.
11:23:07 MR. DACUS: Well, Verizon might.
11:23:08 PROSPECTIVE JUROR: We had Verizon first. Still
11:23:11 didn't have any luck, and then switched to AT&T. Still
11:23:15 don't have any luck, so we were just, we're like, we'll
11:23:18 just use the Wi-Fi.
11:23:19 MR. DACUS: Okay. I got it. Thank you, ma'am.
11:23:20 PROSPECTIVE JUROR: You're welcome.
11:23:22 MR. DACUS: Here's a related question but somewhat
11:23:28 different. What you'll hear about is this invention, this

11:23:34 patent relates to something called Voice over IP, okay?
11:23:42 Not necessarily Wi-Fi Calling. We'll talk about that in
11:23:45 more detail. Voice over IP, some folks use in their
11:23:51 office. That's a common use or has become a more common
11:23:55 use of Voice over IP. Does anyone know if they actually
11:23:59 use -- and when I say Voice over IP, that means you're
11:24:01 getting your voice over the Internet on your phone as
11:24:05 opposed to over what I'll just call the old-fashioned
11:24:09 telephone lines? Does anybody know if they use Voice over
11:24:12 IP at their office? You potentially could use it at your
11:24:15 house, too. But does anybody use it in their office?
11:24:18 Ms. Nunn. Ms. Coats.
11:24:22 Anybody else?
11:24:23 Mr. Sandefur.
11:24:24 Okay. Can we -- I talk with No. 18, Ms. Coats,
11:24:30 please?
11:24:31 You use Voice over IP at your office, ma'am?
11:24:36 PROSPECTIVE JUROR: Yes, sir. We have a company
11:24:37 called RingCentral --
11:24:37 MR. DACUS: Okay.
11:24:39 PROSPECTIVE JUROR: -- and it's completely through
11:24:40 the computer system, and that's how we receive our calls
11:24:45 and make calls and faxes and texting.
11:24:48 MR. DACUS: Yeah. So when you say you have a
11:24:50 company called Ring -- you use RingCentral's services?

PROSPECTIVE JUROR: Through our computer system, yes, sir.

MR. DACUS: Got it.

PROSPECTIVE JUROR: Through our Wi-Fi service. We don't have a land line. It's all through the computer system over Wi-Fi.

MR. DACUS: Perfect. That's what I need to know, ma'am. Thank you.

PROSPECTIVE JUROR: Internet.

MR. DACUS: Anybody in the jury panel ever started a small business that was not successful? Anybody?

THE COURT: Ms. Grosso.

MR. DACUS: Ms. Grosso, may I ask you a question about that? That's No. 13.

PROSPECTIVE JUROR: Yes, sir.

MR. DACUS: You started a small business?

PROSPECTIVE JUROR: My husband and I.

MR. DACUS: Okay. What kind of business?

PROSPECTIVE JUROR: It was a meat market.

MR. DACUS: Meat market. In --

PROSPECTIVE JUROR: Winnsboro.

MR. DACUS: Winnsboro. Okay. Right down the road from Gilmer.

And you said it ultimately was not successful?

PROSPECTIVE JUROR: No, sir.

11:25:40 MR. DACUS: Okay. So if you sit on this jury, some of the things you'll hear, one of the things you'll hear, I think, is you'll hear a little about Aspen and its history. When your meat market wasn't successful, do you think you know why it was not?

PROSPECTIVE JUROR: No.

MR. DACUS: Okay. Did you blame others because it wasn't successful?

PROSPECTIVE JUROR: No, sir.

MR. DACUS: Did you just take responsibility for yourself and say we tried?

PROSPECTIVE JUROR: Yes, sir.

MR. DACUS: We all respect people who try to start businesses, and it just didn't work out. Is that what you did?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: Mr. Dacus, you have five minutes remaining.

MR. DACUS: Thank you, Your Honor.

You agree or do you not agree, Ms. Grosso, we sort of live in this environment, in this society where folks are really quick to try things and then when they don't work to point the finger at someone else and blame them. Do you agree with that or not?

PROSPECTIVE JUROR: Yes, sir.

11:26:38 MR. DACUS: I kind of put that in the personal responsibility versus the blame game category, do you agree?

11:26:44 PROSPECTIVE JUROR: I agree.

11:26:45 MR. DACUS: So in your personal circumstance, you said look, we did our best. We tried to put this business together. Ultimately it wasn't successful, but it's nobody's fault; is that fair?

11:26:56 PROSPECTIVE JUROR: That's fair.

11:26:57 MR. DACUS: Is that sort of your general philosophy that we ought to take personal responsibility for our own actions?

11:26:59 PROSPECTIVE JUROR: Yes, sir.

11:27:00 MR. DACUS: All right. Thank you, Ms. Grosso.

11:27:03 PROSPECTIVE JUROR: You're very welcome.

11:27:05 MR. DACUS: Who here knew before today that a jury makes the ultimate determination on whether or not a patent is valid? Anybody know that before today? Good. I didn't either before I became a patent lawyer many years ago.

11:27:26 But you saw that in the video. So let me ask you Juror No. 14, that's Ms. Smith. So Ms. Smith, did you see in that video this morning that the ultimate determination on the validity of a patent is made by a jury? Did you see that or hear that?

11:27:42 PROSPECTIVE JUROR: Yes.

MR. DACUS: Okay. And that determination is made even though the Patent and Trademark Office has initially issued this patent, do you understand that?

PROSPECTIVE JUROR: I do.

MR. DACUS: Okay. So my question to you is would you have any problem if we proved to you that this patent actually was not new, that someone had this beforehand, had this idea and this solution. Would you have any problem in invalidating the patent that the Patent Office issued?

PROSPECTIVE JUROR: No.

MR. DACUS: Okay. Whatever law the judge gives you, you'd follow that law?

PROSPECTIVE JUROR: I'll follow the law.

MR. DACUS: Okay. While I have you up, I'm going to ask you one more question. In that questionnaire, do you remember that question about how do you feel about jury damage awards?

PROSPECTIVE JUROR: Yeah.

MR. DACUS: The amount of money? In your questionnaire, you checked that you think they've been too small. Do you remember that? The question was, do you think they've been too big, do you think they're reasonable, or do you think they are too small? And in your questionnaire, you checked too small. Do you remember doing that?

11:28:45 PROSPECTIVE JUROR: Well, I can't really remember. 11:28:48 But if I did, I checked it.

11:28:50 MR. DACUS: Let me do a better job of asking the 11:28:53 question. Do you think that jury verdicts have been too 11:28:56 small, in other words, the amount of money awarded should 11:28:59 have been larger?

11:28:59 PROSPECTIVE JUROR: Yes.

11:29:00 MR. DACUS: You do.

11:29:01 PROSPECTIVE JUROR: I do.

11:29:02 MR. DACUS: Okay. That's what I need to know. I 11:29:05 mean, no surprise why I'm asking you that, right? These 11:29:07 folks say they want $250 million or whatever they're going 11:29:12 to ask for. So if you sit on this jury, will you just 11:29:17 listen to the evidence and make a determination, if you 11:29:19 even get that far, as to what a reasonable amount of money 11:29:22 would be?

11:29:22 PROSPECTIVE JUROR: I would.

11:29:23 MR. DACUS: Okay. That's what I needed to know. 11:29:26 Thank you, ma'am.

11:29:26 So here's the -- the question that I need to know 11:29:29 from everybody. The evidence in this case, we think, is 11:29:33 going to show that this patent idea that these folks had, 11:29:38 somebody actually had it before them. And as you heard 11:29:40 from the video, that means the patent is not valid. Is 11:29:44 there anybody here who says, man, I got some reservations

11:29:49 about finding a patent invalid? Anybody at all?
11:29:52 Okay. That's what I need to know.
11:29:55 I will -- I'll wind up here. So like Mr. Findlay,
11:30:00 I've been doing this for a long time and here's what I've
11:30:03 learned, that I'm not smart enough to ask all the questions
11:30:06 that I need to ask. Is there anybody sitting there
11:30:10 thinking you know what, that lawyer probably should have
11:30:13 asked me this. He'd probably want to know this
11:30:16 information, but he just wasn't smart enough to ask me. Is
11:30:20 there anybody sitting there thinking that?
11:30:22 You know while I ask that, I thought of one
11:30:25 question, can you hand that mic to No. 17, Mr. Turner?
11:30:31 Mr. Turner, you said you'd actually served on a
11:30:34 patent jury before, correct, sir?
11:30:37 PROSPECTIVE JUROR: Yes, sir.
11:30:37 MR. DACUS: And I think you said it was a case
11:30:41 against Google, is that right?
11:30:41 PROSPECTIVE JUROR: Yeah, Airsoft (sic) versus
11:30:43 Google.
11:30:43 MR. DACUS: And if I understood you correctly, you
11:30:46 said it settled in the middle of the trial?
11:30:49 PROSPECTIVE JUROR: Yeah.
11:30:49 MR. DACUS: So y'all did not end up rendering a
11:30:52 verdict one way or another?
11:30:54 PROSPECTIVE JUROR: No, sir.

11:30:54 MR. DACUS: Okay. Did you enjoy that experience?
11:30:56 Did you hate that experience? How did you feel about it?
11:30:59 PROSPECTIVE JUROR: Tired.
11:31:01 MR. DACUS: Tired. I understand tired. I promise
11:31:07 you. But why do you say tired just because it was long
11:31:12 days or what?
11:31:13 PROSPECTIVE JUROR: Kept going, everybody on the
11:31:15 jury, we kept going back and forth, and we had -- we kept
11:31:20 asking for, what they call it, when the judge, you have to
11:31:25 ask the judge --
11:31:25 MR. DACUS: Notes, y'all were sending notes back.
11:31:29 PROSPECTIVE JUROR: Kept asking for notes.
11:31:29 MR. DACUS: Okay.
11:31:31 PROSPECTIVE JUROR: So finally, I guess
11:31:34 Judge Gilstrap stepped in and settled it.
11:31:37 MR. DACUS: Okay. All right. Anything about that
11:31:40 experience that would make you lean one way or another in
11:31:43 favor of one of these parties in this case?
11:31:45 PROSPECTIVE JUROR: No, sir.
11:31:46 MR. DACUS: If you sit on this jury, you're going
11:31:48 to listen to the evidence and with a clean slate and make a
11:31:51 decision?
11:31:52 PROSPECTIVE JUROR: Yes, sir, listen and pay
11:31:53 attention.
11:31:53 MR. DACUS: All right. Thank you so much, sir. I

11:31:57 sure appreciate it.

11:31:57 THE COURT: Your time has expired.

11:31:59 MR. DACUS: Thank you, Your Honor.

11:32:00 I just want to say one more word of thanks for the
11:32:03 eight of you who are ultimately selected on this jury. We
11:32:06 very much look forward to the opportunity to present the
11:32:09 evidence to you.

11:32:09 Thank you, Your Honor.

11:32:10 THE COURT: Mr. Findlay?

11:32:13 (Bench conference.)

11:32:23 THE COURT: I got some hardships. Ms. Mitchell,
11:32:29 Mr. Ybanez, Ms. Preuninger, Ms. Grosso, and Ms. Dorgan. So
11:32:36 I'll hold them and ask them, you know, to tell me what
11:32:38 their potential hardship is issue is.

11:32:41 Are there going to be any cause challenges?

11:32:44 MR. FINDLAY: Not from me, Your Honor. There is,
11:32:48 however, I would like to talk with Juror No. 7, Ms. Burger,
11:32:51 at the bench.

11:32:52 THE COURT: Okay.

11:32:53 MR. FINDLAY: And the reason was, it has to do
11:32:56 with a MIL that I didn't want to violate.

11:32:58 THE COURT: That's fine.

11:33:00 MR. FINDLAY: Her cousin works for McKool Smith
versus AT&T --

THE COURT: That's fine.

MR. FINDLAY: -- in a parallel case, so I just wanted to --

THE COURT: That's okay. We'll keep Ms. Burger back.

11:33:07 But no cause challenges for the Plaintiff?

11:33:09 MR. FINDLAY: No, Your Honor.

11:33:09 THE COURT: Any cause challenges for the 11:33:12 Defendant?

11:33:12 MR. DACUS: We would challenge Juror No. 4.

11:33:14 THE COURT: Do you need to talk to her anymore?

11:33:14 MR. DACUS: Please.

11:33:19 THE COURT: You need to talk to her more? She's 11:33:19 been extensively questioned about her relationships. I 11:33:22 can't imagine anything else that needs to be asked.

11:33:22 MR. DACUS: That's --

11:33:22 THE COURT: You can make your challenge, and 11:33:28 I'll -- anything else -- any other cause challenges?

11:33:30 MR. DACUS: No, Your Honor.

11:33:31 THE COURT: Okay. You don't need to talk to 11:33:33 anybody else?

11:33:34 MR. FINDLAY: No, Your Honor.

11:33:34 THE COURT: All right.

11:33:35 (Bench conference concluded.)

11:33:41 THE COURT: Okay. Thank you, ladies and 11:33:45 gentlemen, for your patience and your response to my

11:33:49 questions and the attorneys' questions. There were a
11:33:56 number of you who indicated you had potential hardships,
11:33:59 and I'm going to ask you all to stay in the courtroom.
11:34:02 And those include Ms. Mitchell, I think;
11:34:09 Mr. Ybanez; Ms. Preuninger; Ms. Grosso; and Ms. Dorgan. If
11:34:15 you all would wait for a just few minutes here in the
11:34:18 courtroom.
11:34:18 And, Ms. Burger, if you would stay in the
11:34:22 courtroom, too, as well, the attorneys have some follow-up
11:34:25 questions for you.
11:34:26 We're going to take a real short recess. I'll
11:34:29 need to visit with the panel members who have potential
11:34:35 hardships, and then I'll have to visit with the attorneys
11:34:39 for a few minutes, and then give them a few minutes to
11:34:42 exercise their peremptory challenges. And once all of that
11:34:46 is done, we will go through the process of getting the jury
11:34:52 selected, and the jury will be selected.
11:34:56 Once that occurs, we'll get everyone back in the
11:34:59 courtroom, we'll announce the names of the jurors who are
11:35:03 going to serve in this matter, and everyone else will be
11:35:06 released to go about the rest of their Friday.
11:35:09 All of that is to say if you will be a little more
11:35:13 patient with us for maybe 30 minutes, maybe 45 minutes,
11:35:19 we'll have you back into the courtroom, and all of that
11:35:23 will be resolved. So just be patient with us a little

11:35:28 while longer, and we'll have this -- have this process
11:35:32 completed.
11:35:33 So visit about whatever you want to visit with
11:35:39 anyone else about, get a drink of water, use the restroom.
11:35:45 Don't visit about what you've seen so far or heard so far
11:35:50 about any me or the attorneys. When the jury begins its
11:35:54 deliberations toward the end of next week on this case, it
11:35:57 will base its decision entirely upon the evidence that's
11:36:01 been presented during the course of the trial and the
11:36:04 instructions that I give you about the law that must be
11:36:08 followed during your deliberations. So nothing you've
11:36:13 heard or seen so far should affect that. So please don't
11:36:17 visit with anyone about anything that you've heard so far.
11:36:21 Likewise, don't do any research or independent
11:36:25 investigation into any matter associated with the case, and
11:36:30 don't post anything about your involvement as a -- as a
11:36:35 panel member in this matter.
11:36:36 So with the exception of the six jurors I asked to
11:36:43 wait back here, I'll excuse everyone else for just a few
11:36:47 minutes.
11:36:48 (Venire panel out.)
11:37:19 THE COURT: Okay. Please be seated.
11:37:52 All right. We will start, Ms. Burger, with you.
11:37:59 If you would please stand and take that microphone, one of
11:38:02 the attorneys had an additional question for you.

11:38:04 Did you want to do it up here?
11:38:06 MR. FINDLAY: At the bench if we could, Your
11:38:09 Honor.
11:38:09 THE COURT: Okay. That's fine.
11:38:10 Ms. Burger, if you would, Mr. Savage will escort
11:38:13 you around.
11:38:14 (Bench conference.)
11:38:21 THE COURT: How are you doing?
11:38:23 PROSPECTIVE JUROR: Good.
11:38:23 THE COURT: I want you to come close to this
11:38:25 microphone right here because that's going to record
11:38:27 everything that we say up here.
11:38:29 PROSPECTIVE JUROR: Okay.
11:38:29 THE COURT: Mr. Findlay, you had a question for
11:38:32 Ms. Burger?
11:38:33 MR. FINDLAY: In your questionnaire, you
11:38:34 identified you have a relative, I think it was a-- who
11:38:37 works at McKool Smith.
11:38:39 PROSPECTIVE JUROR: Yes.
11:38:40 MR. FINDLAY: And the reason I'm asking, I don't
11:38:42 want to say too much. The reason I'm asking is because
11:38:45 they represent another party that's kind of in a related
11:38:49 matter. And so is that somebody you talk with a lot?
11:38:52 PROSPECTIVE JUROR: No.
11:38:52 MR. FINDLAY: That you talk about?

11:38:53 PROSPECTIVE JUROR: It's my cousin who just finished law school, and he just started with them.

11:38:59 MR. FINDLAY: Does he know you're here today? Do you know?

11:39:01 PROSPECTIVE JUROR: Well, I did ask him who -- what his title was, but I didn't tell him why I was asking what his title was.

11:39:07 MR. FINDLAY: Does he know you're in jury service -- jury selection today in Marshall?

11:39:11 PROSPECTIVE JUROR: I would have to check the text. I don't remember. I had asked him a week ago. I don't think so.

11:39:15 MR. FINDLAY: No one called you asking about jury service today or anything from McKool or anything like that?

11:39:21 PROSPECTIVE JUROR: No, no, no, no. All he told me is he worked for McKool Smith and he was an associate lawyer, something.

11:39:27 MR. FINDLAY: Okay. And you understand that -- and I don't mean to -- Judge Schroeder has already indicated this, but he's going to instruct you if you're on the jury that, you know, only consider the evidence, you can't talk to anybody.

11:39:39 PROSPECTIVE JUROR: Yeah.

11:39:40 MR. FINDLAY: You would never think of talking to

11:39:42 your cousin since he's a lawyer or anything like that.
11:39:45 PROSPECTIVE JUROR: No, no, no.
11:39:46 MR. FINDLAY: Those are all the questions I have,
11:39:49 Judge, thank you.
11:39:50 THE COURT: Any questions?
11:39:50 MR. DACUS: I don't have any, Your Honor.
11:39:50 THE COURT: Can you tell us just for the record
11:39:51 what your cousin's name is?
11:39:51 PROSPECTIVE JUROR: Parker Blackburn.
11:39:55 THE COURT: Okay. And he just recently graduated
11:39:57 from law school?
11:39:58 PROSPECTIVE JUROR: Yes. I want to say he would
11:39:59 have graduated in the fall --
11:39:59 MR. FINDLAY: 2025.
11:40:03 PROSPECTIVE JUROR: But just passed the bar over
11:40:03 the summer, last summer and started within the last year.
11:40:06 THE COURT: Okay. Good. Thank you.
11:40:07 MR. FINDLAY: Thank you.
11:40:08 PROSPECTIVE JUROR: Yeah, for sure.
11:40:11 THE COURT: You can take your break now.
11:40:17 Just a moment. Any concerns about her?
11:40:20 MR. FINDLAY: No, Your Honor.
11:40:21 THE COURT: Any concerns?
11:40:22 MR. DACUS: No, Your Honor.
11:40:23 THE COURT: Okay.

11:40:23 MR. FINDLAY: Thank you.
11:40:24 THE COURT: Yeah.
11:40:26 (Bench conference concluded.)
11:40:27 THE COURT: Okay. We'll start, Ms. Mitchell, you told us at the top of the morning that you had a potential hardship, and I apologize for making you wait throughout the course of the morning. It's just kind of how we have to do this.
11:40:42 PROSPECTIVE JUROR: I understand.
11:40:43 MR. FINDLAY: Can you tell us --
11:40:44 PROSPECTIVE JUROR: My hardship is just financial. I can't take five days off of work.
11:40:50 THE COURT: Okay. And so you don't get paid when you're not working?
11:40:54 PROSPECTIVE JUROR: That's the nature of it.
11:40:55 THE COURT: Remind me what you do.
11:40:57 PROSPECTIVE JUROR: I'm a vocational nurse.
11:40:59 THE COURT: Okay. And so you're paid when you're on the clock?
11:41:03 PROSPECTIVE JUROR: Correct. And they depend on me to be there to -- for my shift of residents, and if I'm not there, then someone else has to pick up and right now it's a scarcity.
11:41:17 THE COURT: Okay. But to be clear, you don't get paid at all if you're not at work.

11:41:21 PROSPECTIVE JUROR: Correct.
11:41:22 THE COURT: Okay. All right. Good enough. And I can certainly understand under that situation being gone from work five days, including today, could be a significant financial hardship; is that right?
11:41:36 PROSPECTIVE JUROR: Yes, sir.
11:41:39 THE COURT: Okay. Mr. Findlay, do you have any questions for Ms. Mitchell?
11:41:43 MR. FINDLAY: I do not, Your Honor. Thank you.
11:41:45 THE COURT: Mr. Dacus, do you have any questions for her?
11:41:47 MR. DACUS: I do not, Your Honor. Thank you.
11:41:49 THE COURT: Ms. Mitchell, let me visit with the attorneys after we've gone through all of these questions. Go ahead and take your break now. Okay?
11:41:57 PROSPECTIVE JUROR: All right. Thank you.
11:41:58 THE COURT: Thank you very much.
11:41:59 PROSPECTIVE JUROR: Uh-huh.
11:42:00 THE COURT: Mr. Ybanez.
11:42:03 PROSPECTIVE JUROR: Yes. Is it okay if I come up there?
11:42:06 THE COURT: Of course, yeah. Come around.
11:42:08 (Bench conference.)
11:42:21 THE COURT: I'm going to ask you to speak into the this microphone, okay.

11:42:25 PROSPECTIVE JUROR: Okay.

11:42:26 THE COURT: Why don't you come over here, and then I'm going to have Mr. Dacus and Mr. Findlay come there.

11:42:30 PROSPECTIVE JUROR: Is it omnidirectional?

11:42:31 THE COURT: Yeah, it is.

11:42:32 PROSPECTIVE JUROR: First, as a medical thing, I have a hernia that I haven't had a chance to get fixed. It does bother me.

11:42:41 THE COURT: Is it bothering you right now?

11:42:42 PROSPECTIVE JUROR: A little bit. And the second thing is we're going on vacation, and the -- not next week, but the Sunday following the next Friday is when we leave out --

11:42:55 THE COURT: Okay.

11:42:57 PROSPECTIVE JUROR: -- to go out on vacation for a week and a half.

11:42:59 THE COURT: So let me tell you the way this will work is the jury, we expect, will get the case on Thursday to begin its deliberations, but Friday is a federal holiday. I'm assuming -- and I could be wrong, but I am assuming that the jury, having gotten the case on Thursday, will reach a verdict on Thursday. But that's not inevitable.

11:43:29 PROSPECTIVE JUROR: Right.

11:43:32 THE COURT: Sometimes it takes a little bit

11:43:34 longer. Sometimes there's a little delay. So that being
11:43:37 the case, if -- if the jury didn't reach a verdict on
11:43:44 Thursday, and we were not here because of the holiday on
11:43:46 Friday or the weekend, you're telling me that potentially
11:43:50 could impact your vacation plans?
11:43:53 PROSPECTIVE JUROR: Yes, sir.
11:43:53 THE COURT: Okay. And y'all have already bought
11:43:55 your tickets or whatever?
11:43:56 PROSPECTIVE JUROR: Yes, sir. We have a B and B
11:43:59 and a hotel. We're going to Los Angeles to Disney Land.
11:44:03 THE COURT: Okay. And what day were you leaving?
11:44:05 PROSPECTIVE JUROR: We're leaving Sunday. We're
11:44:07 driving down to Houston, and we're flying out from Houston.
11:44:10 THE COURT: Okay. All right. Thank you,
11:44:11 Mr. Ybanez.
11:44:11 Mr. Findlay, any questions?
11:44:13 MR. FINDLAY: No, Your Honor.
11:44:14 THE COURT: Mr. Dacus, any questions.
11:44:15 MR. DACUS: No, Your Honor.
11:44:15 THE COURT: Okay. Go ahead and take your break
11:44:17 now.
11:44:17 PROSPECTIVE JUROR: Okay. Yes, sir.
11:44:18 THE COURT: Thank you.
11:44:20 (Bench conference concluded.)
11:44:20 THE COURT: Ms. Preuninger?

11:44:24 PROSPECTIVE JUROR: Yes. So on Monday, both of my girls go to therapy. They go each week from court. They have to go to therapy through court from whenever I got a divorce, and it's hardship - like, from their dad.

11:44:41 THE COURT: Okay.

11:44:41 PROSPECTIVE JUROR: So it's required for them to go to court -- or to therapy. And then Tuesday, my oldest is getting braces, and Thursday my youngest is getting braces.

11:44:48 THE COURT: This is next week?

11:44:48 PROSPECTIVE JUROR: Yes. So I'm actually on vacation to do these appointments.

11:44:54 THE COURT: You just thought you were on vacation.

11:44:56 PROSPECTIVE JUROR: Yeah. Yeah.

11:44:59 THE COURT: And I assume -- are you the primary caregiver?

11:45:02 PROSPECTIVE JUROR: Yeah. So -- well, my husband, he works out of town sometimes in the oilfield, so they have him in Bossier this week. So he can't take them, so it's just me.

11:45:08 THE COURT: Okay. And so are we talking about this week or next week?

11:45:12 PROSPECTIVE JUROR: Next week -- sorry, next week.

11:45:14 THE COURT: Okay. Next week, he's -- he's unavailable next week, too?

11:45:23 PROSPECTIVE JUROR: Yes, yes, yes.
11:45:23 THE COURT: Okay. All right. That's fair enough.
11:45:25 Mr. Findlay, any questions?
11:45:26 MR. FINDLAY: No, Your Honor.
11:45:27 THE COURT: Mr. Dacus, any questions?
11:45:28 MR. DACUS: No, Your Honor.
11:45:29 THE COURT: I'm going to let you go ahead and take
11:45:30 your break now. I'll visit with them, and we'll get you
11:45:33 back into the courtroom as quickly --
11:45:33 PROSPECTIVE JUROR: Thank you.
11:45:35 THE COURT: -- as we can.
11:45:35 Ms. Grosso?
11:45:40 PROSPECTIVE JUROR: Yes, sir.
11:45:41 THE COURT: Hi. You said you had a potential
11:45:43 hardship earlier?
11:45:45 PROSPECTIVE JUROR: Yes, sir. So just like the
11:45:46 other person, I'm already part time, so I can't afford to
11:45:50 take any more time off work.
11:45:52 THE COURT: Okay.
11:45:52 PROSPECTIVE JUROR: Because we also have a problem
11:45:54 with people showing up. So -- but I also have a doctor's
11:45:59 appointment on Monday.
11:45:59 THE COURT: On this coming Monday?
11:46:00 PROSPECTIVE JUROR: This coming Monday, yes.
11:46:02 THE COURT: And has that doctor's appointment been

set for a while?

PROSPECTIVE JUROR: Yes.

THE COURT: All right. And when you're not at work, you don't get paid?

PROSPECTIVE JUROR: No.

THE COURT: Is that correct?

PROSPECTIVE JUROR: Yes.

THE COURT: All right. And remind me again what you do.

PROSPECTIVE JUROR: I am a cashier for Pilot Travel Centers.

THE COURT: Okay. All right. Okay. Very good. Thank you. Go ahead and take your break --

PROSPECTIVE JUROR: Yes, sir.

THE COURT: -- and we'll get you back into the courtroom --

PROSPECTIVE JUROR: Yes, sir.

THE COURT: -- in just a few minutes.

Ms. Dorgan, Mr. Savage is going to bring you this microphone.

PROSPECTIVE JUROR: We leave on the 18th to go out of town for my -- my son turned 16 in April, but we had to wait until he was out of school to book our vacation, and it's been booked since April. And I can't get refunded on the money or the baseball tickets.

11:46:59 THE COURT: All right. You're leaving on the 18th, which is next Thursday?

11:47:03 PROSPECTIVE JUROR: Uh-huh.

11:47:03 THE COURT: Okay. All right. Where are you going?

11:47:05 PROSPECTIVE JUROR: We're going to Dallas first to go to some Ranger games, and then after that, we're going to leave to go to Gulf Shores.

11:47:13 THE COURT: Okay. And you're planning to leave on --

11:47:16 PROSPECTIVE JUROR: The 18th, that morning.

11:47:17 THE COURT: Okay. On Thursday morning?

11:47:19 PROSPECTIVE JUROR: Uh-huh. We have a game on that day and we'll spend the weekend --

11:47:21 THE COURT: Okay. Fair enough. Okay. Well, I hope you have a good trip.

11:47:26 PROSPECTIVE JUROR: Thank you.

11:47:26 THE COURT: Mr. Findlay, any questions?

11:47:27 MR. FINDLAY: No, Your Honor.

11:47:28 THE COURT: Mr. Dacus, any questions?

11:47:29 MR. DACUS: No, Your Honor.

11:47:30 THE COURT: Ms. Dorgan, I'm going to go ahead and excuse you at this time. I don't think we're going to get to you anyway, but --

11:47:38 PROSPECTIVE JUROR: Do I need to come back --

11:47:41 THE COURT: You don't need to come back.
11:47:43 PROSPECTIVE JUROR: Okay. Thank you.
11:47:44 THE COURT: Okay. Mr. Findlay, just to reconfirm, 11:47:52 we discussed this at the bench, there are no cause 11:47:54 challenges to be made by the Plaintiff. Is that correct?
11:47:57 MR. FINDLAY: That's correct, Your Honor.
11:47:58 THE COURT: Okay. And, Mr. Dacus, you indicated 11:48:01 you all had one cause challenge. I think we probably ought 11:48:05 to deal with the hardship issues first.
11:48:07 MR. DACUS: Okay.
11:48:07 THE COURT: We had Ms. Mitchell, we had 11:48:14 Mr. Ybanez, Ms. Preuninger, Ms. Grosso, Ms. Dorgan. Does 11:48:20 either party have any objection to releasing any of those 11:48:23 jurors?
11:48:23 MR. FINDLAY: I do not, Your Honor -- Plaintiff 11:48:25 does not.
11:48:25 MR. DACUS: Defendant does not either, Your Honor.
11:48:27 THE COURT: All right. Very well. I'm going to 11:48:29 release all -- Juror No. 2, Ms. Mitchell; Juror No. 3, 11:48:37 Mr. Ybanez; Juror No. 10, Ms. Preuninger; Juror No. 13, 11:48:41 Ms. Grosso; and Juror No. 20 -- I've already released 11:48:45 Ms. Grosso -- but the previous four jurors, I am going to 11:48:47 release on the basis of the hardships they expressed to us.
11:48:52 Now, Mr. Dacus, on Ms. Cadenhead, you got a cause 11:48:59 challenge. If there's some basis for additional

11:49:01 questioning of her, I'm happy to get her back into the courtroom. I just thought all that was -- thought both sides had a full and fair opportunity to ask whatever they wanted to ask of her.

11:49:13 MR. DACUS: We do not disagree, Your Honor.

11:49:15 THE COURT: All right.

11:49:15 MR. DACUS: We did have a fair opportunity.

11:49:17 THE COURT: If you want to go to the podium for me.

11:49:21 MR. DACUS: Yes, Your Honor. The basis of the cause challenge, Your Honor, is as you heard, Ms. Cadenhead's sister-in-law was a long time employee of Mr. Findlay's firm, and so, you know, just human nature being what it is, we believe that she would not be able to set that aside. We've got plenty of jurors, and we believe that she should be struck for cause because of that relationship.

11:49:49 THE COURT: Mr. Findlay? Yes.

11:49:52 MR. FINDLAY: We disagree, Your Honor. I think she indicated on the record that she had no idea that was me or that Nicole -- Ms. Nicole Cadenhead worked for Findlay Craft, worked for my law firm, and I would just point out there's a little bit of both concerns on either side. Remember her brother-in-law works for Verizon for 25 years. She said she could set both of those issues aside

11:50:20 and be impartial. We think she can. I don't think there's
11:50:23 a basis for a cause challenge.
11:50:24 THE COURT: Thank you. All right.
11:50:28 Mr. Dacus, I'm going to overrule your objection.
11:50:30 I think if Ms. Cadenhead had given even 1 percent a
11:50:35 slightly different answer, I might be inclined to go with
11:50:39 you on this. Her answers were textbook. They were
11:50:44 textbook answers. And I don't think we can ask for a
11:50:48 better juror. You've made your record. I detected not one
11:50:55 hint of any concern on her part and certainly from the
11:51:01 independent view I have in trying to determine whether it's
11:51:05 a well-held view that she had any concern at all about her
11:51:11 ability or willingness to be fair and impartial to both
11:51:14 sides.
11:51:14 MR. DACUS: Thank you, Your Honor.
11:51:14 THE COURT: Okay. Any other issues to resolve
11:51:19 before we take our short recess for selection of the jury?
11:51:24 MR. FINDLAY: Not from the Plaintiff, Your Honor.
11:51:27 MR. DACUS: Not from Verizon.
11:51:29 THE COURT: All right. Let's go off the record
11:51:30 very briefly.
11:51:31 (Off-the-record discussion.)
11:52:23 THE COURT: Let's go on the record briefly.
11:52:25 Let me just confirm with the parties their
11:52:28 agreement that the strike zone is through Juror No. 18.

11:52:32 MR. FINDLAY: Yes, Your Honor, for Plaintiff.
11:52:34 MR. DACUS: Verizon agrees, Your Honor.
11:52:35 THE COURT: All right. Very good. Give you 15 minutes.
11:52:38 MR. FINDLAY: Thank you, Your Honor.
11:52:40 (Recess.)
12:10:25 THE COURT: We're back on the record.
12:10:36 The parties have submitted their peremptory strikes. We have assembled all of that information. Ms. Combs is now going to read the list of the jurors who were selected.
12:10:52 COURTROOM DEPUTY: No. 6, Cody Northcutt; No. 8, Carmen Rangel; No. 9, Clara Lindley; No. 11, Christopher Sandefur; No. 15, Reagan Reece; No. 16, Krimson Hall; No. 17, Reginald Turner; No. 18, Teresa Coats.
12:11:18 THE COURT: Is the jury good for the Plaintiff?
12:11:19 MR. FINDLAY: Yes, Your Honor.
12:11:20 THE COURT: Is the jury good for the Defendant?
12:11:21 MR. DACUS: Yes, Your Honor.
12:11:22 THE COURT: All right. Is there any reason we should not have the panel return to the jury room at this time?
12:11:27 MR. FINDLAY: No, Your Honor.
12:11:28 MR. DACUS: No, Your Honor.
12:11:28 THE COURT: Mr. Savage.

12:12:26 (Venire panel in.)
12:12:33 THE COURT: All right. Please be seated.
12:12:33 All right. Ladies and gentlemen of the panel, at 12:12:42 this time, Ms. Combs is going to call the names of the 12:12:45 panel members who have been selected to serve as jurors in 12:12:49 this matter.
12:12:50 COURTROOM DEPUTY: No. 6, Cody Northcutt; No. 8, 12:12:57 Carmen Rangel; No. 9, Clara Lindley; No. 11, Christopher 12:13:06 Sandefur; No. 15, Reagan Reece; No. 16, Krimson Hall; No. 12:13:12 17, Reginald Turner; No. 18, Teresa Coats.
12:13:19 THE COURT: All right. Thank you, Ms. Combs.
12:13:22 Ladies and gentlemen of the panel, those of you 12:13:26 who were not selected to serve as jurors in this matter, I 12:13:30 am now going to release you, and I do so with my thanks, 12:13:35 the thanks of the Eastern District of Texas, the parties, 12:13:40 and the attorneys, as well.
12:13:41 We appreciate your being here today. We 12:13:46 appreciate your patience and your attention throughout the 12:13:51 morning. I said it earlier, and I'll say it again, I 12:13:58 believe that by being here and by being willing to serve as 12:14:02 jurors, you have done a great service to our country, and I 12:14:08 am grateful for that.
12:14:10 I believe there are three pillars to good 12:14:15 citizenship in the United States. The first is serving as 12:14:22 a member of our armed forces when your nation has called

12:14:27 upon you. The second is being an active and informed voter. And the third is answering the call of jury service. And you all responded to that well by being here today and by participating in this process.

So I thank all of you who were not selected as jurors, and I'm going to release you at this time.

If for any reason you have any questions, feel free to stop in at the clerk's office on the way out, and Ms. Clendening can assist you.

So with those comments, thanks again on behalf of the parties, the attorneys, and the United States District Court for the Eastern District of Texas. I'm going to excuse you all at this time, except for Ms. Lambert.

Ms. Lambert, how many concerts did the Beatles play in Washington, D.C.?

PROSPECTIVE JUROR: Oh, my gosh.

THE COURT: And what years?

PROSPECTIVE JUROR: Any other question?

THE COURT: You said no one could beat you at Beatles trivia.

PROSPECTIVE JUROR: Next time I'm asked that I'll know the answer.

THE COURT: To be honest, the only reason I know the answer is I was recently at a hotel in Washington where the Beatles stayed when they played their first concert

12:15:54 there in 1964, and they came back two years later in 1966,
12:16:00 I think, and played their second. They only played two
12:16:03 concerts in Washington, D.C., so now you know.

12:16:07 PROSPECTIVE JUROR: I will always remember that.

12:16:09 THE COURT: All right. Thank you. Thanks to all
12:16:11 of you.

12:16:14 PROSPECTIVE JUROR: What do we do with these?

12:16:16 THE COURT: You can leave them on the bench on the
12:16:18 way outside the door there.

12:16:56 (Venire panel out.)

12:16:56 THE COURT: Okay. Let me ask the jurors to come
12:16:59 around and take their positions in the jury box, and we'll
12:17:02 get you sorted out after lunch about exactly where your
12:17:07 seats are, but for how now, just take a seat anywhere in
12:17:11 the jury box.

12:17:12 And everyone else may be seated.

12:17:26 Okay. The first thing I'm going to have you all
12:17:29 do is to stand up and raise your right hand to be sworn in
12:17:32 by Ms. Combs.

12:17:33 (Jurors sworn.)

12:17:53 THE COURT: All right. Please be seated.

12:17:54 Okay. Welcome, ladies and gentlemen of the jury.
12:17:57 We are going to break in just a moment for lunch. That's
12:18:02 the good news.

12:18:03 The second part of the good news is we have lunch

12:18:06 for you here. You don't have to take advantage of that if
12:18:10 you don't want to. I'm going to give you a little longer
12:18:13 lunch break than we will take next week, but that's because
12:18:16 we need to do some additional things. But lunch is here
12:18:21 and will be available for you in the jury room downstairs.
12:18:25 So you're welcome to partake, if you wish. You're also
12:18:30 welcome to, you know, run an errand or work anything out
12:18:33 you need to work out.

12:18:34 My expectation is we will plan to resume here in
12:18:38 the courtroom at 2:00 p.m., so that gives you a little
12:18:41 extra time.

12:18:42 When we do resume here in the courtroom, I'm going
12:18:46 to go over some preliminary instructions for you that tells
12:18:49 you a little bit about your conduct during the trial and
12:18:52 what I'm going to ask of you during the course of it.
12:18:56 It'll tell you a little bit about what this case involves,
12:19:00 some information about the law generally that applies to a
12:19:03 case like this, and it'll give you some further sort of
12:19:07 logistical instructions about how the case will proceed.

12:19:13 There are some rules I'm going to ask you to
12:19:16 follow, of course, and I will go over that in some level of
12:19:20 detail this afternoon.

12:19:22 I'm going to go over just a couple of rules with
12:19:25 you right now, though, because they're real important. I'm
12:19:29 going to ask you to follow them starting now through the

end of the trial.

The first is, as I told you earlier, I'm going to ask you not to communicate with anyone in any way about this matter. There are going to be a lot of people in the courtroom, in the courthouse, and in and around the courthouse throughout the course of the week. So just be aware of that. Best not to have conversation with anyone you don't know about anything during the course of the week when you're here in this -- in this facility. They will not speak to you, and it's not because they're rude or impolite, but it's just that they know my rules about having any kind of communication or contact with a juror.

I'll tell you a little more about that this afternoon.

The second rule I'm going to ask you to follow is not to read anything about the case or do any type of independent research or investigation into any matter even remotely related to the case.

And for the third rule, for those of you who are consumers of social media, I'm going to ask you not to post anything on any social media website or app about the case or your involvement as a juror. By posting something in one of those forums, you're essentially communicating in a way, and that violates the rules I'm going to ask you to follow.

12:21:01 The first rule about not discussing the case with anyone or communicating with anyone about the case is really simple, and the reason for it is simple. If you were to discuss the case with someone, they might seek to influence you, or you might start forming opinions about what your verdict should be before you've heard all of the evidence and before you've been instructed on the law that you have to follow in following, in reaching your verdict.

12:21:32 So please don't discuss the case with anyone, including members of your family, your friends, people involved in the trial, even your fellow jurors before we begin in the morning or on breaks or at the lunch hour or after we've completed the testimony for the day. Just don't discuss anything substantively about the case. So no in-person conversations between your -- you and your fellow jurors, your family members, anything like that. No texting, no emailing, no tweeting. You just should not discuss the case with anyone.

12:22:16 And, obviously, if anyone should attempt to discuss the case with you or to approach you about the case, I'm going to ask you to inform me of that immediately.

12:22:25 The second rule, and this is just as important as the first rule, requires that you not read anything about the case or do any type of independent research or

12:22:36 investigation into anything related to that case. And that
12:22:44 rule is similar, the reason for that rule is similar to the
12:22:48 reason for the first rule. The verdict has to be solely
12:22:52 based on the evidence that's presented in the courtroom,
12:22:54 testimony from the witness stand, the documents that are
12:22:57 admitted into evidence.

12:23:00 That evidence, either from witness testimony or
12:23:03 from documents, is subject to certain rules of evidence
12:23:10 that the Court will enforce. And those rules of evidence
12:23:14 ensure or guarantee that the evidence that you hear and see
12:23:19 in this courtroom is reliable. And so if you were to read
12:23:24 something from some outside source, whether it was a
12:23:28 newspaper or some article or dictionary, something online,
12:23:33 you'd be considering something other than the evidence that
12:23:36 was presented here in the courtroom, evidence that I will
12:23:40 have ensured complies with the rules of admissibility. And
12:23:44 if you were to do that, it could potentially result in a
12:23:47 mistrial. So we don't want that.

12:23:49 Third thing, the reason for asking you not to post
12:23:55 anything about the case, again, it's the same as
12:23:58 communicating with someone, and I just ask you not to do
12:24:03 it.

12:24:03 So anybody have any questions about any of those
12:24:07 rules before we break for lunch?

12:24:09 All right. I'll give you further instruction

12:24:11 about that. I'll provide some more information about the
12:24:14 background of the case, some information about how to
12:24:18 approach your jobs as jurors, and I'll give you more
12:24:24 information about the logistics this afternoon. Basically,
12:24:28 we'll start at 9:00 on Monday morning. We'll go through
12:24:32 about 5:00 to 5:30 each day. We will try to -- we will
12:24:39 move expeditiously. The lawyers will not waste your time.
12:24:42 I will not waste your time. So when you're here, we expect
12:24:45 you to be in the courtroom and hearing testimony or looking
12:24:52 at documents. And I'll give you more information about
12:24:55 that, as well.

12:24:56 As I said, we've got lunch available for you
12:24:59 today. We'll provide it for you next week. If for any
12:25:03 reason you want to do your own thing for lunch, you're more
12:25:06 than welcome to do that. Just let us know. If any of you
12:25:11 have any food allergies or anything like that, let us know
12:25:16 as well, and we'll get that accommodated.

12:25:18 So it's 12:30 now. We will plan to resume as
12:25:21 close to 2:00 o'clock this afternoon as possible with
12:25:24 additional preliminary instructions and the parties'
12:25:30 opening statements to you. So we'll be in recess until --
12:25:33 until about 2:00 o'clock.

12:25:35 COURT SECURITY OFFICER: All rise.

12:25:36 (Jury out.)

12:25:38 THE COURT: Okay. Y'all be seated.

12:26:06 Okay. Any questions, concerns about anything from either side?
12:26:14
12:26:15 MR. FINDLAY: Not from Plaintiff, Your Honor.
12:26:16 THE COURT: Anything from the Defendant?
12:26:17 MR. DACUS: No, Your Honor.
12:26:18 THE COURT: Let me go over very briefly the
12:26:20 preliminary instructions. There were a couple of real
12:26:26 minor disputes. I just want to tell you what I've done.
12:26:31 On the -- on the first one on Page 4, you all have
12:26:37 access to those?
12:26:39 MR. FINDLAY: We'll remember it, Judge.
12:26:41 THE COURT: Okay. On the first one on Page 4, I
12:26:45 think there was a dispute about making, using, offering for
12:26:50 sale or whatever. So on that one, I ended up using the
12:26:55 broader language. I think the full quote there is fine.
12:26:58 That's basically a general description about what the
12:27:00 patent law is, and so I thought -- I thought that was
12:27:05 appropriate to use it there.
12:27:07 When you get to Page 8, there was a question about
12:27:16 that same language. And I think the objection that Verizon
12:27:19 had, which is a valid one, is that -- or was that the
12:27:28 only -- the only asserted claims are method claims. And so
12:27:34 the omission of selling or offering to sell was appropriate
12:27:40 there, and so I think that's what I'm going to go with on
12:27:43 that.

12:27:43 On the language at the top of 9, call switches between a Wi-Fi and cellular connection, I do think that provides helpful context, and it is consistent with the previous decisions since only method claims are at issue.

12:28:06 That may be it.

12:28:12 Page 12, deletion of the word "selling" or "offering for sale" consistent with what I previously told you.

12:28:25 I think that's all.

12:28:33 Any questions about those decisions from either side?

12:28:37 MR. ANDERSON: No, Your Honor.

12:28:38 MR. FINDLAY: No, Your Honor.

12:28:39 THE COURT: Okay. Anything else?

12:28:42 MR. FINDLAY: Not from Plaintiff, Your Honor.

12:28:43 MR. DACUS: Not from Verizon.

12:28:45 THE COURT: All right. We'll see you a little before 2:00.

12:28:49 MR. FINDLAY: Thank you.

12:28:50 COURT SECURITY OFFICER: All rise.

12:28:51 (Recess.)

01:57:58 COURT SECURITY OFFICER: All rise.

01:57:58 THE COURT: All right. Is there anything either party needs to discuss before we have the jury brought up?

01:58:02 MR. HERMAN: Not from Aspen, Your Honor.

01:58:04 MR. DACUS: Not from Verizon, Your Honor.

01:58:05 THE COURT: All right. Mr. Savage, if you would have the jury brought to the courtroom.

01:59:23 COURT SECURITY OFFICER: All rise for the jury.

01:59:25 (Jury in.)

01:59:26 THE COURT: Please be seated.

01:59:52 Okay. Ladies and gentlemen of the jury, welcome back, and I want to thank you again for your service as jurors in this case.

02:00:04 As I said this morning, you're performing, each of you, a pivotal role and duty in our system of justice, and we would not be able to do our jobs without your support and assistance.

02:00:22 I'm now going to go over some preliminary instructions that will add a little more detail to the sort of logistical rules of conduct that I went over previously. I want to give you some additional information about the case, what the parties must prove, what the burdens of proof are.

02:00:46 After I have finished these preliminary instructions to you, the parties will present their opening statements to you, and then we will recess for the weekend. And on Monday morning, the Plaintiff will begin the presentation of evidence in its case-in-chief.

02:01:07 You, as the jury, has now been sworn in as jurors.

02:01:17 You're the sole judges of the facts of the case. It's your duty to decide and determine all of the facts from all of the evidence in the case.

02:01:28 As the Judge, it's my duty and responsibility to instruct you on the law that you are to apply, and you must follow the law as I give it to you, whether you agree with it or not.

02:01:42 You must not be influenced by any personal like or dislike, any opinion or prejudice, any sympathy. What that means is that you must decide the case based solely on the evidence that's presented here in the courtroom.

02:01:59 You will recall, and I will remind you at the end of the case, that you took an oath to do that, to decide the case based solely on the evidence before you.

02:02:12 At the end of the trial, I will give you detailed instructions about the law to apply in deciding the case, and I will also give you a list of questions that you are then to answer. That list of questions is what we call a verdict form, and your answers to all of those questions must be unanimous, and those unanimous answers will constitute the verdict in the case.

02:02:39 I will tell you briefly about what the case is about. It involves a dispute that's related to a United States patent. You all saw the patent video this morning. That was prepared by the Federal Judicial Center or the

02:03:06 Administrative Office of the Courts. That was not prepared
02:03:09 by the parties.

02:03:10 The attorneys discussed in their voir dire
02:03:14 questioning this morning our patent system. I'm now going
02:03:18 to give you some additional instructions about a patent and
02:03:21 how one is obtained.

02:03:22 Patents are either granted or denied by the U.S.
02:03:29 Patent and Trademark Office. Sometimes you'll hear that
02:03:32 referred to as the Patent Office. Sometimes it's the PTO.
02:03:37 Sometimes it's the USPTO.

02:03:38 If a patent is granted, that patent gives its
02:03:43 owner the right to exclude other people from making, using,
02:03:49 selling, or offering for sale or importing what is covered
02:03:56 by the claims of the patent. A patent is granted for a set
02:04:01 period of time, which for the patent involved in this case
02:04:05 has not yet expired.

02:04:07 Once a patent does expire, a patent owner may not
02:04:12 exclude anyone from making, using -- making use of the
02:04:17 invention that is claimed in the patent. The invention
02:04:20 then becomes part of what is called the public domain, and
02:04:25 that means that anyone is free to use it.

02:04:27 During the term of the patent, however, if another
02:04:34 person, without the patent owner's permission, makes, uses,
02:04:39 sells, offers to sell, or imports into the United States
02:04:45 something that is covered by the patent, then that person

02:04:49 is said to infringe the patent.

02:04:51 A patent is a form of property that's called 02:04:54 intellectual property. And like all other forms of 02:04:58 property, a patent may be bought or sold. The violation of 02:05:05 a person's patent rights is called infringement, and a 02:05:08 patent owner may seek to enforce a patent against persons 02:05:13 it believes to be infringers by filing a lawsuit in federal 02:05:17 court.

02:05:18 The process of obtaining a patent is called patent 02:05:23 prosecution. To obtain a patent, one files an application 02:05:28 with the PTO, which is, again, an agency of the federal 02:05:32 government. It employs trained examiners who review 02:05:37 applications for patents. The application that is filed 02:05:41 with the PTO includes something called a specification, 02:05:46 which is a written description of the invention. It tells 02:05:51 what the invention is, how it works, how to make it, how to 02:05:55 use it. The specification concludes or ends with one or 02:06:02 more numbered sentences. These numbered sentences are the 02:06:06 patent claims.

02:06:08 If a patent is eventually granted by the PTO, the 02:06:14 claims define the boundaries of the protection and give 02:06:19 notice to the public of these boundaries. Patent claims 02:06:24 exist in two forms, and they are referred to as either 02:06:29 independent or dependent claims.

02:06:32 An independent claim does not refer to any other

02:06:36 claim in the patent. It's independent. It's not necessary to look at any other claim to determine what an independent claim covers.

On the other hand, a dependent claim refers to at least one other claim in the patent, and it includes each limitation or element of that other claim to which it refers.

You may hear the lawyers and the witnesses refer to a claim from which it depends, as well as those other additional limitations or elements that are recited within the dependent claim itself. Therefore, to determine what a patent -- a dependent claim covers, it is necessary to look at both the dependent claim and the independent claim or that -- claims to which it refers or from which it defends -- depends.

The asserted claims of the patents-in-suit use the word "comprising," and comprising means including or containing. A claim that includes the word "comprising" is not limited to an apparatus having only the elements that are recited in the claim but also covers an apparatus that includes additional elements.

I'm going to give you an example. If you take a claim that covers a table and the claim recites the table comprising a tabletop and legs and glue, the claim will cover any table that has those structures, even if it has

other structures or additional structures, like wheels that go on the end of the legs. That's a simple example, of course, using the word "comprising." In other words, it can have other features in addition to the features that are covered by the patent.

Now, after the application is filed with the PTO, an examiner at the PTO reviews the application to determine whether or not the claims are patentable, that is to say whether or not the claims are appropriate for patent protection and whether or not the specification adequately describes the invention that is claimed.

In examining a patent application, the examiner reviews certain information about the state of technology at the time the application was filed. The PTO searches for and reviews information that is publicly available or that was submitted by the applicant. And that information is called prior art. The examiner reviews that prior art to determine whether or not the invention is truly an advance over the state of the art at the time.

Prior art is defined by law, and I'm going to give you at a later time at the end of the case some specific instructions about what constitutes prior art. But for now, you should know that, for example, something is prior art if it was publicly known to others in the United States before the date of the invention.

02:10:06 In deciding the question of validity, the only
02:10:09 correct comparison is between the prior art and the
02:10:12 limitations of the asserted claims. You do not compare the
02:10:16 prior art to the accused services. However, in general,
02:10:22 prior art includes information that demonstrates the state
02:10:25 of the technology that existed before the claimed invention
02:10:28 was made or before the application for a patent was filed.
02:10:33 A patent contains a list of certain prior art that
02:10:38 the examiner considered, and the items on that list are
02:10:43 called references.
02:10:45 Now, after the prior art search and the
02:10:48 application has been examined, the examiner will inform in
02:10:55 writing -- the applicant in writing of what the examiner
02:10:57 has found, and this is called an Office Action. The
02:11:00 examiner may reject the claims if he or she believes they
02:11:03 don't meet the requirements for a patentable invention, and
02:11:07 if the examiner rejects the claims, the applicant will have
02:11:10 an opportunity to respond to the examiner to try to
02:11:15 persuade the examiner to allow the claims. The applicant
02:11:18 also has a chance to change the claims or submit new
02:11:22 claims.
02:11:24 If the examiner concludes that the legal
02:11:27 requirements for a patent have been satisfied, then the
02:11:30 patent examiner is said to allow the claims, and the
02:11:35 application will issue as a patent.

02:11:38 The papers that are generated during this back and forth communication between the examiner and the application -- and the applicant are called the prosecution history. This process might go back and forth between the applicant and the examiner for some time until the examiner is satisfied that the application meets the requirements for a patent.

And in that case, the application will -- will -- will -- the application will be approved and the patent will issue, or in the alternative, if the examiner ultimately concludes that the application should be rejected, then no patent will issue. Sometimes patents are issued after appeals within the PTO or in a court.

To help you follow the evidence in this case, I'm now going to give you a summary of the positions of the parties.

As you know, the party that brings a lawsuit is called the Plaintiff. And in this case, the Plaintiff is Aspen Networks, Inc., and it may be referred to throughout the trial as either the Plaintiff or Aspen.

The party against whom the lawsuit is brought is called the Defendant, and in this case, the Defendant is Cellco Partnership doing business as Verizon Wireless. It may be referred to as either Verizon or the Defendant.

As I told you this morning, this is a case of

02:13:17 alleged patent infringement, and the asserted patent is
02:13:21 United States Patent No. 8,009,554, which may be referred
02:13:29 to as the asserted patent or the patent-in-suit or just by
02:13:34 the last three digits of its number, the '554 patent.
02:13:39 The '554 patent was obtained by inventors Bill
02:13:46 Chin, Sajit Bhaskaran, and Robin Mavunkel.
02:13:52 Aspen filed suit in this court seeking money
02:13:56 damages from Verizon for allegedly infringing the
02:14:00 patent-in-suit by using a service that Aspen argues is
02:14:04 covered by Claims 1, 2, 6, 15, 16, and 20 of the '554
02:14:11 patent.
02:14:12 Each of these claims may be referred to as an
02:14:18 asserted claim and may -- and they may be collectively
02:14:21 referred to as the asserted claims. The asserted claims of
02:14:26 the '554 patent relate to a specific method of enhancing
02:14:31 the reliability of transmissions containing audio and video
02:14:37 data when the connection has to switch networks mid-call,
02:14:42 such -- such that the transmission is not disrupted as a
02:14:47 result of the switch in networks.
02:14:49 The service that is alleged to infringe is
02:14:54 Verizon's Voice over Wi-Fi or VoWiFi Calling Service when
02:15:04 the users' calls switch or a call switch is between a Wi-Fi
02:15:09 and a cellular connection.
02:15:11 Verizon denies that it has infringed any of the
02:15:17 asserted claims and asserts that Aspen is not entitled to

02:15:19 any money damages. Verizon also contends that the asserted claims of the patent-in-suit are invalid. And I will instruct you later as to patent priority in the ways in which a patent may be invalid.

I know that a lot of these are new words to some of you and new concepts that are being thrown at you today. I'm going to define many of these words and concepts to you -- for you in the next few minutes. The witnesses will help you through their testimony to understand these terms and these concepts, and, you know, please don't feel overwhelmed at this early stage of the case. It will all come together as we go through trial.

One of your many jobs in this case is to decide whether or not the Asserted Claims 1, 2, 6, 15, 16, and 20 of the '554 patent have been infringed. You're also going to be asked to decide whether the claims are invalid. And only if you decide that the asserted claims have been infringed and are not invalid, then you will need to decide what amount of money damages should be awarded to the Plaintiff as compensation for that infringement.

It's my job in this case to tell you what the law is, and I'm going to do that and handle matters on evidence and procedure. I will oversee the conduct of the trial as efficiently as possible and maintain the decorum of the courtroom.

02:17:12 In determining the law, it is specifically the job of the Court to determine the meaning of the claim language from the asserted claims of the patent that need interpretation.

02:17:28 The Court has already determined the meaning of the claims in the patent-in-suit, and you have a document in your binder, which all of you have, that reflects those meanings.

02:17:43 For any claim term that is not -- that you have not been provided with a definition of, you should apply the ordinary meaning of that term that it would have to a person of ordinary skill in the art in the field of the patent. A person of ordinary skill in the art has the level of experience or education or training that is generally possessed by individuals who work in the area of the invention at the time of the invention.

02:18:15 You are to apply the Court's definitions of the terms throughout the case. However, the Court's interpretation of the language of the claim should not be taken as any indication that I have any view at all regarding any issue in the case, such as infringement or validity. Those issues are yours as jurors to decide.

02:18:44 I will give you more detailed instructions on the meaning of the claims before you begin your deliberations.

02:18:49 In deciding the issues you will be required to

02:18:55 decide in this case, you will be asked to consider and 02:18:58 follow specific legal standards, and I'm going to now give 02:19:01 you an overview of those standards, as I will again at the 02:19:06 end of the case before you begin your deliberations.

02:19:10 The first issue you'll be asked to decide is 02:19:13 whether the Plaintiff has shown by a preponderance of the 02:19:17 evidence that Verizon has infringed any asserted claim of 02:19:23 the asserted patent. Aspen contends that the Defendant is 02:19:28 directly infringing Claims 1, 2, 6, 15, 16, and 20 of the 02:19:35 '554 by using in the United States certain accused 02:19:39 services. There may be infringement as to one claim but 02:19:43 not all claims or another claim.

02:19:46 The second issue you'll be asked to decide is 02:19:49 whether Claims 1, 2, 6, 15, 16, and 20 of this patent, the 02:19:56 '554, are invalid. Verizon contends that each asserted 02:20:00 claim is invalid. And invalidity is a defense to 02:20:05 infringement. Therefore, even though the PTO has allowed 02:20:11 the asserted claims and even though a United States patent 02:20:14 was issued by the Patent Office and it is presumed to be 02:20:20 valid, you, the jury, must decide whether the claims are 02:20:23 invalid after you've heard all of the evidence that has 02:20:28 been presented during the course of the trial.

02:20:29 A claim may be invalid for any number of reasons, 02:20:34 including because it claims subject matter that is not new 02:20:38 or obvious. A patent cannot remove from the public the

02:20:43 ability to use what was known or obvious before the
02:20:48 invention was made or patent protection was sought.

02:20:51 You will need to consider a number of questions in
02:20:57 deciding whether the inventions that are claimed in the
02:21:03 asserted patent are invalid, and I will give you additional
02:21:06 instructions with much more detail on these questions at
02:21:09 the end of the case.

02:21:10 If you decide that the asserted claims have been
02:21:13 infringed and are not invalid, then you will need to decide
02:21:17 the amount of money damages, if any, that are to be awarded
02:21:21 to Aspen for that infringement.

02:21:25 A damage award in a patent case must be adequate
02:21:28 to compensate the patent holder for the infringement, and
02:21:33 in no event may the damage award be less than what a --
02:21:36 than what a patent holder would have received if it had
02:21:41 been paid a reasonable royalty for the use of its patented
02:21:45 technology.

02:21:46 However, the damages that you award, if any, are
02:21:52 meant to compensate the patent holder, not to punish the
02:21:56 Defendant. And you may not include in any damages award
02:22:03 any additional amount as a fine or a penalty above what is
02:22:08 necessary to fully compensate the patent holder for the
02:22:13 infringement.

02:22:13 Also, patent damages cannot be speculative, and
02:22:18 the Plaintiff must prove the amount of its damages for the

02:22:22 alleged infringement by a preponderance of the evidence.
02:22:27 And, again, I'm going to give you more detailed
02:22:29 instructions on the calculations of damages, if it is
02:22:35 necessary, at the conclusion of the trial, including some
02:22:41 specific instructions with regard to the calculation of a
02:22:43 reasonable royalty.

02:22:43 As we all discussed this morning, there are two
02:22:52 standards of proof that you will apply in this case. The
02:22:55 first is preponderance of the evidence, and the second is
02:22:56 clear and convincing evidence.

02:22:57 On infringement and damages, you must decide
02:23:01 whether certain facts have been proven by a preponderance
02:23:05 of the evidence. That means that the fact that is to be
02:23:09 proven is more likely true than not true. That means that
02:23:14 the evidence in favor of that fact being true is sufficient
02:23:17 to tip the scale, even if slightly, in its favor.

02:23:24 Regarding invalidity, you must use a higher
02:23:27 standard and decide whether the fact that has been
02:23:30 proven -- whether the fact has been proven by clear and
02:23:32 convincing evidence. Again, if you take that same scale
02:23:37 and put the evidence for and against the party who must
02:23:40 prove the opposite -- prove the fact on opposite sides of
02:23:45 the scale, clear and convincing evidence requires that the
02:23:48 scale tip more heavily toward the party who has the burden
02:23:53 of proof.

02:23:53 Again, bear in mind that the standards -- these
02:23:58 standards are very different than the standards that exist
02:24:01 in the criminal law context where you have the standard of
02:24:05 beyond a reasonable doubt. On a scale of the various
02:24:11 standards of proof, beyond a reasonable doubt is a higher
02:24:15 burden of proof than clear and convincing evidence, and
02:24:19 clear and convincing evidence is a higher burden of proof
02:24:23 than preponderance of the evidence.

02:24:25 Beyond a reasonable doubt is a burden of proof
02:24:29 that does not apply in a civil case. It requires a fact to
02:24:36 be proven with a very high degree of certainty.

02:24:39 Preponderance of the evidence requires that
02:24:42 evidence need to only be sufficient to tip the scales in
02:24:45 favor of the party proving that fact.

02:24:47 So you might think of clear and convincing
02:24:50 evidence as being between those two other standards.
02:24:57 Beyond a reasonable doubt is a much higher burden of proof
02:24:59 than clear and convincing evidence, but clear and
02:25:02 convincing evidence is a higher burden of proof than the
02:25:08 preponderance of the evidence standard.

02:25:09 During the course of the trial, you'll hear from a
02:25:12 number of different witnesses. I want you to keep an open
02:25:16 mind when you're listening to the evidence and not decide
02:25:21 any of the facts until you've heard all of the evidence
02:25:25 that's submitted to you. And this is important. While the

02:25:28 witnesses are testifying, remember that you, the jury, will
02:25:32 have to decide the degree of credibility and believevability
02:25:37 to allocate to each of the witnesses and the evidence they
02:25:40 give.
02:25:41 So while these witnesses are testifying, you
02:25:44 should be asking yourself things like this: Does the
02:25:47 witness impress you as being truthful? Does he or she have
02:25:51 a reason not to tell the truth? Does he or she have any
02:25:54 personal interest in the outcome of the case? Does the
02:25:58 witness seem to have a good memory? Did he or she have the
02:26:02 opportunity and the ability to observe accurately the
02:26:06 things they testified about? Did the witness appear to
02:26:09 understand the questions clearly and answer them directly?
02:26:14 And, of course, does the witness's testimony differ from
02:26:17 the testimony of other witnesses? And if it does, how does
02:26:22 it differ?
02:26:23 These are some of the kinds of things that you
02:26:28 should be thinking about while you are listening to each
02:26:32 witness during the trial of the case and while each and
02:26:34 every witness testifies from the witness stand.
02:26:37 I want to talk briefly about expert witnesses.
02:26:43 When knowledge of a technical subject may be helpful to
02:26:48 you, the jury -- a person -- the jury, a person who has
02:26:52 special training and experience in that field, we call him
02:26:54 or her an expert witness is permitted to testify to you

02:26:59 about his or her opinions on those technical matters.
02:27:03 You're not required to accept an expert witness's opinions
02:27:08 or any other witness's opinions. It's up to you to decide
02:27:12 who to believe and who not to believe and whether an expert
02:27:17 witness or any witness for that matter is correct or
02:27:21 incorrect about what he or she tells you.

02:27:25 There will be expert witnesses testifying in
02:27:28 support of both sides in this case. When an expert witness
02:27:32 is called to testify, it's up to you to listen to his or
02:27:38 her qualifications, and when he or she gives an opinion and
02:27:41 explains the basis for it, you'll have to evaluate what he
02:27:45 or she says, whether you believe it and to what degree, if
02:27:50 any, you want to give it weight.

02:27:51 Judging and evaluating the credibility and the
02:27:56 believability of each and every witness will be an
02:28:00 important part of your job as jurors. You will also hear
02:28:05 testimony presented to you through a deposition.

02:28:13 In trials like this, sometimes it's difficult,
02:28:15 sometimes impossible to get every witness physically here
02:28:19 in court to testify at the same time. And so what happens
02:28:25 is before trial, the lawyers for both sides will take the
02:28:28 depositions of certain witnesses. In the deposition, a
02:28:32 witness is present and sworn and placed under oath just as
02:28:38 if he or she were here sitting on the witness stand.
02:28:42 There'll be a court reporter who's present. The lawyers

02:28:46 for both sides will be there asking questions. All of
02:28:50 those questions will be submitted under oath, and the
02:28:53 answers to those questions, as well as the questions
02:28:56 themselves, are taken down and they're transcribed and
02:29:01 they're recorded. Sometimes there will be video, and you
02:29:03 will see the video. You'll hear the question that's asked
02:29:07 and you'll hear the answer that's given.

02:29:08 It's important for you to know that during the
02:29:11 course of those trials -- this trial, when those deposition
02:29:15 witnesses are presented, you're going to be seeing selected
02:29:20 clips or sections from the total deposition that have been
02:29:23 sort of put together and presented to you.

02:29:28 In a typical deposition, a witness might be
02:29:31 deposed for many hours, and rather than present you with
02:29:36 hours of the playback of that testimony, the parties will
02:29:40 get together and pick out what they believe is the most
02:29:43 important part of the testimony that will all be spliced
02:29:48 together, and it will be presented to you during the trial
02:29:51 as that deposition witness's testimony.

02:29:54 So you will see some breaks in the questions and
02:29:58 the answers. You may notice that a different person's
02:30:01 voice is asking the questions at different times. That's
02:30:05 just all part of the process, and the parties, as I said,
02:30:11 will have an opportunity to select the key parts of the
02:30:16 testimony that they believe are most important, and you'll

02:30:20 just hear a few minutes of that rather than a long period
02:30:24 of testimony.

02:30:25 So I'd ask you to overlook those little breaks and
02:30:30 those changes in the voice and recognize that you really
02:30:33 are being saved a lot of time by having that information
02:30:36 spliced together in that way.

02:30:40 And most importantly, deposition testimony is
02:30:43 entitled to the same consideration by you and is to be
02:30:48 evaluated by you just as if the witness had been here in
02:30:54 the courtroom testifying on the witness stand live in open
02:30:58 court.

02:30:58 So to the same extent possible, you should judge
02:31:02 the testimony of a witness presented by a deposition as to
02:31:08 their believability and their credibility just as you would
02:31:11 judge any other witness, including all of those testifying
02:31:16 live here in the courtroom.

02:31:17 You're also going to see documents that have been
02:31:21 redacted, documents that have been admitted into evidence,
02:31:25 and some of them will have portions that have been blacked
02:31:29 out, and that happens for a number of reasons, but
02:31:32 primarily it is that I have determined in advance of the
02:31:37 trial that portions of those documents are not relevant to
02:31:42 the determination that you're going to be asked to make and
02:31:46 potentially could be distracting or confusing to you.

02:31:50 So when you see a document that has part of it

02:31:53 redacted, don't worry about what has been redacted. Don't
02:31:57 try to guess about what's been there. Just focus on what
02:32:01 is visible that you can read and understand.

02:32:03 There will be times during the course of the trial
02:32:10 where the attorneys will object to certain testimony or
02:32:15 statements. That is their job. They are doing their jobs
02:32:21 when they object. It is their duty to object if they think
02:32:25 the other side is trying to offer testimony or some other
02:32:28 kind of evidence that they believe is not proper under the
02:32:34 rules, either the rules of this Court or the rules of
02:32:38 evidence. So they're just doing their job. And I'll have
02:32:41 to rule on those objections.

02:32:43 Allowing the testimony or other evidence to be
02:32:46 introduced over an objection should not indicate and does
02:32:50 not indicate in any way any opinion that I have about the
02:32:55 weight or the effect of the testimony unless I tell you so.
02:33:01 You, again, are going to be the sole judges of the
02:33:05 credibility and the believability of all of the witnesses
02:33:07 and the weight and the effect, if any, to give to the
02:33:12 testimony that's presented during the course of the trial.

02:33:14 Throughout this case and prior to today, both
02:33:20 sides have worked with the Court very diligently to go
02:33:24 through all of the exhibits that are going to be presented
02:33:26 in the trial. For exhibits that are proposed by either
02:33:34 party that the other side has objected to, those exhibits

02:33:38 have been reviewed and those objections considered in
02:33:43 earlier pre-trials -- pretrial hearings before today.
02:33:49 Those documents have been reviewed, a decision has been
02:33:54 made about what will be admissible and what will not be
02:33:57 admissible.

02:33:58 In cases where a document is admissible, any
02:34:00 objections to that document have already been overruled,
02:34:05 and the document will be considered an exhibit.

02:34:09 In those cases where a document is not admissible,
02:34:11 then I've sustained the objection, and the document will
02:34:13 not be a part of the case.

02:34:15 That means that from that list of pre-admitted
02:34:27 exhibits, the Court has already acted on and approved
02:34:31 those, and you'll not have to sit here and listen to any of
02:34:35 those arguments. You'll not have to hear the back and
02:34:40 forth between the attorneys about what is or is not
02:34:45 admissible under the rule of evidence.

02:34:49 So the parties have worked together very
02:34:53 effectively to save you a lot of time and from having you
02:35:00 listen to all of that.

02:35:01 We're now in a position where most of the
02:35:10 documents have been dealt with, and either side will be
02:35:12 able to show them to you from the list of exhibits that
02:35:15 have been approved and will be able to show it to you
02:35:21 without a formal offer, without any sort of a predicate,

02:35:25 without any arguments or disputes.

02:35:27 It is impossible -- it is -- it is possible and, 02:35:31 in fact, almost a certainty that during the trial, there 02:35:34 will be objections that come up. And when that happens, 02:35:37 I'll rule on those. If an objection is sustained to a 02:35:41 question that gets asked of a witness, you should just 02:35:46 disregard the question entirely and not draw any inference 02:35:49 one way or the other about how the question was asked or 02:35:52 speculate about what the witness would have said if I had 02:35:57 allowed him or her to answer the question.

02:35:59 And if an objection is overruled, then the witness 02:36:02 is going to be allowed to answer the question, and you 02:36:04 should consider the answer and the question just as if no 02:36:08 objection had been made.

02:36:10 The law of the United States permits a judge to 02:36:15 comment to the jury regarding the evidence in the case. 02:36:21 Those comments from a judge are only an expression of the 02:36:24 judge's opinion, and the jury can disregard those comments 02:36:29 in their entirety because as I have said before, you, the 02:36:35 jury, are the sole judges of the facts. You're the sole 02:36:37 judges of the credibility and the believability of the 02:36:39 witnesses and how much weight, if any, to give all of the 02:36:44 testimony that is presented to you over the course of a 02:36:49 trial.

02:36:49 It is unlikely that I'm going to comment on any of

02:36:53 the evidence or to indicate in any way to you that I have
02:36:56 any opinion at all about the outcome, what the outcome
02:37:01 should be, or what the evidence might or might not suggest.
02:37:05 Evaluating and considering the evidence and
02:37:09 determining what the facts are is your job, not mine.
02:37:13 Our court reporter, Ms. Holmes, seated in front of
02:37:18 me, is taking down everything that's said. My job is to
02:37:22 try to make sure that not more than one person talks at a
02:37:27 time so that the record can be clear. My job is also, she
02:37:32 will tell you, to keep the lawyers from talking too fast or
02:37:35 to keep the witness from talking too fast.
02:37:38 I don't always do a great job at that.
02:37:42 But what happens is attorney -- an attorney will
02:37:48 be at the podium, and the witness will be over here and
02:37:51 maybe the witness is slightly nervous, and they will view
02:37:54 it as sort of a conversation. And when we communicate
02:38:01 verbally with each other, a lot of things happen that don't
02:38:06 involve the oral word, and there are nods and indications
02:38:15 and various expressions that way. And in the courtroom, it
02:38:18 has to be a little different because we have to have a
02:38:20 record of what is said.
02:38:24 So if everything goes as it should, the attorney
02:38:27 will ask a question and get all of the question out, then
02:38:29 the witness will answer, and then the attorney will ask
02:38:33 another question. Sometimes there's, you know, talking

that goes on at the same time, and we try to avoid that.

I will do my best to make sure that the record is very clear and that the transcript of what is said and occurs during the course of the trial is accurate.

That transcript will not be available for your use during your deliberations, so you will have to rely on your memories of the evidence and any notes that you have taken during the course of the trial.

Each of you has a notebook. In the back of the notebooks, you'll see a legal pad. You can take notes if you choose to throughout the trial. It's up to you whether you want to do that or not. Those notes are for your personal notes, and you should rely on your memory of what the evidence is, what the testimony has been, and you're welcome to take whatever notes you wish. I would just encourage you not to let your note-taking become so distracting that you miss out on what the testimony has been.

You should also not abandon your recollection just because someone else has different notes from what you can recall or what you have written down. The note -- your notes, if you decide to keep them, are really only to refresh your recollection.

You'll see a copy of the patent in your notebook, as well. Each day, we will be providing you with witness

02:40:23 sheets for the witnesses that you are going to encounter during the course of the day and with lines for you to take notes. So you'll hang on to those while you're here during the trial. If you'll just leave your notebooks in your chairs at the end of the day, we will collect those and make sure they are secure.

I gave you a brief overview of the trial of the case earlier. In just a moment, the lawyers will present their opening statements to you. Those opening statements are designed to give you a roadmap of what each side expects the evidence to show.

Throughout the trial, I want you to remember that what the lawyers tell you is not evidence. It is only their summary of what they believe the evidence is going to show. The evidence in the case amounts to the witness testimony from the witness stand or witness testimony that is presented to you through a deposition, as we discussed, as well as the admitted exhibits that have been introduced into evidence.

What the lawyers tell you is their impression of what they believe the evidence is going to be or has been. They have a duty -- it's their job to try to point out to you where they believe their evidence supports their side of the story. But what they tell you is not itself evidence.

02:42:01 After the lawyers have presented their opening
02:42:04 statements to you, as you know, we will conclude for the
02:42:08 day and return on Monday morning. The Plaintiff will begin
02:42:12 the presentation of its case-in-chief with witnesses
02:42:17 presenting their testimony.
02:42:20 After the witnesses have been called and they have
02:42:23 testified and the other side has had an opportunity to
02:42:26 cross-examine them, they will be released by the Court if
02:42:30 appropriate. After all of the witnesses have been
02:42:33 presented by the Plaintiff, the Plaintiff will rest.
02:42:37 After that, there will be some legal arguments
02:42:40 that the parties and I will discuss.
02:42:46 Subject to all of that, the Defendant will call
02:42:48 its witnesses and present its testimony in the case. And
02:42:53 once that has occurred, the Defendant will rest.
02:42:57 And then the rules allow for the Plaintiff to
02:42:59 present what's called a rebuttal case if they believe it is
02:43:03 necessary to rebut what the witness may have shown during
02:43:08 its case-in-chief. The Plaintiff is not required to put on
02:43:12 rebuttal witnesses, and we won't know until we get to that
02:43:17 point if the Plaintiff chooses to do that or not. But if
02:43:21 they do do that, then those witnesses will testify just the
02:43:26 same way as before and be subject to cross-examination by
02:43:29 the Defendant just as before.
02:43:30 Once the Plaintiff has rested its rebuttal case,

02:43:36 then you will -- if they have a rebuttal case, you will
02:43:39 have heard all of the evidence in the case.
02:43:43 I have given the parties a very specific amount of
02:43:47 time to put their cases on, and I've done that based on
02:43:51 what I believe the complexity of the case involves, what
02:43:54 the issues involved in the case are, and my experience in
02:43:59 other cases of this type. It is an amount of time that I
02:44:04 believe is adequate, fully adequate for them to present
02:44:08 their cases, but they are on a strict timeline. And so I
02:44:12 can assure you they're not going to be wasting your time.
02:44:16 We're going to get here in the morning before you
02:44:20 arrive. We'll work over the lunch hour if necessary.
02:44:23 We'll stay after you've left at the end of the day. They
02:44:26 and I will not waste your time.
02:44:28 There will, however, be times that we do have to
02:44:33 handle things outside of your presence, and that's just the
02:44:36 reality of a trial. Things can come up that we don't
02:44:44 expect that we could not deal with at the normal times
02:44:49 before or after court or over the lunch hour.
02:44:52 So there might be a time or two where you have to
02:44:56 wait in the jury room a little longer than I had predicted,
02:45:03 and there may be times when I have discussions with the
02:45:06 attorneys over here at the sidebar, and that's just part of
02:45:11 a trial. It inevitably occurs, but I do not anticipate it
02:45:16 to be much of a problem. It's just an inevitable part of a

02:45:24 trial.

02:45:25 I know many of the lawyers involved in this case.
02:45:27 I assure you they are good attorneys, and I can assure you
02:45:31 that we are all going to work hard to keep those delays to
02:45:34 an absolute minimum.

02:45:37 I will ask that you be here about 8:45 in the
02:45:40 morning, not tomorrow morning, Monday morning, and during
02:45:45 the mornings, ask you to be here about 8:45 in the morning.
02:45:49 That will give you time to get into the courthouse, get
02:45:52 down to the jury room, get you settled, and then we will
02:45:55 have you brought into the courtroom as close to 9:00
02:46:00 o'clock as possible so that we can start promptly.

02:46:02 We'll go to 9 -- from 9:00 to 5:00 or 5:30 each
02:46:08 day. We'll take a morning break of about 15 minutes, an
02:46:11 afternoon break of the same length, and we'll probably
02:46:14 break about 45 minutes to an hour for lunch each day.

02:46:22 I may be fairly strict with our break times given
02:46:25 the amount of time that the parties have been allotted and
02:46:32 the fact that next Friday is a holiday. I do anticipate
02:46:37 and I think the lawyers expect, we will get this case to
02:46:40 you on Thursday. And it will be ready for your
02:46:47 deliberations at that point.

02:46:49 How long it takes you all to deliberate and when
02:46:53 and how you continue deliberations at that point will be up
02:46:58 to you. But I do expect the case will be in your hands by

02:47:04 sometime on Thursday.

02:47:05 After all of the evidence has been presented to
02:47:12 you, I will give you my final instructions, like I am
02:47:15 giving you instructions now. We call those final
02:47:18 instructions the charge. And once I've given you the
02:47:22 charge, the lawyers for both sides will present their
02:47:25 closing arguments to you.

02:47:29 And then following that is when your deliberations
02:47:32 have -- will begin. And only when all of the evidence has
02:47:36 been presented and you retire to the jury room to
02:47:40 deliberate will you discuss the merits of the case among
02:47:45 yourselves.

02:47:45 As I said, you'll get a verdict form. It will
02:47:49 have a series of questions for you to answer. And at that
02:47:53 time, it will be your duty to begin your deliberations and
02:47:57 to talk to each other about what the evidence has been as
02:48:01 part of the process of answering those questions and doing
02:48:04 your best to come to a unanimous answer on each of the
02:48:07 questions that's on the verdict form.

02:48:09 I gave you fairly thorough instructions before we
02:48:17 broke for lunch about the rules of conduct that I'm going
02:48:20 to ask you to follow. They include not doing any research
02:48:25 or investigation, not communicating with each other or not
02:48:30 posting anything about your involvement as a juror on any
02:48:38 social media website or app. You're not to communicate in

02:48:42 any way with anyone at any time, with each other, with
02:48:48 anyone else orally or in writing, electronically, until the
02:48:52 very end of the case once your deliberations have begun.

02:48:57 As you're coming into the courthouse in the
02:49:02 morning and as you're in the halls throughout the course of
02:49:08 the day, over lunch, leaving, you're going to see a lot of
02:49:10 people associated with this trial both in and around the
02:49:13 courthouse area. I'm instructing them at this time not to
02:49:18 communicate with you in any way.

02:49:20 I know they will follow those instructions. I'm
02:49:24 sure they will not intend it in any way to be interpreted
02:49:31 as being impolite or rude or anything like that. They're
02:49:36 doing their jobs following my instructions. So people
02:49:39 won't be speaking to you if they happen to meet you in the
02:49:43 hall. So please don't interpret it in that way. I know
02:49:48 that you would not.

02:49:49 The last thing I will say is I will remind you
02:49:57 about these instructions throughout the course of the
02:50:00 trial. And I do that not because I have any doubt at all
02:50:04 about your ability to follow those instructions. I don't
02:50:08 have any doubt, but just to reurge the importance and the
02:50:13 significance of them throughout the course of the trial.

02:50:15 Okay. That completes the preliminary jury
02:50:22 instructions.

02:50:26 Does either party wish to invoke the Rule?

02:50:28 MR. HERMAN: Yes, Your Honor.
02:50:29 THE COURT: You do?
02:50:30 MR. HERMAN: Yes.
02:50:31 THE COURT: Okay. Very good.
02:50:32 All right. So, ladies and gentlemen of the jury, 02:50:35 you've heard that at least one of the parties has invoked 02:50:38 the Rule. That is a rule of evidence in our system that 02:50:44 says the witnesses who will be testifying in the trial 02:50:51 cannot hear the other witnesses' testimony. And there are 02:50:58 a number of exceptions to that rule. Corporate 02:51:04 representatives, of course, of a party who are going to -- 02:51:06 who are going to testify may remain in the courtroom. 02:51:09 Expert witnesses may remain in the courtroom, and the like.
02:51:13 But subject to those exceptions, the Rule has been 02:51:16 invoked at this time. And anyone placed under the Rule of 02:51:21 the Court must retire from the courtroom and remain outside 02:51:25 the presence and the hearing of the proceedings here in 02:51:30 court.
02:51:30 All right. Any questions about that from either 02:51:34 side?
02:51:35 MR. HERMAN: Yeah, Your Honor. My understanding 02:51:37 is that those witnesses can stay for the opening. It's 02:51:40 when the first witness comes on Monday, is that --
02:51:43 THE COURT: Is that agreeable to the Defendant?
02:51:44 MR. DACUS: It is, Your Honor.

02:51:45 THE COURT: Okay. That's fine.
02:51:46 MR. HERMAN: Thank you, Your Honor.
02:51:46 THE COURT: Okay. At this time, the parties will present their opening statements to you, and we will begin with the Plaintiff.
02:51:54 MR. HERMAN: Your Honor, would you be so kind as to give me a five-minute warning, please?
02:52:07 THE COURT: I'd be happy to.
02:52:08 MR. HERMAN: Thank you. May I proceed?
02:52:10 THE COURT: You may.
02:52:10 MR. HERMAN: Ladies and gentlemen, let me start where we asked you to start this morning. My name is Barry Herman. I graduated from college with an engineering degree. I worked in the oil and gas field for several years. Met a woman named Heather about 34 years ago. We got married about 32 years ago. She was gracious enough to put me through law school and then gave me three wonderful sons. My oldest is 25. My middle one is 25. And my baby is 20, and he's about three inches taller than me, and I think he's still growing.
02:52:46 I'll go ahead and answer Judge Schroeder's bonus question, too, what do I do for fun. We love hiking with our dog Fletcher. He's about 75 pounds, and he's one of those dogs that needs about five miles a day or else he tears the house up at night. So there's a dual purpose to

02:53:06 us hiking with him.

02:53:07 So thank you for your service. I truly mean that. 02:53:09 My client, Aspen Networks, has been waiting for this day 02:53:14 for quite some time, and we're very excited to present our 02:53:14 case to you.

02:53:16 You met most of our legal team this morning, but 02:53:19 allow me please to reintroduce you to Bill Chin, the first 02:53:23 named inventor on the '554 patent and Aspen's corporate 02:53:25 representative.

02:53:25 As you know by now, this is a patent case. And 02:53:30 the technology is what you heard about briefly this morning 02:53:32 in voir dire, Voice over Wi-Fi, the ability for your cell 02:53:38 phone to automatically and seamlessly switch from the 02:53:41 cellular network to a Wi-Fi network if you lose the cell 02:53:47 signal or it gets too weak. I think you're going to find 02:53:50 this fascinating, folks. And we have one of the best 02:53:53 experts to explain how it works and walk you in detail 02:53:55 through the '554 patent and through Verizon's infringing 02:54:00 Voice over Wi-Fi service.

02:54:00 Dr. Rubin, could you please stand? Oh, you'll 02:54:09 meet him, trust me. In addition to helping in cases like 02:54:13 this from time to time, Dr. Rubin is also a professor. He 02:54:17 earned a Ph.D. from Princeton University in electrical 02:54:21 engineering and has been a professor at UCLA since 1970.

02:54:27 Dr. Rubin has worked on highly secure projects for

02:54:28 several branches of the U.S. military and the Department of Defense. He's truly one of the top experts in telecommunications and computer communications networking.

02:54:37 Before I get into the other witnesses you're going to hear from and the specific patent in this case, I wanted to touch on a couple of things you heard this morning. As you heard from the patent video and Judge Schroeder, the United States Constitution gives Congress the power to pass laws relating to patents.

02:54:59 You know what, Your Honor, I think we're having a problem with the screen. Can you pause for a second?

02:55:04 THE COURT: Yeah, hold on. There we go.

02:55:16 MR. HERMAN: Thank you.

02:55:18 You good? Thank you, Ms. Hopkins.

02:55:21 So here is Article 1, Section 8, Clause 8. So it is a bedrock principle of our country to value innovation, to protect innovation. And it's really kind of amazing that our Founding Fathers had the foresight to include in the Constitution the power of Congress to protect patents.

02:55:41 Our Founding Fathers also knew what they had just left in the late 1700s where decisions were made by the king and the queen or their representatives. We value the people and want to empower them. That is what Judge Schroeder pointed out this morning that the Constitution begins with the words "We the People."

02:56:01 And the 7th Amendment was passed in the late 1700s to give the right to a jury trial for certain civil cases. So the eight of you have been selected and empowered to make these important decisions and to decide this dispute between Aspen and Verizon.

You also heard earlier that a patent is property and it's similar to land. And as you all well know, you don't own all the land, you own a specific piece of land. And landowners typically have a deed to identify which specific land they own. But the best way to mark your land is with a fence. You're telling your neighbors in the world I own what's inside the fence, and I don't own what's outside the fence.

And we're going to explain to you exactly what Mr. Chin and his Aspen co-inventors here invented, how they did it, why it's so important, and, yes, why it's so valuable. I think you're going to see this invention was ahead of its time, folks. Mr. Chin and the Aspen inventors were truly visionary.

So here is the '554 patent. Mr. Findlay showed it to you this morning, and it's on your screen. And as you can see on the cover, it's also in your juror notebooks, I should have added, it's owned by Aspen Networks, Inc. It was filed in June of 2008. And it issued in August of 2011. And here at the end are the claims. This is the

02:57:29 fence. This defines what property Aspen owns. If someone
02:57:33 like Verizon meets each of these claim limitations or
02:57:37 elements, they are on Aspen's land. If they don't meet
02:57:40 these elements, they're not on Aspen's land.
02:57:43 And as Judge Schroeder said earlier, we're
02:57:46 asserting six claims in this case, 1, 2, 6, 15, 16, and 20.
02:57:52 And you're going to hear a lot more detail about these
02:57:54 claims over the next week.
02:57:56 Ms. Hopkins, let's go back to the front page if
02:57:59 you don't mind.
02:58:00 You see here there are three named inventors.
02:58:03 Bill Chin is listed first because he's considered the
02:58:05 principal inventor, and he's a software developer. Robin
02:58:09 Mavunkel is also a named inventor.
02:58:10 Could you stand, please. Thank you, Mr. Mavunkel.
02:58:14 We expect -- Mr. Mavunkel is a specialist in
02:58:17 hardware and testing. We expect both Mr. Chin and
02:58:20 Mr. Mavunkel to testify on Monday.
02:58:22 You will also likely hear testimony from the third
02:58:26 inventor, Mr. Bhaskaran, during the course of this trial.
02:58:29 So what's this patent about? To understand that,
02:58:32 you first have to know a little bit about what Aspen was
02:58:36 doing, what they were working on in the early 2000s. You
02:58:39 will hear that Aspen's product before the invention allowed
02:58:44 small businesses to reliably communicate over the Internet

02:58:48 using multiple Internet connections. So say you had
02:58:52 Xfinity as a service provider and it suddenly went down.
02:58:56 Aspen's original product would automatically switch over to
02:58:59 another Internet connection, say EarthLink and keep the
02:59:02 customer connected.

02:59:04 I want to pause here as I'm talking about that
02:59:07 product that Aspen was selling because something Verizon's
02:59:10 counsel said during voir dire really bothered me. He
02:59:13 implied that Aspen wasn't a successful business and they're
02:59:17 trying to blame Verizon for that.

02:59:20 Ladies and gentlemen, you will not hear one shred
02:59:23 of evidence that Aspen has ever blamed Verizon for slow
02:59:29 sales of the Aspen box. The success or lack of success of
02:59:31 Aspen has nothing to do with whether Verizon infringes the
02:59:36 '554 patent. Aspen doesn't blame Verizon for anything
02:59:40 other than infringing this patent.

02:59:43 Now, around this time in the early 2000s, the
02:59:47 world of telephone service was changing. For decades,
02:59:51 traditional telephone calls used what are called
02:59:54 circuit-switched networks. In those systems, a call used a
02:59:58 dedicated path through the telephone network. That made
03:00:01 the service reliable, but it was also costly and
03:00:05 inefficient. Some of you are old enough to remember busy
03:00:08 signals. That's because there was one line in these
03:00:11 circuit-switched systems that could support only one call

03:00:14 at a time. Then IP networking and the Internet began to fracture that traditional telephone model. Instead of reserving a dedicated circuit for the entire call, voice could be broken into tiny, bite-sized pieces called packets and carried over packet-switched IP networks.

This technology became known as Voice over IP or VoIP. For small businesses this was a major development. Businesses could reduce long distance charges, reduce the cost of traditional phone lines and use the same kind of IP networks they were already using for data.

I remember working in the mid2000s and getting a bill at the end of every month for all of my long distance calls. Once phones switched to VoIP, those things went away. But this evolution to VoIP also created a new problem. Packet-switched calls were cheaper and more flexible but the calls depended on the IP network path, and if that path failed or changed during an ongoing call, the call would drop.

That mattered to Aspen's customers. They already depended on Aspen's product to keep their Internet service connected when one connection failed. If a call -- but VoIP calls presented this harder problem. If a call dropped during a path change, the customer had to hang up, redial the number, and start the call again. That may not be a big deal if you're on the phone having a casual chat

03:01:42 with your sister or brother, but if you've been on the phone for 30 minutes trying to get through to a doctor or customer service and the call drops, this can be a really big deal.

So Aspen solved that dropped call problem over IP networks and described the solution, as you can see here, I've put up Figure 6 in Claim 6 of the '554 patent. Mr. Chin is going to tell you how he figured this out and about that exciting ah-ha moment when he realized he could do this. He will then describe for you all the hard work that went into making this a reality.

Mr. Chin also realized the future applications for this invention. He recognized that cellular networks would eventually go through a similar evolution. At the time, cellular voice calls were still primarily carried over 2G and 3G. Those are circuit-switched networks. Cellular voice still depended on that old infrastructure.

But the direction was clear. Cellular carriers were beginning to go through the same transition that businesses had gone through with VoIP, moving voice away from the circuit-switched paths on to IP networks.

That change promised lower cost, more flexibility, and better integration with Internet-based services, but it also brought the same problems that Aspen had already solved. Once voice traveled over an IP network, the call

03:03:13 could be disrupted if the network path changed. That's
03:03:16 what we call the handover problem. An ongoing call has to
03:03:21 survive a change from one network path to another.

03:03:25 And, yes, Aspen's prediction came true. Years
03:03:28 after the Aspen invention was implemented, after this
03:03:31 patent application had filed and after the '554 patent
03:03:35 issued, the major wireless carriers began launching IP
03:03:38 voice services, including Voice over LTE and Voice over
03:03:43 Wi-Fi. These services used Internet-style networks to
03:03:47 carry voice calls and Voice over Wi-Fi allowed calls to be
03:03:51 carried over a Wi-Fi network connected to the Internet,
03:03:54 such as your home Wi-Fi, your wireless network at work or
03:03:58 school, or at a Starbucks' Wi-Fi connection or at a coffee
03:04:03 shop.

03:04:03 The evidence will show that when the carriers
03:04:06 launched Voice over Wi-Fi, which Verizon called Wi-Fi
03:04:09 Calling, they used the patented solution disclosed in the
03:04:14 '554 patent, allowing calls to be switched between a Wi-Fi
03:04:17 network path and a cellular network path without dropping
03:04:21 the call.

03:04:22 Here's what this means in real life. On the
03:04:25 screen here, you see a gentleman. Let's call him George.
03:04:28 George is on a call using his cell phone, but he's inside
03:04:32 the office, and there isn't good cell service. So he's got
03:04:36 to be using Wi-Fi. George wants to continue the call, but

03:04:39 he needs to leave the office. Without Mr. Chin's
03:04:43 invention, the call would drop when the Wi-Fi signal became
03:04:46 too weak, even though there was a perfectly good cellular
03:04:49 connection from Verizon outside.

03:04:52 The '554 patent allowed Verizon to make sure that
03:04:55 someone like George won't lose the call when he walks
03:04:59 outside. Verizon would switch the call between network
03:05:02 paths from Wi-Fi to cellular without George dropping the
03:05:07 call. The handover would be seamless.

03:05:09 Much like the original Aspen product provided the
03:05:13 security of multiple Internet connections to small
03:05:17 businesses, the new Wi-Fi Calling Service provided the
03:05:22 security of both Wi-Fi and cellular connections to cellular
03:05:24 customers. The result was seamless handover without
03:05:27 dropping the call when the network path changed. Mr. Chin
03:05:30 and Aspen were truly ahead of their time.

03:05:33 So Mr. Chin and Mr. Mavunkel will testify and
03:05:39 explain to you some of the technology in the '554 patent
03:05:42 that may be unfamiliar to you. You'll see on the screen
03:05:46 here the patent uses terms like NAT, which is Network
03:05:49 Address Translation; RTP, which is Real Time Protocol; and
03:05:54 SIP, which is Session Initiation Protocol.

03:05:57 Those are all terms that are very familiar to the
03:06:00 Verizon and the Aspen folks, but I'll be honest, they were
03:06:04 unfamiliar to me when I first got involved in this case.

03:06:07 And so to help you with that, the Court has graciously provided all of us a glossary in Tab 2 of your binder -- in your juror notebooks for some of these terms and acronyms that you will hear most often.

The Court indicated you're going to hear from experts in this case. As I mentioned, you're going to hear from Dr. Rubin, and he is going to show you exactly how Verizon's Voice over Wi-Fi service infringes the claims of the '554 patent.

So what did he do to determine this? He reviewed the patent, the prosecution history, the back and forth between Aspen and the Patent and Trademark Office. He reviewed hundreds of internal Verizon documents, deposition testimony of Verizon engineers. And he conducted his own testing called call trace testing to determine whether there was infringement.

Now, I want to mention something about these Verizon documents you're going to see and be able to review for yourself. Verizon had to produce those to us during this case, and you're going to see that these documents were created long before this lawsuit, folks, long before Verizon was accused of infringement of the '554 patent. They were created by the men and women from Verizon that you heard their counsel talk about earlier.

Now, why do I mention that? Well, I think the

03:07:28 evidence is going to show that time and time again, Verizon and their lawyers will try to walk away from these documents or change the meaning of these documents. So I want you to please be mindful of this.

As the Judge just said, what the Verizon lawyers say is not evidence. The documents and the testimony about those documents is evidence.

So back to Dr. Rubin. He's going to walk you through the claims and all the evidence that he considered and explain to you why Verizon meets each of these claim limitations.

Here on the screen -- if you can go to the next slide. Thank you, Ms. Hopkins.

Here is PX-12. This is a document created by the folks at Verizon which states that the calls may automatically -- are automatically handed over to Wi-Fi from 4G.

Let's look at another one, PTX-90. This explains Verizon's Voice over Wi-Fi handover architecture. And I know what you all are thinking, oh, my gosh, there's more acronyms. But Dr. Rubin is going to explain this to you, and he's going to explain to you how this demonstrates infringement of the claims of the '554 patent. You're going to hear and see many more of these Verizon documents that show how the Voice over Wi-Fi service works exactly as

03:08:45 described by the claims of the '554 patent.

03:08:47 Now, remember what you heard earlier from 03:08:53 Judge Schroeder. Aspen has the burden to show infringement 03:08:56 by something called a preponderance of the evidence, which 03:08:59 just means a little bit over 50 percent.

03:09:01 So we have to have more evidence that Verizon is 03:09:03 within our fence line than Verizon has to argue that it's 03:09:07 outside of our fence line. And, ladies and gentlemen, I 03:09:09 can tell you, we welcome that burden.

03:09:12 So what do I expect Verizon to argue? I got to be 03:09:16 honest. I'm not a hundred percent sure. They may argue 03:09:19 it's somebody else's fault. Maybe it's -- they're going to 03:09:22 say it's you, the consumers, the folks that are using the 03:09:25 cell phone and moving from a place where you can't get a 03:09:29 good cellular signal to a place where you need to make 03:09:34 Wi-Fi to make the call.

03:09:35 Maybe they're going to blame the cell phone 03:09:38 manufacturers like Apple and Samsung. Or they might try to 03:09:41 say that Aspen is somehow moving the fence line and they 03:09:44 aren't actually in it.

03:09:45 We also think they may try to use some creative 03:09:48 artistic license to rewrite the claims with different words 03:09:51 and then suggest they don't do it in that way. That's not 03:09:54 the way this works, folks. As you listen to the testimony 03:09:57 and review the exhibits during the course of this trial,

03:10:00 ask yourself whether Verizon's arguments are credible or
03:10:04 are they just making excuses.

03:10:07 We also think Verizon is going to argue that the
03:10:11 United States Patent and Trademark Office made a mistake
03:10:13 when it granted the '554 patent, that somehow Aspen broke
03:10:18 its part of the deal with the PTO.

03:10:20 As you heard in the patent video this morning,
03:10:23 issued patents are presumed valid, and it takes clear and
03:10:26 convincing evidence to prove that they're not.

03:10:29 Ladies and gentlemen, this is a high burden.
03:10:31 Verizon must have significantly more evidence that the
03:10:35 examiners at the Patent Office somehow got it wrong when
03:10:38 they reviewed this patent for all those years.

03:10:41 We believe the evidence is going to show that
03:10:44 Aspen and Mr. Chin were true visionaries and filed their
03:10:48 patent application years before the cellular companies came
03:10:50 out with their Voice over Wi-Fi Calling.

03:10:54 We think Verizon is going to argue that the '554
03:10:57 patent should not have issued based on the same prior art
03:11:00 that was already reviewed by the Patent Office. Or they
03:11:04 might get creative again and try to argue that Aspen didn't
03:11:08 possess the invention at the time it filed its application
03:11:11 or didn't explain with enough detail how to do it. We look
03:11:15 forward to showing you why these creative arguments hold no
03:11:18 water.

03:11:19 So the last question you're going to answer is
03:11:24 damages, how much to compensate Aspen for Verizon's
03:11:27 infringement. We think Verizon is going to argue that if
03:11:29 they do infringe the patent and the patent is valid, that
03:11:32 we're supposedly asking for too much money in damages.
03:11:37 Well, ladies and gentlemen, we're going to walk
03:11:38 you through Verizon's own documents to show how incredibly
03:11:42 important it was for Verizon to have the capability of
03:11:46 seamless handover from 4G to Wi-Fi and vice versa.
03:11:51 If you look at what Verizon said long before this
03:11:54 lawsuit, the evidence will show it was critical to Verizon.
03:11:59 Their competitors were getting ahead of them, and they
03:12:02 could not let that happen.
03:12:03 Let me preview a few of those documents for you
03:12:07 now. Verizon surveyed its own customers in April of 2014.
03:12:14 Over 64 percent of customers surveyed said Wi-Fi Calling
03:12:20 would add significant or some value to their calling plan.
03:12:23 Verizon knew its customers wanted this feature before they
03:12:27 ever launched it.
03:12:28 Verizon's internal documents also identified
03:12:30 customer requests for Wi-Fi Calling as a specific
03:12:33 justification for launching the service. Verizon's
03:12:37 competitors, T-Mobile, Sprint, AT&T, they were already
03:12:42 offering or announcing Wi-Fi Calling.
03:12:45 And Verizon's own 2014 presentation said the

03:12:50 company would, quote, lose its communication leadership status without this service.

You're also going to hear testimony from Verizon about how much pressure Apple was putting on Verizon. If Apple told Verizon that it needed to have Voice over Wi-Fi Calling if it wanted to provide services for iPhone users, what do you think Verizon was going to do? Well, we're going to show you.

And then there's cost savings. In August of 2015, just months before the launching of Wi-Fi Calling, Verizon prepared an internal presentation called Wi-Fi Calling. That presentation projected capital avoidance of $1 billion over five years for public and enterprise in-building coverage. So Verizon believed a few months before launching its Voice over Wi-Fi service that it would be able to avoid spending $1 billion from 2015 to 2020.

So we have two experts that will help explain to you the tremendous value that Verizon gained by implementing the '554 patent on its nationwide cellular network and as a result what damages are owed to Aspen.

Spoiler alert. It's very much in line with the documents that I've shown and the more that you're going to see.

First is John Minor. Mr. Minor, can you stand, please.

03:14:20 Mr. Minor has spent the last 40-plus years designing and constructing communications networks. In his spare time, he previously served as the mayor of Odessa, Texas. He's going to walk you through the elements of a telecom network, explaining cell towers, backhaul, spectrum, and how adopting the technology in the '554 patent allowed Verizon to use Wi-Fi funded by its customers to improve its network and avoid significant infrastructure spending.

03:14:50 And the reason for this is that Mr. Minor does something called apportionment. All that means is that he's going to explain to you how much of the value of Verizon's Voice over Wi-Fi service is due to its use of the '554 patent. We think you're going to find that testimony very interesting.

03:15:08 You're also going to hear some interesting testimony from Justin Blok.

03:15:11 Mr. Blok, could you please stand for a second? Thank you, sir.

03:15:15 As you can see on the screen, Mr. Blok has a whole bunch of degrees in accounting and finance, and he's a Certified Licensing Professional. Mr. Blok is an expert in valuing patents and determining what they're worth. He's reviewed a bunch of Verizon documents. He's reviewed the deposition testimony of Verizon and Aspen witnesses. He's

03:15:36 done his own investigation, relied on third-party
03:15:40 documents, and he applies Mr. Minor's apportionment to come
03:15:43 up with what was the value of the '554 patent to Verizon
03:15:47 and how much damages are owed to Aspen if you find
03:15:50 infringement of a valid claim.

03:15:51 As part of that analysis, he's going to describe
03:15:55 for you what would have happened in a hypothetical
03:15:57 negotiation. In other words, if Aspen and Verizon had sat
03:16:03 down in December of 2015 right before Verizon launched its
03:16:08 Voice over Wi-Fi Calling Service, what amount of money
03:16:12 would Verizon have paid Aspen to use the invention?

03:16:16 So he's going to tell you that Verizon saved 1
03:16:20 cent, a penny, per Voice over Wi-Fi minute used by its
03:16:24 customers and that the hypothetical negotiation would have
03:16:27 resulted in less than one-tenth of that amount being paid
03:16:31 to Aspen.

03:16:32 Now, as you can imagine, there's a lot of minutes.
03:16:36 Around 360 billion during the last 10 years. So after all
03:16:41 is said and done, we do expect to ask you to award Aspen
03:16:45 around $200 million for Verizon's infringement. The
03:16:49 evidence is going to show that if Verizon didn't adopt this
03:16:52 technology, they would have lost thousands and thousands of
03:16:55 subscribers.

03:16:55 Apple demanded it. Verizon couldn't face the
03:17:01 churn, losing customers to their competitors who were

03:17:05 offering Voice over Wi-Fi.

03:17:06 Verizon would have also been faced with spending a lot more money projected over 1 billion in the first five years on capital expenditures.

03:17:19 So while Mr. Blok's damages calculations may seem like a big ask, we believe the evidence will show that this amount really is reasonable given the value of this patent and this technology to Verizon.

03:17:29 THE COURT: Mr. Herman, you have five minutes remaining.

03:17:32 MR. HERMAN: Thank you, Your Honor.

03:17:32 So what is Verizon going to say in response? We think they're going to argue that Voice over Wi-Fi wasn't that important. It was more of a niche product. A nice to have, not a have to have.

03:17:45 Verizon may even claim it was not important because they couldn't charge for it, but Verizon did use it to improve their coverage and their brand, and they marketed it to its customers that it was free.

03:17:55 Last, Verizon may argue that if you decide to award damages to Aspen for infringement, you should only give Aspen money for calls that actually perform a handover, for those calls that switch from 4G to WiFi and vice versa. But the evidence is going to show that that doesn't really make sense. Verizon's network has performed

03:18:15 billions of handovers, and even when a handover doesn't
03:18:18 occur, the possibility that it could ensures good and
03:18:21 continuous service for its customers.
03:18:22 So I was trying to think of a good analogy and
03:18:26 settled on windshield wipers on your car or truck. We all
03:18:30 agree that windshield wipers have a value, right? That
03:18:34 value is the same whether you're using them every day one
03:18:37 week when there's a lot of rain or whether you go a stretch
03:18:40 of two or three weeks in the hot East Texas summer where
03:18:44 you don't get a drop of rain. Or maybe in the summer you
03:18:47 do get a bunch of bugs so -- on your windshield and you
03:18:51 need to clean it so you can see farther than 5 feet.
03:18:55 You never know when an afternoon storm is going to
03:18:58 pop up or when a bunch -- you're going to get invaded by
03:18:58 some midges or flies. You don't get a discount on the
03:19:03 wipers when you buy them during the dry season. And even
03:19:06 though windshield wipers themselves are pretty inexpensive,
03:19:10 that small part of a big vehicle, when you multiply that
03:19:13 value by all the cars on the road, that becomes a big
03:19:17 number.
03:19:17 Voice over Wi-Fi is similar. You might not use it
03:19:22 every day, but if you're on an important call in your house
03:19:25 or office using Wi-Fi and you need to continue the call in
03:19:29 your car using 4G, you sure as heck don't want to drop the
03:19:33 call and then try to explain to your boss why you missed

03:19:37 the last few minutes of the call.

03:19:39 The value to Verizon is in having the ability for
03:19:41 its customers to have no dropped calls, especially when all
03:19:43 of its competitors were already offering the service. And
03:19:46 you're going to see that literally millions and millions of
03:19:51 Verizon customers use it all the time.

03:19:53 So we are confident that after you hear all the
03:19:57 evidence over the next few days, you will find in Aspen's
03:20:02 favor.

03:20:02 And as Judge Schroeder mentioned, I get to stand
03:20:05 up in front of you next week after the close of evidence
03:20:08 and present closing argument, and I expect to ask you to
03:20:12 find three things.

03:20:12 One, that Verizon's Voice over Wi-Fi service
03:20:16 infringes the claims of the '554 patent.

03:20:18 Two, that the '554 patent is not invalid. The PTO
03:20:23 did not make a mistake when it issued this patent to Aspen.

03:20:26 And then I'm going to ask you to compensate Aspen
03:20:29 for that infringement.

03:20:31 I also expect to walk you through each one of
03:20:34 Verizon's excuses and explain why they're all unfounded.

03:20:39 Now Verizon's counsel gets to go up and explain
03:20:42 what he thinks the evidence will show. He's probably going
03:20:45 to ask you to give Verizon a fair shake. Aspen goes first.
03:20:48 Verizon goes second. Well, we may not agree on much, but I

03:20:52 agree with Verizon's counsel that we want you to hear all
03:20:55 of the evidence in this case and then make a good,
03:21:00 well-informed decision.

03:21:00 I can -- on behalf of Mr. Chin, Mr. Mavunkel, and
03:21:05 Aspen and the entire legal team, I cannot thank you enough
03:21:09 for your service and for your willingness to decide these
03:21:12 issues that these companies were unable to resolve on their
03:21:15 own. We really look forward to presenting our case to you
03:21:18 next week.

03:21:20 Thank you.

03:21:20 Thank you, Your Honor.

03:21:21 THE COURT: Thank you, Mr. Herman.

03:21:25 At this time, the Defendant may present its
03:21:29 opening statement.

03:21:31 MR. DACUS: Your Honor, would you please let me
03:21:33 know when I have five minutes remaining?

03:21:35 THE COURT: Yes.

03:21:35 MR. DACUS: Thank you so much.

03:21:36 Good afternoon. I want to start this afternoon
03:21:44 where I started with you this morning, and that is to say
03:21:47 on behalf of the men and women who work at Verizon, a very
03:21:52 sincere thank you for serving on this jury and for giving
03:21:56 them the opportunity to defend themselves.

03:21:59 We talked about in jury selection this morning
03:22:02 that when somebody points the finger at you and falsely

03:22:06 accuses you, really all you want is somebody to take the
03:22:09 time and listen to your side of the story, and you have
03:22:12 provided them with that opportunity. I know they're very
03:22:17 grateful for that.

03:22:17 I told you this morning that this case is
03:22:19 important. You probably are starting to get a sense of why
03:22:22 it is important to Verizon as a company.

03:22:24 But from Verizon's perspective, this case has
03:22:27 broader implications and broader ramifications. And I'll
03:22:32 start to give you just a bit of a sense of that.

03:22:35 You know from what the Court told you this morning
03:22:38 in the Court's video that our patent system starts in the
03:22:43 Constitution. And, specifically, the purpose of that
03:22:46 patent system, which was to promote the progress of
03:22:51 science, is explicit in the Constitution.

03:22:55 You may think that because Verizon finds itself
03:22:58 sued in a federal courthouse for patent infringement that
03:23:01 Verizon is somehow mad at the patent system or doesn't
03:23:04 respect it. And I know the first thing they want me to say
03:23:08 to you is nothing could be further from the truth.

03:23:11 Verizon has been an innovator in the telephone and
03:23:16 telecommunications for decades, decades. Verizon itself
03:23:21 has lots of patents. So the true purpose of the patent
03:23:25 system and the integrity of the patent system is a big
03:23:29 reason why Verizon is here.

03:23:30 There are a couple of very fundamental, absolutely
03:23:37 important principles in the patent system that are at play
03:23:40 here, and from our -- from our perspective are at risk.
03:23:44 So let me -- we're going to talk about details in
03:23:47 the next 30 minutes, but I want you to keep these high
03:23:50 level principles in mind both today and when we go forward
03:23:55 next week.
03:23:55 You know from what the Court told you in the video
03:23:58 this morning that a patent is just like a deed to a piece
03:24:00 of property. So what you see on your screen on the right
03:24:04 is an example of a deed. Many of you have probably seen a
03:24:07 deed. It is very exacting coordinates of exactly what
03:24:13 piece of property you own. And we can take those
03:24:18 coordinates in a deed, we can plot them on a map, and as
03:24:23 counsel said, we can put a fence around them, and that's
03:24:26 what you own.
03:24:27 In this example, 21.413 acres, no more, no less.
03:24:33 A patent is the same. In that patent, when you look at it,
03:24:35 as the Judge told you, there are claims. The claims define
03:24:38 the fence around the property that these folks own.
03:24:44 Unfortunately, what can happen is in the course of
03:24:48 negotiating with the Patent Office to get a patent, the
03:24:55 patent applicants and eventually owners can tell the Patent
03:24:58 Office, hey, we agree to this narrow piece of land. Once
03:25:03 they get their patent, regrettably what can happen is they

03:25:09 see people operating just outside of that boundary, and 03:25:12 they want to move that fence line. And that principle is 03:25:17 absolutely important and at play in this case.

03:25:20 And our founders in the Constitution did something 03:25:23 very important. They put a jury in charge. Never done 03:25:26 before in the history of the world, nor since. The Patent 03:25:31 Office doesn't police this. The Court doesn't police it. 03:25:33 You, the jury, polices it to make sure a patent owner, once 03:25:37 you get that piece of property, 21.413 acres in this 03:25:42 example, you can't move your fence line. Even if you think 03:25:45 you can get hundreds of millions of dollars by moving your 03:25:48 fence line, you don't get to do it.

03:25:51 There's a second principle at play, and that is 03:25:53 when you apply for a patent and you receive a patent, your 03:25:58 solution in the patent has to be new. No one else could 03:26:01 have had that idea in the solution before you. And, again, 03:26:06 our founders put the jury in charge of making sure that the 03:26:12 patent was actually new.

03:26:13 Let's talk about who the parties are briefly. We 03:26:17 don't need to spend a lot of time on Verizon. We know from 03:26:19 jury selection this morning that everyone knows who Verizon 03:26:23 is. Verizon has its significant corporate offices up in 03:26:27 Irving right down I-20, right outside of Dallas.

03:26:31 Verizon has been one of the country's leading 03:26:34 telecommunications and telephone network operators for

03:26:37 decades. For those decades, they've been literally on the
03:26:43 forefront of innovation of trying to ensure that folks have
03:26:48 telephone service and including cellular service and
03:26:52 specifically including rural areas, outside of cities.
03:26:58 They've spent untold resources trying to make sure that
03:27:02 their cell phone coverage includes folks in rural areas
03:27:05 like we live in.
03:27:07 And what you'll hear as evidence in this case,
03:27:12 including from Mr. Faber, is that that is one of the
03:27:16 reasons that this Wi-Fi Calling is -- was not and does not
03:27:20 take a top priority at Verizon.
03:27:23 We talked about it this morning, and you'll hear
03:27:25 evidence from the stand that when you get a Verizon phone,
03:27:28 the Wi-Fi Calling is actually turned off by default. You
03:27:32 have to take certain steps to actually turn it on.
03:27:35 That doesn't mean that we don't have a Wi-Fi
03:27:38 Calling Service. We do. But what Mr. Faber will tell you
03:27:44 and you'll hear evidence, we prefer that folks use our
03:27:47 cellular service, and there's very good reasons for that
03:27:49 that we'll explain.
03:27:50 Now, who sits at the other table, Aspen Networks.
03:27:54 Aspen is a very different company with a very different
03:27:57 story in history. And I think it is important to talk
03:28:00 about their history for a couple of reasons. The first is
03:28:05 I think it gives you insight into what other people, third

03:28:10 parties, not Verizon, but what did third parties think
03:28:13 about this technology that these folks have just stood up
03:28:16 and told you was so valuable, and they will continue to
03:28:19 tell is valuable. And it also gives you insight, at least
03:28:22 from our perspective, as to actually what's motivating and
03:28:27 what's going on in this lawsuit.

03:28:28 So who is Aspen? Founded in 2000 by a gentleman
03:28:34 by the name of Sajit Bhaskaran. From 2000 to 2006, Aspen
03:28:39 was -- made certain equipment called a router, routing
03:28:45 equipment for Internet service. They were an equipment
03:28:48 maker.

03:28:49 I think what you'll hear from the stand is that
03:28:51 basically because they were not successful in that business
03:28:54 in 2006, they changed their business to go to this Voice
03:29:01 over IP, sometimes we call that VoIP. Aspen had no -- no
03:29:07 experience in that area. Its engineers did not have
03:29:11 experience in that area. I think Mr. Chin will tell you he
03:29:13 didn't have experience in that area.

03:29:15 Voice over IP was something that was well known by
03:29:17 2006. Certainly not something that -- that Aspen invented
03:29:23 in any way. And -- but Aspen was attempting to make
03:29:27 products that made the quality of service, the quality of
03:29:30 the calls on these VoIP calls better.

03:29:34 From 2007 to 2010, Aspen made these types of
03:29:39 products, sold these types of services. I don't have any

03:29:42 pleasure in saying this, but it's a fact. I think what
03:29:46 they'll tell you out of their own mouth is by 2010, they
03:29:49 were unsuccessful. The marketplace didn't -- didn't want
03:29:52 their products or their services. In 2010, they stopped
03:29:56 making those types of products, and they've not made any
03:30:00 since.
03:30:00 From 2010 until now, they've dabbled in a few
03:30:04 other areas that are essentially unrelated to the
03:30:08 technology. What you'll also hear is that in 2015, when
03:30:12 Verizon actually implemented its Wi-Fi Calling, these folks
03:30:17 at Aspen were certainly aware of that. I think you'll see
03:30:20 evidence from Mr. Bhaskaran himself where he knew that
03:30:24 Verizon had implemented Wi-Fi Calling. He had some
03:30:29 suspicion that there was infringement of the patent. I'll
03:30:32 tell you that was completely unfounded.
03:30:34 And then in 2023, literally eight years after we
03:30:40 put this in place, we got sued for lack of a better term
03:30:46 out of the blue. We had no notice or knowledge of this
03:30:49 patent when we designed this system nor at any time before
03:30:53 this lawsuit was filed.
03:30:54 Now, once this lawsuit's filed, as we talked about
03:31:01 this morning, you have a choice. If somebody points the
03:31:03 finger at you and accuses you of something that you think
03:31:07 is unfounded, you can either just rollover and take it or
03:31:10 you can stand up and defend yourself. When you decide to

03:31:13 defend yourself in a federal court of patent infringement, 03:31:16 you do that by asking a jury to ask -- answer a couple of 03:31:19 questions. The first question that you will be asked when 03:31:23 you go back in the jury room is whether or not Verizon 03:31:26 infringes this '554 patent.

03:31:30 So what I want to do is before we talk about the 03:31:34 evidence, I want to make sure that you understand the 03:31:36 process. And the reason I want to make sure you understand 03:31:40 is, so that when you hear evidence from the stand during 03:31:42 the course of the next week, you know how you're going to 03:31:45 apply that. You're not hearing it in a vacuum.

03:31:49 So I'll give you an example. This is an example 03:31:52 somebody gave me a long time ago, and it helped me, so I'm 03:31:55 hopeful that it will help you understand the process.

03:31:57 So let's assume that there is a patent owner who 03:32:02 has a patent on a very specific type of ball. And the 03:32:06 claim of that patent, remember that claim is the fence 03:32:09 line. The claim in that patent says that the ball is made 03:32:13 of leather, seamed together, filled with air, and round. 03:32:17 And assume that that patent owner sues the maker of a 03:32:21 football.

03:32:23 Well, the maker of a football would come to court 03:32:26 and say, my ball is made of leather, seamed together, 03:32:29 filled with air, but it's oblong, it's not round, and, 03:32:33 therefore, there's no infringement. And they would be

03:32:34 exactly right because as the judge told you, every single word of their claim has to be met. They can't move their fence even just a little bit.

Let's assume that same patent owner sued the maker of a baseball. The baseball owner or maker would come and say, it's made of leather, seamed together, and it's round, but it's not filled with air. And, therefore, there's not infringement. And that is exactly right.

So how do those principles, how does that process play out in this trial over the next week? When we got -- when Verizon got sued, they hired Dr. Mark Mahon. Dr. Mahon is one of the country's leading experts in telecommunications in these areas that we're here about in this trial.

We asked him to look at this issue of infringement, to analyze and investigate the allegations. He's done that. He's going to present what he found to you. And he's going to do it in a bunch of detail. I'm going to warn you right now, he's likely to be on the stand for a couple of hours, and he's going to give you probably more detail than you want, more detail than I probably want, but it's the kind of detail that you need to make an informed decision on this infringement issue.

I want to give you just a preview of what I think he'll show you and tell you. He'll do a much better job

03:33:58 than I will, I promise you. I think he'll start by just
03:34:01 giving you some of the basics of these VoIP calls. So I
03:34:05 want to do that so that you have some of these concepts in
03:34:08 your mind.

03:34:09 I've got a diagram on the screen that shows a call
03:34:12 being made by Alice over to Bob. So how does that happen?
03:34:18 Dr. Mahon will explain this to you better than I will. The
03:34:22 first thing that happens is Alice's phone sends what's
03:34:26 called a SIP INVITE over to Bob's phone.

03:34:33 Now, SIP is an acronym that standards for Session
03:34:37 Initiation Protocol. This is a standard. This is a
03:34:38 standard that the industry developed, that -- the standard
03:34:40 existed long before Aspen did, long before this '554
03:34:45 patent.

03:34:46 That INVITE is essentially Alice's phone saying to
03:34:52 Bob a few things. There are fields within this INVITE.
03:34:56 One thing it may contain, Alice's IP address. It may -- it
03:35:01 will -- it will reach out to Bob and say, here are the
03:35:05 protocols, basically the language that I, Alice, want to
03:35:09 speak to you -- you, Bob's, phone. And it will include
03:35:14 something called a Cseq value, a numbering of the fields
03:35:20 within this INVITE. Bob's phone will send an
03:35:23 acknowledgement back and say, okay, I'll talk on that
03:35:26 basis. Sometimes we think about this SIP message, this
03:35:30 INVITE message as sort of like a traffic cop setting the

03:35:33 rules.
03:35:34 And after Bob's phone sends an acknowledgement
03:35:38 back, then they can have a conversation. They have that
03:35:42 conversation through another protocol called RTP, Real Time
03:35:47 Protocol. Again, this is not something that Aspen came up
03:35:50 with. These are industry standards that existed before
03:35:53 this '554 patent. And RTP is just converting this computer
03:36:02 digital language into voice so that you can actually have a
03:36:05 conversation.
03:36:05 Now, let's talk about the patent. Here was the
03:36:12 issue that the patent was attempting to solve. This is the
03:36:16 problem that the patent was attempting to solve. What you
03:36:18 see on your screen is Figure 9 from the patent. As you
03:36:26 heard, remember, we're back in 2008. Internet is not
03:36:30 nearly as good as it is today.
03:36:32 So what you see in Figure 9 is you see this phone
03:36:38 here, and it was attempting to talk to a phone over here.
03:36:41 It's just represented by a server, but it's actually
03:36:44 talking to a phone.
03:36:45 And here was the -- here was the issue. On these
03:36:50 VoIP calls, these ISPs are actually Internet Service
03:36:56 Providers. So if your phone call is occurring on Internet
03:37:01 Service Provider 1, the folks at Aspen said we want to have
03:37:05 a product, and this was their product right here, that
03:37:10 would allow you to switch Internet Service Providers if the

03:37:15 quality on Internet Service Provider 1 was not up to speed,
03:37:19 if the quality on others were better.

03:37:21 The problem with that is this phone right here has
03:37:29 a specific IP address. And if you switch to Internet
03:37:39 Provider 2, then that phone has a different IP address.

03:37:46 And the problem, as Mr. Chin, I think, will tell
03:37:48 you directly, is that call would almost always drop or at a
03:37:54 minimum be delayed or disrupted in some way.

03:38:00 Now, let me say a couple of things about this IP
03:38:02 address because some of you may know about IP addresses.
03:38:07 You may have heard the term. Some of you may not. But
03:38:11 there are a couple of interesting aspects to it that are
03:38:13 very important.

03:38:14 An IP address is just a series of numbers assigned
03:38:18 to the phone. Sort of like a telephone number, but it has
03:38:22 some important differences, and the differences are these.
03:38:26 This IP address is assigned to this phone only on a
03:38:29 temporary basis. So it's not like a phone number where
03:38:33 it's permanent. It's temporary.

03:38:34 The second thing is, it is assigned by the ISP, by
03:38:38 the Internet Service Provider. So if I'm on -- using ISP
03:38:45 1, I get an assigned IP address from that Internet Service
03:38:51 Provider. If I switch to Internet Service Provider 2, this
03:38:56 phone gets a new IP address. The problem is the phone out
03:39:02 here hasn't been told that I got a new address, and so it

03:39:09 can't communicate.
03:39:10 And that's the problem this patent was attempting
03:39:13 to solve.
03:39:13 Now, how did the patent go about it? These are
03:39:18 the claims. This is Claim 1. We're going to look at it in
03:39:22 a little more detail. But before we look at the words, I
03:39:25 want to -- I want to show you by way of diagram. I just
03:39:32 took the Figure 9 from the patent that we were just looking
03:39:34 at, put it into a more simplistic form to show these
03:39:38 different Internet Service Providers. If there's a switch
03:39:43 from ISP 1 to ISP 2, this, Bob's phone is no longer
03:39:50 communicating and the call drops because it has a new IP
03:39:54 address.
03:39:54 So the solution in the patent was to send
03:39:57 something called a SIP RE-INVITE message to Bob, and that
03:40:03 SIP RE-INVITE message would include Alice's new IP address
03:40:09 from ISP 2. That's -- that's the problem, and that's the
03:40:14 solution in the patent.
03:40:14 Of course, the question becomes -- and we're going
03:40:19 to talk about it -- is that the solution that Verizon
03:40:22 actually uses? Hold on to that for one second because I
03:40:25 want to talk about this patent claim in detail.
03:40:28 This is Claim 1 of the patent. This is what I
03:40:36 want you to know about how these folks came up with this
03:40:41 solution, and there are a couple of things that they didn't

03:40:43 tell you that I think are important. This patent, by the way, is not about inventing Wi-Fi Calling. Aspen certainly didn't do that. It's not about inventing cellular service. They certainly didn't do that. The patent is about, as they said, a handover or a crossover between two networks. They want to say between Wi-Fi and cellular service. But they didn't invent handovers. Not in any way. And we know that from the evidence.

03:41:15 So here's what you see on the screen. This is what the judge told you is prosecution history. This is the discussion between Aspen, the patent owner, and the Patent Office when they first applied for the patent. And what Aspen told the Patent Office is, hey, we have this method for handing over, and that transmission allows the call not to be disrupted. And you know what the Patent Office said? That's not new. Folks have known for some time how to make that handover without disrupting the call, so your patent is rejected.

03:41:52 They tried again. What you see on the screen, you see is their amended application. And they said to the Patent Office, well, look, we've got this specific way of making this handover using this thing called Network Address Translation, and the Patent Office said no, that's not new either. People have already done that before.

03:42:14 So they tried another time, and they said this

03:42:18 time to the Patent Office, hey, we've got this really
03:42:22 specific way of doing this that for this SIP signaling
03:42:27 sequence that we talked about, it requires maintaining the
03:42:33 sequence of the transmission, okay? Very specific way.
03:42:39 And the Patent Office said, okay, you can get a patent on
03:42:43 that very specific way of doing it.
03:42:45 And that's very important in this case. This is
03:42:48 the fence or the boundary line that the Patent Office gave
03:42:51 them, not on any broad transmission, not on any kind of
03:42:58 handover, but a very specific type of handover.
03:43:02 I want to give you just a short example to kind of
03:43:06 emphasize this point because it's an important part of this
03:43:09 case. So assume that I went to the Patent Office and said,
03:43:15 hey, I want to get a patent on a method of how to bake a
03:43:19 cookie. What do you think the Patent Office would say?
03:43:23 They would say what are you talking about. Cookies have
03:43:26 been made long before you. This is not new.
03:43:28 So I might have to go back to the Patent Office
03:43:30 and say, okay, I've got a method for baking a cookie that
03:43:36 includes chocolate chips, macadamia nuts and sprinkles and
03:43:42 not just any kind of sprinkle but a purple, pink, and
03:43:46 white-striped sprinkle, and the Patent Office might say,
03:43:51 yeah, that's new. But the result of that is I don't get to
03:43:55 sue somebody for infringement for making any type of
03:43:59 cookie. I only get to sue them for infringement and

03:44:00 they're only guilty of infringement if they make that very
03:44:04 specific type of cookie. It all goes back to this fence
03:44:07 line, and this is the fence line that the Patent Office
03:44:10 gave to the folks at Aspen.
03:44:13 So how does that relate to infringement? This is
03:44:18 the thing that the Patent Office said, okay, now we see
03:44:21 that you have this very specific way of doing this SIP
03:44:25 signaling sequence. And by the way, this is something that
03:44:28 the Court has defined for you in your notebook. You can
03:44:31 look at it later when you have time. But the Court has
03:44:34 said that what this means is maintaining the continuity in
03:44:39 the signaling sequence of the SIP used in the transmission.
03:44:45 That's what these folks have to show.
03:44:47 So does Verizon's system operate in that way?
03:44:53 That's the question, right? Comparing the patent to the
03:44:57 balls. Here we're comparing the patent to how Verizon
03:45:00 operates.
03:45:00 So how does the Verizon Wi-Fi Calling System
03:45:03 operate? We've got a phone -- by the way, this is a
03:45:07 technical document from the Verizon network. I heard
03:45:11 counsel say we're going to run from these documents. I'm
03:45:13 running to it, not from it. This shows exactly how the
03:45:18 system works. You've got a phone with an IP address. That
03:45:22 phone can communicate. You see that green line is over the
03:45:27 cellular service. You see that cellular tower right there

03:45:30 to indicate that it's on cell service. It can also
03:45:34 communicate over Wi-Fi. That's what that indicates right
03:45:40 there, and it can switch back and forth in between. But
03:45:43 there's one very important fact. Verizon itself is an
03:45:49 Internet Service Provider. So this phone, when it is using
03:45:53 cellular or Wi-Fi has the exact same IP address. Let me
03:45:59 say it again, has the exact same IP address.

03:46:02 So remember what the purpose of this patent was,
03:46:06 was to fix a problem when you switched IP addresses and you
03:46:11 were switching from one network to another. Verizon
03:46:15 doesn't have that issue. Its phone has the same IP address
03:46:21 whether that phone is talking over cellular or whether that
03:46:26 phone is talking over Wi-Fi.

03:46:27 Dr. Rubin, their expert who they pointed to
03:46:35 figured that fact out, and he came up with a creative
03:46:38 argument. He said, well, the Verizon system has this thing
03:46:41 called a Re-Registration command in it, not a RE-INVITE,
03:46:46 but a Re-Registration command.

03:46:50 THE COURT: Mr. Dacus, you have five minutes.

03:46:52 MR. DACUS: Thank you, Your Honor.

03:46:53 What you're going to find about that
03:46:56 Re-Registration that he points to is exactly what I just
03:47:00 told you. And this is again a Verizon technical document,
03:47:03 that when it switches between Wi-Fi and cellular, that
03:47:07 assigned IP address of the phone never changes, never

changes. So we don't have the problem that this patent was intended to resolve, and because of that, we don't maintain this continuity in the signaling sequence as the patent requires.

There's another thing I want to talk to you about, another reason Verizon doesn't infringe. This patent requires, you'll see it here in the language, that when you switch between the first network path, you switch between a plurality of alternative paths.

Now, plurality is probably not a word that you ever use. You may not know, it means two or more, two or more is what plurality means. Remember, they wrote this. This is what -- the deal they made with the Patent Office. So when you switch from whatever network you're talking on, you have to choose between two or more paths.

And in the Verizon system, there are not two or more paths to choose from. If you're talking on the cellular network, the only other path to choose from is the Wi-Fi network. If you're on the Wi-Fi network, the only other path to choose from is the cellular network. So there are not two or more alternatives as the patent requires and as their fence lines dictate.

Let me touch on this invalidity issue. If you have a patent, it has to be new. I don't have time. The Judge just told you, I've got a few minutes. We're going

03:48:41 to present to you in detail a patent from a company called
03:48:44 Qualcomm, one of the country's leading experts in telecom
03:48:50 telephone communications. We're going to show you exactly
03:48:53 this, and it's going to sound familiar to you.
03:48:56 This patent, the '377 patent from Qualcomm, shows
03:49:03 folks talking on a Wi-Fi network and the ability to
03:49:10 crossover or handover to a cellular network. And that
03:49:13 patent allowed that to be done by a SIP proxy. All of that
03:49:22 probably sounds very familiar to you. It sounds exactly
03:49:25 like the patent that I just described that Aspen has. And
03:49:30 we'll walk through in detail that this Qualcomm patent,
03:49:35 combined with these SIP standards, were in existence -- and
03:49:40 it won't be disputed, were in existence before this patent
03:49:44 was issued.
03:49:45 There's another problem with this patent, and it's
03:49:51 a lack of written description. What happened is when they
03:49:56 added this last claim that the Patent Office required them
03:49:59 to add, they didn't explain to anybody how it is that you
03:50:03 maintain this signaling sequence. It's hard to prove a
03:50:08 negative in an opening statement, and I won't try, but
03:50:10 we'll show you when you have a patent, the purpose is to
03:50:13 explain to the public how to do it, and these folks simply
03:50:16 did not do it at all.
03:50:18 I'll close with this. These folks are asking for
03:50:27 a lot of money. I'm not going to talk about money because

03:50:30 Verizon doesn't believe that it owes them anything. But
03:50:33 this is what I would ask you to do over the course of next
03:50:36 week. Listen closely to -- when they put on their damages
03:50:39 evidence, listen to the method and the process that they go
03:50:43 through to get to these numbers because I'll tell you this,
03:50:49 damages in these types of lawsuits and trials can tell you
03:50:52 a lot about what a case is really about, what a lawsuit is
03:50:56 really about. They've told you what they want you to
03:50:58 believe it's about, but if you'll listen closely to the
03:51:02 method and the process that they go through to get to these
03:51:04 big numbers, I think you'll figure out that it's about
03:51:08 something a little different.
03:51:09 I very much appreciate everyone's attention today.
03:51:14 I know it's been a long day. We very much look forward to
03:51:18 the opportunity to present the evidence to you next week
03:51:20 and ultimately to receive a verdict from you. Thank you.
03:51:24 Thank you, Your Honor.
03:51:24 THE COURT: Thank you, Mr. Dacus.
03:51:25 All right. Ladies and gentlemen of the jury, that
03:51:28 completes today's portion of the trial. I hope you all
03:51:31 have a nice weekend. We will see you Monday morning at,
03:51:34 say, 8:45. Try to be here by 8:45. That'll give you time
03:51:39 to get into the courthouse, get down to the jury room, get
03:51:44 settled.
03:51:45 As a reminder, our day will go roughly from 9:00

03:51:50 a.m. until 5:00, 5:30 when we will recess for the day.
03:51:58 We'll provide lunch for you each day. You may have noticed
03:52:02 it's pretty chilly in the courtroom, so if you want to
03:52:04 bring a jacket or a sweater or something like that, feel
03:52:07 free to do that.

03:52:08 I do want to instruct you again, because we're
03:52:11 going into the weekend. During this recess and at any
03:52:19 time -- any other time during the trial, don't discuss the
03:52:21 case among yourselves or with anyone else. Don't allow it
03:52:25 to be discussed in your presence. Don't form any opinion
03:52:31 or express any opinion about the case until all of the
03:52:35 evidence has been presented to you and you have been
03:52:39 instructed on the law.

03:52:41 Likewise, don't do any independent research or
03:52:45 investigation into any matter associated with the case, any
03:52:48 of the legal issues that you hear being discussed, any of
03:52:53 the attorneys, any of the parties, anything about the law
03:52:57 or the case in any respect.

03:53:01 And, finally, don't post anything about your
03:53:04 involvement as a juror on any social media website or app.

03:53:08 Hope you all have a very nice weekend, and we'll
03:53:11 see you Monday morning about 8:45.

03:53:15 COURT SECURITY OFFICER: All rise.

03:53:17 (Jury out.)

03:53:18 THE COURT: Okay. Anything to discuss?

03:53:52 MR. HERMAN: Your Honor, there was one thing from Aspen. You had mentioned this morning -- I'll come up here. You had mentioned this morning about, you know, just generally -- this was when just me and Mr. Findlay and Mr. Dacus and Mr. Anderson were in your chambers.

03:54:09 I think all the parties kind of forgot that because it's Friday night, we're going to give our deposition designations on Saturday that we want to play on Monday, and I've talked to my team, I think it's fine as long as you can make that -- if there are -- hopefully we can work anything out. If you let us know first thing Monday morning, and if we have to argue it, I get it, and then we can cut it at lunch because we're not going to play it until later that day.

03:54:30 THE COURT: You got something Monday afternoon?

03:54:32 MR. HERMAN: I anticipate, it could bleed into Tuesday morning, so I'm not exactly sure how long things are going to take, but there probably are going to be at least one deposition played on Monday afternoon.

03:54:43 THE COURT: Okay. And so under, remind me, under the terms of the order, when do you disclose those designations to the other side?

03:54:53 MR. HERMAN: Saturday night.

03:54:54 THE COURT: And so objections would be due on Sunday?

03:54:56 MR. HERMAN: Correct.
03:54:56 THE COURT: All right. And you'll provide those
03:54:58 to us --
03:54:59 MR. HERMAN: They actually will be provided
03:55:01 Saturday night, I think, and then if there's a still a
03:55:04 dispute, we let you know Saturday night. Because normally,
03:55:07 Sunday morning, if we had court, you would make a ruling so
03:55:10 that we could cut it on Monday. And I'm just letting you
03:55:13 know that maybe you can make the ruling or we'll just --
03:55:16 we'll deal with it Monday morning. I just wanted to -- I
03:55:18 almost said something to you this morning, but it was --
03:55:21 THE COURT: Do you have something to say?
03:55:24 MS. DUPRIEST: He got the timing right.
03:55:26 THE COURT: It looked like you were itching to say
03:55:26 something.
03:55:26 Okay. I was concerned about the timing.
03:55:28 Do the Defendants agree with the timing?
03:55:31 MR. ANDERSON: Correct, Your Honor.
03:55:31 THE COURT: Okay. You get it to us. We'll rule
03:55:33 as quickly as we can. If it's Monday morning, you know,
03:55:36 we'll -- we'll turn it around pretty quickly. I mean, I
03:55:40 recognize you all know, I mean, it takes some time to get
03:55:43 that done, but I'm sure our folks in the hot seats are
03:55:48 fully capable of handling that.
03:55:50 MR. HERMAN: I agree, Your Honor.

03:55:51 THE COURT: But thanks for drawing my attention to it.

03:55:53 MR. HERMAN: Absolutely, Your Honor. Thank you.

03:55:54 THE COURT: All right. Anything from the Defendants?

03:55:56 MR. DACUS: No, Your Honor.

03:55:57 THE COURT: Okay. Y'all have a good weekend. See y'all Monday morning.

03:56:01 MR. HERMAN: You too, Your Honor.

03:56:03 (Court adjourned 3:56 p.m.)

CERTIFICATION

I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.

/S/ Shelly Holmes 6/12/2026
SHELLY HOLMES, CSR, TCRR Date
CERTIFIED SHORTHAND REPORTER
State of Texas No.: 7804
Expiration Date: 10/31/2027