IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

| | | |
|---|---|---|
| ASPEN NETWORKS, INC., | )( | |
| PLAINTIFF, | )( | CIVIL ACTION NO. |
| | )( | 2:23-CV-557-RWS |
| VS. | )( | MARSHALL, TEXAS |
| | )( | |
| CELLCO PARTNERSHIP D/B/A | )( | |
| VERIZON WIRELESS, | )( | JUNE 15, 2026 |
| DEFENDANT. | )( | 8:34 A.M. |

---

TRANSCRIPT OF JURY TRIAL

BEFORE THE HONORABLE ROBERT W. SCHROEDER III,

UNITED STATES DISTRICT JUDGE, AND A JURY

VOLUME 2, PAGES 218 THROUGH 533

---

FOR THE PLAINTIFF:

Mr. Barry J. Herman
Ms. Julie Giardina
Womble Bond Dickinson (US) LLP
100 Light Street
26th Floor
Baltimore, MD 21202

Mr. Preston H. Heard
Ms. Christine H. Dupriest
Mr. John G. Perry
Mr. Jace D. Williams
Womble Bond Dickinson (US) LLP
1331 Spring Street NW
Suite 1400
Atlanta, GA 30309

Mr. Fabio E. Marino
Womble Bond Dickinson (US) LLP
1279 Oakmead Parkway
Suite 200
Sunnyvale, CA 94085

FOR THE PLAINTIFF: Mr. Eric H. Findlay
Findlay Craft, PC
7270 Crosswater Avenue
Suite B
Tyler, TX 75703

FOR THE DEFENDANT: Mr. Deron R. Dacus
The Dacus Firm, PC
821 ESE Loop 323
Suite 430
Tyler, TX 75701

Mr. Kevin P. Anderson
Ms. Elissa Sanford
Duane Morris LLP
901 New York Avenue NW
Suite 700 East
Washington, DC 20001

Mr. Matthew C. Gaudet
Mr. Glenn D. Richeson
Mr. John R. Gibson
Mr. Matthew S. Yungwirth
Duane Morris LLP
1075 Peachtree Street NE
Suite 1700
Atlanta, GA 30309

Mr. Aleksander J. Goranin
Mr. John Hillman
Mr. Robert M. Palumbos
Ms. Brianna M. Vinci
Duane Morris LLP
30 South 17th Street
Philadelphia, PA 19103

Ms. Holly E. Engelmann
Duane Morris LLP
Terrace 7
2801 Via Fortuna
Suite 200
Austin, TX 78746

COURT REPORTER: Ms. Shelly Holmes, CSR, TCRR
Official Court Reporter
Honorable Robert W. Schroeder III
United States District Judge
Eastern District of Texas
Texarkana Division
500 North State Line Avenue
Texarkana, TX 75501
shelly_holmes@txed.uscourts.gov

(Proceedings recorded by mechanical stenography, transcript produced on a CAT system.)

P R O C E E D I N G S

08:34:57

08:34:58 (Jury out.)

08:34:58 COURT SECURITY OFFICER: All rise.

08:34:59 THE COURT: Please be seated.

08:35:06 Good morning, everyone.

08:35:08 MR. DACUS: Good morning.

08:35:08 THE COURT: Okay. I've taken a look at the
08:35:16 overnight filings, and I think some of them probably should
08:35:20 be dealt with first thing. Maybe others can be discussed
08:35:25 throughout the day, certainly later on.

08:35:29 Whoever wishes to be heard on -- I think maybe the
08:35:33 first issue that needs to be discussed is Dr. Rubin's
08:35:37 Demonstrative 149.

08:35:39 Who would like to be heard on that?

08:35:41 MR. ANDERSON: Yes, Your Honor. Kevin Anderson.

08:35:43 THE COURT: Good morning.

08:35:44 MR. ANDERSON: Yes, Your Honor. If I could just
08:35:46 have the document camera so I can show what this slide...

08:35:53 Okay, Your Honor. It's really -- the issue is
08:36:16 about these --

08:36:18 THE COURT: Why don't you identify for the record
08:36:19 what we're looking at?

08:36:21 MR. ANDERSON: Yes. We're looking at Dr. Rubin's
08:36:23 Slide 149.

08:36:24 And the issue, Your Honor, is that these are -- these two bullet points are both claim constructions that are not in Dr. Rubin's report, and they're not claim constructions that the Court has issued.

08:36:41 On this plurality issue, I feel a little bit like it's déjà vu all over again. We've had this extensively previously. And I think the Court resolved that motion in a manner where it did not --

08:36:57 THE COURT: Which motion?

08:36:58 MR. ANDERSON: It was Verizon's motions for summary judgment on the plurality issue.

08:37:02 And the way the Court resolved that was -- and we're looking at -- okay. Looking at Docket 372 at Page 52 of 64.

08:37:26 And in the plurality summary judgment briefing, they had raised for the first time. It's not in their expert report, not anywhere else, that the first network path could be one of the plurality of alternative network paths to which the communication was switched.

08:37:48 And we briefed it. We argued it. And the Court's decision actually looks -- favors us. I will say there isn't an explicit claim construction in here. I acknowledge that.

08:38:04 But in resolving this, the Court said that the theory that Dr. Rubin would be allowed to put forward was

08:38:17 there may be more than one of a plurality of RAN-based
08:38:21 paths when switching from Wi-Fi to cellular.
08:38:24 What the ruling did not say is that when I'm
08:38:29 switching from Wi-Fi to cellular, that Wi-Fi was
08:38:34 encompassed in one of the plurality of paths, alternative
08:38:41 network paths, that the switch is going to occur to.
08:38:44 And these arguments and the slide is not in
08:38:52 Dr. Rubin's report. They're plainly claim constructions
08:38:55 that got raised both in the summary judgment briefing and
08:39:00 then when we had the argument. And just on the merits,
08:39:05 they make no sense. I mean, I'm switching from a first
08:39:08 path to one of a plurality of alternative network paths. I
08:39:15 can't switch from myself to myself.
08:39:18 The plurality of alternative network paths must
08:39:22 mean there's two alternatives. So in -- or more.
08:39:25 So in total, there have to be three paths, right,
08:39:29 a first network path and a plurality of alternative network
08:39:32 paths. That's the plain language of the claim there. And
08:39:36 they have now raised this, but I'm sure they'll disagree
08:39:41 with me, but a claim construction issue that they didn't
08:39:43 raise until their, like, sur-reply and summary judgment.
08:39:47 So I'm happy answer questions. But I'll bet
08:39:51 Your Honor has heard a lot --
08:39:52 THE COURT: Yeah, let's hear from the Plaintiff.
08:39:55 MR. HEARD: Good morning, Your Honor.

08:39:59 THE COURT: Good morning.

08:39:59 MR. HEARD: So I think Mr. Anderson is right, you -- Your Honor addressed this in ruling on the motion for summary judgment, Docket 157, and denied Verizon's motion for non-infringement on this very basis. Your Honor's order did not exclude reference to Dr. Rubin's opinion on this issue. And I'll -- since the document camera is up, I will.

This is Dr. Rubin's opening report at Paragraph 154, and there are other paragraphs that specifically disclose this exact theory, which is a multi-media call can be transferred from an LTE network to a Wi-Fi, a Wi-Fi access network or vice versa.

And it is very clear that that switch from one to another is contemplated. He walks through -- there's discussion of the patent that also discloses embodiments with just two paths. We'll hear inventor testimony this morning about the actual invention, the box that was created had two paths. Those are -- a plurality is two or more. This whole argument that it requires three or more is a belated claim construction argument that Your Honor recognized and denied and said this is just a veiled attempt to relitigate the summary judgment motion.

So this -- the theory was properly disclosed. It was -- they tried this argument already in summary judgment

and Daubert and were unsuccessful.

THE COURT: So tell me exactly where it is disclosed.

MR. HEARD: In Paragraph 154 that we're looking at is specific disclosure of one path, one Wi-Fi path to an LTE path and vice versa.

THE COURT: Okay.

MR. HEARD: And then ensuing paragraphs, in 155.

THE COURT: Okay.

MR. HEARD: As Your Honor said in Docket 372 at 52 which Mr. Anderson was putting on the screen, he noted that Verizon is mistaking illustrative examples provided by Dr. Rubin as exhaustive ones and narrowly constrains his opinion. We think that's exactly what they're trying to do again here today.

THE COURT: So I guess the question I've got for you is Verizon's -- Verizon basically is taking the position that you need more than one alternative path. What's your response to that?

MR. HEARD: That that is a belated claim construction issue. This was not -- this term was not identified during the claim construction phase. Dr. Rubin's report submitted after the claim construction phase relied on this theory, among the other ones that were noted about multiple access paths along the RAN network.

It did not move to exclude it on that basis. They did move for summary judgment on that basis.

And as Mr. Anderson pointed out, he argued it strenuously before Your Honor a few months ago, but that motion was denied, and the order does not exclude any reference to the theory that Dr. Rubin put forward in his report and that is expressed on this demonstrative.

THE COURT: So Verizon takes the position that this is an issue that needs to be resolved under 02 Micro. What's your response to that?

MR. HEARD: Your Honor, this is -- Dr. Rubin's is a straightforward application of the plain and ordinary meaning of the term. And that, again, this was a -- should it be a claim construction issue, they should have identified it. But this is a straightforward reading of the term itself in light of the patent with the figures that we are talking about with the two network paths being the plurality of alternatives that can be selected.

Your Honor pointed out that the network path is not the same thing as a type of network connection in denying the motion for summary judgment.

THE COURT: I guess Verizon's position is going to be if the Plaintiff was going to hinge its case on this particular interpretation of the claim language, it should have requested that the Court construe the scope of that

08:44:30 term a long time ago.

08:44:33 MR. HEARD: Your Honor, respectfully I suggest
08:44:35 it's in the opposite direction. They're attempting to
08:44:38 narrow it by -- plurality is very clearly two or more.
08:44:41 Verizon is now saying it must be three or more. You start
08:44:44 with one, and then there must be at least two additional
08:44:47 ones beyond that. That is a narrowing specific
08:44:50 application.

08:44:50 THE COURT: Well, aren't they taking the position
08:44:54 essentially that there have to be three, not three or more?

08:44:58 MR. HEARD: And that is a specific narrowing that
08:44:59 wasn't ever proposed before this point.

08:45:01 THE COURT: So where does Dr. Rubin disclose in
08:45:04 his report any kind of an opinion that this is a plain and
08:45:12 ordinary meaning or would be a plain and ordinary meaning
08:45:14 to a person of skill in the art?

08:45:15 MR. HEARD: Here in Paragraphs 153 through the
08:45:20 rest of the section addressing Claim Element 1[b], he
08:45:26 applies the claim language and says based on the review of
08:45:30 the evidence, including the Verizon documents, that the
08:45:33 multi-media call when switched from a Verizon LTE network
08:45:38 to a Wi-Fi network and vice versa satisfies the claim
08:45:41 language.

08:45:42 He doesn't -- again, this was never identified as
08:45:44 an issue that needed a narrowing construction that Verizon

08:45:47 now proposes. And he identified -- then he goes on to identify internal diagrams showing a switch from one to another, from a Wi-Fi connection to a cellular connection and vice versa.

08:46:02 And it shows in the call flow that the UE sends a SIP Re-Register message once it successfully identifies it has changed access network to indicate a RAT change, a Radio Access Technology change. He was consistent in all of his opinions that change from the Wi-Fi to the cellular or vice versa satisfied this claim limitation.

08:46:25 THE COURT: But that's not really an opinion about what the claim language is. That just addresses how the service operates.

08:46:34 MR. HEARD: And then in the outset of his report, he notes that for any term not given a specific construction by the Court, he applied the plain and ordinary meaning to one of ordinary skill in the art.

08:46:44 Again, this is a position that Verizon is now late-litigated. They didn't identify this as a claim construction dispute. There was no evidence that was ever put in the record that Dr. Rubin shouldn't rely on two or more being a plurality, and now this is their attempting to inject an 02 Micro issue at this late stage.

08:47:05 THE COURT: So, I mean, I think at this point, we're on the first day of trial, first day of testimony, at

08:47:14 least, and there's a dispute about what the plain and
08:47:19 ordinary meaning is between the parties. You agree with
08:47:23 that?
08:47:23 MR. HEARD: Your Honor, I would agree with that,
08:47:27 and I think the experts then can testify and explain to the
08:47:31 jury their view of that plain and ordinary meaning. I
08:47:33 assume Dr. Mahon will do the same, and I assume advance
08:47:38 this theory that Verizon is now proposing that it must be
08:47:43 three or more.
08:47:43 THE COURT: All right. Mr. Anderson?
08:47:45 MR. ANDERSON: Your Honor, what they're just
08:47:51 advocating is for the two experts to argue claim
08:47:55 construction before the jury. That's not proper. We do
08:47:58 think this is something that the Court has to resolve.
08:48:00 THE COURT: Tell me, again, Mr. Anderson, why this
08:48:03 was not raised by Verizon earlier?
08:48:05 MR. ANDERSON: It wasn't raised by either party
08:48:07 during any of the briefing. And he is not saying in
08:48:12 this -- in this section here when it's switching from LTE
08:48:20 to a Wi-Fi, he is not saying that I can switch from LTE
08:48:24 back to myself, which is what they're trying to say.
08:48:29 And one of the reasons that I think neither party
08:48:32 raised it is the claim language is so clear on this point.
08:48:38 I'm switching from a first network path to -- so I have to
08:48:44 be able to switch from to something, one of a plurality of

alternative network paths. I can't switch from myself to myself. That is violence to the claim language there.

The alternative, the alternative that I'm switching to, the word "alternative" is applying alternative to the first one. That's like -- I mean, the plain language of the claim says that, which is why I don't think either side teed this up in claim construction because it was so clearcut. I mean, it -- alternative has to have a meaning there, as does -- I'm switching to one of -- and if you think plurality is at least two, one of at least two alternative network paths. So I have to have a first network path and I have to have two -- at least two alternative network paths. That's kind of the plain language of this.

THE COURT: Okay. Can I ask you to explain to me how one network path can be an alternative to itself?

MR. HEARD: Because, Your Honor, they're attempting to inject some additional language in there. The alternative modifies the network paths that are available upon connection, not alternative -- what they're -- Mr. Marino argued this at length during our last hearing before you that what they're attempting to do is put alternative to the first network path.

They're injecting some additional language there, and he pointed -- walked through the various embodiments

08:50:22 throughout the specification that show, including the one
08:50:25 here on the face of the patent, two network paths.
08:50:28 THE COURT: But what would it be -- what otherwise
08:50:32 would it be an alternative to?
08:50:33 MR. HEARD: What they're trying to equate is
08:50:35 alternative and alternate. And, again, this is -- it's a
08:50:40 sleight-of-hand, honestly. Alternate might mean alternate
08:50:44 to the one that you're currently on. The alternative
08:50:48 networks are the various paths that could be taken to
08:50:51 connect in the first place.
08:50:53 And that's how Dr. Rubin explained, that's what
08:50:55 was put forward in the briefing. It is not alternative to
08:50:58 the one it already established. That's what they're
08:51:01 adding, just a little bit of extra language there that is
08:51:04 not in the claim and that is not consistent with the
08:51:06 disclosed embodiments.
08:51:07 THE COURT: Okay. When will Dr. Rubin testify?
08:51:14 MR. HEARD: Likely after lunch.
08:51:16 THE COURT: Okay. All right. Any question that
08:51:20 this -- or any chance this issue will come up before
08:51:25 lunchtime?
08:51:28 MR. HEARD: Not that I believe, Your Honor.
08:51:31 THE COURT: Mr. Anderson?
08:51:33 MR. ANDERSON: Yes, Your Honor. I would say not
08:51:35 by Dr. Rubin, but it sounded like they plan to have their

08:51:37 expert, or their inventor testify on claim construction and
08:51:41 apply the claim to their own product.
08:51:43 That's exactly what Mr. Heard just said is that
08:51:46 they're going to have their inventor, who is their first
08:51:49 witness, testify that the box had two, and so, therefore,
08:51:53 it meets the claim language, so we'll obviously be
08:51:59 preserving our objection at that point, but I want to raise
08:52:03 that issue.
08:52:03 THE COURT: Sure. Okay.
08:52:03 MR. ANDERSON: Yeah.
08:52:04 THE COURT: All right. Is that what you intend to
08:52:05 do with your inventor?
08:52:06 MR. HEARD: Certainly not testify to claim
08:52:08 construction, Your Honor.
08:52:08 THE COURT: I wouldn't think so.
08:52:11 All right. So I'm going to think about the
08:52:12 parties' arguments on this issue. To the extent I think
08:52:19 additional construction is necessary, I'll be prepared to
08:52:22 do that in advance of the -- of the witness's testimony.
08:52:28 All right. What else do we need to resolve this
08:52:31 morning? I know the parties have worked together and
08:52:36 worked out a number of the initial disagreements about some
08:52:42 of the deposition testimony.
08:52:46 MR. ANDERSON: Your Honor, I would just say on the
08:52:48 deposition testimony that's disputed, it won't be played

08:52:51 until tomorrow.

08:52:51 THE COURT: Okay.

08:52:52 MR. ANDERSON: So it's not something that needs to
08:52:54 be resolved this morning.

08:52:55 THE COURT: Okay. Good enough.

08:52:57 MR. FINDLAY: May I be heard on --

08:52:58 THE COURT: Of course, yes.

08:53:00 MR. FINDLAY: Thank you, Your Honor.

08:53:00 There is one small motion in limine issue that I
08:53:03 think does need to be raised before additional
08:53:06 cross-examination of our witnesses. I raised this with
08:53:09 Mr. Dacus last night.

08:53:11 Judge Payne ruled on two of our motions in limine
08:53:15 together, and in that order he said that Defendants are
08:53:22 prohibited from pointing out to the jury a lack of prior
08:53:24 notice of the asserted patents. This is in Docket 359, his
08:53:29 ruling on Plaintiff's MIL No. 4: Unless leave is granted
08:53:33 based on a showing that Plaintiff has suggested that
08:53:36 Defendants were placed on notice, the order does not
08:53:38 prevent Defendants from arguing that they had no prior
08:53:41 knowledge of the asserted patents.

08:53:43 And in the pretrial hearing that we had with Judge
08:53:46 Payne, Your Honor, his -- he drew a line because he thought
08:53:50 that saying there was no notice suggested there might have
08:53:52 been a duty or obligation on the part of the Plaintiff to

08:53:55 bring the patent to Verizon's attention.

08:53:58 During opening statements, Verizon, at Page 199,
08:54:07 Line 16 through 20, said: And then in 2023, literally
08:54:12 eight years after we put this in place, we got sued, for
08:54:16 lack of a better term, out of the blue. We had no notice
08:54:19 or knowledge of this patent when we designed this system
08:54:22 nor at any time before the lawsuit was filed.

08:54:23 The knowledge part of that statement is
08:54:26 appropriate under the Court's ruling, obviously. The
08:54:28 notice is what concerns us. And last night before the
08:54:35 parties met and conferred more, there were a lot of
08:54:37 designations that Verizon made of Mr. Bhaskaran, which
08:54:41 they've since withdrawn, but they went to this lack of
08:54:44 notice, lack of notice.

08:54:45 And my reason for raising it now is I'm concerned
08:54:49 that during the cross-examination, for instance, of
08:54:52 Mr. Chin later this morning or this afternoon, that would
08:54:55 be a focus of their examination, and I think that's
08:54:59 improper.

08:55:00 And we would also ask the Court to possibly
08:55:02 consider at the charge conference some instruction to make
08:55:05 clear that the jury understands there is no requirement in
08:55:09 the law or otherwise that Verizon be put on notice before
08:55:12 the complaint is filed.

08:55:13 THE COURT: Okay. Who wants to be heard on that?

08:55:17 MR. DACUS: Good morning, Your Honor.

08:55:23 THE COURT: Good morning.

08:55:23 MR. DACUS: So to be clear, Judge Payne's order on the limine expressly says: This order does not prevent Defendants from arguing that they had no prior knowledge of the asserted patents.

08:55:38 THE COURT: Sure.

08:55:38 MR. DACUS: So he expressly said that we could say that we had no knowledge of the patents during the design of our products --

08:55:46 THE COURT: I don't think that's the complaint, Mr. Dacus. The complaint is whether you used the term "notice."

08:55:52 MR. DACUS: Yes, Your Honor. Let me -- I'll just put it on the screen so Your Honor has it in front of you.

08:55:56 So the part in the opening statement was expressly saying that when we designed our product, from that time until now, we had no knowledge of these patents. We were not aware of these patents. That is the full import of that sentence. And to alleviate any further concern, I'm the one cross-examining Mr. Chin, and there is nothing in the cross-examination about lack of notice.

08:56:26 THE COURT: As long as there's not --

08:56:27 MR. DACUS: There's not, Your Honor.

08:56:28 THE COURT: -- we'll deal with this when we get to

08:56:30 instructions.
08:56:31 MR. DACUS: Great. Thank you, Your Honor.
08:56:31 THE COURT: But I will -- I won't hesitate to
08:56:34 instruct the jury --
08:56:35 MR. DACUS: Understood.
08:56:35 THE COURT: -- on this issue, you know, in the
08:56:39 final instructions and to the extent somehow it comes up in
08:56:43 cross, I won't hesitate to stop and do it right then,
08:56:47 Mr. Dacus.
08:56:47 MR. DACUS: Understood, Your Honor.
08:56:48 THE COURT: So you're on fair notice.
08:56:50 MR. DACUS: Understood, Your Honor. I'm familiar
08:56:53 with fair notice. Thank you, Your Honor.
08:56:58 MR. FINDLAY: Nothing else from Aspen, Your Honor.
08:57:00 THE COURT: Okay. I think we're waiting on one
08:57:03 juror.
08:57:52 (Pause in proceedings.)
09:03:29 THE COURT: Mr. Savage, if you would have the jury
09:04:30 brought up.
09:04:43 COURT SECURITY OFFICER: All rise for the jury.
09:05:38 (Jury in.)
09:05:39 THE COURT: Please be seated.
09:05:58 Good morning, ladies and gentlemen of the jury.
09:06:02 Welcome back. Hope you all had a nice weekend. You should
09:06:06 have all found your juror notebooks in your chair.

09:06:10 When we concluded the day on Friday afternoon, the parties had presented their opening statements to you.

09:06:16 And at this time, the Plaintiff will call its first witness.

09:06:20 MR. HERMAN: Thank you, Your Honor. Aspen calls Mr. Bill Chin.

09:06:32 THE COURT: Sir, if you'll come around and raise -- no, you can come on this way, and raise your right hand to be sworn.

09:06:41 (Witness sworn.)

09:06:48 MR. HERMAN: Your Honor, can I have Ms. Ney bring up some witness binders, please?

09:06:54 THE COURT: Of course.

09:06:55 MR. HERMAN: Thank you.

09:06:55 THE COURT: And the witness might need some water, too. All right. Mr. Herman, whenever you're ready you may proceed.

09:07:10 MR. HERMAN: Appreciate it, Your Honor. Thank you.

09:07:12 Good morning, ladies and gentlemen.

09:07:13 BILL CHIN, PLAINTIFF'S WITNESS, SWORN

09:07:13

09:07:13 DIRECT EXAMINATION

09:07:14 BY MR. HERMAN:

09:07:14 Q. Good morning, Mr. Chin.

09:07:15 A. Good morning.

09:07:16 Q. Can you tell the jury where you grew up?
09:07:19 A. Yes. I grew up -- well, I was born in Chicago,
09:07:19 Illinois.
09:07:22 Q. And did you actually go to grade school in Chicago?
09:07:25 A. No. When I was five years old, my parents moved to the
09:07:27 Bay Area in California, so I grew up in San Mateo, so I
09:07:31 went to grade school in San Mateo. I went to middle school
09:07:37 and high school in San Mateo.
09:07:39 Q. Did you go to public school or private school?
09:07:43 A. That was all public school.
09:07:44 Q. How did you get into computer programming?
09:07:46 A. That was a passion of mine. It was something, you
09:07:49 know, when you grow up, you -- you know, I got -- I was
09:07:54 just fascinated by just like writing some code that can
09:07:58 operate a computer. That was always fascinating to me. So
09:08:01 when I was a kid, my parents bought me a Commodore 64. I
09:08:07 wish I could have gotten an Apple, but that was too
09:08:08 expensive. I got the low end Commodore 64. But still you
09:08:13 could program it, do basic, and do a bunch of cool stuff.
09:08:15 You could play games. That's something I truly loved.
09:08:17 Q. Are you a video game enthusiast?
09:08:19 A. Yeah, I've played my share of computer games, and my
09:08:23 favorite computer game is Badlur's Gate 3.
09:08:27 Q. Do you do anything for fun that doesn't involve
09:08:30 computers?

09:08:30 A. Yeah, I play basketball. I watched the NBA finals and I was rooting for the Spurs. I like to go hiking. I watch movies. I read.

09:08:47 THE COURT: Why don't you pull the microphone a little closer to you.

09:08:50 THE WITNESS: Oh, sure.

09:08:51 THE COURT: A little more.

09:08:52 THE WITNESS: More, okay.

09:08:54 MR. HERMAN: Thank you, Your Honor.

09:08:54 Q. (By Mr. Herman) As you were here during jury selection and Judge Schroeder asked a bonus question of the -- of the jurors, so I'll ask you the same one. Can you tell the jury a fun fact about you?

09:09:06 A. Fun fact. So I was looking for a pasta recipe and I found bolognese recipe from the Italian cook Marcella Hazan. And I made it. It was really, really good. It was so good I made it every Sunday repeatedly for six months straight. And the only reason I stopped is because my kids said please don't make that anymore.

09:09:33 Q. So tell the jury a little bit about your family. Are you married?

09:09:37 A. Yes, I'm married. I met my wife 30 years ago. We met on the Internet, and back then the Internet was a more innocent and friendly place. And we've been married for 29 years.

09:09:50 Q. And you mentioned your kids, how many children, do you have, Mr. Chin?
09:09:54 A. I have three adult children, age 26, 23, and 21. Two girls and one boy.
09:10:01 Q. Great. Let's move to your educational background. Did you go to college?
09:10:05 A. Yes, I went to the University of California, San Diego.
09:10:09 Q. And what did you major in?
09:10:10 A. Of course, I majored in computer engineering. That's something I really loved. But I also double majored in management science.
09:10:19 Q. So you got two degrees?
09:10:21 A. Two degrees.
09:10:22 Q. Have you ever served in the military?
09:10:23 A. Yes, I did. When I was going to college at San Diego, I joined the Marine Corp officer candidate school program. That program involved going to three month summer long sessions -- two of them over in Quantico, Virginia. And when you get through with those programs then you're qualified to become a second lieutenant.
09:10:47 And normally when you go to college it's a four year program, and so my last -- the fourth year I went through the final phase of training, and I was ready to go into the Marine Corp. I was, you know, really passionate about military. I studied World War II as a kid.

09:11:04 Unfortunately, since I double majored, it took me five
09:11:06 years to graduate, and on that fifth year I focused on
09:11:09 computer science and the military started to fade away.
09:11:14 And so when it came time to graduate, the choice was accept
09:11:18 my commission or go -- or stay in the private life, and I
09:11:22 decided to stay private and do computer science for a
09:11:24 living.
09:11:25 Q. So this was about 1986 when you graduated college?
09:11:29 A. Yes, I graduated in 1986.
09:11:30 Q. I shouldn't say about. It was 1986?
09:11:32 A. Yes, it was 1986.
09:11:34 Q. Was it easy to find a job?
09:11:36 A. It was tough. When I graduated -- you know, I was
09:11:39 looking for a job in San Diego, and there wasn't any. So I
09:11:43 came home, back to the Bay Area, and I applied for jobs the
09:11:46 old-fashioned way. I mean, I looked in the newspaper,
09:11:49 circled job, you know, sent 200 resumes by printing them
09:11:53 out -- printing out the cover letter, putting them in
09:11:56 envelopes, sending them, and getting all those rejection
09:11:58 letters back in the mail. It was a really difficult time.
09:12:00 Q. Did you eventually -- were you able to find a job?
09:12:04 A. Yes. I eventually got a job at a company called NEC
09:12:08 America, and they worked on a modem network of all things.
09:12:13 Q. Over the next decade, did you have the opportunity to
09:12:17 move to different positions either within that company or

at other companies?
A. Yeah. So over about 15 years, I started working on computer -- not computers -- network -- computer networking applications, so I ended up building faster and faster networking interfaces.
And then I moved into operating systems, the heart of computers. So I studied what it took to actually build computer systems and operating systems.
And finally I moved into routing, computer routing, how to move data between various complex networks.
Q. In 1998, before you joined Aspen, did you have -- did you get a job at a place called CoSine Communications?
A. Yes, CoSine was in the 2000s. It came out at the peak of the dot com era, if I you guys -- I'm old enough to have been through that. Yeah, I worked for six years there, and that's when I met the founders of Aspen Networks.
Q. So you worked at CoSine from 1998 to 2004?
A. Yes.
Q. Prior to joining Aspen in 2004, how would you describe your experience, your -- the things that you had gained expertise in?
A. So my experience focused on networking and computer systems, all those low-level things. I worked a lot -- how hardware and software come together. So I have a tremendous amount of experience in those areas.

09:13:50 Q. The jury heard in opening statements something about packets. Like, were you working with packets in the 1990s?
09:13:58 A. All the time.
09:13:59 Q. Okay.
09:14:00 A. And so packets are essentially little pieces of data that you would send over a computer network.
09:14:05 Q. Before we get to your career at -- beginning with Aspen, do you have any other patents besides the '554 patent that's at issue here?
09:14:14 A. Yes. I've been awarded 16 U.S. patents with my name listed as an inventor.
09:14:21 Q. All right. Let's move on to Aspen. Can you tell the jury about Aspen Networks?
09:14:28 A. Yes. Aspen Network was a small technology company founded in January of 2000.
09:14:33 Q. And what -- what -- what was it like at the beginning? What do you understand it was like in 2000?
09:14:39 A. So Aspen is a really small company, and they were a startup company, so unlike big companies where you may have worked at where it's somewhat rigid, they control what you work on. You have to have lots of meetings. Aspen was nothing like that. They're -- you know, you did stuff. For me, I wrote a lot of code. I got involved in things you normally wouldn't get involved at. I talked to customers. You know, I helped with a lot of testing. So

09:15:05 working at small companies, you just wear a lot of
09:15:08 different hats.
09:15:09 Q. So you didn't join -- it started -- Aspen started in
09:15:12 2000, and you didn't join until 2004, correct?
09:15:15 A. Yes.
09:15:15 Q. Okay. So you had the opportunity to join in August of
09:15:21 2004. What led you to join Aspen?
09:15:23 A. So when CoSine started to fall after the dot com bubble
09:15:31 burst, Sajit Bhaskaran, the founder of Aspen, he reached
09:15:36 out to me and asked if I wanted to join his company.
09:15:38 Q. And when you joined in 2004, what was your title, if
09:15:41 you remember?
09:15:42 A. The director of software.
09:15:43 Q. Are you still associated with Aspen?
09:15:50 A. I still do some consulting off and on for Aspen.
09:15:54 Q. And have you done that intermittently since you first
09:15:59 joined in 2004?
09:15:59 A. Yes, so even though I left in 2008, I had interactions
09:16:03 with them pretty much the rest of the time.
09:16:05 Q. Give the jury, if you would -- wouldn't mind, a little
09:16:10 more flavor for what it was like working for a startup in
09:16:13 Silicon Valley in 2004.
09:16:16 A. So it's a crazy experience. You're working on so many
09:16:20 things at the same time, like I was saying. And, you know,
09:16:23 for me writing code, right, it was great not having

09:16:26 somebody tell me what to write. You just create that, and you solve. You work with the CEO and says, okay, what do you want to build? Okay. I'll just go write that. And that was a truly liberating experience.

09:16:38 Q. Who else was at Aspen at the time that you joined?

09:16:41 A. So at the time, Sajit Bhaskaran, the founder; John Yu, another founder; there was the -- Dan Berger, the CEO; Robin Mavunkel, he's responsible for testing; and there was an intern that came through, as well.

09:16:56 Q. Did Aspen have a product when you first joined?

09:17:00 A. Yes. They sold a product that essentially made Internet highly reliable. That was their product.

09:17:07 Q. What was it called?

09:17:10 A. It was -- the first product was called a -- Headquarters product is called the N2000.

09:17:17 Q. And can you provide a little more detail as to how that provided that Internet reliability?

09:17:23 A. So the Headquarters product is essentially meant for small or medium size businesses where they have more than one office, so that, of course, goes into the main office, and it would have access to eight different ISPs that you can connect to it. ISP being an Internet Service Provider.

09:17:38 Q. And what was the purpose of having eight different ISP -- the ability to have eight different ISP providers on the N2000?

09:17:45 A. One is to have a lot of high reliability of the
09:17:49 Internet, because back then, the Internet can actually go
09:17:52 down fairly often, and also to increase the bandwidth. You
09:17:56 can aggregate all of that -- all eight ISPs together to get
09:17:59 higher access -- higher speed access to the Internet.
09:18:03 Q. What kind of customers generally were interested in
09:18:05 this type of technology that was in the N2000?
09:18:07 A. Aspen focused on small to midsize companies.
09:18:12 Q. And those companies needed the Internet in order to run
09:18:17 their day-to-day operations or --
09:18:20 A. Yes.
09:18:20 Q. -- why was it so important for them?
09:18:22 A. Yes. They focused on companies that really -- the
09:18:25 Internet was really a main part of their business. For
09:18:27 example, if you're doing -- selling customers -- selling
09:18:31 products to customers that need access to Internet to place
09:18:35 orders, to ask important questions, or -- or any customer
09:18:40 service-type customers that need the Internet to be fully
09:18:44 active. Those are the kind of customers Aspen focused on.
09:18:49 Q. Can you tell the jury about Aspen's next product, the
09:18:53 N500?
09:18:53 A. The N500 is the BRANCH product. So the Headquarters
09:18:58 product, the N2000, then you have the BRANCH, the smaller
09:19:04 product, the N500. Essentially it's based the same as the
09:19:05 N2000 but it's a smaller piece of hardware, and it

09:19:07 supported less ISPs.
09:19:10 Q. Did Aspen develop another product after the N500?
09:19:14 A. Yes. It created a product called the Aspen 365 Voice
09:19:20 over IP or VoIP.
09:19:21 Q. And what did the Aspen 365 VoIP do?
09:19:24 A. The 365 VoIP is targeted at VoIP, Voice over IP
09:19:28 customers, and so any customers that -- that were to look
09:19:31 for cheaper phone service other than the traditional
09:19:36 landline would use Voice over IP, and this product was
09:19:39 targeted at those customers.
09:19:40 Q. Did the Aspen 365 VoIP interact with SIP?
09:19:44 A. Yes. It was primarily -- its primary purpose was to
09:19:49 interact with SIP.
09:19:49 Q. And tell the jury if you would what SIP stands for.
09:19:54 A. SIP stands for Session Initiation Protocol.
09:19:56 Q. And could you explain in layman's terms what SIP is?
09:20:02 A. So SIP is a set of standards or rules that are defined
09:20:08 to allow making, managing, and ending phone calls over IP
09:20:14 networks.
09:20:15 Q. Have you worked with SIP before you joined Aspen?
09:20:18 A. No, have not.
09:20:20 Q. So how did you figure out how SIP worked?
09:20:23 A. Well, there -- they published a specification, they
09:20:27 being the Internet task force. They published these --
09:20:33 they're very complex specifications that describe the

09:20:40 protocol. I don't know if anybody has ever read one of those. You can read one of those; it's written in English. I read them five times, and I still can't understand what they say, and it's really difficult. And so I got a book, right, at the time it's not easy to find books on SIP. So I got a book to help explain that, and even then that was really difficult. So the only real way to understand how SIP works as an engineer is to write software to actually observe how it works.

09:21:04 Q. And did you end up doing that?

09:21:06 A. Yes, I did.

09:21:07 Q. Did the SIP standard itself address how to switch a call from one network path to another?

09:21:14 A. No, it didn't say that.

09:21:16 Q. And did the SIP standard identify switching a call from one network path to another as a problem in the SIP standard?

09:21:24 A. No, that was not mentioned.

09:21:25 Q. Before the invention described in the '554 patent, what happened when an Aspen 365 VoIP customer would try to switch a VoIP call from one network to another?

09:21:39 A. So that's what the Aspen box did, it switches data from one network path to another, which includes Voice over IP. So when the Aspen box switched, the call dropped. And it was expected because in the industry whenever you changed a

09:21:56 network path, the phone call would drop, and then you would
09:21:58 have to call back and then reconnect.
09:22:00 Q. Would the call drop every time, or was it kind of
09:22:05 random?
09:22:05 A. Every time.
09:22:06 Q. And do you have an understanding, was this an Aspen
09:22:10 problem? Like was it a problem with the box or was this an
09:22:13 industry wide problem?
09:22:14 A. Industry wide problem. You talk to customers, and
09:22:17 that's their expectations, as well.
09:22:19 Q. Did your customers express interest in seeing if you
09:22:22 could resolve this problem?
09:22:23 A. Yes, because --
09:22:23 MR. DACUS: Objection, Your Honor, calls for
09:22:25 hearsay.
09:22:26 THE COURT: Can you --
09:22:30 MR. HERMAN: I can rephrase it.
09:22:31 THE COURT: -- rephrase the question?
09:22:33 MR. HERMAN: Yes.
09:22:33 Q. (By Mr. Herman) Did you have an understanding of
09:22:35 whether or not -- well, did someone ask you whether you
09:22:41 could try to solve the problem of dropped calls?
09:22:43 MR. DACUS: Objection, Your Honor. Calls for
09:22:44 hearsay.
09:22:44 THE COURT: Can you rephrase it?

09:22:49 Q. (By Mr. Herman) Was there a reason why -- at some
09:22:51 point did you go about trying to solve the problem of --
09:22:56 the dropped calls problem when you switched from one path
09:22:58 to another?
09:22:59 A. Yes. So actually because of the nature of our product,
09:23:03 we have multiple ISPs, customers are -- would ask, hey, I
09:23:08 make a phone call, can you --
09:23:09 MR. DACUS: Your Honor, I have to object. It
09:23:11 sounds like the answer is going to contain hearsay.
09:23:14 MR. HERMAN: Your Honor, it's based on his present
09:23:16 understanding on what -- what he was working on and the
09:23:19 problems that were expressed to him by his customers.
09:23:25 So --
09:23:25 THE COURT: I'm going to allow it, Mr. Dacus.
09:23:28 MR. HERMAN: Thank you, Your Honor.
09:23:31 A. So as I was saying, our box has more than one Internet
09:23:34 service provider, and a customer would ask, hey, you know,
09:23:38 since you're failing the phone calls over, why can't the
09:23:43 phone calls stay up. And we'd have to tell them that just
09:23:47 doesn't work that way.
09:23:48 Q. (By Mr. Herman) Did you think this was a problem that
09:23:50 could be solved?
09:23:50 A. At the time, no. Everybody in the industry working
09:23:53 with SIP and Voice over IP understood that was not a
09:23:56 possibility.

09:23:56 Q. Did something happen to change your mind to make you think that it would be possible?
09:24:01 A. Yes.
09:24:02 Q. And what was that?
09:24:03 A. So as you're building a new product, of course, you're testing a product against various other vendors. And during that testing, we encountered a piece of equipment called a Kagoor. It's basically a SIP server that we talk to when we want to make phone calls. And so as we're testing against this piece of equipment, what we always do is, okay, let's disconnect one ISP that the phone call is on and then we expect the phone call to move and drop on the other ISP.
09:24:34 But in the case when we're testing with the Kagoor, as we disconnect the ISP, we realized -- now, you're talking on the phone, right? You -- it's -- is the connection still up? And all of a sudden we were shocked. The connection still worked. And we tested this several times. Yes, this is the behavior of that particular piece of equipment we were connecting to.
09:24:55 Q. And did you determine -- was this something that -- so Kagoor had solved the problem. Is that what you discovered when this issue arose?
09:25:04 A. So what Kagoor -- so, of course, we, as engineers tried, to understand why did that work? And so we were

09:25:12 analyzing the packet traces. We used a tool called Wireshark to look at all the packets going back between the SIP servers, the call, where that's going.

And it actually turned out that it was a bug with the Kagoor. It never should have allowed that because as we moved traffic to the other alternate ISP, the -- all that data still carried information from the first path and none of that should have went through. That was like a network violation. And so it was a bug. It was actually a security bug by the Kagoor. It was luck that it worked.

Q. So how did this inform or define what you and Mr. Mavunkel and the others at Aspen started working on in this time frame?

A. So seeing that work kind of opened at least my mind to the realm of possibility, hey, I shouldn't just assume in moving a phone call, a voice call to another path would actually fail. So here's a case where it works. So it kind of just changed my mindset from that -- that -- it became possible.

Q. And at this point, were you still writing code and working on the Aspen 365 VoIP box?

A. Yes, we're adding code, creating new features, fixing bugs, a lot of development was happening during this time period.

Q. And please tell the jury what happened one time when

09:26:40 you were on a phone call and the call was put on hold.
09:26:45 A. So what -- so as we're testing various features with 09:26:52 the Voice over IP, one of those features was putting the 09:26:55 call on hold. And, of course, you guys all know when you 09:26:58 put a call on hold, the other party gets music, and when 09:27:01 you take the call off hold, then the conversation resumes.
09:27:05 And so as we're looking at testing all these 09:27:08 different features with the VoIP phone calls, what we began 09:27:12 to -- what I began to notice is that when you have a phone 09:27:19 call and then you hit hold, all of a sudden, the -- we see 09:27:23 music gets switched in through the phone call. I hear it. 09:27:26 And you take it off hold, and you hear the other person 09:27:29 speaking again.
09:27:30 And that was interesting because that told us 09:27:34 that, well, okay, there is a way of changing what you hear 09:27:39 when you press hold. And because we create a product that 09:27:44 has multiple ISPs, and our problem was moving that call to 09:27:48 an alternate path or the other ISP, it dawned on me, 09:27:53 what -- instead of just putting music here, what if I just 09:27:57 told it to move everything to the other ISP.
09:27:59 And that's not easy to do. It took a lot of work 09:28:01 to actually get that software to do that. But the concept 09:28:05 was there that we can -- if I can just tell the SIP server 09:28:09 on the other side that, yes, I'm moving this call over to 09:28:12 this other network path, maybe it would work.

09:28:16 Q. And what was significant about that observation?
09:28:18 A. And so what the significance was after a lot of testing, so we were testing this thing to see if we can make this work. Robin and I was making phone calls. I was changing software.
09:28:30 So I think it took about a week of debugging and testing to finally get to the point where, all right, I'm going to make a phone call, Robin. And I make the phone call. Robin is on the other end --
09:28:41 Q. Robin is Mr. Mavunkel?
09:28:42 A. Yes, sorry, Robin is Mr. Mavunkel who is responsible for testing the system. I said, all right, let's make the phone call. And then, of course, when I make the -- when I make the phone call, he disconnects the cable for the first ISP where the phone call is going, and then that call switches over, and you can still hear the conversation.
09:29:01 That was the most incredible experience because for us, it's like the ah-ha moment. It's like someone told us you couldn't do something, and we just found a way to do it. It was like -- it was like -- I remember just giving Robin the high five. It was -- it was wonderful. I still remember that experience today.
09:29:19 Q. So were you done at that point? Had you figured out the problem? You had solved the problem, and you were good to go?

09:29:27 A. No. That was just proof-of-concept. Wow, we did it, and, of course, there was a lot more work to make that happen. You know, as you test against other pieces of equipment, it wouldn't work, right? So now you have to figure out why doesn't that work. And that's call -- you know, we had to do a lot of things to that session, that SIP session state that -- that's -- when we make that phone call and actually make that call move to another -- an alternate network path, there's a lot of -- let's call them state that needs to be maintained for the call to be coherent and continue to function.
09:30:03 Q. Did you have a name for this internally? What did you call this technology?
09:30:10 A. We called it the No Call Drop.
09:30:12 Q. Mr. Chin, you have a binder in front of you. Could you take a look at that and look at PTX-35, please?
09:30:21 A. Sure. Okay. I have it.
09:30:28 Q. Can you tell the jury what PTX-35 is?
09:30:30 A. This is a version of the source code that I was working on that supports this No Call Drop feature.
09:30:38 Q. Can you tell us the date of that document?
09:30:40 A. The date of the document is June 5th, 2007.
09:30:44 Q. And what's the release date -- the release number?
09:30:47 A. The version of the file is 1.91.
09:30:53 Q. That's the revision. What about the release?

09:30:55 A. Oh, release, sorry. That's Release 6.0.5.
09:31:01 Q. And it says author, it says Bill, who is Bill?
09:31:04 A. Bill is me.
09:31:05 Q. Okay. Is this an accurate reflection of the code you
09:31:09 were working on in June of 2007?
09:31:11 A. Yes, it is.
09:31:14 Q. Is this record kept in the ordinary course of Aspen's
09:31:17 business?
09:31:17 A. Yes.
09:31:18 MR. HERMAN: Your Honor, I move admission of
09:31:20 PTX-35.
09:31:20 THE COURT: Any objection?
09:31:21 MR. DACUS: No, Your Honor.
09:31:23 THE COURT: Very well. It'll be received.
09:31:25 MR. HERMAN: Thank you, Your Honor.
09:31:26 Ms. Hopkins, would you publish that to the jury?
09:31:29 Q. (By Mr. Herman) How many pages is this document,
09:31:32 Mr. Chin?
09:31:33 A. So this document's about 70-plus pages. This
09:31:37 particular version is about 5,793 lines of code.
09:31:44 Q. Approximately?
09:31:45 A. Approximately, yep.
09:31:47 Q. Please explain to the jury generally what is source
09:31:51 code?
09:31:51 A. Source code is -- this particular source code is

09:31:54 written in a language called C, and it essentially is a
09:31:58 program that determines how software operates. In this
09:32:02 case, it operates the -- what we call the SIP application
09:32:07 layer gateway, which is a piece of software that runs on
09:32:12 the Aspen box that supports VoIP, Voice over IP.
09:32:15 Q. So at this time, in June of 2007, had the No Call Drop
09:32:19 functionality been fully implemented by the time of this
09:32:26 code release?
09:32:27 A. All the core features are there, but there's still
09:32:30 ongoing development.
09:32:30 Q. So what happened from there?
09:32:31 A. So from here, we released a new software release that
09:32:38 contained this functionality.
09:32:39 Q. And after that code was developed, what did you do with
09:32:42 it?
09:32:43 A. That release to software.
09:32:47 Q. So you put it onto the product, the Aspen 365 VoIP?
09:32:51 A. Yes.
09:32:51 Q. Okay.
09:32:51 THE COURT: Let me ask you, Mr. Herman, it's --
09:32:55 it's enticing to have a, you know, give and take that goes
09:33:01 on very quickly. It's incredibly difficult to construct a
09:33:07 dependable record if you do that. So although it's
09:33:12 somewhat artificial, Mr. Herman, if you'll ask the
09:33:15 question --

09:33:15 MR. HERMAN: I apologize, Your Honor.
09:33:16 THE COURT: -- and give him a chance to -- just
09:33:20 slow down, please.
09:33:21 MR. HERMAN: Thank you, Your Honor.
09:33:21 Q. (By Mr. Herman) So you said you released it onto the
09:33:26 Aspen 365 -- 5 VoIP product. Did Aspen rename its product
09:33:31 at that time when the No Call Drop technology was
09:33:33 implemented?
09:33:34 A. No.
09:33:34 Q. So it still was called the Aspen 365 VoIP?
09:33:37 A. Yep. With that new feature.
09:33:41 MR. HERMAN: Ms. Hopkins, can you please bring up
09:33:42 PTX-22?
09:33:44 Q. (By Mr. Herman) Mr. Chin, are you familiar with this
09:33:54 document?
09:33:54 A. Yes, I am.
09:33:54 Q. Can you explain to the jury what this is?
09:33:56 A. This is a product brochure for the Aspen 365 VoIP
09:34:00 product.
09:34:00 Q. And can you go ahead and read the highlighted portion,
09:34:03 please?
09:34:04 A. Yes. Aspen's advanced QoS features include sub-second
09:34:08 fault detection, auto-failover with no dropped calls, and
09:34:14 remote SIP survivability and VoIP prioritization. By
09:34:19 enabling hosted providers to develop nonstop VoIP services

09:34:23 with proactive problem resolution, Aspen helps improve
09:34:27 customer satisfaction and retention while dramatically
09:34:31 lowering support costs.
09:34:32 Q. So this product was being actively sold to customers,
09:34:32 correct?
09:34:36 A. Correct.
09:34:36 MR. HERMAN: You can put that down, thank you.
09:34:39 Q. (By Mr. Herman) Did you apply for a patent to protect
09:34:41 your work?
09:34:42 A. We did.
09:34:43 MR. HERMAN: Ms. Hopkins, can you please bring up
09:34:45 JTX-1.
09:34:45 Q. (By Mr. Herman) Mr. Chin, is this the '554 patent?
09:34:47 A. Yes.
09:34:48 Q. Can you tell the jury when this was filed?
09:34:53 A. June 11th, 2008.
09:34:55 Q. And when did it issue?
09:34:56 A. August 30th, 2011.
09:34:59 Q. And what's the title of the '554 patent?
09:35:02 A. Method For Multiple Link Quality of Service For Voice
09:35:07 and Video Over Internet Protocol.
09:35:17 Q. And who owns the '554 patent?
09:35:19 A. Aspen Networks.
09:35:20 Q. And I see three named inventors there. Can you
09:35:20 describe the role that each of the named inventors played

09:35:21 in the invention?
09:35:22 A. Yes, first name is me. I'm the primary inventor and wrote all the code. Second name is Sajit. He helps with how the invention affects the product. And Robin Mavunkel is responsible for testing the products.
09:35:35 Q. At a high level, can you explain for the jury what the invention in the '554 patent actually does?
09:35:43 A. So at a very high level, the invention is about keeping an active voice or video call from dropping when the call must move from one network path to another.
09:35:55 Q. Can we go through a few of the figures in the patent?
09:36:02 A. Sure.
09:36:02 Q. Great.
09:36:03 MR. HERMAN: Ms. Hopkins, can you pull up Figure 2b of the '554 patent, please.
09:36:07 Q. (By Mr. Herman) Mr. Chin, can you walk the jury through what this figure shows?
09:36:13 A. Yeah, this is a -- sorry, diagram of how the software would be -- look like inside the Aspen box if you just peer inside. The very top box at the top there is where the Aspen software VoIP software would actually sit. That's the software I wrote.
09:36:33 The next two layers are the networking stack and sending packets out on to the wire. Right, this is just transmitting packets over the network.

09:36:42 And below that is we'll focus on SIP and RTP packets. That's setting up phone calls and moving the voice conversation across the Internet.

09:36:53 And then you have a physical interface shown there, and what we're showing here is two -- two different paths that SIP and voice call can traverse over two separate networks.

09:37:06 Q. So is this an example of the invention that you and the other co-inventors have come up with?

09:37:12 A. Yes.

09:37:13 Q. How does the invention allow for an Internet-based phone call to be moved from one network route to another seamlessly without the call dropping?

09:37:25 A. So that's all defined in the claims.

09:37:32 Q. Let's go ahead and call up the claim, if you don't mind.

09:37:35 MR. HERMAN: So we'll go to Claim 1 of the '554 patent.

09:37:37 Q. (By Mr. Herman) Describe the claim just generally for the jury, please.

09:37:41 A. So this is a set of -- I know there are a lot of words here, but it describes the environment --

09:37:46 MR. DACUS: Your Honor, I need to object to the extent this is calling for claim construction of the claim.

09:37:52 THE COURT: Are you asking the witness to conduct

09:37:54 claim construction --
09:37:55 MR. HERMAN: Not --
09:37:56 THE COURT: -- Mr. Herman?
09:37:58 MR. HERMAN: -- not at all, Your Honor.
09:37:59 THE COURT: Okay. To the extent you disagree,
09:38:01 Mr. Dacus, when we get to that point, you can object.
09:38:03 MR. DACUS: Thank you, Your Honor.
09:38:04 A. So this basically describes the process of how the
09:38:11 patent works and also how the software works. Of course,
09:38:14 it talks about this is done over an IP network using IP,
09:38:17 which is the network protocol. It talks about switching
09:38:21 from one path to another, which I talked about.
09:38:25 It also says you have to use something called
09:38:29 Network Address Translations, which is basically just
09:38:31 changing the network IP address as you move across
09:38:34 different networks.
09:38:35 It talks about this thing called Real Time
09:38:37 Protocol, which is just, you know, how voice and video is
09:38:40 transmitted. That's a specific protocol for how voice is
09:38:44 transmitted over a network.
09:38:47 And, of course, SIP, we talk about that. That --
09:38:50 you know, it's how phone calls are actually made.
09:38:52 And the final thing at the bottom is the thing
09:38:55 called SIP signaling sequence, and that's the process of
09:38:58 maintaining the state of the -- of the dialog of that

09:39:04 current phone call when you move it from one path to
09:39:08 another.
09:39:08 Q. Can you describe in a little more detail what is a SIP
09:39:11 signaling session?
09:39:15 A. In terms of the --
09:39:18 Q. With the -- the Cseq numbers?
09:39:20 A. Oh, an example of the main SIP signaling sequence. In
09:39:26 the protocol, there's something called the Cseq number.
09:39:30 It's really a -- just an incrementing number that defines
09:39:34 to the protocol -- like, this is the next message in the
09:39:37 sequence. And so you have to make sure that when you are
09:39:41 sending messages like, you know, go put someone on hold,
09:39:45 that -- that sequence is in the correct order.
09:39:48 If it's in the wrong order, the other side will
09:39:50 not accept it. And that gets complicated because when
09:39:54 you're moving a phone call from one interface, one path to
09:39:58 another, there's a lot that needs to happen to tell the
09:40:03 other side this is what you're doing, and not confuse all
09:40:07 the phone calls in the middle -- I mean, the phone calls at
09:40:10 the end.
09:40:11 MR. HERMAN: Ms. Hopkins, can we bring up Figure 4
09:40:13 of the '554 patent, please?
09:40:15 Q. (By Mr. Herman) Mr. Chin, generally, what does
09:40:19 Figure 4 show?
09:40:20 A. So this is a flowchart or a set of steps that the

09:40:25 software would run to act -- to move a voice or video call
09:40:30 from one network path to another.
09:40:31 Q. Can you -- at a high level walk the jury through what's
09:40:37 happening in this Figure 4, the flowchart?
09:40:39 A. Sure. So at the very top, we -- you know, we're in the
09:40:44 middle of a SIP session, so a phone call is already in
09:40:47 progress.
09:40:48 The next three kind of parallelograms there are
09:40:53 triggers to, okay, when would we actually decide to move an
09:41:01 existing voice call from one path to another? And, you
09:41:05 know, for example, if the quality of the phone call is not
09:41:07 very good, you want to move it as an example.
09:41:11 Q. And then what happens next?
09:41:14 A. So the next box there is, okay, is that phone call
09:41:17 actually over the Internet because if it's not, then you
09:41:19 don't have to do a whole bunch of stuff. There's no path.
09:41:23 We're not changing any paths if you're not -- if the call
09:41:26 isn't over one of the ISPs.
09:41:28 And then in Box 150, we're going to check is there
09:41:32 an available path for the current phone call to actually
09:41:35 move to?
09:41:38 Q. And then 160?
09:41:39 A. 160 is -- we are going to send what's known as a SIP
09:41:45 INVITE -- in this case we're sending a second one, it's
09:41:48 called a RE-INVITE -- to actually move the call from one

09:41:52 path to another, and we're also going to update that
09:41:56 sequence number I talked about.
09:41:57 Q. And then if the server accepts the request, what
09:41:59 happens?
09:41:59 A. So now the server can decide to accept it or not. If
09:42:02 it does, then the server could challenge a request, which
09:42:07 means is the person making -- is the actual phone device
09:42:13 part of the network, right? So it's going to do a
09:42:16 challenge. And if it is, then it'll accept you.
09:42:20 And then the final step down there, 210, is, okay,
09:42:24 once the other side accepts that all -- these are all the
09:42:28 things we're going to do to move the phone call, then we
09:42:32 actually will physically move it, right? There's software
09:42:37 to actually physically move it on the box from one path to
09:42:39 the other. And then we -- if we need to update the
09:42:43 sequence numbers, we do. We don't do it all the time. And
09:42:45 then the -- the call is moved.
09:42:48 Q. Great. Thank you.
09:42:52 MR. HERMAN: Can we pull up Figure 5, please, of
09:42:57 the '554 patent?
09:42:57 A. Okay. This is a really complex diagram.
09:43:00 Q. (By Mr. Herman) Try to simplify it for the jury, if
09:43:03 you could.
09:43:04 A. This is what's called a state machine, or finite state
09:43:08 machine. And all it represents is that each one of those

09:43:11 circles there is a particular state the software might be in. And all those boxes in this example represents what you do when an INVITE or RE-INVITE comes in and how you process it.

So each of those circles is one of those states that you may get into, and each of those lines is called a state transition. And that -- all that is, is a reason why you're moving from one state to another.

Q. If a code developer was looking at Figure 5, would they understand how to follow the logic and draft code, or would they need help from someone like you to be able to do that?

A. Anybody who knows how to write software, right, can look at this and understand how to turn this diagram into that code that you saw before. In fact, that code that you saw has this diagram implemented.

Q. What claim limitation of the '554 patent does this Figure 5, this SIP transaction state machine relate to?

A. This relates to maintaining the SIP sequence number --

Q. Thank you.

A. -- that number.

Q. Mr. Chin, were you in the court on Friday during opening statements?

A. Yes.

MR. HERMAN: Ms. Hopkins, can you please bring up Slide DD1.17 from Verizon's opening slides?

09:44:25 Q. (By Mr. Herman) Did you hear Verizon's lawyer explain to the jury their view of how the '554 patent solved the problem of dropped calls?
09:44:35 A. Yes.
09:44:37 MR. HERMAN: Ms. Hopkins, could you bring up the trial transcript, Page 205, please?
09:44:43 Q. (By Mr. Herman) Mr. Chin, is this the explanation that Verizon's counsel gave to the jury?
09:44:47 A. Yes.
09:44:48 Q. Do you agree with Verizon's explanation?
09:44:51 A. I do not.
09:44:53 Q. And why not?
09:44:54 A. Because there is nothing about changing IP addresses or anything of IP addresses in moving a call from one path to another.
09:45:06 Q. What was the problem you were trying to solve?
09:45:08 A. The problem was taking an active call, making sure it doesn't drop, and moving it from one path to another. That's the problem.
09:45:16 Q. And is that the same thing as the address changing from one ISP to another?
09:45:20 A. No. There's no relevance here.
09:45:22 Q. So -- and what was the solution to the problem that you and your co-inventors had identified?
09:45:27 A. That's all defined in Claim 1.

09:45:33 MR. HERMAN: Ms. Hopkins, can you please bring up -- back up the '554 patent, and zoom in on Claim 1, please?
09:45:39 Q. (By Mr. Herman) Mr. Chin, do you see anything in Claim 1 of the '554 patent about changing IP addresses?
09:45:46 A. Nothing in there.
09:45:47 Q. Do you see anything in Claim 1 of the '554 patent about sending RE-INVITE messages?
09:45:53 A. That's not in there either.
09:45:54 Q. And do you see anything in Claim 1 about sending INVITE messages?
09:45:58 A. Nope, not there.
09:45:59 Q. And do you see anything in Claim 1 about maintaining the SIP sequence?
09:46:04 A. Yes, that is the last line -- last claim on the bottom.
09:46:11 Q. Would you go ahead and please read that to the jury?
09:46:13 A. The SIP signaling sequence of the transmission is maintained after said switching from the first network path to the one of a plurality of alternative network paths.
09:46:22 MR. HERMAN: Great. You can take that down, please.
09:46:24 Q. (By Mr. Herman) On Friday, Verizon's counsel also told the jury that the evidence would show that Aspen did not invent handovers. Do you agree with that?
09:46:31 A. No.

09:46:32 Q. Why not?
09:46:34 A. Aspen didn't invent handovers that fail. Aspen
09:46:39 invented handovers that work.
09:46:43 Q. Thank you.
09:46:44 Mr. Chin, when you were working on the technology
09:46:50 that became the '554 patent, were you thinking about
09:46:54 Aspen's small business box or did you see a broader future
09:46:58 for the invention?
09:46:58 A. I saw there -- this is coming, this -- this movement to
09:47:06 IP and networking was all happening, and, yeah, I foresaw
09:47:11 that this -- this invention could have some interesting
09:47:15 applications in the future.
09:47:16 Q. At that time, the cellular networks were on 2G or 3G;
09:47:22 is that right?
09:47:22 A. That is correct. So yeah, the carrier networks were
09:47:25 using old circuit-based technology, which is not IP. So
09:47:29 they weren't currently using anything like this. But as
09:47:34 VoIP moved to IP and started displacing standard landlines,
09:47:41 right, because it's a lot cheaper and you don't have to pay
09:47:44 long distance charges, you can see that, okay, when the
09:47:49 carriers start doing the same thing, they're going to want
09:47:51 to move to IP and they're going to want to take advantage
09:47:54 of the savings that offers.
09:47:56 Q. Does the '554 patent itself discuss the invention
09:47:59 regarding cellular networks?

09:48:01 A. Yes, it does.
09:48:02 MR. HERMAN: Can we call up Claim 6, please?
09:48:05 Q. (By Mr. Herman) Can you read that to the jury?
09:48:07 A. Yes. The method of Claim 1 wherein the source device
09:48:11 is a mobile device.
09:48:12 Q. Great. Thank you.
09:48:14 MR. HERMAN: You can take that down.
09:48:15 Q. (By Mr. Herman) Mr. Chin, do you have occasions where
09:48:19 you need to be able to switch over from Wi-Fi to 4G and
09:48:23 vice versa today?
09:48:24 A. Yes, all the time.
09:48:25 Q. And why is that?
09:48:26 A. When I'm on a phone call at home, which is using my
09:48:29 Wi-Fi network, and I need to go somewhere in my car and
09:48:32 still talk on the phone. Yeah, I will get in my car, drive
09:48:36 away, be out of range of my Wi-Fi network, and it switches
09:48:42 over to the cell network, and I can still make that call.
09:48:45 It's great.
09:48:46 Q. You stated earlier that you're no longer a full-time
09:48:50 employee for Aspen. What do you do now?
09:48:51 A. I currently work at Huron.
09:48:54 Q. And what is that?
09:48:56 A. Huron is a midsized consulting company that focuses on
09:49:02 education and healthcare.
09:49:02 Q. Do you still do consulting for Aspen?

09:49:05 A. Yes, I do.
09:49:05 Q. Are you doing anything right now, working on any projects for Aspen?
09:49:09 A. Yes, working on a new project for Aspen. It's a security-minded messaging and data service.
09:49:16 Q. If Aspen is successful in this lawsuit, what do you stand to gain?
09:49:23 A. If the value of the Aspen stock increases, I will gain from that.
09:49:31 Q. So you do own Aspen stock?
09:49:33 A. Yes, I own about 5 percent.
09:49:35 Q. Maybe the jury is curious why you offered to be here as Aspen's corporate representative if you are no longer an employee. How would you respond to that?
09:49:48 A. Well, this is my invention. I created it. And I really believe in the -- the potential of this invention, and I'm here to defend it.
09:50:01 Q. Does Aspen blame Verizon for the limited success it had in selling the Aspen 365 VoIP?
09:50:07 A. No.
09:50:08 Q. Great. Thank you.
09:50:09 MR. HERMAN: I'll pass the witness, Your Honor.
09:50:11 THE COURT: All right. Cross-examination?
09:50:15 MR. DACUS: Thank you, Your Honor. Your Honor, may we have leave to pass out binders?

09:50:18 THE COURT: Of course.
09:50:20 MR. DACUS: Thank you. May I proceed, Your Honor?
09:51:00 THE COURT: You may.
09:51:02 MR. DACUS: Thank you.

09:51:03 CROSS-EXAMINATION

09:51:03 BY MR. DACUS:
09:51:03 Q. Good morning, Mr. Chin.
09:51:06 A. Good morning.
09:51:06 Q. I'm Deron Dacus. I represent Verizon. I don't think you and I have ever met before; is that right, sir?
09:51:06 A. No, sir.
09:51:06 Q. Well, it's good to meet you, and I apologize that it's under these circumstances, but I would -- I need to ask you some questions about your testimony and about this patent. Is that okay?
09:51:16 A. Sure.
09:51:17 Q. All right. As you told the jury, you're the named -- or one of the named inventors on the '554 patent, correct?
09:51:23 A. That's correct.
09:51:24 Q. In fact, you are the one who originally came up with the concept for this '554 patent, right?
09:51:30 A. Yes, sir.
09:51:32 Q. And I want to talk about that patent, but before we do, would you agree with me, sir, that as a general proposition, it's true that some, maybe many patents have a

09:51:46 theoretical solution to a problem on paper in the patent,
09:51:52 but in the real world, they're not -- they're not
09:51:55 practical. Would you agree with that?
09:51:56 A. Yeah, that can happen. Yes.
09:51:58 Q. Okay. You've seen that happen, right?
09:52:00 A. Yes.
09:52:01 Q. Okay. Now, what I want to do is I want to kind of set
09:52:05 the stage, go back to 2008 when this patent was applied
09:52:10 for, and I want to kind of set the stage and talk about the
09:52:12 facts in that time period. Does that sound fair?
09:52:18 A. Yes.
09:52:20 Q. All right. Before we do, I want to kind of -- I want
09:52:23 to set the overall -- what I understood you to say the
09:52:26 overall goal and solution of this '554 patent was.
09:52:31 And it was to prevent dropped calls when VoIP
09:52:39 calls changed from one path to another, correct?
09:52:42 A. Correct.
09:52:43 Q. And when I say VoIP, I think the jury has heard it, but
09:52:49 it's VoIP -- we're talking about Voice over Internet
09:52:52 Protocol, fair?
09:52:52 A. Well, it's more specific than that.
09:52:59 Q. Well, all I'm asking is the acronym "VoIP" stands for
09:53:05 Voice over Internet Protocol; is that true?
09:53:07 A. That is correct.
09:53:08 Q. Okay. And just to be clear, when VoIP -- we're just

09:53:14 talking about making a voice phone call, could be audio --
09:53:18 I mean, it could be video also, but a voice phone call over
09:53:21 the Internet. That's what we're talking about, right?
09:53:24 A. Well, the patent itself is not limited to just that.
09:53:28 Q. I'm just asking what --
09:53:30 A. Oh --
09:53:31 Q. Right now you and I are talking about VoIP, Mr. Chin;
09:53:36 is that okay?
09:53:36 A. Yes, sorry.
09:53:37 Q. Would you agree with me that VoIP is just voice call
09:53:40 over the Internet rather than the old-fashioned telephone
09:53:43 network?
09:53:43 A. Yes.
09:53:44 Q. Okay. Now, to get back to setting the stage for when
09:53:55 this patent was filed in 2008, I think you said that Aspen
09:54:03 was founded as a business in 2000, correct?
09:54:07 A. Correct.
09:54:07 Q. Founded by Sajit Bhaskaran, correct?
09:54:10 A. Yes, sir.
09:54:13 Q. Okay. Mr. Bhaskaran not only founded it, but he's now
09:54:17 the current CEO and a -- and a significant owner of Aspen,
09:54:22 correct?
09:54:22 A. Yes.
09:54:24 Q. Now, as far as you know, before early 2006, Aspen had
09:54:31 not been in the business of VoIP, correct?

09:54:38 A. Correct.
09:54:38 Q. Okay. From 2000 to roughly early 2006, it had been in this business of creating this other type of product, basically a router, correct?
09:54:48 A. Yes.
09:54:49 Q. And it's true, sir, that as of 2006, that product, being diplomatic, was not having success in the marketplace, fair?
09:55:00 A. Yes.
09:55:02 Q. And Aspen decided to change its business to this VoIP or VoIP technology, true?
09:55:08 A. Yes.
09:55:08 Q. You would agree with me that VoIP is a complex and complicated piece of technology, fair?
09:55:18 A. Yes, sir.
09:55:19 Q. And you would agree with me that before you joined Aspen, you had no experience with VoIP, correct?
09:55:27 A. That is correct.
09:55:30 Q. In fact, I think you said you graduated in 1986, right?
09:55:34 A. Yes, sir.
09:55:35 Q. So from 1986, that period of 20 years up until the time you joined Aspen, you had not worked in any business related to VoIP technology, correct?
09:55:46 A. That is correct.
09:55:46 Q. And you had not worked for a telephone service

09:55:52 provider, correct?
09:55:53 A. That is correct.
09:55:53 Q. And from what I heard you say, not only yourself, but
09:56:00 Aspen in general had not been in the VoIP business up until
09:56:04 early 2006, true?
09:56:06 A. Correct, sir.
09:56:07 Q. And you agree with me that Aspen certainly did not
09:56:15 invent VoIP or Voice over Internet Protocol, correct?
09:56:19 A. Yes, sir.
09:56:21 Q. By the time that Aspen began working on it in 2006,
09:56:30 Voice over Internet Protocol or VoIP had been around for
09:56:33 many, many years, true?
09:56:35 A. Yes, sir.
09:56:36 Q. In fact, there were actually industry standards that
09:56:40 had been created related to VoIP, true?
09:56:44 A. Yes, sir.
09:56:45 Q. Leaders in the industry, telephone companies, equipment
09:56:53 makers, all those people had held meetings, had standard --
09:56:58 bodies put together standards to create Voice over Internet
09:57:03 Protocol, fair?
09:57:03 A. Yes.
09:57:04 Q. Neither you nor anyone else at Aspen was involved in
09:57:09 creating those standards, were you, sir?
09:57:11 A. That's correct.
09:57:11 Q. Before we continue on, sir, do you agree that it's at

09:57:25 least possible and perhaps probable that folks who get into
09:57:29 a new area of technology, a new area that they've not been
09:57:34 in previously, have ideas that they think are new and novel
09:57:41 and very practical but yet it's not so? Do you agree with
09:57:47 that?
09:57:47 A. That's possible, yes.
09:57:49 Q. Okay. Because somebody who enters a piece -- an area
09:57:54 of technology for the first time when there's an entire
09:57:58 body of industry experts who have been out there, although
09:58:02 you think something may be new and novel, those people who
09:58:06 have devoted their professional life to that technology may
09:58:09 not think it's new, you agree?
09:58:11 A. That is possible, yes.
09:58:13 Q. I mean, I've been a lawyer for 32 years. If I decide
09:58:18 tomorrow that I'm going to be an electrician or a
09:58:21 carpenter, I may go out there and say, oh, this is a new
09:58:24 way of doing things. But those who have been doing that
09:58:28 for decades and decades may say, no, we've actually thought
09:58:32 about that beforehand, you agree?
09:58:36 A. I agree. But can I comment?
09:58:38 Q. Your -- so -- were you here for the beginning of this
09:58:42 trial, Mr. Chin?
09:58:43 A. Yes.
09:58:43 Q. You hear the judge say that we're on a strict time
09:58:46 table?

09:58:47 A. Okay.
09:58:47 Q. Okay. Your lawyer is going to have a chance to ask
09:58:50 you, and I bet he'll give you a full chance to answer.
09:58:53 A. Sure.
09:58:54 Q. Does that sound fair?
09:58:57 A. That's fine.
09:58:58 Q. Okay. Now, you mentioned two acronyms. One is SIP,
09:59:02 which is Session Initiation Protocol, you remember that?
09:59:04 A. Yes.
09:59:05 Q. The other was RTP, Real Time Protocol. You remember
09:59:09 that?
09:59:09 A. Yes, sir.
09:59:09 Q. Now, both SIP and RTP were standards that were created
09:59:14 in the telecom industry long before this '554 patent,
09:59:18 right?
09:59:18 A. That is correct.
09:59:19 Q. And you would agree, sir, that you were not and you are
09:59:24 not an expert on SIP, correct?
09:59:29 A. What do you mean by expert? After I worked on it, I
09:59:33 think I'm -- I know a lot.
09:59:34 Q. Well, you agree, sir, that you have said under oath
09:59:39 that you are not an expert in SIP, correct?
09:59:42 A. Oh, I did say that. That is correct.
09:59:43 Q. So was that true that you're not? What you said under
09:59:49 oath, is it true that you are not an expert in SIP?

A. I did say that.
Q. Is it true?
A. Is it true?
Q. Yes.
A. I would say there's so many standards out there, I have no idea what they are. So yes, in the totality of that space, I do not know that.
Q. And it's true, sir -- I'm not being critical, I just want the jury to have all the facts. It's true that you're not an expert in RTP either, are you, sir?
A. That is true.
Q. Now, you told us about this product that Aspen created, this Aspen 365. You remember that?
A. Yes. Yes, sir.
Q. That's a product that included this '554 patented technology, correct?
A. Yes.
Q. And you had that product even before you filed for the patent, fair?
A. Yes, sir.
Q. You wrote the computer code, I think you said, for it --
A. Yes.
Q. -- right? Aspen attempted to sell that product out in the marketplace, fair?

10:00:48 A. Correct.
10:00:50 Q. I've seen in this case and I think you'll agree Aspen
10:00:54 issued press releases and advertisements touting how great
10:01:00 its technology was, fair?
10:01:01 A. Yes.
10:01:02 Q. And you would agree with me, sir, without us sort of
10:01:09 belaboring the point, that that product was just not
10:01:15 successful in the marketplace, true?
10:01:17 A. Sure.
10:01:18 Q. So much so that in 2008, you left Aspen, correct?
10:01:22 A. That is correct.
10:01:23 Q. And you did so because you knew -- and these are your
10:01:28 words, not mine -- you knew that Aspen was going down,
10:01:32 correct? Those are your words?
10:01:33 A. I said that? I don't recall. But okay.
10:01:36 Q. And to be fair, when you said going down, what you
10:01:38 meant is this Aspen 365 product that had this '554
10:01:46 technology just wasn't being sold in the marketplace,
10:01:48 correct?
10:01:48 A. Yes, it had its challenges.
10:01:52 Q. Right. And you knew it wasn't going to be sold in the
10:01:56 future, true?
10:01:56 A. Well, the future I didn't know, but yeah, based on the
10:02:00 current trend, it had its challenges.
10:02:01 Q. Isn't it true, sir, that you left Aspen in part because

10:02:04 you believed that any future sales were not really going to
10:02:08 happen?
10:02:08 A. I don't know if that was the reason.
10:02:14 Q. That's what you believed that no future sales were
10:02:19 going to happen, correct?
10:02:19 A. Did I actually say that? I don't recall.
10:02:21 Q. Okay. Do you have a notebook there in front of you,
10:02:33 Mr. Chin?
10:02:33 A. Yes. Yes, sir.
10:02:33 Q. You see that it has tab numbers there?
10:02:36 A. Yes.
10:02:36 Q. If you'd look at Tab 1, that is a sworn deposition that
10:02:42 you gave in this case. Do you remember doing that?
10:02:43 A. Yes, I do.
10:02:45 Q. Okay. Let me ask you to turn to Page 145. Do you see
10:02:51 there are page numbers down on the bottom?
10:02:55 A. Okay. Okay.
10:02:55 Q. Let me know when you get to Page 145.
10:02:59 A. I have it.
10:03:10 Q. Okay. Look at Lines 18 through 23. Let me know when
10:03:16 you've had a chance to read those. Have you read that,
10:03:36 sir?
10:03:36 A. Yes, I did.
10:03:37 Q. Okay. So does that refresh your recollection that
10:03:40 under oath you said you left Aspen because you didn't

10:03:42 believe any future sales were going to come?
10:03:44 A. Yes.
10:03:44 Q. Okay. Now, by 2008 when you left, Aspen was actually
10:03:57 on its, I think, fourth CEO or leader by that time; is that
10:04:02 true?
10:04:02 A. It may be. I don't know for sure.
10:04:04 Q. Mr. Bhaskaran, as the founder, he was the original CEO
10:04:08 and leader, correct?
10:04:09 A. Correct.
10:04:09 Q. Then a gentleman by the name of Jim Summers came in and
10:04:14 took over, correct?
10:04:16 A. I don't know him, but correct.
10:04:17 Q. You know that though, right?
10:04:20 A. I know that, yes.
10:04:21 Q. Gentleman by the name of Dan Berger came in and left,
10:04:21 correct?
10:04:25 A. Yes, yes.
10:04:26 Q. And then we were back to Mr. Bhaskaran by 2008,
10:04:26 correct?
10:04:28 A. Yes.
10:04:33 Q. Now, Mr. Bhaskaran is one of these guys who is sort of
10:04:37 a serial or repeat Silicon Valley startup technical
10:04:44 individual, fair?
10:04:46 A. I'm not sure what you mean by that.
10:04:48 Q. Well, that's what he does, right? He has repeatedly

10:04:56 formed startups in Silicon Valley, correct?
10:05:00 A. Aspen and I believe he tried to start a couple others, yes.
10:05:03 Q. Okay. And to be fair -- I mean, for full disclosure, you've actually been involved in multiple startups in Silicon Valley in California, correct?
10:05:13 A. That is correct.
10:05:13 Q. And the truth is -- again, not being critical but just getting the facts out there -- those have been relatively unsuccessful, true?
10:05:23 A. Correct.
10:05:24 Q. Now, consistent with what you knew or at least predicted about sales of this product that actually includes this '554 patented technology, by 2010, Aspen quit selling the product, true?
10:05:42 A. Correct.
10:05:42 Q. And the reason it quit selling is because people in the marketplace just didn't want it, fair?
10:05:47 A. And it could not support them either.
10:05:50 Q. The sales of the product --
10:05:53 A. Yes.
10:05:53 Q. -- the product that included this technology that you and your lawyers are telling this jury is so valuable, Aspen stopped selling it because the marketplace didn't want it. That's a fair statement, correct?

10:06:06 A. Correct.
10:06:07 Q. Now, you, of course, know, because you're here, that Aspen has sued Verizon for alleged infringement of this '554 patent, true?
10:06:21 A. Yes, sir.
10:06:23 Q. And although you left 2000 -- in 2008, I think you said Aspen -- you work as a consultant for Aspen, and they've paid you hourly; is that correct?
10:06:34 A. That is correct.
10:06:34 Q. And they're paying you hourly for your work on this lawsuit, including testimony, fair?
10:06:42 A. They covered my expenses, yes.
10:06:45 Q. Well, they're paying you hourly, also, correct?
10:06:48 A. They're paying me hourly, but they covered my expenses for this.
10:06:52 Q. They covered your expenses, whatever those are, plus they're paying you an hourly rate, correct?
10:06:57 A. Correct.
10:06:57 Q. And in addition to that, you have -- you are actually a percentage owner in Aspen, true?
10:07:03 A. That is correct.
10:07:04 Q. I think you said 5 percent, but you previously told us it was 8 percent. Do you remember that?
10:07:08 A. I do remember.
10:07:09 Q. Well, which one is accurate?

10:07:10 A. It's 5.
10:07:11 Q. Okay. So you're a 5-percent owner in Aspen, also,
10:07:15 right?
10:07:15 A. That is correct.
10:07:16 Q. So you do have a financial interest in this lawsuit,
10:07:20 true?
10:07:20 A. Yes.
10:07:22 Q. It is true, sir, that the only reason you have to
10:07:29 believe that Verizon infringes this '554 patent is based on
10:07:33 what the Aspen CEO, Mr. Bhaskaran, told you, correct?
10:07:38 MR. HERMAN: Objection, Your Honor.
10:07:39 THE COURT: What's the objection?
10:07:40 MR. HERMAN: This is the issue we were talking
10:07:43 about this morning. Your Honor, may I approach?
10:07:47 THE COURT: Yes.
10:07:48 (Bench conference.)
10:07:56 MR. HERMAN: I believe that Mr. Dacus is going
10:08:00 into when they figured out whether or not Verizon
10:08:06 infringed --
10:08:07 MR. DACUS: I'm not going to say anything about
10:08:08 notice.
10:08:09 MR. HERMAN: Where are you going -- can I ask him
10:08:11 where he's going with this because my concern is, is that
10:08:14 then he can't defend himself. He has a lot of reasons why
10:08:19 he believes Verizon infringes. If he wants to open the

10:08:22 door, then he can do that, but this is something that I
10:08:25 completely took out of his direct this morning because of
10:08:27 the issue with notice. And they're going to say that he's
10:08:33 not an infringement expert and then he's going to ask him,
10:08:37 well, this is all you know about this. That's going to
10:08:39 open the door for me to be able to ask him what else he
10:08:45 knows.
10:08:45 THE COURT: Let's see where you're going.
10:08:47 MR. DACUS: It's nothing about notice, Your Honor.
10:08:47 It's just his knowledge of whether there's infringement,
10:08:50 and he testified in depos limited to Mr. Bhaskaran. So
10:08:55 that's all I'm going to ask him.
10:08:56 THE COURT: Let's see where he goes.
10:09:01 (Bench conference concluded.)
10:09:03 Q. (By Mr. Dacus) I'll re-ask the question, Mr. Chin.
10:09:06 It's true, sir, that the only reason you have to
10:09:09 believe Verizon infringes this patent is based on what
10:09:13 Mr. Bhaskaran told you, correct?
10:09:14 A. Yes, sir.
10:09:16 Q. And it's true, sir, that you did not personally
10:09:20 investigate any of the assertions that Mr. Bhaskaran told
10:09:24 you, correct?
10:09:25 A. Yes, sir.
10:09:26 Q. And Mr. Bhaskaran, I think, first told you that he
10:09:32 believed there might be infringement in 2016, true?

10:09:39 A. I don't recall that --
10:09:41 Q. Okay.
10:09:41 A. -- date.
10:09:44 Q. You're certainly not here to testify about whether or
10:09:48 not Verizon infringes, fair?
10:09:50 A. That is correct.
10:09:52 Q. Okay. And to be fair to you, okay, you're not the one
10:09:56 who was involved in the decision to bring this lawsuit,
10:10:00 correct?
10:10:00 A. That is correct.
10:10:00 Q. Mr. Bhaskaran is the one who decided to bring this
10:10:04 lawsuit, true?
10:10:05 A. Yes, sir.
10:10:05 Q. In fact, you did not even learn about this lawsuit
10:10:09 until more than a year after it was filed, fair?
10:10:12 A. Yes, sir.
10:10:15 Q. Now, I'd like to switch gears and ask you a few
10:10:19 questions about the patent. Is that okay?
10:10:21 A. Yes.
10:10:22 Q. Okay. I want to -- I want to start it sort of at the
10:10:27 highest level to make sure I understood what your testimony
10:10:30 was and more importantly to make sure the jury understands,
10:10:33 does that sound fair?
10:10:34 A. Yes, sir.
10:10:35 MR. DACUS: Mr. Duval, can you pull up DD6.1,

10:10:39 please?
10:10:39 Q. (By Mr. Dacus) To do this, Mr. Chin, to make sure I
10:10:42 understand, I'm just going to use a little graphic that I
10:10:45 created; is that fair?
10:10:46 A. Yes, sir.
10:10:47 Q. Okay. So what you see on the screen is an example,
10:10:49 sort of like what I used in opening of Alice making a phone
10:10:52 call to Bob. You see that?
10:10:54 A. Yes.
10:10:55 Q. And the first thing that happens in that call is this
10:11:01 SIP signal is sent from Alice over to Bob's phone, true?
10:11:04 A. Yes, sir.
10:11:05 Q. And I heard you say in your direct that this SIP is
10:11:08 sort of a set of rules that lets the two phones know what
10:11:13 the rules are that they -- on which they'll be
10:11:16 communicating, true?
10:11:17 A. Yes, sir.
10:11:19 Q. Sort of like an instruction set, fair?
10:11:23 A. Yes, sir.
10:11:24 Q. And this SIP, this is stuff that the other people in
10:11:27 the industry had created long before this '554 patent,
10:11:30 fair?
10:11:31 A. Yes.
10:11:31 MR. DACUS: Can you pull up DTX-31, Mr. Duval,
10:11:34 right quick?

10:11:35 Q. (By Mr. Dacus) And just to confirm this, sir, this is DTX-31, an exhibit in the case.

10:11:43 Do you recognize this as the standard for SIP or Session Initiation Protocol?

10:11:52 A. Yes, sir.

10:11:53 Q. Okay. Do you see that it's dated June of 2002?

10:12:00 A. Yes.

10:12:00 Q. So June of 2002 was a full six years before the '554 patent was applied for, correct?

10:12:10 A. Correct.

10:12:10 Q. And do you see that some of the people who contributed to this SIP standard are folks like Columbia University, Ericsson, WorldCom, AT&T, those are all leaders in the telecommunications industry, correct?

10:12:26 A. Yes, sir.

10:12:26 Q. And by the way, WorldCom you know their technology eventually became a part of Verizon, you know that?

10:12:32 A. Now that you said so, yes.

10:12:34 Q. Okay. So six years before this patent, others in the industry had created this SIP standard, true?

10:12:47 A. Yes, sir.

10:12:47 Q. Okay.

10:12:51 MR. DACUS: We can take that down, Mr. Duval. And can we go back to 6.2, please, DD6.2.

10:13:01 Q. (By Mr. Dacus) Now, the other thing that I think you

10:13:03 said happened, Mr. Chin, if we want to complete our
10:13:06 diagram, is once we have this SIP signal between Alice's
10:13:12 and Bob's phone, they can actually begin voice
10:13:16 communicating, correct?
10:13:17 A. That is correct.
10:13:17 Q. And that happens over this standard called RTP or Real
10:13:22 Time Protocol, correct?
10:13:22 A. Yes, sir.
10:13:23 Q. And for very simplistic people like me, RTP is just
10:13:27 taking these bits that are in the digital language and
10:13:30 converting them into voice, correct?
10:13:32 A. Yes, sir.
10:13:33 Q. Computer language and putting it into voice language,
10:13:36 fair?
10:13:36 A. That works.
10:13:37 Q. But to be truthful, this RTP standard was something
10:13:40 that others in the industry had done long before this '554
10:13:45 patent, fair?
10:13:46 A. Yes, sir.
10:13:52 Q. Now I want to switch and talk about the structure and
10:13:55 the concept in the patent. Does that sound fair?
10:13:57 A. Yes, sir.
10:13:58 Q. Okay.
10:13:58 MR. DACUS: Can you pull up Figure 9, please,
10:14:01 Mr. Duval? Thank you.

10:14:06 Q. (By Mr. Dacus) This is Figure 9 from the '554 patent. It's JTX-1. Do you recognize that?
10:14:11 A. Yes, I do.
10:14:12 Q. Okay. This is an embodiment of the invention in the '554 patent, correct?
10:14:17 A. Yes, sir.
10:14:18 Q. All right. Now, just to orient ourselves, over here on the left, right here, what's marked as 900, that's a telephone, correct?
10:14:28 A. Correct.
10:14:28 Q. And it's actually a wired telephone, correct?
10:14:31 A. Yes.
10:14:31 Q. Rather -- and I say wired as opposed to wireless, as opposed to cellular or some other mobile phone. This was a wired phone, correct?
10:14:42 A. Correct.
10:14:42 Q. Okay. Now, what we also see is this phone is connected to this thing called a VoIP QoS Gateway/Firewall. Do you see that?
10:14:55 A. Yes.
10:14:56 Q. That's actually the product like the Aspen 365 that Aspen was creating or had created and was attempting to sell, correct?
10:15:07 A. Correct.
10:15:07 Q. Okay. Now, this Aspen product, this VoIP -- by the way

10:15:13 QoS means quality of service, correct?
10:15:16 A. That is right.
10:15:16 Q. So that device was connected to things called Internet
10:15:21 routers, correct?
10:15:23 A. Correct.
10:15:23 Q. Those are just pieces of equipment that route the
10:15:27 Internet through them, fair?
10:15:28 A. Yes, sir.
10:15:29 Q. And then each one of those Internet routers is
10:15:32 connected to what's called an ISP. Do you see that?
10:15:35 A. Yes.
10:15:36 Q. And ISP stands for Internet Service Provider, true?
10:15:41 A. Yes, sir.
10:15:42 Q. And as the name implies, those are companies or
10:15:46 providers of Internet service, fair?
10:15:48 A. Yes.
10:15:52 Q. Just to put a little more concrete on that, back in the
10:15:57 2000s, 2008, it might have been AOL, correct?
10:16:00 A. That's right, uh-huh.
10:16:01 Q. Not a name that most of us are familiar with if you're
10:16:06 younger these days, but that's an Internet provider back in
10:16:10 the day, so to speak, correct?
10:16:10 A. That is correct.
10:16:11 Q. Today it might be Spectrum, Charter, might be AT&T,
10:16:17 might be Verizon, a whole list of folks, fair?

10:16:20 A. Yes, sir.
10:16:20 Q. Okay. So this device that Aspen created and this concept under the invention would allow for the changing of Internet service providers when the quality of service of one provider was inferior or substandard to another provider, correct?
10:16:46 A. Yes, sir.
10:16:46 Q. So, in other words, if we've got a call on ISP 1 right here, and for some reason, whatever it may be, that connection is inferior or less than what we can get on ISP 2, the concept was we'll switch to ISP 2, fair?
10:17:04 A. Yes, sir.
10:17:05 Q. And you did the software work or the writing of the software code to allow that to happen, fair?
10:17:20 A. Yes, sir.
10:17:22 Q. Now, this -- this customer box -- this box right here, that would actually be on the customer's premises at their office, so to speak, right?
10:17:34 A. Yes, sir.
10:17:35 Q. And the specific issue that the patent was addressing is if there was a switch from ISP 1 to ISP 2, as you explained in your direct testimony, the call would drop, fair?
10:17:49 A. Can you repeat that?
10:17:50 Q. Sure. The problem that this patent was attempting to

10:17:56 solve was that if you switched from ISP 1 to ISP 2, the
10:18:03 call would drop, correct?
10:18:05 A. Yes, sir.
10:18:06 Q. Okay. And I think you said virtually every time, if
10:18:09 not every time?
10:18:10 A. Yes, that is correct.
10:18:20 MR. DACUS: Take that down for now, Mr. Duval.
10:18:22 Q. (By Mr. Dacus) So with that background in mind, I want
10:18:27 to talk a little bit about this lawsuit and how this fits
10:18:31 into this lawsuit. Does that sound fair?
10:18:35 A. Yes, sir.
10:18:35 Q. Okay. Now, what Aspen accuses here is the situation
10:18:41 where Verizon's Wi-Fi Calling switches to its cell phone
10:18:49 network, correct -- to its cellular network?
10:18:51 A. Yes.
10:18:51 Q. Or vice versa, where someone is on the cellular network
10:18:54 and it switches back to Wi-Fi, correct?
10:19:00 A. Correct.
10:19:00 Q. First of all, you know that happens -- or do you
10:19:04 know -- you know that happens in very, very limited
10:19:07 circumstances that there's actually a handover or a switch
10:19:10 between cellular and Wi-Fi?
10:19:11 A. I know it happens. I just don't know how often.
10:19:17 Q. Okay. And I heard you say -- well, let me ask you
10:19:23 this. Switching or handovers between networks, that had

been invented long before the '554 patent, correct?
A. Yeah. Generically, yes.
Q. What -- would you repeat your answer?
A. A generic switch-over, handover, yeah.
Q. Okay. Now, you would agree with me, sir -- I heard you say that you have a -- you have many patents, correct?
A. Yes, sir.
Q. So you would agree that a fundamental requirement of a patent is that it describes what it allegedly invented, true?
A. Yes, sir.
Q. That way the public can read the patent and know how to perform the teachings of the patent, so to speak, correct?
A. Yes, sir.
Q. I mean, the bargain or the agreement that patent owners make with the Patent Office is in return for getting that 20 years, you agree to tell or teach the public exactly how to do your invention, fair?
A. Yes, sir.
Q. It's an important part of the process, correct?
A. Agreed.
Q. Now --
MR. DACUS: Can I have the document camera, please?
Q. (By Mr. Dacus) -- just to draw this in a -- sort of a

10:20:36 crude fashion, Mr. Chin, what we're talking about here
10:20:45 is -- pardon my handwriting -- we're talking about this
10:20:56 switch between Wi-Fi Calling and cellular calling, correct?
10:21:02 A. Yes.
10:21:03 Q. That's what's being accused in this lawsuit, fair?
10:21:06 A. Yes.
10:21:06 Q. Now, it's true, as you've already said, Wi-Fi existed
10:21:11 long before the '554 patent, correct?
10:21:13 A. That is correct.
10:21:14 Q. Wi-Fi Calling existed long before the '554 patent,
10:21:17 fair?
10:21:18 A. There were versions of it I don't know the date, but,
10:21:24 yes.
10:21:24 Q. So you would agree with me that Aspen did not invent
10:21:27 Wi-Fi Calling, true?
10:21:29 A. Correct.
10:21:29 Q. Likewise, I presume you agree Aspen certainly didn't
10:21:34 invent cellular networks or cellular calling, correct?
10:21:37 A. That is correct.
10:21:38 Q. Okay. In fact, you know the original Wi-Fi standard
10:21:43 goes back to 1997, fair?
10:21:47 A. Yes, sir.
10:21:48 Q. Full decade before this patent, fair?
10:21:51 A. Yes.
10:21:51 Q. Now, although what's being accused of infringement is

10:21:59 this handover or switch between Wi-Fi and cellular, you
10:22:03 would agree with me, sir, that nowhere in the '554 patent
10:22:07 does the term "Wi-Fi" ever appear, does it, sir?
10:22:11 A. You mean in the claims or -- or anywhere?
10:22:15 Q. Anywhere.
10:22:16 A. I believe you.
10:22:19 Q. So you just told us that what you're supposed to do in
10:22:26 a patent is describe your invention, correct?
10:22:29 A. Yes, sir.
10:22:29 Q. What's accused of infringement here is this handover or
10:22:33 switching between Wi-Fi Calling and a cellular network
10:22:38 call, correct?
10:22:41 A. Can you repeat that?
10:22:42 Q. Sure. What's accused here is the handover or the
10:22:46 switch between Wi-Fi Calling and a cellular path, correct?
10:22:52 A. I think the accused is an IP network running on those
10:22:56 Wi-Fi or cellular paths. That's the patent itself.
10:23:01 Q. Were you here for opening statements, sir?
10:23:04 A. Yes, sir.
10:23:04 Q. Did you hear your lawyers say that what's accused here
10:23:08 is Verizon's switching or handing over between Wi-Fi
10:23:12 Calling and a cell call? Did you hear that?
10:23:14 A. Yes, sir.
10:23:16 Q. Is he correct?
10:23:17 A. Yes, sir.

10:23:19 Q. Okay. Yet you agree, sir, as the person responsible for the patent, that nowhere in that patent does the word "Wi-Fi" ever appear, true?
10:23:30 A. That is correct.
10:23:30 Q. In fact, Wi-Fi is actually a standard, and the standard is IEEE 802.11, correct?
10:23:36 A. That's correct.
10:23:37 Q. And nowhere in the patent does that standard even appear, correct?
10:23:45 A. Correct.
10:23:45 Q. You would agree, sir, and you would admit that when this patent was written and designed, you did not even have the concept of a cellular network in your head, true?
10:24:00 A. That's not correct.
10:24:04 Q. Okay. Do you have that notebook in front of you, sir?
10:24:07 A. Okay.
10:24:09 Q. Turn to Page 107, if you would.
10:24:19 MR. DACUS: Can we -- can we just publish, Mr. Duval, Page 107, Lines 11 to 13?
10:24:29 Q. (By Mr. Dacus) You can just look on your screen, Mr. Chin.
10:24:31 A. Okay.
10:24:32 Q. I'll shortcut this.
10:24:33 This is from your sworn deposition testimony. And by the way, Mr. Chin, you were here when the Court read its

10:24:39 instructions to the jury, correct?
10:24:40 A. Yes, sir.
10:24:42 Q. And you remember the judge saying that the jury has to
10:24:45 judge the credibility of the testimony they hear from the
10:24:47 stand, correct?
10:24:48 A. Yes, sir.
10:24:49 Q. You remember that?
10:24:50 A. Yes, sir.
10:24:51 Q. And one of the things they should do, according to the
10:24:54 judge is, they should compare and see if people said one
10:24:58 thing under oath on one day and then come to court and say
10:25:02 another thing at trial and to this jury, do you remember
10:25:05 that?
10:25:05 A. Yes, sir.
10:25:06 Q. So under oath we asked you --
10:25:08 MR. HERMAN: Objection, Your Honor. He's
10:25:10 published the deposition testimony but he hasn't
10:25:13 established that he said something different than what he
10:25:15 was asked at --
10:25:18 MR. DACUS: That was the original question.
10:25:20 THE COURT: I think he's getting ready to do that.
10:25:22 MR. HERMAN: There was a long wind up, Your Honor.
10:25:22 THE COURT: I'm sorry?
10:25:22 MR. HERMAN: There was a long wind up there.
10:25:24 THE COURT: There was a very long wind up there.

10:25:27 Mr. Dacus, we'll see whether the proof is in the
10:25:31 pudding.
10:25:32 MR. DACUS: Yes, Your Honor. And I'm happy to
10:25:35 respond, Your Honor, but --
10:25:38 Q. (By Mr. Dacus) You agree, sir, that under oath we
10:25:41 asked you: Did you design the '554 patent with a concept
10:25:44 of cellular networks in mind?
10:25:46 And you said: No.
10:25:48 Correct, sir?
10:25:49 A. I said that, yes.
10:25:50 Q. Okay.
10:25:51 MR. DACUS: We can take that down, Mr. Duval.
10:25:53 Q. (By Mr. Dacus) And I think you said this a minute ago,
10:25:58 sir, but these Aspen products that y'all were making and
10:26:01 designing using this technology, those were hard-wired or
10:26:05 wired products, not mobile or cellular, correct?
10:26:08 A. That is correct.
10:26:08 Q. And you were here for opening, you said?
10:26:18 A. Yes, sir.
10:26:19 Q. You heard your lawyers say that this patent was
10:26:23 visionary and that its inventors were visionary, you heard
10:26:28 him say that?
10:26:29 A. Yes, sir.
10:26:29 Q. But you would agree, sir, that nowhere in this patent
10:26:33 does the word "Wi-Fi" appear, correct?

10:26:36 A. That's correct.
10:26:36 Q. And at the time that you conceived of this, you didn't even have cellular in mind, fair?
10:26:43 A. Oh, yes, sir.
10:26:50 Q. Is that fair?
10:26:51 A. Yes, sir.
10:26:51 Q. Even though Wi-Fi had been around for a decade, correct?
10:26:59 A. Can I offer an explanation?
10:27:01 Q. Well, what I would ask you to do, sir, is just answer my question. Does that sound fair?
10:27:06 A. Sure. Yes, sir.
10:27:08 Q. By the time you wrote this patent, Wi-Fi had been around for a decade, correct?
10:27:13 A. Yes, sir.
10:27:13 Q. You certainly knew what Wi-Fi was; is that fair?
10:27:16 A. Yes, sir.
10:27:17 Q. Certainly if you intended the patent to cover Wi-Fi, you knew about Wi-Fi, could have written it in the patent, fair?
10:27:23 A. We knew about Wi-Fi. We just didn't need to put it in the patent.
10:27:42 MR. DACUS: Can we pull up JTX-1, Claim 1 -- that's the '554 patent and Claim 1, please, Mr. Duval?
10:27:50 Q. (By Mr. Dacus) I want to talk a little bit more about

10:27:52 the patent and the claims. Is that okay, Mr. Chin?
10:27:55 A. Yes, sir.
10:27:56 Q. All right. I think we've established this, but just so we're clear, Aspen didn't invent the general concept of switching or handovers between networks, fair?
10:28:04 A. Yes, sir.
10:28:07 Q. In fact, you know, sir, that when Aspen applied for this patent originally, that it was rejected by the Patent Office, fair?
10:28:22 A. Yes.
10:28:24 Q. In fact, it was rejected multiple times, true?
10:28:26 A. Yes, sir.
10:28:27 Q. And you know that ultimately the patent was granted, based on this very specific SIP signaling sequence that's contained in the last limitation of Claim 1, right?
10:28:44 A. Yes, sir.
10:28:45 Q. And by the way, Aspen asserts several different claims from this patent in this case, correct?
10:28:56 A. What do you mean by that?
10:28:57 Q. There are several different claims within the patent that Aspen asserts are infringed?
10:29:04 A. Oh, yes. Yes, sir.
10:29:06 Q. Okay. And you know that every one of those claims, every one of them requires this very specific SIP signaling sequence, correct?

A. Yes, sir.
Q. So the upshot of that is if Verizon doesn't do it in this very specific way, then there is no infringement, true?
A. Yes, sir.
Q. Okay. Now, I want -- I want to talk about this -- this last element just a bit.
MR. DACUS: Can we go to DTX-31, Mr. Duval? And can we go to Page 9 -- PDF Page 9, please? Scroll down to the Overview.
Q. (By Mr. Dacus) This is that SIP standard that we were looking at, Mr. Chin. Do you remember that?
A. Yes, sir.
Q. And this is sort of the overview of operations. Do you see that?
A. Yes, sir.
Q. It says: This section introduces the basic operations of SIP using simple examples. This section is tutorial in nature and does not contain any normative statements.
Did I read that correctly?
A. Yes, sir.
Q. Okay.
MR. DACUS: Now, can you go to the next page, Mr. Duval?
Q. (By Mr. Dacus) And what we have right down here --

10:30:32 MR. DACUS: If we can blow that part up.
10:30:35 Q. (By Mr. Dacus) -- that's just showing, as it said, an example of how SIP works, correct?
10:30:39 A. Yes, sir.
10:30:39 MR. DACUS: Now, can we pull up DD1.2 alongside this, Mr. Duval, if that's possible? It's the Demonstrative DD1.2 -- or 6.2, actually, I think. There we go.
10:31:08 Q. (By Mr. Dacus) So, Mr. Chin, what's in this SIP standard in diagram form over here is basically the same thing that you and I talked about earlier, correct?
10:31:18 A. Yes, sir.
10:31:19 Q. In other words, Alice's phone is sending this INVITE right here, correct?
10:31:25 A. Yes, sir.
10:31:26 Q. And then there's this Media Session, which is this RTP stream between Alice and Bob's phone, fair?
10:31:34 A. Yes, sir.
10:31:34 Q. And eventually, when the -- when the call is terminated, there would actually be a BYE message, correct?
10:31:45 A. That is correct.
10:31:45 Q. Okay.
10:31:46 MR. DACUS: Now, can you pull up Figure 9 from the patent, PTX-1 (sic), please, Mr. Duval? We can take down the graphic on the right.

10:32:03 Q. (By Mr. Dacus) Now we're back to Figure 9 from the
10:32:05 patent. Do you see that, Mr. Chin?
10:32:07 A. Yes.
10:32:08 Q. As we said, the problem that this patent was trying to
10:32:13 solve was when we switch from ISP 1 to either ISP 2 or
10:32:18 ISP 3 and prevent the call from being dropped, fair?
10:32:21 A. Yes, sir.
10:32:26 MR. DACUS: Now, can you pull up side-by-side of
10:32:28 that, Mr. Duval, Column 5, Lines 47 through 61, of the
10:32:34 patent?
10:32:46 Q. (By Mr. Dacus) Here's what I want to make sure that
10:32:48 all of us understand, Mr. Chin, and that is -- make sure I
10:32:56 got the right part.
10:33:01 So in this example, talking about Figure 9, there
10:33:04 are three routers on the network, correct?
10:33:06 A. Internet routers, yes.
10:33:11 Q. Yes, sir.
10:33:12 A. Yes, sir.
10:33:13 Q. And then it -- starting right here, it says: Network
10:33:17 interfaces 961, 962, and 963 correspond to globally
10:33:22 routable public IP addresses.
10:33:24 You see that?
10:33:25 A. Yes, sir.
10:33:25 Q. So here's what we're talking about is this Internet
10:33:28 traffic that's going along these lines, they correspond to

10:33:34 globally routable public IP addresses, correct?
10:33:37 A. Yes, sir.
10:33:38 Q. And it says: Belonging to three access Internet
10:33:46 Service Providers, you see that?
10:33:47 A. Yes, sir.
10:33:48 Q. This is your patent, correct?
10:33:49 A. Uh-huh, yes, sir.
10:33:51 Q. So what that means is, when it says belonging to, it
10:33:55 means each Internet Service Provider has a separate IP
10:33:59 address, correct?
10:34:00 A. That is correct.
10:34:01 Q. Okay. In other words, when we're on ISP 1, it assigns
10:34:08 a certain IP address to the phone, correct?
10:34:12 A. Who assigns the IP address to the phone?
10:34:18 Q. The Internet Service Provider.
10:34:20 A. It does not have to do that.
10:34:21 Q. It does that, doesn't it?
10:34:24 A. The device -- the VoIP QoS Gateway can do that.
10:34:28 Q. Okay. So either the gateway or the provider assigns an
10:34:34 Internet IP address to the phone that comes from ISP 1,
10:34:34 correct?
10:34:42 A. That is not correct.
10:34:44 Q. Okay. You would agree with me, sir, that each one of
10:34:47 these Internet Service Providers has their own set of IP
10:34:53 addresses, correct?

10:34:54 A. That is correct, sir.
10:34:56 Q. Okay. And there's not overlap between them, correct?
10:34:58 A. That is correct.
10:34:59 Q. And the issue is if I switch from ISP 1 to ISP 2, then
10:35:07 this phone receives a new IP address, fair?
10:35:11 A. That is not correct.
10:35:13 Q. Okay. You would agree that the gateway, to be more
10:35:20 technically correct, the gateway gets a new IP address?
10:35:24 A. The gateway has the IP address of the ISPs, that is
10:35:29 correct.
10:35:29 Q. Correct. So that ultimately, the issue becomes, if we
10:35:34 have this phone out here that we're talking with, this
10:35:36 phone does not know the new IP address for ISP 2 when you
10:35:42 switch to it, correct?
10:35:43 A. It does not.
10:35:44 Q. And that's what causes the call to drop, fair?
10:35:48 A. Not if the Aspen device is there.
10:35:51 Q. Well, let's talk about that. That's the problem you
10:35:57 were trying to solve, correct?
10:35:59 A. Well, are we talking with the invention or before the
10:36:02 invention?
10:36:02 MR. DACUS: Let's pull up Figure 7, Mr. Duval.
10:36:08 Q. (By Mr. Dacus) So this is Figure 7 from your patent,
10:36:11 correct?
10:36:11 A. Yes.

10:36:13 Q. And this is explaining that the problem that the patent was attempting to solve, fair?
10:36:18 A. That is correct.
10:36:19 Q. Okay. So if we look right down here, it says difficulty of moving call due to a quality event. So this is the patent describing, hey, here's the issue that we're trying to -- the problem that we're trying to solve, fair?
10:36:32 A. That is correct.
10:36:33 Q. Okay. And we can read it in detail, but I think you would agree with me, the problem is if you switch from ISP 1 to ISP 2, then this phone can no longer communicate with this phone because 711, this phone down here, has a new IP address. That's a fair summary, correct?
10:36:54 A. That's still not correct.
10:36:55 Q. Well, look right here, when it says the prior art, that's talking about what was done before this patent, fair?
10:37:08 A. That is correct.
10:37:09 Q. It says: In the prior art, gateway 752 -- that's right here -- it is not possible for 752 to reliably move the call from path 721 to path 722.
10:37:24 That's what it says, correct?
10:37:25 A. That is correct.
10:37:26 Q. Without breaking the call, fair?
10:37:28 A. That is correct.

10:37:28 Q. And that's because when that type of move or switch occurs, the NAT or the PAT, that's the translation that's going on -- that's performed, the servers don't recognize these as belonging to the call from 711 anymore, fair?
10:37:46 A. You're referring to which server in this case?
10:37:50 Q. I'm just reading what the patent says. Is the patent accurate?
10:37:55 A. The patent is accurate, but I'm not following your explanation of it.
10:37:59 Q. Okay. You agree that the call breaks because the RTP server --
10:38:11 MR. DACUS: Am I the only one that lost the screen? I lost my screen, Your Honor. My screen is down, Your Honor. Okay. Back up.
10:38:36 Thank you, Your Honor.
10:38:37 Q. (By Mr. Dacus) You agree, Mr. Chin, that the call breaks because RTP server 702 drops packets coming from the new IP address and port number associated with path 722, correct?
10:38:54 A. The RTP -- okay. Let's be very clear. So you're talking RTP coming from where, to Phone 711?
10:39:03 Q. I'm reading what your patent says, Mr. Chin. Did I read it correctly?
10:39:08 THE COURT: Is that the question -- is the question only --

10:39:11 MR. DACUS: Yes.
10:39:11 THE COURT: -- did he read this piece of paper correctly?
10:39:14
10:39:15 A. If you're reading what this is, I'm not disputing it.
10:39:19 I'm just not following exactly what you're saying.
10:39:21 Q. (By Mr. Dacus) I'm reading from your patent. Did I
10:39:23 read the patent correctly?
10:39:25 A. Okay. If you read from there, then I have no dispute
10:39:28 with that.
10:39:29 MR. DACUS: Can we pull up DD1.6, Mr. Duval?
10:39:36 Q. (By Mr. Dacus) What I did is draw another diagram,
10:39:45 Mr. Chin, to kind of represent this and hopefully a more
10:39:49 simplistic and understandable fashion, does that sound
10:39:53 fair?
10:39:54 A. Sure. Yes, sir.
10:39:54 Q. So what we're talking about here is Alice's phone, when
10:39:58 it initially makes a call, if it does so on ISP 1 and it's
10:40:02 connected to Bob's phone, they can communicate, correct?
10:40:07 A. So you're describing a scenario where before you're
10:40:11 talking on ISP 1 and now you're moving the call to ISP 2,
10:40:16 normally they can't talk.
10:40:17 Q. Right. That was -- that was the problem that the
10:40:19 patent was attempting to solve, fair?
10:40:21 A. But this IP address has moved. That's not what the
10:40:24 patent is doing.

10:40:25 Q. Well, just hold with me.
10:40:29 MR. DACUS: Can you go to DD1.7, correct (sic)?
10:40:36 Q. (By Mr. Dacus) And this is what I want to ask you
10:40:38 about. Before we do that, do you have any idea whether or
10:40:46 not Verizon, when it switches from Wi-Fi to cellular or
10:40:52 vice versa, whether or not the phone changes the IP
10:40:55 address?
10:40:55 A. I'm not aware of what the -- the actual phone does.
10:40:58 Q. Okay. You are aware that Verizon is actually an
10:41:04 Internet Service Provider, correct?
10:41:05 A. Yes, sir.
10:41:05 Q. So as we described in the patent, when we're looking at
10:41:09 ISPs, Verizon can actually assign those itself, fair?
10:41:14 A. Sure. Yes, sir.
10:41:15 Q. Aspen, when it was -- to be clear, when it was
10:41:19 developing its product, Aspen was not an Internet Service
10:41:21 Provider, correct?
10:41:22 A. Yes, sir.
10:41:22 Q. That's why it had to rely on or did rely on other
10:41:27 Internet Service Providers assigning different IP
10:41:30 addresses, true?
10:41:30 A. Yes, that is correct.
10:41:38 MR. DACUS: Can you go to 6.7, please?
10:41:41 Q. (By Mr. Dacus) And so this is what I want to talk to
10:41:43 you about in the patent, Mr. Chin.

10:41:46 What the patent describes is when there's a switch from ISP 1 to ISP 2, then there is a message that must be sent from Alice's phone to Bob's phone relaying Alice's new IP address, correct?
10:42:11 A. Which -- we're talking Alice's -- now you're implying Alice's phone has a new IP address?
10:42:19 Q. Yes, that's what you told us happens, Mr. Chin. When Alice switches from ISP 1 to ISP 2, her phone receives a new IP address, correct?
10:42:29 A. The patent does not require this.
10:42:30 Q. But that's what happened. Whether the patent requires it or not, either the gateway that is associated with Alice's phone or Alice's phone receives a new IP address, correct?
10:42:45 A. How this diagram was related, you can say what you want to draw here, but in terms of the IP address to the phone, there's no mention of that in the patent claims.
10:42:53 Q. You would agree with me, sir, that the entire problem that was attempting to be solved was the fact that an IP address changed when the service provider changed, correct?
10:43:06 A. The problem is the path changes. Do you need the IP address to know to fix that?
10:43:12 Q. So whether we say the path changes or the IP address changes, something changed that caused the call to drop, correct?

10:43:21 A. And how it does that and how you react to it is
10:43:24 important, but I'm not willing to say this is what the
10:43:26 patent does.
10:43:27 Q. You will agree, I presume, sir, that what the patent
10:43:30 does is send a SIP message containing new information to
10:43:38 let Bob's phone know that there has been a change? You
10:43:42 will agree with that surely?
10:43:43 A. There is information sent to the other side about how
10:43:49 the voice and RTP streams go, but does that -- how does
10:43:54 that affect Alice's phone? Now you're bringing in
10:43:58 something that's not in the patent.
10:43:59 Q. Let's be clear --
10:44:02 A. Yes, sir.
10:44:03 Q. -- and I want to be precise in my question, and I want
10:44:06 to make sure I get a clear answer. Does that sound fair?
10:44:10 A. Yes, sir.
10:44:10 Q. You would agree that if a network path is switched
10:44:13 without sending any SIP message from one phone to the other
10:44:19 phone, that would not use the '554 patent, correct?
10:44:24 A. If no SIP messages were sent on a path change, then the
10:44:28 call would drop.
10:44:29 Q. Right. And that would not use the '554 patent,
10:44:29 correct?
10:44:33 A. If the call dropped, that is by definition not the '554
10:44:36 patent.

10:44:36 Q. The '554 patent, to be very clear, requires that a SIP message, when there's a change in path or provider, be sent from the sending phone to the receiving phone, true?
10:44:50 A. The patent does not require a SIP message to be sent.
10:44:55 Q. It doesn't --
10:44:55 A. It does not require --
10:44:57 Q. It requires a message to be sent?
10:44:59 A. It does not say anything about messages to be sent.
10:45:01 Q. Let me be perfectly clear on this question, sir.
10:45:04 A. Yes, sir.
10:45:05 Q. I don't want there to be any mistake. Does that sound fair?
10:45:09 A. Yes, sir, yes, sir.
10:45:10 Q. If a network path is switched, as an example changing ISP providers, without sending any message from Alice's phone to Bob's phone to let it know what the new path or IP address is, that would not infringe the '554 patent, correct?
10:45:29 A. I didn't say that, because the claims of the patent says you must maintain the SIP signaling sequence, which does not say anything about SIP messages.
10:45:39 MR. DACUS: Can we pull up Deposition Page 40 -- Mr. Chin's deposition, Page 40, Line 24, and then go to Line -- Page 41, Line 6, if we could, Mr. Duval?
10:45:59 Q. (By Mr. Dacus) So, Mr. Chin, in your sworn deposition,

10:46:06 we asked you: If a network path is switched without sending any SIP message from one phone to another, does that practice the '554 patent in your view?

10:46:16 And you said: No.

10:46:17 Did I read that correctly, sir?

10:46:19 A. Yes, that's what it says there.

10:46:25 MR. DACUS: You can take that down, Mr. Duval.

10:46:30 THE COURT: Mr. Dacus, when you get to a good stopping place...

10:46:33 MR. DACUS: Now is just fine, Your Honor.

10:46:35 THE COURT: All right. Ladies and gentlemen of the jury, we've been going an hour and 20 something minutes, so I think now is a good time for our morning break. Longer than that actually, an hour and 40 minutes, I think. So thanks for your patience and your attention. We'll be in recess for about 10 minutes.

10:46:54 COURT SECURITY OFFICER: All rise.

10:47:00 (Jury out.)

10:57:31 COURT SECURITY OFFICER: All rise.

10:57:32 THE COURT: All right. Let's get our witness back up and have the jury brought up.

10:59:31 COURT SECURITY OFFICER: All rise for the jury.

10:59:33 (Jury in.)

10:59:35 THE COURT: Please be seated.

10:59:54 Mr. Dacus, you may continue.

10:59:58 MR. DACUS: Thank you, Your Honor.
11:00:00 Mr. Duval, would you pull up DD6.7, the one we've been looking at?
11:00:07 Q. (By Mr. Dacus) So, Mr. Chin, you remember I asked you early in our discussion whether or not your information about infringement came from Mr. Bhaskaran's assertion that there was infringement?
11:00:24 A. Yes, sir.
11:00:25 Q. And you remember you said to me that was true, but you could not remember the date that he told you that or exactly what he told you. You remember that?
11:00:35 A. That's correct.
11:00:36 MR. DACUS: Your Honor, may I approach?
11:00:37 THE COURT: Yes.
11:00:38 MR. DACUS: Thank you.
11:00:57 Q. (By Mr. Dacus) What I've handed you, Mr. Chin, is an August of 2016 email from Mr. Bhaskaran to you. Do you see that?
11:01:08 A. Yes, sir.
11:01:09 Q. He was the author and you were recipient, correct?
11:01:14 A. Correct.
11:01:14 MR. DACUS: Your Honor, at this time, we'd offer DTX-228.
11:01:19 THE COURT: Any objection? Any objection?
11:01:23 MR. HERMAN: No objection, Your Honor.

11:01:25 THE COURT: It'll be received.
11:01:26 MR. DACUS: And may I have the document camera, please?
11:01:35 Q. (By Mr. Dacus) So, again, August of 2016 from Mr. Bhaskaran as the CEO to -- including you as a recipient, Bill Chin, correct?
11:01:46 A. Yes, sir.
11:01:46 Q. Okay. And what Mr. Bhaskaran said to you is that he thinks that the telco, Verizon, is infringing because they are maintaining the SIP Cseq value when they send out the RE-INVITE, correct?
11:02:07 A. Yes, sir.
11:02:08 Q. And as you confirmed, you've done nothing -- you did nothing to either validate his statement as true or false, correct?
11:02:18 A. That's correct.
11:02:21 Q. And it's true, sir, you don't know whether Verizon maintains the SIP Cseq value, do you, sir?
11:02:27 A. I do not know.
11:02:28 Q. And you don't know if Verizon sends that RE-INVITE, correct?
11:02:34 A. That is correct.
11:02:34 Q. You would agree if they do not, there is no infringement, correct?
11:02:45 A. Do not send the INVITE, you mean?

11:02:48 Q. Correct.
11:02:50 A. The claim --
11:02:51 MR. HERMAN: Objection, Your Honor. Is he asking him for his noninfringement opinion after he --
11:02:56 THE COURT: I don't know whether he is or not.
11:02:58 MR. DACUS: I'll withdraw that question, Your Honor.
11:03:00 THE COURT: Okay.
11:03:01 Q. (By Mr. Dacus) Mr. Chin, that's all the questions I have for you. I very much appreciate your patience with me.
11:03:07 MR. DACUS: And I pass the witness, Your Honor.
11:03:08 THE COURT: All right. Redirect?
11:03:10 MR. HERMAN: Yes, Your Honor.
11:03:31 REDIRECT-EXAMINATION
11:03:32 BY MR. HERMAN:
11:03:32 Q. Mr. Chin, hello again.
11:03:34 A. Hi.
11:03:34 Q. You were asked a series of questions about the slow sales of the Aspen box. Do you have an understanding as to why more companies weren't buying the Aspen 365 VoIP?
11:03:49 A. Yes, I do. Even though a lot of companies that buy our product, they really like the feature sets. One of the challenges -- we are a startup and a very small startup, and a lot of companies, even if you're a small company

11:04:05 yourself or midsized ones, they kind of wonder if you're going to be around to support that product in a few years if they buy it. And that is really the biggest problem.

It's not the technology or anybody wants it, it's I can go buy a Cisco well-known name-brand product, and I'm safe. I'm not going to lose my job buying that product. But if I buy a small startup product and that company goes under and no one supports the product, you could lose your job and your boss could say, hey, why did you buy that and not buy this big vendor over here. And that's a big problem all small companies face.

Q. And, Mr. Chin, do you have an understanding as to whether the customers that you were trying -- that Aspen was trying to sell the Aspen 365 VoIP box, did they give you information related to the success or non-success of the No Call Drop feature of that patent?

A. What do you mean by --

MR. DACUS: Your Honor. Excuse me, Your Honor, it calls for hearsay, and I object.

THE COURT: Can you rephrase the question to avoid the objection?

Q. (By Mr. Herman) Do you believe that one of the reasons that the Aspen VoIP 365 was not very successful was a negative reaction to the No Call Drop feature?

A. No, that's the reason why it sold.

11:05:29 Q. Okay. Thank you.
11:05:40 MR. HERMAN: If we can call back up JTX-1, the
11:05:46 patent.
11:05:48 Q. (By Mr. Herman) Now, Mr. Dacus asked a number of
11:05:55 questions suggesting that your patent does not describe and
11:05:58 cover Wi-Fi and cellular applications, correct?
11:06:00 A. Yes, that is correct.
11:06:01 Q. And do you agree with that?
11:06:02 A. No.
11:06:04 MR. HERMAN: Can we take a look at Figure 2,
11:06:06 please?
11:06:07 Q. (By Mr. Herman) And do you see the list of examples in
11:06:12 the top left, Mr. Chin?
11:06:13 A. Yes, I do.
11:06:15 Q. Is a cell phone one of those examples?
11:06:17 A. It is.
11:06:18 Q. So when Mr. Dacus asked you if the patent contemplates
11:06:23 a cell phone, what is your answer?
11:06:25 A. Yes, it does.
11:06:26 Q. And how would a cell phone communicate to the Aspen
11:06:31 box, the application layer 320?
11:06:34 A. Over Wi-Fi.
11:06:35 Q. Around this time, had the iPhone just come out?
11:06:39 A. I think it's close to coming out.
11:06:44 Q. How do you know it would connect via Wi-Fi?

11:06:48 A. The iPhone?
11:06:49 Q. Or -- looking at Figure 2, how do you -- how do you know that the cell phone would connect to the application layer computer program using the Internet -- using Wi-Fi?
11:07:00 A. How is it -- I'm not clear on the question, because when a cell phone connects over Wi-Fi, it has to be on the local network, and then the Aspen gateway would be aware of it.
11:07:16 Q. Okay.
11:07:17 MR. HERMAN: Can we turn to Figure 6 -- I mean, excuse me, Claim 6?
11:07:21 Q. (By Mr. Herman) And you read this to the jury on the direct, but does this indicate whether the patent contemplated mobile devices when the patent was issued?
11:07:38 A. Yes.
11:07:38 Q. And that's in Claim 6 of the --
11:07:40 A. Yes.
11:07:42 Q. And do you have an understanding whether that's being asserted against Verizon in this case?
11:07:47 A. Yes.
11:07:47 Q. Thank you.
11:07:50 MR. HERMAN: You can take that down.
11:07:51 Q. (By Mr. Herman) Mr. Chin, you were asked a series of questions about whether you knew Verizon was infringing the claims of the '554 patent, correct?

A. Correct.
Q. And have you seen any confidential Verizon documents in this case?
A. No.
Q. Okay. Were you qualified as an expert on infringement in this case?
A. No, I am not.
Q. Does Aspen have someone that's going to testify to the jury about whether or not Verizon's Wi-Fi Calling Service infringes the claims of the '554 patent?
A. Yes, Dr. Rubin will do that.
Q. Do you have an understanding as to whether Dr. Rubin has had access to all of the Verizon confidential information?
A. That is my understanding.
Q. And you understand, Mr. Chin, that Verizon had to produce that to us, and then Mr. -- Dr. Rubin looked at all that information? I just want to make clear you haven't seen any Verizon highly confidential documents?
A. I have not seen anything.
Q. Okay. You were also asked a number of questions about the SIP protocol. Do you remember that?
A. Yes, sir.
Q. And you talked a little bit on direct, but can you explain to the jury how you became familiar and gained

11:09:25 experience with the SIP protocol?
11:09:26 A. So as I was saying before, I did a lot of experiments as an engineer with SIP. And my background is computer networking. At the time 15 years of experience working with computer networking, computer hardware protocols. I understood routing. I understood protocols. Those specifications are really hard to read. It takes awhile. I can read them and understand them because I've done this work before.
11:09:56 So when it comes to SIP, yeah, it's new, but after a while you figure the stuff out. And when you're debugging this thing and working with it and writing, that SIP file that we showed you, right, at the end of the day, when I was done at Aspen, that file was almost 10,000 lines of code. That's how much I worked on it. I worked on it a lot.
11:10:20 And, yeah, I don't call myself an expert because there's, like, dozens if not tens of dozens of specifications, and I can't tell you what those are. But for that thing we were working on, I knew exactly how that worked, and I spent so much time and energy on that.
11:10:37 But as an engineer, right, you need to make that stuff work, otherwise it just doesn't work, right? And if you're not precise about that, you will get it to fail and it won't do what you want. And we spent so much energy

11:10:52 making a really good product for our customers so that failover to keep that call live would actually survive. And we worked really hard. We studied.

11:11:02 Q. And I believe he showed you a SIP standard. It was DTX-31.

11:11:09 MR. HERMAN: Can we call up the second page of the '554 patent, please? And if you can highlight the bottom right.

11:11:24 Q. (By Mr. Herman) Mr. Chin, SIP had come out before the filing of your patent application on the '554 patent, had it not?

11:11:33 A. Yes, sir.

11:11:34 Q. Okay. Did you submit or did -- did you submit the SIP standard to the Patent Office during the prosecution of the '554 patent?

11:11:44 A. No.

11:11:45 Q. Did -- did the patent examiner, though, consider the SIP standard, whether you submitted it to them or they found it themselves, did they consider the SIP standard when they were prosecuting and looking at the claims of the '554 patent?

11:12:00 MR. DACUS: Objection, Your Honor. Calls for opinion testimony.

11:12:04 MR. HERMAN: Your Honor, I'm going to point him right to the second page of the document where --

11:12:09 THE COURT: Overruled.
11:12:10 MR. HERMAN: Thank you, Your Honor.
11:12:14 Can you highlight -- you see at the bottom
11:12:19 right -- right there, the 3261.
11:12:24 Q. (By Mr. Herman) Do you have an understanding -- and
11:12:27 read that to yourself, if you don't mind. Do you have an
11:12:30 understanding as to whether the SIP protocol was in front
11:12:33 of the examiner during the prosecution of the '554 patent?
11:12:37 A. Yes, that is the RFC. This is one of the few RFCs I
11:12:46 actually know. It is the SIP -- RFC -- they're called core
11:12:47 specification.
11:12:47 Q. So this was one of the things you studied to gain
11:12:49 expertise in the SIP protocol, and that was in front of the
11:12:53 examiner during prosecution of the claims of your patent?
11:12:55 A. That is correct.
11:12:58 Q. Okay.
11:12:58 MR. HERMAN: You can take that down, please.
11:13:00 Q. (By Mr. Herman) Mr. Chin, are you proud of the
11:13:03 invention described and claimed in the '554 patent?
11:13:06 A. Yes, I'm very proud of it.
11:13:08 Q. And why is that?
11:13:09 A. Because that's -- it did something -- people thought it
11:13:12 couldn't be done, and the fact that we found a way, I'm
11:13:16 really proud of we did something no one else could do.
11:13:19 Q. Thank you very much.

11:13:21 MR. HERMAN: I pass the witness, Your Honor.
11:13:22 THE COURT: All right. Recross?
11:13:25 RECROSS-EXAMINATION
11:13:29 BY MR. DACUS:
11:13:29 Q. Let me just start right there with you, Mr. Chin. You
11:13:36 understand that nobody on our side is saying you don't have
11:13:38 a right to be proud of your patent, correct?
11:13:40 A. Yes, sir.
11:13:41 Q. You agree, sir, though, that if Verizon does not use
11:13:45 this very specific method described in the patent, Verizon
11:13:49 shouldn't have to pay anything, correct?
11:13:50 A. Yes, sir.
11:13:52 Q. And both can be true. You can be proud of your patent,
11:13:56 and Verizon doesn't use it? Both can be true, correct?
11:13:58 A. Yes, sir.
11:13:59 Q. And those -- those questions -- you remember I asked
11:14:05 you those questions about what the patent covers because
11:14:08 you now -- you now claim it covers this handover between
11:14:12 Wi-Fi and cellular, correct?
11:14:14 A. Yes, sir.
11:14:16 Q. And the reason I asked you that, sir, is because you
11:14:19 swore under oath that you did not have cellular in mind
11:14:23 when you designed this patent, correct?
11:14:26 A. I said that.
11:14:29 Q. Okay. You said you did say that, correct?

A. Yeah, I said that.
Q. Okay.
MR. DACUS: That's all the questions I have, Your Honor. I pass the witness.
THE COURT: Any redirect?
MR. HERMAN: One question, Your Honor.

REDIRECT-EXAMINATION

BY MR. HERMAN:
Q. Mr. Chin, now that you've read the patent and the patent has issued, do you have an understanding as to whether the '554 patent covers the mobile environment and the Wi-Fi environment?
A. It does.
Q. Thank you.
MR. HERMAN: No further questions.
THE COURT: Anything?
MR. DACUS: No.
THE COURT: All right. You may step down, sir.
THE WITNESS: Thank you.
THE COURT: All right. Call your next witness.
MR. MARINO: Thank you, Your Honor. Fabio Marino, also representing Aspen Networks. And our next witness is Robin Mavunkel --
THE COURT: All right.
MR. MARINO: -- who is outside waiting.

11:15:23 THE COURT: All right.

11:15:24 MR. MARINO: And, Your Honor, can we hand out -- well, once the witness is sworn in, can we hand out binders?

11:15:32 THE COURT: Please. You can do that now.

11:15:38 If you would, sir.

11:15:47 Sir, if you would just pause right there and raise your right hand to be sworn. This way.

11:15:55 (Witness sworn.)

11:16:00 THE COURT: You can take a seat on the witness stand. Once you're settled, if you'll pull the microphone toward you.

11:16:22 Whenever you're ready.

11:16:24 MR. MARINO: Thank you, Your Honor.

11:16:25 ROBIN MAVUNKEL, PLAINTIFF'S WITNESS, SWORN

11:16:25

11:16:25 DIRECT EXAMINATION

11:16:29 BY MR. MARINO:

11:16:29 Q. Good morning, Mr. Mavunkel.

11:16:31 A. Good morning, sir.

11:16:32 Q. Would you mind introducing yourself to the jury, please?

11:16:35 A. Hi, I'm Robin Mavunkel.

11:16:36 Q. Mr. Mavunkel, where are you from?

11:16:38 A. I was born in Georgia. My childhood was mostly in the Baltimore area. And then after the middle of high school,

I moved to San Jose, California.
Q. Sir, is this your first time giving testimony in a court of law?
A. That's right. It's the first time.
Q. Are you a little bit nervous? It's okay if you are.
A. Of course.
Q. So what I'll do --
THE COURT: Hold on, could I ask you to either sit up or pull the microphone --
THE WITNESS: Sure.
Q. (By Mr. Marino) So what I'm going to do is I'm going to go slow. If you don't understand the question, please let me know and I'll try to rephrase it so the jury can understand your testimony.
A. Yes, sir.
Q. So start with something simple. Can you tell us something about yourself?
A. Fun fact. I think -- I speak four languages, English, Malayalam, which is a South Indian language, Spanish and Portuguese.
Q. And, sir, are you married?
A. Yes, I've been married to my wife for 15 years coming this October.
Q. Do you have any children?
A. Yeah, I have two boys, 10 and 11 years old. Going into

the fifth and sixth grade.
Q. Okay. Did you attend college?
A. Yeah, I went to the University of California, Santa Cruz.
Q. And I think UC Santa Cruz is an interesting mascot. Can you tell the jury what that is?
A. Yeah, the mascot of UC Santa Cruz is the banana slug.
Q. I wasn't familiar with it, so maybe they're wondering too. What is a banana slug?
A. Yeah, the banana slug is a bright yellow slug that lives in the Redwood forest around the university, and it looks like a banana.
Q. Okay. When did you graduate from college?
A. In 2002.
Q. And what degree did you obtain at UC Santa Cruz?
A. I graduated with a Bachelor of Science in information systems management, which is a mix of computer science and business.
Q. Okay. And by the way, before I go into your work history, what do you like to do for fun, Mr. Mavunkel?
A. Yeah, I really love the outdoors. I go hiking a lot with my family, go fishing, watching basketball and football, and just playing with my boys and playing video games with them.
Q. Do you do any coaching on the side?

11:18:56 A. Yeah, last year I also coached my fourth grader's boys' basketball team. That was a lot of fun.
11:19:05 Q. Let's turn to your work history. What did you do upon graduating from college?
11:19:10 A. Yeah, right out of college, I started working for Aspen Networks.
11:19:13 Q. Okay. And did you have a prior relationship with Aspen when you graduated from college?
11:19:19 A. Yeah. Sajit Bhaskaran, the co-founder of Aspen, was my parent's neighbor and actually still is my parents' neighbor, and he gave me an internship while I was still in university.
11:19:30 Q. Okay. And so then after you graduated, you rejoined Aspen, correct?
11:19:34 A. Yeah, after I graduated, they offered me a full-time job at Aspen.
11:19:38 Q. Okay. What were your job responsibilities at Aspen?
11:19:42 A. Yeah. When I started there, I was doing QA testing on the software, which is like a quality assurance testing. I was also maintaining their IT network and also maintaining their website for them.
11:19:55 Q. Okay. So you told us your training from college is in computer science. So did you have occasion to write any software code for Aspen?
11:20:04 A. Not for the product itself, but I wrote software for QA

11:20:08 testing, as well as other IT systems in the office.
11:20:11 Q. Okay. And who was writing the software code for the
11:20:17 actual Aspen product?
11:20:17 A. That would be Bill Chin, the head of software
11:20:21 engineering for Aspen.
11:20:22 Q. Now, what is your current relationship with Aspen?
11:20:27 A. Yes. I'm still working for them as a consultant. A
11:20:31 few hours per month working there as a consultant.
11:20:37 Q. Okay. And you're being compensated for your work?
11:20:39 A. That's right.
11:20:40 Q. And is your testimony -- is your compensation dependent
11:20:43 in any way on the outcome of this case?
11:20:45 A. No, sir.
11:20:46 Q. Okay. Do you own any stock in Aspen?
11:20:50 A. Yes, I do.
11:20:51 Q. Approximately what percentage do you own?
11:20:54 A. It's about 2 percent of the company.
11:20:56 Q. Okay. So you've -- by this point in time, how long
11:21:01 have you been associated with Aspen for, off and on?
11:21:05 A. Yeah. Off and on, whether it's full time, part time as
11:21:08 a consultant, I've been working for them for 24 years,
11:21:11 which is more than half my life.
11:21:13 Q. Now, I'm going to show you an exhibit.
11:21:16 MR. MARINO: Ms. Hopkins, if you wouldn't mind
11:21:18 bringing up PTX-007.

11:21:21 Q. (By Mr. Marino) And, Mr. Mavunkel, do you recognize this document?
11:21:25 A. Yes. This is the product sheet for the Aspen 365-BRANCH, which shows the features and capabilities of the Aspen product. I helped write this document, as well.
11:21:37 Q. Okay. So that's how you're familiar with the document?
11:21:39 A. Yeah. Another part of my job was to write a lot of the technical documentation for Aspen products.
11:21:44 Q. Okay. And did this product actually implement the patented invention?
11:21:50 A. Not in this product, particularly.
11:21:52 Q. Okay. So it's the version of the product before the invention?
11:21:57 A. Yes, sir.
11:21:57 Q. Okay. And what did this product do?
11:21:59 A. Yes. We sold this product to customers that would have this in their office, and they would connect multiple Internet service links to the box. And this product could switch a -- network traffic from one Internet link to the other. And so the end users in the office that were browsing email or browsing the web, they wouldn't ever know that their Internet went down. So the Aspen box could switch over that traffic for that business.
11:22:25 Q. Okay. Just going to ask you a couple of questions about the figure that you see on the screen.

11:22:31 So you see the 365-BRANCH box, right?
11:22:36 A. Yes, I do.
11:22:37 Q. That represents the Aspen box?
11:22:39 A. Yes, sir.
11:22:39 Q. And you see on the left-hand side, you have a bunch of
11:22:41 what are labeled ISP 1, 2, 3, 4, right?
11:22:45 A. That's right.
11:22:45 Q. What do those represent?
11:22:47 A. Those are the different Internet service links that the
11:22:50 customer could have, like cable, DSL, and you could have
11:22:54 either two or more of these Internet links that could be
11:22:57 used with the Aspen box.
11:22:58 Q. Okay. And then on the other side of the Aspen box, you
11:23:01 see some desktop, laptop PCs, you see that?
11:23:07 A. Yes, I do, sir.
11:23:08 Q. And you also see something that says IP phones, SIP,
11:23:13 MGCP, Skype. Do you see that?
11:23:15 A. Yes, sir.
11:23:16 Q. So what are those?
11:23:17 A. Yes. The LAN side, the backside of the Aspen box, in
11:23:20 the office, you would have firewalls, computers, laptops,
11:23:24 phones, whatever you would have in the office. This is all
11:23:26 behind the Aspen box.
11:23:27 Q. Okay. So before the invention, which you told us this
11:23:31 product is before the invention, what would happen if you

11:23:34 were talking on the phone and you had to switch from one
11:23:38 ISP to the other?
11:23:39 A. Yeah. So if you were on a phone call before the
11:23:43 invention and we detected the ISP that was basically having
11:23:47 bad quality and going to go down, we'd switch over traffic
11:23:49 to another Internet link. The phone call would drop, and
11:23:53 the user would have to redial and call back whoever they
11:23:57 were talking to.
11:23:59 Q. Okay. Was that a problem for some customers?
11:24:01 A. Yes, definitely. If you're in the middle of an
11:24:03 important call and your call drops, it's inconvenient.
11:24:07 Some customers like contact centers or customer support
11:24:10 places, they would have phone calls as the core part of
11:24:14 their business, so that was a big problem for them.
11:24:17 Q. I think you heard some of it in voir dire, some of you
11:24:21 had expressed frustration with customer service. Would
11:24:24 that be a problem -- if you're waiting for half an hour to
11:24:28 talk to customer service, and then the call drops, what
11:24:31 happens then?
11:24:32 A. Yes. That would be -- I would be pretty frustrated if
11:24:35 I was on a call and had to redial and get back in the queue
11:24:38 of a customer support call and start all over again. So
11:24:41 this was definitely an issue.
11:24:42 Q. Okay. Now, just before we go back to this function, I
11:24:47 want to ask, there was some confusion about this in

previous testimony which you didn't hear. So I want to see if I can clarify this.
The -- the 365 box, would that receive some kind of IP address from an ISP?
A. Yeah, typically we'd assign them different IP before addresses.
Q. Okay. And you know this from your work at Aspen?
A. Yes, my work at Aspen and all my experience in testing software.
Q. Okay. And has that changed? Do people still connect to ISPs -- with ISPv4 address -- I'm sorry, with IPv4 packets today?
A. Yes, even today, in 2026, most of the Internet is on IPv4. Although there are some new technologies coming out like IPv6. It hasn't really been rolled out too much across the Internet today.
Q. I just want to ask you a little bit more about that. So you said there is a new standard IPv6. Why wouldn't -- why don't people use IPv6 instead of IPv4 today?
A. It would be a huge investment for different businesses to upgrade their equipment and folks at home with their Wi-Fi routers to change out the equipment. So it's going to take a while for that to be adopted across the entire Internet.
Q. And just to be clear, you still work in the

11:26:15 telecommunication industry today, right?
11:26:16 A. Yes, sir.
11:26:16 Q. You do your routine tests, how devices connect to ISPs?
11:26:20 A. Correct.
11:26:21 Q. And that's how you know about the usage of ISP -- of
11:26:25 IPv4 versus IPv6?
11:26:27 A. Yes, sir.
11:26:28 Q. Okay. Let's go back to the box. Let me show you the
11:26:33 next exhibit, which I believe is PTX-08.
11:26:39 MR. MARINO: Thank you.
11:26:41 Q. (By Mr. Marino) What is this document?
11:26:42 A. Yes, this is a User Manual for the Aspen 365 product,
11:26:46 and I also helped write this manual.
11:26:48 Q. This is the same product you showed us in the previous
11:26:51 document, right?
11:26:51 A. Yes, sir.
11:26:52 Q. Okay.
11:26:54 MR. MARINO: Can we turn to Page 7, please?
11:26:56 Q. (By Mr. Marino) Okay. Can you tell us what's shown on
11:26:59 this figure, Figure 1, that's captioned Typical Network
11:27:05 Configuration?
11:27:05 A. Yeah, this is a typical network configuration that we
11:27:08 would have at a customer site. You can see the Aspen 365
11:27:12 box, and on the WAN, which is the top side, you'll see two
11:27:16 links, which are different ISPs or Internet Service

Providers.

On the LAN, which is the bottom of the box, you can see various equipment in an office like a firewall, VPN router, email servers, as well as all of the PCs and laptops that would be in an office.

Q. Okay. And I think you told us earlier, so the functionality of this box was if one of the Internet connections went down, it would reroute the traffic to the other connection?

A. That's correct. The Aspen box would measure each of the Internet links and if you detected packet loss on a link, we would failover to the secondary Internet link and traffic would continue on that other ISP.

Q. And how well did that work for things like email, web access, and the like?

A. Yeah, for users sending email, browsing the web, they wouldn't even know that the Internet went down. It was so quick that they kept on doing their regular -- things they were working on on the Internet.

Q. But what about phone calls?

A. Yeah, at a point with this invention at this time when they were on a phone call, the phone call would drop, and the user would have to redial and call back who they were talking to.

Q. Okay. So that -- was that a problem that was unique to

11:28:36 Aspen, or is that an industry-wide problem?
11:28:39 A. At that point in time, any product that could share multiple links had the same problem with phone calls dropping.
11:28:46 Q. Okay. And was Aspen able to address that product -- I mean, that problem?
11:28:52 A. Yeah, we were able to solve that with our '554 patent technology.
11:28:58 MR. MARINO: Please take PTX-08 down and bring up JTX-001.
11:29:05 Q. (By Mr. Marino) Just for the record is this the patent you're referring to?
11:29:07 A. Yes, sir.
11:29:09 MR. MARINO: Now, if we can turn to Figure 9 of JTX-1, please.
11:29:14 Q. (By Mr. Marino) I think the jury has now seen this figure a few times so I won't belabor it. But can you tell us at a high level what's shown in this diagram?
11:29:21 A. Yeah, it's an embodiment or an example of how our Aspen product could be deployed in a network.
11:29:26 Q. Okay. And you said your role was to conduct QA, quality assurance testing, right?
11:29:32 A. That's correct.
11:29:33 Q. Does this diagram describe typical testing environment in which you developed the patent with Mr. Chin?

A. Yes, sir.
Q. So can you describe what this testing environment would look like?
A. Yeah, in the diagram, No. 910, which is the voice -- VoIP QoS Gateway/Firewall, that would be our Aspen product or Aspen box, and we would have connected two or more Internet links to the WAN side, the top side of the Aspen box.
And then on the backside you can see a SIP user endpoint, which would be a phone -- a SIP phone behind that. The testing would be I would start up a phone call from that phone across the Internet. And I would be taking a network tap using a program called Wireshark, which I was able to look at all the packets that were being sent from the phone out to the Internet.
And then I would go and unplug one of the ISP links to simulate the Internet going down. And then I would observe the behavior of the SIP and RTP messages, as well as the behavior of the phone call that was taking place during that test.
Q. Okay. Mr. Mavunkel, where did you conduct this testing?
A. Yes, I would be doing this in Aspen's lab in the office, which was a section where we had network equipment and different switches, phones and our Aspen box for

11:30:55 testing.
11:30:55 Q. Okay. Mr. Mavunkel, what I'd like to do now, I want to
11:31:00 show you a physical exhibit.
11:31:02 MR. MARINO: Your Honor, may I approach and --
11:31:03 THE COURT: You may, yes.
11:31:16 MR. MARINO: Thank you. Let the record show I
11:31:17 handed the witness PTX-199.
11:31:19 Q. (By Mr. Marino) Now, Mr. Mavunkel, can you identify
11:31:22 for us what PTX-199 is?
11:31:26 A. Yes. This is our Aspen 365 Voice over IP box.
11:31:31 Q. So is this a version of the Aspen box that implemented
11:31:34 your '554 invention?
11:31:35 A. Yes, this is a model that implements our invention.
11:31:39 Q. And how do you know that?
11:31:40 A. Because I was testing this in both our lab and in
11:31:44 customer sites at the time.
11:31:47 Q. Okay. And so this would be depicted in Figure 9 as Box
11:31:52 910 you told us?
11:31:53 A. Yes. That would be 910, the Voice over IP
11:31:59 Gateway/Firewall in the diagram.
11:32:01 Q. Okay. And can you describe -- and show the jury and
11:32:02 perhaps describe the ports that are on that box, PTX-199?
11:32:05 A. Yeah. There would be one port that would be connected
11:32:07 to the LAN. So all the office equipment would be on the
11:32:10 bottom side of the Aspen. And then you can see two ISP

11:32:15 ports that we can plug in two cables to two different ISPs, like a Comcast Cable connection and a DSL connection, for example.
11:32:22 Q. So you have two ISP ports on PTX-199, correct?
11:32:32 A. That's correct.
11:32:32 Q. Now, can you just physically demonstrate for the jury how you would simulate when one of the ISPs went down?
11:32:40 A. Yeah. So I'd start the phone call and start the wiretap -- or the Wireshark trace to look at the data. And then I would go and literally unplug the cable from ISP 1 to simulate the Internet link going down. The Aspen box would detect that via packet loss and then switch the traffic to the secondary Internet service link -- to the second cable.
11:33:00 Q. Okay. And why did you physically unplug the wire?
11:33:04 A. Yeah. I couldn't go get the Internet to go down for that particular ISP, so I would have to unplug the cable that was coming from the Internet router link.
11:33:14 Q. Okay. And was that a valid way of simulating the Internet link going down?
11:33:20 A. Yes, sir.
11:33:22 Q. Okay. What would the Aspen box do when it saw the wire being pulled out?
11:33:28 A. Yeah, the Aspen box would continuously be measuring both the links to make sure that it was up and healthy.

11:33:35 And when it started detecting packet loss on the ISP that
11:33:39 -- now the cable is unplugged, we'd switch over all traffic
11:33:42 to the secondary link.
11:33:43 Q. Okay. Now, I believe the jury has heard from Mr. Chin
11:33:47 this morning, but can you tell us how did you go about
11:33:51 solving the problem of dropped calls?
11:33:54 A. Yeah. We were working with customers that were
11:33:58 interested in this feature, and through testing, we were
11:34:02 able to observe the way that the phone calls behaved before
11:34:06 and after switching. And we were able to determine that we
11:34:10 needed to maintain SIP signaling sequence after we moved
11:34:13 the call to a different ISP.
11:34:15 So, you know, Bill implemented some test software
11:34:18 where we put it on the Aspen box, installed it, and then
11:34:21 repeated our tests and observed a behavior, a way to move
11:34:24 the call from one ISP to the other without dropping the
11:34:28 call.
11:34:28 Q. Okay. There's a lot there, so I'm going to take you
11:34:31 back through it a little bit more slowly for the jury.
11:34:34 So, first of all, you mentioned earlier you were
11:34:37 doing testing using something called Wireshark. Could you
11:34:40 explain to the jury what Wireshark is?
11:34:42 A. Yeah. So the Wireshark is a software that's installed
11:34:46 on the network to look at the traffic coming from the
11:34:49 phone, going to the Aspen box, going out of the Aspen box

11:34:52 to the Internet. And it's almost like a wiretap. So I can
11:34:55 see all those packets and analyze the packets of what's
11:34:58 going on there.
11:34:59 Q. Okay. And would you place the Wireshark in any
11:35:02 particular network location? Did it matter?
11:35:05 A. I could put it behind the Aspen box on the customer
11:35:09 site or in front of the Aspen box at the customer site
11:35:12 before it went off to the Internet.
11:35:14 Q. Okay. And in the course of developing the invention,
11:35:16 did you use the Wireshark to inspect the packets that were
11:35:21 being communicated over the network?
11:35:22 A. Yes, that was my primary tool to look at all that data.
11:35:26 Q. Okay. And what did you observe by looking at that data
11:35:30 you captured using the Wireshark?
11:35:32 A. Yeah. We observed that the SIP signaling sequence,
11:35:38 which is the communication from the phone out to the
11:35:42 endpoint on the Internet, had a particular sequence that we
11:35:45 had to keep in tact when we moved over to a different
11:35:50 Internet link. If that sequence got messed up, the phone
11:35:53 call wouldn't survive and would drop the call.
11:35:57 Q. Okay. So was that a problem with a specific ISP
11:36:00 address being communicated, or was it a problem with the
11:36:04 SIP sequence?
11:36:04 A. It was with the SIP sequence. That's in the signaling
11:36:07 messaging going on from the phone out to the other endpoint

11:36:11 on the Internet.
11:36:11 Q. All right. So let's talk about SIP a little bit more.
11:36:15 Again, the jury heard about SIP from Mr. Chin, but what is
11:36:18 your understanding of what the SIP protocol was used for in
11:36:21 the Aspen product and in your testing?
11:36:24 A. Yeah. So SIP is the protocol -- Session Initiation
11:36:29 Protocol, which is the protocol used by a SIP phone to
11:36:32 communicate and set up that phone call. So it would send
11:36:37 messaging out to the other side and both parties would
11:36:39 communicate over that SIP messaging to set up the phone
11:36:43 call. And once that was done, the actual phone call would
11:36:47 be set up and the voice would start flowing on another
11:36:50 stream, an RTP stream, a Real Time Protocol stream.
11:36:53 Q. Okay. And I think actually with Mr. Chin, there
11:36:56 were -- the jury was shown a diagram that had the two
11:36:58 separate lines, the SIP line at the top that showed the
11:37:02 whole setup and the RTP stream at the bottom that showed
11:37:05 the packet flows. Is that your understanding of how that
11:37:09 works, as well?
11:37:10 A. Yes, sir.
11:37:10 Q. Okay. Now -- and so you detected through testing that
11:37:17 there was a problem with the SIP sequence. What did you do
11:37:19 next?
11:37:20 A. Yeah. So then Bill implemented some software, which I
11:37:25 installed on this Aspen box and repeated the testing. And

11:37:29 we were able to get a phone call to switch without
11:37:31 dropping, which was, like, our big breakthrough moment
11:37:35 where I remember high fiving Bill in the lab that we had
11:37:38 gotten this successfully.
11:37:41 Q. Okay. And did you perform any tests with the Wireshark
11:37:43 to validate that, in fact, the SIP sequence wasn't being
11:37:48 interrupted?
11:37:48 A. Yes, I performed the same testing with the Wireshark to
11:37:51 look at the packets and see that now we are being able to
11:37:56 maintain the SIP sequence.
11:37:57 Q. Okay. And what would happen to the call when you then
11:38:01 switched over from one ISP to the other?
11:38:02 A. Yeah, the call would quickly switch over, and the call
11:38:06 wouldn't drop, and you could continue talking to whoever
11:38:08 you were talking to on that phone call.
11:38:10 Q. And, Mr. Mavunkel, do you have an understanding of
11:38:14 whether the software that Mr. Chin wrote is described in
11:38:17 the patent?
11:38:17 A. Yes, sir.
11:38:20 Q. Is it described?
11:38:21 A. The invention is described, yes.
11:38:24 Q. Well, how the software -- is there a description of the
11:38:29 software Mr. Chin wrote in the patent?
11:38:30 A. There's a description on how to write the software.
11:38:32 Q. Okay. So let me show you Figure 4 of JTX-1.

11:38:39 Is this what you're referring to?
11:38:41 A. Yeah -- yes, sir.
11:38:43 Q. Okay. And you said you have a background in computer
11:38:47 science, right?
11:38:48 A. Yes, sir.
11:38:48 Q. As a computer science-educated person, do you
11:38:52 understand what Figure 4 is describing?
11:38:54 A. Yes, sir. This is a flowchart.
11:38:56 Q. Okay. And is a flowchart the standard way for
11:39:01 programmers to communicate to one another what the
11:39:03 functionality of a program is?
11:39:06 A. Yeah, so the flowchart that shows the algorithm and the
11:39:09 logic on how to write the software.
11:39:11 Q. You use flowcharts in your work every day, right?
11:39:13 A. Yes, correct.
11:39:15 Q. Let me show you the next figure, Figure 5.
11:39:19 Is this also part of the description of the
11:39:21 functionality of the software?
11:39:23 A. Yes, sir. This is a finite state machine, which is
11:39:26 also how to implement the code and actually write the code.
11:39:30 Q. Okay. And is this also a way that you use to
11:39:35 communicate to other programmers how to implement software?
11:39:38 A. Yes, the combination of 4 and 5 is how you would write
11:39:42 the software.
11:39:42 Q. Okay. Now, we talked about what happens on the box,

11:39:58 right, and then in the invention when you pull out that
11:40:01 cable.
11:40:02 What happens to -- if I'm talking on the phone and
11:40:07 you said there is a stream of RTP packets are going back
11:40:10 and forth, what happens to those RTP packets when you pull
11:40:14 out the cable?
11:40:15 A. Yeah, when you pull out the cable, there's packet loss,
11:40:19 those packets are lost until we're able to switch that call
11:40:23 to the other Internet link.
11:40:24 Q. Okay. So anytime you pull out the cable to simulate an
11:40:27 ISP going down, there is packet loss?
11:40:30 A. Yes, sir.
11:40:30 Q. Okay. Does that play a role in the switch-over?
11:40:36 A. Yeah, the Aspen box is measuring packet loss on all the
11:40:40 links, which is a signal for us to actually move the call
11:40:45 and switch over to the other ISP link, and as we're
11:40:48 switching, there's also packet loss.
11:40:51 Q. Okay. So does the invention of the '554 eliminate
11:40:55 packet loss when you switch over?
11:40:57 A. No, there's always packet loss, even before you switch
11:41:00 over.
11:41:07 MR. MARINO: Now, let me bring up JTX-1 again and
11:41:10 look at the claim; Claim 1.
11:41:15 Q. (By Mr. Marino) Now, you were here for opening
11:41:18 arguments, right?

11:41:18 A. Yes, sir.
11:41:18 Q. And you heard Verizon explain to the jury what their understanding of the invention -- the problem and the solution of the invention was?
11:41:24 A. Yes, sir.
11:41:24 Q. Did you agree with them?
11:41:26 A. No, absolutely not.
11:41:27 Q. I believe and I think the jury has now heard it a couple of times today, I think what Verizon said is that the problem was that there was a mismatch in the ISP addresses. Do you see anything in the claim about ISP addresses?
11:41:44 A. No mention of that in the claim.
11:41:46 Q. And I think Verizon said the solution was to send the SIP RE-INVITE message. Is there any mention of a SIP RE-INVITE message in the claim?
11:42:00 A. No, no mention of SIP INVITE in the claim.
11:42:02 Q. Okay. Now, you mentioned a few times the problem you were trying to solve was switching from one network path to the other without dropping the call, right?
11:42:12 A. Yes, sir.
11:42:12 Q. Is that mentioned in the claim?
11:42:14 A. Yes, sir, it is.
11:42:15 Q. And you also mentioned that the solution you found was to maintain the SIP sequence, right?

11:42:20 A. Yes, sir.
11:42:20 Q. Is that mentioned in the claim?
11:42:22 A. It is, sir.
11:42:23 Q. Okay. Now, once you implemented the invention, did you
11:42:35 actually put it in the box that's in front of you?
11:42:39 A. Yes, we would have installed the software on here, and
11:42:43 I would have done the QA testing on that to verify that it
11:42:47 was working as expected.
11:42:48 Q. Okay. And did you -- was part of your job
11:42:54 responsibility also to write product documentation?
11:42:57 A. Yes, I wrote all the product manuals for the Aspen
11:43:00 product as well as the spec sheets that showed all the
11:43:03 features of the Aspen product.
11:43:04 Q. Okay. So let me show you those documents.
11:43:06 MR. MARINO: Let's bring up first PTX-20.
11:43:10 Q. (By Mr. Marino) And what is PTX-20?
11:43:12 A. Yeah, this is the data sheet for Aspen 365 VoIP where
11:43:18 we list all the features and benefits of our software, so
11:43:20 potential customers would look at this to see what our box
11:43:23 could do.
11:43:23 Q. Okay. And did you also write this document?
11:43:27 A. Yes, I wrote this document.
11:43:28 Q. And this is after the invention had been implemented?
11:43:31 A. Yes, this is the product that has our technology in it
11:43:36 with the patent.

11:43:36 MR. MARINO: If you can scroll down, Ms. Hopkins,
11:43:40 a little bit further through -- yeah, the benefit that
11:43:44 starts with all common IP phone functions.
11:43:47 Q. (By Mr. Marino) What does that language highlighted in
11:43:50 yellow refer to?
11:43:50 A. Yes. This refers to the No Call Dropped feature that
11:43:52 we've now added to our box where we can move one call from
11:43:54 one network path to the other without dropping the call.
11:43:57 So we added this to our spec sheet now.
11:44:04 MR. MARINO: Now, let's -- you can take that down.
11:44:06 Thank you. Can we bring up PTX-21?
11:44:12 Q. (By Mr. Marino) And what is this document,
11:44:14 Mr. Mavunkel?
11:44:14 A. Yes. This is the Aspen manual with -- updated for our
11:44:19 products that I also wrote. These are the manual for the
11:44:22 Aspen box.
11:44:23 Q. Okay. This is the Aspen box with the invention
11:44:25 implemented on it?
11:44:26 A. Yes, sir.
11:44:26 Q. Okay.
11:44:27 MR. MARINO: So if we could turn to Page 50 of
11:44:29 this document.
11:44:30 Q. (By Mr. Marino) There's a section entitled SIP No
11:44:37 Dropped Calls. And by the way, I think this was asked
11:44:39 earlier this morning, but what does no drop refer to in the

11:44:43 product documentation?
11:44:44 A. Yeah. The no drop refers to our patent, which we also call the No Call Dropped patent, which was the ability to move the -- the voice call from one network path to another without dropping the phone call.
11:44:58 Q. Okay. Why did you call this technology the no drop -- the No Call Drop?
11:45:02 A. We called it the No Call Drop because it didn't exist at that time. We were the first to implement this in a product.
11:45:10 Q. Okay. And, again, did you write this section of the documentation?
11:45:25 A. Yes, I wrote the manual.
11:45:36 MR. MARINO: I think that's all I have for this witness, Your Honor.
11:45:44 THE COURT: Is that all?
11:45:47 MR. MARINO: That's all on direct.
11:45:48 MR. GAUDET: Thank you, Your Honor. Can I have leave to have my colleagues hand the witness the witness binder?
11:45:53 THE COURT: Of course.
11:45:55 MR. GAUDET: Thank you, Your Honor.
11:46:20 CROSS-EXAMINATION
11:46:21 BY MR. GAUDET:
11:46:21 Q. I think it's still morning. Good morning,

11:46:23 Mr. Mavunkel.
11:46:24 A. Good morning.
11:46:24 Q. My name is Matt Gaudet. This is actually the first time that the jury has heard my voice. They've probably seen me moving around and such.
11:46:31 You said you were born in Georgia, I think?
11:46:34 A. Yes, sir.
11:46:34 Q. Where in Georgia were you born?
11:46:36 A. Augusta, Georgia.
11:46:38 Q. Okay. I actually -- I asked because I live in Georgia now, although you might be able to tell from my last name, G-a-u-d-e-t, I grew up in South Louisiana. I grew up in Lafayette, so I'm a Cajun. You and I have not met before?
11:46:56 A. No, sir.
11:46:56 Q. Okay. I represent Verizon. I'm going to ask you some questions to sort of follow up on the testimony that you just gave, and that all sounds perfectly fair, right?
11:47:04 A. Yes, sir.
11:47:05 Q. Okay. And if at any point I ask you something and the question doesn't quite make sense to you, just let me know and I'll try to ask a better question, okay?
11:47:17 A. Yes, sir.
11:47:17 Q. So you are the second witness that Aspen has called in this trial. You understand that?
11:47:21 A. Yes, sir.

11:47:22 Q. Okay. And in fairness to you, this lawsuit was not your idea, right?
11:47:29 A. No, sir.
11:47:30 Q. Okay. In fact, nobody asked your opinion -- nobody asked your opinion about the '554 patent before Aspen filed this lawsuit, correct?
11:47:41 A. No, sir.
11:47:41 Q. And just that -- you agree with my statement?
11:47:46 A. I agree with your statement.
11:47:47 Q. Okay. Thank you.
11:47:49 And you didn't even learn about this lawsuit until sometime last year, fair?
11:47:54 A. Yes, sir.
11:47:54 Q. You learned about it from Mr. Bhaskaran, who is Aspen's CEO, correct?
11:47:58 A. That's correct, sir.
11:47:59 Q. Okay. And I imagine that -- don't tell me anything that you've talked about with lawyers or anything else, but I imagine that since that time, you've had some chances to talk with that side of the room and hear about, you know, some things and theories of the case and such. Is that just generally fair?
11:48:19 A. That's fair, sir.
11:48:21 Q. Okay. So Mr. Chin had a reaction to a question, and I actually -- I want to see your reaction. Do you even know

11:48:28 whether the word "Wi-Fi" ever appears even once in the '554
11:48:32 patent?
11:48:32 A. I don't believe it does.
11:48:36 Q. Not once. 802.11, that's the Wi-Fi standard, right?
11:48:41 A. Yes, sir.
11:48:42 Q. Not even once, right?
11:48:43 A. Yes. We refer to it as network paths -- for any
11:48:47 network path.
11:48:48 Q. No. The phrase "Wi-Fi" never appeared even once,
11:48:53 right?
11:48:54 A. Not to my recollection.
11:48:55 Q. When -- you were here yesterday for the opening, right?
11:49:02 A. Yes, sir.
11:49:02 Q. When Mr. Herman addressed the jury, we were kind of
11:49:05 running a count, he said Wi-Fi 40 times in 30 minutes.
11:49:09 Does that sound right to you?
11:49:10 A. Sure, sir.
11:49:12 Q. But when you were disclosing your invention to the
11:49:15 public, not even one time, correct?
11:49:17 A. Can you repeat that, please?
11:49:18 Q. Yeah. When Aspen was telling the public what its
11:49:22 invention was, the constitutional bargain, it didn't say
11:49:25 Wi-Fi even once, that's correct?
11:49:27 A. That's correct, sir.
11:49:28 Q. Okay. Now, you did not invent Wi-Fi Calling, fair?

11:49:35 A. That's fair, sir.
11:49:36 Q. And Aspen did not invent Wi-Fi Calling, fair?
11:49:40 A. Yes, sir.
11:49:40 Q. Okay. You didn't invent SIP, that's an easy one, right?
11:49:44 A. Yes, sir.
11:49:44 Q. But you also didn't invent handing over a call from a Wi-Fi access network to a cellular network, correct?
11:49:56 A. We did without dropping the call.
11:49:58 Q. I'm going to -- I'm going to get to dropping a call, I promise, but let's just take this in baby steps.
11:50:04 Will you agree with me you did not invent handing over a call from a Wi-Fi access network to a cellular access network, you agree with that?
11:50:14 A. Yes, sir.
11:50:15 Q. Okay. And you also -- to be more specific, you didn't invent handing over a call from a Wi-Fi access network to a cellular network in a SIP-based -- S-I-P, the Session Initiation Protocol, a SIP-based environment, you didn't invent that either, right?
11:50:35 A. Without -- yes, sir.
11:50:36 Q. Okay. Now, I do want to just be clear -- and please understand, I don't mean any offense whatsoever by this. I have no patents with my name on it. I'm just trying to understand the scope of what's yours and what's not yours.

11:50:55 Mr. Herman referred to you -- and it's a very nice thing to say about someone that you guys were ahead of your time and you were sort of visionaries, do you recall that?
11:51:08 A. Yes, sir.
11:51:08 Q. And that may well be true in a lot of respects, don't get me wrong, but by 2008, there was nothing ahead of its time about Wi-Fi, right? It was very known by then, will you agree with me?
11:51:20 A. Wi-Fi, yes, sir.
11:51:21 Q. And when you were working on the technology described in the '554 patent, you believed it was a useful feature, right, for Aspen's current and future customers. Is that generally fair?
11:51:41 A. Yes, sir.
11:51:41 Q. And that -- the box that you've got there, if you could just do me a favor and sort of hold it up one more time so we've got that image. Okay. That's the Aspen 365 VoIP box that -- that's the product you were working on along with Mr. Chin when you developed the patent, correct?
11:51:59 A. Yes, this is what we implemented the patent on, yes.
11:52:03 Q. Okay. And isn't it true, right, that product was not designed to connect to cellular networks?
11:52:10 A. That's correct.
11:52:12 Q. Okay. Aspen didn't offer its products to cellular companies at all, right?

11:52:18 A. No, we didn't.
11:52:21 Q. And that's your -- you're agreeing with my statement?
11:52:24 A. Yes, because there was no -- yeah.
11:52:26 Q. Okay. And the reason I'm asking that is just we do have to create a record, and so that's the only reason I'm asking for that clarification.
11:52:33 THE COURT: Mr. Gaudet, the record will be clearer if you won't interrupt the witness, okay? So let's try not to step on top of each other's statements.
11:52:43 MR. GAUDET: I very much appreciate that, Your Honor.
11:52:47 And Mr. Mavunkel, I apologize for that.
11:52:49 THE WITNESS: No problem.
11:52:50 Q. (By Mr. Gaudet) Cellular companies were not Aspen's target base. Is that fair?
11:52:57 A. That's correct. They were using SIP at the time.
11:53:04 Q. Now, the problem solved when you were working on the '554 patent is that the Aspen box connected to multiple Internet Service Providers, ISPs, correct?
11:53:17 A. Could you repeat that, please?
11:53:18 Q. Yes. The -- yeah, let me try that again.
11:53:24 The problem that -- the background of the problem -- the background of the problem that you were addressing is that the IS -- the VoIP -- the Aspen 365 VoIP product, it connected to multiple different Internet

11:53:45 Service Providers, correct.
11:53:46 A. Yes, it connected to multiple providers, correct.
11:53:50 Q. And, for example, it could be one connection out to
11:53:53 AT&T, one connection out to Spectrum, for example, right?
11:53:58 A. That's correct.
11:53:58 Q. And just for the reason you might do that, back in
11:54:03 2002, Internet connections were a lot slower than they are
11:54:07 now, right?
11:54:08 A. Yes, that was the speed at that time.
11:54:09 Q. Okay. And so it could well be that on a given day one
11:54:13 was really slow and the other one was a little faster; is
11:54:13 that fair?
11:54:17 A. Yeah, that's fair.
11:54:18 Q. So this idea of one company having two different
11:54:21 Internet subscriptions and wanting to go from one company
11:54:26 they pay a bill to a different company they pay a bill to,
11:54:29 it kind of made some sense back in -- at the time that you
11:54:32 were with Aspen, right?
11:54:33 A. Yes, it made sense to have more than one ISP.
11:54:37 Q. Okay. But the problem was when you switched from one
11:54:42 company to another company, you're saying the call would
11:54:44 drop, right?
11:54:45 A. That's right.
11:54:47 Q. Okay. And I know we heard you say, and it's this
11:54:50 phrase that's difficult, that when you switch the call, the

11:54:55 SIP signaling sequence wouldn't be maintained? It's almost a tongue-twister.
11:55:03 A. That's correct.
11:55:03 Q. Do you know why when you switch a call, the SIP signaling sequence is not maintained?
11:55:07 A. Yes, sir.
11:55:09 Q. The reason is that if you switch the IP address between ISPs and there is something called Network Address Translation, or NAT, on that line, the call will drop; is that fair?
11:55:27 A. That as well as the SIP signaling sequence is going out of sequence.
11:55:29 Q. Sure. But what causes it to go out of sequence is the presence of a change in IP address and, and Network Address Translation, right?
11:55:42 A. That's -- no, sir.
11:55:44 Q. Okay. Is that -- is that -- let me back up then.
11:55:47 Those two things occurred in the problem you were solving, right?
11:55:54 A. Those two things occurred when we switched from one Internet link to the other Internet link.
11:56:02 Q. And the call dropped, right?
11:56:03 A. The call did drop.
11:56:05 Q. Okay. Now, I'm wondering, did you ever test and verify, test and verify for certainty whether that problem

would exist with exactly the same IP address and no Network Address Translation whatsoever?

A. Yes, we tested it with the same ISP, yes.

Q. Okay. That wasn't my question.

The same IP address, that's the question. Do you know the answer to that?

MR. MARINO: Objection, Your Honor, that's an incomplete hypothetical. I don't know how you switch if you only have one IP address.

THE COURT: Let me ask him to rephrase the question.

MR. GAUDET: Sure. Absolutely.

THE COURT: If there's an objection, Mr. Marino, you can just object without the speech.

Q. (By Mr. Gaudet) This is all I'm trying to establish, sir. Part of the problem was just switching from one IP address to another IP address and there's other stuff that happens, too, that's part of the problem. Can we agree on that?

A. Yes, sir.

Q. Thank you.

Now, do you have any idea whether Verizon ever switches IP addresses when a customer goes from Wi-Fi to cell or vice versa?

A. Yes, sir.

11:57:23 MR. MARINO: Your Honor, can we approach?
11:57:25 THE COURT: Sure. Yes.
11:57:28 MR. GAUDET: I tell you what, Your Honor, I'll make this easy. I'll withdraw that question. I'll simply -- I know we're on a clock. Thank you.
11:57:37 Q. (By Mr. Gaudet) Okay. Let me jump back to, sir, your background. You joined Aspen in 2002 as a summer intern. That fair?
11:57:46 A. Yeah, middle of 2002, yes.
11:57:49 Q. Okay. And it had about 10 employees then; is that fair?
11:57:54 A. Yeah, it was a small startup.
11:57:55 Q. And you were sort of just out of college. No VoIP experience at all at that point, fair?
11:58:01 A. Yes, sir.
11:58:01 Q. Okay. And no experience with cell phone technology before working at Aspen; is that fair?
11:58:07 A. Just as an end user.
11:58:09 Q. Okay. Terrific. And more generally, you didn't have experience in telecommunications at that point; is that fair?
11:58:15 A. Yes, sir.
11:58:15 Q. One of the aspects of this Aspen product you were working on, you mentioned cable and DSL and T1 lines I believe at various points. Did I have that right?

11:58:37 Different --
11:58:37 A. Yeah, different types of ISPs, yes.
11:58:39 Q. So, for example, if -- at that time, if you had a cable modem, you might get that from Spectrum, right; is that fair?
11:58:47 A. That's fair, sir.
11:58:47 Q. And if you wanted DSL, you might get that from AT&T; is that -- is that fair?
11:58:54 A. Yes, that's fair.
11:58:55 Q. Okay. And you decided to leave Aspen in January 2004 because sales were slow; is that fair?
11:59:04 A. Yes, sir.
11:59:05 Q. All right. Then you rejoined in 2005; is that correct?
11:59:11 A. That's correct, sir.
11:59:13 Q. And you did that because Mr. Bhaskaran and his co-founder had received some funding, and they approached you with an offer to rejoin; is that --
11:59:21 A. Yes, I rejoined then, yes.
11:59:23 Q. Okay. And then you left again in 2009 for the same reason you left in 2004; is that fair?
11:59:31 A. That's fair, sir.
11:59:32 Q. And that's -- sales were declining and Aspen was running out of funding; is that generally right?
11:59:38 A. That's right, sir.
11:59:39 Q. Okay. So today, you're working as a consultant for

11:59:46 Aspen, right?
11:59:46 A. Yes, sir.
11:59:47 Q. And I believe you're paid $200 an hour for your consulting work; is that correct?
11:59:53 A. Yes, sir, a few hours per month.
11:59:55 Q. Okay. Terrific. And I think at one point last year you said that maybe it was even 25 hours some months; does that sound right?
12:00:04 A. Up to 25 hours, yes.
12:00:05 Q. Okay. And you own about 2 percent of the company.
12:00:13 Now, you were not involved in the decision to seek protection on the '554 patent, correct?
12:00:18 A. Yes, sir.
12:00:19 Q. Okay. So -- you were here for the openings yesterday?
12:00:23 A. I was, sir.
12:00:28 MR. GAUDET: Now, I want to put up Slide 18 from Mr. Dacus's opening yesterday.
12:00:33 Q. (By Mr. Gaudet) And I'm just going to ask you a quick question about it if that's okay.
12:00:39 MR. GAUDET: Mr. Duval, if you could, that is I believe DD1.18. No, our opening. Thank you.
12:00:51 Q. (By Mr. Gaudet) And Mr. Dacus explained this is a copy of the original claim that Aspen submitted to the Patent Office and said, hey, here's our idea. Can we have a patent on it? Does that sound right.

12:01:12 A. That sounds right, yes, sir.
12:01:13 Q. And, interestingly, the language is right there, the transmission is not disrupted as a result of said switch. You see that?
12:01:21 A. I see that, sir.
12:01:22 Q. So the call is not dropped, right?
12:01:24 A. The call is not dropped.
12:01:26 Q. Okay. Now, you said that that was the kind of invention, I believe. But the Patent Office didn't agree with that, right?
12:01:34 A. I'm not sure.
12:01:37 Q. Well, the next part of the story is the Patent Office said, no, you can't have a patent if you're just -- just on this general idea of switching between two networks without dropping the call. This was rejected. Does that sound familiar?
12:01:53 A. It must have been some back and forth to get the language just right.
12:01:56 Q. Okay. Well, that language stayed the same. You had to add more language because that wasn't good enough; does that sound right?
12:02:04 A. Yes, it was a combination of things that had to be done to get the call to not drop.
12:02:09 Q. So let's go to the next slide.
12:02:10 One thing that you had to add was this only really

12:02:14 matters in situations where there's this Network Address Translation. Remember I asked you about IP addresses being changed where there was also a Network Address Translation? Do you recall that question?
12:02:26 A. Yes.
12:02:27 Q. And this is adding that in, that, yeah, we're only talking about a situation where there's this thing called Network Address Translation. Is that --
12:02:35 A. Yes, sir.
12:02:35 Q. Okay. And this still wasn't good enough, right?
12:02:38 A. No.
12:02:38 Q. Okay. So the next thing that happened --
12:02:48 MR. GAUDET: And we'll put up the next slide.
12:02:52 Q. (By Mr. Gaudet) -- is we had to add this phrase -- we -- Aspen had to add this phrase at the end of the patent, "the SIP signaling sequence of the transmission is maintained," and it goes on. Do you see that?
12:03:00 A. Yes, sir.
12:03:01 Q. I just sort of want to underline that just for a little bit.
12:03:05 And that's --
12:03:10 MR. GAUDET: Actually, let's do this instead. Put -- put this slide side-by-side with Claim 1. I'm speaking to Mr. Duval, my colleague.
12:03:20 Mr. Duval, if you would put this slide

12:03:22 side-by-side with Claim 1 and just highlight that last
12:03:26 phrase in Claim 1 of the patent as it issued, and then
12:03:32 we'll underline the phrase "the SIP signaling sequence of
12:03:38 the transmission is maintained."
12:03:40 Q. (By Mr. Gaudet) Do you see that?
12:03:41 A. Yes, sir.
12:03:41 Q. Okay. That's kind of what you're saying is the magic;
12:03:41 is that fair?
12:03:45 A. It's the combination of everything said in Claim 1,
12:03:48 yes.
12:03:48 Q. Okay. But until you had that in, you didn't have a
12:03:51 patent, right?
12:03:52 A. Yes, sir.
12:03:54 Q. Okay. And we've used this phrase, you know,
12:03:59 "constitutional bargain," sort of an agreement between an
12:04:02 inventor and the public. Does that basic concept, is
12:04:09 that -- do you have a general level of familiarity with
12:04:12 that?
12:04:12 A. Could you repeat that, please?
12:04:14 Q. Let me do it this way. I'm going to put just a
12:04:19 slide -- a bit of the transcript from the proceeding
12:04:22 yesterday (sic) when Judge Schroeder gave kind of a -- just
12:04:26 a preliminary background instruction to the jury about what
12:04:31 patents do.
12:04:34 MR. GAUDET: And so it's Page 144 of -- I said

12:04:37 yesterday -- of Friday's transcript.
12:04:40 Q. (By Mr. Gaudet) And I just want to draw your attention to Lines 13 through 17.
12:04:46 MR. GAUDET: And we'll go ahead and highlight that.
12:04:49 Q. (By Mr. Gaudet) The application that is filed with the PTO include something called a specification, right, which is a written description of the invention.
12:05:00 You see that?
12:05:01 A. Yes, sir.
12:05:02 Q. And more or less, everything in that patent, all the way up until you get to the numbered claims, that's the specification, right?
12:05:08 A. Could you define specification?
12:05:12 Q. Well, we'll do it this way. It's a written description of the invention. That's -- the language is here.
12:05:20 MR. GAUDET: If you'll highlight the next phrase.
12:05:23 Q. (By Mr. Gaudet) Does that make sense?
12:05:24 A. Yeah. Claim 1 would be written description, yes.
12:05:26 Q. And will you accept my representation to you that the claims, the numbered claims are actually not the written description. The written description is everything that comes before that; is that -- does that sound right?
12:05:40 MR. MARINO: Objection, Your Honor.
12:05:42 THE COURT: What's the objection?

12:05:43 MR. MARINO: It's well established --
12:05:43 THE COURT: I can't understand -- you'll have to come closer.
12:05:53 MR. MARINO: Yes, Your Honor. So it's well established that the originally filed claims are part of the specification of the patent under 35 U.S.C. 112, I believe.
12:06:06 MR. GAUDET: I'm happy to rephrase this, Your Honor.
12:06:07 THE COURT: Yeah, let's just rephrase the question.
12:06:10 MR. GAUDET: Absolutely.
12:06:11 THE COURT: Thanks.
12:06:12 Q. (By Mr. Gaudet) Will you agree with me that the specification is a lot more than just if -- even if you could include the claims, it's all the rest of that description in the patent that's teaching the public how to do the invention? Does that sound right?
12:06:23 A. I would say that one is telling about the invention. Everything else supports that.
12:06:27 Q. Okay. And that's that next phrase. It tells --
12:06:32 MR. GAUDET: Let's highlight this.
12:06:33 Q. (By Mr. Gaudet) What the invention is, how it works, right?
12:06:36 MR. GAUDET: We'll go ahead and highlight --

12:06:39 highlight this -- next sentence.
12:06:41 Q. (By Mr. Gaudet) How to make it, you see that? How to
12:06:44 use it? That's a lot of hows, right? How, how, how. And
12:06:49 that's the constitutional bargain. You got to tell the
12:06:51 public how. Is that fair?
12:06:53 A. That's fair.
12:06:54 Q. Okay. Now, you told the jury a lot about that Figure 4
12:07:03 and that -- and in that kind of circly diagram, Figure 5?
12:07:09 A. Yes, sir.
12:07:09 Q. You recall that?
12:07:10 A. Yes, sir.
12:07:11 Q. Okay. But we took -- you agree with me that when we
12:07:19 asked you previously if you could tell us how, how, how the
12:07:26 magic in this patent, maintaining the SIP signaling
12:07:31 sequence, how you actually do it, you said you didn't know.
12:07:37 A. Yes. I was referring to the source code, yes, that
12:07:41 Bill Chin wrote.
12:07:41 Q. Well, let's -- let's take a look at the entire -- the
12:07:45 entire colloquy here.
12:07:49 MR. GAUDET: If we pull up your deposition --
12:07:52 Q. (By Mr. Gaudet) And, sir, there's a copy of your
12:07:53 deposition -- it should be Tab 1 in that binder.
12:07:53 A. Okay.
12:08:06 Q. And what I want to do is direct your attention to Line
12:08:10 33 -- I'm sorry, I said Line -- Page 33, sir -- Page 33.

12:08:30 MR. MARINO: May I ask for a clarification? When I was in trial with you before, you had to show the witness the transcript before publishing it to the jury. Has that rule changed? If the practice has changed, I apologize.

12:08:43 THE COURT: I'm not sure what the question is. Let's wait to see what the question is, Mr. Marino.

12:08:49 MR. MARINO: Thank you.

12:08:50 Q. (By Mr. Gaudet) And what I want to point you to, is actually Page 32, beginning at Line 17, okay, down to -- okay. It's actually 33:14. 33:14 is where we're going to start. And --

12:09:39 THE COURT: Are you just asking him to review --

12:09:41 MR. GAUDET: Yes, I'm sorry, sir. Yes.

12:09:43 THE COURT: Mr. Marino?

12:09:45 MR. MARINO: No objection to that.

12:09:46 Q. (By Mr. Gaudet) I'd just like you to review 33:14, and over to 34:14. That's the part that I want to ask you to review. And just let me know once you've had a chance to read that.

12:10:24 A. Yes, sir, I've read it.

12:10:26 Q. Okay. And I just -- I now want to publish this portion to the jury.

12:10:33 THE COURT: What's the purpose exactly, because I don't think he's -- he's testified contrary here. He agreed with your previous statement.

12:10:41 MR. GAUDET: Your Honor, what I want to establish is that he gave testimony in the context that -- of the Claim 1 that he didn't know how to maintain the SIP signaling sequence. That's the point. So I was going back -- I was going back simply to set the context. Let me ask a cleaner question, Your Honor. I'll withdraw.

12:11:04 THE COURT: That'd be better, yes.

12:11:06 Q. (By Mr. Gaudet) Sir, would you agree with me very simply it's accurate to say you don't know how the SIP signaling sequence is maintained; is that fair?

12:11:21 A. No, it's not fair.

12:11:23 Q. Okay.

12:11:27 MR. GAUDET: Let's pull up 34:12 to 34:14.

12:11:32 Q. (By Mr. Gaudet) And this was a deposition that you gave under oath. Let's just --

12:11:35 MR. GAUDET: It's only 34:12 to 14 that we want. Mr. Duval, let's blow up only 34:12 to 14 if we could.

12:11:56 Q. (By Mr. Gaudet) The question was: Is it accurate to say you don't know how, how the SIP signaling sequence is maintained?

12:12:10 And your answer was: Correct.

12:12:13 That was your testimony, right?

12:12:14 A. In the context of the software, yes.

12:12:16 Q. And you're saying in the context of the software, but all you can tell us about how this is done is that it's

12:12:23 done in software, right?
12:12:24 A. No, with Figures 4 and 5 I could write software that could do that, but I was referring to Bill Chin's software.
12:12:34 Q. And so if we -- if we -- if we go back up then, we're going to now -- if we start with -- I mean, you understand that this question came from the context of Claim 1 of the patent -- of the language that we were looking at, right?
12:13:01 A. Yes, Claim 1, yes.
12:13:03 Q. Okay. Terrific.
12:13:05 You mentioned Mr. Chin a number of times, and Mr. Chin was the lead inventor obviously. You would need to ask Mr. Chin about the details, for example, of the software you're saying that he designed for -- for the patent, fair?
12:13:25 A. Yes, sir.
12:13:26 Q. Okay. I want to show you some sworn testimony that Mr. Chin gave about this invention, and then I'll ask you a question about it.
12:13:41 MR. GAUDET: So we're going to put up on the screen Mr. Chin's deposition testimony from his July 8th, 2025 deposition. The jury's seen this already. It's Page 40, Line 24, to Page 41, Line 2.
12:13:58 Q. (By Mr. Gaudet) Do you see that?
12:14:07 A. Yes, sir.
12:14:08 Q. So Mr. Chin testified: If a network path is switched

12:14:13 without sending any SIP message from one phone to another,
12:14:17 does that practice the '554 patent in your view?
12:14:22 And Mr. Chin said: No.
12:14:25 Under oath, do you see that?
12:14:26 A. Yes, sir.
12:14:27 Q. And given sort of the deference you show to Mr. Chin, I
12:14:33 assume if that's his sworn testimony, you'd support that as
12:14:37 well; is that fair?
12:14:38 A. That's what he said.
12:14:39 MR. GAUDET: Pass the witness. Thank you.
12:14:41 THE COURT: Redirect?
12:14:43 MR. MARINO: I have a short redirect, probably
12:14:45 five minutes.
12:14:46 THE COURT: That's fine.
12:14:48 REDIRECT-EXAMINATION
12:14:48 BY MR. MARINO:
12:14:52 Q. Mr. Mavunkel, a couple of follow-up questions. The
12:14:56 first one is, you were asked a bunch of questions about
12:14:59 handovers, whether you invented them or not, and I think
12:15:03 you said something to the extent that you didn't invent
12:15:07 handovers that failed but you invented handovers that
12:15:13 succeed. Is that such a thing as a handover that fails?
12:15:17 A. No, if you handover and fail, it would break and it
12:15:21 wouldn't work.
12:15:22 Q. If I try to give you -- shake your hand and you don't

12:15:25 shake my hand, that's not a handshake, right?
12:15:29 A. That's right.
12:15:29 Q. So what you did invent are handovers that work?
12:15:32 A. That's correct.
12:15:32 Q. And you were solving the problem with handovers that
12:15:37 failed?
12:15:37 A. We were solving that problem, yes.
12:15:38 Q. And that applies also to Wi-Fi and cellular, right?
12:15:41 A. Yeah, any network path.
12:15:45 MR. MARINO: If we could have JTX-1, Figure 9,
12:15:49 please.
12:15:49 Q. (By Mr. Marino) Okay. I want to ask you -- so you
12:15:53 were asked questions about NAT, Network Address
12:15:55 Translation. And I apologize if we didn't talk about that
12:15:59 earlier today.
12:16:00 You told me, though, that you get these ISP -- I'm
12:16:06 sorry, these IPv4 addresses from an ISP. Do you recall
12:16:11 that?
12:16:11 A. Yes, sir.
12:16:12 Q. Okay. What does that have to do with Network Address
12:16:14 Translation?
12:16:14 A. Yeah, the IPv4 address that was given to you by an ISP
12:16:21 would have to do a Network Address Translation. So
12:16:23 everything behind your firewall would be using private IP
12:16:26 addresses that aren't accessible from the Internet, and

12:16:30 they would be translated via NAT to go out to the Internet.
12:16:34 Q. Okay. Is there a way for Figure 9 to work without
12:16:39 doing Network Address Translation?
12:16:40 A. Figure 9, no. No, sir.
12:16:45 Q. You always have to do Network Address Translation if
12:16:48 you wanted to talk to this phone 900 and any of the ISPs,
12:16:55 right?
12:16:55 A. That's right, sir.
12:16:56 Q. Okay. Lastly, you were asked questions about, you
12:16:59 know, what you meant in that answer and you referred to
12:17:04 Mr. Chin, what did you mean? You were trying to explain,
12:17:08 counsel didn't let you, so...
12:17:11 A. For the question on Claim 1?
12:17:12 Q. Yeah. Do you know whether the patent describes how to
12:17:15 implement the invention, and you said, well, I'll defer to
12:17:19 Mr. Chin. What did you mean by that?
12:17:21 A. I meant that he wrote the software that implemented
12:17:25 that solution in the software. The overall patent does,
12:17:28 but he's the one that wrote the software.
12:17:30 Q. So he would know the software better than everybody
12:17:33 else?
12:17:34 A. That's right, Bill Chin would know.
12:17:35 Q. And that's a commonly accepted concept in software
12:17:38 engineering, right? The author of the software knows the
12:17:41 code best than everybody?

12:17:43 A. Yes, sir.
12:17:44 Q. Does that mean you don't understand this code?
12:17:46 A. I mean, if I read the source code, I could understand the code, but I didn't write it, Bill Chin did.
12:17:53 Q. So he would know it better than you?
12:17:56 A. That's correct.
12:17:58 Q. And you already testified on direct you would know how to write code to implement the invention by reading the patent specification, right?
12:18:01 A. That's correct, with Figures 4 and 5 and other things in the patent, I could write software with that.
12:18:07 Q. Okay. And that's still your testimony after the cross?
12:18:10 A. That's correct.
12:18:12 MR. MARINO: Thank you, Your Honor. No further questions.
12:18:14 THE COURT: Thank you.
12:18:15 Mr. Gaudet?
12:18:16 MR. GAUDET: Nothing further. Thank you.
12:18:18 THE COURT: All right. Thanks. You may step down.
12:18:20 THE WITNESS: Thanks, Your Honor.
12:18:21 THE COURT: Ladies and gentlemen of the jury, I think now is a good time for our lunch break. Your lunch is here and downstairs. We will plan to resume our proceeding in the courtroom in about one hour's time.

12:18:37 As a reminder, don't discuss the case among
12:18:39 yourselves. Don't permit it to be discussed in your
12:18:41 presence. Don't do any independent research or
12:18:43 investigation into any matter associated with the case.
12:18:45 And finally, don't post anything about your involvement as
12:18:47 a juror on any social media website or app.
12:18:51 Enjoy your lunch.
12:18:52 THE COURT: All rise.
12:18:54 (Jury out.)
12:18:55 THE COURT: Okay. Please be seated.
12:19:24 I think there's severe weather warnings that are
12:19:31 going on throughout the courtroom. So somehow that
12:19:35 overrides the silence feature on your phone.
12:19:39 So the parties raised overnight this dispute with
12:19:50 respect to one of the exhibits, I think 149, Plaintiff's
12:19:58 149. And it's my view that what -- essentially what the
12:20:06 Plaintiff is seeking to argue to the jury is that first
12:20:09 network path may be included in the number of plurality of
12:20:17 alternative network paths.
12:20:22 The Defendant objected to that exhibit, arguing
12:20:26 that it was an incorrect claim construction statement.
12:20:32 The Plaintiff's response to that this morning was
12:20:36 that it was not raising a claim construction argument and
12:20:41 that it was unnecessary for the Court to interpret the
12:20:46 claim language.

12:20:49 Despite that, I do think there is a dispute here regarding the scope of the claim term that must be resolved pursuant to 02 Micro.

12:21:03 The parties, of course, are more familiar than me that that case holds that when there is a fundamental dispute regarding the scope of a claim term, the Court has a duty and an obligation to resolve it.

12:21:18 So the dispute here concerns the meaning of the following limitation of Claim 1 under the '554, quote, switching the transmission from the first network path to one of a plurality of alternative network paths. And specifically the dispute here relates to the meaning of plurality of alternative network paths.

12:21:48 What the Plaintiff seeks to argue is that all that is required to satisfy this limitation is the first network path and one additional network path.

12:22:05 And Verizon's position is that the first network path may not be considered one of the plurality of alternative network paths, arguing that switching the transmission from the first network path to one of a plurality of alternative network paths requires at least three networks, a first path and two or more, which is the plurality, of alternative network paths.

12:22:31 Having reviewed the briefing and considered the parties' arguments this morning before we began with the

12:22:41 jury, I do agree with Verizon on this point. The
12:22:47 Plaintiff's interpretation of the claim language, I
12:22:52 believe, is incompatible with the plain meaning.

12:23:00 Aventis Pharmaceutical versus Amino Chemicals
12:23:05 Limited, 715 F.3d 1363 at 1373, Fed Circuit case from 2013,
12:23:14 explains the courts must look to the words of the claims
12:23:18 themselves to define the scope of the patented invention.

12:23:25 That case is citing Vitronics Corp versus
12:23:29 Conceptronic, Inc., 9 F.3d 1576 at 1582, a Fed Circuit case
12:23:37 from 1996.

12:23:39 Here, I believe that it is beyond any reasonable
12:23:50 dispute that an object cannot be an alternative to itself.
12:23:54 Here, a first network path cannot be an alternative to the
12:23:59 same first network path such that a switch between the two
12:24:03 may occur. In other words, an alternative network path is
12:24:09 a path that is different from the one on which the
12:24:13 transmission starts, that is, the first network path.

12:24:18 Contrary to the Plaintiff's claim, this
12:24:20 construction is consistent with the Court's order in the
12:24:26 Defendant's non-infringement summary judgment motion. In
12:24:30 denying that motion, the Court explained that even though a
12:24:34 handset user may only be switching from Wi-Fi to 4G, there
12:24:38 may be more than one that is a plurality of RAN-based paths
12:24:45 through which the user could access the 4G network. Under
12:24:52 this scenario, the first network path is a path through

which the handset is connected to Wi-Fi.

So when the switch occurs, the user's device could access the 4G network through more than one alternative path, thereby ceasing its Wi-Fi connection. This example does not require that the Wi-Fi path to which the user was first connected be considered one of a plurality of alternative networks.

So for these reasons, I am going to construe the term switching the transmission from the first network path to one of a plurality of alternative network paths to require at least three network paths. The first network path and two or more alternative paths to which the first may switch.

So I do hope that provides some clarification on the dispute this morning. To the extent the parties have questions about that, I'll be glad to answer them. Anything right now?

MR. ANDERSON: Nothing from Verizon.

MR. HEARD: Could I just address one thing?

THE COURT: Of course.

MR. HEARD: Your Honor, just accepting the Court's claim construction ruling but just for the record, I do want to note that under Cupp Computing v. Trend Micro 53 F.4th 1376 and other cases in the Phillips progeny, a construction that would exclude preferred embodiments is

12:26:29 generally disfavored and it would be Plaintiff's position
12:26:33 that this construction would exclude some of those
12:26:35 preferred embodiments.

12:26:35 THE COURT: Well, I do agree with you they're
12:26:38 generally disfavored. But I do think that where there
12:26:56 is -- where they are inconsistent with the specification
12:27:02 and the claims in the Court's construction, these disclosed
12:27:08 embodiments cannot and should not override the claim
12:27:13 language. And I'm not sure the case you cited.

12:27:17 MR. HEARD: Would you like me to repeat it, Your
12:27:19 Honor?

12:27:19 THE COURT: Yes, please do.

12:27:19 MR. HEARD: Cupp Computing v. Trend Micro,
12:27:24 53 F.4th 1376. Just a recent Federal Circuit case.

12:27:30 THE COURT: What exactly does the case say?

12:27:33 MR. HEARD: A patent claim interpretation that
12:27:37 excludes a preferred embodiment from the scope of the claim
12:27:39 is rarely if ever correct.

12:27:41 THE COURT: Okay. And your position is that
12:27:44 somehow this construction would exclude that preferred
12:27:47 embodiment?

12:27:47 MR. HEARD: Yes, Your Honor. The -- a number of
12:27:50 the embodiments, like in Figure 2 and -- and other figures
12:27:53 of the patent show two network paths, so there are multiple
12:27:58 embodiments. We've seen Figure 9 who had 3, but, Your

12:28:02 Honor, we would submit that there is -- some of the
12:28:04 embodiments just have the two network paths and is
12:28:06 contemplated by the scope of the independent claims.
12:28:08 THE COURT: Okay. Well, that's fair enough, and
12:28:10 you've protected your record. I guess the Lucent case,
12:28:14 which is the case that we had looked at earlier, is an '08
12:28:21 case that says while it is true that we may construe claims
12:28:26 to sustain their validity when the claims are amenable to
12:28:30 more than one reasonable construction, when the claims are
12:28:33 susceptible to only one reasonable construction, we will
12:28:37 construe them as the patentee drafted. And where we
12:28:41 conclude that the claim language is unambiguous, we have
12:28:44 construed claims to exclude the disclosed embodiments.
12:28:48 So as I understand it, based on what the parties
12:28:56 have argued here, you're not taking the position that all
12:28:59 of the embodiments would be excluded, would you?
12:29:04 MR. HEARD: No, Your Honor.
12:29:05 THE COURT: Okay. And the Court -- the Federal
12:29:08 Circuit, of course, has said that, you know, the claim
12:29:13 language controls.
12:29:14 But I think you've protected your record. Is
12:29:16 there anything you want to add, Mr. Anderson, to this?
12:29:19 MR. ANDERSON: No, Your Honor, I think -- I think
12:29:22 you got the law exactly right.
12:29:23 THE COURT: Okay. All right. Good enough.

12:29:25 Anything else before we -- Mr. Herman, if you would come to the --

MR. HERMAN: Very quick. Can Mr. Mavunkel be excused?

THE COURT: May the witness be excused?

MR. DACUS: We have no objection, Your Honor.

THE COURT: Very good. All right. The witness will be excused.

What else?

MR. HERMAN: Nothing from Aspen, Your Honor.

THE COURT: Anything, Mr. Dacus?

MR. DACUS: No, Your Honor.

THE COURT: All right. We'll see you in about an hour.

COURT SECURITY OFFICER: All rise.

(Jury out.)

(Recess.)

COURT SECURITY OFFICER: All rise.

THE COURT: Okay. Anything to discuss before we have the jury brought up?

MR. HERMAN: Not from Aspen, Your Honor.

MR. DACUS: Not from Verizon, Your Honor.

THE COURT: All right. If you would, Mr. Savage, have the jury brought up.

COURT SECURITY OFFICER: All rise for the jury.

01:23:27 (Jury in.)

01:23:33 THE COURT: Please be seated.

01:23:55 All right. Welcome back, ladies and gentlemen.

01:24:08 At this time, the Plaintiff may call its next 01:24:10 witness.

01:24:11 MR. HEARD: Thank you, Your Honor. And at this 01:24:12 time, Aspen calls Robert Faber by video deposition. 01:24:16 Mr. Faber is a distinguished member of technical staff at 01:24:19 Verizon. Time allocation is about 7 minutes for Aspen, and 01:24:24 we'll play it by video at this time.

01:24:26 THE COURT: All right.

01:24:26 ROBERT FABER, PLAINTIFF'S WITNESS, SWORN

01:24:27 TESTIMONY BY VIDEOTAPE DEPOSITION

01:24:27 (Videoclip played.)

01:24:31 Q. ...full name again for the record, please?

01:24:36 A. Robert Peter Faber, Junior.

01:24:38 Q. And Mr. Faber, what is your current title and employer?

01:24:41 A. Distinguished member of technical staff, Verizon 01:24:46 Wireless.

01:24:46 Q. And you understand that Wi-Fi Calling was commercially 01:24:51 launched by Verizon in late 2015?

01:24:55 A. Yes.

01:24:56 Q. And that was just for a select number of devices?

01:24:59 A. Yes.

01:24:59 Q. And would you agree that then over the ensuing months

01:25:11 or couple of years, Verizon expanded the Wi-Fi Calling
01:25:15 Services to additional devices?
01:25:16 A. Yes.
01:25:16 Q. And just at a general level, what did you understand
01:25:23 Verizon's motivation to be or perceived benefits or
01:25:26 advantages of introducing VoWiFi?
01:25:33 A. Keeping up with the competition.
01:25:37 Q. So what -- what benefits or advantages, other than
01:25:43 keeping up with the competition, do you recall being
01:25:46 considered at Verizon in the 2015 time frame to introduce
01:25:51 VoWiFi services?
01:25:52 A. Cellular coverage is not available everywhere. So
01:26:02 particularly in one's basement. So by having a home Wi-Fi
01:26:09 network, it would allow users to make or receive phone
01:26:13 calls in the depths of their homes.
01:26:18 Q. So for one like you describe in someone's basement
01:26:25 where cellular coverage is not available, does having the
01:26:29 ability to make the call -- make or receive phone calls in
01:26:36 the depths of their homes enhance the reliability of
01:26:41 their -- their coverage?
01:26:42 A. Gives them service where they wouldn't have service
01:26:46 previously.
01:26:46 Q. Yes. Correct. Exhibit 10.
01:26:49 A. Yeah.
01:26:50 Q. All right. Is this -- is this a document you've ever

01:26:55 seen before?
01:26:55 A. Yes.
01:26:55 Q. And you mentioned earlier S2b-U SIP and RTP support. 01:27:02 Do you see that one?
01:27:03 A. Yes.
01:27:09 Q. The last one says: Track SIP calls across handovers.
01:27:14 Do you see that?
01:27:15 A. Yes.
01:27:16 Q. What does that refer to?
01:27:17 A. How many calls move between LTE and Wi-Fi and Wi-Fi to 01:27:25 LTE.
01:27:25 Q. And why are they referred to as SIP calls?
01:27:31 A. It's SIP protocol.
01:27:37 Q. And in one of those active voice or video calls, the 01:27:42 goal for that user is to stay connected and not have a call 01:27:48 drop, right?
01:27:50 A. That is the expectation.
01:27:52 Q. What does a SIP Re-Registration mean?
01:27:56 A. During RAT changes, when we change from cellular to 01:28:06 Wi-Fi and vice versa, the device will send a Re-Register 01:28:11 changing the access network identifier, saying I'm on 01:28:14 cellular or Wi-Fi.
01:28:19 Q. And it sends that SIP Re-Registration message once it 01:28:23 successfully identifies it's changed access network. 01:28:27 That's exactly what you were just referring to, right?

01:28:30 A. Correct.
01:28:31 Q. Okay. And that Re-Register occurs after the new -- so
01:28:39 if a switch is being made to Wi-Fi, that message is sent
01:28:47 after the -- that connection is made?
01:28:48 A. Yes.
01:28:54 Q. There's no new SIP INVITE message sent at that point,
01:28:58 right?
01:28:58 A. There is no new SIP INVITE.
01:29:01 Q. And is the UE, or the VoLTE device in this case, the
01:29:05 source of a transmission that occurs when a call is made?
01:29:09 A. If it is a mobile-originated call, it would be the
01:29:18 source.
01:29:18 Q. So in that -- in the context of mobile-originated or
01:29:23 mobile-terminated call, one of the devices is remote from a
01:29:27 Local Area Network used in a Wi-Fi call, right?
01:29:30 A. Right.
01:29:34 Q. Mr. Faber, before lunch we were looking at a call flow
01:29:41 document from late 2017. Do you recall that? Exhibit 14?
01:29:46 A. Yes.
01:29:46 Q. Now, four points -- if we go down to 4.10 in this
01:29:55 document, on Page 103, which is Bates numbered 8255, does
01:30:05 Section 4.10 deal with call flows in an active call
01:30:11 situation?
01:30:11 A. This would be a video call.
01:30:12 Q. So LVC, a live video call?

01:30:16 A. I think so. Sorry, LVC is the acronym. I don't
01:30:24 remember exactly what it means, but that's for video.
01:30:26 Q. So here, this call flow diagram on the next page, 8256,
01:30:33 this one does depict an active call handover situation,
01:30:39 right?
01:30:39 A. This is an active voice and video call from LTE to
01:30:46 Wi-Fi handing over -- yeah, from LTE to Wi-Fi.
01:30:49 Q. What's the -- what do you mean by the data plane?
01:30:53 A. Your audio or video, or audio and video packets in this
01:30:58 situation.
01:30:59 Q. And the downlink data packets, are those -- does that
01:31:03 refer to RTP packets?
01:31:05 A. Yes.
01:31:11 Q. Let's just look briefly at Exhibit 18, the Excel file.
01:31:17 A. Okay.
01:31:18 Q. And go to the NATRealm tab. Look at Row 22, if we can.
01:31:28 A. Okay.
01:31:28 Q. It says that the -- this variable that's listed in A
01:31:33 is -- describes it as the total number of NAT44 flows
01:31:39 denied ports. Do you have any understanding of what that
01:31:44 means?
01:31:45 A. That would be a remapping, signal remapping of NAT
01:31:55 between IPv4 and IPv4.
01:31:57 Q. Is that -- these variables listed in A, are these
01:32:02 variables that Verizon can access or monitor through its

01:32:05 NATRealm data?
01:32:17 A. Yes.
01:32:17 (Videoclip ends.)
01:32:19 MR. HEARD: Thank you, Your Honor.
01:32:20 Next Aspen calls one more video, a short one.
01:32:22 Samirkumar Patel by video deposition. Mr. Patel
01:32:27 is a distinguished system engineer at Verizon. This one is
01:32:30 9 minutes from Aspen and 3 minutes from Verizon.
01:32:33 THE COURT: All right. Thank you.
01:32:35 MR. HEARD: Thank you.
01:32:35 SAMIRKUMAR PATEL, PLAINTIFF'S WITNESS, SWORN.
01:32:36 TESTIMONY BY VIDEOTAPE DEPOSITION
01:32:36 (Videoclip played.)
01:32:36 Q. Could you again just state your full name for the
01:32:39 record, please?
01:32:40 A. Yes. My full name is Samirkumar Patel.
01:32:46 Q. And could you please give your current title and
01:32:50 employer?
01:32:51 A. My current title is Distinguished System Engineer, and
01:33:00 my current employer is Verizon Wireless.
01:33:03 Q. What was your understanding of why the implementation
01:33:08 of VoWiFi services was important to implement?
01:33:14 A. I mean, at that point, as we are moving from legacy
01:33:22 technology like 3G to 4G, and if you look at it, the
01:33:30 architecture of the 4G does have ePDG as one of the core

01:33:34 functionalities. And we were just getting to the 4G
01:33:40 architectures, so we were introducing the ePDG. That's one
01:33:49 of the aspect, but the other aspect was, you know,
01:33:54 competitive, as well. You know, couple of the operators
01:33:59 were doing similar things. But Verizon never charged the
01:34:03 customer or it's a free of cost service. So there's
01:34:07 nothing revenue-generating or anything. It's just
01:34:11 competitive. And because moving to the 4G core, 4G
01:34:16 architectures, introducing these gateways was part of the
01:34:20 3GPP.
01:34:20 Q. And what did -- focusing on the customer experience,
01:34:30 what was your understanding of the intended benefit of the
01:34:35 Wi-Fi -- the introduction of VoWiFi services to Verizon and
01:34:41 its customers?
01:34:42 A. I mean, its benefits to the customer was, you know, the
01:34:48 places where they don't have a coverage or cellular, but
01:34:52 they do have a Wi-Fi, they can be able to make additional
01:34:59 call when they are not on cellular coverage.
01:35:01 Q. And -- and that's something that -- a functionality
01:35:08 that Verizon still offers, right?
01:35:11 A. Yes, it's capabilities as part of this service, but
01:35:16 there is no extra cost to the user. It's a free or -- free
01:35:21 service for the users.
01:35:22 Q. The -- and part of the test planning, the test plans
01:35:32 for introduction of VoWiFi services involves testing the

01:35:37 handover capability in a number of scenarios between Wi-Fi
01:35:41 and cellular; is that right?
01:35:43 A. That's one of the functionalities being verified as
01:35:53 part of the test plans.
01:35:55 Q. What is a Network Address Translation, or NAT, to your
01:36:01 understanding?
01:36:02 A. Okay. So we're talking about from a networking
01:36:06 perspective, its typical terms when we use NAT to translate
01:36:14 from one IP to another IP.
01:36:16 Q. And so going from an untrusted source, like a user's
01:36:22 home Wi-Fi through -- to the Verizon cellular network,
01:36:28 would a NAT be required to traverse that -- that switch?
01:36:39 A. Not really. I mean, there is no need for it. It's up
01:36:41 to how the user has set their network. So whatever the
01:36:47 user has set the network, whether it's a NAT or not NAT,
01:36:52 Verizon has nothing to do with it. It's a user choice in
01:36:56 their network.
01:36:56 Q. So you don't have any requirements for part of the
01:37:08 Verizon network that checks on NATs, the NAT messaging or
01:37:13 NAT performance?
01:37:19 A. I'm not sure. If you can rephrase the question or
01:37:24 clarify what the question is about.
01:37:27 Q. Yeah. Are you familiar with a NAT Keep message or NAT
01:37:32 Keep Alive?
01:37:33 A. Yes, I know about NAT Keep Alive message.

01:37:40 Q. And what's the purpose of a NAT Keep Alive message?
01:37:44 A. If you're referring -- you mean the device and ePDG, 01:37:51 there is a NAT Keep Alive messages, but it's not 01:37:57 specifically to Verizon or anything. It's -- it's to keep 01:38:01 the connectivity alive. Because sometimes as the routers 01:38:15 and gateways -- and nothing to do with Verizon, by the way. 01:38:18 This is across the ISP's providers. In a certain level, if 01:38:24 the packets are not flowing, they will disconnect the 01:38:27 connectivity.
01:38:28 So it has nothing to do with the NAT in the terms 01:38:32 of network translation from IP to IP. It's just keeping 01:38:38 the connection warm between two entities.
01:38:43 Q. What's your understanding of how a NAT may be required 01:38:46 for a Wi-Fi access router?
01:38:48 A. I mean, this is -- again, it's an industry standard. 01:38:52 Nothing Verizon-specific. But if you're asking only how 01:38:57 the router works within the user's vicinity or their home 01:39:04 or maybe offices, depends on the users.
01:39:07 So if your question is related to the routers, 01:39:10 then it's a router functionality within the user's, you 01:39:17 know, office or home locations where they do NATing between 01:39:24 public IP address and their own network to separate the 01:39:28 traffic.
01:39:28 Q. Mr. Patel, I put two documents in the Chat. I'm 01:39:34 going to share the first of these, which will be marked as

01:39:40 Patel Exhibit 2, which is -- first Bates number is
01:39:50 VZ_Aspen_000585868.
01:39:55 One of the -- the second requirement -- or, excuse
01:39:58 me, the second bullet point in that Revision 29 refers to
01:40:10 an RTP packet loss detection. Do you see that?
01:40:12 A. Yes.
01:40:13 Q. And it's -- so the communications over the -- a voice
01:40:18 or video call on a Verizon network employs the use of Real
01:40:23 Time Protocol, RTP, to carry the packets?
01:40:29 A. That's a typical industry using RTPs for voice and
01:40:33 video. So it's not specific to Verizon, but it's an
01:40:37 industry standard.
01:40:39 Q. Patel 9 should be Bates No. 658174.
01:40:45 And if we go to that attachment, the next page,
01:40:50 175, there's a Voice over Wi-Fi Test Plan February -- dated
01:40:56 February 2017. Does that look generally familiar to you?
01:40:59 A. Yes.
01:41:00 Q. Then under the Test Objectives, you see the stated
01:41:11 objective from Verizon in this document is to: Define the
01:41:16 device compliance test cases for Voice over Wi-Fi, VoWiFi,
01:41:21 functionality. This includes verification that the users
01:41:25 can successfully make a voice and video call over a Wi-Fi
01:41:29 network from the multi-device.
01:41:32 Do you see that?
01:41:33 A. Yes, I do see that.

01:41:34 Q. Do the -- on the Verizon network, do devices have the capability to switch or handover a call from Wi-Fi to LTE and back to Wi-Fi?
01:41:47 A. Yes, we do have those capabilities, but it's not a seamless or consistent handover, knowing that this is a similar mechanism as Drop Before Make. So the session has to be dropped before it's successfully making the connection with other technology.
01:42:20 Q. You're referring to the Break Before Make?
01:42:26 A. Yeah, yeah. You can call it Break Before Make, Make Before Break or -- it's not a Make Before Break. It's a Break Before Make. So you break it before you're making another connection, yes.
01:42:40 Q. And so how in that -- in that scenario do you ensure that the user will have a successful handover?
01:42:52 A. This is like you make -- you are breaking the connections on the source access technology. For example, let's say you're moving from Wi-Fi to LTE. You're disconnecting the session on Wi-Fi, and then you're making a connection on LTE. And during that transition, the rebuilt packet losses, there will be connection interruptions from the user's standpoint. The -- so -- so there will be some delay, but we try to minimize as much as possible if there is a possibility.
01:43:50 Q. We'll go back to Patel Exhibit 3. That was Bates No.

01:43:59 659418.

01:44:01 And then a little further down in the document, 01:44:05 Bates No. 541, there's a Section 1.5.3.1.13.3. There's a 01:44:20 discussion that: The device shall monitor LTE and Wi-Fi 01:44:23 signal quality.

01:44:24 Do you see that?

01:44:25 A. Yes, I can see that.

01:44:29 Q. And it talks about some of the metrics and some of 01:44:33 which we discussed about -- discussed earlier, the RSRP and 01:44:36 the RSRQ, right?

01:44:38 A. That's right.

01:44:46 Q. And how does -- are these ways of measuring the quality 01:44:51 of the -- the datastream?

01:44:53 A. Not the datastream. This is just measuring the 01:44:59 cellular signal information.

01:45:05 Q. Measuring the signal quality, is that -- are these 01:45:09 metrics to measure the signal quality?

01:45:12 A. Yes. It's specifically referring to RSRP, RSRQ, yes.

01:45:24 (Videoclip ends.)

01:45:25 MR. HEARD: Okay. Your Honor, ready for the next 01:45:27 witness?

01:45:28 THE COURT: Yes.

01:45:28 MR. HEARD: Okay. Aspen calls our expert, Izhak 01:45:32 Rubin. And while he's taking the stand, may we pass out 01:45:38 some binders?

01:45:40 THE COURT: You may, yes.
01:46:00 (Witness sworn.)
01:46:20 MR. HEARD: Your Honor, may we proceed?
01:46:21 THE COURT: Whenever you're ready.
01:46:23 MR. HEARD: Thank you.
01:46:25 IZHAK RUBIN, PH.D., PLAINTIFF'S WITNESS, SWORN
01:46:25
01:46:25 DIRECT EXAMINATION
01:46:26 BY MR. HEARD:
01:46:26 Q. And good afternoon, Dr. Rubin. How are you?
01:46:28 A. Good afternoon. Thank you. Very good.
01:46:29 Q. Thank you for speaking into the mic. That's good.
01:46:33 A. Very strong.
01:46:34 Q. There we go.
01:46:35 Professor Rubin, could you please state your full
01:46:38 name for the jury?
01:46:39 A. Yes. I'm Professor Izhak Rubin.
01:46:42 Q. And, Professor Rubin, where do you live?
01:46:45 A. I live in Santa Monica, California.
01:46:50 Q. What do you do for a living, Professor?
01:46:52 A. I am a distinguished professor in electrical and
01:46:57 computer engineering department at UCLA.
01:46:59 Q. And do you do any -- outside of being a professor, do
01:47:02 you do anything else in industry?
01:47:04 A. Yes. I have been for many years a consultant, and I
01:47:08 have my own consulting organization, IRI Computer

Communications Corporation.
Q. And, Professor, do you work for Aspen Networks?
A. I do not.
Q. And have you ever worked for Aspen Networks?
A. No, I never did.
Q. Then why are you here today?
A. I'm here to testify as it relates to Patent '554, whether the Aspen -- I'm sorry, whether Verizon's Voice over Wi-Fi service infringes or doesn't infringe the patent.
Q. And how are you compensated for your time?
A. I am paid on an hourly basis.
Q. And have you prepared some slides today for the jury?
A. Yes, I did prepare slides.
Q. And before we get into those technical opinions, I want to talk about your background just a little bit.
What is your general field of expertise?
A. So my field of expertise is in the area of computer communication and telecommunication networks.
Q. And did you attend college?
A. I did attend college, yes.
Q. Where did you go?
A. So I got my master's and bachelor at Technion, and I got my Ph.D. degree at Princeton University, all in electrical engineering.

01:48:37 Q. And did you graduate with any honors?
01:48:42 A. I did. I graduated with my bachelor, summa cum laude.
01:48:47 Q. And when did you join the faculty at UCLA?
01:48:50 A. I joined UCLA in 1970.
01:48:55 Q. So you've been a professor there for over 55 years?
01:48:58 A. Hard to believe, but it's true, yes.
01:49:03 Q. Must love it if you're still -- still doing it?
01:49:06 A. I do love it. I'm very excited about this technology, 01:49:09 yes.
01:49:09 Q. And before we talk about that technology, could you 01:49:12 tell the jury a little about your family?
01:49:15 A. Yes. So we have been married for more than 60 years, 01:49:22 also believe it or not, and we have three children and 01:49:26 eight grandchildren, and they live all over the country in 01:49:30 various places.
01:49:32 Q. Do you get to see them from time to time?
01:49:34 A. I sure hope so. I should see them more often.
01:49:38 Q. Yes, absolutely.
01:49:39 Well, when you joined the faculty at UCLA, tell 01:49:41 the jury what type of courses have you been teaching over 01:49:44 the years.
01:49:44 A. So I taught many different courses, but mostly in 01:49:50 computer communications and telecommunications, information 01:49:54 theory, detection, communication system, encoding, and 01:50:01 queuing systems, many different one. I taught also

01:50:05 management engineers how to allocate resources to companies
01:50:10 and so on and so forth. Quite a few.
01:50:13 Q. And there's a lot of terminology -- terminology that I
01:50:16 didn't recognize, like queuing theory and the like. What
01:50:19 general field are you in?
01:50:21 A. The general field is electrical engineering. So I'm
01:50:23 teaching in the Department of Electrical and Computer
01:50:27 Engineering Department. Queuing is waiting in line. So
01:50:30 that's not very pleasant, but that's what packets do on the
01:50:34 Internet, they wait in line.
01:50:35 Q. And over the course of your tenure at the -- at UCLA,
01:50:41 have you guided any students through their Ph.D. studies
01:50:45 and master's work?
01:50:47 A. Yes. I got a very large number of bachelor, master's,
01:50:53 and Ph.D.s, and they are now employed all over the country.
01:50:58 Q. And you've been in the courtroom since the start of
01:51:01 proceedings, except when we tried to introduce you on
01:51:03 Friday.
01:51:04 A. That's true, yeah.
01:51:05 Q. But you've heard -- otherwise, you've heard all of the
01:51:08 testimony?
01:51:08 A. Otherwise, I'm good. Yes, I heard everything.
01:51:11 Q. Wonderful.
01:51:12 And you are familiar with the '554 patent, what
01:51:14 we're here to talk about?

01:51:15 A. Yes, I am familiar.
01:51:17 Q. And the coursework that you've had over the time at UCLA, has it been in the same field of technology as the '554 patent that we're discussing?
01:51:26 A. Yes, very much so.
01:51:28 Q. And outside of the -- your time at UCLA, have you authored any papers or publications over the years?
01:51:36 A. Yes, I have done extensive research in many different areas, and I authored more than 200 peer-reviewed research papers in journals and conferences. And I just recently authored a book, close to 800 pages, on principles of data transfer. There's more than 20 some chapters and covered a lot of different topics.
01:52:06 Q. And all of those, the papers that you've written and the book that you've written, are they generally in the same field as the patent, the '554 patent that we've been discussing?
01:52:16 A. Yes, they are in the field of computer communication, networking and telecommunications. Some of the chapters are about communication between self-driving cars and drones, UIV, some other interesting things.
01:52:29 Q. So pretty wide ranging?
01:52:31 A. Very wide ranging, yes.
01:52:32 Q. But also in the field of telecommunications and wireless networking?

01:52:36 A. Precisely, in the field of telecommunication and computer communications networks.
01:52:41 Q. So then outside of the -- your teaching work and all the authorship of papers, can you tell us about some of the research that you've done over the years?
01:52:53 A. Yes. So I have done research on computer networking as it relates to algorithms, methods, and protocols for networking hard devices to other devices. That's what protocol is.
01:53:09 And when I came to UCLA in 1970, I joined the teams that developed the Internet. So there was no Internet, but we worked on the developing of the Internet. We still haven't one -- found one with this computer.
01:53:22 Q. And, Professor, let me ask you to just slow down a bit for the benefit of the court reporter --
01:53:29 A. Yes.
01:53:29 Q. -- and all of us to hear, but, yes --
01:53:30 A. Very good point. Sometimes students tell me also.
01:53:31 Q. You get excited, I know.
01:53:32 A. Yeah, I get excited. I talk very fast.
01:53:36 Q. Continue.
01:53:37 A. So I was very fortunate to join the Internet developing team. Our responsibility was for performance analysis across the Internet at that time. And so I worked on that and worked on a very large number of research topics

01:53:58 relating to computer communication networks.
01:54:01 Q. And then could you tell the jury about the consulting work? You mentioned IRI. What type of consulting work have you done over the years?
01:54:09 A. Yes. So as part of my consulting, I was involved in developing of protocol, performance analyses, testing for a very large number of companies, both commercial and military organization.
01:54:25 So I showed some names of some companies, and they include commercial companies. They include quite a few telephone companies. I've done a lot of work for telephone companies over many years, including companies such as Southwestern Bell, US West, Pacific Bell, just to mention a few.
01:54:51 And I have done a lot of networking development and analysis for the U.S. military. I worked for many years on networks for the Navy all over the country, and I developed software for the Navy's use to tune up the networks on all the naval carriers. And I mentioned a few other companies, here, defense companies and aerospace companies -- a lot of aerospace companies.
01:55:21 Q. And in the course of that work for the government and the military branches, have you had occasions to get certain security clearances?
01:55:29 A. Oh, yeah, I did get a high security clearance in order

01:55:33 to work on these kind of systems, including DARPA systems
01:55:37 that I worked on, underwater system, all kind of other
01:55:41 fancy stuff. I had to have a high security clearance, yes.
01:55:45 Q. In the course of those projects over the years, have
01:55:49 they touched on the same types of technology that we're
01:55:51 here to discuss relating to the '554 patent?
01:55:53 A. Yes, very much so.
01:55:55 Q. And then, finally, are you a member of any professional
01:55:59 organizations?
01:56:00 A. Yes, I am a member of several professional
01:56:02 organizations, but the largest one around the world is
01:56:09 IEEE, which stands for Institute of Electrical and
01:56:15 Electronics Engineers. And I have been very active. I was
01:56:17 the chairman of a few conferences, several key conferences
01:56:22 and workshops.
01:56:24 And I have been elected for my contribution to
01:56:29 research and to engineering education to a life fellow of
01:56:34 IEEE. That's the highest grade that IEEE awards to any one
01:56:40 of its members, and only very few of them to receive such
01:56:44 an award.
01:56:45 Q. What is that, a life fellow?
01:56:46 A. So a fellow member, which I was elected first, and then
01:56:53 because of the length of my activity over such a long
01:56:57 period of time, I operated in such excellent research and
01:57:03 education, I received a life fellow membership award.

01:57:08 Q. And then the book that you -- how recent was that that you authored?
01:57:14 A. So the book came recently in 2015. And it took me quite a few years to write it, accumulating a lot of my notes and experiences over many, many years.
01:57:29 Q. Thank you.
01:57:30 And the -- the work that you've done, the groups that you've been a part of, the IEEE and then your consulting, is that all related to the technology at issue in the '554 patent?
01:57:40 A. Oh, yes, absolutely. Yes. Absolutely. Computer communication and telecommunication networks, that's what we are talking. Moving messages across network.
01:57:51 MR. HEARD: Your Honor, at this time, we'd tender Professor Rubin as an expert in the field of telecommunications and mobile networking.
01:57:57 THE COURT: Any objection?
01:57:58 MR. GAUDET: No objection, Your Honor.
01:58:00 THE COURT: Very well.
01:58:01 Q. (By Mr. Heard) So, Professor, what were you asked to do in connection with this litigation?
01:58:06 A. So what I was asked to do is to read the patent, to analyze it, to consider material, a large number of documents that has been produced as part of this patent and operation of Verizon. And to analyze the Verizon network

01:58:39 that practices what is described in the certain claims of the patent and to determine, based on my research over a very long -- over investigating a large number of documents, whether this service, Verizon's Voice over Wi-Fi service infringes or doesn't infringe the asserted claims of the '554 patent.

01:59:06 Q. And you mentioned a few of them, but what sources of information, what all did you take into account to reach those opinions?

01:59:13 A. So I wrote here a number of them, but as you can imagine, and you'll see a few of them, technical documents, deposition testimony, testing, call trace testings that I have done myself with the help of technicians. A few of them you met today, amazing persons, and, of course, my expertise over so many years.

01:59:42 Q. And so just at a -- we'll get into it in much more detail, but at a high level, what opinion did you reach with respect to infringement of the '554 patent?

01:59:50 A. So after studying everything very carefully and taking all of that into consideration, I concluded that the asserted patents -- the asserted claims of the '554 patent are being infringed by Verizon's Voice over Wi-Fi service.

02:00:13 Q. And so, Professor, let's take a step through the technology, and thankfully we've had some witnesses this morning talk about the technology. We've heard from the

02:00:24 attorneys explain it to some degree. But this is the first time we've been able to hear from our UCLA professor about it.

So take us back to traditional ways of communicating by phone. How was that done?

A. So traditionally, plain old telephone service it's called, nice word, but we use circuit switching, which basically you talk to a destination party. Your voice is transmitted end-to-end by a telecommunications network. How do they go about doing it?

The method known as circuit switching, there are two important things that take place before your transmissions will go end-to-end, two different things.

Number one, you have to signal the network. We used to do it by dialing. Today maybe you push some buttons on your cell phone, but you have to do that. Why? Because the network doesn't know who do you want to talk to. So you send the signal, and you tell the network, you know what, I would like to talk to that party, can you connect me, can you set up a call?

So a signaling system is used to set up the call. Under circuit switching, what would happen, at that point in time, a path in the network is set up to the destination. And that will consist of nodes and line, nodes and line, nodes and line, nodes and line, okay,

02:02:11 that's a network. A path is set. They select a route, for
02:02:11 your path is a route.
02:02:17 And the dedicated capacity for your transmission
02:02:23 across each link of the path. So as you talk, your voice
02:02:27 signals will go from that link to that link to that link to
02:02:31 that link, like you were on a highway between different
02:02:38 cities, but capacity is reserved for you. You don't have
02:02:42 to wait at intersections. That's circuit switching.
02:02:45 Q. Well, then obviously something more has come. We've
02:02:47 heard about packets. Tell us how has that evolved into
02:02:52 this packet-switched environment?
02:02:53 A. That's very exciting, because as I joined UCLA in 1970,
02:02:58 that's what we worked on on the Internet. And the Internet
02:03:00 uses packet switching. So the circuit-switching people say
02:03:05 that will never work. So you can work whatever you want.
02:03:07 I said -- we said, okay, we'll do it. We will do data not
02:03:13 voice, we won't compete with it initially.
02:03:14 What is packet switching? In packet switching,
02:03:17 you don't dedicate capacity to a call. You talk to
02:03:21 somebody else or you can send video or data over the
02:03:28 Internet or voice and video over Verizon using their
02:03:33 service. But you don't dedicate capacity. A path
02:03:42 typically is not a plurality selected either, doesn't have
02:03:45 to.
02:03:45 So what you do is you talk to the microphone, the

02:03:50 microphone generates electrical signals, it's digitized. 02:03:56 These electrical signals are mapped into 0s and 1s. So 02:04:01 it's like something that sits on a computer, and they 02:04:04 collect a bunch of them and make a submessage which we call 02:04:07 a packet.

02:04:08 It's not a package. Some students say package. 02:04:15 It's a packet. So they collect a number of bits; they make 02:04:18 a packet. They send a packet. They collect the next few 02:04:20 bits; they make a packet. They send a packet. So the 02:04:23 packets are transmitted from one packet switch to another 02:04:28 packet switch to another packet switch to another packet. 02:04:30 If it's a small packet switch it's known as a router 02:04:33 because a router also makes its routing decision.

02:04:35 Now, the intermediate switches actually can be 02:04:39 very smart. That's advantage of packet switching, major 02:04:44 advantage. Because they can be computers that can read 02:04:48 what's happening in what you're transmitting, and not only 02:04:51 deciding what should be the outgoing port but also deciding 02:04:55 whether they should do something to your packet. Maybe I 02:04:59 should fix something, maybe I should change something so it 02:05:01 will keep going on its way to the right destination. 02:05:04 That's packet switching.

02:05:06 Q. So, professor, you're explaining some of the 02:05:09 advantages, but just could you maybe simplify and say why 02:05:13 is it better? In what way is packet switching better for

02:05:17 transmitting data than circuit switching?
02:05:19 A. So I already described two major advantages.
02:05:24 Advantage No. 1 you save capacity. When you talk
02:05:28 or when you transmit data, we realize at the time that
02:05:33 you're not talking, you're not transmitting all the time.
02:05:36 You're transmitting a little bit and you're pausing.
02:05:40 You're going to drink coffee, transmitting a little and
02:05:41 pausing. In circuit switching, it dedicates to your
02:05:45 capacity the whole period, whether you're active or not
02:05:47 active, you dedicate the capacity. Oh, that doesn't make
02:05:51 sense.
02:05:52 The Advantage No. 2 is since I am transmitting
02:05:55 everything in these packets in a digitized format, and each
02:06:01 intermediate switch or processor sees it, it can look into
02:06:06 it and process it so that it goes correctly to the
02:06:12 destination.
02:06:13 Q. And Professor, we've heard talk of protocols. How are
02:06:17 protocols used in the context of this packet switch and
02:06:23 Voice over IP context?
02:06:24 A. So from what I explain to you now, you already realize
02:06:27 that you need two types of protocol. You need one protocol
02:06:31 that will set up the code, and that's called a signaling
02:06:34 protocol. Today, we use a protocol known as SIP. You
02:06:39 heard so much about SIP. I'll tell you SIP -- I'll go more
02:06:43 into it later. It's a Session Initiation Protocol. It

02:06:47 sets up the session, it terminates the session, it manages
02:06:51 the session, okay?
02:06:52 So these are messages, they're just packets,
02:06:57 again, packets, but signaling packets. They don't carry
02:07:00 voice or video or data. They carry signaling. And the
02:07:05 different entities understand the signaling. He wants to
02:07:09 set up a call or he wants to hold a call or he wants to
02:07:13 terminate a call or he wants to tell us something about
02:07:17 parameters of the call.
02:07:17 Another type of protocol that we use is to carry
02:07:20 what we call the media messages, voice video data, that's
02:07:27 media. And if you have a Real Time Protocol, we're talking
02:07:32 realtime to an entity like voice and video like what we are
02:07:36 talking here. Sometimes we say you're streaming, same
02:07:39 thing, then we need a protocol that will carry your
02:07:44 streaming packet, your streaming voice and video packet,
02:07:46 and today we use RTP.
02:07:50 The name is very appropriate, it's called Real
02:07:57 Time Protocol, okay? So we have SIP for signaling, we have
02:08:00 RTP for media transmission, and actually it's not just a
02:08:04 transmission, it's a protocol that is used by the
02:08:06 destination to reconstruct the voice or the video. So it
02:08:12 sounds good. It doesn't sound funny.
02:08:13 Q. So --
02:08:15 THE COURT: It's very difficult for the court

02:08:17 reporter to keep up with you when you're going that fast.
02:08:19 I'd like to understand what you're saying. It would be
02:08:22 helpful to me and to the court reporter if you would slow
02:08:25 down pretty significantly, okay?
02:08:27 THE WITNESS: Thank you very much. Yes. I tend
02:08:29 to talk fast. I completely agree. Thank you very much,
02:08:33 Your Honor.
02:08:33 MR. HEARD: We'll just hold a stop sign up for
02:08:36 you.
02:08:38 Q. (By Mr. Heard) So, Professor --
02:08:38 A. Give me some signal to slow down.
02:08:40 Q. Professor, did -- SIP existed -- the Session Initiation
02:08:44 Protocol, it existed before the '554 patent, right?
02:08:46 A. Yes, it did exist.
02:08:48 Q. And RTP, did it, as well?
02:08:50 A. Yes.
02:08:50 Q. And so tell us about the context of this invention --
02:08:56 or actually, excuse me, of the voice as it transferred to
02:09:01 Voice over IP? What is VoLTE or Voice over LTE?
02:09:05 A. Okay. So LTE is a first generation cellular network,
02:09:15 and it uses packet switching, IP protocols rather than
02:09:24 circuit switching. The old telephone network used circuit
02:09:29 switching. The modern one like 4G/LTE and subsequent ones
02:09:33 use packet switching.
02:09:35 So Voice over LTE is a service by a telephone

02:09:42 network that employs LTE for the transmission of Voice over
02:09:50 IP. Voice over IP is called in brief Voice over IP or
02:09:54 VoIP, they say.
02:09:57 Q. And, Professor, the inventors of the '554 patent did
02:10:00 not invent Voice over LTE, right?
02:10:04 A. That's right.
02:10:05 Q. And then we talked about handovers. We've heard some
02:10:08 of that discussion this morning. What is a handover in the
02:10:10 context of this -- this field?
02:10:11 A. So in this context, handover is switching the network
02:10:20 path from one network path to another network path. You're
02:10:27 pretty familiar with that on an every day basis, for
02:10:31 example. But in this example I show it to you here. You
02:10:36 may talk -- so Wi-Fi in the home, and then take a walk
02:10:43 outside the home and you don't have a Wi-Fi connection. So
02:10:49 you would like the assistant to switch you into Voice over
02:10:53 LTE, into cellular.
02:10:54 Q. Now, again, we've heard from the -- two of the
02:10:59 inventors this morning. After you reviewed the '554
02:11:04 patent, what was your understanding of the problem that the
02:11:07 inventors set out or encountered as they set out to -- with
02:11:11 their invention?
02:11:16 A. Well, the problems that you heard this morning from the
02:11:21 inventor is that it was not known at the time how to switch
02:11:26 from one network path over IP to another network path

02:11:32 without dropping the call. That was the problem that they
02:11:35 had to solve.
02:11:35 Q. And we -- we heard a lot of discussion about the SIP
02:11:40 standards, which we'll hear more about, I'm sure. The
02:11:45 existing SIP standards at the time, did they speak to these
02:11:49 switches and network paths?
02:11:50 A. So the SIP standard at the time, the one that is
02:12:03 defined by RFC3261, and still is today, does not tell you
02:12:13 how to manage the characterization of the SIP messages, how
02:12:19 to set up the SIP messages once there is switching in the
02:12:26 network path. They tell you how to do it if the network
02:12:31 path is constant. But once there is a switching, they
02:12:34 didn't tell you what to do.
02:12:36 Q. And so what was the practical outcome of that? What
02:12:40 would happen, then, when there would be a switch during an
02:12:44 active call?
02:12:45 A. So the problem was the call will drop.
02:12:50 Q. Can you give a practical example of that problem?
02:12:54 A. Yes. In this figure is the same story I told you
02:13:00 before and you heard it before. You talk Wi-Fi at home,
02:13:05 and then you leave the home, and you go outside, and you
02:13:09 don't get good reception off your Wi-Fi. And at some point
02:13:14 no reception whatsoever.
02:13:15 But you do have cellular, so you would like to
02:13:17 switch to cellular, but you're in the midst of a call.

You're still going. So my wife says what happened? I said, don't worry, it won't drop. I'll leave the Wi-Fi, I go outside, and the call won't drop. It will continue seamlessly. Seamlessly means doesn't drop.

Q. And so, Professor, tell us what is your -- after you reviewed the patent and the file history and all the documents surrounding it, what was the solution that the inventors arrived at?

A. So the solution is well described in the asserted claims of the '554 patent.

Q. And is that what we see on our screen? You're familiar with the '554 patent, JTX-1?

A. Precisely. So that's the face page of the '554 patent.

Q. And that's also a tab in the juror notebooks and in the notebook that's on your desk, I believe?

A. Yes.

Q. When was the patent filed?

A. So the patent was filed June 11, 2008.

Q. And issued when?

A. And it was issued August 30th, 2011.

Q. And so then tell us again about the -- what did the Aspen inventors solve through this problem?

A. So the problem was as I described. You would like to switch the network path, let's say from a Wi-Fi network path to a cellular network path, so from any network path

02:14:54 to any other network path without dropping the call while
02:14:59 the call is ongoing -- in the midst of the call. And
02:15:06 that's what is being described -- described by the patent.
02:15:11 And the patent tells you that in order to do that, certain
02:15:16 things have to be performed by whoever practices the patent
02:15:23 and --
02:15:24 Q. Professor, if I could, what -- where do we find the
02:15:27 fence line? We've heard a lot about counsel talking about
02:15:30 the fence line. Where is the fence line?
02:15:32 A. Yes, the fence line are the asserted claims. So if you
02:15:39 look at Claim 1, it tells you have to do those things, [a],
02:15:42 [b], [c], [d], [e], whatever. And that's it. That's what
02:15:46 it tells you. It doesn't tell you other things. If
02:15:49 somebody doesn't do some of those things, well, it doesn't
02:15:52 infringe the patent. Or if he thinks that he has to do
02:15:57 some other things, doesn't infringe the patent.
02:15:59 Q. And what are the claims that are asserted by Aspen in
02:16:03 this case?
02:16:04 A. There are two independent claims, Claim 1 and Claim 15.
02:16:12 And there are Claims 2 and 6 that depends on Claim 1 and
02:16:17 Claim 16 and 20 that depends on Claim 2 (sic). Independent
02:16:23 claims give the basis of what has to be done. A dependent
02:16:24 claim tells you you have to do everything stated in the
02:16:31 independent claim, but we are adding another limitation.
02:16:34 In addition to that, you also have to do that thing.

02:16:38 Q. And where can these claims be found?
02:16:40 A. So the claims are found in the patent. If you look
02:16:46 towards the end of the patent, you see the claims, such as
02:16:48 what I show here. And you see Claim 1, for example, on the
02:16:52 side it says 1, so that's Claim 1. And then 2, 6, 15, 16,
02:16:59 and 20. These are the claims.
02:17:02 Q. And there's already been a lot of discussion about
02:17:05 Figure 9 this morning. What generally are you showing in
02:17:08 Figure 9 on Slide 119?
02:17:11 A. So Figure 9 is from the patent, and it shows you that
02:17:15 you have a telephone device -- could be any telephone
02:17:22 device. And then the telephone device is communicating
02:17:34 with another device, which is sometimes called a border
02:17:42 controller. It's a border line between the office or home
02:17:45 and the outside, and sometimes it's called a gateway, which
02:17:52 means the same thing. When you say a gateway, it's an
02:17:56 interface between two networks. That's a gateway.
02:17:59 And -- and that's 910. That's the Aspen box in
02:18:04 this figure, 910. They do certain things. And the
02:18:10 telephone device communicate with the Aspen box 910, so
02:18:16 990, which is a Local Area Network. Okay.
02:18:19 So you go from the telephone device, Local Area
02:18:23 Network, you go to the Aspen box, to the gateway. And this
02:18:32 gateway provides for switching of network paths in a
02:18:38 similar fashion. These are breaking the path. That's the

02:18:42 invention.
02:18:44 And what you see here, you see that this gateway
02:18:47 can provide switching between three different Internet
02:18:54 routes. One served by Internet Service Provider 1, another
02:19:02 by ISP 2, another one by ISP 3.
02:19:04 So in this example, that office says,
02:19:09 communication is the word that's critical to our business.
02:19:13 If one connection fails, we want to switch over seamlessly
02:19:19 without losing the conversation to another connection. And
02:19:29 that's what you see here.
02:19:29 And in order to communicate eventually in this
02:19:33 example, there is communication across the Internet to a
02:19:35 SIP server. And in order to communicate over the Internet,
02:19:40 there's something very important to remember. To
02:19:44 communicate over the Internet, you need a router. The
02:19:48 router understands the language of the Internet. It will
02:19:52 form the packets in the right way so they can go to the
02:19:56 right destination through the Internet.
02:20:00 So today at home, you have an access point, this
02:20:03 box that provides you Wi-Fi service, and nested in it
02:20:07 typically you have a router that will connect you to the
02:20:10 Internet. So that's what you see here in this example.
02:20:13 Q. And so, Professor Rubin, you mentioned reviewing a lot
02:20:17 of Verizon internal documents. Could you tell us on Slide
02:20:22 120, is this one such document that you looked at?

02:20:25 A. Yes. So this is one of the documents, and Verizon here in this document talks about Voice over Wi-Fi and indicates Voice over Wi-Fi smartphone. So you have this service on the smartphone, such as an iPhone. And it tells you a major advantage of it, that using this service, it increases the Verizon voice footprint.

And the reason for that is that it can now commune -- allow customers to communicate through the Verizon network using the tower directly, using what we call LTE. That's the tower. Or if they have Wi-Fi, they communicate via Wi-Fi. So there are these two ways that they can communicate.

Now, that allows them to accommodate a much larger number of customers or subscribers, yes.

Q. And when did Verizon introduce its Voice over Wi-Fi or Wi-Fi Calling Service?

A. So you see here on the bottom of that document that they were planning to do that, and it was virtually almost ready. 3 Quarter of 2015, towards -- I believe, the end of 2015, it was actually introduced according to the documents that Verizon sent us.

Q. And this is from the same document, PTX-90. So this is a large presentation. What is this illustration we see depicting on Slide 121?

A. So this is a Verizon document, and it talks about Voice

over Wi-Fi handover architecture. So handover means switching from one network path to another network path -- network path. Architecture is the overall concept, the overall method that Verizon uses in performing this handover. Okay? That's what they use. That's what they tell us.

What you see here is two paths. You see here the blue path, which is now almost red -- the blue path on the top that describes a connection between a cellular device, identified here as a Voice over LTE device, to the destination through the Verizon network by exiting directly the tower. This is the tower right here. The tower is attached to a node that is called base station.

So in the LTE terminology, this is an eNodeB. B stands for base station. And you go through the RAN, access network of Verizon. That's the RAN, what you see right here. And then you go into the core network of Verizon. That's the blue cloud. The blue cloud is the core network of Verizon.

Q. Professor, what did you say there, the core network?
A. Correct.
Q. Is which part?
A. The blue one.
Q. Okay.
A. The blue one. And in brief, we call it EPC, you see it

02:24:24 says EPC on it, which is -- which stands for evolving
02:24:28 packet core -- core. So that's the part of the network or
02:24:32 at least part of the network which we call core. And there
02:24:38 are various modules there that at this point I won't go
02:24:41 into. And attached in the -- and all of that is going to a
02:24:46 node which is called the packet gateway.

02:24:49 Now, you know what packet is, and you almost know
02:24:52 what a gateway is. So a packet gateway is acting like a
02:24:57 router. It takes packets that arrive, looks what needs to
02:25:02 be done -- do with them -- what needs to be done with them,
02:25:06 and moves it somewhere else.

02:25:07 So another box that's in the core and other boxes
02:25:12 in the yellow cloud. The yellow cloud is extremely
02:25:17 important, and you see it is called IMS, which stands for
02:25:30 IP Multimedia Subsystem. And we'll talk about it later,
02:25:33 but it provides a lot of the very important functions that
02:25:37 are required to process the SIP packets. Remember the SIP
02:25:43 packets, the connection packets, it looks at them very
02:25:47 carefully to make sure that nobody is invading my systems,
02:25:51 that they are precise, that everything is done correctly.
02:25:55 That's one network path.

02:25:59 Another network path that you see on the bottom
02:26:01 right here provides for a connection between a cell phone
02:26:19 through a Wi-Fi access point. You see it says Wi-Fi AP.
02:26:26 That's a Wi-Fi. AP is access point. And this network that

02:26:31 you have at home between your device and the access point
02:26:33 is called the Wireless Local Area Network. It's a Local
02:26:37 Area Network based on using wireless. WLAN.
02:26:41 And what is going to happen here is you're going
02:26:51 to communicate at the home or at the office or at the
02:26:54 airport or at Starbucks to the AP, to the Wi-Fi of this
02:26:58 organization, and then your messages will be sent to
02:27:03 Verizon over the Internet, okay? Over the Internet. And
02:27:12 it will be sent to a specific node within Verizon which is
02:27:16 identified here. The evolved Packet Data Gateway, ePDG.
02:27:22 You may hear it later, but it doesn't matter. That's what
02:27:26 it's saying, in the core of the Verizon network.
02:27:30 One thing to say about the Internet -- we didn't
02:27:38 think initially about it but we know it now -- it's a
02:27:42 non-trustful network. People do a lot of things on the
02:27:46 Internet.
02:27:46 Q. Professor, you said untrustful?
02:27:48 A. Untrustful.
02:27:49 Q. What does that mean?
02:27:51 A. That means that I cannot guarantee the security of your
02:27:57 messages as they are transported over the Internet. But
02:28:01 for this service and others, we do want to guarantee. So
02:28:04 what do we do? We encrypt your messages, okay? So your
02:28:09 messages are encrypted. And we have a protocol for doing
02:28:12 that. And we send your encrypted messages to the Verizon

02:28:21 network through this red path, which is known as IPsec. 02:28:29 IPsec means IP security. That means it's encrypted. It's 02:28:33 secure. Nobody can read it except the source device and 02:28:39 the destination entity ePDG. Otherwise, it goes through 02:28:45 the Internet from one router to another router to another 02:28:49 router, they don't know what's inside. The AP doesn't know 02:28:53 what's inside. So it's encrypted, and it goes through the 02:28:56 Verizon network through a path through a conduct 02:29:03 mechanism -- a transport mechanism that we call a tunnel. 02:29:11 Now, A tunnel means the following. I take your encrypted 02:29:14 secure message, and I put it in an envelope. I shut this 02:29:20 envelope. I write the true destination -- source and 02:29:24 destination, where it comes from and where it's going to on 02:29:27 top of that envelope, and then I insert that in another 02:29:33 envelope. And in the other envelope, I write another 02:29:37 source and destination, which is opened, so that the 02:29:44 Internet routers and the Wi-Fi, if you're home, will know 02:29:48 what to do with this message. Otherwise what do they do? 02:29:53 They cannot read the encrypted material, the envelope. 02:29:55 They can only read the external envelope. And that's 02:29:59 what's happening here.

02:29:59 Q. Professor, is this an illustration that you created?

02:30:03 A. No. This is a Verizon document that described their 02:30:10 architecture, and they're telling you here that these two 02:30:14 paths are anchored. We call it anchored. They actually

02:30:18 meet at the single point within the Verizon system, which
02:30:24 is the packet gateway and associate modules, of course.
02:30:32 You need all kinds of modules in order to process the
02:30:35 information.
02:30:35 Q. And did you see other architecture diagrams that were
02:30:37 produced by Verizon in this case that looked similar?
02:30:41 A. So I sure did. I viewed and analyzed a very large
02:30:48 number of documents, spent a lot of time. And I saw the
02:30:50 same architecture repeating in different times, different
02:30:55 dates, but as far as what I described to you, as you see
02:30:59 here, it's the same architecture. This is from 2014, same
02:31:03 architecture. Each time there may be additional services,
02:31:05 additional boxes added, but as far as what I described,
02:31:09 same architecture as you see right here. You see the upper
02:31:16 path which is the LTE network path, and you see the lower
02:31:20 path which is the Wi-Fi network path.
02:31:21 Q. Remember to slow down, Professor.
02:31:23 A. Oh, I'm sorry.
02:31:25 Q. This is PTX-87 you said from 2014. And then what is
02:31:30 the PTX-78 on the next slide?
02:31:33 A. As I kept looking at different years, here is one from
02:31:37 2020, and you see basically the same thing. You see how
02:31:40 the LTE path converges with the Wi-Fi path, the packet
02:31:49 gateway, and you see how the packet gateway has access to
02:31:52 various modules including the IMS that I just described

02:31:56 earlier.
02:31:56 Q. And then similarly, PTX-182, is this another internal
02:32:01 Verizon document --
02:32:03 A. Yes.
02:32:03 Q. -- with an architecture diagram?
02:32:06 A. Sorry. Yes, this is still a Verizon internal document.
02:32:12 Q. And what is -- what's important about showing these
02:32:15 throughout the various years in terms of what you reviewed
02:32:20 to form your opinions?
02:32:22 A. So one of the interesting point is that the basic
02:32:27 architecture haven't changed over these several years.
02:32:33 Q. So let's turn to your -- the infringement analysis.
02:32:36 You mentioned all the claims, Claim 1 will take us
02:32:40 the longest, but let's work through it.
02:32:42 Why do you have it broken down into different
02:32:46 boxes here?
02:32:46 A. So for ease of analysis, what we do is we break the
02:32:55 different elements or steps of the claims in such a
02:33:00 fashion.
02:33:01 So I say that's what Claim 1 requires, but let's
02:33:04 look at it element-by-element. So you can see here that we
02:33:07 have these different elements. And I'm going to discuss
02:33:12 them one-by-one.
02:33:13 Q. So let's go first to the 1 -- what you have labeled as
02:33:20 1[pre]. What does 1[pre] refer to?

02:33:23 A. So pre stands for preamble. So a claim often has a
02:33:29 preamble, and the preamble provides the context to what is
02:33:32 being claimed. What's happening here? What's the system?
02:33:36 And as indicated here by the red line, this is a method of
02:33:47 enhancing the reliability of a transmission from a source
02:33:52 to a destination in a communication network that operates
02:33:57 on top of the Internet Protocol.
02:34:01 So, in particular, looking at the red path, we are
02:34:11 talking that the purpose of the method is to enhance the
02:34:14 reliability of the transmission, and it is a transmission
02:34:19 from a source to a destination. So that's what we have
02:34:22 here.
02:34:22 Q. And what did you review to gain an understanding as to
02:34:27 whether the preamble had been satisfied in the case?
02:34:30 A. So I looked at a variety of sources, including Verizon
02:34:41 statements and my own analysis. And as you have seen,
02:34:47 that's what Verizon's Voice over Wi-Fi service tells you
02:34:54 their objective of the service is.
02:34:56 The objective of the service is to improve the
02:35:02 reliability of the transmission from one source, could be a
02:35:07 cell phone, to another entity or destination, could be a
02:35:12 cell phone or another phone. And so we are told by Verizon
02:35:19 that that's precisely what is performed by the Voice over
02:35:26 Wi-Fi service that they offer.
02:35:29 Q. And is that one example of the many documents you

02:35:32 referred to, PTX-147 on your screen?
02:35:35 A. Yes. So I reviewed a wide range of documents and found
02:35:45 out that that's what the Voice over Wi-Fi service is all
02:35:47 about. It's providing a path to accommodate the
02:35:56 transmission from a source to a destination. You talk on a
02:36:01 phone. You want somebody else on the other phone to
02:36:04 receive you. So there is a transmission from you to the
02:36:06 other phone.
02:36:07 And this would improve the reliability of the
02:36:11 system, obviously. We already discussed because if you
02:36:15 lose one connection, you go outside the basement -- you go
02:36:21 outside the home, let's say, and you don't have a Wi-Fi
02:36:25 connection, it will seamlessly transition into an LTE
02:36:30 connection.
02:36:32 Q. So turning to 1[a], Professor, what does 1[a] require?
02:36:39 A. So 1[a] states: Transmitting data between a source and
02:36:46 destination over a first network path made up of one or
02:36:54 more network links where at least one of the network links
02:36:58 is to a Local Area Network that is remote from the
02:37:07 transmission source.
02:37:09 So let me explain, and that will go to confirm
02:37:17 that, in fact, that's what Verizon Voice over Wi-Fi service
02:37:21 performs.
02:37:22 So what does Claim 1[a] require? It requires the
02:37:26 system, in this case the Verizon system, the Verizon

02:37:32 network, to transmit the data across the flow from the source of the destination over a first path and a path is -- is clear -- is made of one or several links.

What is a link? A link is a connection between two nodes. So you go from one router over a link to another router, over a link to another router, over a link to another router, over a link to another router, or you go from the phone over Wi-Fi link to the Internet. And then, of course, the Internet -- the Internet has many routers, router to router to router, that's link.

Or you go over an empty access link and then you go inside the network over multiple links. And that's what it says. So the data is transmitted from the source to a destination, but the first path, that consists of one or multiple links obviously.

Q. Professor, what evidence did you look at to determine whether this element was satisfied?

A. So I looked at the Verizon documents to see that, in fact, that's what they are performing. And we can go back to a document that I already described to you. And what you see here that when you have either an LTE path, LTE network path or the upper one or a Wi-Fi network path, this is the LTE network path or the Wi-Fi network path, then you have transmissions over multiple links.

When you use the LTE path, you have transmission

02:39:29 over multiple links. When you have Wi-Fi path -- and you can see definitely right here that there is a Wireless Local Area Network. A Local Area Network exists. As you know from your home, you want to access the Internet, you go over Wi-Fi network. The Wi-Fi network provides you a router which accesses the Internet. To access the Internet, you need a router. A router talks the language of the Internet, talks IP. So it can send your messages in the form of packets to the Internet.

So this Local Area Network provides connection to a Wide Area Network. This Wide Area Network -- the Internet is a Wide Area Network. Verizon is a Wide Area Network. It's not a Local Area Network. It's -- it doesn't reside in your home or in the office or inside Starbucks. So obviously, you've got a Local Area Network which is distant from the source.

Q. Professor, did you also perform some testing in the context of this case to determine whether infringement occurred?

A. Yes.

Q. And we've generally been calling that call trace testing. What does that refer to?

A. So we set up a test according to my specification, and I transmitted the messages, such as voice messages, from a telephone device in the office, eventually to a cell

02:41:21 phone -- to a Verizon cell phone. And I traced the packets
02:41:29 that were transported across this path. Traced, that means
02:41:36 I use what we call an analyzer, such as a Wireshark
02:41:44 analyzer. You already heard many people using Wireshark.
02:41:48 I used it, as well. And I looked at those packets, and I
02:41:51 learned what's happening as this communication takes place,
02:41:57 as my voice packets go from my phone to the cellular phone
02:42:04 and as packets from the cellular phone comes through the
02:42:08 Verizon network to my phone. I traced it.
02:42:16 Q. And how does that data come to you? You talked about
02:42:20 Wireshark. We heard Mr. Mavunkel talk about it. What does
02:42:22 the data look like?
02:42:23 A. Well, the data is in form of packets. It's packet and
02:42:28 packet and packet and packet running in one direction, in
02:42:32 the other direction. And if you look at the output of
02:42:38 Wireshark analyzer, which captures those packets as they
02:42:45 run around from source to the destination, this analyzer
02:42:49 tells you a lot about the packets. It tells you the
02:42:55 source, IP address, the destination IP address as it
02:43:01 relates to the entities that captures it.
02:43:08 Also, when you look at it carefully, you can see
02:43:10 the ultimate UE source. UE, by the way, you'll see it
02:43:13 later, is user equipment. It's the cell phone or the
02:43:15 telephone. And you can see on the side, if you dip into
02:43:20 it, it says, oh, this packet comes from this box to your

02:43:27 analyzer and goes through another box, but it comes from a wireless phone. It's generated by Verizon and so on and so forth.

So every line, every line in this output corresponds to information that represents the features of a single packet. Packet, packet, packet, packet come at certain time, and you look at it. If you go to the green line -- I was playing with it on my home -- you can freely download the app, the Wireshark app, and you click -- as you see the green line, you click SIP and double click, it will filter all the packets. You may see thousands of packets. It may filter then and show you just the SIP packet. And you can look at the SIP packet and see what exactly they are and what's inside these SIP packets, and that's what you see here.

Q. And so these are -- what we're seeing are packet by packet lines of information that the Wireshark analyzer captures?

A. Correct, yes.

Q. And PTX-202 that's on the screen is the output of that testing that you performed?

A. Yes, that's right. That's right.

MR. HEARD: Your Honor, may I approach with some physical exhibits?

THE COURT: Yes.

02:45:18 Q. (By Mr. Heard) Dr. Rubin, you're being handed a number of exhibits, PTX-201, and as you're sorting through them, can you just tell the jury what they are generally?
02:45:29 A. Yeah, absolutely. Since you have some old goodies here, we can put them together.
02:45:39 THE COURT: Could I get you to speak into the mic?
02:45:42 THE WITNESS: Oh, yes, that's right. That's right.
02:45:46 MR. HEARD: Maybe most importantly the --
02:45:49 THE WITNESS: Thank you, Your Honor. Oh, yeah, that's a good one.
02:45:58 Q. (By Mr. Heard) So Dr. Rubin, you don't have to arrange it all, but just generally what is PTX-201 that you've been handed?
02:46:05 A. Okay. I won't take too much time, but -- but basically, what's happening here --
02:46:09 Q. And make sure you speak into the microphone there.
02:46:17 A. I have to speak into the microphone.
02:46:21 Okay. You can see some elements of my test and that I asked the Aspen people to put for me together and you met the hardware guy, the testing guy, and he was very useful to putting everything together. Highly appreciate it. And thank you very much, Robin.
02:46:50 And what you see here in our testing in the office, we have a telephone device right here.

02:46:57 Q. And Professor, just -- you prepared on the slide, is this the illustration corresponding to the physical exhibits that you have sitting in front of you?
02:47:05 A. Exactly, too. So that is very useful.
02:47:12 So what you see here, you see on one hand we have the Aspen office phone. It's not a simple phone; it's a SIP phone. It talks SIP and IP, okay? Wonderful phone. And that goes through a PBX. This is the PBX, that box. And what we really use the PBX for is so that when you push hold on the phone, it sends a SIP message to the PBX.
02:47:46 And this PBX looks at all the SIP messages and regenerates them, it does a wonderful job. But it's searching to see if it's hold. And if it's hold, you know what it's doing, it plays music to the other side. Okay. That can be very nice or annoying, just depends. Now, that goes through the PBX. Now, that's connected to a router. So you see we have two routers. So it's connected to one of the router. And -- and then we use the router to access the Internet, as you heard before.
02:48:32 And over the Internet, we connect to another device, which you see right here. It's called a SIP trunk, which provides a nice service. It allows our communication to interface the Verizon network. So it interfaces the Verizon core network. And from the Verizon core network, the Verizon network obviously will look at the voice

02:49:03 messages it regenerated and will deliver them to the Verizon cell phone. And vice versa. Information from the Verizon cell phone will flow through the Verizon network and going through all of those boxes back to the Aspen phone.

The interesting thing here to note -- I may have some old goodies here, you see this one, this is a bridge, provides a connection between entities, which inside it we nested the Wireshark entity, the ones that captures the information. The Wireshark entity is this guy and it sits right here in our test. This is just for testing purposes. I wish I could put it inside the Verizon network, but they would never allow me to do that obviously. So I did what I can. I put it here.

Q. So just if you could briefly walk us through the making the call and what you did to end the call, just quickly through those steps.

A. Yes. So the test that was run was as follows, the Verizon cell phone connect -- was connected via wireless access to the Aspen phone. It goes through all of these entities, the wireless -- sorry, Verizon network and all the way, as I indicated before, to the office phone. And -- and then I switched the call. I switched the call by changing the Wi-Fi access path to an LTE access path. Of course, it's very easy to do that. If you want to go on

02:51:12 Wi-Fi and you don't want to go on LTE, you just set it just
02:51:19 one way to do that, many ways, just like you do it on a
02:51:24 plane, enter the plane mode. Then it doesn't transmit to a
02:51:28 tower and doesn't jam the pilot, and then you set -- you
02:51:34 turn on Wi-Fi and it goes through Wi-Fi.
02:51:37 And vice versa, I turn off Wi-Fi, I turn on LTE,
02:51:40 very easy to do, and then it goes through LTE. So that's
02:51:43 what I did, and I measured the SIP and RTP packets that
02:51:51 were going around back and forth, back and forth as I did a
02:51:54 variety of other things.
02:51:55 Q. And then did you terminate the call?
02:51:56 A. Eventually I terminated the call on the Verizon mobile
02:52:05 phone and while I was doing it interestingly enough, I was
02:52:10 continuously listening to the conversation going on between
02:52:14 the Verizon phone and the office phone. We were nicely
02:52:23 listening to each other before the switch, and as the
02:52:27 switch took place, the call continued. It did not drop.
02:52:32 And we were still listening to each other talking.
02:52:35 Everything worked perfectly well. And we also very closely
02:52:39 watched all the packets and the parameters to make sure
02:52:45 that all their requirement imposed by the asserted claim of
02:52:52 the '554 patent are actually being followed. Otherwise, it
02:52:57 would drop.
02:52:58 Q. And so, Professor, did the call trace testing support
02:53:01 your opinion with respect to this Claim Limitation 1[a]?

02:53:06 A. Yes, so it supported my opinion with respect to different element, but very easily, it supported with respect to 1[a] because obviously there is a transmission going on here between one link and another link and another link, multiple links, inside the Verizon network. I already showed you that.

And also there is a Local Area Network, the Wi-Fi Local Area Network which is remote from the source. It leads information to the Wide Area Network, to the Verizon network in this example through the Internet, which is a Wide Area Network. So everything that I told you before is confirmed, and as a result, I concluded that Verizon, Verizon's Voice over Wi-Fi service infringes Element 1[a].

Q. And then Claim Element 1[b], what does 1[b] require?

A. Element 1[b] states: Switching the transmission from the first network path to one of a plurality of alternative network paths.

Q. And what did you look at to confirm your opinion with respect to this limitation?

A. So as I already described to you, the switching is performed by the Verizon network. And you see the two paths are anchored, coincide, meet at a packet gateway which then, of course, interacts with a variety of other modules. So the switching is performed by the Verizon's Voice over Wi-Fi service.

02:55:01 Q. And how does JTX-3 that's on the next slide inform that opinion, as well?

02:55:06 A. If we look at this Verizon document, it states that calls may automatically hand over to Wi-Fi from 4G/LTE when a known Wi-Fi access point is available and cellular signal is too weak. So they tell you what it is all about. If the cellular signal is weak, it is possible for the call to automatically switch to Wi-Fi access, and this is supported by the Voice over Wi-Fi service provided by Verizon.

02:55:49 Q. Professor, what is depicted in this complicated diagram in PTX-86? Just at a very high level, what is -- what is this?

02:55:59 A. Okay. So at a high level, in looking at the process that takes place for switching, here is one diagram that shows you the process that takes place in a specific switch. In that case, it's from LTE path to Wi-Fi path.

02:56:28 Q. And what does this type of diagram or figure, what is it called?

02:56:31 A. This is often called a flow diagram because it shows you the flow of messaging that takes place from that module to that module to that module. So you see where it's going from one point to another point.

02:56:50 Now, we see here various things, but it will take too long to tell you about it. But if I go through the process here, you can see what I described to you before.

02:57:02 Q. What is the significance of a SIP Re-Register RAT change?
02:57:08 A. So that tells you that when you switch the paths, a Re-Register message has to be generated. It's just another SIP message. And this SIP message is there to inform the network that the network access technology, or in this case we call it the radio access technology, RAT, is changing from -- in this case changing to Wi-Fi. And that's what it tells the system.
02:57:42 Q. And then PTX-87 on the next slide, that's just another call flow example that you analyzed?
02:57:48 A. Yes, that's a similar call flow. There's some additional information here, but I basically wanted to tell you how the thing may start, it doesn't have to start that way, by producing a Re-Register message that informs the Verizon network, you know what, there is a switching from one access to another access, go ahead and arrange for it. Arrange for the end-to-end path so that I can talk to the destination, and the destination can respond -- respond to me. And that's the notification.
02:58:27 Q. And, Professor, did the call trace testing speak to this, as well?
02:58:33 A. Yes, absolutely. So we're talking about the switching elements -- element here, just to remind you what we are discussing. And in the call trace testing, I watched the

packets running back and forth, the SIP and RTP packets, from the cell phone to the office phone and from the office phone to the cell phone captured by the analyzer, which was positioned right there. And I looked at it, and I saw that there is -- there was a similar switching taking place as I switched access. Of course, as soon as I heard the conversation between the two entities going on, it didn't drop. The call did not drop. Yeah.

Q. And what about the lack of plurality of alternative networks? When switching from one to another path, how did you analyze that claim term?

A. Yes. So you heard that I am talking about switching from LTE access, that's accessing to the tower or accessing the tower. A base station uses a tower, to a Wi-Fi access. That means going through Wi-Fi access point.

Now, there are multiple base stations in general that could be used, and there are multiple access points that could be used.

MR. GAUDET: Objection.

THE COURT: What's the objection?

MR. GAUDET: Rule 26.

THE COURT: Are you saying it wasn't disclosed?

MR. GAUDET: Not disclosed. The second part was not disclosed.

MR. HEARD: I can point to Your Honor. Can we

approach?

THE COURT: Yeah, sure.

(Bench conference.)

MR. GAUDET: Your Honor, the objection is not to multiple -- sorry.

THE COURT: You have to speak --

MR. GAUDET: Thank you. Your Honor, the objection is not to the base stations. The objection is to the multiple Wi-Fi access points. That's the part that was not disclosed.

MR. HEARD: I don't agree with that. He relied on multiple base stations, and that's what he should be testifying to.

MR. GAUDET: I'm okay with that, but he went further and so --

THE COURT: You want to rephrase it?

MR. HEARD: I can. Thanks.

MR. GAUDET: Because he got the words out, I'm worried about those words being in the record. Can we --

THE COURT: Let's just rephrase the question.

MR. GAUDET: Okay. Thank you, Your Honor.

(Bench conference concluded.)

Q. (By Mr. Heard) So, Professor, to be clear, you're relying on the ability to connect to multiple base stations over the radio access network to satisfy this claim

03:01:56 limitation?
03:01:57 A. Yes.
03:01:57 Q. And back in the call tracing, you said when you switched, you -- basically you forced switched off the cellular and enabled Wi-Fi, did you see it switch with -- without issue?
03:02:08 A. Yes. It went ahead and switched.
03:02:12 Q. And so what is your opinion with respect to Claim Element 1[b] of Claim 1?
03:02:20 A. So it's actually obvious. So the Verizon network on their Voice over Wi-Fi service performed a switching element. It switches the transmission from one network path to another network path.
03:02:40 Q. And so, Professor, we get to a wordy one here, Claim Element 1[c]. Could you break down the three things that must be shown in this claim element?
03:02:53 A. Yes. So if you read Claim 1, it's a little bit long. So I am analyzing it by looking at three key points.
03:02:59 It states: Wherein said transmission is not disrupted as a result of said switch to the one of a plurality of alternative network paths.
03:03:13 So first thing before I continue, it's not disrupted. This is the invention. You heard -- in fact, that was the name even of the box for a while. The invention is No Drop. Okay? So it has to be done so that

03:03:29 the call is not dropped. The call is not dropped. That's
03:03:32 what that means.
03:03:35 Said transmission contains audio or video data.
03:03:41 Of course, we saw that that's advertised by
03:03:44 Verizon. It contains audio or video.
03:03:46 And at least one Network Address Translation is
03:03:54 performed on said transmission.
03:03:55 And that has to be done, as well, and I'm going to
03:03:59 discuss it very soon. I have some slides, I think, to
03:04:03 explain to you a little bit better.
03:04:05 Q. And so what does PTX-81 on the next slide tell us about
03:04:09 practice of this claim limitation?
03:04:11 A. So what it states -- part of within Verizon document
03:04:19 states: When a customer uses Advanced Calling on our
03:04:25 4G/LTE network and travels outside of coverage, the call
03:04:31 will seamlessly transfer to a known Wi-Fi hotspot when
03:04:37 available.
03:04:39 So we discussed that several times.
03:04:41 Q. And then how does JTX-3 that's on the screen now, is it
03:04:46 somewhat similar?
03:04:47 A. It says pretty much the same thing, that calls may
03:04:54 automatically hand over to Wi-Fi from 4G/LTE.
03:04:57 Q. And then the call trace testing, as you described when
03:05:01 you forced the switch over, it didn't drop the call, right?
03:05:04 A. That's precisely what I just described to you. It

03:05:08 didn't drop the call when I switched.
03:05:10 Q. And then we heard testimony via deposition a few
03:05:14 moments before you took the stand from Mr. Faber. Did you
03:05:18 rely on his testimony for practice of this claim element?
03:05:22 A. Yes, and as you just heard Mr. Faber telling us that it
03:05:31 is the expectations that the call will not drop when you
03:05:34 switch.
03:05:35 Q. And then, Professor, one other document, PTX-98. What
03:05:42 does this one tell us about -- that that next piece of the
03:05:45 claim element on whether the transmission contains audio or
03:05:49 video data?
03:05:50 A. So it says: Verizon's Voice over Wi-Fi service allows
03:05:59 the user to make and receive voice and video calls -- so
03:06:04 they do accommodate voice and video calls -- over Wi-Fi
03:06:11 from the Voice over LTE service device, cellular phone,
03:06:16 Verizon cellular phone, when cellular network is not
03:06:19 available.
03:06:21 Q. And then did Mr. Faber's testimony confirm your view on
03:06:25 this claim term?
03:06:26 A. Yes. So he completely confirmed it. He says: Your
03:06:31 audio or video -- or audio and video packets in this
03:06:35 situation are being accommodated.
03:06:39 Q. And how about the testimony from Mr. Patel. Did that
03:06:44 inform your opinion on this claim term?
03:06:46 A. Yes. And Mr. Patel confirmed that, in fact, in

03:06:54 transmitting voice and video RTP protocol is used by this
03:07:01 service. So obviously there is a transmission of voice and
03:07:02 video, and even more it says RTP protocol is used for that
03:07:06 purpose.
03:07:06 Q. Now, there's still this requirement for Network Address
03:07:10 Translation. We've heard quite a bit about it. But just
03:07:13 very briefly, what is NAT?
03:07:14 A. So this red highlighted sub-element within this element
03:07:24 required NAT, Network Address Translation, to be performed.
03:07:30 So what NAT is, is the following. To route information
03:07:37 across the Internet, you need to use IP addresses that are
03:07:46 understood by routers on the Internet. These are called
03:07:55 Global IP addresses, okay? Global IP addresses.
03:07:59 We have regulations set forth by the Internet
03:08:10 Engineering Task Force as to what should be the format of
03:08:13 global addresses. A router is not required to understand
03:08:18 you if you don't use a global address.
03:08:22 On top of that, we define another set of
03:08:28 addresses, a set of private addresses, okay? Private IP
03:08:31 addresses. Private IP addresses are used just for
03:08:36 communication within your home or office because these
03:08:42 addresses, IP addresses are not going to be understood by
03:08:45 routers on the Internet or somewhere else.
03:08:51 Now, the problem has been for a long time, and
03:08:57 still is, that the number of global addresses using IP

03:09:03 Version 4 standard -- two version, IPv4, IPv6. What do I
03:09:09 mean just two versions. IP version 4 is a short address.
03:09:14 IP version 6 is four times longer. Okay? Now, you got the
03:09:21 secret.
03:09:22 So if you use IP version 4 address it's limited,
03:09:26 the number of addresses. How many addresses can you make?
03:09:27 At the beginning when we started it, myself, my friends and
03:09:31 other colleagues, nobody was interested in the Internet,
03:09:35 and there were not that many people communicating.
03:09:39 Suddenly, people found out that's pretty good, we
03:09:42 can start using it. And then millions of millions of
03:09:46 people and entities use the Internet, and we are running
03:09:51 out of addresses. So we said, look, private IP addresses,
03:09:55 you can reuse in different organizations. They don't go on
03:09:59 the Internet, I don't care. You can use the same private
03:10:02 IP address that another office uses.
03:10:04 Now, if you are an entity in the office and you
03:10:10 generate a message, a voice, a video message, you packetize
03:10:16 it. Now, it's in form of packets. And you put a -- you
03:10:22 have a private IP address that you got from the router at
03:10:25 your home. How do you get your IP address? We developed
03:10:30 long time ago, I was on the team, we developed a program,
03:10:35 an app called DHCP, okay, host configuration protocol, that
03:10:42 provides you IP addresses. And that resides from having
03:10:49 your router at home. So that's how you get an address.

03:10:52 But it will give you a private address. So you transmit a message, a voice message. It wants to go globally over the Internet to get to Verizon and go somewhere else, the router says that's impossible for me to transmit it outside your private domain. It's called domain.

So what the router will do, it will perform Network Address Translation. That's NAT. It will translate your private address to a public address, okay? It will remember -- a router is like a computer. It will remember the translation. And what I'm describing here, it's a S-NET. It's a source net.

Your source address is private. It will convert it to a public one. Why? So the destination when it talks to you back talks to obviously for the information to go on the Internet back, it has to use your global source address. Then it comes to your home router, office router, business router, and that says ah, okay, this global address is what I assigned to this private address, and within your Wi-Fi network we'll send this message to your device by using the private address, okay?

Q. So Professor --

A. So a translation here.

Q. I'm glad I asked for the brief answer. I don't want to know what the long answer is.

A. Okay. Never mind.

03:12:43 Q. PTX-94 that you've put on the next slide, how did this speak to whether Verizon is performing Network Address Translation?

03:12:50 A. Yes. Verizon definitely do that, and not at least on the IPsec counters that I mentioned to you before. At any rate, the routers, when they provide this NAT, are very impatient. These guys are very impatient. Seconds is a long time. So if you are not communicating for a brief period of time, for a certain period of time, like 20 seconds, they will delete this NATing. So when you get a little bit later a message coming back to you, the router says, I don't know, I deleted all the information. I don't know who you are talking to.

03:13:41 So we provided the solution. And the solution is to send -- send a NAT keep-alive messages. And Verizon requires you to do that on the IPsec tunnel, and elsewhere whenever necessary -- tells you there is NAT being performed.

03:14:04 Q. And then does the testimony from Mr. Patel speak to this NAT being performed, as well?

03:14:10 A. Of course. This -- he confirmed that NAT is an industry standard. There is no other way to do it, by the way. If you have a device at home, you have to do -- the router has to do this NATing. If you got from the device an IP Version 4 address, which is private and it has to

03:14:36 translate it to a global one, and he confirmed it.
03:14:40 Q. And then Mr. Faber spoke about PTX-127 here, a 2018
03:14:45 vintage email and document, and was -- what was he
03:14:48 discussing about NAT and the statistics that Verizon
03:14:51 tracks?
03:14:52 A. Yes. And Mr. Faber confirms that in his performance
03:14:57 measurements on the Verizon network, he collects NAT
03:15:02 performance statistics.
03:15:05 Q. And then is that what's shown here on Slide 165, the
03:15:11 NAT description and the NAT flows that were tracked at the
03:15:15 Verizon level?
03:15:15 A. Yes. So we see directly -- just like what Mr. Faber
03:15:21 told us, that they track the statistics.
03:15:24 Q. And so, Professor, is Claim Element 1[c] practiced in
03:15:28 the Verizon service?
03:15:29 A. Yes. So we analyzed it in detail, and Verizon performs
03:15:37 1[c] in complete.
03:15:39 Q. And I think we can make quick work, hopefully, of 1[d],
03:15:43 but this is where we've heard many times now RTP and SIP.
03:15:48 So do services provided by Verizon employ the use of RTP
03:15:53 and SIP?
03:15:54 A. Yes. So we've already seen it in many documents.
03:15:57 Verizon uses SIP for signaling and RTP for transmitting
03:16:03 voice and/or video messages.
03:16:07 Q. And PTX-91 is one example that you provided the jury.

03:16:10 How does this one inform your opinion on SIP and RTP?
03:16:14 A. So if you look at this Verizon document, it defines 03:16:22 some interfaces and tells you explicitly we use SIP and 03:16:27 RTP. It says explicitly SIP and RTP. This interface has 03:16:32 to be -- tells you that it's for SIP and RTP support. So 03:16:36 Verizon uses SIP and RTP.
03:16:39 Q. And then did you see this in the call trace testing, as 03:16:43 well?
03:16:43 A. Of course. I showed you, I think, earlier that when I 03:16:47 captured the calls that are going from the Verizon cell 03:16:51 phone through the Verizon networks, through our system, and 03:16:57 vice versa, I saw that the signaling messages use SIP and 03:17:00 the media messages use RTP. It says it explicitly. And 03:17:05 you can see right here packet by packet description, and 03:17:11 you can see that the media messages use RTP. It says RTP 03:17:15 if you look at it carefully here.
03:17:17 Q. And then did Mr. Patel confirm that RTP is used in 03:17:21 transmission of the packets on Verizon's network?
03:17:23 A. Yes, Mr. Patel confirmed what is well known, that it's 03:17:28 used in the industry, as you say. It's an industry 03:17:31 standard. RTP is used in the transmission of media voice 03:17:37 or video packets.
03:17:38 Q. And so is Claim Element 1[d] practiced in the Verizon 03:17:41 service?
03:17:42 A. Yes. We just analyzed it, and Verizon uses RTP and

03:17:47 SIP. So it is performed by the -- Verizon's Voice over Wi-Fi service.
03:17:53 Q. And then the last element of this claim, 1[e], is the SIP signaling sequence, which we've heard a lot about already, but tell us how you know this -- this element is performed by Verizon's Voice over Wi-Fi service.
03:18:08 A. So the statement here is that the SIP signaling sequence of the transmission is maintained after said switching from the first network path to the one of plurality of alternative network paths.
03:18:31 Now, there is a Court construction here that tells you: Maintaining here means maintaining continuity in the signaling sequence of the SIP used in the transmission.
03:18:49 Q. And how did you confirm whether that was done in Verizon's service?
03:18:52 A. So I followed the whole process.
03:18:58 Now, I will tell you that to maintain after the switching, you basically have to follow the rules, the protocol. If the protocol tells you -- the protocol should be done like our sequencing of messages should be done -- if there is no switching.
03:19:20 Now there is switching. The protocol doesn't tell you what to do. The invention says you know what, maintain it. Follow the rules of the protocol after the switching. Even though the protocol doesn't require it, we found out

03:19:35 that if you do that, the call will not drop.
03:19:41 So we followed the documents we obtained by
03:19:44 Verizon, and we see this is a scenario -- the other
03:19:48 scenarios that I described to you -- that the UE sends a
03:19:54 SIP Re-Registration. Once it's successfully identified, it
03:20:00 exchange access network to indicate a radio access
03:20:05 technology change. And this indication will go to the
03:20:13 P-CSCF. It's a call session control function. And you
03:20:15 don't have to memorize all of that. That's the proxy of
03:20:20 it. I know it extremely well.
03:20:22 And basically what's happening here is the
03:20:24 following. Whenever you change something, you have to
03:20:30 re-register, like you want to take another course, you have
03:20:33 to register. Go to our registrar at UCLA and register.
03:20:39 Same thing with this network. You are going to change
03:20:42 something, maybe I let you do it, maybe I won't let you do
03:20:46 it, but tell me. First tell me.
03:20:48 So there is a registration here. So you want to
03:20:50 switch. There is a registration, and you can do it in a
03:20:53 variety of ways. Here is one way. So you send a SIP
03:20:57 message. This is a SIP. This is still SIP, which is
03:21:02 called registration. I registered before. So sometimes we
03:21:06 call it Re-Registration, but the protocol doesn't care.
03:21:09 It's a registration. So it's a SIP registration. And you
03:21:13 tell the network, you know, I changed access, and that all

03:21:20 goes to the packet gateway. You already send that, and the packet gateway says, that's very valuable information. I need to know that. That will make a big difference in my operation.

Who is responsible for that? I told you, IMS. IMS is working on the signaling. It's a fancy guy and originally developed by a large organization. But just functionally. But there is an implementation by Verizon, and it does the way it tells you right here, okay? So that's the first step in what's happening in this scenario -- one scenario.

Q. Did the call trace testing inform your opinion on the SIP maintenance?

A. Then I said, okay, this is a scenario. That's fine. And I already discussed video, the architecture. Let's go and run a test and see if, in fact, there is maintenance of the SIP sequence. SIP messages have numbers associated with them.

So if you have SIP messages that are part of a certain dialog, it's called dialog, and the numbers should kind of follow in a non-decreasing fashion, like if the previous one was a hundred, the next one cannot be 20. The next one has to be higher than a hundred. So there is a rule that you have to follow.

The SIP servers, when they get your messages, they

03:23:08 look at these numbers. This is the sequencing. And they
03:23:12 say this is the wrong number. That's not what the rule
03:23:16 should be. So they take your SIP message and drop it.
03:23:20 They say I cannot accept it. That's somebody that has
03:23:24 invaded my system or something wrong is going somewhere
03:23:28 else, which happens.
03:23:29 So it's very important that you maintain it also
03:23:37 after switching. That's what it says. Maintain it after
03:23:40 switching. The same rules for the numberings that existed
03:23:44 before switching maintain it after switching. That's what
03:23:48 it says.
03:23:49 Q. So, Professor, how did the call trace test show that?
03:23:52 A. So I looked very carefully --
03:23:57 THE COURT: Mr. Heard, would this be a good
03:23:59 stopping place for our afternoon break?
03:24:01 MR. HEARD: Absolutely.
03:24:03 THE COURT: Okay. We've been going about two
03:24:05 hours this afternoon, ladies and gentlemen of the jury.
03:24:07 We're going to take our afternoon break at this time.
03:24:09 We'll be in recess about 15 minutes.
03:24:11 COURT SECURITY OFFICER: All rise.
03:24:13 (Jury out.)
03:24:13 THE COURT: You can step down.
03:24:41 THE WITNESS: Thank you, Your Honor.
03:39:28 (Recess.)

03:39:29 COURT SECURITY OFFICER: All rise.
03:39:31 THE COURT: All right. Are we ready to have the jury brought up?
03:39:37 MR. HEARD: Our witness is coming up, yes, Your Honor.
03:39:39 THE COURT: Okay. Let's have the jury brought up, Mr. Savage.
03:40:18 COURT SECURITY OFFICER: All rise for the jury.
03:40:20 (Jury in.)
03:40:21 THE COURT: Please be seated.
03:40:42 All right. Mr. Heard, you may continue.
03:40:47 MR. HEARD: Thank you, Your Honor.
03:40:49 Q. (By Mr. Heard) And, Professor, we are getting late in the afternoon. Let's be respectful of everyone's time. Try to get through these last few ones quickly. But could you just take us through the call trace test and how those packets show us that Claim Element 1[e] is practiced in your view?
03:41:07 A. Yes. So in the test, Verizon's cell phone was connected initially via wireless, and to form the connection, you see the red line INVITE message, that's a SIP message, is sent to the other side to indicate that I like to start a call connection. It has a Cseq number 1.
03:41:52 The other side responded, and eventually it was set up between the cell phone and the office phone. And

03:42:02 then you see another INVITE here in red frame, and that is
03:42:07 when the office phone set up a reverse direction or a
03:42:13 connection, a call in the reverse direction and allocate to
03:42:20 it a certain Cseq number 29357.
03:42:26 We actually -- that's typically what we do, we
03:42:29 make the Cseq numbers very different from each other so
03:42:32 they won't collide, so there won't be any ambiguity in the
03:42:36 numbers.
03:42:37 So an INVITE message went to the other side and
03:42:42 now a connection was also set for transmission of voice and
03:42:49 video information from the office phone to the cell phone,
03:42:53 and that's what you see right here, and this has been
03:42:57 captured and recorded. Basically captured by Wireshark,
03:43:08 and then we did a number of things. We pushed the hold
03:43:12 button on the office phone. So the office phone, we put it
03:43:16 on hold, and that changed -- sent another INVITE message to
03:43:23 the other side telling the other side I'm putting myself on
03:43:28 hold.
03:43:29 And we looked at the SIP message -- INVITE SIP
03:43:44 message here which is part of this original dialog, and it
03:43:48 had the same Call-ID, which identifies the dialog. And it
03:43:53 had a Cseq number, a sequence number which is one higher,
03:43:58 as it's supposed to be. And we also looked at the RTP
03:44:04 frame messages, and we actually noted that in response to
03:44:09 the hold SIP message, the PBX I have generated music. So

03:44:16 we captured music RTP messages.
03:44:20 Q. So then, Professor, what happens just after that?
03:44:23 A. Okay. Then we took it off hold, and there was another SIP -- another -- sorry -- SIP INVITE message generated, and we did it several times. And after doing it several times and noting that the Cseq number increased consecutively properly, the way that it was supposed to be, the Cseq number of the SIP generated by the office phone, we switched the connection. And then after switching the connection, we still -- we're still listening to the conversation going on uninterrupted. The call did not drop. The Call-ID is the same. Everything stayed the same.
03:45:13 And then we again put it on hold and off hold, on hold and off hold several times, and we observed the Cseq numbers. You can see them there. And they increase 29361, 29362, 29363. There were beautifully maintained, as the inventors told us. And then if we keep going, we terminated the call from the Verizon cell phone.
03:45:48 So when you terminate the call, the SIP message on the Verizon cell phone through the Verizon network and through the office and through the monitor came to the destination, which is the office -- office phone. And what does this message tell? We captured it. The message tells you, look here, 2 BYE. What does it mean 2 BYE? It's a

03:46:19 BYE message means call is terminated. And 2 means -- you remember the previous message was INVITE, and it had a Cseq No. 1? Unbelievable, this is Cseq No. 2. It's maintaining the sequencing.

So we confirmed the maintenance element of the claim.

Q. And so in your view, Professor, was Claim Element 1[e] shown to be practiced by the Verizon VoWiFi service?

A. Definitely.

Q. And Mr. Faber's testimony confirmed this to you, as well?

A. Yes. So if you read there, it confirmed the flow that I started showing you, that, in fact, when you make a change, a Re-Register message is performed by Verizon. Remember -- remember, when you start a dialog, you always have an INVITE message. And then you can make changes with update messages and so on.

But if you switch the technology and nothing else changes, a SIP message called Re-Register is sufficient. And he said, yeah, that's what we do. We don't need anything else. Perfectly what explains a hundred percent my measurement what he says.

Q. So just to summarize, what's your opinion with respect to all of the claim elements of 1 -- Claim 1 of the '554 patent?

03:47:56 A. So 1[e] is also met, so all the claim elements of the -- all the claim elements of Claim 1 of the '554 patent are being performed by the Verizon Voice over Wi-Fi service.
03:48:14 Q. Thank you, Professor.
03:48:15 And these next ones thankfully can be a little quicker. Claim 15, it is an independent claim, right? So tell us about the elements. What's new that needs to be shown here?
03:48:28 A. So we note here in red two new things. So Claim 15, in addition to what we -- I described to you before, states in 15[c]: And at least one Port Address Translation is performed on said transmission.
03:48:48 So when we send an IP packet, we wrap it in another packet called UDP, stands for User Datagram Protocols. And that has an identifier which is called a port. You've seen it on your computer, but that's exactly what it is, it's a port. It identifies typically the application.
03:49:14 And this claim tells you that at least one PAT, Port Address Translation, needs to be performed. And 15[e] tells you that the transmission contains data used in control of audio or video transmission.
03:49:34 Q. And in your view, Professor, is a Port Address Translation performed in the operation of the Verizon

03:49:41 service?
03:49:41 A. Yes, definitely. Port Address Translation is performed by Verizon in a number of ways. One way, it is done together with NATing. Remember that they do NAT. There is a translation of the network address at the same time there is also a translation of the port address as provided by the device -- the user device to another port address. So that's almost universally. That's actually universally done. So there is definitely that Port Address Translation.
03:50:28 Now, there is another Port Address Translation, and that relates to operation over the IPsec tunnel. There, you need to indicate a specific port number in order for this message to pass through firewalls and other constraints that are put by some routers. And as you see in a Verizon document, it states: For Wi-Fi networks that block VPN traffic, they will need to ensure ports 500 and 4500 are open devices to connect to our -- across the IPsec tunnel.
03:51:23 So in order for the messages to go using Wi-Fi access to Verizon, you have to use these ports. So there is this port translation, as well.
03:51:34 Q. And how about the claim limitation about control data being used in the transport of audio and video?
03:51:42 A. Yes. So that's also done together with -- that's

03:51:49 universally done. Together with Real Time Protocol, we have also Real Time Control Protocol that's done jointly. The Real Time Control Protocol allows the receiver to send some control message to the sender to tell him about the performance of this connection. As we see then --
Q. I was going to ask for PTX-78 that we see on our screen, what does this show us about that control protocol?
A. So Verizon tells us in its own documents that RTCP flows -- we have flow status enabled to allow RTCP flows, so they are controlled -- the TCP packets that are allowed to flow in the Verizon network.
Q. And so --
A. Also, it shows in the next highlight that both RTP and RTCP are accommodated.
Q. And so, Professor, what's your opinion with respect to whether Claim 15 -- Independent Claim 15 of the '554 patent is performed by the Verizon -- the Wi-Fi service?
A. So it is performed by this service. As we noted, these two additional elements are performed. So all the elements of the claim are performed.
Q. And then you mentioned just a few dependent claims. You talked about Claim 6 and Claim 20 -- or, excuse me, Claims 2 and Claims 16. Can you tell us, what do those add?
A. So Claim 2 and 16 tells us that the dependent claim,

03:53:33 wherein the switch from the first network path to one of a
03:53:36 plurality of alternative network paths occurs as a result
03:53:41 of a stream quality event.
03:53:42 Q. And what did you -- did you apply a Court claim
03:53:50 construction in looking at this claim term?
03:53:51 A. So the Court construction states that the stream
03:53:56 quality event -- RTP stream quality drops below or exceeds
03:54:03 configured quality thresholds.
03:54:06 Q. And what did you see in the Verizon documentation and
03:54:09 other material you reviewed to form your opinion on these
03:54:15 dependent claims?
03:54:15 A. So I looked at Verizon document, and they tell us that
03:54:22 the calls may automatically switch from one network path to
03:54:26 another network path. And that's based on call quality
03:54:32 events, as they say. One path may have a stronger signal
03:54:36 and another path may be weaker, so that's an indication
03:54:40 that you should switch.
03:54:42 Q. And then what is in PTX-90 that we're looking at on the
03:54:46 screen, this Verizon presentation?
03:54:49 A. So this measurement done by Verizon, and they tell you
03:54:55 here are good power threshold levels that could be used to
03:55:02 determine whether the reception of a signal is good or --
03:55:10 or acceptable or poor, as you see here, as far as it
03:55:14 relates to transmissions from the cell phone. And also
03:55:19 there are power thresholds here that are shown in relation

03:55:23 to Wi-Fi transmission and indicating if it is below that level, that's a poor Wi-Fi transmission. If it is above that level, that's a good Wi-Fi transmission. So they have experimented with even specified various thresholds that could be used in order to trigger transmission of the network paths.

03:55:45 Q. And did you rely upon some testimony from Mr. Patel about these thresholds?

03:55:49 A. Yes, of course. And Mr. Patel confirmed what I just described to you, that you make some power measurements, and you use them as a basis for triggering the transition. And he mentioned RSRP, which is a power measurement or signal transmitted -- transmitted from the base station and your iPhone and other cellular phone, including Verizon's cellular phone, measured -- you can measure other -- or calculate it actually other, I understand he says, other measure of such is a signal to those and others and he confirmed it. Yeah, you can do this measurement, and that will serve as the thresholds that we discussed that induce this transition.

03:56:45 Q. And so what's -- what is your opinion as to whether Verizon infringes Dependent Claims 2 and 16?

03:56:52 A. So that shows that they do infringe 2 and 16.

03:56:56 Q. And then the last two that you point out, we can treat together, Claim 6 and Claim 20. So can you tell the jury

03:57:04 what this requires?
03:57:04 A. So this requires that the source device be a mobile
03:57:09 device in most cases. Now, we know there are mobile
03:57:12 device -- we've already seen in all of those figures that
03:57:14 they use cell phones obviously. So that's it. There is a
03:57:20 mobile device there, and the source can be a mobile device.
03:57:22 Q. So this is throughout the documentation that you
03:57:25 reviewed, right?
03:57:25 A. We've already seen that, and we see a device used for
03:57:32 Verizon Voice over Wi-Fi which serves as a source device, V
03:57:39 over Wi-Fi smart phone and obviously it's a mobile device.
03:57:43 Q. And Mr. Faber confirmed that a source device is a
03:57:45 mobile device when placing a call from their network?
03:57:47 A. Yes, it says in a mobile-originated call, if you start
03:57:52 the call from your mobile device, you are using a mobile
03:57:55 device. That's a source.
03:57:56 Q. So what's -- is your opinion with respect to whether
03:57:59 Verizon infringes Claim 6 and Claim 20?
03:58:02 A. So they do. They infringe this claim.
03:58:05 Q. And, Professor Rubin, as part of your analysis, did you
03:58:10 also review a number of third-party agreements and patents
03:58:16 that were licensed and under those agreements?
03:58:17 A. I did.
03:58:18 Q. And after your review of those agreements and patents,
03:58:23 were you made aware of any patents that were technically

03:58:25 comparable to the '554 patent?
03:58:27 A. No, I was not.
03:58:30 Q. And then as part of your analysis, did you also review
03:58:33 information regarding alternative ways to do the same
03:58:37 thing, to basically what we call non-infringing
03:58:40 alternatives to the '554 patent?
03:58:42 A. I reviewed some alternatives that were presented --
03:58:47 Q. And --
03:58:48 A. -- by Verizon.
03:58:51 Q. And did you -- were you made aware of any that were
03:58:54 technically acceptable alternative methods in your view?
03:58:56 A. I was not aware. I didn't find any.
03:58:58 Q. And then Professor, in your opinion, are there
03:59:03 technical -- technically comparable licenses or so-called
03:59:06 non-infringing alternatives to the '554 patent?
03:59:07 A. I reviewed whatever information I was given, and my
03:59:15 answer is I didn't find them to be technically comparable.
03:59:17 Q. And so just to summarize for the jury, what is your
03:59:20 opinion with respect to the Asserted Claims 1, 15, and then
03:59:24 the Dependent 2, 6, 6, (sic) and 16 in this case?
03:59:30 A. So based on my analysis, as I presented to you my
03:59:33 conclusion is that they are all infringed by the Verizon
03:59:38 Voice over Wi-Fi service.
03:59:41 MR. HEARD: Thank you, Professor.
03:59:47 THE COURT: Thank you, Mr. Heard.

03:59:49 Cross-examination?

03:59:49 MR. GAUDET: Yes, Your Honor. May we bring up some witness binders?

03:59:52 THE COURT: Of course.

03:59:53 MR. GAUDET: Thank you. May I proceed, Your Honor?

04:00:43 THE COURT: Whenever you're ready.

04:00:44 MR. GAUDET: Thank you.

04:00:45 CROSS-EXAMINATION

04:00:46 BY MR. GAUDET:

04:00:46 Q. Good afternoon, Dr. Rubin.

04:00:48 A. Good afternoon.

04:00:48 Q. My name is Matt Gaudet. I don't think we've met before, but it's nice to see you here. I'm going to ask you some questions about the testimony you just gave, you understand that?

04:00:59 A. Of course.

04:01:00 Q. Now, is it fair to say that over the last 25 years or more, you've done what you're doing now on a number of occasions, that is, either hired by the Plaintiff's side of a patent case or the Defendant's side of a patent case and come to court and sort of present, you know, that side of the story; is that fair?

04:01:25 A. Yeah, I have done it several times.

04:01:27 Q. Okay. And when you do that, you're always paid by the

04:01:31 hour to do that, correct?
04:01:31 A. Yeah.
04:01:31 Q. Okay. And you sort of know the drill; is that fair?
04:01:37 A. Well, I don't know. I know the general basis, but it does vary from case to case.
04:01:44 Q. I'm going to go out on a limb here, and you tell me if I'm wrong, but I'm going to bet that there's never been a time when you were cross-examined -- let's say that you said that a patent was infringed, and somebody like me came up to the podium and during the course of the cross-examination, you finally said, you got me, all right, you don't infringe? That's probably never happened; is that fair?
04:02:04 A. Yeah, I think it probably is fair.
04:02:06 Q. Okay. And so you understand what I'm going to try to do is see if we can reach agreement on some basic points, and then Verizon is going to have our own expert witness that's going to take the stand and will fully present Verizon's side of the story? You understand that, right?
04:02:24 A. Yes.
04:02:26 Q. Okay. Now, I was listening to your credentials, your background, and that was pretty awesome. I mean it sort of sounds like you kind of know everything there is to know almost about major developments in the industry. I mean, it's, I guess, whether you agree with that characterization

04:02:45 or not, you agree with me it's an impressive background?
04:02:49 A. Thank you. Thank you very much. Appreciate it.
04:02:51 Q. Absolutely.
04:02:52 And you would be aware of really big developments
04:03:00 in your industry, right?
04:03:01 A. Depends.
04:03:04 Q. Yeah --
04:03:04 A. If it's not in my area or even in my area, I don't know
04:03:09 everything.
04:03:09 Q. That's fair. But certainly the subject matter of this
04:03:11 case, that's in your area, right?
04:03:13 A. The subject matter is, but not everything.
04:03:18 Q. Yeah. Because the first time you ever, ever heard of
04:03:24 the '554 patent was when you were asked by Aspen to be
04:03:27 their expert in this case in 2023, correct?
04:03:31 A. Yes.
04:03:32 Q. Okay. That was also the first time you ever heard of
04:03:37 Aspen, right?
04:03:39 A. Yes, I think so.
04:03:41 Q. And first time you ever heard of Mr. Chin, 2023, when
04:03:45 you were hired by his lawyer -- or rather Aspen's lawyers
04:03:48 to come here and testify, correct?
04:03:53 A. First time I heard about Mr. Chin?
04:03:55 Q. Mr. Chin.
04:03:56 A. Yes.

04:03:57 Q. That he was -- that he existed?
04:03:59 A. Yes.
04:03:59 Q. And it's the same answer with respect to Mr. Mavunkel, right?
04:04:04 A. Yes.
04:04:04 Q. And it's the same answer with respect to Mr. Bhaskaran, correct?
04:04:07 A. Yes.
04:04:07 Q. Okay. Last kind of preliminary point I want to do, and then we'll start talking about a little more of the substance, is we went through the process where we had your backgrounds -- we heard your background. There was a what's called a tender for you as an expert, I didn't object, and you're certified as a testifying expert. That's a fair kind of recap of the beginning of your testimony?
04:04:34 A. Okay. Yes.
04:04:36 Q. Okay. And the reason we do that is experts sort of get almost a special set of rules that experts can testify based on things that they don't have first-hand knowledge of, sort of hearsay, if you will. It's kind of a special rule. But to do that, you have to give us an expert report where we sort of see everything you're going to say. So that's kind of the special process if you're going to be a testifying expert. Does that, again, generally sound fair?

04:05:04 A. I am not sure I understand what you're saying. I do
04:05:08 have to produce an expert report. I agree with that.
04:05:10 Q. Okay. And, for example, you can then testify --
04:05:13 remember at one point Mr. Dacus made a hearsay objection
04:05:16 earlier today. I didn't make any hearsay objections
04:05:19 because experts are allowed to testify about things that
04:05:24 they don't have first-hand knowledge of. Is that fair?
04:05:27 A. I'm not aware of that, but...
04:05:30 Q. Okay. The reason I'm making this distinction is
04:05:34 Mr. Faber there, you will agree, has extraordinary
04:05:37 expertise in this subject matter, right?
04:05:40 A. I would expect so. I don't know him personally,
04:05:44 obviously.
04:05:45 Q. But he will testify as a fact witness because he's just
04:05:49 going to stand up and say what he knows based on first-hand
04:05:53 information. Does that sound right?
04:05:56 A. That's okay. If you select him to testify, I have no
04:05:59 objection.
04:06:00 Q. Okay. And so when it comes to Verizon's Voice over
04:06:07 Wi-Fi product, even though you're formally designated as an
04:06:11 expert, surely you'll agree with me that Mr. Faber has
04:06:15 spent a lot more time working with, studying the Verizon
04:06:21 Voice over Wi-Fi service. Do you agree with that?
04:06:23 A. Yeah.
04:06:25 Q. Okay. Terrific.

04:06:26 All right. I want to talk a little bit about sort of the background knowledge that you bring to this. So to understand a patent, you have to sort of understand what was already out there, what was already known in the prior art. Do you agree with me?

04:06:40 A. Yes.

04:06:40 Q. And that funny phrase, prior art, it just means the stuff people already knew, right?

04:06:45 A. Correct, yes.

04:06:46 Q. Okay. And so you had a background section in your report that went into the background of the technology, right?

04:06:51 A. Yes.

04:06:53 Q. Okay. Aspen filed its patent in 2008, correct?

04:06:59 A. Yes.

04:07:01 Q. I'm going to ask Mr. Duval to put up an imagine that I think you've seen because Mr. Dacus used it. It's DD6.2. It's just a basic demonstrative of SIP and RTP.

04:07:19 Okay. So do you -- you see that demonstrative?

04:07:22 A. Yes.

04:07:24 Q. Okay. And, again, the idea here is SIP messages are -- that's sort of like -- and our analogy here is like the traffic cops. You know, there's -- there are some of them, but then the RTP stream, that's the traffic. That's the actual voice. Is that generally fair?

04:07:44 A. SIP messages are signaling messages. It's not in telecommunication what is signaling. This has been around for a long time. And RTP messages are used for the proper reception of voice and video streams.
04:08:01 Q. Terrific.
04:08:02 And so what we'll do is now pull up VDTX-31. That's the original SIP standard. We'll just have that up, as well.
04:08:18 And Mr. Dacus did this earlier, but just kind of as a preliminary matter, this was issued on June -- June 2002 there on the right. Is that consistent with your recollection?
04:08:29 A. Yes.
04:08:32 Q. And Aspen's patent was six years later in 2008, correct?
04:08:37 A. Yes.
04:08:37 Q. So before the -- Aspen's patent, of course, there were devices that used VoIP and STP and -- I'm sorry, SIP, that is S-I-P, and then RTP the -- the actual traffic, there were a lot of devices that did that already, correct?
04:08:53 A. Yes.
04:08:56 Q. Now, the word "Wi-Fi" it's -- it's come up a lot so far, right?
04:09:09 A. Yes, uh-huh.
04:09:11 Q. I think, again, we kind of kept count, couldn't help

04:09:16 it. I think we counted you used the word Wi-Fi 41 times by
04:09:19 the time we had a break. Does that sound right?
04:09:22 A. Okay. Yeah, that's fine.
04:09:24 Q. It's a really easy word to use when that's what you
04:09:28 mean, right?
04:09:28 A. Yes, it is easy to use, yeah.
04:09:31 Q. And as we've discussed, that word's never used in the
04:09:39 patent, nowhere, right?
04:09:40 A. Right.
04:09:42 Q. Okay. But that absence wasn't because Wi-Fi was
04:09:46 somehow cutting edge in 2008. By 2008, Wi-Fi was old news,
04:09:50 right?
04:09:51 A. It was used, yes.
04:09:56 Q. Okay. So I'm going to pull up the original Wi-Fi
04:09:59 standard, and that's going to be VDTX-27.
04:10:04 Okay. You see the upper right, it says 1999
04:10:08 Edition?
04:10:08 A. Yes.
04:10:09 Q. Okay. That's the date. And next to it it says IEEE
04:10:16 standard 802.11, you see that?
04:10:18 A. Yes.
04:10:18 Q. Okay. That's nine years before the patent, right?
04:10:24 A. Yes.
04:10:25 Q. All right. And then Wireless LAN, right in the middle
04:10:27 there, that's the title, you see that?

04:10:29 A. Yes, I do.
04:10:31 Q. And you talked about Local Area Networks, which are, you know, inside of a Starbucks I think was one of your examples or a house or an office, do you recall that?
04:10:41 A. Of course, yes.
04:10:42 Q. And -- and this is talking about doing one of those wirelessly, a Wireless Local Area Network, right?
04:10:52 A. Yes.
04:10:53 Q. And to be crystal clear, Wireless LAN or WLAN, those don't appear anywhere in the patent either, right?
04:11:00 A. I don't remember they do, yeah.
04:11:03 Q. Okay. You're agreeing with me they do not appear in the patent, correct?
04:11:08 A. I don't remember that, no.
04:11:09 Q. Okay.
04:11:09 A. But I -- I would not contest it.
04:11:11 Q. Okay. Now, I do -- there was something I was wondering about, and I want to confirm this. You were here for Mr. Herman's opening statement, right?
04:11:29 A. Yes.
04:11:30 Q. Okay. We've seen some figures so far. He actually put up only one single figure for the patent in his opening statement. Is that consistent with your recollection?
04:11:40 A. No, I don't remember that.
04:11:42 Q. You don't remember. Okay. Well, I'll just -- I'll

04:11:44 remind you of this --
04:11:47 A. If you want to show it to me.
04:11:48 Q. I'm going to do it as a point of reference, and that's the only reason.
04:11:53 A. Okay.
04:11:53 Q. This is going to be Slide 10 from his opening.
04:11:56 A. Okay.
04:11:57 Q. Okay. You got that in mind?
04:11:59 A. Yeah, Figure 6.
04:12:02 Q. Figure 6.
04:12:03 MR. GAUDET: So let's go ahead and take that screen off. You can take that down.
04:12:07 Q. (By Mr. Gaudet) The report you submitted to us was 334 pages long, right?
04:12:13 A. My expert report --
04:12:17 Q. Yes.
04:12:18 A. -- you referring to?
04:12:20 Q. Yes.
04:12:21 A. It could be, yeah, it was long, yeah.
04:12:22 Q. It never referenced that figure, Figure 6, not one time in 334 pages, the one thing Mr. Herman showed the jury, not once in 334 pages, right?
04:12:35 A. I don't know, but I didn't check that, but if you say that, that's okay.
04:12:44 Q. You referenced other figures, right, you referenced

Figure 4 three times and Figure 9 four times and Figure 10 one time. Never that one, though?
A. Let me make sure. I don't quite understand. Figure 6 shows --
Q. Sir, please listen to my question.
A. Go ahead.
Q. What I'm asking you now is that you referenced other figures besides Figure 6, that's my only question.
A. Of course.
Q. So yes or no to that?
A. Yes.
Q. Okay. Now, the next figure the jury saw was when Mr. Chin put up Figure 2b here today. Were you here for that?
A. I -- I don't remember if he put it or not.
Q. Okay.
A. But could be.
Q. That's another one.
A. Okay.
Q. 3 -- 334 pages and not once in your report, right?
A. Okay.
Q. And then after that, he put up Figure 5. That's the kind of circly one, that he said was a really complex diagram.
A. That's right.

04:13:44 Q. And you need somebody kind of really smart to explain it to you almost, right?
04:13:49 A. Okay.
04:13:49 Q. But, again, 334 pages, you never referenced it even once, right?
04:13:53 A. Could be. I don't remember that.
04:13:57 Q. Okay. Let's go back to talking about the history of Wi-Fi.
04:14:01 So you were -- I saw that one of the companies you worked with was Intel, is that right on your -- on that slide?
04:14:10 A. Yeah. I worked with Intel at some time, yeah.
04:14:16 Q. And are you familiar with Intel's Centrino platform that was introduced in 2003?
04:14:23 A. I was somewhat familiar with it sometime ago.
04:14:27 Q. In 2003, Intel had the Centrino. It was the chip and the set of chips that basically made every computer that was sold from that point forward a Wi-Fi device. So everybody had Wi-Fi in 2003, right?
04:14:42 A. I don't remember that.
04:14:44 Q. Okay.
04:14:44 A. It could be.
04:14:45 Q. I'm going to put up a timeline just so we kind of have a reference here.
04:14:50 What we've got is the Wi-Fi protocol over in '99.

04:14:55 We've got the patent far over there in 2008. And we'll just kind of bring up where Centrino, the Intel chip that made -- you know, suddenly everybody's got Wi-Fi back in 2003.

04:15:07 Now, the development of the SIP protocol, which we'd already talked about, that made it possible for commercial providers like Vonage and Skype to actually offer Voice over IP products to people commercially, right?

04:15:25 A. Could be. I didn't investigate that either.

04:15:28 Q. Really? That wasn't something that actually appeared in your infringement report?

04:15:32 A. Which -- what do you refer to? Can we go back? I do mention this company, but --

04:15:40 Q. Sure. I'll refresh your recollection.

04:15:44 Take a look at Tab 1 --

04:15:46 A. Okay.

04:15:46 Q. Do you have the first binder volume there?

04:15:48 A. Yes.

04:15:49 Q. Okay. If you would, take a look at Tab 1 and go to Page 30, and I'll direct you to Paragraph 100. And just let me know when you're there.

04:16:19 A. Okay. I am on Page 30, 100, yes.

04:16:23 Q. 30, Paragraph 100. And if you would just -- we're just going to refresh your recollection now so we won't put up anything from this on the screen. About halfway through,

04:16:32 there's a sentence that starts "these developments". Just
04:16:35 read that to yourself, and then I'll ask you the question
04:16:38 again.
04:16:52 A. Yes. I see the quotes that you mentioned before, yeah.
04:16:56 Q. And by the way, this report is -- it's your report.
04:17:01 Although I'm calling this out to you, you're the one who
04:17:04 wrote the this, right?
04:17:06 A. Correct. Yes.
04:17:06 Q. And the point is that by the early 2000s, a company
04:17:09 called Vonage and a company called Skype had made Voice
04:17:13 over IP services broadly available to people in the United
04:17:15 States and elsewhere, right?
04:17:16 A. I don't remember the detail but I remember these
04:17:20 companies, yes.
04:17:21 Q. Okay. Well, let's see if you remember the Skype image.
04:17:26 We'll put this one up -- in 2003. Okay. Do you see that?
04:17:29 A. Oh, yeah, yeah.
04:17:30 Q. So Skype was a company that would let you use VoIP for
04:17:34 phone calls on your computer, right? Is that your
04:17:40 recollection of -- is that why you included it in your
04:17:42 report?
04:17:42 A. I'm sorry. I didn't know the technical details, but I
04:17:45 did use Skype, yes.
04:17:47 Q. Okay. That was -- you didn't realize that you were
04:17:49 using VoIP when you used Skype in 2003?

04:17:51 A. I don't remember that. That's been a long time ago. So I don't know if I realize or not realize.
04:17:56 Q. Okay. What about Vonage --
04:17:59 A. Voice over IP, yes, I did know Voice over IP.
04:18:01 Q. Okay.
04:18:01 A. Yeah.
04:18:01 Q. Vonage in 2004, that's another -- it was a big name in the Voice over IP world. We'll bring up that logo here. And you might recall this one. And I -- I have -- well, it might be even showing my age.
04:18:18 They had these commercials with this funny, like, jingle, and the point was, it was like -- the tag line was people do stupid things, and it showed somebody doing something ridiculous like skiing off of a roof, and they would say, like paying too much for long distance service. Is any of this ringing a bell with you.
04:18:38 A. Sounds like something I saw before, but I don't remember the detail.
04:18:42 Q. Vonage is telling everybody, use VoIP and you don't have to pay for long distance or anything else anymore. That's all going on in this '03, '04 period, right?
04:18:53 A. Yes.
04:18:54 Q. Okay. Then '06, do you recall that T-Mobile, which is another -- another cell phone carrier like Verizon, in 2006 announced that it was the first major mobile phone company

04:19:10 carrier to begin selling service that would allow a single
04:19:14 handset to communicate over both cellular networks and
04:19:17 Wi-Fi hotspots? Does that ring a bell?
04:19:21 A. Yes, I remember.
04:19:22 Q. So let's put 2006 up for that.
04:19:24 And what they reported to the public, to the world
04:19:31 through, like, articles is you could -- you could avoid
04:19:35 using some of your cell minutes in some places if you
04:19:39 wanted to, right?
04:19:40 A. T-Mobile, I believe they did not use SIP.
04:19:46 Q. Okay. That -- that is -- that is fine. What I'm
04:19:49 asking, though, is the whole point of the service was you
04:19:55 could switch from Wi-Fi on your call -- on your cell phone,
04:20:00 or you could use cellular on your cell phone, right?
04:20:03 A. Yes, they did announce that --
04:20:05 Q. Okay.
04:20:06 A. -- at some time. I don't remember exactly the date,
04:20:08 but, yes.
04:20:09 Q. Okay. This is my point, sir. While this has all felt
04:20:16 like alphabet soup to this jury, I am sure -- I mean, RTP
04:20:19 and SIP and VoIP and all this stuff, okay? This stuff was
04:20:25 all over the world by 2006, right?
04:20:27 A. No. Of course not. What we are talking about was not
04:20:33 there using SIP. I just mentioned to you --
04:20:35 Q. Let me ask a better question.

04:20:37 The idea of cell phones that could maybe use Wi-Fi and -- and switching between things and Wi-Fi with VoIP, right, if that's what you meant in 2008, that's what you say in 2008, right?
04:20:56 A. I don't quite understand the question. What the claim means, it states very clearly, I've just gone through it. So I don't understand your question.
04:21:09 Q. Okay. Well, let's talk about what Aspen told the public that it's VoIP patent was about.
04:21:15 MR. GAUDET: So let's look at Figure 9 of the patent, and I think this might be one that we have to turn sideways.
04:21:27 Q. (By Mr. Gaudet) Now, I do want to start -- this is one that you did have in your report, and you went through on your direct examination, right?
04:21:34 A. Yes, I did.
04:21:37 Q. Okay. But you made an interesting comment. You referred to I think this as maybe a mobile possibility -- that this was a mobile embodiment somehow?
04:21:47 A. Yes, I say that it could be a IP wireless phone, as well.
04:21:56 Q. You say that?
04:21:57 A. I say that.
04:21:58 Q. Let's see what Aspen said to the American public.
04:22:02 MR. GAUDET: Let's pull up Column 5, Line 62, over

04:22:08 to Column 6, Line 41. And if we could -- yeah, this will probably take a second. Some of this stuff I'm doing on the fly, so I'm not giving Mr. Duval a whole lot of, you know, prep time on this.

04:22:28 But if you could, Mr. Duval, let's just kind of merge together so we've got it in one clean shot, 5:62, which is at the bottom of the column, over to 6:41, which is kind of the top of the next column. So that's the top part, and here comes the bottom part.

04:22:53 Q. (By Mr. Gaudet) So we're talking about Figure 9, you see that up at the top, right, what is highlighted in Figure 9?

04:23:00 A. Yes, uh-huh.

04:23:01 Q. And then the bottom paragraph, in this embodiment, do you see that?

04:23:05 A. In this embodiment.

04:23:06 Q. That means in this example, right?

04:23:08 A. Yes.

04:23:08 Q. And it says: 3 alternate paths for quality of service in the non-mobile domain are shown.

04:23:18 I read that correctly, didn't I? Just yes or no, did I read that correctly, sir?

04:23:24 A. You read it correctly, yes.

04:23:26 Q. Okay. And if we go back to Figure 9 --

04:23:38 MR. GAUDET: And we can take the rest of it away,

04:23:41 I'll sort of clean up our screen a little bit.
04:23:44 Q. (By Mr. Gaudet) -- this phone that's highlighted
04:23:46 there, that was -- I mean, Mr. Chin said that's a wired
04:23:48 phone. That was a wired phone in that example, do you
04:23:51 recall that?
04:23:53 A. Okay. Yeah.
04:23:54 Q. Okay. So I want to work us through this a little bit.
04:23:57 And, again, Mr. Dacus did a little bit of this, but I'm
04:23:59 going to ask you a few more questions about it. But to
04:24:02 set -- sort of set this up, the sort of bar there with 990
04:24:10 on it and then the VoIP QoS Gateway/Firewall, right, that's
04:24:17 in essence what we're calling kind of the Aspen product,
04:24:20 right?
04:24:20 A. The 910 --
04:24:22 Q. 910, correctly.
04:24:23 A. The 990 would be a Local Area Network.
04:24:27 Q. Okay. Terrific. Perfect.
04:24:28 And there are the three different lines that each
04:24:32 go to a different Internet router. Do you see that? It's
04:24:36 green, blue, and purple.
04:24:38 A. Yes, I do see them.
04:24:39 Q. And each Internet router corresponds to a different
04:24:43 ISP, right, ISP 1, ISP 2, ISP 3, you see that, right?
04:24:47 A. Yes, uh-huh.
04:24:49 Q. Okay. And I think at least this part I think is clear

04:24:51 that, like, Internet Service Provider, ISP, is talking about a company, right -- correct?
04:24:57 A. I didn't hear you. It's talking about...
04:24:59 Q. A type of company, a business.
04:25:07 A. Yes.
04:25:07 Q. A company that you would send -- they will send you a bill each month for sending -- for providing service to you, right?
04:25:12 A. Yes.
04:25:13 Q. Okay. Now, I want to -- there were some statements about IP addresses. And, again, I just want to be clear about how those things get assigned. So let's -- again, Mr. Duval is going to be very upset with me.
04:25:32 MR. GAUDET: But let's slide that over to that half of the screen if we could, and what I want to do is bring up Column 5, Line 47 to 61. Yeah. So the part that I now want to highlight is the sentence that says, network interfaces 961, 962, and 963, and it goes on -- let's go ahead and highlight that whole sentence. And then I want to underline the phrase public IP addresses belonging to the 3 access Internet Service Providers.
04:26:31 Q. (By Mr. Gaudet) Do you see that?
04:26:32 A. Yes, uh-huh.
04:26:33 Q. And in particular, it's that word "belonging" that I want to talk about, okay?

04:26:37 A. Okay.
04:26:37 Q. Do you see the word "belonging"?
04:26:39 A. Yes.
04:26:39 Q. And the reason that Aspen used the word "belonging" is that Internet Service Providers, for example, Verizon or AT&T or Charter or any other example, they basically have the right to assign to their customers a set of IP addresses, correct?
04:27:00 A. Yes.
04:27:01 Q. Okay. And those sets don't overlap, right? Verizon's addresses are 100 percent different than AT&T's addresses, which are 100 percent different than Spectrum's addresses, correct?
04:27:16 A. Are you talking about IP global addresses?
04:27:20 Q. Correct.
04:27:20 A. They cannot overlap.
04:27:21 Q. They can't overlap, right?
04:27:22 A. No, they have to be unique.
04:27:24 Q. Right. And so using Verizon as an example, Verizon has a set of addresses -- of public addresses that nobody else in the world can assign to their customers, right?
04:27:34 A. Global addresses.
04:27:38 Q. Exactly. Global --
04:27:40 A. Private address is --
04:27:41 Q. I'm talking about public IP addresses like it's saying

04:27:44 here, right?
04:27:44 A. Okay. Yes, just to be precise.
04:27:46 Q. Just to be precise.
04:27:48 Okay. And Verizon or any ISP will assign those temporarily to a customer when they're -- for example, if you're a Verizon customer and you turn on your phone, at that moment, Verizon will assign you one of their available IP addresses. That's how the process works, right?
04:28:09 A. I am not sure I understand the question. If you are an IP router and you are sold by Verizon, ISP is Verizon, Verizon will assign to you one Global IP address that is owned by Verizon. Is that what you're saying?
04:28:35 Q. Let me try again. And if my question wasn't clear, then I do apologize.
04:28:40 A. Okay.
04:28:40 Q. Okay. I'm -- I mean, I love saying this in front of my clients. I am a Verizon customer. So I literally mean me, I mean Matt Gaudet. If I were to turn on my phone, okay, Verizon will assign me at that moment in time an IP address that is associated with my phone until I turn that phone off. And so I temporarily -- that's my IP address. Does that sound right to you?
04:29:08 A. No. How can it be right? You're talking about turning on your Verizon cell phone, let's say? What phone are you talking about?

04:29:16 Q. I'm talking about turning on my Verizon cell phone.
04:29:21 A. Okay. That's a different story. So that's what I said before. So --
04:29:26 Q. And I apologize. That is what I -- I mean the cell phone I've got right here. If I pull it out and turn it on, the Verizon network will assign me a temporary IP address until I turn it off. That's how it works, right?
04:29:43 A. No. The Verizon network is a bunch of Global IP addresses that it assigns to a Wi-Fi router in our home. And when I turn on my device and I attach to the wireless router, I get an IP address from the wireless router, and that's how I get my IP address.
04:30:16 Q. Sir, sir, I was talking about literally taking it out and turning it on, not at my home. Right here in the courtroom, which I will not do because that's forbidden. But theoretically if I were to do it, okay, I am nowhere close to my home, I'm not using Wi-Fi, I'm turning my phone on, and all I want is cellular, okay? And Verizon will assign me an IP address. Will you agree with that, sir? It's okay if you don't know, we'll move on. If you don't know this area, that's fine. We'll move on.
04:30:52 A. But the issue is that I do know because I know in great detail how it works.
04:30:58 So you are talking about LTE access now. You're not talking about Wi-Fi access.

04:31:07 Q. Correct.
04:31:08 A. And you're saying when you turn on your phone and you register with Verizon, you'll get some name, which is in the form of an IP address. That's absolutely right. If you want to represent it -- to present it this way. This is, however, not too interesting. That's not the IP address that you -- you use to route over the Internet. You got it completely wrong, if that's what you want to claim.
04:31:45 Q. No, sir -- and since I'm sort of on a clock, that's the -- the perhaps frustrated look on my face is just that I'm trying to manage the clock.
04:31:57 I'm going to take our agreement on the first part, right, about what happens when we turn on a cell phone in a cell network, and we'll have our folks talk about the rest. Does that sound fair?
04:32:07 A. Of course.
04:32:08 Q. Okay.
04:32:08 A. Of course.
04:32:09 Q. Now, what I want to talk about next is the problem in the '554 patent, okay?
04:32:20 A. Okay.
04:32:21 Q. And -- and to do this, we're now going to pull up Figure 7, okay?
04:32:27 A. Sure.

04:32:28 Q. Okay. And we'll do it all by itself. And the first thing I just -- we'll just sort of highlight over that 711 phone. It's got a No. 711 but it actually looks like the phone, it might actually still be in my parents' house in South Louisiana, but certainly I remember that phone growing up. But SIP Endpoint 1, that phone that says 711 there, do you see that?
04:33:01 A. Yes.
04:33:01 Q. Okay. Now, the other thing I want to do is highlight in, we'll use green, the other phone, SIP User Endpoint 712. You see that?
04:33:13 A. Yes.
04:33:14 Q. Okay. That's the phone -- that's the other phone. So two people calling. This is two different sides, okay.
04:33:20 A. Correct.
04:33:21 Q. And that phone, we have our sort of SIP servers and our RTP servers, right? It's connected to a SIP server and an RTP server, 701 and 702. You see those?
04:33:33 A. Yes, I do.
04:33:34 Q. Okay. So we'll just literally highlight 701 and 702 in green, okay?
04:33:48 Now, the language that I want to focus on here is the bottom right column, which is Difficulty of Moving Call Due to a Quality Event. Do you see that?
04:34:02 A. Yes.

04:34:02 Q. All right. Terrific.
04:34:04 And that's, right? That's what you said this is
04:34:07 all about, right? The problem, the reason that in the
04:34:09 prior art there was a problem that you couldn't move a call
04:34:13 when there was a quality of service, a quality event, when
04:34:16 something -- when it didn't sound right; is that fair?
04:34:19 A. The issue was the call will drop. Not the quality of
04:34:28 the call, but the call will drop.
04:34:29 Q. Absolutely. But the title is: Difficulty of Moving
04:34:33 Call Due to a Quality Event. Do you see that?
04:34:36 A. That's right.
04:34:37 Q. Okay. That's what I'm talking about. So I want to
04:34:43 start highlighting: In the prior art gateway 752. Do you
04:34:47 see that?
04:34:47 A. Yes.
04:34:51 Q. And that prior art gateway, this is the old version.
04:34:53 This is -- this is something -- it would be sitting in that
04:34:57 same place as the Aspen box, but it was the old one that
04:35:01 had the problem, right?
04:35:02 A. Yes.
04:35:03 Q. Okay. It is not possible for 752 to reliably move the
04:35:10 call from path 721 to path 722. Do you see that?
04:35:18 A. Yes.
04:35:18 Q. And 721 is ISP 1, right? So let's highlight that, say,
04:35:23 in blue.

04:35:28 MR. GAUDET: If you could do blue instead of yellow, that'd be great.
04:35:31
04:35:32 Q. (By Mr. Gaudet) And ISP 2, we'll do that in, say, orange. And so the problem is you can't move the call from ISP 1, let's call that AT&T, which has its own set of IP addresses that nobody else in the world can use, to ISP 2, and let's call that Spectrum, which has a different set of IP addresses that no one else can use. Are you with me so far?
04:35:38
04:35:46
04:35:52
04:35:57
04:36:00
04:36:04
04:36:04 A. Yes.
04:36:05 Q. Okay. You couldn't move from one to the other without breaking the call. You see that?
04:36:08
04:36:10 A. Yes.
04:36:11 Q. Okay. And then we'll keep highlighting that line.
04:36:18 MR. GAUDET: Go ahead and highlight in yellow too without breaking the call. Yeah, it's just -- it's just -- yeah. I will be buying Mr. Duval dinner this evening for doing this to him.
04:36:20
04:36:28
04:36:33
04:36:34 Q. (By Mr. Gaudet) All right. The next sentence. This is because when such a move occurs, all right, and this NAT/PAT thing happens, right, the servers 701, 702, that's those green things, right, on the other side, right --
04:36:37
04:36:43
04:36:51
04:36:53 A. Uh-huh, yes.
04:36:54 Q. -- do not recognize these as belonging to the call from 711 anymore. Do you see that?
04:37:00

04:37:02 A. Yes.
04:37:03 Q. Right. We changed ISPs. By definition, we got a new ISP address, and now people don't recognize each other anymore, right?
04:37:14 A. No. That's not the problem indicated here. The problem is NAT/PAT.
04:37:25 Q. Right. NAT/PAT after you've -- NAT/PAT exists before the change, right?
04:37:31 A. Yes.
04:37:32 Q. And it's okay then, right?
04:37:33 A. It may have been okay there, but after the change, the NAT/PAT causes you a problem.
04:37:42 Q. So let's read the next sentence to find out exactly why that happens, right?
04:37:47 MR. GAUDET: Keep highlighting.
04:37:49 Q. (By Mr. Gaudet) The call breaks because RTP server 702 drops packets coming from the new IP address, right? That's the new address from the new ISP, right?
04:38:07 A. Yes, yes, correct.
04:38:09 Q. Okay. Terrific.
04:38:13 Now, let's talk about the solution.
04:38:18 MR. GAUDET: So I want to bring up the patent. We'll go to Claim 1 and the very last element, the SIP signaling sequence of the transmission is maintained.
04:38:31 Q. (By Mr. Gaudet) Do you see that?

04:38:32 A. Yes.
04:38:32 Q. Okay. And we've gone through this a bit, but Aspen had
04:38:37 to add that phrase to get this patent, right? Without that
04:38:40 phrase, it's no deal, right?
04:38:42 A. Yeah, they definitely put that phrase in, yes, I do
04:38:47 remember -- I do remember that, yes.
04:38:48 Q. Okay. So what we'll do, and we'll try to do this
04:38:54 quickly, is just actually set eyes on the official
04:38:57 documents so they're in the record.
04:38:59 If you look at Tab 10 of the binder there. I'm
04:39:06 just kind of giving you a heads up of where this stuff will
04:39:11 be. And I'm actually not sure which of the two volumes --
04:39:26 A. That must be Volume 2.
04:39:28 Q. Yeah. Thank you.
04:39:34 A. Okay.
04:39:34 Q. Okay. So we're going to pull up -- it's sort of funny,
04:39:41 that document, it's called the prosecution history, right,
04:39:44 which means that contains all of the back and forth between
04:39:47 Aspen and the Patent Office, that sound right?
04:39:51 A. Yes.
04:39:51 Q. Okay.
04:39:53 MR. GAUDET: So let's pull up Page 197.
04:39:59 Q. (By Mr. Gaudet) And this is actually the original
04:40:01 application that was filed. It's the cover page of the
04:40:04 original application with the inventors there listed on it.

04:40:07 Does that look familiar?
04:40:08 A. I saw that, but there are no page numbers here.
04:40:12 Q. I know. And I apologize. Aspen produced that to us.
04:40:17 A. Okay.
04:40:17 Q. I don't have a -- I tell you what, just follow along on the screen, and if -- and please let me know if I ever ask you a question or you say I really need to see the paper version, just tell me and we'll stop. But it might be that you don't need to do that. Does that sound okay?
04:40:36 A. All right, sure.
04:40:36 Q. Okay.
04:40:37 MR. GAUDET: So, let's now go to -- it's Page 55, but it's got a Bates number Aspen 464 of JTX-02. And we can just have the full screen be this language for now. We can take off the language on the left.
04:40:57 Q. (By Mr. Gaudet) So this was the original claim, the original effort that Aspen or Aspen's attorneys submitted to the Patent Office, right?
04:41:09 A. Okay.
04:41:10 Q. Okay. And what I want to highlight here, again, is the phrase "switching the transmission from the first network path to one of a plurality of alternative network paths." You see that?
04:41:24 A. Yes.
04:41:24 Q. Okay. That's switching, right?

04:41:25 A. Yes.
04:41:25 Q. And then the next bit of language there says "the transmission is not disrupted as a result of the switch." You see that?
04:41:35 A. Yes.
04:41:35 Q. Okay. So Aspen went to the Patent Office and said, can we have a patent on the idea of doing the switch but not just doing the switch, doing the switch without dropping the call, right? The transmission is not disrupted. That's what Aspen tried to do, right?
04:41:53 A. Of course, yes.
04:41:55 Q. Of course. And, of course, the Patent Office said, no, that's not new, right?
04:42:00 A. I don't know. I don't remember all of that, but I think you're right. I think they were rejected several times. Was it -- we already went through it today earlier two or three times, and then they added some stuff, and it was admitted.
04:42:17 Q. Sir, I actually want to focus on the first part of your answer you just said.
04:42:21 A. Okay. Sure.
04:42:22 Q. You really didn't know and didn't remember that Aspen tried to get a patent like this, and the Patent Office said absolutely not?
04:42:29 A. Of course I do.

04:42:30 MR. HEARD: Objection, Your Honor. It mischaracterizes the testimony.
04:42:33 THE COURT: Hold on. It's cross-examination now.
04:42:36 Q. (By Mr. Gaudet) Sir?
04:42:37 A. Yes, I did know. I read the file history, and I saw that.
04:42:40 Q. So when you said I don't know and I don't remember just 30 seconds ago, that was -- I'll move on.
04:42:47 THE COURT: Why don't you rephrase the question.
04:42:50 MR. GAUDET: I'll withdraw that question, Your Honor. Absolutely.
04:42:54 Q. (By Mr. Gaudet) All right. I want to talk about that phrase "the transmission is not disrupted" for a minute. You had to add more stuff, but I want to figure out exactly what that means, what you were trying to do there. So let's -- the language "the transmission is not disrupted," that's talking about the phone call, right? The phone call is not disrupted. You can hear each other, right?
04:43:14 A. Yes.
04:43:15 Q. Okay. And when the patent eventually issued with a bunch of other requirements, that's still what that meant. The transmission is not disrupted is the phone call is not disrupted, right?
04:43:26 A. Yes.
04:43:26 Q. Okay. Terrific.

04:43:27 So we'll bring up what happens next, and that's
04:43:33 going to be JTX-002, Page 125. This is Bates No. 0377.
04:43:46 And what I want to do is -- there you go. The box
04:43:51 at No. 6 says: Claims 1 to 21 are rejected.
04:43:56 So no deal, right?
04:43:57 A. Yes.
04:43:58 Q. Okay. Then Aspen went back to the Patent Office.
04:44:02 MR. GAUDET: And we'll pull up -- this is Page
04:44:06 115, which is Aspen 00000367. And I want to now highlight
04:44:15 the NAT -- it's the most indented paragraph there, which
04:44:19 has the phrase "Network Address Translation," or "NAT" in
04:44:25 it. There you go. That's perfect just like that.
04:44:30 Q. (By Mr. Gaudet) So Aspen says, all right. Well,
04:44:33 it's -- it's got to happen when there's this Network
04:44:36 Address Translation thing going on. So now Aspen's adding
04:44:40 that, correct?
04:44:40 A. Yes.
04:44:41 Q. Still no deal, though, right?
04:44:44 A. Uh-huh.
04:44:45 Q. Okay. Did you remember that part?
04:44:47 A. I did remember that.
04:44:49 Q. Okay. Good.
04:44:52 MR. GAUDET: So let's take a look at Page 93.
04:44:54 This is Aspen 000345.
04:45:03 Q. (By Mr. Gaudet) And, just to confirm, Claims 1 to 50

04:45:08 are rejected. Is that -- that's -- at that point that's correct, right?
04:45:12 A. Yes.
04:45:13 Q. Okay. And, of course, Network Address Translation, that all existed long before Aspen's patent, right?
04:45:19 A. Just by itself?
04:45:22 Q. Sure.
04:45:23 A. Yes.
04:45:24 Q. Or by itself with everything else that Aspen had attached to it at the time it submitted the application and the Patent Office said that's still not good enough, that was all in the prior art already, right?
04:45:36 A. I don't know about that, but NAT existed.
04:45:38 Q. Well, what we just saw is the Patent Office did think that it existed and it existed along with everything else, including the idea of switching a call without dropping it, right? That's what Aspen asked for, and that's what the Patent Office said no to, correct?
04:45:55 A. Yes. They did reject that, yeah.
04:45:57 Q. Okay. Terrific.
04:45:58 Now, Aspen tried again, and the third time was the charm. You generally recall that?
04:46:05 A. Yeah, I recall that.
04:46:07 Q. Okay. And we can sort of short-circuit this. What they then submitted was the final version that is what

04:46:22 looks like Claim 1.
04:46:24 MR. GAUDET: So we'll just go ahead and pull up
04:46:26 Claim 1. Okay. So I want to highlight this language, "the
04:46:36 SIP signaling sequence of the transmission is maintained."
04:46:43 Q. (By Mr. Gaudet) All right. So I want to talk about
04:46:48 this key requirement, and I'm going to ask you just a
04:46:55 series of questions to see if you'll just say yes or no to
04:46:59 them. I'm going to ask you three questions, and just tell
04:47:02 me yes or no to each of them, if that's okay. Does that
04:47:09 sound fair, sir?
04:47:09 A. I will try.
04:47:10 Q. Absolutely. You know what, I should have said that.
04:47:13 Yes or no or Mr. Gaudet, that made no sense, or I don't --
04:47:17 whatever. But I think you're -- I think we're on the same
04:47:20 page.
04:47:20 First question. In the '55 (sic) patent, you have
04:47:27 to have an extra SIP message that informs the other side of
04:47:34 the transition between networks. Is that a true statement?
04:47:42 An extra SIP message that informs the other side of the
04:47:46 transmission between networks. Do you agree?
04:47:48 A. No, I don't know what is extra SIP message. I'm not
04:47:51 sure.
04:47:51 Q. Okay. Second question. In the '554 patent, that extra
04:47:54 SIP message describes the new IP address that the other
04:47:57 side should use.

You agree with that?
A. It could. It could include that information in the SDP.
Q. It could, but the point of the '554 patent to distinguish over prior art -- will you agree with me, just yes or no, does it have to, or are you saying just that it could? It's not necessarily a point of distinction?
A. I don't understand your question. You're asking whether it must include something? I don't -- can you repeat the question, please?
Q. In the '554 patent, that extra SIP message to the other side describes the new IP address that the other side should use, that that is part of the invention of the '554 patent?
A. No, because I don't know what is extra SIP message. If you can define for me what is extra SIP message.
Q. Okay.
A. Or if it appears somewhere.
Q. I have one more question, and then I'll help us out.
A. Okay.
Q. And since you didn't agree to the last question, would you agree that this is because if you're the party who switched networks, then you moved away, so if you talk to me based on what you know so far, you're not going to reach me. Does that -- you agree with that?

04:49:25 A. No, that's not clear. You're talking probably after switching. I don't know what you're -- what you characterize here. It's not precise enough, and it's not clear to me.
04:49:41 Q. Okay. If you were -- you gave several depositions in the case, right?
04:49:44 A. Yeah.
04:49:46 Q. Okay.
04:49:46 A. I think to Verizon one deposition.
04:49:51 Q. Sure. And take a look at Tab 3 of your binder there.
04:49:56 A. Okay.
04:49:56 Q. And I want you to read from -- just to yourself, just to yourself, Page 112, Line 7, to Page 113, Line 15.
04:50:06 A. Just a minute. So --
04:50:12 Q. Yeah, and take whatever time you need, sir.
04:50:16 A. Okay. So, sorry, which page?
04:50:30 Q. Absolutely. It's Tab 3. Do you have Tab 3, sir?
04:50:36 A. Yes.
04:50:36 Q. Page 112, Line 7.
04:50:51 A. Page 112, yes, please.
04:50:53 Q. To Page 113, Line 15. So it goes over to the next page.
04:50:58 A. Okay.
04:50:59 Q. Okay. All I want you to do is read that to yourself, and once you've done that, I'm going to play it on the

04:51:04 screen. And my only question is just whether you've read
04:52:02 that --
04:52:02 A. Then to Page 13 --
04:52:04 Q. Page 112:7, to 113, Line 15.
04:52:11 A. Line 15, okay.
04:52:14 Q. Have you read it?
04:52:15 A. I'm reading it. I think that's the example I
04:52:18 gave you --
04:52:19 Q. Sir --
04:52:20 THE COURT: Hold on just a minute First of all, I
04:52:21 can't hear you. If you'll pull your microphone towards
04:52:25 you.
04:52:25 THE WITNESS: Oh, okay. Sorry, sorry, Your Honor.
04:52:27 THE COURT: So is there a question pending?
04:52:29 Q. (By Mr. Gaudet) The question is, have you read that?
04:52:30 A. No, I didn't finish reading it.
04:52:37 Q. Okay. It's about a -- it's about, what, 30 lines from
04:52:41 Page 112:7 to 113:15. I just want you to read it to
04:52:47 yourself, and tell me when you've read it to yourself, and
04:52:49 then we're going to play the video so that everybody can
04:52:52 see it. Okay? So all I want to hear from you is once
04:52:56 you've read it, but please do take your time.
04:53:01 A. Yes, I read it.
04:53:04 Q. Okay.
04:53:04 A. I remember that, yes.

04:53:06 Q. Okay. We'll play the video.
04:53:08 (Videoclip played.)
04:53:08 Q. Sir, I just have one more question and then we can take a break. And I finally understand -- I think finally understand what you were trying to tell me.
04:53:18 A. Okay.
04:53:18 Q. Which is that before the '554 patent, it may have been known to increment the Cseq values between different SIP messages, but that by itself you're saying is not enough, I have to have this extra SIP message in there that is informing the other side of the transition between networks, and then I have to continue the maintenance of the SIP signaling sequence; is that --
04:53:50 A. I didn't agree, but you're getting closer. I said that because of the NAT/PAT mechanism, you have to do something about it so you can inform the other side about it.
04:54:03 Q. And one example of informing the other side is the SIP RE-INVITE?
04:54:09 A. Not by itself.
04:54:10 Q. The SIP RE-INVITE followed by the --
04:54:16 A. The SIP INVITE will have an SDP that describes the new IP address that the other side should use, because I moved away. I'm not there. If you talk to me based on what you know so far, you're not going to reach me. I am somewhere else. So I'm going to tell you where I am right now, and I

don't exactly know where I am right now because the ones that changed the -- my private address to public address didn't tell me. So I need --
Q. Sure.
A. -- reason to find it out. And once I find it out, I can do it.
(Videoclip ends.)
Q. (By Mr. Gaudet) Okay. Next question, so if I am the phone making the switch, I am the phone making the switch, once I find out my IP address, my new IP address, I tell the other side about that, correct?
A. No.
Q. Okay. And then you might say no to this one, too, you continue with a future series of SIP messages that maintain the SIP continuity or the -- the continuity of the SIP signaling sequence; is that right?
A. And then you continue --
Q. After --
A. Go ahead.
Q. I tell you what, you disagreed with my first statement, so we'll just cut to the chase.
MR. GAUDET: Let's play -- take a look at 114:3 to 114:19.
THE COURT: I'm sorry, is this impeachment?
MR. GAUDET: It is, sir. I read to him exactly

04:55:59 the statement he made from his deposition, and he denied
04:56:03 it.
04:56:03 THE COURT: Okay.
04:56:04 MR. GAUDET: Or the question he affirmed.
04:56:09 Q. (By Mr. Gaudet) Okay. This is going to be Volume 1,
04:56:13 Tab 3, 114:3 to 114:19.
04:56:19 (Videoclip played.)
04:56:19 Q. But once I find out my IP address, my new IP address, I
04:56:23 tell the other side about that in the SIP RE-INVITE, and
04:56:27 then I continue with a future series of SIP messages that
04:56:31 maintain the SIP continuity -- maintain the continuity of
04:56:37 the SIP signaling sequence?
04:56:38 A. Exactly. If I don't want to drop the call, I have to
04:56:41 do that, yes.
04:56:42 Q. And that's the distinction you've been trying to
04:56:45 explain to me over what was known in the SIP standard; is
04:56:50 that correct?
04:56:50 A. That was not known. The SIP standard --
04:56:53 Q. Was not known. I'm sorry. That was not known in the
04:56:56 SIP standard --
04:56:58 A. And that does not address this issue. And that's why
04:57:01 you have all of the following RFCs.
04:57:09 (Video ends.)
04:57:09 Q. (By Mr. Gaudet) You were here, sir, when we showed
04:57:11 some deposition testimony that Mr. Chin gave. We showed it

04:57:14 to Mr. Chin and then we showed it to Mr. Mavunkel, I
04:57:17 believe, and we're going to put that up on the screen.
04:57:19 It's -- it's Mr. Chin's deposition testimony from Line --
04:57:29 it's Page 40, Line 24, to Page 41, Line 2. We're just
04:57:35 going to put that right back up again.
04:57:35 A. Before I close this, do you have any other questions on
04:57:39 this part to me?
04:57:40 Q. That's a good question, sir. Thank you for asking
04:57:42 that.
04:57:42 A. From what you played. I fully agree with what they
04:57:46 say.
04:57:46 Q. Sir, I --
04:57:47 A. But if --
04:57:48 Q. Sir, let me just --
04:57:50 A. Sorry.
04:57:51 Q. And I very much apologize if I'm coming off short.
04:57:53 That's not my intention. We're on a clock, and we only get
04:57:57 a set number of hours, and so I have to work through my
04:58:00 outline, but your -- your counsel will have all the time in
04:58:03 the world to ask whatever clarification; is that --
04:58:06 A. Okay.
04:58:06 Q. Does that sound like a fair process?
04:58:08 A. I understand.
04:58:09 Q. Okay.
04:58:12 A. Thank you very much. Sorry.

04:58:13 MR. GAUDET: Let's pull up the image of Mr. Chin's testimony.
04:58:17 Q. (By Mr. Gaudet) Okay. If a network path is switched without sending any SIP message from one phone to another, does that practice the '554 patent, in your view?
04:58:30 Answer: No.
04:58:31 Do you see that?
04:58:32 A. Yes.
04:58:32 Q. Okay. Isn't it true, sir, that when we essentially track these words in your deposition, you could not dispute, even after your tests, that Verizon phones are able to switch between Wi-Fi and cellular without using any SIP messaging to the other phone; isn't that true?
04:58:59 A. Can you repeat the question? I am not sure I understand it. There were --
04:59:04 Q. Sure.
04:59:05 A. -- many conditions there.
04:59:06 Q. Okay. When we asked you the question in your deposition using similar words that Mr. Chin talked about -- let me actually just -- I'll do it this way. You can't dispute that Verizon phones are able to switch between Wi-Fi and cellular without using any SIP messaging to the other phone, correct? You have no basis to dispute that, right?
04:59:43 A. Of course it's not true.

04:59:47 Q. Okay.
04:59:47 A. I already explained that it's not true.
04:59:49 Q. This is what we're going to do on this one -- actually
04:59:53 we'll play the video. Take a look at 499:11 to 499:17.
05:00:07 I'm sorry, Volume 3. My colleagues are telling me it's Tab
05:00:10 5 -- Tab 5, Volume 3.
05:00:15 A. Okay.
05:00:16 Q. Page 499:11 to 499: -- to 499:17, and just -- do you
05:00:26 have that there?
05:00:26 A. I am getting there.
05:00:29 MR. GAUDET: All right. Let's play the videoclip
05:00:32 clip.
05:00:32 (Videoclip played.)
05:00:32 Q. So you agree with me that Verizon phones are able to
05:00:35 switch between Wi-Fi and cellular without using any SIP
05:00:42 messaging to the other phone, correct?
05:00:44 A. I don't know that. I just know that I didn't capture
05:00:48 it. That's all I can see here. But it's possible, yeah.
05:00:58 Q. Okay.
05:00:59 (Videoclip ends.)
05:01:01 Q. (By Mr. Gaudet) So what I'm going to do now, sir --
05:01:04 were you asked that question under oath, and did you give
05:01:07 that answer under oath? It's yes or no.
05:01:08 A. I believe so, yeah.
05:01:10 Q. We're going to put side-by-side what Mr. Chin said

05:01:15 under oath and what you just said under oath so that we can
05:01:18 compare the words.
05:01:49 MR. GAUDET: If you could just shrink it down so
05:01:52 we only have 11 to 17 on the right.
05:01:59 Q. (By Mr. Gaudet) Sir, Mr. Chin swore under oath that if
05:02:04 a network path is switched without sending any SIP message
05:02:12 from one phone to another, right, that does not practice
05:02:15 the '554 patent.
05:02:17 And you, sir, when asked if you agree that Verizon
05:02:23 phones can switch between Wi-Fi and cellular without using,
05:02:31 same words, any SIP messaging to the other phone, you said:
05:02:35 I don't know. I just know I didn't capture it, but it's
05:02:39 possible.
05:02:40 You couldn't dispute it. That's what that shows,
05:02:43 right, sir?
05:02:43 A. I didn't capture it. That's exactly true, yeah.
05:02:46 Q. Sir --
05:02:47 A. I agree with Mr. Chin.
05:02:48 Q. Yeah. So putting these two things together, sir, if
05:02:53 Mr. Chin testified under oath and you testified under oath,
05:02:56 we don't infringe?
05:02:58 A. We say the same thing, I agree.
05:03:01 Q. Okay.
05:03:03 MR. GAUDET: That's a great place to end, Your
05:03:03 Honor, I think, for today. If we're going to stop at 5:00,

05:03:07 that's a great place to end.
05:03:07 THE COURT: No, no, no.
05:03:08 MR. GAUDET: We're not.
05:03:08 THE COURT: Let's keep going.
05:03:10 MR. GAUDET: I got you. All right.
05:03:13 Q. (By Mr. Gaudet) All right. We're going to do some
05:03:15 more on the same topic, okay, sir?
05:03:19 All right. This calling that you did, it was --
05:03:23 you had -- you were in an office, but you had both ends of
05:03:29 the call going, right? In other words, you were literally
05:03:33 calling from an office phone to somebody who was on a
05:03:39 Verizon phone in the other end of the room essentially; is
05:03:46 that right?
05:03:46 A. You're calling from one Verizon cell phone to another
05:03:49 Verizon cell phone. Is that what you're saying?
05:03:51 Q. No. I'm talking about your tests, the tests that you
05:03:54 ran?
05:03:54 A. Oh, in my tests?
05:03:55 Q. Your tests, yes.
05:03:57 A. Oh, okay.
05:04:00 Q. Yeah. You went from a Verizon cell phone on one side,
05:04:04 correct?
05:04:04 A. Yes.
05:04:04 Q. To the Polycom -- it's like an office phone on the
05:04:08 other side, right?

05:04:09 A. Yes.
05:04:09 Q. Okay. And those things were basically in the same office, right?
05:04:13 A. The Verizon network is not in the same office.
05:04:20 Q. The Verizon phone was in the same office, correct?
05:04:23 A. Yes.
05:04:23 Q. Okay. To your point, the signal goes from the Verizon phone way out into the, you know, great beyond and eventually the signal, it all comes back to that office, correct?
05:04:41 A. Yes.
05:04:42 Q. Okay.
05:04:42 A. Yes.
05:04:43 Q. So I want to -- I'm going to use the image that you used. This is PDX-137, I believe.
05:04:55 MR. GAUDET: If we could pull that up.
05:04:58 Q. (By Mr. Gaudet) I think this is your image. And what I want to do here is I want to show which part of this is the Verizon phone doing anything and which part of this is other stuff that has nothing to do with Verizon, okay? Is that -- and to do that, I'm going to ask Mr. Duval to highlight the left side of this image in blue. And, again, in his defense, this is one of those that I didn't give him much of a heads up on, so...
05:05:56 MR. GAUDET: Oh, I'm sorry, Mr. Duval, if you

05:05:58 could highlight the left side of this image in blue.
05:06:04 Q. (By Mr. Gaudet) And the point is, as he's doing that together -- maybe we could do a slightly darker color, but for all of that equipment you were talking about, the stuff that Verizon has anything to do with is the Verizon phone, right, the Verizon cell tower, Verizon's got its core network there, and the Verizon phone -- the cell phone will switch between that -- that network tower and the Wi-Fi access point, right? And then it eventually goes back to that sort of orange thing that you're calling the core network. That's what you're calling the Verizon part of that, right?
05:06:49 A. Yes.
05:06:50 Q. Okay. Everything about --
05:06:51 A. Excuse me. That's not exactly what I called the Verizon part. The wireless router doesn't belong necessarily to Verizon, and the Internet doesn't belong to Verizon either.
05:07:05 Q. I agree with both of those points, sir.
05:07:08 MR. GAUDET: So why don't we do this, let's kind of take that blue up a little bit up so -- the bottom of it so we're not covering that Internet -- that wireless router that's actually not ours, if we could just bring the bottom of that up a little bit.
05:07:25 Q. (By Mr. Gaudet) My point is this, all this talk about

05:07:28 hold and music playing and all those things, Verizon has
05:07:34 nothing to do with any of that, right?
05:07:36 A. Of course, it has to do with everything in the sense
05:07:40 that the core went end-to-end and went through the Verizon
05:07:50 network and the call did not drop and we held each other.
05:07:56 MR. GAUDET: Let's highlight the right side of
05:07:57 this slide then, and we're going to highlight that in kind
05:08:00 of an orangish brown color. That's close enough.
05:08:19 Q. (By Mr. Gaudet) All right. So the switch that we've
05:08:20 heard so much about happens over on the blue highlighted
05:08:24 side, correct?
05:08:36 A. Well, as indicated before, when you switch to Wi-Fi
05:08:40 access, the wireless router and the Internet are definitely
05:08:45 involved. So you have to be careful here.
05:08:47 Q. That's fine. But the Verizon phone is switching
05:08:51 between the cell tower on the left and the Wi-Fi router on
05:08:55 the left, right? That's -- that's what we're talking about
05:08:59 switching between?
05:09:00 A. Yes.
05:09:01 Q. Okay. Great. And the test that you ran was designed
05:09:05 to capture all of the SIP messages that flowed between the
05:09:10 two phones, the Verizon phone on the far left and that
05:09:15 Aspen office phone on the far right, correct?
05:09:18 A. Yes, those ones that the Wireshark module captures is
05:09:28 right there between those entities.

05:09:30 Q. But the only messages by the Verizon phone that were the only SIP request messages from the Verizon phone that you captured were the INVITE that started the call and the BYE that ended the call, right? That's -- that's what you captured?
05:09:56 A. I did capture those. The INVITE and after the switch the BYE, just like you're saying.
05:10:02 Q. Of course. And nothing else that started from the Verizon side, right?
05:10:06 A. That's right.
05:10:07 Q. Okay. And by the way, I mean, people have been sending VoIP calls with an INVITE and a BYE since the very beginning of VoIP calls, right?
05:10:19 A. I didn't understand what you are just saying.
05:10:24 Q. That's okay.
05:10:25 A. That's all I captured, and that's what I was supposed to capture. That's exactly correct.
05:10:30 Q. To be crystal clear, there was never not one RE-INVITE from the Verizon side to the Aspen side, correct? None?
05:10:51 A. Well, in general, there is a RE-INVITE or update -- update is an alternative to INVITE. When you make some changes in this specific set, trace run, I didn't make any further changes. So there was no need to INVITE to change any parameters of the source.
05:11:13 Q. I'm only talking about the testing that you did to come

05:11:17 to this jury to try and demonstrate infringement. You
05:11:20 understand that?
05:11:21 A. Yes.
05:11:21 Q. In that testing, there were no, none, RE-INVITEs from
05:11:29 the Verizon side to the Aspen side, even though the Verizon
05:11:34 phone switched from Wi-Fi to cellular, that's correct,
05:11:37 right?
05:11:37 A. Yes, in this specific scenario, you're right, there was
05:11:42 no need for it. The SIP message that was sent, the
05:11:47 Re-Register was sufficient.
05:11:49 Q. Okay. That Re-Register message you talked about --
05:11:53 and, obviously -- first, a RE-INVITE message and a
05:11:58 Re-Register message are two different things, right?
05:12:00 A. We just played what Mr. Faber said.
05:12:05 When you switch to another Radio Access
05:12:10 Technology, you have to Re-Register. You always have to
05:12:13 Re-Register when you switch.
05:12:14 Q. My question is just a RE-INVITE message and a
05:12:18 Re-Register message, although they both have the word "re"
05:12:24 in them, they're two very different kinds of messages, will
05:12:27 you at least just yes or no to that?
05:12:29 A. They're different messages.
05:12:30 Q. Okay.
05:12:30 A. They're different SIP messages.
05:12:31 Q. You also didn't find any Re-Register message, zero,

05:12:37 none, that went from the Verizon phone to the Aspen phone, correct?
05:12:41 A. Of course, that's why I showed you the first diagram. That's why I started with the Re-Register. It went to the IMS. The IMS had no reason to pass it to the office, so I did not expect for the Re-Register to show into my analyzer. So that's perfectly fine. That's exactly how it's supposed to work.
05:13:01 Q. Absolutely. So the only thing that went to the other side is an INVITE to start the call and a BYE to end the call, even though we switched the call, because that's exactly how it's supposed to work in the Verizon system, right?
05:13:14 A. And that infringes 1[e]. That's exactly all it takes.
05:13:18 Q. Now, remember where we started, that you had never actually admitted that you were wrong about an opinion. You're doing a great job of holding onto that, but you understand that that last question about infringement, we very much disagree, and we're going to have somebody present our perspective on that, right?
05:13:34 A. I don't know. We'll see.
05:13:37 Q. Okay.
05:13:37 A. But so far, I don't see anything.
05:13:42 Q. Okay. Now, interestingly, when Mr. Bhaskaran, back in -- I believe it was 2015, 2016 -- thought --

05:13:58 Mr. Bhaskaran is Aspen's CEO, correct?
05:14:01 A. Yes.
05:14:01 Q. Okay. When he first thought Verizon's infringing our patents -- my patent, the whole reason he thought that is that he thought there was going to be a Re-Register message from the Verizon side -- my colleague has reminded me, and I'm going to start all over again.
05:14:20 And, Dr. Rubin, I bet you followed --
05:14:22 A. I heard it, yeah.
05:14:24 Q. Absolutely. So the words are confusing.
05:14:27 The reason Mr. Bhaskaran thought Verizon infringed this patent was because he thought Verizon sent a RE-INVITE from the phone on the Verizon side all the way over to the phone on the Aspen side. Do you recall seeing documents and reading testimony to that effect?
05:14:51 A. I don't remember. You'll have to show me. I've seen so many things, but I don't remember that.
05:14:57 Q. Sure.
05:14:58 MR. GAUDET: We'll pull up -- it's Exhibit 228, which should be --
05:15:05 Q. (By Mr. Gaudet) Well, I'll show this to you and hopefully we can just move right through it.
05:15:10 MR. GAUDET: It's Exhibit 228, and we'll pull it up on the screen here.
05:15:14 Q. (By Mr. Gaudet) Mr. Dacus talked to Mr. Chin about

05:15:16 this, right? So this is an email from -- it says CEO
05:15:19 Aspen. But that's Mr. Bhaskaran, correct?
05:15:24 A. Yes, I believe it is.
05:15:25 Q. Okay. And he says: Since Cseq is mandatory, I am sure
05:15:34 that all the telco infringers out there are maintaining the
05:15:38 SIP Cseq value when they send out the RE-INVITE.
05:15:43 Do you see that?
05:15:44 A. Yes, I do see that.
05:15:45 Q. So he sure would have expected to see some RE-INVITEs
05:15:50 when you did the call testing that you testified about,
05:15:53 right?
05:15:53 A. I don't know. He didn't tell me if he expected to see
05:15:56 a RE-INVITE.
05:15:57 Q. This is why I'm asking. I know -- you heard in the
05:16:02 openings when Mr. Herman said that you performed the tests.
05:16:07 Do you recall when he said that?
05:16:08 A. Yes, I performed the tests. I gave them all the
05:16:12 requirements I had for the tests. They put it together,
05:16:15 yes.
05:16:16 Q. The "they" is Mr. Bhaskaran and Mr. Mavunkel, right?
05:16:21 A. Yes, mostly the latter one.
05:16:26 Q. Okay. And you didn't physically perform the tests,
05:16:35 right?
05:16:35 A. Excuse me?
05:16:35 Q. You didn't physically perform the tests?

05:16:39 A. Physically? I -- I don't know what that means. They set it up physically, and then we performed the test together pushing the buttons.
05:16:52 Q. Okay. You didn't even personally design the methodology for the tests, right?
05:16:55 A. They designed the test. I told them what I wanted to be tested.
05:17:01 Q. Okay. And after the tests, for example, you couldn't even explain why packet numbers of information that were supposed to have come from a Verizon phone actually showed that it can had come from an AT&T phone? You didn't know because you hadn't designed it or actually performed the tests, right?
05:17:25 A. Either that or I didn't remember. They may have told me. I met with them, and they told me all the details, but I didn't really remember that it -- it turns out it was a device that was both from AT&T. It has nothing to do with AT&T service.
05:17:41 Q. Okay. You know that now, but they're the ones who did the tests, right?
05:17:46 A. Exactly.
05:17:47 Q. Okay. And the Wireshark module, the Aspen folks, they configured the Wireshark module, right?
05:17:56 A. They set it up, and they send me all the results, and I could filter through whatever I wanted.

05:18:11 Q. Okay. For example, you couldn't remember at your deposition whether the Wireshark was set up to capture SIP messages from that PBX that plays the music to the Polycom phone, you couldn't remember whether it was supposed to capture that or not. Does that sound right?
05:18:26 A. I don't remember that, but I saw on my computer the RTP messages that are relevant to music. I saw that.
05:18:36 Q. Okay. And that -- that PBX that plays music when you put it on hold and sends out a whole bunch of messages, you don't know anything at all about the detailed operation of that device, right?
05:18:48 A. I didn't know the precise detail of it, but I knew in general what it's doing, and I watched the messages going back and forth.
05:19:02 Q. Okay. So, sir, the test that Mr. Bhaskaran and Mr. Mavunkel decided to set up, right, realizing Mr. Bhaskaran really wanted to see RE-INVITE messages, okay, they threw something in there that created a bunch of completely irrelevant RE-INVITE messages from your side, this holding and playing music, right?
05:19:28 A. No, they didn't do anything there. The only reason they put the IP PBX is to play the music, and it played the music. And we listened to the conversation going back and forth. We switched it, it didn't drop. We watched everything we wanted. We looked at the RTP and the SIP

05:19:50 messages, and they told us what we expected to hear.
05:19:54 Nothing else happened.
05:19:56 Q. All of those RE-INVITEs that showed up in your testing,
05:19:59 every single one of them were generated the process -- were
05:20:03 generated by the process of taking the Aspen Polycom phone,
05:20:07 putting it on hold, and then taking it off hold, correct?
05:20:10 A. Yes, and I just explained why.
05:20:14 Q. Okay. Now --
05:20:18 MR. GAUDET: And, Your Honor, there's another
05:20:20 module to go into.
05:20:22 THE COURT: Let's go about 10 more minutes.
05:20:24 MR. GAUDET: Perfect, thank you.
05:20:25 Let's pull up Tab 5A so we can actually dig in and
05:20:30 look at these results a little bit. I'm sorry. I may have
05:20:39 just -- I do believe it's Tab 5A in your binder.
05:20:44 THE WITNESS: Oh, in the binder.
05:20:45 MR. GAUDET: It was RDX-9. So it was Exhibit 9 to
05:20:50 your -- to I believe it was the November 20th deposition.
05:20:55 There we go.
05:20:56 Q. (By Mr. Gaudet) Not a very inviting looking document,
05:21:00 right?
05:21:02 A. You're talking about 5 or 5A?
05:21:06 Q. 5A, sir. 5A.
05:21:08 A. 5A, okay, yes.
05:21:11 Q. And what this is -- and we'll break it down, but just

05:21:16 before we even start diving into it, this is an excerpt
05:21:19 from the Aspen call flow, right, which is all of the SIP
05:21:25 messages that show up in the Aspen call flow, and we
05:21:29 created this and showed it to you in your deposition. Is
05:21:33 that -- does that appear to be what that is?
05:21:36 A. I don't remember the numbers, but I accept it, yes.
05:21:42 Q. Okay. Terrific.
05:21:43 So in essence, right, this would be -- this is a
05:21:50 chart of all of the SIP messages, starting with these
05:21:55 requests and things, that went back and forth between that
05:22:00 Verizon phone and the Aspen phone on the other end, right?
05:22:05 A. Okay.
05:22:06 Q. Okay. So as we work through it, we're going to
05:22:09 highlight a few fields.
05:22:12 The word "Time" on the upper left, we're just
05:22:17 going to highlight just the word "Time," okay.
05:22:22 And that's referring to literally seconds, right,
05:22:25 I mean, just the 3.803, that's three seconds after you
05:22:29 started. Does that sound right?
05:22:32 A. Yes.
05:22:32 Q. Okay. Great.
05:22:34 The next one I want to highlight is "Source."
05:22:38 MR. GAUDET: And let's actually -- and we'll just
05:22:39 do "Source" in yellow for now.
05:22:41 Q. (By Mr. Gaudet) And actually it sort of almost plays

05:22:52 tricks on your eyes. There are actually only two addresses
05:22:55 in this entire source column, and the 208.73.146.93, that
05:23:01 first one, and we'll highlight that in blue, you see that?
05:23:06 A. Yes.
05:23:06 Q. Okay. And your theory is -- and I say your theory
05:23:10 meaning --
05:23:11 MR. GAUDET: We'll highlight it in blue if we
05:23:13 could.
05:23:14 Q. (By Mr. Gaudet) The proposition of your testing is
05:23:16 that is the Verizon phone, correct?
05:23:20 A. This is the IP address of the Nextiva trunk, which
05:23:29 receives and sends messages from the Verizon phone, and if
05:23:31 you double click on the result, it will say wireless phone.
05:23:34 It will say this is the Verizon phone. It says it
05:23:37 explicitly, so it comes from the Verizon phone.
05:23:41 Q. Perfect. But the only point I want to be sure we're in
05:23:44 agreement on is when we see 208, then based on your testing
05:23:48 methodology, think Verizon phone; is that fair?
05:23:50 A. No. This is an IP address. It doesn't say Verizon
05:23:54 phone.
05:23:55 Q. Okay.
05:23:55 A. There is messages from the office phones that go to it,
05:23:59 and there are messages from the Verizon phone that come to
05:24:06 it. But if you look at the source -- I think that's what
05:24:07 you probably meant. If you look at the Source column, when

05:24:10 it comes from that, it comes from the Verizon --
05:24:15 Q. Okay. The Verizon side?
05:24:16 A. Yeah, the Verizon side.
05:24:18 Q. Perfect.
05:24:19 A. Just from that column.
05:24:20 Q. Perfect. Thank you, sir. Thank you.
05:24:24 MR. GAUDET: I want to jump down one, two, three,
05:24:27 four, five, and there's a reason I'm doing it this way, but
05:24:30 the 192, that's at Line -- excuse me, 531, that one right
05:24:36 there, and we'll highlight that one that same kind of
05:24:39 orangish, brownish color maybe that we used for the Aspen
05:24:42 side.
05:24:42 Q. (By Mr. Gaudet) Okay. When you see 192, you think
05:24:47 Aspen's side, right? That's the stuff that's originating
05:24:50 over on the Aspen side, right?
05:24:51 A. Yes.
05:24:52 Q. Okay. Terrific.
05:24:55 Now, the -- the very first line, when you go all
05:25:08 the way over to the right, it says "request INVITE." You
05:25:12 see that?
05:25:12 A. Which line --
05:25:14 MR. GAUDET: We'll go ahead and highlight "request
05:25:17 INVITE."
05:25:17 A. Request INVITE on the first line.
05:25:21 Q. (By Mr. Gaudet) Yes.

05:25:21 A. Yeah, uh-huh.
05:25:21 Q. That is the SIP INVITE message from the Verizon side over to the Aspen side, correct?
05:25:23 A. Right. And telephone number of the -- you see them, the telephone number of the Aspen phone and the Verizon phone there too.
05:25:32 Q. Perfect.
05:25:34 And then there are a number of sort of follow-on things that just standard happen whenever you send something like that.
05:25:37 A. Uh-huh.
05:25:38 Q. And that takes -- I think it's our next four messages are all sort of part of that, so does that sound right?
05:25:45 A. Yeah, uh-huh.
05:25:49 MR. GAUDET: So what I want to do is actually highlight and block the first five lines of this chart, and I want a block highlight but all in that blue color that we're using for the Verizon side, okay?
05:26:07 THE WITNESS: Okay.
05:26:17 MR. GAUDET: And now I want to go all the way down to the last two lines, which are 6628 and 6629, and highlight those in blue also.
05:26:26 Q. (By Mr. Gaudet) That's the BYE, the goodbye, B-Y-E, that comes from the Verizon side, right?
05:26:32 A. Yes.

05:26:33 Q. Okay. And then every other SIP message that's shown in here was initiated by the Aspen side, right, the brown side, correct?
05:26:48 A. Precisely. That's what I explained before. That's the scenario I ran.
05:26:50 Q. True.
05:26:51 And the switching happened between the 20th second and the 40th second, right, somewhere in that neighborhood?
05:27:00 A. Yeah.
05:27:03 Q. Okay. And we can see that if we go down to 18 -- what we'll do is kind of a red -- yeah, we'll kind of do it in red there -- anything that's got a 20 on down and that's got a 40, okay, all of the messages while the switching is happening, right, those are all being created by Mr. Bhaskaran and Mr. Mavunkel by putting on the hold button and playing music, right?
05:27:34 A. Pushing the hold button and turning off the hold button. Pushing the hold button and turning off the hold button as I explained before.
05:27:48 Q. They just happened to be doing that during the switch, but that has nothing to do with Verizon's process of switching a phone, right?
05:27:53 A. It has to do a lot with Verizon. That goes to Verizon.
05:28:01 Q. It goes to Verizon. It's not part of what Verizon uses to switch a phone, right?

05:28:15 A. That's exactly what Verizon reacts to in doing its switching. It looks very carefully at the SIP messages coming from both sides. So it's --
05:28:27 Q. I tell you what --
05:28:28 A. -- very critical to what Verizon is doing.
05:28:30 Q. So let me be clear about this. All those brown messages during the switching, right, the switching operates exactly the same even if on the Aspen side Mr. Bhaskaran and Mr. Mavunkel hadn't done any of the stuff that's shown in the brown, right? We would still have the INVITE and the goodbye, right?
05:28:57 A. In this scenario, I didn't do anything else with the cell phone. I could do other things, and then it wouldn't happen just that way. I told you, that's the scenario.
05:29:13 Q. Okay.
05:29:13 A. In this scenario, I connected the cell phone, and then I disconnected it after the switch. That's all I did. I didn't do anything else, and you got what you're supposed to get.
05:29:23 Q. And I've got just a few more questions on this because we've kind of gone down this line. I'll try to get them out because I don't want to have to rebuild this figure.
05:29:29 A. Sure.
05:29:33 Q. But the -- what we'll -- maybe slide --
05:29:41 MR. GAUDET: Is it possible to slide this figure

05:29:42 over to the left, sort of shrink it and slide it? And I
05:29:46 want to bring up the Court's claim construction -- in other
05:29:50 words -- I said, claim construction -- definition --
05:29:51 definition of the phrase "SIP signaling sequence of the
05:29:55 transmission is maintained." Okay. I want to see what the
05:30:01 definition of that is.
05:30:03 And this is in the notebooks that everyone's got.
05:30:07 Q. (By Mr. Gaudet) It says maintaining -- I'm sorry.
05:30:09 MR. GAUDET: If we could just highlight this.
05:30:10 Q. (By Mr. Gaudet) Maintaining continuity in the
05:30:13 signaling sequence of the SIP used in the transmission.
05:30:16 You see that?
05:30:17 A. Yes.
05:30:20 Q. In the transmission -- the transmission, as we talked
05:30:22 about 45 minutes ago, the transmission is the call, right?
05:30:25 The thing that can't be dropped, correct?
05:30:29 A. Yes.
05:30:29 Q. Okay. So we have to -- as you put it, we have to go
05:30:34 up -- we have to increase -- we have to increase, right,
05:30:40 the SIP -- the signaling sequence of the SIP, we have to
05:30:45 increase it?
05:30:46 A. No, I didn't say that.
05:30:47 Q. You didn't say you have to keep increasing each time?
05:30:50 A. That specific message I pointed to at the time.
05:30:55 Q. Okay. Let's see if we can agree on this, sir, okay?

05:31:04 One -- and we'll underline them as we go along. And
05:31:08 actually, let me -- the column that has these numbers is
05:31:11 entitled Sequence Number. You see that?
05:31:13 A. Yes.
05:31:13 Q. That's -- so SIP signaling sequence, that's -- those
05:31:19 are the numbers, all right, that according to the Court,
05:31:23 you have to maintain the continuity of the sequence in the
05:31:27 call, in the transmission, in the entire call, right?
05:31:31 A. Yes, of course.
05:31:31 Q. Are you willing to admit that 1, 29,357, 29,358,
05:31:46 29,359, 60, 61, 62, 63, 2, 2 is not a continuous sequence?
05:31:54 Do you agree with me to that?
05:31:55 A. Not at all. It's maintaining it perfectly well.
05:32:00 Maintaining the sequencing after the switching which
05:32:05 means --
05:32:05 Q. Sorry.
05:32:06 A. -- maintaining continuity of the sequencing means if
05:32:06 you don't have the switch, there are certain rules to SIP
05:32:10 as to what should the sequence numbers be. So now you
05:32:15 switch. You have to use the same rules. You cannot change
05:32:20 your rules.
05:32:21 Q. Sir --
05:32:22 A. That's what it means.
05:32:23 Q. -- and the rules we can't change are that the number
05:32:28 must increase. Will you at least agree that 2 does not

increase from 29,363 --
A. Sorry, keep going.
Q. We do agree at that point, right?
A. Not at all. I just explained to you that the rule is not to increase the number. You keep saying it, but that's not the rule. The rules are much more complex than that.
MR. GAUDET: Your Honor, I think this is a good place to stop, if that's okay.
THE COURT: All right. Good enough.
MR. GAUDET: Thank you.
THE COURT: All right. Ladies and gentlemen of the jury, it's been a long day. Thank you for your attention and focus throughout the day.
I'll ask you to be back at 8:45 so that we can start promptly at 9:00 o'clock here in the courtroom. We did get a substantial amount of time in the courtroom today with the witnesses. So we are moving along nicely according to the schedule I have previously discussed with you.
So as a reminder, not because I think you have any -- I have any concerns about your ability to follow the rules of conduct I've previously given you, I just want to emphasize and reemphasize their importance. It is important for you not to discuss the case with anyone or to permit it to be discussed in your presence. Please don't

05:33:45 do any independent research or investigation into any matter associated with this trial. And finally, don't post anything about your involvement as a juror on any social media website or app.

I hope you all have a pleasant evening, and we'll see you back at 8:45 in the morning.

COURT SECURITY OFFICER: All rise.

(Jury out.)

THE COURT: You can step down.

THE WITNESS: Thank you.

THE COURT: I don't know if the parties have anything to discuss before we recess for the day.

I apologize for being strict about breaks and whatnot. We do have, of course, you know, a limited number of days this week, but we got, I think, six -- more than six and a half hours off the clock today, so that's good. I think we're on track to finish this, as we all expected to, on Thursday.

So we will plan to start very promptly in the morning with them at 9:00 o'clock. And like I said, we'll keep our breaks to 10, maximum of 15 minutes, and an hour for lunch.

Mr. Dacus?

MR. DACUS: Yes, Your Honor. I'd just like to confirm on the record the Court's practice that Dr. Rubin

05:35:25 is sequestered because he's on cross-examination.
05:35:29 THE COURT: That's generally my practice. Has the
05:35:32 Plaintiff got any heartburn with that?
05:35:33 MR. HEARD: Well, Your Honor, I just did want to
05:35:35 put on the record that it feels a bit unjust to hold him
05:35:39 over when we spent about 40 minutes, Mr. Gaudet did, on
05:35:43 invalidity issues. So it was -- we just assume he's not
05:35:47 going to retread any ground that he covered this morning.
05:35:50 THE COURT: I certainly hope we're not going to do
05:35:53 that.
05:35:53 MR. GAUDET: Your Honor, absolutely not. If I did
05:35:55 such a thing, they would be quite upset with me.
05:35:57 THE COURT: No, I -- how much time additional do
05:36:01 you think you have?
05:36:01 MR. GAUDET: I think I've got really one more
05:36:04 thing that's probably in the 10 to 15-minute range.
05:36:07 THE COURT: Okay.
05:36:07 MR. GAUDET: Something like that.
05:36:08 THE COURT: Fair enough.
05:36:10 MR. HEARD: Thank you, Your Honor.
05:36:11 THE COURT: Okay. Thanks.
05:36:13 (Court adjourned at 5:36 p.m.)

CERTIFICATION

I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.

/S/ Shelly Holmes 6/15/2026
SHELLY HOLMES, CSR, TCRR Date
CERTIFIED SHORTHAND REPORTER
State of Texas No.: 7804
Expiration Date: 10/31/2027