IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

| | | |
|---|---|---|
| ASPEN NETWORKS, INC., | )( | |
| PLAINTIFF, | )( | CIVIL ACTION NO. |
| | )( | 2:23-CV-557-RWS |
| VS. | )( | MARSHALL, TEXAS |
| | )( | |
| CELLCO PARTNERSHIP D/B/A | )( | |
| VERIZON WIRELESS, | )( | JUNE 16, 2026 |
| DEFENDANT. | )( | 8:32 A.M. |

---

TRANSCRIPT OF JURY TRIAL

BEFORE THE HONORABLE ROBERT W. SCHROEDER III,

UNITED STATES DISTRICT JUDGE, AND A JURY

VOLUME 3, PAGES 534 THROUGH 820

---

FOR THE PLAINTIFF:

Mr. Barry J. Herman
Ms. Julie Giardina
Womble Bond Dickinson (US) LLP
100 Light Street
26th Floor
Baltimore, MD 21202

Mr. Preston H. Heard
Ms. Christine H. Dupriest
Mr. John G. Perry
Mr. Jace D. Williams
Womble Bond Dickinson (US) LLP
1331 Spring Street NW
Suite 1400
Atlanta, GA 30309

Mr. Fabio E. Marino
Womble Bond Dickinson (US) LLP
1279 Oakmead Parkway
Suite 200
Sunnyvale, CA 94085

FOR THE PLAINTIFF: Mr. Eric H. Findlay
Findlay Craft, PC
7270 Crosswater Avenue
Suite B
Tyler, TX 75703

FOR THE DEFENDANT: Mr. Deron R. Dacus
The Dacus Firm, PC
821 ESE Loop 323
Suite 430
Tyler, TX 75701

Mr. Kevin P. Anderson
Ms. Elissa Sanford
Duane Morris LLP
901 New York Avenue NW
Suite 700 East
Washington, DC 20001

Mr. Matthew C. Gaudet
Mr. Glenn D. Richeson
Mr. John R. Gibson
Mr. Matthew S. Yungwirth
Duane Morris LLP
1075 Peachtree Street NE
Suite 1700
Atlanta, GA 30309

Mr. Aleksander J. Goranin
Mr. John Hillman
Mr. Robert M. Palumbos
Ms. Brianna M. Vinci
Duane Morris LLP
30 South 17th Street
Philadelphia, PA 19103

Ms. Holly E. Engelmann
Duane Morris LLP
Terrace 7
2801 Via Fortuna
Suite 200
Austin, TX 78746

COURT REPORTER: Ms. Shelly Holmes, CSR, TCRR
Official Court Reporter
Honorable Robert W. Schroeder III
United States District Judge
Eastern District of Texas
Texarkana Division
500 North State Line Avenue
Texarkana, TX 75501
shelly_holmes@txed.uscourts.gov

(Proceedings recorded by mechanical stenography, transcript produced on a CAT system.)

P R O C E E D I N G S

08:32:53

08:32:54 (Jury out.)

08:32:54 COURT SECURITY OFFICER: All rise.

08:32:55 THE COURT: Please be seated.

08:33:01 Good morning, all.

08:33:02 I know there were a number of disputes raised overnight, but I do think we should start with yesterday's morning disputes. There were, I think, a couple that are remaining that were not resolved with respect to deposition designations. Did the parties work those out, or do we need to discuss those?

08:33:31 MR. GORANIN: Your Honor, Alex Goranin for Verizon. My first time before Your Honor, pleasure -- pleasure to be here.

08:33:35 THE COURT: Good morning.

08:33:37 MR. GORANIN: We have one remaining one.

08:33:37 THE COURT: Okay.

08:33:39 MR. GORANIN: We on behalf of Verizon have an objection to a counter-designation by Aspen to the deposition of Mr. Bhaskaran.

08:33:49 So if I could have the document camera.

08:33:55 The portion of Mr. Bhaskaran's deposition that we designated was --

08:34:05 THE COURT: Can you cite me to a page number?

08:34:07 MR. GORANIN: Yes, I'm sorry, sir. It's the July
08:34:11 17th transcript. This is Page 56, Line 22, through 57,
08:34:18 Line 4.
08:34:18 All we did was ask -- in this deposition, all that
08:34:25 is being asked is for Mr. Bhaskaran to identify an email
08:34:30 that Mr. Chin was crossed about yesterday and provide a
08:34:33 date, August 17th, 2016. The counter-designation was 13
08:34:41 pages earlier, Lines 43:17 to 45:6, which just to
08:34:47 summarize, Your Honor, as we see it, Mr. Bhaskaran just
08:34:50 testifying to what the invention was. Unrelated testimony
08:34:55 and obviously something that if they had wanted to put into
08:34:57 the record they could have done during their case-in-chief
08:35:01 through Mr. Bhaskaran.
08:35:02 And I'm happy to show that to Your Honor on the
08:35:04 document camera.
08:35:05 THE COURT: Please do, yes.
08:35:08 MR. GORANIN: Yeah. This is the start of it, and
08:35:20 whenever Your Honor is ready, I'm happy to flip the page.
08:35:24 THE COURT: Okay. Okay. And so the objection is
08:35:47 to --
08:35:49 MR. GORANIN: It's outside the rule of
08:35:51 completeness, sir. If they had wanted to play his 30(b)(6)
08:35:54 testimony, their position was in this -- in this court, a
08:35:58 party can affirmatively play the testimony of their
08:36:01 30(b)(6) representative. I'm not sure whether that's the

08:36:04 case or not, and I didn't bother Mr. Dacus with that
08:36:06 question but even --
08:36:07 THE COURT: You didn't bother what?
08:36:11 MR. GORANIN: Mr. Dacus with that question.
08:36:11 THE COURT: Oh.
08:36:11 MR. GORANIN: But even if it were --
08:36:14 THE COURT: Mr. Dacus could have easily been
08:36:15 bothered with that question.
08:36:16 MR. GORANIN: But even if it were, they should
08:36:18 have designated Mr. Bhaskaran affirmatively during their
08:36:22 case-in-chief.
08:36:23 THE COURT: So the rule 32(a)(6)does provide that
08:36:26 if a party offers in evidence only part of a deposition, an
08:36:31 adverse party may require the offeror to introduce other
08:36:33 parts that in fairness should be considered with the part
08:36:38 introduced, and any party may itself introduce any other
08:36:42 parts.
08:36:42 MR. GORANIN: Yeah. So we would argue this is
08:36:46 outside the rule of completeness, sir.
08:36:48 THE COURT: All right. Let me hear from the
08:36:53 Plaintiff.
08:37:03 MS. GIARDINA: Good morning, Your Honor.
08:37:08 THE COURT: Good morning.
08:37:10 MS. GIARDINA: Julie Giardina on behalf of Aspen.
08:37:16 This is also my first time in front of Your Honor.

08:37:16 THE COURT: Good to have you.

08:37:18 MS. GIARDINA: Glad to be here. Verizon's categorical argument that Aspen should have called Mr. Bhaskaran live if it wanted the jury to hear these topics misstates the issue. Its Aspen's understanding that in this court a party may play testimony of its own 30(b)(6) witness in Verizon's contrary authorities all come from the Northern District of California.

08:37:35 Even if Aspen were limited to the rule of completeness, Aspen's counter-designations are independent affirmative testimony. Their responsive context for Verizon's own designations specifically in the designated testimony Verizon elicits that SIP was known before the '554 patent. It was not a short discussion.

08:37:54 Verizon asked the same question multiple times over numerous transcript pages, first generally then in the context of specific documents. Aspen is entitled to include Mr. Bhaskaran's explanation from the same line of questioning that the claimed invention addressed the problem that switching paths typically broke calls and that Aspen's solution included relevant elements as a combination including --

08:38:15 THE COURT: Can you slow down for me just a little bit?

08:38:18 MS. GIARDINA: Sorry.

08:38:19 Omitting that explanation would leave the jury
08:38:24 with an incomplete and misleading account of the witness's
08:38:27 testimony.
08:38:34 THE COURT: Okay. And so can you address the rule
08:38:41 of completeness?
08:38:44 MS. GIARDINA: Yes, Your Honor. So it's our
08:38:47 position that the counter-designated testimony is
08:38:51 completely responsive to the testimony designated by
08:38:57 Verizon. It's not an unrelated topic. Verizon's counsel
08:39:04 moved from the complexity of maintaining SIP signaling
08:39:09 sequence across supported topologies to the very next
08:39:13 question.
08:39:14 Whether that idea came from the SIP RFC, and
08:39:18 Mr. Bhaskaran explained why it did not. That's a straight
08:39:21 continuation of Verizon's line of examination and omitting
08:39:22 it would leave the jury with an incomplete impression of
08:39:25 the testimony Verizon chose to play.
08:39:28 THE COURT: Okay. All right. Let me hear from
08:39:32 Verizon again, if you've got anything else.
08:39:36 MR. GORANIN: Not much, Your Honor. All I will
08:39:39 say is according to the information we've been exchanging,
08:39:46 and ignore my scribbles here, the designation that we're
08:39:49 talking about here, Lines 43:17 to 45:6 was a counter to
08:39:56 Lines 56:22 to 57:04, and that's the testimony that I
08:40:02 showed Your Honor.

Question: Do you recognize Exhibit 22?

It looks like an email I sent to Mr. Bill Chin and John Yu.

And you see the email was sent on August 17, 2016.

That's correct.

And can you describe for the jury what you're telling Mr. Chin and Mr. Yu?

Nothing further, Your Honor.

THE COURT: Okay. Anything else from you?

MS. GIARDINA: Your Honor, I was going to attempt to use the ELMO. I've never used it before.

THE COURT: It's not that hard.

MS. GIARDINA: The counter-designations are directly responsive to --

THE COURT: Tell me how. How is it responsive?

MS. GIARDINA: Well, it relates to the same topic, and if you -- I don't think I have the prior pages in front of me, but it was a long line of questioning. This wasn't just a simple one -- one question, one answer. It all relates to the same topic and spans over multiple pages across the transcript.

And it addresses whether the claimed invention was merely taught, and it's directly probative of issues Verizon injected concerning SIP, the origin of the claimed idea, and the significance of known protocol materials.

08:41:51 THE COURT: Okay. All right. I'm going to
08:41:57 sustain the objection. I do think that the -- you know, I
08:42:05 think -- obviously, Aspen can, you know, play the
08:42:09 designations in its case-in-chief, but it's got to comply
08:42:12 with Rule 32(a)(6), and I don't think in these
08:42:15 circumstances Aspen's -- you know, I think their
08:42:24 description of why it's responsive is just incredibly
08:42:28 general.
08:42:28 So I'll sustain the objection.
08:42:29 All right. Next issue?
08:42:33 MR. GORANIN: Your Honor, the next issue is with
08:42:38 respect to Mr. Minor, John Minor, who will be testifying we
08:42:42 believe later this morning as Aspen's technical
08:42:45 apportionment expert.
08:42:46 THE COURT: All right.
08:42:47 MR. GORANIN: So I think what makes the most sense
08:42:49 is for me to kind of group the issues into three groups.
08:42:53 And the easiest way, I think, for Your Honor to get a sense
08:42:57 is I have excerpts -- all of these thematically are linked
08:43:03 by -- what we see on the slides aren't in Mr. Minor's
08:43:08 expert report --
08:43:08 THE COURT: Are not?
08:43:10 MR. GORANIN: Are not with respect to the
08:43:12 technical apportionment opinion. So what I'll do, Your
08:43:14 Honor, with permission, is hand you up a copy of the

relevant section of Mr. Minor's report --

THE COURT: Okay.

MR. GORANIN: -- and then I'll --

THE COURT: I may have it.

MR. GORANIN: Yeah, but this is much easier and succinct.

Okay. So if Your Honor could look at Paragraph -- Group 1 I call the linking together two charts issue.

THE COURT: Let me -- just for the record, let's make sure we're -- is this the document that was filed with the overnight disputes, the document that you just handed up?

MR. GORANIN: I believe so, Your Honor. I believe we submitted the report. It's just -- and I have provided a copy to Aspen's counsel so --

THE COURT: Good. I just want to make sure the record --

MR. GORANIN: Yeah, no dispute about that.

Okay. So Group 1, I call the mushing together two charts. This relates to the slides that I'm going to show Your Honor, PDX-323, inclusive, through PDX-328. And if Your Honor would look at Mr. Minor's expert report at Paragraphs 183 and 186. They should be facing on facing pages.

So 183 is his final kind of apportionment starting

08:44:29 point. I believe he calls it the convergence starting
08:44:35 point. It's a number of -- he kind of -- you may remember
08:44:38 this from the Daubert hearing. But he takes five layers,
08:44:42 and he assigns each of them a percentage. The preceding
08:44:46 paragraph 183 has those same layers in a different order.

08:44:50 And the issue we have with the slides that I
08:44:52 submitted -- sorry, that I referenced here is what
08:44:56 Mr. Minor does on the slides is he kind of group -- he
08:45:00 takes those two tables, and he brings them together to
08:45:06 suggest that his discussion in Paragraph 183 directly and
08:45:13 coherently related to the dependency weights in
08:45:18 Paragraph 186.

08:45:20 And the problem for us, Your Honor, is during
08:45:23 Mr. Minor's deposition, we specifically asked him about
08:45:28 this issue.

08:45:32 I'll pause because it'll take too long for me to
08:45:37 read this in the record, but the relevant portion from
08:45:40 Mr. Minor's transcript -- deposition transcript that I've
08:45:44 put up is from -- the best -- I gave you the additional
08:45:46 context. This is a -- in essence, a discussion of how does
08:45:50 Paragraph 183 relate to the dependency weights in Paragraph
08:45:54 186.

08:45:54 The key portion is at 78, Line 10, on down.

08:45:54 THE COURT: Okay.

08:46:00 MR. GORANIN: I asked him specifically: Is any of

08:46:02 the discussion in the patent relevant interaction column in Paragraph 183, did that directly translate into one of the dependency weight numbers that you have in the dependency weight column at Paragraph 186?

And then he gave me the -- you know, the answer: Some of them indirectly relate. It's different. There's a relationship. There's steps. It's different language. But there's some relationship. That's the best I can say, honestly.

And here he seems to be making a direct relationship.

THE COURT: Here?

MR. GORANIN: Here in his slides.

THE COURT: Okay.

MR. GORANIN: In the slide range. He seems to be making a direct relationship. That's the toughest issue, Your Honor, with Mr. Minor.

THE COURT: Okay. So would splitting up the sections of the slide accomplish --

MR. GORANIN: Yes, sir. Yes, sir. As if -- if he split it up and just presented the tables in Paragraph 183 separately from the table in Paragraph 186, no issue.

THE COURT: Is there any objection to that?

MR. PERRY: Your Honor, we believe that all we're doing is -- he did testify there was a relationship --

08:46:58 THE COURT: I'm going to need you to come to the podium.

08:47:00 The question is, is there any objection to splitting them up on the slides?

08:47:04 MR. PERRY: Yes, Your Honor. The objection is that all we are doing is taking information that's presented in his report that he has testified that there is a relationship between them. We're just trying to put it in one chart for the jury because he's talking about these five layers. In one chart, he's talking about certain things about those five layers. In the second chart he's talking about those same five layers and something different.

08:47:31 So it's -- we want the jury to be able to see it together. He did reorder when he -- in his report he reordered the second slide based on the highest to lowest of dependencies. But to not confuse the jury between the reordering, we just put them all together in the order they appeared in the first chart, and we're letting him explain it.

08:47:53 They asked him about it in his deposition. He said there was a relationship. They don't think his explanation was coherent enough, but he explained what he was doing. So he should be allowed to do it. We're trying to simplify the presentation to the jury.

08:48:05 THE COURT: Okay. Let me let Verizon finish its argument.

08:48:09 MR. GORANIN: Yeah, respectfully, Your Honor, I don't believe that's entirely what's done. What the suggestion to the jury here is, is that the Paragraph 183 discussion, which is the second column on the slide, PDX-323, directly supports and led to the dependency weight number in Paragraph -- in -- in the third column.

08:48:31 That's not what he testified to. He couldn't provide an explanation. And we're concerned that that's going to be an unfair inference the jury's going to draw.

08:48:39 THE COURT: Okay. Anything else you want to add?

08:48:41 MR. PERRY: Yes, Your Honor. Their objection to his -- his -- the slide is that it's outside the scope of his report. All this is clearly in his report, and he is just organizing and presenting it to the jury in a way he thinks will simplify it for the jury.

08:48:58 THE COURT: So I don't think that splitting up the charts necessarily prevents you from simplifying it for the jury. I think he can explain what he did, but I do think -- I think the objection here is valid.

08:49:12 So I'll just ask that you split them into different -- into different pages.

08:49:18 MR. GORANIN: Next one should be easier, Your Honor.

08:49:20 Okay. This issue relates to Slides PDX-325, PDX-326, and PDX-327. So here, if Your Honor has the chart in Paragraph 186 of the report in front of you, what has -- what Mr. Minor has done on these slides, I'm showing you on the screen, PDX-326 as representative, is he's now included additional discussion in these bullet points.

08:50:00 Our objections to the -- obviously to the linkage, but also to the bullet points and -- for instance, he never says in the relevant Paragraph 186 that Control/Policy is the core of what the '554 patent does.

08:50:13 And then on the following slide illustratively PDX-327, he's now saying this is a significant impact on how voice packets are treated. Again, outside the scope of the report. Your Honor has Paragraph 186 of his report in front of you. That's the entire discussion in the report of that number.

08:50:36 THE COURT: You're saying this opinion was not disclosed?

08:50:39 MR. GORANIN: Correct.

08:50:40 THE COURT: Okay. Let's hear from -- let's hear from Aspen.

08:50:44 MR. PERRY: Your Honor, all this is, is a -- their argument is that we have to use the exact words that were in his report. Mr. Minor is trying to explain very complex concepts to the jury. The bullet points, the additional

08:51:17 bullet points is just his layman's explanation.
08:51:21 THE COURT: The core of what the patent does --
08:51:23 MR. PERRY: Yeah.
08:51:24 THE COURT: -- type language?
08:51:26 MR. PERRY: Yes. So it's literally trying to
08:51:29 simplify what's at the top, which is in his report. They
08:51:32 come from those two charts we just talked about, and this
08:51:35 is how he's going to try to explain it in lay terms to the
08:51:38 jury. He's entitled to do that.
08:51:40 It's not -- it's not a new opinion. It's -- it's
08:51:43 essentially a simplification of what -- you know, when he
08:51:48 says governs the continuity of secure tunnel and traffic
08:51:54 classification, he's trying to explain that in more plain
08:51:57 terms to the jury. That's all that is. It's not a new
08:51:59 opinion.
08:51:59 THE COURT: You're just saying the precise words
08:52:01 were not used?
08:52:02 MR. PERRY: Correct. And they're seeming to argue
08:52:04 that if the exact words are not duplicated, we can't put it
08:52:09 on the slide.
08:52:09 THE COURT: Right. Sure.
08:52:10 MR. PERRY: And so we're saying he has a right to
08:52:13 talk and explain it to the jury in terms they can
08:52:15 understand it.
08:52:16 THE COURT: All right. Let me hear from Verizon

08:52:18 about this.

08:52:18 MR. GORANIN: All I'll say, Your Honor, is if

08:52:24 Mr. Minor had wanted to say for that layer that is the core
08:52:27 of what the '554 patent does, he could have easily said it.
08:52:31 All we have -- it's not a simplification, it's an
08:52:34 elaboration of something that was literally a phrase in one
08:52:38 paragraph of his report.

08:52:39 THE COURT: All right. Here's what I'm going to
08:52:40 ask you to do. Modify the slides if the words were not
08:52:44 used in the report. Take them off the slides. When the
08:52:48 witness testifies, to the extent you simplify his opinions,
08:52:51 I'm going to give you some latitude to do that. To the
08:52:54 extent that Verizon thinks that leads to the rendering of
08:52:59 an opinion that was not appropriately disclosed, it's
08:53:05 entitled to object at that point, and we can deal with it.
08:53:08 All right?

08:53:09 MR. GORANIN: I can get this one in in a couple
08:53:11 minutes, Your Honor.

08:53:12 THE COURT: Okay.

08:53:13 MR. GORANIN: Final one on Minor, I'm looking at
08:53:16 PDX-333, and then there's also an earlier slide, same
08:53:22 thing -- same thing appears on PDX-330, 332. I'm just
08:53:27 going to show you the one on PDX-333.

08:53:29 So Mr. Minor at the tail end of his apportionment
08:53:32 does what he calls exclusions. And this one is for a

08:53:38 parallel innovation. Those phrases, "remove handset value"
08:53:44 and "remove non-asserted technologies" appear nowhere in
08:53:47 his report.
08:53:47 And if you could look -- specifically the one
08:53:49 place they pointed us to is Paragraph 208 of his report
08:53:54 under Parallel Innovation Discount. He does not talk about
08:53:59 handset value -- filtering out handset value or removing
08:54:05 non-asserted technologies. We're particularly concerned
08:54:08 about both. But non-asserted technologies kind of suggests
08:54:11 that he filtered out here other patents, other patented
08:54:11 technologies that are not asserted in this case, and that's
08:54:11 nowhere disclosed in Paragraph 208.
08:54:11 That's it for me on that point.
08:54:28 THE COURT: All right. Thank you.
08:54:28 MR. PERRY: And on this one, Your Honor, again,
08:54:31 this was an attempt to kind of break out and simplify what
08:54:35 Mr. Minor is going to talk to the jury about. He calls
08:54:39 this the parallel innovation discount. And, you know, what
08:54:45 he says in his report is, you know, I reviewed
08:54:50 documentation, field trial equipment specifications. You
08:54:54 know, and then he says -- and he gives some examples,
08:54:58 adaptive schedulers, antenna diversity, Qualcomm codec
08:55:04 optimizations. So he said I looked at all, you know, these
08:55:06 other things, and here are a few examples.
08:55:08 And they're essentially saying if the examples

08:55:12 weren't listed, he can't talk about them. And literally
08:55:15 they asked two questions in his deposition about this, and
08:55:17 it had nothing to do with the examples. It was just, you
08:55:20 know, how did he come up with the 20 percent.

08:55:23 THE COURT: Okay.

08:55:24 MR. PERRY: So he should be able to, you know --

08:55:27 THE COURT: Well, he explains that in Paragraph
08:55:30 209, right?

08:55:30 MR. PERRY: Yes.

08:55:31 THE COURT: Okay. So same -- same ruling on this
08:55:34 slide. I'm going to ask you to take out the words that
08:55:36 were not used in the report. To the extent you can
08:55:41 summarize it or simplify it during the direct testimony,
08:55:45 please do that. If there's an objection that it was not
08:55:48 properly disclosed, Verizon can make that objection at the
08:55:52 time, and I'll rule on it.

08:55:53 MR. PERRY: All right. Thank you, Your Honor.

08:56:10 MR. GORANIN: All right. Your Honor, we got
08:56:12 issues with two slides of Mr. Justin Blok who is the
08:56:16 damages expert.

08:56:17 THE COURT: Okay.

08:56:18 MR. GORANIN: Not nearly as -- not nearly as
08:56:22 challenging, I think, as Mr. Minor.

08:56:25 First one is an issue with Slides 420 to 421.
08:56:31 Again, outside the scope of Mr. Blok's report.

08:56:33 I'm going to put up on the document camera,
08:56:36 this -- this -- all these are callouts of an exhibit,
08:56:43 PTX-166. I believe it is in evidence.
08:56:45 But Mr. Blok, despite discussing other documents
08:56:48 like this in his report, says nothing about this particular
08:56:52 document in his report, does no analysis. All Aspen has
08:56:55 pointed us to is that this is among the many, many
08:56:58 documents he listed in his documents-reviewed section, you
08:57:02 know, the tail end of his report.
08:57:04 That's it on that slide, Your Honor.
08:57:06 THE COURT: And what's the objection?
08:57:09 MR. GORANIN: The objection is outside the scope
08:57:12 of the report. Rule 26 issue.
08:57:15 THE COURT: Let me ask, did the jury see this
08:57:17 document already?
08:57:18 MR. GORANIN: They have not, Your Honor.
08:57:20 MR. HERMAN: They're going to see it this morning,
08:57:22 Your Honor.
08:57:22 THE COURT: All right.
08:57:22 MR. HERMAN: We're going to play the deposition
08:57:24 testimony of Mr. Kondratiuk, and they're going to see it.
08:57:27 And all this relates is there's one document that has
08:57:30 already been shown that says the 1.06 billion. This says
08:57:34 the same exact thing, but it doesn't have "draft" on the
08:57:37 cover. Mr. Blok was asked about this at his deposition,

08:57:40 and he said, no, I understand this was presented to leadership. It's not just a draft. And all we're trying to do is establish that.

08:57:47 So, I mean, it's a pre-admitted exhibit that the jury's going to see before he goes, and it's entirely consistent with everything he says.

08:57:55 THE COURT: So is he going to render an opinion about the document?

08:57:58 MR. HERMAN: He's rendering an opinion about the $1.06 billion that's throughout his report. So it's just the same number in a different document that he did rely on and that the jury is going to have seen this morning.

08:58:11 THE COURT: So this is not a perfect solution, but I think the fair thing to do is, you know, when the document is shown to the jury during the course of the -- the day's testimony, Mr. Blok will be in the courtroom, and he can see that. To call it out specifically on a different slide, I think, is somewhat problematic.

08:58:33 So I'll let you ask him about it and ask whether, you know, it's consistent with his testimony, was he in the courtroom, did he see it? I'll allow questions about that, but to call it out specifically on its own slide, I think I'll sustain the objection to that.

08:58:51 MR. HERMAN: Okay, Your Honor. Relatedly, I just wanted to -- we had -- this is a slide, excuse me, that we

08:58:58 have in the report. And when I was going through it with
08:59:00 Mr. Blok last night, I realized that the "draft" part had
08:59:02 inadvertently been covered up on the slide. So we're
08:59:07 just -- we're taking the slide that they didn't object to
08:59:09 and just making sure that the jury sees that there is
08:59:12 "draft" on that slide.

08:59:13 THE COURT: Any objection to that?

08:59:14 MR. GORANIN: No, Your Honor.

08:59:15 THE COURT: Very well.

08:59:18 Good. Okay.

08:59:20 MR. GORANIN: I got one last one.

08:59:21 THE COURT: All right.

08:59:22 MR. GORANIN: So now we're looking at Slide 427 of
08:59:26 Mr. Blok. This is his discussion of Georgia-Pacific
08:59:29 Factors No. 8 and 11. It's captioned Commercial Success
08:59:33 and Extent of Use. And our issue is with that first bullet
08:59:38 point: Available on most smartphones. We have two issues.

08:59:42 One is in the nature of a 403, where if Your Honor
08:59:45 will remember from the preliminary jury instructions, this
08:59:48 is a method -- method claims, infringements through a
08:59:51 method of use. This is suggesting that Verizon uses Wi-Fi
08:59:57 Calling by making it available on most smartphones. So
09:00:00 available is a capability. That's the first objection.

09:00:02 Second objection, we've combed over Mr. Blok's
09:00:07 discussion in his report of these two Georgia-Pacific

09:00:09 factors, and we don't see that he ever says Wi-Fi Calling
09:00:12 is available on most smartphones.
09:00:14 If he were to remove that first bullet point, we
09:00:17 would have no issue with the slide.
09:00:18 THE COURT: I mean, doesn't the world know that?
09:00:21 MR. GORANIN: I don't think they do, Your Honor,
09:00:25 respectfully. I don't know that the world knows that Wi-Fi
09:00:28 Calling is available on most phones.
09:00:31 THE COURT: Okay.
09:00:32 MR. GORANIN: The data in this case is only 40
09:00:34 percent of people actually go and activate Wi-Fi Calling.
09:00:39 And if Your Honor will remember Mr. Dacus asking the jury
09:00:41 how many have activated Wi-Fi Calling, I think it was only
09:00:41 two out of 40. I think it's actually a key issue in the
09:00:43 case, how many people know whether it's available.
09:00:46 THE COURT: Fair enough. Okay.
09:00:47 MR. HERMAN: Your Honor, everyone does know, and
09:00:50 the -- it's throughout Mr. Blok's report. This is
09:00:53 directly -- directly relevant to Georgia-Pacific Factors
09:00:58 8 and 11, commercial success and extent of use. And he
09:01:02 discusses at length in his report smartphone availability,
09:01:06 Voice over Wi-Fi provisioning, and minutes of use evidence.
09:01:08 The minutes of use that is throughout his report
09:01:12 and the basis for his damages calculation, this is all
09:01:17 about how many people are using the capability.

09:01:21 THE COURT: I'm going to overrule the objection on this. To the extent when we get into testimony there's a question that Verizon thinks is inappropriate, it can object at that time, but the slide itself is not problematic.

09:01:34 MR. HERMAN: Thank you, Your Honor.

09:01:35 MR. GORANIN: Thank you, Your Honor.

09:01:38 MR. HERMAN: Your Honor, I think the next issue is Mr. Faber who's not going to go until at the earliest late this afternoon. I see the time. Would you prefer that we take that up at lunch?

09:01:49 THE COURT: I would, yeah, I think so. Is there anything else we need to discuss before we start the completion of the cross-examination?

09:01:58 MR. GORANIN: Not from Verizon, Your Honor.

09:02:01 MR. HEARD: Your Honor, I believe we need to read the exhibits into the record. We can do that now or --

09:02:05 THE COURT: No, let's do that later. Let's do that later.

09:02:10 Anything else?

09:02:11 MR. DACUS: No, Your Honor.

09:02:12 MR. HERMAN: Not from Aspen, Your Honor.

09:02:14 THE COURT: Okay. Dr. Rubin, could we get you back on the witness stand?

09:02:18 And Mr. Savage, if you would have the jury brought

to the courtroom.

COURT SECURITY OFFICER: All rise for the jury.

(Jury in.)

THE COURT: Please be seated.

Ladies and gentlemen of the jury, good morning. I hope you all had a pleasant evening.

When we concluded the day yesterday, the Defendant was still in its cross-examination of the witness.

At this time, Mr. Gaudet, you may continue.

MR. GAUDET: Thank you, Your Honor.

IZHAK RUBIN, PH.D., PLAINTIFF'S WITNESS,

PREVIOUSLY SWORN

CONTINUED CROSS-EXAMINATION

BY MR. GAUDET:

Q. Good morning, Dr. Rubin.

A. Good morning.

Q. As you can see as I'm walking up here, I only have two pieces of paper, which means the end is near. And I conferred with my team. There's actually really only one other topic I want to cover with you, and it's almost in the category of housekeeping item. But what I'd like to do first is have my colleague hand you another document.

MR. GAUDET: So, Your Honor, if we could have someone approach to hand Dr. Rubin a document.

THE WITNESS: I have it, I think.

09:04:12 MR. GAUDET: Oh, you've got it? They're way ahead
09:04:15 of me. Terrific. You've got it.
09:04:17 Q. (By Mr. Gaudet) So if you would just look at this
09:04:19 document that's marked VDTX-233.
09:04:24 MR. GAUDET: And we'll bring it up on the screen
09:04:26 so we can all look at it together. It's exhibit --
09:04:35 Exhibit 6 to Dr. Rubin's November 20th deposition. And
09:04:41 we've marked it VDTX-233, just for purposes of the process
09:04:46 here.
09:04:47 Q. (By Mr. Gaudet) So this is another one of these
09:04:49 documents that when you look at it, your eyes kind of glaze
09:04:54 over in the first instance. But what I want to do is focus
09:04:57 you on the upper left, and I'm going to kind of circle a
09:05:02 portion here on the screen. You see there's a 50 inside of
09:05:07 that circle?
09:05:08 A. Yes.
09:05:09 Q. And -- and this is a printout of the 50th packet from
09:05:20 the call trace test that you did; is that correct?
09:05:22 A. Yes.
09:05:22 Q. And then if we go over to this side, the right side.
09:05:25 I'm going to circle, okay, that, that word "INVITE" is
09:05:33 right there. This is the -- the INVITE, right, that --
09:05:37 it's the only INVITE that the Verizon side sends over to
09:05:42 the other side at -- to start the call, correct?
09:05:46 A. Yes, it seems that way.

09:05:49 Q. Okay.
09:05:50 MR. GAUDET: Your Honor, at this time, we move
09:05:51 into evidence DTX-233.
09:05:55 THE COURT: Any objection?
09:05:56 MR. HEARD: No objection.
09:05:57 THE COURT: It'll be received.
09:05:59 MR. GAUDET: Thank you, Your Honor.
09:06:00 Let's now pull up the second page of this
09:06:05 document. Pull up the screen here.
09:06:08 Q. (By Mr. Gaudet) And I'm just going to draw your
09:06:10 attention -- it's towards the middle. There' this Call-ID
09:06:16 right here. It says Call-ID. And it ends with a 119.20.
09:06:25 Do you see that?
09:06:26 A. Yes, I do.
09:06:27 Q. Okay. What is that Call-ID field?
09:06:31 A. The Call-ID is identifier of the call.
09:06:36 Q. Okay. Now, sir, that particular Call-ID, that is not a
09:06:44 Call-ID that can be used in Verizon's network, correct?
09:06:54 A. I don't know if it's used in the Verizon network. I
09:06:56 don't understand the question then.
09:06:57 Q. I'm sorry, you understand what I mean by Verizon's
09:07:00 network, the stuff Verizon owns, right?
09:07:01 A. Yes.
09:07:02 Q. Okay. You don't know whether or not that is a Call-ID
09:07:07 that can be used in Verizon's network; is that fair?

09:07:14 A. Yes.
09:07:15 Q. Okay. Yes, you don't know, correct?
09:07:17 A. Yes, right. I don't know whether it's used in the
09:07:20 Verizon network --
09:07:20 Q. Thank you.
09:07:21 A. -- just to be precise.
09:07:22 Q. Thank you.
09:07:23 MR. GAUDET: I pass the witness, Your Honor.
09:07:25 THE COURT: All right. Redirect?
09:07:27 MR. HEARD: Yes, Your Honor.
09:07:42 REDIRECT-EXAMINATION
09:07:43 BY MR. HEARD:
09:07:43 Q. Good morning, Professor. How are you?
09:07:46 A. Very good. Thank you.
09:07:48 Q. Good. Thank you for slogging through yesterday
09:07:52 afternoon. It seems like we're almost finished. But thank
09:07:55 you for, you know, having the opportunity to come back this
09:07:59 morning and clear up a few things.
09:08:02 A. You're welcome.
09:08:03 Q. Verizon's attorney yesterday asked you a number of
09:08:05 questions about the prosecution history. Do you remember
09:08:08 that? The back and forth with the Patent Office?
09:08:10 A. Yes. I remember that, yes.
09:08:15 MR. HEARD: Can we pull up JTX-2?
09:08:19 Q. (By Mr. Heard) And this was -- and it's in your binder

if you need to see that, as well, but it's on your screen.
Is this the prosecution history that you reviewed as part of forming your opinions in the matter?
A. Yes, it is.
Q. And you've testified in a number of cases -- a number of patent cases, right?
A. That's correct.
Q. And amending the claim -- so Verizon's attorney took you through the back and forth where language was changed, that -- when amendments were made. Do you recall that?
A. Yes, I do.
Q. And that's a very normal part of the process with the Patent Office, is it not?
A. Absolutely.
Q. And to support your opinions, you have to look at the claims as they actually issued and were approved by the Patent Office, right?
A. Yes.
Q. And I want to take a look just at one thing, because Verizon's attorney had you look at what was originally filed. What did the inventors look at back when they first filed in 2008?
MR. HEARD: So if we could go there to PDF Page 197.
Q. (By Mr. Heard) And Verizon's counsel showed you this.

09:09:34 This was the original application the first time Mr. Chin
09:09:36 and the co-inventors went to the Patent Office, right?
09:09:38 A. Yes.
09:09:38 Q. And you reviewed this, as well, in forming your
09:09:42 opinions?
09:09:42 A. I did.
09:09:43 Q. And just to clarify a few points that I think Verizon's
09:09:48 counsel didn't mention yesterday. If we go to the original
09:09:51 claims as filed and look at the bottom -- Claim 4 in the
09:09:55 original application, was SIP signaling sequence being
09:10:00 maintained? Was that part of the original claims?
09:10:02 A. Yes, it is part of the original claim. It's there.
09:10:05 Q. And, likewise, if you go down a few more claims to
09:10:10 Claim 9, was -- did the Aspen inventors claim from the very
09:10:16 outset, from the first time they went to the Patent Office
09:10:18 a mobile device?
09:10:20 A. Yes, they did.
09:10:21 Q. And that's a claim that we're considering in the actual
09:10:25 issued claims now, isn't it?
09:10:26 A. Correct.
09:10:27 Q. And so -- and it goes even beyond that. If we go back
09:10:32 a few pages to Paragraphs 39 and 40, this is part of that
09:10:36 whole -- you know, detailed description of all the
09:10:42 embodiments, right?
09:10:44 MR. HEARD: If we could highlight just the title.

MR. GAUDET: Your Honor, I object. This is outside the scope of his report.

MR. HEARD: Your Honor, it's squarely -- squarely within the scope of the cross-examination yesterday that went through this document in detail.

MR. GAUDET: Your Honor, I didn't touch this page of the document or this -- anything about this discussion back and forth.

MR. HEARD: And that's kind of the point of it. It was omitted from the cross-examination to give the impression that mobile devices were not contemplated.

THE COURT: Was the -- was this an opinion that was disclosed?

MR. HEARD: That mobile devices were always contemplated, yes.

MR. GAUDET: That was not an opinion that was disclosed.

THE COURT: I'm sorry?

MR. GAUDET: That, what he just referred to, there is nothing in Dr. Rubin's report that discloses that --

THE COURT: Let me have you all approach.

MR. HEARD: Sure.

(Bench conference.)

THE COURT: Go grab it. If it was disclosed, just show me where it was.

09:11:42 MR. HEARD: Yeah, sure.
09:11:43 MR. GAUDET: Thank you.
09:12:17 (Pause in proceedings.)
09:12:25 MR. GAUDET: Your Honor, is it all right if
09:12:27 Mr. Anderson is up here as well?
09:12:29 THE COURT: Yeah.
09:12:30 MR. GAUDET: Okay. Thank you, Your Honor.
09:12:31 MR. HEARD: Throughout the report, what we're
09:12:32 talking about, the dispute is were those paragraphs of the
09:12:38 provisional application cited, there's not going to be
09:12:40 anything. But throughout this described in the '554 patent
09:12:43 that it was directed to a mobile device embodiments, Figure
09:12:47 6 is cited, Figure -- all the detailed description is
09:12:50 cited --
09:12:53 THE COURT: Whoa, whoa, whoa, whoa, whoa. One
09:12:56 person at a time. Mr. Anderson can take his seat. He's
09:13:00 still talking. He's still talking.
09:13:03 Mr. Gaudet, you will very quickly get into trouble
09:13:05 with me.
09:13:12 MR. HEARD: Your Honor, just to that end,
09:13:13 throughout the entire overview of the accused -- I mean, of
09:13:17 the '554 patent, Dr. Rubin explains that it is in the
09:13:20 mobile device context. And then Mr. Gaudet in his
09:13:23 cross-examination questioning tried to imply that the
09:13:27 original claims only showed portions of the -- of the

09:13:31 application to give the impression that mobile devices or
09:13:34 cellular devices were not contemplated.
09:13:37 And this is just completeness for the jury.
09:13:39 They've been -- they've been misled to believe the original
09:13:43 application didn't contemplate cellular. That's a fair
09:13:45 rehabilitation of the witness.
09:13:48 MR. GAUDET: First of all, I apologize, and thank
09:13:52 you for --
09:13:52 THE COURT: It's just too much chatter. I get too
09:13:56 much chatter up here at the bench when you do that.
09:13:59 MR. GAUDET: And I apologize.
09:14:00 First of all, there is no citation nowhere in his
09:14:04 report where he says -- where he addresses this as the
09:14:09 patent -- pointing to the patent covering mobile devices.
09:14:12 He just says -- he cites to Figure 6. That's incorrect.
09:14:16 He confirmed on the stand that in his 334-page report, he
09:14:20 never cites Figure 6. That was literally the only -- the
09:14:24 only reference he just gave. It's not in there.
09:14:27 When I addressed the prosecution history, that
09:14:32 200-page document, I never used the word "mobile." That
09:14:35 had nothing to do with whether or not mobile was in there.
09:14:39 I was going through to show that they did not get something
09:14:42 on simply switching between networks. And then they had to
09:14:48 add NAT, and that wasn't good enough. And they added the
09:14:51 last phrase. In the entire discussion of the prosecution

09:14:54 history, I never -- my recollection, I never referenced
09:15:00 mobile, and, again, he from the stand confirmed that he
09:15:04 never referenced any in his report -- any of those figures
09:15:07 have anything to do --
09:15:08 THE COURT: Can you tell me where it was
09:15:09 disclosed?
09:15:10 MR. HEARD: Paragraph -- this is one example but
09:15:12 on Page 14 of Dr. Rubin's report he's going through the
09:15:12 claims and pointing out that this source is a mobile device
09:15:19 in describing the invention. Again, we're not going back
09:15:21 to -- we haven't had a dispute as to whether the
09:15:23 provisional application fully supported the issued claims,
09:15:27 and that's what really we're getting into now. So there's
09:15:30 no discussion does the provisional application -- also Page
09:15:35 14 of his report.
09:15:36 THE COURT: Can you just ask him generally about
09:15:38 what his opinions are?
09:15:40 MR. HEARD: Sure.
09:15:40 THE COURT: Without citing to the those specific
09:15:43 pages?
09:15:44 MR. GAUDET: I would say there is no opinion
09:15:46 anywhere in his report explaining why the patent would
09:15:49 cover mobile. That doesn't exist. That's what I'm saying.
09:15:54 He needs to show us something.
09:15:56 MR. HEARD: I just showed you, he goes through,

09:15:58 and that's why he's applying to mobile device in the entire
09:16:01 section discussion --
09:16:02 THE COURT: I'm going to overrule the objection.
09:16:04 MR. GAUDET: Okay. Thank you, Your Honor.
09:16:06 (Bench conference concluded.)
09:16:14 Q. (By Mr. Heard) Let's pick back up where -- where we
09:16:17 were. So we were looking at the original provisional
09:16:20 application. And this is the very end of the detailed
09:16:23 description. And what -- what is the title there,
09:16:26 Dr. Rubin, of this -- this final section of the original
09:16:30 application filed in 2008?
09:16:32 MR. GAUDET: Your Honor, I apologize. Could we
09:16:34 actually approach just one more moment?
09:16:39 (Bench conference.)
09:16:45 MR. GAUDET: I thought the ruling that he wasn't
09:16:48 supposed to do this with the document. He's now going
09:16:52 through with the document. If I misunderstood, I
09:16:54 apologize.
09:16:54 MR. HEARD: I took it as the objection was
09:16:56 overruled.
09:16:57 THE COURT: The objection is overruled. I just
09:16:58 think if you can --
09:16:59 MR. HEARD: Move on.
09:17:01 THE COURT: Well, I think if you can do it without
09:17:03 specifically referring to the document that was on the --

09:17:06 MR. GAUDET: Yeah.
09:17:07 MR. HEARD: Thank you.
09:17:07 (Bench conference concluded.)
09:17:12 Q. (By Mr. Heard) So, Dr. Rubin, we can take down the
09:17:18 detailed description.
09:17:20 So what was your opinion and understanding after
09:17:23 having reviewed the prosecution history and reviewed those
09:17:26 original claims as filed as to whether the inventors
09:17:30 contemplated a mobile device, a mobile domain for their
09:17:34 invention?
09:17:34 A. It's clear to me by reading those documents that they
09:17:39 did contemplate mobile devices.
09:17:41 Q. Now, did the -- did Claim 1, as issued, does it require
09:17:46 Wi-Fi specifically?
09:17:47 A. Not specifically, no.
09:17:49 Q. Does Claim 1 talk about a network path?
09:18:00 A. It talks about switching from one network path to
09:18:03 another network path.
09:18:04 Q. So it discusses network paths, right?
09:18:06 A. Yes.
09:18:07 Q. Is Wi-Fi an example of a network path?
09:18:10 A. Wi-Fi is an access link which is part of a network
09:18:19 path.
09:18:19 Q. And if we go to your -- pull up your CV, which
09:18:25 Mr. Gaudet took you to -- talked about a little bit. But

09:18:28 is this your current CV?
09:18:30 A. Yes.
09:18:30 Q. And I just want to look at two publications that you --
09:18:35 you did around the same time of the -- the application of
09:18:39 the '554 patent. You see those on your screen?
09:18:41 A. I do.
09:18:42 Q. And do these relate to wireless networks and even the
09:18:46 802.11 standards?
09:18:48 A. Yes, they do. They do. I studied it extensively.
09:18:56 Q. And this is something that you were well attuned to in
09:18:58 this time frame when the '554 patent was -- was filed,
09:19:05 right?
09:19:05 A. Of course, I was very active in this area.
09:19:08 Q. So what is your opinion as to whether of one of skill
09:19:10 in the art reading the '554 patent would understand that
09:19:13 Wi-Fi is contemplated and covered as a potential network
09:19:17 path?
09:19:17 A. Yes, absolutely.
09:19:18 Q. Yesterday --
09:19:24 MR. HEARD: You can take that down, Ms. Hopkins.
09:19:26 Thank you.
09:19:27 Q. (By Mr. Heard) On cross-examination there was a lot of
09:19:31 questions about SIP messages, right?
09:19:32 A. Yes.
09:19:32 Q. And specifically Mr. Gaudet asked quite a bit about

09:19:35 RE-INVITE messages. Do you recall that?
09:19:37 A. Yes, that's right.
09:19:38 MR. HEARD: Can we bring up JTX-1, please?
09:19:44 Q. (By Mr. Heard) And we're focusing in on Claim 1, which 09:19:46 we've talked quite a bit about. In Claim 1, is there any 09:19:51 reference to a RE-INVITE message?
09:19:53 A. No, not specifically INVITE. The claim talks about SIP 09:20:00 messages. INVITE is an example of one SIP messages. There 09:20:03 are many others. There are REGISTER, there are UPDATE, 09:20:07 there are BYE, they're all SIP messages.
09:20:10 Q. And there was -- how about in the other claims that we 09:20:13 looked at, 2 and 6 and 15, 16, 20, is there any reference 09:20:17 to a -- a RE-INVITE message?
09:20:19 A. No, not specifically.
09:20:23 Q. Is there any reference in Claim 1 to an extra SIP 09:20:27 message?
09:20:27 A. No, not at all. We discuss what the extra is 09:20:34 yesterday, and I just -- it just what I said before. I saw 09:20:36 the document. A SIP message often contains additional 09:20:40 information. It's called Session Description Protocol, 09:20:46 SDP. And that's what I testified at the time. That's what 09:20:50 it is.
09:20:50 Q. What evidence did you look at to determine whether the 09:20:52 Verizon Voice over Wi-Fi service meets the requirements 09:20:57 relating to SIP in the claim?

09:20:59 A. I did my own testing, and I read the documents that Verizon presented and I read the expert reports that their expert presented and followed these analyses.
09:21:19 Q. And do you recall Mr. Gaudet showing you some testimony from Bill Chin, one of the Aspen inventors, yesterday?
09:21:28 A. Yes.
09:21:29 Q. And specifically he asked you about some testimony that if a network path is switched without sending any SIP message from one phone to another, does that practice the '554 patent?
09:21:42 And Mr. Chin's answer was: No.
09:21:44 Do you remember being asked about that? Would you like to see it on the screen?
09:21:52 A. Yes. I don't remember being asked about it.
09:21:55 MR. HEARD: It's from the transcript yesterday, 507, Lines 3 to 8. If we could bring that up.
09:22:05 Q. (By Mr. Heard) And when Mr. Chin's testimony was presented to you, you said yes, and I agree with him.
09:22:12 So is Mr. Chin's testimony inconsistent in any way with the opinion you have given on Claim 1?
09:22:19 A. I don't understand your question. Could you please repeat it?
09:22:31 Q. Sure.
09:22:32 A. Yeah.
09:22:32 Q. This concept of must any SIP message be sent, you

09:22:37 agreed with Mr. Chin's testimony that said -- when he was
09:22:39 asked if a network path is switched without sending any SIP
09:22:43 message, does that practice the '554 patent?
09:22:45 No.
09:22:46 You said: I agree with him.
09:22:49 Why is that?
09:22:50 MR. GAUDET: Your Honor, just one objection, is
09:22:53 that he left out a very important part of the testimony on
09:22:56 the screen. I would just ask that he actually read the
09:22:58 quote on the screen before --
09:23:01 THE COURT: The quote on the screen? You want him
09:23:03 to read it?
09:23:04 MR. GAUDET: He read half of it and then stopped.
09:23:04 THE COURT: All right.
09:23:07 MR. GAUDET: I was just asking him to read the
09:23:09 entire quote.
09:23:09 THE COURT: Maybe read the whole thing.
09:23:11 Q. (By Mr. Heard) If a network path is switched without
09:23:14 sending any SIP message from one phone to another, does
09:23:17 that practice the '554 patent, in your view?
09:23:22 Answer: No.
09:23:23 And he asked if you saw that.
09:23:23 And you said: Yes.
09:23:25 And you later said: I agree with Mr. Chin.
09:23:27 A. Yes.

09:23:27 Q. Why is that?
09:23:28 A. Obviously, the patent requires the use of SIP, so in order to switch a path, a SIP message is being used. And I believe that's what Mr. Chin said.
09:23:48 Q. So if there's no SIP -- there are no SIP messages that we see anywhere, of course the '554 patent is not practiced, in your view, right?
09:23:57 A. No, SIP is required. Yeah, that's obvious. It's in the patent.
09:24:03 Q. And is that your understanding of what Mr. Chin was saying?
09:24:05 A. Yes, absolutely.
09:24:06 Q. And is that also your opinion?
09:24:08 A. It is my opinion. SIP is required.
09:24:12 MR. HEARD: Thank you, Ms. Hopkins. We can bring that down.
09:24:16 And then I want to bring up Exhibit 9 from the tab that was looked at yesterday.
09:24:20 Q. (By Mr. Heard) Some read-outs from your call trace testing, do you remember being asked about that?
09:24:24 A. Yes.
09:24:24 Q. Including this morning, but this is one that was used with you yesterday. Do you recall seeing that?
09:24:29 A. Yes, I do recall.
09:24:31 Q. Now, one question Mr. Gaudet -- Gaudet asked you talked

about an AT&T phone. Was there an AT&T phone involved in the testing?

A. No. I don't have any AT&T phone. There are routers that were provided by AT&T, but not a telephone.

Q. So you weren't testing AT&T's cellular network in this test?

A. Not at all, no.

Q. But you were using a Verizon phone testing Verizon's cellular network?

A. Correct, yes. Absolutely.

Q. And how many SIP dialogs or SIP transact -- or excuse me, SIP dialogs do we see -- or SIP sequences in this call trace read-out?

A. So as I explained when we started, the sequence numbers have to be ordered. That's very critical to the Claim Element 1[e], the dialog. I say that and I say it again.

When I talk to a friend and I set my sequence numbers to be 1, 2, 3, 4, 5, and then he talks to me and he sets his sequence numbers 1, 2, 3, or some other number, when you look at the totality of sequence numbers, you see 1, 2, 3, 4, 5, and 1, 2, 3 sometimes mixed, not at the same time. So the sequence number have to be per dialog.

Now, as you see here, there is dialog 1 whereby the source is that 93, and the destination 200. So here there is an INVITE for the cell phone sent through the

09:26:25 Verizon network to the office, captured by my monitor, and it is Cseq -- Cseq 1 as indicated here. The sequence number is 1.

After a while, I terminated this call from the Verizon cell phone. So what should be the next sequence number? 2, that's the same dialog, and you see at the end 2.

On the other end, when I set up the connection from the Verizon telephone to the office phone, the office phone set up a connection in the reverse direction. So we can talk to each other. When the cell -- I'm sorry, the office phone or not the cell phone. So the office phone sets up the connection in the reverse direction. And it does that by initiating a SIP message called INVITE, which is discussed here. INVITE or equivalent messages is required for this patent to function. INVITE is everywhere.

Now, the Cseq number, the sequence number of the SIP messages going in the reverse direction are 29357, 358, 359, 360, 361, 362, 363, very consistent as required by 1[e]. Now, when you look at the totality of number, you say, well, I don't understand what it is. It's all mixed. It's all over the place. But the SIP standard, you have to follow the standard, otherwise nothing would work. The SIP standard says it has to be very specifically done. It has

09:28:25 to be maintained per dialog, and it is. So it's perfect.
09:28:31 It's satisfying Element 1[e], as I discussed.
09:28:39 Q. And so you were also asked to focus on that 20 to 40
09:28:43 second time frame, do you recall that?
09:28:44 A. I do.
09:28:45 MR. HEARD: So if we could highlight those -- the
09:28:47 middle area.
09:28:48 Q. (By Mr. Heard) This is, I think, what you were shown,
09:28:50 too. And is this before and after the switch? Is that
09:28:53 what you were telling us?
09:28:54 A. Yes. So we look at the SIP messages. We look at those
09:29:01 sequence numbers. And you see that when you compare the
09:29:06 sequence numbers that were specified before the switch and
09:29:11 after the switch, there is a continuation.
09:29:17 SIP Element 1[e] talks about continuation of the
09:29:21 SIP sequence number. Continuation of what? The sequence
09:29:26 number that are following the rule specified by the SIP
09:29:32 pattern. They continue in a highly consistent fashion, and
09:29:36 that's well demonstrated here.
09:29:38 Q. And is there any impact on your analysis of the claim
09:29:44 which direction those SIP messages are travelling as you
09:29:47 evaluate the claim term?
09:29:48 A. It's fully satisfied at Claim 1[e] because Claim 1[e]
09:29:57 requires that there would be continuation of the SIP
09:30:02 message sequencing, the order after the switch.

09:30:06 Continuation means use the same rules that you use without switching, and you well used it before the switch, after the switch keep using it. The fact that it was not used, that's in discovery -- the fact that it was not used caused the call to drop. And it is absolutely used.
09:30:34 Q. And you were asked a few questions about the belief of Mr. Bhaskaran, one of Aspen's employees, back in 2016. Do you recall that? About the sending of an INVITE message?
09:30:45 A. Yes, I held this discussion.
09:30:47 Q. Now, do you know if Mr. Bhaskaran ever received access to the -- all of the confidential internal Verizon documentation that you have as part of this case?
09:30:55 A. I'm not aware of anything, what he received or did not receive, but I don't believe he did.
09:31:05 Q. Based on your call trace testing and all of the evidence that you reviewed in this case, do you believe that Verizon infringes the claims that you walked us through yesterday in the '554 patent?
09:31:15 A. Definitely. I followed it element-by-element, and that proves it. And also what I read in their expert reports confirms it fully.
09:31:28 Q. Thank you very much, Professor.
09:31:38 MR. GAUDET: Your Honor, I just have a very brief --
09:31:41 THE COURT: Of course, yes.

09:31:42 MR. GAUDET: Thank you.

09:31:44 I'll ask Mr. Duval to put that same document up on the screen. That's -- I think we've been calling it RDX-9. And this -- the first thing I actually want to do, I don't think this has been moved into evidence, so I would move this in as DTX-234.

09:32:13 THE COURT: Any objection?

09:32:15 MR. HEARD: No objection.

09:32:17 THE COURT: It'll be received.

09:32:19 MR. GAUDET: Thank you. And what I want to do is -- let's put a -- actually I'll do this. These are the numbers that we've been focusing on. I can sort of see this here. Well, you get the point, okay.

09:32:34 RECROSS-EXAMINATION

09:32:35 BY MR. GAUDET:

09:32:35 Q. And you agree with me those are the numbers for the entire call, correct?

09:32:39 A. You mean the Cseq numbers?

09:32:44 Q. Yes, the Cseq numbers for the entire call, correct?

09:32:48 A. These are the Cseq numbers that were captured by our analyze during the call.

09:32:56 Q. Okay. But they reflect a single phone call, correct?

09:32:59 A. Yes, that's what happened during our call when we ran our test.

09:33:08 Q. Okay. And during that single phone call, you will

09:33:10 agree with me that the jump from 29363 to 2, so I'm now
09:33:19 focusing right here, 29363 to 2, that is not a continuous
09:33:26 sequence? Just those two numbers, that's all I'm looking
09:33:30 at, you'll agree that's not a continuous sequence, correct?
09:33:33 A. I highly disagree. I just explained why that's not
09:33:36 true.
09:33:36 Q. Okay, sir. What I heard you say is that you're
09:33:39 separating the dialogs and that the 29357 to 29363 stands
09:33:45 on its own. That's what I heard you say. Is that not what
09:33:52 you said?
09:33:53 A. I said that there are rules, according to the standard,
09:33:57 as to how Cseq numbers needs to be specified. And the
09:34:03 continuation has to be in accordance with the rule. You
09:34:07 just -- you don't just look at numbers independent of the
09:34:10 rule.
09:34:10 Q. Okay. But I'm talking about the patent claim which
09:34:14 doesn't say a rule, and that's why I just want to
09:34:17 understand. Will you agree with me -- forget about the
09:34:20 rule. Very narrow question. Very simple question, right?
09:34:25 29363 to 2, right, that's not a continuous sequence.
09:34:31 That's just -- I don't care about the rule, I just care
09:34:34 about continuous sequence or not. Will you agree with me
09:34:37 on that point?
09:34:38 A. Strongly disagree. Very strongly disagree. I
09:34:41 explained to you that the system won't work if you don't

09:34:43 follow the SIP rules. The SIP server in your system -- in
09:34:49 the Verizon system will reject it. It will drop the call.
09:34:52 It looks at the rules. It looks at the dialogs.
09:34:55 Q. Last question. For all the talk about dialogs, will
09:34:59 you also agree with me that the claim element we're talking
09:35:03 about is about the entire transmission which you told me
09:35:07 over and over again is the call? Will you agree with me
09:35:11 about that?
09:35:11 A. I'm not sure I understand. The claim element is about
09:35:18 SIP continuation, SIP message continuation.
09:35:21 Q. Thank you. Sir, we'll leave it there. I appreciate
09:35:24 your time.
09:35:26 MR. HEARD: Nothing further, Your Honor.
09:35:27 THE COURT: All right. You may step down.
09:35:36 At this time, the Plaintiff may call its next
09:35:38 witness.
09:35:41 MS. DUPRIEST: Your Honor, Aspen calls Michael
09:35:48 Kondratiuk by video deposition. Mr. Kondratiuk is
09:35:51 Verizon's senior director of core network infrastructure
09:35:53 planning. The time allocation is 35 minutes for Aspen and
09:35:57 4 minutes for Verizon.
09:35:58 THE COURT: Okay.
09:35:58 MICHAEL KONDRATIUK, PLAINTIFF'S WITNESS, SWORN
09:35:59 TESTIMONY BY VIDEOTAPE DEPOSITION
09:35:59 (Videoclip played.)

09:35:59 Q. Could you please state your full name for the record?
09:36:23 A. Michael Kondratiuk.
09:36:23 Q. All right. So in the early 2000 -- like, 2010, '11
09:36:35 through '15, you were in the technology and the network
09:36:38 implementation department, right?
09:36:39 A. That's correct, in a rough -- rough time frame, yes.
09:36:46 Q. Okay. And I think you said that involved being --
09:36:50 managing new technologies for the network.
09:36:54 Did your job and responsibilities when you were
09:37:02 working with the technology/network implementation involve
09:37:07 anything to do with Voice over Wi-Fi?
09:37:09 A. It did, yes.
09:37:13 Q. So you were in the network implementation division from
09:37:17 inception through going to market for Voice over Wi-Fi
09:37:20 services for Verizon?
09:37:21 A. From what I recall, yes.
09:37:28 Q. And who at Verizon was responsible for overseeing the
09:37:35 planning for Wi-Fi Calling?
09:37:38 A. The planning from which regard?
09:37:45 Q. Implementation of the technology.
09:37:46 A. Implementation of Voice over Wi-Fi from a network
09:37:55 perspective was in my -- on my team. Network
09:38:00 implementation.
09:38:01 Q. Okay. So you were -- you were -- you were overseeing
09:38:04 that?

09:38:04 A. I was overseeing the network project management of Voice over Wi-Fi.
09:38:12 Q. How did Wi-Fi Calling align with Verizon's long-term strategic goals at the time it was being discussed for implementation?
09:38:23 A. Verizon's goal for Voice over Wi-Fi was to provide the ability to make a stationary call in the event a customer could not make that call at their home over the cellular network. So a basement scenario where no cellular coverage was available, a user would be able to make a voice call there utilizing Voice over Wi-Fi.
09:38:58 Q. And is that sometimes referred to as in-home coverage?
09:39:06 A. It could be, yes.
09:39:10 Q. And so providing better in-home coverage was one of the reasons for implementing Voice over Wi-Fi?
09:39:26 A. Providing the ability for a customer to make a voice call in the home.
09:39:35 Q. How did Verizon evaluate potential risk and benefits of implementing Wi-Fi Calling?
09:39:40 A. If memory serves correctly, it looked at what other carriers were doing at the time.
09:39:50 Q. Okay. You mentioned earlier churn. Can you explain to me what churn is?
09:39:54 A. Churn is when a customer leaves the business.
09:40:03 Q. Okay. And did Verizon do any analysis of the impact on

09:40:10 Voice over Wi-Fi services and churn?
09:40:18 A. Yes.
09:40:19 Q. Did Verizon determine that offering Voice over Wi-Fi
09:40:29 services would reduce churn?
09:40:32 A. I don't think so specifically.
09:40:34 Q. What is this document?
09:40:35 A. Looks to be a document that talks through the testing
09:40:41 of Voice over Wi-Fi.
09:40:46 Q. All right. The title of this document is VoWiFi ATP
09:40:53 FOA Strategy. Do you see that?
09:40:54 A. I do, yes.
09:40:55 Q. And it's dated January 20th, 2015, correct?
09:41:00 A. Correct.
09:41:00 Q. And the service for Voice over Wi-Fi is make and
09:41:05 receive voice calls in Wi-Fi when there is no or poor
09:41:12 cellular coverage, correct?
09:41:13 A. Yes.
09:41:13 Q. And the purpose is stated as increase the Verizon voice
09:41:20 footprint.
09:41:21 Can you explain to me what that means?
09:41:23 A. That means in a home where there's no or poor cellular
09:41:30 coverage, a user can make a voice call.
09:41:38 Q. It doesn't reference in-home there. Could it be
09:41:43 anywhere that there's no cellular or poor coverage and
09:41:45 there's access to Wi-Fi?

09:41:47 A. It could be, yes.
09:41:48 Q. Okay. And the title of it is Verizon Wireless Voice
09:41:57 over Wi-Fi, April 2014. And it appears to be related to a
09:42:01 study done on interest in Voice over Wi-Fi services.
09:42:07 Is that a fair statement?
09:42:08 A. Yes, that's fair.
09:42:11 Q. All right. And the study objectives says: With the
09:42:18 exception of voice calls, Verizon customers can currently
09:42:20 perform all core communications services, messaging, video
09:42:24 calling, et cetera, over Wi-Fi.
09:42:26 Was that an accurate statement in April of 2014?
09:42:31 A. What I recall, yes.
09:42:35 Q. All right. On Slide 11, Recommendations, the
09:42:42 recommendation from -- would these be recommendations from
09:42:48 the marketing team at Verizon that conducted this study?
09:42:53 A. That's a fair assessment, yes.
09:42:58 Q. The Verizon marketing team was recommending, based on
09:43:01 the study that they conducted, that Verizon develop and
09:43:04 position Voice over Wi-Fi as a seamless service.
09:43:07 A. I would not summarize it that way.
09:43:12 Q. But that's what this says here, correct?
09:43:14 A. Not to me, it doesn't.
09:43:17 Q. Can you read what the last sentence in red states
09:43:20 there?
09:43:21 A. I can read it, yes.

09:43:26 Q. Will you read it?
09:43:27 A. Develop and position Voice over Wi-Fi as a seamless service.
09:43:32 Q. All right. The second bullet point there states: Impacts on Verizon's brand perception are also positive.
09:43:41 Correct?
09:43:42 A. It states -- the slide does state that, yes.
09:43:46 Q. A conclusion made by the Verizon marketing department that prepared this presentation is that the value of the current calling plans improve with the inclusion of Voice over Wi-Fi, according to the first bullet point on this slide.
09:44:07 A. Well, looking at the data points, it appears for general customers that there is a percentage of some value and no value related to the Verizon brand.
09:44:31 Q. Actually, what it represents is general customers, 12 percent of them said that it would create significant value, and 52 percent said there would be some value, correct? That's what the pie chart there represents?
09:44:47 A. That's what it represents, yes.
09:44:51 Q. Yes. But it is "value added to current calling plan."
09:44:55 That's what's stated right above these pie charts, correct?
09:44:58 A. That's what's stated.
09:45:00 Q. And 64 percent of general customers think that the

09:45:07 inclusion of Voice over Wi-Fi services adds value, some
09:45:11 value, or significant value to current calling plans.
09:45:15 A. Yes. But it's not clear what -- how value is being
09:45:20 defined.
09:45:22 Q. And under General Customers, this reflects that 46
09:45:27 percent of general customers were likely to use Voice over
09:45:33 Wi-Fi service when there is poor 4G/LTE service while not
09:45:37 at home or work, but you have Wi-Fi access.
09:45:40 That's what this represents?
09:45:52 A. Are you asking me if --
09:45:54 Q. Is that what this slide is representing?
09:45:56 A. This slide shows information related to a bunch of
09:46:04 questions for general customers versus international
09:46:09 travellers.
09:46:11 Q. And one of those pieces of information is that 46
09:46:16 percent, under the General Customer column, is next to the
09:46:22 data point that says, when you have poor 4G/LTE service
09:46:27 while not at home or work, but you have Wi-Fi access.
09:46:34 A. That is depicted on the slide, yes.
09:46:36 Q. And below that is 39 percent of general customers next
09:46:41 to the data point, when you have poor 4G/LTE service at
09:46:45 home but have Wi-Fi access.
09:46:49 A. Yes.
09:46:54 Q. Okay. Can you give me your understanding of what Wi-Fi
09:46:57 offload is?

09:46:58 A. My understanding of Wi-Fi offload is the ability for a customer to make a call or have a data session over Wi-Fi versus the cellular network.
09:47:23 Q. Do you know what percentage of Verizon's subscriber base currently uses Voice over Wi-Fi services?
09:47:30 A. I have a rough idea.
09:47:37 Q. And what is that?
09:47:37 A. Are you looking for -- help me understand what you're looking for, please.
09:47:51 Q. Okay. All right. In general, the rough percentage of Verizon's subscriber base that uses Voice over Wi-Fi, so active users.
09:48:05 A. Active users is roughly about -- less than 20 percent of the customer base.
09:48:13 Q. Do you know what this document is?
09:48:17 A. When you say do I know what it is --
09:48:26 Q. Have you -- have you seen this document before?
09:48:28 A. Not -- not to my recollection, no.
09:48:32 Q. The title of the document is VoWiFi Default-On Network Impact Analysis and Recommendation from September of 2016. And it says MTCE Voice Engineering. Do you know what MTCE is?
09:48:51 A. Yes.
09:48:52 Q. What is that?
09:48:52 A. Maintenance engineering.

Q. Okay. And this exhibit we're looking at is a analysis and recommendation from Verizon's maintenance engineering team, and on this slide, it's listing the pros of having Wi-Fi Calling default-on for new HD Voice devices?
A. That's what the document seems to be representing.
Q. Yeah. And one of the pros, number one, is better customer experience, right?
A. That's what it is indicating.
Q. And it says 100 percent take rate. What does that mean?
A. That would mean any device that has Voice over Wi-Fi capability would now be provisioned because the service would be on day one.
Q. Right. And then it says: Improve Voice over LTE call drop rate by approximately 19 percent with the current low 6.6 opt-in rate, opportunity for further impact with default on.
What does that mean?
A. It seems to imply that there are differences in -- there seems to be differences in opting in versus not.
Q. Another pro reflected on this slide is better mobility support, including seamless handoff from LTE and Wi-Fi.
What does that mean?
A. As stated earlier, when we introduced Voice over Wi-Fi capability, we also tested the handoffs between Wi-Fi and

09:50:58 LTE.
09:50:58 Q. And according to this, seamless handoff from LTE and Wi-Fi is a pro, correct?
09:51:13 A. I did not do this analysis, but the wording on the slide is in the pro category.
09:51:26 Q. Okay. And another pro is if there's default-on, it would reduce network cost by offloading LTE traffic to Wi-Fi, correct?
09:51:43 A. Again, I didn't do the analysis, but that's what this slide indicates.
09:51:48 Q. Do you know if Verizon decided to use default-on for Voice over Wi-Fi services?
09:51:55 A. From my memory, we never did, no.
09:52:00 Q. So you don't think Verizon ever made Verizon on -- or, excuse me, Voice over Wi-Fi default-on its policy?
09:52:13 A. That's correct.
09:52:15 Q. On the next slide, which is No. 5, this says: Call Drop Impact With and Without Wi-Fi. And the first bullet point says: With no Wi-Fi support, the call drop rate KPI for VoLTE is estimated to be approximately 1.1 percent.
09:52:39 Does that indicate the call drop rate is a KPI that is tracked for Voice over LTE?
09:52:57 A. I don't want to speculate. And I didn't do this analysis, so I'm not certain what the data here is and how it's being represented.

09:53:06 Q. Okay. And the second bullet point says that the call drop rate KPI for VoLTE is estimated to improve to approximately .89 percent with Wi-Fi support.
09:53:18 Do you see that?
09:53:19 A. I see it.
09:53:23 Q. Do you have any reason to disagree with that?
09:53:26 A. Again, I did not do the analysis, nor do I know where this data is coming from.
09:53:33 Q. And then, finally, Wi-Fi Calling improved the VoLTE call drop rate by approximately 19 percent with the current 1.6 million VoWiFi subs with a 6.6 opt-in rate.
09:53:51 Do you see that?
09:53:51 A. I see it, yes.
09:53:52 Q. Do you have any reason to believe that's inaccurate?
09:53:55 A. Again, I did not do the analysis, and I do not know where the data points come from.
09:54:01 Q. All right. And the file name for this is RAN versus Wi-Fi MOU and subscribers. That's not reflected here, but that's the title of the electronic file.
09:54:13 Are you familiar with this spreadsheet?
09:54:18 A. Familiar, yes.
09:54:20 Q. Okay. What is this spreadsheet? And really all I want to do is kind of go through the tabs and just kind of have you identify what the different data is.
09:54:31 A. Okay. This is our minutes of use for voice calls.

09:54:38 Q. So for July and August of 2017, the percentage of total gross voice calls for Verizon on Wi-Fi is less than 1 percent, correct?
09:54:50 A. That's correct.
09:54:51 Q. And as we go down through the years, by the time we get to July of 2021, Wi-Fi Calling is 5.8 percent of total calls, correct?
09:55:06 A. It's 5.8 percent of minutes of use.
09:55:13 Q. Minutes of use. Okay.
09:55:18 Do you know why this data stops at July 2021?
09:55:23 A. I do not know.
09:55:26 Q. Mr. Kondratiuk, are you familiar with this document?
09:55:31 A. I don't recall seeing it earlier on, but components of it.
09:55:37 Q. On Slide 3 about why this project matters, is it true that all of Verizon's communication services except for voice was currently available on Wi-Fi?
09:56:01 A. That's my understanding, yes.
09:56:03 Q. And as far as the competitive landscape, both T-Mobile and Sprint were already supporting Voice over Wi-Fi?
09:56:10 A. As per the information here, yes.
09:56:16 Q. And AT&T was expected to implement Voice over Wi-Fi services?
09:56:25 A. As per the information, yes.
09:56:27 Q. What does it mean at the bottom where it says: Verizon

09:56:33 will lose its communications leadership status if it is not
09:56:36 providing service where customers want it?
09:56:46 A. I would only be speculating without objective data.
09:56:51 Q. So you can't tell me what that means?
09:56:53 A. I did not write it, no.
09:56:56 Q. Okay. Slide 5: The Cost of Increasing Domestic
09:57:07 Coverage.
09:57:08 Did Verizon consider alternatives to Voice over
09:57:11 Wi-Fi for increasing domestic coverage?
09:57:15 A. Yes.
09:57:21 Q. And are four of those alternatives listed on this
09:57:25 slide?
09:57:25 A. Yes.
09:57:27 Q. Okay. First bullet point is Unit Cost of Consumer
09:57:33 Grade Network Extender, approximately $200. Can you
09:57:37 explain to me what a consumer-grade Network Extender is?
09:57:41 A. Yes.
09:57:42 Q. What is that?
09:57:42 A. So it's a program that we employ even today for
09:57:51 customers to -- we send out a device -- in this case a
09:57:58 network device -- to a customer for them to plug in at
09:58:01 their home and extend cellular coverage for them to make
09:58:04 calls.
09:58:12 Q. All right. Bullet Point No. 2: Unit Cost of
09:58:17 Business-Grade Network Extender. Is that just the same

09:58:19 thing as a consumer-grade Network Extender? It's larger
09:58:23 and can reach more people?
09:58:25 A. The Network Extender for business has more power.
09:58:28 Q. And it's estimated approximately 2200 unit cost for
09:58:37 that?
09:58:37 A. According to this slide, that's what the cost estimate
09:58:40 is.
09:58:41 Q. The third bullet point is upgrading existing cell,
09:58:45 approximately 65 to 90,000 per cell site.
09:58:49 Do you know what type of upgrades that's referring
09:58:51 to?
09:58:52 A. Not specifically here, no.
09:58:55 Q. Last bullet point is building out new sites,
09:59:02 approximately 450 to 500,000 per cell site.
09:59:06 And does that mean, like, building a new tower?
09:59:09 A. Potentially, yes.
09:59:10 Q. This is a PowerPoint titled: Wi-Fi Calling, August 10,
09:59:20 2015.
09:59:20 Are you familiar with this document?
09:59:22 A. I've seen it, yes.
09:59:27 Q. Okay. It is -- did you create this document?
09:59:30 A. No, I did not.
09:59:33 Q. Do you know who did?
09:59:35 A. I believe it came from our marketing department.
09:59:42 Q. Did you have any input into this document?

09:59:54 A. No, not that I recall.
09:59:56 Q. And this presentation also represents: More aggressive VoLTE deployment enables faster spectrum refarming.
10:00:04 Correct?
10:00:04 A. I see that, yes.
10:00:07 Q. What is spectrum refarming?
10:00:10 A. Spectrum refarming is reutilizing our spectrum for another technology or service.
10:00:26 Q. Why does implementing Voice over Wi-Fi allow for more aggressive VoLTE deployment?
10:00:31 A. That's not clear to me here.
10:00:36 Q. So even though you may disagree with some of these statements, these are statements that were created by marketing -- Verizon's marketing department?
10:00:47 A. That's my understanding, yes.
10:00:55 Q. And they were the ones that were asking for the implementation of Wi-Fi Calling?
10:01:01 A. That's my understanding, yes.
10:01:07 Q. The middle column says Customer Experience/Demand, and it indicates that customers request for Wi-Fi Calling.
10:01:20 Is that a reason to implement Wi-Fi -- Voice over Wi-Fi?
10:01:25 A. Not from a network perspective, no.
10:01:30 Q. From a marketing perspective?
10:01:34 A. I would only be speculating.

10:01:38 Q. How about overall business perspective?
10:01:41 A. From a network perspective, no.
10:01:51 Q. I asked about a business perspective.
10:01:53 A. I'm going to say no.
10:01:58 Q. The next slide is titled Network In-Building Cost
10:02:05 Avoidance.
10:02:06 Can you explain to me what this slide means?
10:02:08 A. I do not know where these numbers came from.
10:02:11 Q. The source indicated in the bottom right corner is
10:02:16 Network Planning Analysis, B. Stone. Does that refresh
10:02:19 your recollection about where these numbers came from?
10:02:22 A. I know Network Planning and Bill Stone, but I don't
10:02:26 know specifically to this chart how these numbers were
10:02:33 calculated.
10:02:34 Q. The bottom says that network estimates over 1 billion
10:02:38 in in-building cost avoidance with the introduction of
10:02:43 Wi-Fi Calling.
10:02:44 Do you see that?
10:02:44 A. Yes.
10:02:45 Q. So these are actually Network's estimates, not
10:02:49 marketing's estimates, correct?
10:02:51 A. It would appear so.
10:02:52 Q. What is -- do you know how launching Wi-Fi would reduce
10:03:02 CapEx for in-building coverage deployment?
10:03:05 A. No, I do not.

10:03:06 Q. Who would know?
10:03:07 A. To my recollection of network -- being in network
10:03:15 planning, because of our strategy of Verizon defaulting the
10:03:24 service to off, there was no strategy ever to have a cost
10:03:34 avoidance of capital expenditures due to Voice over Wi-Fi.
10:03:40 Q. All right. The next slide is -- Slide 5 is Churn and
10:03:46 Revenue Risk.
10:03:47 Do you know how this was calculated?
10:03:50 A. I do not know, no.
10:03:56 Q. This slide indicates that there is a increased churn
10:04:00 risk if Voice over Wi-Fi is not implemented, correct?
10:04:04 A. There was a calculation. There was data points
10:04:09 suggesting a churn risk without VoWiFi, yes.
10:04:13 Q. And that equals 34.4 million annual revenue lost,
10:04:20 correct?
10:04:20 A. Without knowing the background of the calculation, I
10:04:26 would only be speculating based on what this slide is
10:04:29 showing me.
10:04:30 Q. But that's what the slide says?
10:04:32 A. Yes. The draft slide shows 34.4 million.
10:04:36 Q. All right. Slide 6 is Customer Demand for Wi-Fi
10:04:41 Calling.
10:04:41 The slide indicates that Wi-Fi Calling is expected
10:04:50 to be available on all major U.S. carriers by the end of
10:04:54 the year.

10:04:54 Is that what that says?
10:04:57 A. That's what the slide shows, yes.
10:05:01 Q. Did Verizon feel competitive pressure to implement
10:05:04 Voice over Wi-Fi services in 2015?
10:05:05 A. Verizon's strategy was to satisfy a use case within the
10:05:16 home of a stationary call and the ability for that customer
10:05:21 that didn't have cellular coverage to make calls.
10:05:24 Q. So it had nothing to do with competitive pressure?
10:05:30 A. Not to my knowledge. And Verizon deployed and
10:05:35 implemented a different approach overall versus
10:05:40 competition.
10:05:41 Q. These numbers that are here, the 11 percent, 37
10:05:47 percent, 34 percent, it says the source is GfK, Wi-Fi
10:05:53 Calling Research, May 2025 (sic)?
10:05:57 Do you know what that is?
10:05:59 A. I do not know.
10:06:00 Q. Do you know what GfK is? Is that an internal resource
10:06:05 or an external -- or third party?
10:06:07 A. I do not know.
10:06:08 Q. And these indicate that 11 percent of Verizon customers
10:06:13 are likely to switch to another carrier for Wi-Fi Calling?
10:06:16 A. Was there a question?
10:06:18 Q. Is that what this indicates?
10:06:20 A. I would only be speculating that that's the data point.
10:06:23 I did not do the calculation nor put the slides together.

10:06:26 Q. This is -- the title appears to be Verizon Wireless
10:06:31 2016 Product Plan Review dated November 12th, 2015. Do you
10:06:37 see that?
10:06:37 A. Yes, I do.
10:06:38 Q. Okay. And what is this document?
10:06:41 A. Appears to be a culmination of different products to be
10:06:51 discussed during a meeting in 20 -- late 2015 time frame
10:07:02 for the following year.
10:07:03 Q. And so, I mean, what type of meeting would that be? Is
10:07:07 it with a bunch of different divisions? Is it product
10:07:11 division? I mean, what type of meeting would -- had this
10:07:15 been presented at?
10:07:20 A. It would be our -- it would be a leadership meeting
10:07:24 with various leadership department heads across marketing
10:07:30 product, consumer enterprise, so on and so forth.
10:07:35 Q. Would you have attended a meeting like this?
10:07:38 A. No.
10:07:39 Q. On Slide 43, under the Revenue & Efficiency Targets,
10:07:49 there's a line item bullet point here that says: Wi-Fi
10:07:53 Calling: 1 billion in capital avoidance for in-building
10:07:58 efforts.
10:07:59 Do you see that?
10:08:00 A. I do, yes.
10:08:01 Q. And is that consistent with the presentation we just
10:08:03 looked at that indicated Wi-Fi Calling could result in

10:08:07 1 billion in capital avoidance for in-building efforts?
10:08:12 A. It appears to be the same, yes.
10:08:14 Q. And the Footnote 2 says that -- excuse me.
10:08:19 This -- the source of that is Network Operations'
10:08:26 estimate.
10:08:26 Do you see that down at the very bottom? I know
10:08:29 it's kind of small.
10:08:32 A. I see it, yes.
10:08:33 Q. Is Network Operations, is that -- was that part of the
10:08:37 network implementation that division that you -- you were
10:08:42 in at that time?
10:08:43 A. No, Network Operations is separate.
10:08:46 Q. Did Verizon communicate the availability of Wi-Fi
10:08:50 Calling to its customers?
10:08:51 A. Not proactively, no.
10:08:55 Q. When you say not proactively, what does that mean?
10:08:58 A. From what I recall, it was self-discovery by the
10:09:04 customers only.
10:09:06 ATTORNEY: Harold, if you'll put up Document
10:09:11 720141. It's going to be Exhibit 14.
10:09:14 Q. Are you familiar with this document? Have you seen it
10:09:17 before?
10:09:18 A. I don't recall if I've seen it before or not.
10:09:21 Q. What was the Active Selling team?
10:09:26 A. It looks like multiple individuals from different

10:09:29 departments, as depicted on Page 21.
10:09:34 Q. All right. The Active Selling -- this is the Active
10:09:39 Selling Team Agenda for October 26, 2015. That's the title
10:09:43 of the electronic file.
10:09:45 And do you know what the purpose of this
10:09:47 presentation was?
10:09:49 A. Appears to be informational.
10:09:58 Q. If you look at Slide 19, it's titled advanced Calling
10:10:05 Evolution. There's a -- under the 12/3 target date,
10:10:10 there's a bullet point that says Active Selling Marketing
10:10:16 Campaign Begins.
10:10:18 Do you see that?
10:10:19 A. Yes.
10:10:19 Q. And so there was a marketing campaign for Active
10:10:28 Selling?
10:10:28 A. It's not clear to me that that's related to Voice over
10:10:32 Wi-Fi.
10:10:32 Q. All right. Exhibit 20 -- or, excuse me, Slide 20 of
10:10:37 Exhibit 14: Advanced Calling 2.0. Key Customer Benefits.
10:10:44 Do you see that?
10:10:45 A. Yes.
10:10:49 Q. And a key customer benefit of Advanced Calling 2.0 is
10:10:54 over 4G/LTE or any Wi-Fi network on the right.
10:10:58 Do you see that?
10:10:59 A. Yes.

10:11:08 Q. And the bullet point below that says: Seamless
10:11:12 experience across networks.
10:11:13 Correct?
10:11:14 A. Yes.
10:11:18 Q. So seamless experience across networks is a key
10:11:20 customer benefit of Advanced Calling 2.0?
10:11:24 A. It's not clear how seamless is defined here.
10:11:27 Q. I didn't ask you how to define it. I'm just saying,
10:11:30 that's what this says?
10:11:32 A. That's what this slide reads, yes.
10:11:35 Q. Okay. And Advanced Calling 2.0 includes Voice over
10:11:39 Wi-Fi services, correct?
10:11:41 A. No, I would not say that.
10:11:43 Q. Then -- then what is -- over to the right, over 4G --
10:11:50 4G/LTE or any Wi-Fi network, what does that mean to you?
10:11:53 A. That means in Advanced Calling 2.0, the capability for
10:12:02 Voice over Wi-Fi exists, however it is not proactively
10:12:05 provisioned and is self-discoverable from the customer
10:12:09 themselves. That's what it means.
10:12:13 Q. So the fact that it's provisioned, Voice over Wi-Fi
10:12:19 services are provisioned in Advanced Calling 2.0, right?
10:12:24 A. No.
10:12:25 Q. Mr. Kondratiuk, Exhibit 15 is similar to the document
10:12:29 we just looked at. It's an agenda for an Advanced Calling
10:12:33 team dated March 21st, 2016.

10:12:37 All right. Slide 12 is titled Auto-Provisioning of HD Voice, What Are We Doing?
10:12:48 Do you see that?
10:12:49 A. I do, yes.
10:12:50 Q. Okay. And the middle, the third bullet point states:
10:12:54 We're simplifying the message to reps and customers by automating the provisioning process and retiring the use of the term "Advanced Calling" in order to focus on the benefits of service.
10:13:05 And it states that the top key selling features include Wi-Fi Calling in-building and around the world from any known hotspot.
10:13:14 Do you see that?
10:13:18 A. I see that, yes.
10:13:20 Q. Was that the message that Verizon was giving to its reps and its customers in March of 2016?
10:13:25 A. So there's nothing here that indicates this is a proactive marketing campaign for Voice over Wi-Fi.
10:13:36 Q. But it's the message that Verizon -- according to this document, was a message that was given to reps and customers, correct?
10:13:45 A. It's a message given to reps and customers about the retiring of Advanced Calling nomenclature.
10:13:57 Q. And the top key selling features include Wi-Fi Calling in-building, correct?

10:14:13 A. Yes. But it's not clear to me in terms of the reasoning behind that, and I would only be speculating.
10:14:21 Q. Okay. And if Wi-Fi Calling is a top key selling feature, would that be communicated to a customer when you're trying to sell them Verizon's wireless services?
10:14:38 A. I would only be speculating.
10:14:40 Q. And so this reads like an advertisement or a tagline when it says: Join America's largest wireless HD voice network to make calls over Wi-Fi, take video calls, talk/surf at the same time and experience calls so clear you'd swear you're chatting face-to-face. The best part, it now comes ready to use when you buy select smartphones.
10:15:09 Was that what the marketing campaign was?
10:15:12 A. The priority and strategy from Verizon is the HD Voice VoLTE service as being the premier service for us to utilize for voice because we can control the customer experience.
10:15:24 Q. For modelling purposes, y'all are using -- Verizon was using a macro cell unit cost in 2016 of $575,000?
10:15:35 A. That's what it seems, so, yes.
10:15:37 Q. Okay. And for an in-building, the unit cost in 2016 was $1,045,000?
10:15:54 A. Yes, for the -- for the ones that are highlighted in Column N, as in Nancy, looks like.
10:16:06 (Videoclip ends.)

10:16:08 MS. DUPRIEST: Your Honor, Aspen calls John Minor
10:16:19 as our expert in technical --
10:16:22 THE COURT: You know what, I think now is probably
10:16:23 a good time for us to take our morning break. Let's do
10:16:27 that now before we start the next witness.
10:16:29 So ladies and gentlemen of the jury, we'll be in
10:16:32 recess about 15 minutes.
10:16:34 COURT SECURITY OFFICER: All rise.
10:16:35 (Jury out.)
10:31:32 COURT SECURITY OFFICER: All rise.
10:31:33 THE COURT: Mr. Savage, if you would have the jury
10:31:42 brought up.
10:32:55 COURT SECURITY OFFICER: All rise for the jury.
10:33:35 (Jury in.)
10:33:37 THE COURT: Please be seated.
10:34:02 All right. Ms. Dupriest, at this time the
10:34:05 Plaintiff may call its next witness.
10:34:07 MS. DUPRIEST: Thank you, Your Honor. Aspen calls
10:34:08 John Minor to the stand.
10:34:13 THE COURT: Mr. Minor, if you'd raise your right
10:34:25 hand.
10:34:26 (Witness sworn.)
10:34:28 THE COURT: You may have a seat.
10:34:41 JOHN MINOR, PLAINTIFF'S WITNESS, SWORN
10:34:41
10:34:41 DIRECT EXAMINATION

10:34:44 BY MS. DUPRIEST:
10:34:44 Q. Mr. Minor, good morning.
10:34:45 A. Good morning to you.
10:34:46 Q. The jury hasn't had an opportunity to meet either of us
10:34:49 yet.
10:34:50 MS. DUPRIEST: Thank you guys so much for being
10:34:51 here. My name is Christy Dupriest. I'm part of the team
10:34:55 representing Aspen. Ms. Ney is going to hand out some
10:34:59 binders while I talk. And I have four kids, ages four to
10:35:02 12, so like many of you I don't have a ton of hobbies.
10:35:06 Q. (By Ms. Dupriest) Mr. Minor, can you -- well, first of
10:35:08 all, did you prepare a set of slides for use to accompany
10:35:12 your testimony today?
10:35:13 A. I did.
10:35:13 Q. And are these slides shown on the screen in front of
10:35:16 you?
10:35:16 A. Oh, over here, yes.
10:35:18 Q. Yes, sir.
10:35:19 Okay. Well, let's -- let's introduce you to the
10:35:22 jury. Where do you live?
10:35:24 A. Yeah, my name is John B. Minor. I live in Odessa,
10:35:29 Texas.
10:35:29 Q. And how long have you lived in Texas?
10:35:32 A. All my life.
10:35:33 Q. I heard Mr. Herman mention in opening that you were

10:35:38 once the mayor of Odessa. What was that like?
10:35:40 A. Yeah, that was -- that was an exciting experience. I
10:35:46 decided to run for office to try to make a difference. I
10:35:49 think it had an impact. Even to this day people come up to
10:35:54 me and want to visit about it. But it offered me an
10:35:58 opportunity at a young age to begin to participate more and
10:36:04 understand more about our government. So I always
10:36:07 encourage younger people to participate in some way, and
10:36:13 certainly vote.
10:36:14 Q. So what do you do for a living now?
10:36:16 A. Well, I run a number of businesses. I'm a busy sort of
10:36:27 fellow. But primarily what I currently do is offer
10:36:29 consulting services. I'm a researcher, inventor, analyst,
10:36:36 and I offer some consulting services, and I'm also
10:36:39 developing intellectual property.
10:36:43 Q. Mr. Minor, did you attend college?
10:36:44 A. I did. I attended Odessa College in Odessa.
10:36:51 Q. Did you -- what did you study?
10:36:53 A. Well, I started out studying -- because of my childhood
10:36:58 background and deep interest in science, microscope at
10:37:03 seven or eight years old, and, you know, science projects
10:37:09 that were always fascinating and now connected to my
10:37:15 background, I started out studying sciences and taking some
10:37:19 basic courses. But ultimately, I settled on the new
10:37:25 technology revolution, and that was an IBM Mainframe at

10:37:31 that time prior to microcomputers. So I learned systems analysis, operations, and particularly programming, basic assembly language, lowest level languages, and then some upper level languages, like COBOL you may have heard of.
Q. Did you finish college?
A. I did not. I had -- I had gotten married at a really young age and had a child at 18 actually. And so I tried to be responsible, and I -- I attended night school up to the point that I had to get deeply involved in the first real career that I pursued.
Q. And what was that career?
A. Well, I joined the courts. I began -- I was -- I was offered an opportunity for a job. I was a very energetic leadership-oriented kid when I went to work for local government. And I was looking for ways that I could utilize my new-found skills in IBM Mainframe technology and programming to express what my value might be.
So as a city employee and knowing a lot of other city employees, the paycheck wasn't quite what we thought it should be, so I rewrote the payroll system, while at college, of course, and took that in and delivered it and said, you know, I'd like to do this sort of work. And after that review, then a recommendation was made that maybe I might want to have a look at an emerging need, and that was to automate recordkeeping and case flow processes

10:39:28 through the courts.
10:39:30 So I accepted and pursued a career from there.
10:39:34 Q. And did you spend a lot of time in courtrooms as part
10:39:37 of that job?
10:39:38 A. Yes, I did. I -- I spent 10 years sitting next to a
10:39:46 judge in chambers or in the courtroom. You know, I had my
10:39:49 own office, but I spent every day with judges understanding
10:39:58 more about the process and, you know, how we could begin
10:40:00 the automation process, because courts were notoriously
10:40:05 behind in what I call now analog. You know, they used
10:40:10 ledgers and a lot of papers.
10:40:11 And then, of course, the clerk's office, I was --
10:40:13 I was a manager over all of that process and was able to
10:40:21 engage in automation even up through the jury wheel.
10:40:24 Q. So you were trying to make these folks' lives a little
10:40:29 simpler?
10:40:30 A. I'm sorry?
10:40:31 Q. You were trying to make these folks' lives a little bit
10:40:36 simpler?
10:40:37 A. Oh, yeah, it was always about trying to simplify and
10:40:38 improve things. That's -- from the beginning, looking
10:40:39 through a microscope, like, I was so full of wonder, I just
10:40:44 simply wanted to discover more and make a difference
10:40:47 somehow.
10:40:48 Q. What was the most interesting thing you saw while

10:40:52 working for the courts?
10:40:53 A. Well, I worked -- one anecdote, I worked in the courts of Central Texas. I did move into Central Texas, the area between Austin and San Antonio. Those rural counties were really badly -- they were growing rapidly and badly needing automation. The judges -- two district judges -- state district judges approached me and hired me to come and introduce the first rural court's automation project.
10:41:26 And so we -- we had to look at not only the records that I've spoken of, but the post Republic of Texas period, there were a lot of not only records but also a lot of evidence in old vaults in these counties. So we were looking at how to -- how to catalog. And, you know, they kept -- they kept much of this for historic value.
10:41:55 So I encountered in one instance in one of the vaults a knife from a murder wrapped in a 1875 Galveston newspaper. And, you know, I was trying to figure out how we were going to convert all of this on into a digital recordkeeping format. So it was kind of stunning to see some of this stuff. I was fairly naive during that period.
10:42:18 Q. That's a -- that's an interesting story. Was there blood on the knife?
10:42:27 A. Oh, there was still dried blood on it, absolutely. The newspaper was soaked in blood. I -- you know, who knows how -- how the decisions were made so long ago when to keep

10:42:37 evidence or eliminate it.
10:42:40 Q. Interesting. What did you do after your work with the courts?
10:42:45 A. Well, late in my career with the courts, of course, I was -- I was highly organized. I received training in -- you know, additional management training and so forth over the years, and I always assumed a leadership role, even nationally, among the people who were beginning to do what I was doing.
10:43:07 But I found myself fascinated with the technology revolution that was arriving, from mainframe to ultimately microcomputers. Somewhat like what we have now and actually the predecessor to what we're using now. And so I tried to figure out a way that I could move forward. I simply decided to take a plunge.
10:43:37 I had been wanting to be an entrepreneur from the get-go. My grandfather was an entrepreneur. So I plunked down savings. $15,000 was a lot of money at that point in 1980, '81, and I bought an IBM PC. It had no hard drive. It had 64K of memory, but that was equal to the IBM Mainframe so I thought that will suffice for what I'm going to do. It didn't, but that was the beginning of developing a commercial software product that I was able to sell and make a little money on and progress toward that independence.

10:44:14 I left the courts and established multiple businesses over the decades and have been a busy fellow and trying to give back both publicly and in leadership roles and public service and in a business or corporate manner and tried to help people learn more.

10:44:37 Q. So, Mr. Minor --

10:44:41 MS. DUPRIEST: Let's go to the next slide, please.

10:44:43 Q. (By Ms. Dupriest) Has the consulting work you've done, including -- included fiber optics and network engineering?

10:44:51 A. It has. Early in the 1980s, I was interested in -- in trying to -- I had become interested in the communications between terminals and the mainframe and pursued that. I had some experience in the courts with electronic intercepts and things like that associated with lawful intercept activities. And I was -- I was the primary logger of activity and so forth.

10:45:21 But I pursued -- once I was in my own business, I pursued using revenue from the business to the degree I could, reinvesting in technology that could help me understand how what I could see was the way forward, how communications linkage would occur.

10:45:46 Fiber optics was an area that fascinated me because in my childhood, I think I was in the 8th grade, my science project was a ruby laser. And to this day I have a -- I have some collectible things that are sentimental

10:46:03 that associate with that. But that became the foundation
10:46:08 drive for me to move into the optical network arena. And I
10:46:14 received training from Corning, IBM Lucent, et cetera,
10:46:20 among many others.
10:46:21 But particularly for the fiber, that initiated a
10:46:25 process of developing my own technique to take a team in
10:46:31 and build -- you know, design, plan, build, provision,
10:46:38 test, maintain one of these networks.
10:46:40 Q. So, Mr. Minor, there's an icon on the slide we're
10:46:46 looking at that says Texas Tech University Health Sciences
10:46:50 Center. Can you tell us a little bit about the work you
10:46:53 did there?
10:46:54 A. Yes, yes. Prior to that, I had established a
10:46:57 corporation, RadlinQ, back in the early '90s. I might have
10:47:04 mentioned that because it was all associated. At RadlinQ,
10:47:10 I produced -- I invented and produced an early wireless
10:47:14 router product. Sold it. It sold for a lot more money
10:47:16 than the monetized Wi-Fi router that you think of now, but
10:47:19 it was for business purposes, Fortune 500 primarily, across
10:47:26 the international boarder with Mexico and business links.
10:47:29 The Texas Tech University Health Sciences Center
10:47:35 project, we began to build -- bid and then build and
10:47:39 provision and maintain larger and larger networks. And
10:47:47 that consisted of developing a multiple technology-type
10:47:51 solution linking Texas Tech University's central campus in

Lubbock and the Health Sciences Center Hospital, University Medical Center, to Amarillo campus, which is a sizeable campus, as well, back down to Midland/Odessa and out to El Paso.

And then we evolved -- and that consisted of not only optical networks but also wireless networks and wired networks. After interconnecting all of this, then we extended from these central campuses out to tiny communities with lower bandwidth lengths so that telemedicine services could be extended.

It was arguably one of the earliest, if not the earliest, telemedicine experiment in a rural area. And this is a wide area of Texas. You all know, living in Texas, what the stretch of miles are. It was -- it was a large area -- basically all of Western Texas and the panhandle.

Q. I believe you also mentioned teaching. Would you please tell the jury a little bit about your teaching business you built?

A. Well, you know, in the early stage of the technology revolution, for microcomputers, there was really not any college course. That's why I stopped attending college. I had to travel in and out of Silicon Valley and became a frequent visitor to early companies like Apple, for example, or Intel. And I would purchase these sometimes

10:49:37 quite expensive technical books and manuals to inform
10:49:42 myself further how -- how we could move forward and utilize
10:49:47 some of the technology.
10:49:48 I realized in the early '90s that certifications
10:49:55 were coming to the forefront and would become more
10:49:58 important. I achieved certifications myself. So I
10:50:03 purchased a multi-story building in El Paso and repurposed
10:50:08 it for classrooms. And -- and we taught both
10:50:16 communications systems, as well as, you know, applications
10:50:22 and servers for products like you would think of today,
10:50:27 like Microsoft or that sort of thing.
10:50:29 Some -- some of those were Microsoft or companies
10:50:32 you're familiar with, Cisco, for example. But there were
10:50:36 earlier companies that sort of fell by the side or may
10:50:41 still be around, but they're in more discrete use that
10:50:46 you're not familiar with.
10:50:47 And so we successfully ran that business until the
10:50:51 Internet became commercialized, and then that resulted in a
10:50:55 decline in in-person training. And we all know that you
10:51:01 can learn anything on the Internet now.
10:51:06 Q. Mr. Minor, have you ever been awarded a patent?
10:51:09 A. I have. I didn't seek a patent for that early wireless
10:51:14 router, but I applied for a patent in 20 -- I think it was
10:51:21 early 2013, as I recall, regarding a method of validating
10:51:26 cellular carrier records. That patent, U.S. 9,113,307 was

10:51:36 awarded in August 2015 and I'm quite proud of that.
10:51:41 Q. And are your professional certifications indicated on
10:51:45 the slide here?
10:51:46 A. Yes, ma'am, some of them. This is a few examples. A
10:51:52 certified network engineer was one of those early
10:51:54 designations beginning about 1990. I became later, once
10:52:04 digital forensics came into focus, near the turn of the
10:52:10 century and certainly right after 2000, I became a
10:52:15 certified computer examiner with the International Society
10:52:19 of Computer Forensic Examiners.
10:52:22 And I became a -- let's see, that was -- that was
10:52:26 testing that I attained for that because I had a deep
10:52:33 background already, but I also received training and became
10:52:39 a certified signals analyst in Washington D.C. I trained
10:52:43 in -- in Falls Church, Virginia where one of the key
10:52:48 convergence points of the Internet is located.
10:52:52 It's called MAE-East, MAE-East, MAE-West,
10:52:59 California. But those I received firewall training and a
10:53:02 variety of other, but signals analyst is -- .com is one of
10:53:07 the -- one of the domain names that I own among many
10:53:12 others.
10:53:12 I became a steganography examiner, that's a
10:53:18 cryptographic hiding of data used in a variety of areas
10:53:20 including intelligence agencies and military but also by
10:53:26 nefarious actors hiding data in images or in other manners.

10:53:32 I later in the mid -- well, in the -- in 2017, I
10:53:38 think it was, I received some training in cyber warfare
10:53:46 operations design by trainers from U.S. military associated
10:53:50 with Capitol University in Washington D.C. and ultimately
10:53:58 training and became a defensive cyber operations engineer
10:54:01 so that I could give back.
10:54:03 I contribute time every year in those areas for
10:54:08 things like technical surveillance countermeasures, trade
10:54:14 craft methodologies and so forth.
10:54:14 Q. Mr. Minor, are you a member of the IEEE, the Internet
10:54:20 Society and the ASTM as shown on the slide here?
10:54:23 A. Yes, ma'am. You've seen Dr. Rubin, for example,
10:54:26 belongs to many of -- some of these things, like IEEE. I,
10:54:32 too, belong to some of these entities.
10:54:37 And I've -- I've tried to belong -- I'm a patron
10:54:40 benefactor to the American Association for the Advancement
10:54:45 of Science, which publishes a science magazine weekly. So
10:54:45 I end up with piles of books and piles of standards
10:54:45 documents and so forth. But I've been a voting member of
10:54:55 standards bodies that I can belong to for a good number of
10:54:58 years.
10:54:59 Q. Mr. Minor, does your experience and knowledge cover the
10:55:02 core technology of the '554 patent?
10:55:04 A. Yes, ma'am, it does.
10:55:05 Q. In your consulting experience, have you worked with

every core technology of the '554 patent?
A. I have.
MS. DUPRIEST: Your Honor, at this time, I tender Mr. Minor as an expert in cellular communication systems, telecommunication network design engineering, and technical benefits analysis.
THE COURT: All right. Any objection?
MR. DACUS: No objection, Your Honor.
THE COURT: Very well.
Q. (By Ms. Dupriest) All right. Mr. Minor, Dr. Rubin walked the jury through the technical workings of the '554 patent. Can you explain it in plain terms?
A. In plain terms, the '554 patent brings an innovation that enables the use of Wi-Fi Calling to Verizon by providing the opportunity to provide a stabilized continuity function or keep a call running. And the ability to -- when bars drop or signal fades or there are other disruptions for the link to be switched, and you've heard a lot about this, between Wi-Fi and in this case 4G cellular, we've talk about a lot, LTE, Long Term Evolution, and that functionality, maintaining that functionality is one of the most important aspects of this, because absent that, you end up with dropped calls.
So having that quality of service is important.
Q. So, Mr. -- Dr. Rubin presented infringement opinions.

10:56:54 What were you asked to do in this litigation?
10:56:56 A. I was asked to, based upon my background in both develop -- designing, developing, in the areas that I've spoken of, but also in bidding and, you know, building a lot of this infrastructure over the years in over 20 U.S. states, about 24 states, to develop an analysis that determines the -- the portion of functionality that the Verizon network benefits from using the '554 patent techniques.
10:57:40 Q. And so are you offering any opinions about whether Verizon did or did not use the patented method?
10:57:47 A. No, I listened to Dr. Rubin's testimony I believe almost completely, and that is the basis I function on.
10:57:59 Q. What materials did you -- did you review in performing your analysis?
10:58:05 A. Well, like -- like my predecessor on the witness stand, I reviewed the patent and its history, the -- you know, some of the various -- I saw part of the filings with the Court and that sort of thing, decisions, and a variety of documents produced internally from Verizon, and a large variety of publicly available documents from -- from research. And I think that covers the basic areas.
10:58:40 Q. And after going through that process, were you able to reach an opinion on apportionment in this case?
10:58:46 A. I was.

10:58:48 Q. And what opinion did you reach?
10:58:50 A. Well, I think you see on the screen, I determined the relative contribution of the '554 patent, Claims 1, 2, 6, 15, 16, and 20 to the benefits and value. And I arrived at a figure of 30 to 35 percent.
10:59:10 Q. And can you give a brief overview of how you reached that opinion?
10:59:14 A. Yes. What I did -- I've got these numbered, but what I did was analyze the major subsystems or layers of the Voice over Wi-Fi architecture. I'm operating from a higher level view of this to try to help you understand, but this -- this is broken down in that manner.
10:59:40 And then what I did was quantify or estimate in -- based upon my four-plus decades of knowledge, skills, and experience, each layer's dependency on the patented methodologies. I made further reductions to account for other items -- and I'm just looking at No. 3, which you can read there -- that contribute economic value to Voice over Wi-Fi but are not attributable to the '554 patent.
11:00:13 It's important to deduct the items that aren't attributable.
11:00:21 Q. And, Mr. Minor, what is your understanding of how your apportionment opinion will be used in this case?
11:00:27 A. It's my understanding that Mr. Justin Blok will testify as a damages expert regarding dollars and cents from my

11:00:39 apportionment estimate.
11:00:40 Q. So before we get into the details of how you arrived at those opinions, I'd like to discuss some background on the technology. So I hope we can move through because the jury's heard bits of it before.
11:00:55 A. Yes.
11:00:55 Q. What are the basic components of a telecommunications network?
11:00:57 A. Well, what -- what we look at on an overview, high-level basis, is from your cell phone, there is spectrum. There's cell towers. And then there's something called backhaul. And that's -- I'll talk briefly about those.
11:01:19 Q. Well, let's start with spectrum. What is spectrum?
11:01:21 A. Think of spectrum as the radio signals. I often opine about it when I'm teaching in some of the conferences about a shrinking air gap. We've seen spectrum, the radio waves that your phone uses from its antenna to communicate with a cell tower antenna. That, of course, has been shrinking and is really a short distance once we get to a Wi-Fi access point. That's -- that's really what we're talking about.
11:01:56 Q. Is spectrum regulated?
11:01:58 A. Well, spectrum is regulated by the Federal Communications Commission. You might think of it or know

11:02:07 it more clearly as the FCC. It is the regulatory agency, and it determines who uses what spectrum, what rights they have or what -- what they can do. And all of the cell phone companies compete with each other in annual auctions to purchase pieces of the spectrum, various bands. And that becomes what's called licensed spectrum, part of what we're talking about here.

11:02:41 Q. So -- oh, I'm sorry.

11:02:43 A. Well, the other half of that is there are segments of the spectrum that are unlicensed, and we'll be talking quite a bit about that, as well, and the other transitions between the two.

11:02:59 Q. How about cell phone tower, what role does that play in the network?

11:03:04 A. Well, I know you're all familiar with those tall cell phone towers or -- with the little -- what look like little vertical white line antennas near the top on what I call an antenna array, maybe on the side of a building. You know, you see them in various places. Those small antennas are actually typically 5 or 6 feet tall, traditionally. They've shrunk a little bit and gained some girth as we moved into later technologies.

11:03:45 But one of those antenna arrays weighs several hundred pounds, sometimes up to maybe over a thousand pounds. They're very heavy in all composite with all the

11:03:55 antennas and cables and so forth in place.

11:03:59 Those are the primary towers that we all use to

11:04:05 connect our cell phone and use the cellular network.

11:04:11 Q. And how about backhaul? What's backhaul?

11:04:13 A. Well, backhaul is a primary area that I've worked in,

11:04:19 as well. And backhaul is the use of a link from the cell

11:04:27 tower to get communications from your phone back to the

11:04:32 switching core -- the central switch, if you will. That --

11:04:37 that process is important, and it has grown in need for

11:04:47 depth and breadth, so that it could be both reliable and

11:04:52 provide you even more of it.

11:04:56 You can think of lanes on a highway getting you

11:05:00 back to downtown, for example.

11:05:01 Q. And how do these three elements work together?

11:05:05 A. Well, I've sort of covered that. Together the

11:05:09 components make it possible for millions of people to

11:05:13 connect simultaneously on -- on the Verizon network or the

11:05:17 network of their choice and do that reliably and without

11:05:23 interference.

11:05:23 Q. So I think you mentioned when you were discussing

11:05:27 backhaul, although I may be wrong, backhaul is what takes

11:05:30 the signal from the tower to the core; is that correct --

11:05:33 did I get that right?

11:05:35 A. It does. Backhaul is -- you know, as I mentioned, the

11:05:43 shrinking air gap, the radio spectrum licensed or

11:05:48 unlicensed is a relatively small gap. It's critical, of
11:05:53 course, in order for us to use our cell phones or tablets
11:05:56 and so forth. The cell towers that they connect to have to
11:06:01 be connected back into the central network core systems,
11:06:09 what we often call a mobile switching center on an overview
11:06:13 basis. And the backhaul provides that linkage back to the
11:06:23 so-called core. I hope that's helpful.
11:06:26 Q. And we heard Mr. Chin and Dr. Rubin discuss the
11:06:29 transition from circuit switched to networks -- packet
11:06:33 switched each a bit. Can you just briefly explain the
11:06:37 evolution as carriers move from 2G to 3G to 4G?
11:06:43 A. Absolutely. I lived that transition technically in
11:06:45 having begun building optical network links in the
11:06:51 mid-1980s. Those -- those links -- virtually all the links
11:06:58 that all of us -- I was one of many -- you know, millions
11:07:06 of groups of subcontractors or contractors building these
11:07:13 things. They became part of the network of networks we
11:07:16 call the Internet.
11:07:16 The circuit-switched network was in place when
11:07:24 Alexander Graham Bell built -- you know, designed -- or
11:07:24 invented and that was built out. And that network
11:07:30 consisted of what we thought of always in our minds as we
11:07:34 grew up as -- some of you may be old enough that you didn't
11:07:37 have this in your home, but as a landline telephone or what
11:07:42 often has been called plain old telephone service, which

11:07:47 virtually doesn't exist these days in that sense unless
11:07:51 it's emulated.
11:07:52 Circuit-switched technology worked well, and there
11:07:56 was -- there was a need, though, for more bandwidth and
11:08:00 more -- more durable functionality for fault tolerance,
11:08:06 something we call fault tolerance. So that the evolution,
11:08:11 as Dr. Rubin spoke of, may be a little bit more beyond
11:08:17 Mr. Chin that it -- it created the evolution to transition
11:08:21 from fixed, vulnerable point-to-point links to a
11:08:28 multi-pathing packet-switched solution.
11:08:33 And that -- that moved to turning information,
11:08:40 voice and data, into little packets enabled a much higher
11:08:46 fault tolerance and capability to get both seamless
11:08:50 communications and reliable persistent communications for
11:08:54 all -- all of us.
11:08:55 Q. And does the '554 patent relate to specifically the
11:09:03 Wi-Fi Calling after it -- after the transition to the
11:09:08 digital packet transfer methods?
11:09:10 A. It does.
11:09:11 Q. And what does Wi-Fi Calling as a service allow a
11:09:16 carrier like Verizon to do?
11:09:17 A. Well, I've got -- I've got a little slide graphic here,
11:09:23 but it kind of lays it out here. But it -- it basically
11:09:28 enables modern smartphones -- and I know all of you have
11:09:33 been -- probably been using things like an iPhone or, you

11:09:39 know, some sort of so-called smartphone that's actually
11:09:42 quite powerful as a computer to route voice and video calls
11:09:50 through the Wi-Fi network instead of -- you know, as an
11:09:54 alternate to the cellular network. And I know you've seen
11:09:56 a lot about that up until just prior to my testimony.
11:09:59 I hope -- I hope I'm giving you enough clarity of
11:10:03 my perspective.
11:10:04 Q. How do these three concepts we've discussed, Voice over
11:10:13 IP, core network, and Wi-Fi Calling, how do they interact?
11:10:19 A. I'm sorry, can you repeat that?
11:10:20 Q. I can, I'm sorry. Is your hearing aid messing with
11:10:28 you?
11:10:28 A. Yeah. I was involved in a crash a little over two
11:10:28 years ago and it caused me to have to wear these. That
11:10:31 airbag damage.
11:10:31 Q. No problem. Our court reporter will probably
11:10:32 appreciate me getting closer, too.
11:10:35 How did the three concepts we've been discussing,
11:10:38 Voice over IP, telecom core networks, and Wi-Fi Calling
11:10:42 work with each other?
11:10:44 A. Well, Voice over IP, of course, is the process of
11:10:51 converting your voice to data packets, as I spoke of, for
11:10:55 voice and data, just previously and travel across the
11:11:01 Internet as in the backhaul. And although the network
11:11:07 is -- cellular network is now fairly pervasively part of

11:11:12 the backhaul, the -- I mean, the Internet, there was a time
11:11:16 when that was a dramatic shift because they were separate.
11:11:21 But they did merge. There was a convergence. Convergence
11:11:26 is something that happens in historic milestones in
11:11:32 technology evolution.

11:11:33 But the telecore -- telecom core networks provide
11:11:37 the quality controls. And that's where it's critically
11:11:41 important that Verizon, for example, and their strict
11:11:45 adherence to both standards and controlling their network,
11:11:50 managing their network, gives us the best option to
11:11:55 communicate on the network, the cellular network.

11:11:59 But Wi-Fi Calling brings a method as an
11:12:05 alternative to both extend the service that Verizon is
11:12:08 offering and also provide alternatives where there is
11:12:13 sparse signal or perhaps where signal doesn't exist at all.
11:12:20 And that has a lot to do with -- what I usually testify
11:12:26 about is the morphologies, you know, the walls restrict or
11:12:32 attenuate radio signal, a whole variety of impact factors
11:12:40 cause signals to scatter or to get lower, maybe to disperse
11:12:46 differently and not be so available.

11:12:48 You experience that personally on your phone with
11:12:51 the lowering of bars, and that is part of this process.
11:12:56 That's how decisions are made, depending upon that -- not
11:13:02 just the bars, but that's what you see visually, but the --
11:13:05 the quality of the service that you're experiencing and how

11:13:10 this transition to utilize Wi-Fi Calling.

11:13:13 And I think some of you, from what I've observed sitting in the courtroom, already use Wi-Fi Calling and have -- probably have a pretty good technical understanding.

11:13:25 Q. So finally, Mr. Minor, can you help the jury understand Wi-Fi offloading?

11:13:31 A. Yeah, Wi-Fi offloading has become in predominant use by most of us. Once -- once we realized as subscribers that when your bars drop on the cellular network and -- or when enough subscribers connect to an antenna, a macro, a cell tower antenna, and that shared bandwidth that's available, the -- what functionality is shared, then we often -- because of our expectation for instant results, we begin to see things slow down. And that's -- that's what we're talking about, being able to look at this.

11:14:21 I've got a graphic here that talks about offloading data packets. Using Wi-Fi is a very convenient, robust way to -- for Verizon to benefit, they realized early on, and to offer subscribers greater satisfaction and keep them maintaining their subscription to the Verizon network.

11:14:50 And what we -- what we see looking at a highway with an offramp here is that licensed spectrum is the preferred method that provides high quality, great

functionality. This -- this image of the freeway, those are pot holes in case you wondered what the spots were on there, to sort of demonstrate that networks can encounter issues. And it may be, you know, in rare cases something to do with the network internally. A very high percentage of the time it's outside factors or crowding. You know, too many subscribers or a variety of events like that.

And Wi-Fi -- that would be the licensed spectrum, as I mentioned. Wi-Fi would be the unlicensed spectrum offload opportunity.

So you can use your phone for voice calls on the cellular network and still surf the net or perhaps be on your favorite social media app at the same time. And that functionality has done nothing but expand, and as we approach the future generations, I'm sure we'll see more of that convergence.

Q. So is Wi-Fi something of an HOV lane, it's there when you need it if there's bad traffic?

A. Yes.

Q. And would you -- what role does the '554 patent play in that?

A. Well, the '554 patent enables a seamless experience, so-called -- I've heard that term "seamless" quite a bit -- of having continuity, whether it's -- whether it's the licensed spectrum or the move to unlicensed spectrum as in

11:16:49 Wi-Fi Calling to maintain calls, to be able to switch
11:16:51 between the two back and forth as needed and maintain the
11:16:56 call quality and other aspects, other metrics, we call it,
11:17:02 that Verizon carefully monitors, of course. And those of
11:17:08 us in the network field across the spectrum are familiar
11:17:12 with many of those metrics.
11:17:14 Q. So on your little graphic here, would the '554 patent
11:17:17 be the offramp that let's you get into the HOV lane?
11:17:21 A. Yes, that's it. Sorry, I -- I start talking and --
11:17:27 Q. That's okay. Just making sure we get all the way
11:17:31 there.
11:17:31 A. Yes.
11:17:33 Q. So how does the implementation of Voice over Wi-Fi
11:17:38 services save Verizon money?
11:17:43 A. Verizon encounters savings in some interesting areas,
11:17:47 and it's -- you've seen some about this, maybe a lot
11:17:51 already. You're quite aware. But I'll start on the left
11:17:56 here with cell towers.
11:17:57 It reduces the need to construct or augment
11:18:03 technology, cellular technology. And you saw some of the
11:18:08 expenses that -- those expenses are consistent with my
11:18:12 analytical report. But the need to what I have described
11:18:20 as densify. We thought -- we thought as we progressed in
11:18:25 these technologies, densification would become really
11:18:29 intense. But we found that the license to unlicensed

11:18:37 transition capability, thanks to the '554 patent, has
11:18:44 enabled this huge cost savings.
11:18:47 In the backhaul area, a backhaul is -- is an
11:18:52 Internet subscription. But it's something called a service
11:18:58 level agreement, an SLA, that provides priority for the
11:19:04 connectivity between the cell tower antenna and the -- the
11:19:07 mobile core.
11:19:12 That prioritization enables, you know, a high
11:19:16 quality consistency, but it also comes at a cost. And
11:19:21 reducing dependency on that by offloading to unlicensed
11:19:27 spectrum, Wi-Fi, uses less of this. And so it doesn't
11:19:32 require growing the -- the capacity even further.
11:19:37 Spectrum-wise, you've seen a little bit about
11:19:42 refarming or repurposing spectrum. Spectrum is expensive
11:19:47 for Verizon. And they welcome an opportunity -- or they
11:19:54 welcomed an opportunity to try to lessen that cost
11:20:03 and utilize it. They may still purchase at auction similar
11:20:06 spectrum, but they're able to grow the subscriber base even
11:20:12 more while depending upon Wi-Fi offload, Wi-Fi Calling in
11:20:18 particularly.
11:20:19 Q. Mr. Minor, were any of these cost savings reflected in
11:20:23 internal Verizon documents you reviewed?
11:20:24 A. Yes, ma'am, they were. This particular one is an
11:20:28 example. I think you've seen this already more than once
11:20:31 perhaps. But it's a part of a slideshow, a PowerPoint

11:20:40 presentation titled Wi-Fi Calling, dated August 2015. And
11:20:45 it -- it discusses -- and by the way, it was by the Network
11:20:51 Planning Analysis area by someone I'm not familiar with. I
11:20:57 know a lot of employees in these organizations -- by the
11:21:00 name of B. Stone.
11:21:05 And it was an analysis that resulted in
11:21:08 determining that there was an impact of maybe perhaps
11:21:10 likely over a billion dollars over a five-year period, and
11:21:17 that was from 2015. That's one example of how Verizon was
11:21:23 looking at this, and I think you've seen that before.
11:21:26 Q. Mr. Minor, you were here during opening. Do you
11:21:29 remember hearing Mr. Dacus say that we prefer that folks
11:21:32 use our cellular service, and there's very good reasons for
11:21:35 that?
11:21:35 A. I do. I recall that.
11:21:37 Q. Does that impact your opinion?
11:21:40 A. Well, no. It doesn't change my opinion.
11:21:45 Q. Can you explain that, please?
11:21:46 A. The reason it doesn't change my opinion?
11:21:50 Q. Even if it's true that Verizon prefers people to use
11:21:53 their -- their cellular service, does that -- sorry, go
11:21:59 ahead.
11:21:59 A. Sorry. You know, the cellular networks are
11:22:05 indispensable to us these days. We know that. And their
11:22:10 licensed spectrum provides the quality. I think -- I think

11:22:14 what Verizon encountered in this process back during that
11:22:20 period, not only did -- did their competitors begin to
11:22:25 adopt Wi-Fi Calling. But there was a need -- many of these
11:22:34 entities met, whether they admit it or not, and determined
11:22:37 that it could get to be cost prohibitive to spend the kind
11:22:41 of monies that were required to build additional
11:22:45 infrastructure, such as cell -- backhaul cell towers, small
11:22:49 cells, which are also quite expensive when properly
11:22:54 implemented, as well as the other aspects of this to grow a
11:23:02 subscriber base and still maintain the kind of
11:23:05 profitability that they were aiming for.
11:23:07 Q. Okay. Mr. Minor, how does the '554 patent relate to
11:23:13 quality or you've mentioned quality of service a few times?
11:23:16 A. Well, I've highlighted these areas, and we talk about
11:23:26 stream quality event in Claim 2 and Claim 16, for example.
11:23:31 All of this is related to preventing disruptions,
11:23:35 maintaining continuity of communication sessions so that
11:23:39 you don't have a dropped call.
11:23:42 The term "churn" has been discussed some. And
11:23:49 churn is something that all of the cell phone companies
11:23:54 look for not to happen with their subscriber base. And one
11:23:58 of the primary metrics or factors in causing churn is
11:24:05 dropped calls. That's -- that's one of those key critical
11:24:09 aspects.
11:24:10 And what the '554 patent does is maintain this

11:24:18 signal throughout the communications, as well as while changing paths back and forth. So multi-pathing is a functionality that's dependent upon this innovation.

Q. And what is your understanding of how the patented method is implemented in Verizon's core network?

A. Well, with this slide, what I was doing is helping you understand that if you look at the top bullet, "IP-based tunnelling," this solves the problem by maintaining that encrypted tunnel that occurs in the actual licensed spectrum cellular network.

IPsec is the current preferred, for many years, encrypted tunnelling system to prevent disruption by hackers or other issues.

And then "link monitoring" relates -- and these all relate to the '554 patent. "Link monitoring" is -- is discussing, I would explain the -- the maintenance of that continuity process, observing the process of quality in the service and fluctuations that result in the need to switch paths to move between Wi-Fi and LTE or 4G network and back and forth in that manner.

"Dynamic link selection," likewise, has to do with the multi-pathing, and that would be -- dynamic, you know, would be while -- while observing signal quality and the health of that link, being able to switch between the different technologies, licensed to unlicensed spectrum,

11:26:28 cellular LTE, Long Term Evolution, to Wi-Fi Calling and
11:26:33 back.
11:26:34 And then that results in that stream quality event
11:26:38 with Real Time Protocol, RTP.
11:26:42 "QoS aware session control" is inherent in this
11:26:45 patent. That's all in compliance with something called
11:26:52 3GPP standards. 3G -- I apologize.
11:26:55 Q. That's okay. I was just going to ask what are 3GPP
11:26:59 standards?
11:27:00 A. Yes, ma'am. 3GPP standards are another standards body
11:27:09 that is primarily created -- it was created by the Mobile
11:27:15 Network Operators to converge the technology evolution and
11:27:22 specify how implementation of many of the other
11:27:28 technologies within the cellular network on a specific
11:27:32 basis. And within each 3GPP standard document are a whole
11:27:41 series of references to other standards. Many of those
11:27:45 IETF, Internet Engineering Task Force standards, or IEEE,
11:27:52 Institute of Electrical and Electronics Engineers
11:27:53 standards, for example. There may be some other standards
11:27:56 bodies associated, but that -- that gives you an idea of
11:28:01 how this fits together.
11:28:02 The terminology within 3GPP standards is primarily
11:28:07 focused on the type of terminology that the cell phone
11:28:14 network -- the cellular carrier, Verizon Wireless, is --
11:28:19 has built and is maintaining and functions to your benefit.

11:28:23 Q. And with that understanding, can you -- let's go back to the meth -- your methodology for your opinions.
Can you explain how you used that information to -- in your apportionment opinion?
A. Well, I used -- I used a couple of the 3GPP standards to perform a -- what I've termed a causal dependency of network architecture-layer weighting analysis to determine the functional benefit that the '554 patent lends to this process and why it's so important.
And so I broke it down according to layers that are -- that are generally identified in both -- I wrote it down here at the bottom. I left -- I omitted another standard that's associated. 3GPP Technical Standard 24.302, and then another 23.402. A little confusing, they're so similar, but they are -- they are disparate.
And the two of those provide a lot of that understanding and inform how the carrier would implement 3GPP network to non-3GPP network. In other words, licensed spectrum to unlicensed spectrum, and vice versa. How -- how the so-called path switching or handovers occur and, you know, quality levels are maintained. It's a lot of technical information.
But this -- this series of layers is something that I thought could help everyone understand how this -- how this quantifies -- how it applies on a specific basis

11:30:25 in several areas to the '554 patent's contribution to Wi-Fi Calling to the benefit of Verizon.
11:30:35 Q. Now, if I were to pull up those standards you just mentioned, would I see a table with these five layers right there on Page 3?
11:30:42 A. No, unlike -- unlike some of the protocol, you've heard that term, as well, layering systems, this isn't so specifically delineated or explained in pretty pictures. But it's mentioned throughout, and this is a logical representation of that.
11:31:08 And it's important to understand that although there are some technical diagrams, they become confusing easily. And my whole purpose is to distill this to a level that's easily understood by all parties, and I believe that I've done that.
11:31:27 Q. Now, you've mentioned quantifying this a bit. How did you determine the dependency weight for each of the layers you were just describing?
11:31:37 A. Well, as I -- as I approach with this apportionment opinion explanation, three points. Causal control, does the patent -- you know, I ask myself questions. Does the patent -- patented mechanism govern the operation? That's an important thing to think about. And based upon my 40-plus years, knowledge, skills, and experience, training, et cetera, participation in a lot of this, I took a look at

11:32:13 these questions.

11:32:15 And then I look at performance sensitivity. Does 11:32:20 this layer's performance materially change when the 11:32:22 patented mechanism is disabled? That, too, is an important 11:32:29 threshold, if you will, a level at which I could begin to 11:32:35 assess a -- what we call a dependency weight on -- 11:32:39 dependency on the patented methodology.

11:32:41 And then No. 3, suitability, could this layer's 11:32:45 functions proceed normally through standardized 11:32:47 alternatives without the patented method?

11:32:53 In combination, I was able to answer those 11:32:57 questions to myself and use my -- my background and 11:33:02 experience and assess and arrive at an estimated percentage 11:33:05 that I felt was fair.

11:33:09 MS. DUPRIEST: Let's go to the next slide.

11:33:11 Q. (By Ms. Dupriest) The -- so, Mr. Minor, are the 11:33:13 dependency weights for each of the five layers indicated on 11:33:16 this slide?

11:33:16 A. They are.

11:33:19 Q. Is that the middle column there?

11:33:21 A. That is the middle column. The first column is 11:33:24 those -- those layers, if you will.

11:33:27 Q. Okay. And the last column we see here after the 11:33:32 dependency weights, what does that column show?

11:33:35 A. Well, I -- that's the -- that column is titled

11:33:40 Attribution to Patent. And what I did was look at the
11:33:47 dependency weight values that I concluded. And then I --
11:33:55 then I assigned a relative overview attribution that ranged
11:34:06 from high to moderate to low to minimal, a practical sort
11:34:12 of thing that I've used in -- in some of my government
11:34:18 works with respect to some of the military background
11:34:23 things that I've done, and certainly in the -- over in the
11:34:29 intelligence community. We look at things on a basis
11:34:32 that's a range that -- that fits within that.
11:34:35 And I felt like that was a good way to depict this
11:34:40 and help everyone understand how I was looking at it.
11:34:44 Q. And after analyzing the attribution to the patents, did
11:34:48 you -- were there certain layers that you focused on for
11:34:52 the rest of your analysis?
11:34:53 A. There were. I -- you know, I felt like the minimal or
11:35:01 low shouldn't be attributed to the patent. I was looking
11:35:06 to get some sort of gauge on attribution overall and do it
11:35:12 in a fair manner, and I believe that I did so. So I
11:35:18 focused on transport/security, control/policy, and
11:35:26 core/IMS -- IP Multimedia System media layers.
11:35:29 Q. All right. Let's talk about each of these just
11:35:32 briefly, starting with the transport security layer. What
11:35:37 does that layer do?
11:35:38 A. Sure. Yeah, the transport security layer, as I spoke
11:35:42 of, is related to that transportation mechanism, which is

11:35:47 absolutely vital. You've got to have the transport
11:35:51 foundation in order to get any of this communication
11:35:53 accomplished. So it has a very high importance. But also
11:35:59 to protect that information as it traverses the network and
11:36:07 the call path, I should say probably. Maybe that makes it
11:36:11 a little more clear to you, because we are talking about
11:36:13 the pathway of the call.
11:36:14 And I found -- and there's another thing called an
11:36:20 ePDG gateway there. Wi-Fi Calling accesses -- once a call
11:36:27 is initiated or if a phone is available via a Wi-Fi access
11:36:34 point, accesses the core network through its enhanced --
11:36:39 I'm sorry, evolved packet data gateway.
11:36:43 There are a variety of those gateways around the
11:36:46 U.S. and -- and a various pattern that relates to the
11:36:52 density of subscribers to make it possible to connect at
11:36:59 even lower latency so that you don't get too far away and
11:37:04 have call quality drop.
11:37:07 This -- this patent relevant interaction column
11:37:11 that I've got over here, the patent governs the continuity
11:37:16 of that secure tunnel and the traffic classification, you
11:37:19 know, what's it going to be?
11:37:21 So, you know, how's the path going to be? You
11:37:24 know, which one we're involved with.
11:37:26 Q. Okay. So as a result of this analysis, what dependency
11:37:30 weight did you assign to the transport security layer?

11:37:33 A. I decided upon 30 percent, a high direct QoS
11:37:43 continuity. I felt like it had a high priority because of
11:37:48 the criticality of, you know, literally having that
11:37:54 continuous link maintained, because absent that, none of
11:37:58 this functions.
11:38:00 Q. Okay. How about the control policy layer? What does
11:38:04 the control policy layer do?
11:38:06 A. The control policy layer has to do with call session
11:38:13 control functions and policy control rules function. But
11:38:18 it's -- it's the brains of the system is what it's focused
11:38:24 on. This is how your phone is able to function and the
11:38:32 core network's able to guide and determine, because Verizon
11:38:36 actually makes these decisions -- helps make these
11:38:41 decisions and determines what cell tower antenna you attach
11:38:46 to. Even though your phone may find that it's attractive,
11:38:53 it will depend upon how -- how many subscribers are also
11:38:57 attached. You know, it could be a little crowded, for
11:39:02 example.
11:39:02 So there are a variety of reasons that the brain
11:39:05 has to make the key decisions to cause you to be on one
11:39:10 unlicensed (sic) or, two, the unlicensed spectrum aspect of
11:39:18 connecting to the network. I hope that's helpful.
11:39:21 I mention over here under patent-relevant
11:39:24 interaction, the patent governs decision logic for
11:39:29 multi-link session retention and RE-INVITE sequencing. The

11:39:33 multi-link session retention, again, is, you know, being
11:39:36 able to switch paths, hand off -- hand over, if you will,
11:39:42 various terms, between licensed and unlicensed spectrum and
11:39:47 maintain call quality that's adequate that subscribers
11:39:52 don't experience voice disruption that causes them to hang
11:39:59 up and the call to drop or disruptions that simply cause
11:40:03 the call to disrupt. And we've all experienced all these
11:40:06 things.
11:40:06 Q. So is that last piece you just described how the
11:40:09 patent -- the '554 patent interacts with the control policy
11:40:12 layer?
11:40:13 A. It is.
11:40:14 Q. Okay. And what dependency weight did you assign to the
11:40:19 control policy layer?
11:40:20 A. 25 percent for that or high, as well.
11:40:24 Q. Okay. Okay. And, finally, what about the core IMS
11:40:29 layer, what does it do?
11:40:31 A. Well, the core IMS IP multi-media system layer is --
11:40:39 and, you know, you think it's easy to think that all of
11:40:42 this is -- well, it's all part of the, you know,
11:40:46 transportation of this process, and it is. But we have to
11:40:50 break it down so that we can understand what's occurring.
11:40:53 And this is where Real Time Protocol, RTP, you
11:40:58 know by now by all the background, by Mr. Chin and
11:41:02 Dr. Rubin, that RTP stream is how this works. And

something called stream quality event language and the multi-pathing language within the patent claims helps us understand that RTP stream handling, quality of service enforcement, and so forth directly governs -- the patent directly governs the packet treatment and continuity thresholds so that those -- those functions can occur. Again, so the decisions can be made about -- further about how -- when and how to switch between unlicensed spectrum and licensed spectrum.
Q. And --
A. I hope that's informative enough for you.
Q. You're good.
And as a result of that analysis, what dependency weight did you assign to the core IMS layer?
A. I applied a 20 percent or moderate weight to that. Based on my background and experience, I felt like that was appropriate and fair.
Q. And once you had assigned the dependency weights, how did you compute an overall technical attribution?
A. Well, the top three of all of those I added together to arrive at 75 percent.
Q. Okay. Did you do anything to validate your 75-percent attribution?
A. Yes, I tried -- I always try -- the patent I created has to do with the validation and error mitigation of

11:42:51 records related to cellular carriers and other records.
11:42:54 But I always try to traverse through a validation process
11:42:59 when I begin to look at things -- I always did -- as
11:43:03 whether we were designing or bidding or building.

11:43:08 And so I tried to empirically verify what you see
11:43:17 at the top here, comparing the network behavior with and
11:43:22 without the benefit of the '554 patent functionality. And
11:43:25 so I chose three metrics, I call it. And I felt like those
11:43:31 gave sort of a cross-sectional view of how we might be able
11:43:36 to view this and understand it across the board so that
11:43:42 it's -- it's fair with everyone, I think.

11:43:44 And that is session continuity and handover loss.
11:43:50 Absent that, from what I could read in some -- some notes
11:43:56 between the participants in developing the 3GPP
11:44:03 standards -- and I'm not a member of that body, so I
11:44:06 couldn't log into that particular portal. But in some of
11:44:10 the open source web searching that I was doing, I ran
11:44:14 across access to a document -- or actually it was
11:44:18 information, you know, conversations that I actually
11:44:23 thought was publicly available at the time.

11:44:26 But it's a conversation during the development of
11:44:29 one of the series of versions of this standard -- Technical
11:44:34 Standard 23.402. And it related to inter-RAT, inter-Radio
11:44:44 Access Technology test results.

11:44:46 Well, inter-RAT would be unlicensed spectrum to

11:44:51 licensed spectrum. And particularly this standard
11:44:57 number -- you might recall I talked about in an earlier
11:45:01 slide -- is applicable. It has complete application to
11:45:08 so-called non-3GPP access technologies and the hand-off
11:45:19 process to this and the other standard that I mentioned.
11:45:22 So I felt like it was a fair empirical presentation.
11:45:27 I read many other documents. I'm relentless about
11:45:30 reviewing things, whether I'm doing this type of work or
11:45:34 developing, you know, other background work in some of the
11:45:38 other areas that I'm working in, to try to get to the true
11:45:42 answer. I'm always looking for the truth, and I felt like
11:45:45 that provided that opportunity.
11:45:46 Q. So, Mr. Minor, I think -- I think the discussion you
11:45:50 just -- everything you were explaining, that was the
11:45:52 session continuity metric; is that right?
11:45:55 A. It was.
11:45:56 Q. Okay. And in this context, what is -- what is the term
11:45:59 or the heading Typical Performance Drop in that middle
11:46:03 column refer to?
11:46:03 A. Well, that refers to the performance drop in this case
11:46:10 for this metric, the performance -- a performance drop
11:46:14 typically that without the '554 patent functionality and
11:46:21 benefit would -- would incur. And that's -- that's a
11:46:29 critical performance drop, as you can see, absent that
11:46:32 functionality.

11:46:33 Q. All right. How about Mean Opinion Score, what is that measuring?
11:46:38 A. MOS or Mean Opinion Score has to do with voice quality. These systems, since the early days of cellular, they operate on something called a codec. It's a piece of software that encrypts and decrypts or encodes or decodes voice from your voice waves in the air to digital form.
11:47:12 And those codecs have evolved over time with the improvement that we go through for each generation, 2G, 3G, 4G, for example. The voice improvement has been clear, and that -- that is an important -- that's a -- the Mean Opinion Score or MOS is opinion of you, the subscriber, for example. What's the quality according to subscribers? A perceived quality of that, and I was able to look at some advisory organizations, this CTIA/GSMA regarding Voice over Wi-Fi field results.
11:48:02 There are other studies that I reviewed that also have tried to measure and quantify, you know, the process of moving between LTE and Voice over Wi-Fi or Wi-Fi Calling and back. And it's very clear that once we hit 25 to 30-percent reduction in this MOS, which is typically, as I recall, it's a five -- think of five points, somewhere between 0 and 5 mean opinion score. So, you know, it's limited in size, and, you know, it might be four and a half or it might be two and a half, but it would be somewhere in

11:48:50 between. But a reduction of that, of 25 to 30 percent, or,
11:48:55 in other words, if it drops back to 70, 75 percent of what
11:49:01 it was, then that -- that gives us information about the
11:49:05 importance of that to the '554 patent functionality.
11:49:10 Q. And finally, how about packet loss/latency variance,
11:49:16 what is that measuring?
11:49:18 A. Packet loss, I think you've heard this in prior
11:49:21 testimony, perhaps from Mr. Chin or Professor Rubin
11:49:25 particularly, that networks incur packet loss. The
11:49:29 question is how -- how is -- how is that packet loss and
11:49:37 what kind of error rates we're encountering and, you know,
11:49:42 a wide variety of other metrics.
11:49:44 Latency is the -- the time it takes to travel
11:49:52 between two points, either with a radio waves or over the
11:49:58 entire network link, for example, to traverse part of the
11:50:04 signal, you know, those packets.
11:50:07 Both of those are important, and combined, they
11:50:11 give us a snapshot of functionality that's critical to
11:50:17 maintaining the continuity of a call.
11:50:23 So here I was seeing in some FCC -- and bear in
11:50:28 mind that the Federal Communications Commission has public
11:50:31 information available and then they have closed information
11:50:34 available, because they get a lot of reporting from the
11:50:37 carriers, from the cell phone companies and other -- others
11:50:41 who use spectrum, but they don't share all of that.

11:50:45 Again, in open source research, I was able to peek
11:50:53 at some information that gave me some insight into those
11:50:58 benchmarks. And they were actually consistent with my
11:51:00 understanding in my professional experience, you know,
11:51:04 building and operating these networks, because I've done a
11:51:09 lot of protocol-level work.
11:51:11 And the -- the typical performance drop or
11:51:16 increase in packet loss and latency variance, in other
11:51:20 words, vary -- varying the latency can create problems that
11:51:25 we associated with some other metrics. But that can result
11:51:29 in a 60 to 70-percent increase in performance drop. And,
11:51:35 again, that's -- that's a serious drop that could result in
11:51:38 both disruption and, you know, loss of that communication
11:51:44 link when things get high enough.
11:51:46 And this goes directly -- each of these go
11:51:49 directly from a little different angle to the benefit of
11:51:55 the '554 functionality.
11:51:56 I hope that's helpful.
11:51:58 Q. So how do these three typical performance drop metrics
11:52:03 shown at the top of the slide relate to your 75 percent
11:52:07 technical attribution from the previous slide?
11:52:09 A. They're consistent -- when I looked at the other one
11:52:09 that doesn't look like it's consistent is that 25 or 30
11:52:16 percent but that's actually, you know, a drop back to a
11:52:21 level of 70 to 75 percent. I just basically looked at that

11:52:27 on an average basis and I arrived at 73 percent, which is
11:52:32 very near that original attribution percentage that I
11:52:37 started with.
11:52:38 Q. Did you also perform an economic cross-check to
11:52:42 validate your dependency weights?
11:52:44 A. I did. In the past I've done, of course, a lot of
11:52:50 bidding on projects. My teams -- my sales teams and
11:52:54 technical teams worked together as we worked through the
11:52:58 decades building various aspects. So I was familiar with
11:53:01 that process, of course. And I've been involved in other
11:53:07 cases against these companies -- these cell phone companies
11:53:12 over the years, and came to have a much deeper
11:53:16 understanding over the years of -- based on my background
11:53:21 of the cost for constructing a cell tower.
11:53:25 I'm familiar with -- you know, I was familiar with
11:53:27 the cost increases over time, as well as other aspects, for
11:53:34 example. And I just simply went through a reference in my
11:53:41 mind of the ratio of operator cost savings, as I indicate
11:53:45 here, that vanish if the patented method is absent.
11:53:49 It's very clear that this patent is a very
11:53:52 important patent. The methods that are in this patent I
11:53:58 don't know that they existed, what we're arguing about in
11:54:04 this -- in this litigation. And so, therefore, it's
11:54:07 important that we realize that the cost savings that are
11:54:14 borne by Verizon as a result of this vanish if that

11:54:17 patented method isn't in use because this all goes away
11:54:23 and, you know, we not only have that, we have a reduction
11:54:26 in subscriber satisfaction. So we probably have
11:54:30 subscribers moving to competitors.
11:54:32 Q. And how does your apportionment opinion incorporate
11:54:37 both the metrics and the economic cross-check shown here?
11:54:42 A. Well, you know, in the conclusion here in the bottom, I
11:54:48 had about 73 percent, the proportion of Voice over WiFi's
11:54:53 measurable functionality that would not operate at
11:54:57 carrier-grade quality absent the patented method.
11:54:59 And, you know, the goal is always within cell
11:55:05 phone company's networks to operate at so-called carrier
11:55:09 grade. That's a very high grade compared to the Internet
11:55:15 access that you use and, for example, apps that you would
11:55:22 perform voice calling over. This -- this is a
11:55:25 maintenance -- a quality maintenance level that is enabled
11:55:32 by the '554 patent functionality that I could see in these
11:55:35 metrics as examples that give us that cross-sectional
11:55:40 understanding. I hope that's helpful.
11:55:43 Q. Thank you.
11:55:44 Does your apportionment analysis end there?
11:55:47 A. No, ma'am.
11:55:47 Q. Tell me what the next step was.
11:55:51 A. Well, we -- you know, I started from 100 percent Wi-Fi
11:56:00 Calling benefits in this graphic, and the -- the second

step under that, the causal dependency analysis, architecture network-based analysis that I did. I needed to go through a series of exclusions to exclude things that aren't attributable to the patent. And so I worked diligently through the process in my mind and research to try inform myself how I could perform that step. And what I did was look at the next exclusion level as removing standards functions.

Standards and commodities, for example, is one of the terms that I've used. But removing standards functions -- I've talked about standards quite a bit, belonging to standards bodies, and the adoption of 3GPP standards, Third Generation Partnership standards by Verizon, in addition to all these other standards that exist. And close adherence to that, that's what I'm talking about. Those standard processes can't, if they already existed, they can't be applied to the value that we consider for the value that I convey on to the damages expert.

Q. So, Mr. Minor, this standards exclusion that you're talking about right now, that's the green bubble shown on the screen?

A. Yes, ma'am.

Q. And what percentage exclusion did you use for the standards functions?

11:57:43 A. I used a 30-percent exclusion for that.
11:57:46 Q. Okay. Let's talk about the next exclusion, which is subscriber funded. What does this exclusion represent?
11:57:56 A. Well, that next step, subscriber-funded exclusion, would be, for example, your cell phone and other technologies that relate to subscriber-funded technology, for example, the Wi-Fi access point in your home. The Internet service in your home can't be considered in that benefit.
11:58:18 The use of it occurs, of course. You pay for it. But that's just used as part of the Verizon network, because the network extends through your home or office Wi-Fi service to the phone as though it's part of the 3GPP or cellular network.
11:58:38 Q. And what was the third exclusion you considered?
11:58:44 A. Something called parallel innovations. And this is an important area of exclusion because you've heard a lot about patent and inventive processes and so forth. And there are literally millions of patents. And Verizon, as well as other phone companies, hold a large portfolio of patents themselves.
11:59:10 But there are many people, such as myself or Dr. Rubin, who are -- Mr. Chin, particularly, who innovate and decide to take the step and sort of risk of getting through the process of owning some innovation because it's

11:59:28 something to be proud of.
11:59:29 Parallel innovations deduction involves
11:59:36 innovations that are part of the network but can't be
11:59:43 considered as part of the '554 patent. They can't be
11:59:49 attributed.
11:59:50 So there are -- you may hear later about tens of
11:59:53 thousands of patents. There are. I've told you. But in
11:59:56 reality, you know, I had a way in my mind how I was going
12:00:03 to attribute each of these exclusions, and I applied a 20
12:00:11 percent additional discount.
12:00:12 Q. And what was the last area you considered in refining
12:00:15 your apportionment analysis?
12:00:16 A. I think what you have to bear in mind is, as you've
12:00:21 seen, you know, I'm not providing you with, you know,
12:00:27 numeric or clear calculations of each of these steps
12:00:31 because this is a logic process that I've engaged in based
12:00:38 upon my 40-plus decades of knowledge, skills, and
12:00:42 experience and background of working in these areas and
12:00:45 innovating and -- in part.
12:00:51 So I felt like it was fair and impartial to add a
12:00:58 safety margin deduction of 5 percent so that I could arrive
12:01:01 then at a final figure.
12:01:04 Q. Okay. Mr. Minor, we've walked through a lot of numbers
12:01:07 and percentages in the last 30 minutes or so. Can you
12:01:11 explain to the jury how they fit together to arrive at your

12:01:14 apportionment opinion?
12:01:15 A. Yeah. Think of convergent technical attribution, which you remember the 73 percent a few steps back there. 73 percent, think in terms of .73, and each of these overview percentages are on that basis.

So the reduction for standards and commodities was 30 percent -- in other words, that is a multiplier of .70.

Likewise, the reduction for subscriber funding of 20 percent was .80.

Reductions for parallel innovation was .80.

And the safety margin of 5 percent is a multiplier of .95 percent, what's retained and deducted.

And that left me -- by multiplying these together in a contraction, I arrived at .31 or 31 percent is the portion of Voice over Wi-Fi benefit that can be attributed to the '554 patent.

I hope that helps you understand how I arrived at this process.
Q. Thank you, Mr. Minor.

MS. DUPRIEST: Your Honor, I pass the witness.

THE COURT: All right. I think probably now is a good time for us to break for lunch.

Ladies and gentlemen of the jury, I think your lunch should be here and downstairs for you. We will plan to resume the proceedings a little after 1:00 o'clock.

12:02:51 Enjoy your lunch.
12:02:53 THE COURT: All rise.
12:02:54 (Jury out.)
12:02:55 THE COURT: All right. See you all in about an
12:03:21 hour.
12:46:22 (Recess.)
01:09:50 THE COURT: Okay. Is there anything we need to
01:11:24 discuss before we continue?
01:11:28 Mr. Anderson?
01:11:29 MR. ANDERSON: Yes, Your Honor. They have some
01:11:31 objections to the slides from Mr. Faber, and it would be
01:11:33 upon helpful if we could resolve those now since we expect
01:11:37 him to go on at some point late this afternoon.
01:11:40 THE COURT: Okay.
01:11:41 MR. ANDERSON: Is that --
01:11:42 THE COURT: All right.
01:11:43 MR. ANDERSON: We'll do it briefly.
01:11:45 Go ahead.
01:11:46 THE COURT: Let's -- can we do it pretty briefly?
01:11:49 Like, how -- I mean, how long do you think it will take
01:11:53 you?
01:11:53 MR. WILLIAMS: Sub 10 minutes.
01:11:55 THE COURT: No, I think we better go on and
01:11:58 continue. We'll deal with it as soon as we finish with the
01:12:02 witness who is on right now.

01:12:05 All right. Okay. Mr. Savage, if you would have the jury brought to the courtroom.
01:12:20 COURT SECURITY OFFICER: All rise for the jury.
01:12:36 (Jury in.)
01:12:36 THE COURT: Please be seated.
01:12:52 All right. Ladies and gentlemen of the jury, welcome back. When we completed the morning's business, the witness had completed his direct testimony.
01:13:04 At this time, Mr. Dacus, you may cross-examine the witness.
01:13:07 MR. DACUS: Thank you very much, Your Honor.

01:13:10 CROSS-EXAMINATION

01:13:11 BY MR. DACUS:
01:13:11 Q. Good afternoon, Mr. Minor.
01:13:13 A. Good afternoon, sir.
01:13:15 Q. I need to ask you a few questions about your work, testimony, and opinions in this case, if that's okay?
01:13:21 A. Certainly.
01:13:21 Q. All right. You've been here for the entire trial, correct?
01:13:28 A. Most of it, yes.
01:13:29 Q. Okay. You were here for the judge's preliminary instructions, correct?
01:13:37 A. I was.
01:13:38 Q. You heard him tell the jury that one of the things

01:13:40 they'll have to do here is judge the credibility of the evidence and the testimony that they hear from witnesses on the stand, correct?
01:13:47 A. Yes.
01:13:49 Q. And specifically for experts, one of the things he told them they need to do is they need to take into consideration the specific experience that an expert has in the specific area in which that expert is testifying. You remember that?
01:14:03 A. I do.
01:14:05 Q. Okay. Now, you took, by my watch, 20 minutes or so to detail for this jury what your experience is in telecommunications, correct?
01:14:16 A. On an overview, yes.
01:14:18 Q. Okay.
01:14:19 A. It's -- it's considerably more complex, of course.
01:14:23 Q. Understood. But you agree, sir, that just talking about experience in telecommunications, the actual work that you did here is much more specific than that, correct?
01:14:35 A. It is.
01:14:35 Q. Okay. In fact, what you're here doing is you're here testifying regarding the value of Wi-Fi Calling and the contribution of the '554 patent to that Wi-Fi Calling, correct?
01:14:52 A. Yes.

01:14:52 Q. And that contribution part is what you referred to and I think your lawyers have referred to as this term called "apportionment," correct?
01:15:00 A. Yes.
01:15:00 Q. All right. Now, I want to focus on your experience in calculating or determining the value of Wi-Fi Calling, one; and, two, for apportionment, okay? Does that sound fair?
01:15:23 A. I will attempt to answer your questions.
01:15:24 Q. Okay. Those are the two things you're doing in this case and that you've testified about, fair?
01:15:29 A. Please ask. That is.
01:15:34 Q. Okay. Now, let's start here. I look -- you actually have a website, correct?
01:15:41 A. Well, I have many websites.
01:15:43 Q. Many. Your expert business, serving as an expert, you actually have a website for that, correct?
01:15:52 A. I do. Yeah, for a specific area.
01:15:55 Q. Right. And that's what I want to talk about. That specific --
01:15:59 A. Sure.
01:15:59 Q. -- area is something called forensic analysis, correct?
01:16:03 A. It is.
01:16:03 Q. And I'll let you explain it if I get it wrong, but that's basically trying to determine the location of someone from their cell phone or cell phone records, fair?

01:16:16 A. Well, it's more involved than that.
01:16:21 Q. I have no doubt.
01:16:22 A. It is -- it is an emerging forensic area that I have been retained many, many times on, as well as, of course, for these patent infringement cases, all of which is part of the mobile network for the most part.
01:16:40 Q. And that's what I want to focus on. I think your website said you'd testified somewhere around 50 times. Does that sound right?
01:16:48 A. Yeah, probably exceeds that considerably, but...
01:16:51 Q. And I want to focus on your experience. Of that 50 times, only three of those have been in patent cases, correct?
01:17:00 A. At trial, yes. I've been on a good number of -- a whole variety of mobile network technology cases in the patent area.
01:17:09 Q. It's true, sir, that the -- that the thing you're here to testify about, this technical patent apportionment, this is the first time that you have prepared a formal apportionment opinion in a case, correct?
01:17:24 A. It is. It's the first -- normally in these -- these cases, I have produced what are called multipliers. I've looked at what -- what it costs for equipment and what the savings may be and looked at how many -- how many times in a multiplier the cost savings were in capital or operating

01:17:50 expenses.
01:17:51 Q. Sir, just to be crystal clear, this is the first time
01:17:54 you ever prepared a formal apportionment opinion in a case,
01:17:58 true?
01:17:58 A. That's correct.
01:17:58 Q. The second thing you're here to testify about, this
01:18:02 value of Wi-Fi Calling, you likewise have never testified
01:18:06 in a court about the value of Wi-Fi Calling, correct, sir?
01:18:09 A. Well, I have not, but I don't believe that this patent
01:18:13 has ever been apportioned or valued previously, and so I
01:18:21 had to achieve that through innovative means.
01:18:24 Q. All I'm -- I'm talking about your experience, sir.
01:18:27 You're here telling this jury about the value of Wi-Fi
01:18:31 Calling and never in the history of your 50-year career
01:18:34 have you ever testified about the value of Wi-Fi Calling.
01:18:38 That's a true statement, correct?
01:18:40 A. It is a true statement.
01:18:40 Q. Okay. And I bring those two things out, sir, because
01:18:44 you spent 20 minutes telling this jury about your
01:18:48 experience, but you did not tell them that this is the
01:18:51 first time in your entire 50-year career that you're doing
01:18:55 the two things you're here to testify about, did you, sir?
01:18:59 A. I didn't specifically bring that up. I was certain
01:19:04 that you would.
01:19:04 Q. I want to talk a little bit about this '554 patent.

01:19:14 Does that sound okay?
01:19:15 A. Certainly.
01:19:16 Q. Okay. I think you said earlier that your opinion that
01:19:22 you're giving here, these two -- two subparts, it
01:19:26 ultimately relates to the damages or the money that Aspen's
01:19:31 seeking in this case. Did I hear you correctly?
01:19:33 A. My -- my opinion -- final opinion on this apportionment
01:19:41 hands off to Mr. Blok, the damages expert retained by
01:19:45 Aspen, yes.
01:19:46 Q. Okay. You agree, sir, that for patent damages it is
01:19:54 very important to identify the specific invention in the
01:19:56 patent that's being valued, true?
01:19:58 A. True.
01:19:59 Q. And you know here that the invention, based on what
01:20:07 Mr. Rubin said, and I'll just quote Aspen's lawyer from his
01:20:16 opening is: A method of switching or handover from a
01:20:20 cellular to a Wi-Fi network.
01:20:21 That's the alleged patented invention, correct?
01:20:24 A. Yes, while maintaining continuity and quality of
01:20:29 service.
01:20:29 Q. Right. It's a very specific method of doing
01:20:34 switch-over or handover, fair?
01:20:36 A. It is about multi-pathing and switching between
01:20:42 technologies, yes.
01:20:43 Q. And you agree, sir, that it's very important for

01:20:48 damages in patent cases, including what you're doing, that
01:20:51 we only value the specific invention, true?
01:20:54 A. Yes.
01:20:58 Q. Now, I want to talk about that, but before we do,
01:21:06 you -- you would agree that all of the patent claims in
01:21:09 this case have an element of them that relates to switching
01:21:13 the transmission from one path to another, correct?
01:21:16 A. Directly or indirectly.
01:21:21 Q. Okay.
01:21:21 A. Yes.
01:21:22 Q. And what -- what's been accused here is this switching
01:21:25 between cellular network and Wi-Fi network, correct?
01:21:31 A. Yes.
01:21:32 Q. Okay. Now, you agree that not every Wi-Fi call on the
01:21:41 Verizon network infringes, fair?
01:21:42 A. Wi-Fi Calling as a whole is not an infringement. I
01:21:51 believe that's what I understood from Dr. Rubin's
01:21:56 testimony.
01:21:56 Q. I agree, and I want to confirm it with you.
01:21:59 For example, if a customer gets on Wi-Fi Calling
01:22:02 and never switches to the cellular network, that call is
01:22:08 not infringing, is it, sir? Not even accused to be
01:22:11 infringing by Aspen, correct?
01:22:13 A. Well, I wasn't tasked to look at infringement aspects,
01:22:21 and I've spoken about that to you. That's fundamentally

what -- what my understanding is what Dr. Rubin testified to.
Q. I'm going to read something to you, sir, and you tell me whether you agree with this.
The '554 patent is not practiced in certain Wi-Fi calls, such as calls that originate and terminate on Wi-Fi with no intervening handover.
Is that accurate?
A. I think that's accurate.
Q. Okay. And to be fair to you, sir, I'm reading directly from the report that you wrote in this case, okay?
A. Oh, sure.
Q. I'm not trying to trick you. I just want to establish very clearly that, for example, if someone is using Wi-Fi in their office building where they can't get a cell signal for whatever reason and that entire call stays on Wi-Fi and never switches over to -- to cellular, even Aspen agrees that's not infringing, correct?
A. That's my understanding.
Q. I guess to put this in a summary fashion, if there's no switch, there's no infringement. That's true, right?
A. Well, like I said, I took Dr. Rubin's testimony and opinions. I read those, and I agree.
Q. And just -- just to be clear, your understanding is no switch, no infringement, fair?

01:23:55 A. I know that that's the fundamental innovation of the patent, yes. I think that's fair.
01:24:18 Q. And we just read from your report. And I'm not trying to quibble with you, sir. I just want -- let me tell you what my goal is, to ask you very direct questions and to get very direct answers, does that sound fair?
01:24:33 A. Well, I -- you know, I've been around this path before, and I understand.
01:24:37 Q. Okay. And all I want to confirm is if there's no switch or handover, there is no infringement, even according to Aspen. That's your understanding, correct?
01:24:52 A. As I said, yes, that's my understanding. It's -- it's the multi-pathing functionality while continuing quality of service in a continuous communication stream.
01:25:07 MR. DACUS: Your Honor, may I have leave to use the --
01:25:09 THE COURT: Of course, yes.
01:25:10 MR. DACUS: Thank you.
01:25:11 Q. (By Mr. Dacus) So just so we keep that in mind, Mr. Minor, I wrote up there exactly what you've told me. If there's no switch -- no handover between the networks, there's no infringement; is that fair?
01:25:42 A. That's my understanding.
01:25:52 Q. Okay. I suspect, sir, that one of the reasons that you're hesitating is because you know -- or at least I

01:26:01 assume you know, by reviewing Verizon's records in this
01:26:04 case, that there are months and months and months of
01:26:12 Verizon records that show that less than 1 percent of the
01:26:18 people who get on Wi-Fi Calling switch over to the cell
01:26:23 network. Did you review those records?
01:26:25 A. I have seen some records, yes. And, you know, it
01:26:31 depends upon the period and the region and, you know, what
01:26:36 the adoption rates are and so forth, of course.
01:26:38 Q. It does. But you and I, I assume, can agree at a high
01:26:43 level that the vast, vast majority of people who ever get
01:26:49 on Wi-Fi Calling never switch over to the cell network,
01:26:53 correct?
01:26:53 A. From what -- what information I have had access to, the
01:27:03 limited information, that's what I saw, yes.
01:27:05 Q. Okay. All right. Now, I want to -- I want to go back
01:27:11 to your proposition and your statement that what we need to
01:27:13 value here is the patent. Are you following me so far?
01:27:19 A. Yes, that's my goal.
01:27:22 Q. So here's what I want to do. Draw a chart here.
01:27:34 What you did, sir, as you just spent some
01:27:38 considerable time explaining to the jury, is you valued
01:27:43 Verizon's Wi-Fi Calling Service, correct? Correct?
01:27:51 A. The patent methodology, yes.
01:27:54 Q. No, sir.
01:27:55 A. On an overall basis, yes, you're correct.

01:27:57 Q. Let me be really clear. What you valued was Verizon's Wi-Fi Calling Service. That is a true statement?
01:28:07 A. I did.
01:28:08 Q. Okay. Now, we know on the other side over here sits the cellular service, correct?
01:28:12 A. Yes.
01:28:14 Q. And we know what's in between, at least for some limited customers, is this switch or handover, fair?
01:28:25 This thing is a little hard to write on.
01:28:27 Is that correct?
01:28:29 A. Yes, sir.
01:28:29 Q. And I'll just use switch and handover interchangeably. Does that sound fair?
01:28:34 A. I think that's understandable by the jury.
01:28:38 Q. And we know that this '554 patent, that's the switch, right? That's what the patent is, a method of switching, correct?
01:28:45 A. Yes.
01:28:46 Q. But what you valued, sir, was the value of Verizon's Wi-Fi services, correct?
01:28:58 A. I started at that point.
01:29:00 Q. Right. Were you here when Mr. Bill Chin, the inventor himself, testified?
01:29:04 A. I was. I believe I heard --
01:29:08 Q. Were you here when I drew this very diagram --

01:29:11 THE COURT: Hold on, Mr. Dacus. You can't interrupt the witness.
01:29:14 MR. DACUS: It's my apologies, Your Honor.
01:29:16 Q. (By Mr. Dacus) I apologize, Mr. Minor.
01:29:17 You were here when Mr. Chin testified?
01:29:22 A. Yes, sir, I was --
01:29:23 Q. Okay.
01:29:24 A. -- for most, if not all of it.
01:29:26 Q. Did you saw -- did you see me draw this very diagram with Mr. Chin?
01:29:29 A. I couldn't see very clearly, but I -- I knew there was a diagram that had a couple of circles like this, and I was following the conversation. I believe that may be very close.
01:29:40 Q. And do you remember that I asked Mr. Chin did this '554 patent invent anything of Wi-Fi Calling? Do you remember what -- do you remember me asking him that?
01:29:50 A. I do.
01:29:51 Q. And you remember he said: None of it. None of it. You remember that's what he said?
01:30:00 A. I agree.
01:30:01 Q. And do you remember I put a big ole X over Wi-Fi Calling and I asked Mr. Chin if that was accurate and he said yes. Do you remember that?
01:30:10 A. Yes, I do.

01:30:11 Q. He said Wi-Fi Calling had been around for years, if not a decade, before this '554 patent, correct?
01:30:24 A. Sure. Yes.
01:30:25 Q. So to go back -- and certainly you agree that the '554 patent did not invent the cellular network, correct?
01:30:32 A. No.
01:30:34 Q. Well, when you say no, you mean you agree with me?
01:30:37 A. I agree, it does not invent the cellular network.
01:30:43 Q. To the extent there's an invention here, and we've got a little dispute about that, it's about this switch right here, correct?
01:30:52 A. It is. And as far as that diagram goes, yes.
01:30:58 Q. And yet what you valued, where you started is with Wi-Fi Calling that the '554 patent doesn't even invent, doesn't even purport to invent, correct?
01:31:16 A. Yes. In order to begin the valuation process and/or the attribution process, I needed a start point. So I looked at the overall Wi-Fi network and arrived at a conclusion. And then I worked from there, performing a variety of exclusions, I think you would call.
01:31:39 Q. Correct, sir. What you did is if this Wi-Fi Calling is a pie that I've drawn, you took some piece of that pie and said that's what I attribute to the '554 patent? That's what you did, correct?
01:31:52 A. I did.

01:31:55 Q. But yet that pie you're cutting, sir, has no invention in the '554 patent, correct?
01:32:01 A. The benefit of the functionality of the '554 patent is directly related to Wi-Fi unlicensed spectrum, and, therefore, that was the only basis I could operate from to arrive at some measurement that was understandable in terms of how this could be applied.
01:32:34 Q. What you should have done, sir -- you remember where we started is by you admitting and agreeing that for damages, what we need to do is value the alleged patented invention, correct? Correct? Remember that's where we started?
01:32:52 A. That was my approach. But I had to take a look at the foundation technology at work in order to value a part of that technology that is involved in this that has an impact.
01:33:06 Q. What you should have done is valued this handover or switch, correct?
01:33:11 A. I believe that the way I viewed this was to value it as a part of -- because this has to do with a switch from Wi-Fi to cellular service and vice versa back the other way while maintaining continuity and a level of quality that compatible, somewhat equal with the cellular network as it becomes an extended part of it. So that was my choice.
01:33:51 Q. So let's leave it here, Mr. Minor. You've done this enough to know that at the end of this evidence,

01:34:01 Judge Schroeder's going to give the jury instructions on
01:34:04 how to calculate damages, correct?
01:34:08 A. I've never been present for the damages end of this
01:34:14 honestly. I testify and am not in the courtroom typically.
01:34:18 Q. So are you saying that you're here as an expert, and
01:34:20 you don't have an understanding that the judge is going --
01:34:23 A. Oh, I certainly have an understanding, but I've not
01:34:25 been present for it.
01:34:26 Q. Let me finish. And I know it's hard sometimes, and I'm
01:34:29 not fussing at you.
01:34:31 A. Sorry.
01:34:32 Q. But just so the record is clear.
01:34:33 Are you telling me that you do or do not have an
01:34:38 understanding that at the conclusion of the evidence
01:34:41 Judge Schroeder is going to give this jury an instruction
01:34:44 and it's going to specifically tell them that they need to
01:34:47 be very particular and make sure that they value the
01:34:50 invention, the specific invention of the '554? You
01:34:52 understand that?
01:34:52 A. Of course.
01:34:54 Q. Okay. And it's true, sir, that even if you were --
01:35:00 even if you had valued this switch, this '554, you'd still
01:35:07 have to cut this switch pie because the '554 is not all of
01:35:11 the technology of the switching or handover, correct?
01:35:13 A. It is not all of it.

01:35:16 Q. Right. I mean, you've been in the courtroom. You've seen that when this '554 patent was applied for, it was rejected multiple times, correct?
01:35:25 A. I'm sorry, can you -- I didn't understand that -- that --
01:35:31 Q. Sure.
01:35:31 A. -- the term that you used.
01:35:33 Q. Sure. You've seen that when they made application for the '554 patent, multiple times, the Patent Office rejected that application because what they were applying for was not new. You've seen that?
01:35:46 A. Yes, sir. I'm familiar with the patent application and that entire process. And it's quite common for there to be some communication back and forth. I have my own patents and so forth that I worked through. And I think that's not an uncommon process. I saw that.
01:36:05 Q. Sir, I'm not asking you if it's common or uncommon. We can agree under the facts of this case that the Patent Office said to these folks related to this '554 patent that 90 percent of that claim that they ultimately got was not new, correct?
01:36:24 A. I don't -- I don't recall a 90-percent mention.
01:36:28 Q. You remember when I -- Mr. Chin testified that the reason they got this patent is that very last limitation, the one dealing with sequencing? Do you remember that?

01:36:39 A. I do.
01:36:40 Q. Okay.
01:36:41 A. Of course.
01:36:41 Q. Could you see how many words and limitations there were
01:36:45 above that in the claim?
01:36:46 A. I did.
01:36:49 Q. And that -- all that stuff that was above it is stuff
01:36:53 that the Patent Office said this is not new, so we're not
01:36:55 going to give you a patent, fair?
01:36:57 A. I understand that.
01:36:59 Q. Yes.
01:37:00 A. Okay.
01:37:01 Q. So my only point is if you had actually valued the
01:37:04 switch, you'd still have to cut that switch pie pretty
01:37:07 thin, fair?
01:37:08 A. Actually, the -- the value that conveys from my view
01:37:12 the way I performed this -- I approached this apportionment
01:37:17 was to look at the overall value of Wi-Fi Calling, look at
01:37:23 the patent functionality, and determine what I knew to be
01:37:30 extreme value in terms of the multi-pathing functionality
01:37:35 because absent the '554 patent functionality, there was
01:37:41 nothing. It wasn't able to function in the fashion that it
01:37:46 needed to.
01:37:46 Q. Let me ask you about that, sir.
01:37:48 A. Sure.

01:37:49 Q. You just said that Wi-Fi Calling cannot function without the switch-over in the '554 patent? Is that what you just said?
01:37:57 A. Well, I said in the -- in the -- in the context or paradigm of what we're referring to here, handoffs between the two, which is the huge benefit that is conveyed to both subscribers and to the carrier.
01:38:13 Q. Didn't you and I just have a conversation just a few minutes ago that -- in the vast majority of months, 99 percent of Wi-Fi calls never switch over, and yet they function perfectly fine, correct?
01:38:28 A. Well, in that -- in that snippet of produced data and certainly early on the numbers were lower. But they grew to approximately 5 percent or so over time. I believe that's correct. And that -- that is a very significant low percentage, very significant impact on the cost savings conveyed in using this technology to Verizon and for capital expenditures that would be necessary or -- and expenses that would be borne.
01:39:09 Q. So even if we took your 5-percent number, that would mean 95 percent of the time people who get on a Wi-Fi call never switch over to the cell phone, correct?
01:39:21 A. Well, that's what that would mean, yes.
01:39:24 Q. And Wi-Fi Calling operates perfectly fine without this switch or handover, true?

01:39:30 A. Well, it operates independently, but not practicing the
01:39:36 functionality of the switch, as you depicted.
01:39:42 MR. DACUS: May I have the document camera,
01:39:47 please?
01:39:47 Q. (By Mr. Dacus) This is sort of the starting of your
01:39:53 apportionment opinion, Mr. Minor, and I want to ask you
01:39:55 some questions about these numbers if that's okay.
01:39:58 A. Yes, sir, I'll -- I'll attempt to answer --
01:40:01 Q. Okay.
01:40:03 A. -- as frankly and honestly as possible.
01:40:05 Q. If I understood you correctly, just at the highest
01:40:12 level, this was your estimation of what percentage the '554
01:40:20 patent contributed to each of these separate layers within
01:40:25 Wi-Fi Calling. Did I characterize that accurately?
01:40:29 A. The -- what I mentioned is I looked at causal control,
01:40:33 performance sensitivity, and suitability assigned -- to
01:40:38 assign dependency weights to each layer.
01:40:41 Pardon me, I'm having some sort of allergy
01:40:45 response.
01:40:45 That process arrives at a conclusion of a
01:40:54 dependency weight for the patented methodology.
01:41:00 Q. I'm going to be honest with you, sir, I get confused
01:41:03 when you say all that. I'm trying to be as straightforward
01:41:06 as I can.
01:41:07 What I understand the purpose of this is, you

01:41:11 saying that the '554 patent -- if we just take the transport security layer within Wi-Fi Calling, your opinion is that 30 percent of that layer within Wi-FI Calling is attributed to the '554 patent, is that a fair statement?
01:41:27 A. That's where I start, yes.
01:41:28 Q. Okay. And you say that, despite the fact that the inventor himself said the '554 patent has nothing to do with Wi-Fi Calling, true?
01:41:35 A. Well, I heard Mr. Chin's testimony.
01:41:43 Q. Who do you think knows more about what this patent was, you or Mr. Chin?
01:41:50 A. Of course, we depend upon the inventor and intent, but I, too, have looked at this information and performed an analysis. And that link with switch capability with continuity, quality of service maintained, is a very valuable portion of this. And I took a mere 30-percent dependency weight. I had to -- I had to use my background and experience in functional network transport and security to understand what the gravity of that might be, absent the functionality.
01:42:46 Q. Let me ask you about these numbers right here, sir.
01:42:49 A. Okay.
01:42:49 Q. These numbers right here are your subjective opinion, correct?
01:42:54 A. They are subjective.

01:42:56 Q. Right. You didn't show the jury, because there's -- you didn't show the jury any articles to support that, did you, sir?
01:43:04 A. I cited articles that are cited in my report and referenced, but I used my 40-plus years, knowledge, skills, and experience and background, to fundamentally draw a conclusion of what my estimate would be. I could see no other way to arrive at a conclusion other than depending upon my deep background. That's why I was retained, and that's what I used.
01:43:39 Q. You didn't show the jury any publications, textbooks, specific calculations, none of that to support those percentages in that chart. That is a true statement, correct?
01:43:52 A. Well, listen, that is true.
01:43:54 Q. All right.
01:43:55 A. I did not have any basis because this patent -- this link/switch mechanism had never been estimated in value, and that -- you know, what the -- what the applied --
01:44:08 Q. And that -- that's my point, sir.
01:44:12 A. -- functional capability is.
01:44:14 Q. Excuse me for interrupting.
01:44:17 Let me be clear. You've now told us, and we're going to talk about more numbers, but you've now told us this is the first time you've ever done this in your

01:44:26 50-year career, and the numbers that you put in front of
01:44:29 this jury are just your subjective opinion with no
01:44:33 articles, publications, textbooks to support them, correct?
01:44:37 A. I used the background information coupled -- that I was
01:44:43 able to review, a wide variety as I've indicated, you know,
01:44:51 including the patent itself. And I was able to use my
01:44:56 background and experience, coupled with primarily publicly
01:45:03 available information. And, of course, coupled with some
01:45:07 of the evidence produced by Verizon that revealed that my
01:45:14 estimates were probably in the right track, simply because
01:45:18 of the value that they conveyed in some of these analytical
01:45:24 documents.
01:45:25 Q. Here's -- here's another chart --
01:45:28 A. Pardon me.
01:45:29 Q. -- that you showed the jury, correct, Mr. Minor?
01:45:32 A. Yes.
01:45:39 Q. And if I understood what you were attempting to convey
01:45:42 and say, when you added up these three percentages and came
01:45:45 to this 75 percent, what I understood you to say is that's
01:45:49 the percentage of Wi-Fi Calling that is attributable to the
01:45:55 '554 patent, correct? That's what you said.
01:45:56 A. It is the portion attributable to Wi-Fi Calling while
01:46:11 practicing the method of the '554 patent. That's what I've
01:46:13 been referring to this entire process.
01:46:15 Q. And, you know, setting aside that Mr. Chin says the

01:46:22 '554 didn't contribute to Wi-Fi Calling -- setting that
01:46:24 aside, what you were attempting to do in this whole
01:46:28 exercise that you were undertaking here was to determine
01:46:32 what percentage of the '554 benefits relate -- I mean, the
01:46:38 Wi-Fi Calling benefits relate to the '554, correct?
01:46:40 A. Could you repeat that?
01:46:44 Q. Sure. What you were attempting to do at the highest
01:46:47 level is determine what percentage of the Wi-Fi Calling
01:46:53 benefits can be attributed to the '554 patent. That's what
01:46:58 you told us?
01:47:00 A. Yes.
01:47:03 Q. And you did that by looking at these individual layers
01:47:07 within Wi-Fi Calling, correct?
01:47:08 A. Yes.
01:47:14 Q. And then determining the percentage that the '554
01:47:18 patent allegedly attributed -- attributed or contributed to
01:47:25 each of those layers, fair?
01:47:26 A. Yes. That functionality related to the practice of the
01:47:32 patent.
01:47:32 Q. To actually determine -- even if we were to accept your
01:47:36 methodology, to actually determine the percentage that the
01:47:41 '554 contributed overall to Wi-Fi Calling, wouldn't we need
01:47:45 to average these rather than add them together?
01:47:47 A. No, I felt -- I took the five layers, and I felt like
01:47:59 those top three layers rose to a level of importance or

01:48:04 criticality that absent those and not averaged together,
01:48:09 but absent any one of those, the -- the functionality of
01:48:17 the link switch you called it, the multi-pathing, while
01:48:23 maintaining continuity and quality of service, could not be
01:48:28 practiced.
01:48:29 Q. Let me -- let me show you, Mr. Minor, why I say they
01:48:34 think they should be averaged.
01:48:36 A. Sure.
01:48:37 Q. Let's assume that I was to ask you based on this work,
01:48:41 what percentage of each of these layers did the '554 not
01:48:45 contribute? So it would just be the inverse of these,
01:48:50 correct? 70 percent right here, 75 percent right here, 80
01:48:54 percent right there, correct?
01:48:59 A. Those are -- right. Those numbers in a decimal form
01:49:05 are the multiplier that I used.
01:49:07 Q. Right. Here's -- here's the thing that doesn't make
01:49:11 sense. What we're talking about is the total value of
01:49:17 Wi-Fi Calling, correct? Correct?
01:49:22 A. Yes, I've answered --
01:49:23 Q. Whatever that value is, it's a hundred percent -- can
01:49:27 be no more than a hundred percent, correct?
01:49:29 A. That's correct.
01:49:31 Q. Correct.
01:49:32 A. I agree.
01:49:33 Q. Yet if someone asked you based on this methodology that

01:49:37 you used what percentage of the Wi-Fi Calling value and
01:49:42 benefit is something other than the '554 if we added these
01:49:48 things up, that's 145 -- 225 percent. That can't be right.
01:49:56 The total can only add up to a hundred. It cannot be, can
01:50:01 it, sir, that the value of everything except the '554 adds
01:50:07 up to more than the whole. Don't you agree with that?
01:50:11 A. Well, you're -- you're twisting this in that direction,
01:50:18 but what I did by arriving at a dependency weight is figure
01:50:22 out how to deduct for that weight and assume that I had a
01:50:33 sum that would equal to an amount or a percentage that I
01:50:41 could further deduct.
01:50:47 Q. What you did next, sir, is you took this -- this is the
01:50:51 chart that you showed the jury, correct?
01:50:53 A. It is.
01:50:53 Q. And if I understood you correctly, you said, hey, what
01:50:57 I want to do is see if I thought my 75-percent number that
01:51:02 we just looked at, if that's accurate. I want to
01:51:06 double-check my math work, fair?
01:51:07 A. That was part of the process that I engaged in to
01:51:11 attempt to validate or verify what -- what steps I was
01:51:14 taking, yes.
01:51:15 Q. And so I want to talk to you about these numbers, but
01:51:18 before we do it, you came to this conclusion, 73 percent is
01:51:24 the proportion of Voice over Wi-Fi, that's voice -- that's
01:51:30 Wi-Fi Calling, measurable functionality that would not

operate at carrier-grade quality absent the patented method.

Did I read that correctly?

A. You did, yes, sir.

Q. 70 -- so you're saying to this jury, 73 percent of Wi-Fi Calling won't even work unless it used this patent, is that what you're saying?

A. What I'm -- what I'm referring to directly is at the top of the page by comparing network behavior with and without the benefit of the '554 functionality, which is the link.

Q. Sir, we know this conclusion can't be right because you and I have agreed that 99 percent of the time people use Wi-Fi Calling and don't even use this switching and handing over, correct?

A. Well, that may be your opinion, but it's not mine.

Q. You agree that the Verizon data shows that for months and months, billions and billions of minutes of calls, there are people who get on a Wi-Fi call and never switch over, 99 percent of them, true?

A. We know that there are a percentage level that Verizon has reported, yes. And I believe in my estimation, my confirmation was this holds great value. Verizon has validated it in their own documents that there was large cost savings associated with this transition. And that in

01:53:07 essence, what would be required would be additional densification of the network requiring cell tower bills, upgrades to equipment, small cells at a large value each, and, you know, spectrum acquisition to cover not only what the Wi-Fi Calling path switching accomplished but also the additional subscriber growth that they were driving forward for.
01:53:41 Q. So all of those cost reductions that you just described, Mr. Minor, relate to and are attributable to Wi-Fi Calling. That's what you would say, correct?
01:53:51 A. They're attributable to the '554 patent functionality, sir. That's what I --
01:53:57 Q. All those documents you showed to the jury say we're going to have cost savings because of Wi-Fi Calling, correct?
01:54:05 A. Certainly.
01:54:05 Q. Not a single one of them, sir, not a single one -- and I'll give your lawyer an opportunity to show me if I'm wrong -- not a single one of them said we're going to get these costs because of this switch-over or handover, did they, sir?
01:54:21 A. Well, there are -- it's very clear that the patent method solved the key problem to being able to integrate the licensed spectrum to unlicensed spectrum path switching, handoff. And that function has a tremendous

01:54:51 value, and, you know, your opinions -- I know what
01:54:57 Verizon's opinions are. But speaking in those documents in
01:55:02 dollars and cents is not the perspective I used to try to
01:55:06 quantify this in a manner that could be utilized when I
01:55:11 hand off to the damages expert.
01:55:12 Q. Well, let's talk about the method you used.
01:55:15 All of these percentages that you used here as
01:55:17 your mathematical check, you see those percentages on the
01:55:21 screen, sir?
01:55:21 A. I do.
01:55:24 Q. Every one of those are just your subjective opinion,
01:55:28 correct?
01:55:28 A. It's -- it's my opinion expressed based upon reviewing,
01:55:36 you know, a volume of documents, a large volume of
01:55:38 documents. But I cite a few regarding notes about -- by
01:55:48 cellular carrier employees who are the only participants
01:55:53 that I was aware of who could discuss that in a 3GPP
01:55:56 standards context. And then these other advisories are
01:56:04 reporting to the FCC where, you know, I couldn't -- I
01:56:09 couldn't produce the documents because the links weren't
01:56:12 accessible once I went back.
01:56:13 Q. It's true, sir --
01:56:16 A. Sorry?
01:56:17 Q. It is true in this lawsuit you did not produce to us
01:56:20 nor did you show the jury a single work paper nor a

01:56:24 calculation to support any of these percentages, correct? That's a true statement?
01:56:29 A. I did not. I didn't put together work papers.
01:56:34 Q. You've done this enough, sir, to know that trials and juries's decisions are based on evidence, correct? Do we agree?
01:56:46 A. Well, they are produced on evidence, and my background as an expert enables me, I believe I understand that the Court has allowed me to render opinions based upon a deep background and experience in technologies that are related.
01:57:07 Q. No disrespect to you, sir.
01:57:09 A. Yes, sir.
01:57:10 Q. Your background and experience for doing an apportionment analysis is exactly one in 50 years, and that's this one, correct?
01:57:17 A. Well, but that -- that --
01:57:19 Q. Is it true or not, sir?
01:57:22 THE COURT: Well, hold on. Just a moment. Hold on, hold on.
01:57:26 Your question was somewhat compound, Mr. Dacus. If you want to rephrase it --
01:57:32 MR. DACUS: I will.
01:57:33 THE COURT: -- to call for a yes or no answer, you're welcome to do that.
01:57:37 Q. (By Mr. Dacus) It is a true statement, sir, that the

01:57:39 sum total of your experience in doing this apportionment
01:57:43 that you're talking to this jury about is exactly one time
01:57:45 in 50 years, and it's this time, true?
01:57:49 A. Yes, I agreed with that in the beginning.
01:57:53 Q. Now, you also did these things that you called
01:57:57 exclusions. You remember that?
01:57:58 A. I did.
01:57:59 Q. First one was this thing called standards and
01:58:04 commodities exclusion. And you said 30 percent, correct?
01:58:07 A. I did.
01:58:07 Q. You agree, sir, that's just your subjective opinion.
01:58:11 Don't have a calculation, don't have an article, don't have
01:58:14 a publication to show this jury, true?
01:58:17 A. It's true. I made the estimate based upon the
01:58:20 publication backgrounds that I reviewed and the material
01:58:25 Verizon produced to try to arrive at a fair assessment of
01:58:31 deductions or exclusions.
01:58:33 Q. Your next exclusion was this subscriber-funded
01:58:37 exclusion, correct, sir?
01:58:39 A. Yes, sir.
01:58:40 Q. Came solely from you, no other source, your subjective
01:58:44 opinion, no calculation, no article, no publication to
01:58:48 support it, correct?
01:58:50 A. That's correct. I made a best judgment effort to get
01:58:55 this process as fair and accurate as possible.

01:58:59 Q. Your next deduction was this thing called a parallel innovation deduction (sic), correct?
01:59:06 A. Yes.
01:59:07 Q. And you said that should be 20 percent, correct?
01:59:10 A. I did.
01:59:10 Q. And you -- you've told us before, and I assume you will again, that was solely a, quote, unquote, mental exercise that you performed with no documents nor calculation to support it, correct?
01:59:23 A. That's correct.
01:59:25 Q. And then I guess for good measure, you said to be safe, I'm going to add in this 5-percent safety margin, fair?
01:59:41 A. I did do that, yes.
01:59:43 Q. Once again, that number could have been 6, 7, 8, 10. Only you could decide, correct?
01:59:51 A. To use your term, I tried to be fair, sir.
01:59:53 Q. Well, it could have been 10. Why didn't you make it 10 if you were being fair?
02:00:00 A. I chose that percentage as I did with the rest. I own it. I did do it, and I believe it's fair.
02:00:09 Q. I want to ask you about a couple of documents, if I could, Mr. Minor.
02:00:19 Do you remember showing the jury this document about this cost savings based on Wi-Fi Calling?
02:00:29 A. Yes, sir.

02:00:30 Q. You know that this relates to what's called public and
02:00:35 enterprise in-building equipment savings, correct?
02:00:45 A. I don't -- I don't recall the words "public and
02:00:49 enterprise."
02:00:50 Q. Did you read this entire PowerPoint?
02:00:54 A. Well, I reviewed it, yes. But I've seen a lot of
02:00:58 information. I don't remember those two words, but Network
02:01:02 in-Building Cost Avoidance is what is the title of this
02:01:06 page -- this slide.
02:01:08 Q. Do you even know what public and enterprise in-building
02:01:12 costs are, what that means at Verizon?
02:01:15 A. I do.
02:01:16 Q. What does it mean?
02:01:17 A. Well, it would relate to infrastructure in public
02:01:26 areas --
02:01:26 Q. Right.
02:01:28 A. -- versus enterprise areas or --
02:01:31 Q. Right.
02:01:33 A. -- so whatever that is defined as within the Verizon
02:01:37 network.
02:01:37 Q. A public area might be, for example, AT&T Stadium where
02:01:42 the Cowboys play, correct?
02:01:44 A. Of course.
02:01:44 Q. Have you ever been to a game in a stadium before?
02:01:47 A. I have.

02:01:47 Q. Have you ever noticed that you can't get cell service?
02:01:50 A. Well, I'm not going to debate with you whether cell service is available. I'm familiar with these public places and how the antenna systems occur.
02:02:03 And I know that it depends upon subscriber aggregation numbers and that -- that is a significant part of this process, but I didn't come to talk about that.
02:02:17 Q. You do -- well, you talked about it because you pointed to this $1 billion number so I want to make sure that the record is clear. Does that sound fair?
02:02:26 A. I'm fine with that.
02:02:27 Q. You -- you agree, as you've said, that this public building that this cost avoidance was talking about is in a stadium setting. And you agree, sir, that in those stadium settings, many of those stadiums have now implemented Wi-Fi because of the congestion of cellular, correct? That's a true statement?
02:02:47 A. True.
02:02:50 Q. And you know in those situations when you have Wi-Fi in those public settings, like a stadium, there's no handover going between Wi-Fi and cell, correct?
02:03:04 A. I'm not privy to Verizon's configuration for those settings.
02:03:10 Q. Okay. The reason I asked, sir, is you're pointing to a savings that relates to a stadium setting, and you don't

02:03:22 even know if handover is occurring in that situation,
02:03:27 correct?
02:03:27 A. Well, you're referring to stadiums. I was looking at
02:03:32 in-building access. And, you know, that's -- that's my
02:03:39 view of what I saw in this particular slide in that
02:03:42 presentation.
02:03:43 Q. Do you think it'd be fair, sir, before you plop a
02:03:51 document down in front of the jury and tell them that
02:03:53 Verizon is saving a billion dollars, that you at least know
02:03:57 what it relates to? Does that sound like a fair thing that
02:03:59 you should have done?
02:04:00 A. I believe I understand what it relates to.
02:04:03 Q. I've got one more set of questions for you, Mr. Minor.
02:04:12 If you'll be patient with me, I want to ask you about this
02:04:16 company Qualcomm. That's a company you know, correct?
02:04:19 A. It is.
02:04:19 Q. You actually know them very well, right?
02:04:21 A. I've had some Qualcomm training, yes, sir.
02:04:24 Q. Yeah. Qualcomm, you would agree, is one of the
02:04:28 pioneers in cellular, Wi-Fi, telecommunications, telephone
02:04:35 communications in our country, correct?
02:04:41 A. They are. They're -- Qualcomm is a lot like the
02:04:44 Microsoft of the cellular world. They're -- they're a
02:04:47 large, important company.
02:04:50 Q. And as you said, Qualcomm -- you've actually received

02:04:53 lots and lots of training -- I saw it on your resume --
02:04:57 from Qualcomm, correct?
02:04:59 A. Yes, sir, I have.
02:04:59 Q. We won't detail it but many different types of
02:05:03 certifications and --
02:05:03 A. Yes.
02:05:04 Q. -- courses, fair?
02:05:04 A. They do.
02:05:05 Q. You know, sir, that Qualcomm has thousands of patents,
02:05:17 maybe tens of thousands, but we'll just stick with
02:05:21 thousands related to telecommunications, Wi-Fi, telephone
02:05:23 service, fair?
02:05:23 A. Yes, sir, just as Verizon does. Most of you have large
02:05:30 numbers -- large portfolios, if you will, of intellectual
02:05:33 property.
02:05:33 Q. And were you here for opening statement, sir, when I
02:05:36 gave an opening statement?
02:05:37 A. Yes, sir, I was.
02:05:38 Q. Did you hear me say that we're going to show that
02:05:41 Qualcomm actually had a patent that did this cellular Wi-Fi
02:05:48 transfer more than four years before this '554 patent?
02:05:50 A. I heard that, sir.
02:05:51 Q. Wouldn't surprise you that Qualcomm had a patent in
02:05:55 that area, would it, sir?
02:05:57 A. I just know that this -- this patent, I understand, is

02:06:04 a predecessor to other methods for this multi-pathing while
02:06:11 maintaining continuity at a quality of service level
02:06:15 with -- you know, this -- this stream quality event.
02:06:17 Q. That's all the questions I have for you, Mr. Minor. I
02:06:23 appreciate your patience with me.
02:06:24 A. Thank you very much.
02:06:25 MR. DACUS: And I pass the witness, Your Honor.
02:06:28 THE COURT: Ms. Dupriest?
02:06:42 REDIRECT-EXAMINATION
02:06:43 BY MS. DUPRIEST:
02:06:43 Q. Mr. Minor, I'm going to try to get you off the stand.
02:06:46 You've been up here a while.
02:06:48 Mr. Dacus asked you a bunch of questions trying to
02:06:52 imply that you made up your opinions. Did you?
02:06:54 A. No, I did not.
02:06:54 Q. Are you aware of any expert that Verizon has ever
02:06:57 offered or disclosed that will offer any apportionment
02:07:00 opinion to compete with your opinion?
02:07:01 A. I don't know of one.
02:07:02 Q. Is the first time anyone has tried to apportion the
02:07:06 benefits of the '554 patent -- sorry, is this the first
02:07:09 time anyone has tried to apportion the benefits of the '554
02:07:13 patent to Verizon's VoWiFi system?
02:07:17 A. Yes, this is uncharted territory. I tried to use
02:07:22 standard methods the best I could to get estimates that

02:07:25 were fair and balanced. I try to be fair and just as
02:07:31 neutral as I can be in the process.
02:07:35 Q. So because no one had done it before, was there any
02:07:40 absolutely on-point data that you could go look at?
02:07:44 A. No. I wasn't able to look at specific data at all that
02:07:49 I knew of in all that I examined and searched for, nor the
02:07:57 material that Verizon produced that could give me a good
02:08:03 sense. But I had a sense of the value and the importance
02:08:08 of this functionality to Verizon's network and their --
02:08:14 their ability to serve subscribers as well as the bottom
02:08:19 line.
02:08:20 Q. Mr. Minor, when apportionment is required by law, how
02:08:28 do you go about apportioning if that kind of information
02:08:31 just doesn't exist?
02:08:32 A. In this case, as anyone would do, I referred back to my
02:08:42 background, and you know a little bit about it, it's a very
02:08:47 deep background with a lot of different facets to it. And
02:08:50 I -- I fell back to that and tried my best to arrive at a
02:08:58 fair apportionment and attribution.
02:09:02 Q. Mr. Minor, Mr. Dacus also asked you about a document
02:09:05 right there at the end, the Verizon's 1 billionish
02:09:13 in-building cost avoidance savings. Do you remember that?
02:09:15 A. I do.
02:09:16 Q. I believe he was asking you some questions about
02:09:18 stadiums. Is that --

02:09:20 A. Yes.
02:09:21 Q. Okay. What is your understanding -- well, first of all, is stadiums part of that -- that calculation in your view?
02:09:27 A. It's -- it's an overview calculation, yes. But it -- there are many, many ways, metro trains or subways, other public venues -- one of the -- one of the most difficult problems for a cell phone company is to be able to accommodate aggregation or gatherings of large numbers of people and still supply service and not have dropped calls, because that wouldn't please the subscribers.
02:10:06 But that happens if there's a -- sometimes with a car crash on the freeway or other public aggregation events. I'm very familiar with that, and part of my own patented methodology, by the way, referred to or cited in a -- in a -- one of the carriers recent patent covers this -- some of these functional issues that have to be dealt with to perform a verification or a validation and error mitigation.
02:10:43 So I referred back to that, and I believe that it's an accurate assessment on that basis.
02:10:52 Q. Okay. Let me ask a slightly different question.
02:10:56 A. Yes, ma'am.
02:10:57 Q. What do you understand the 1.06 billion in in-building cost avoidance savings that Verizon has attributed to Wi-Fi

02:11:01 Calling to include? What does that mean, in-building cost
02:11:09 avoidance savings?
02:11:10 A. In-building cost avoidance would, of course, include
02:11:15 Wi-Fi in your home, Wi-Fi at an office you would work at,
02:11:20 all those things that I've spoken of in addition to perhaps
02:11:25 the stadium that he spoke of. So there are many facets to
02:11:30 this, and it's -- it's difficult as -- you know, as the
02:11:37 growth of these networks occurs to get into the corners or
02:11:41 into the less frequent -- the less quality signal areas
02:11:49 where you have lower bars and provide service.
02:11:53 Wi-Fi Calling and this ability to hand off or
02:11:58 multi-path while maintaining that quality of service
02:12:03 continuity is -- is critical to maintaining customer
02:12:08 satisfaction and gaining cost savings. And without it, the
02:12:15 cost savings would -- would escalate exponentially
02:12:23 potentially for densification.
02:12:25 Q. All right. Mr. Minor, Mr. Dacus also asked you several
02:12:28 questions about which calls infringe. Do you remember
02:12:31 that?
02:12:31 A. I do.
02:12:32 Q. Are you here to testify about infringement?
02:12:34 A. Not at all.
02:12:35 Q. Were you aware through your review of Mr. Rubin's
02:12:39 report that not every Wi-Fi call includes a handover?
02:12:43 A. Yes.

02:12:44 Q. Did you consider that in forming your opinions?
02:12:46 A. Yes, I did.
02:12:46 Q. Mr. Dacus also -- he drew the little diagram with the two circles and the -- do you remember this?
02:12:51 A. Yes, ma'am, sure.
02:12:52 Q. Okay. So he asked you whether you valued a piece of the pie of Wi-Fi Calling instead of the switch. Do you remember that?
02:12:59 A. Oh, yes, I do.
02:13:00 Q. Okay. And he -- I believe he told you you were wrong to do -- to value Wi-Fi Calling or at least he used Wi-Fi Calling as your starting point because Aspen didn't invent Wi-Fi Calling. Do you remember that?
02:13:11 A. I do recall that --
02:13:12 Q. Okay.
02:13:12 A. -- yes, ma'am.
02:13:14 Q. Mr. Minor, does Wi-Fi Calling predate the 4G environment that the mobile operators are operating in today?
02:13:26 A. Yes.
02:13:26 Q. Okay. Did Verizon adopt a Wi-Fi Calling Service on its 4G platform -- on its nation-wide network before it could enable handovers?
02:13:36 A. It did not. They wouldn't touch it until that functionality was arrived at, and that functionality is an

02:13:48 innovation in the '554 patent.
02:13:51 Q. Now, do you remember seeing the presentations, they've been up earlier today, about the importance of seamless handovers to Wi-Fi Calling?
02:14:00 A. I did.
02:14:01 Q. And what did those indicate?
02:14:02 A. Well, seamless handovers clearly are and always have been a holy grail, if you will, for a mobile network operator, a cell phone company to be able to have flawless as possible service without affecting voice quality so much that you want to hang up and go away because somebody talks like a duck or a frog, you know. So it is a very important threshold, yes.
02:14:37 Q. Now, Mr. Minor, towards the end of the diagram discussion, Mr. Dacus drew a pie on the switch and said you should have valued this instead, right?
02:14:48 A. Yes.
02:14:49 Q. Do you remember that?
02:14:49 A. I recall that.
02:14:50 Q. Okay. In the context of networking, can you value a switch without looking at the value of the things it's switching between?
02:14:57 A. No. It's really not feasible. I mean, the only reference point that I could have, of course, was the Wi-Fi Calling process. And then, of course, the -- on the

02:15:12 benefits side, the ability to path switch, hand off between
02:15:18 the two licensed spectrum aspect, LTE, and the unlicensed
02:15:25 spectrum, Wi-Fi Calling. And that combination is an
02:15:30 incredibly powerful -- incredibly powerful combination.
02:15:39 Sorry.
02:15:39 Q. That's okay.
02:15:40 Now, through the apportionment process that we
02:15:44 explained to the jury before lunch -- that you explained to
02:15:47 the jury before lunch --
02:15:48 A. Yes, ma'am.
02:15:49 Q. -- did you ultimately eliminate any value from that
02:15:52 Wi-Fi Calling starting point that you believe is not
02:15:54 attributable to the '554 patent?
02:15:55 A. Yes. That was my intent in the exclusion process, to
02:16:00 get through that.
02:16:03 Q. Okay. And, finally, Mr. Minor, Mr. Dacus asked you a
02:16:07 whole bunch of questions and made statements in those
02:16:10 questions a bunch of times about months and months of less
02:16:12 than 1 percent of Wi-Fi calls, including a handover. Do
02:16:16 you remember those questions?
02:16:17 A. I do, yes, ma'am.
02:16:19 Q. And I think he said something in the process to the
02:16:21 effect of I'll let Aspen's counsel correct me if I'm wrong.
02:16:25 Do you remember that?
02:16:25 A. Yes.

02:16:25 Q. Do you recall reviewing certain calculations from Verizon's own experts in the course of your work in this case about the number of -- the percentages of Wi-Fi calls that include a handover?
02:16:35 A. Yes, ma'am.
02:16:37 Q. Do you recall that that conclusion was that 15 percent of Wi-Fi calls include a handover?
02:16:42 A. Yes, ma'am, I do. It was a different number.
02:16:45 Q. Thank you, Mr. Minor.
02:16:47 MS. DUPRIEST: I'll pass the witness.
02:16:48 THE COURT: Mr. Dacus?
02:16:50 RECROSS-EXAMINATION
02:16:50 BY MR. DACUS:
02:16:50 Q. Let's just be clear, Mr. Minor, on what these percentages are. So the question I asked you, sir, and I think you will still agree, is that for those folks who get on Wi-Fi Calling as their initial call, there are months and months -- we may see years and years of data where less than 1 percent of those people ever switch over to the cell network, correct?
02:17:20 A. I agree that there are some 1 percents. And, you know, I don't have all the picture of adoption rates and usage rates, but we know that there is value and percentages did climb higher, according to your expert. So I -- you know, I've tried to be fair, like I said, both sides-wise.

Q. I've been asking you questions about your damages-related opinions, Mr. Minor. But you agree, sir, that if this jury were to find and they do find that there's no infringement, then with all due respect to you, your opinions are really irrelevant, correct?
A. Well, that's -- the purpose of my apportionment is based upon infringement, yes.
Q. In other words, they would -- they would only need your testimony if they found both infringement and that the patent was valid, correct?
A. That's my understanding. I hinge on the infringement expert, and that's why I went after Dr. Rubin.
Q. Thank you, Mr. Minor. Appreciate it.
MR. DACUS: Pass the witness.
THE COURT: Ms. Dupriest.
MR. HERMAN: No further questions, Your Honor.
THE COURT: You may step down, sir.
THE WITNESS: Thank you, sir.
THE COURT: May I ask counsel to approach? Whoever.
(Bench conference.)
THE COURT: You guys have one additional witness; is that right?
MR. HERMAN: No. We're playing a deposition video, and we're having Mr. Blok, our damages expert come

02:18:57 up.

02:18:57 THE COURT: How long is the depo, do you know?

02:18:59 MR. HERMAN: It's about 20 minutes.

02:19:01 THE COURT: Let's get through him and then we'll take our break, and we'll take up y'all's objections on those slides -- or y'all's objections to their slides, and then we'll come back and do Blok.

02:19:14 MR. HERMAN: Perfect. Thank you.

02:19:16 (Bench conference concluded.)

02:19:16 THE COURT: All right. At this time, the Plaintiff may call its next witness.

02:19:19 MS. DUPRIEST: Thank you, Your Honor. Aspen calls Verizon's witness Magnus Blair by video deposition. Mr. Blair is Verizon's director of brand and network strategy. The time allocation is 18 minutes for Aspen and 2 minutes for Verizon.

02:19:37 MAGNUS BLAIR, PLAINTIFF'S WITNESS SWORN

02:19:39 TESTIMONY BY VIDEOTAPE DEPOSITION

02:19:39 (Videoclip played.)

02:19:42 Q. Good morning, Mr. Blair. Could you please state your full name for the record?

02:19:46 A. Sure. My name is Magnus Blair, no middle name.

02:19:49 Q. So let's discuss your background briefly. I believe you've been at Verizon since October of 2020; is that correct?

02:19:57 A. That's correct.
02:19:58 Q. What was your job description at that time when you were hired?
02:20:01 A. I was hired as director of brand strategy. I'm now director of brand and network strategy. A couple of years after that, I picked up some additional responsibilities looking after our network marketing. So I'm probably within our marketing function, the person who stays closest to our network and is best informed on it.
02:20:25 Q. Based on the documents that you've reviewed, what do you understand the primary goals of the Wi-Fi Calling project to have been?
02:20:32 A. As I said, the Wi-Fi Calling in marketing terms was always part of a bigger offering centered around a different feature of HD Voice, as it subsequently was called, voice over 4G/LTE.
02:20:48 But Wi-Fi Calling itself was a functionality -- again, was not personally involved. This is just what I'm reconstructing from a quick read of the documents -- was a feature that we brought to market I would say driven largely by Apple, who were putting it into their own phones. They're obviously a hugely important partner for us now, as they were then, and some of the things we do at a network level are driven by, you know, their requests. So my sense was this was a feature set we brought to

02:21:23 market.

02:21:24 My knowledge of the category suggests that it was

02:21:26 not one that we marketed particularly heavily. T-Mobile

02:21:29 marketed it somewhat heavily because they were in a

02:21:32 position where their network perceptions lagged ours, and

02:21:38 they were looking for anything that might shift the needle

02:21:41 for them.

02:21:41 It was never a particularly high priority for us,

02:21:45 but obviously we wanted to play nicely with Apple and also,

02:21:50 you know, to not allow our carrier -- our competitors to

02:21:56 have differentiation from us.

02:22:00 Q. And that would still be true today, right? At present,

02:22:03 all three major carriers offer Wi-Fi Calling, correct?

02:22:08 A. I think it's a functionality that exists, yes. It's

02:22:12 not something I think any of us talk about. The market

02:22:16 narrative has significantly moved on.

02:22:18 Q. But you offer it, correct?

02:22:20 A. It's a setting on phones that can be switched on, so I

02:22:24 guess yes. I mean, define offer. But it's -- it's a part

02:22:29 of the network feature stack.

02:22:31 Q. Do you agree that this document correctly describes the

02:22:34 competitive environment at the time Verizon was considering

02:22:37 launching Wi-Fi Calling?

02:22:39 A. I think it describes a small facet of the competitive

02:22:46 environment. There were many more significant competitive

02:22:50 dynamics at this point in time than -- than Wi-Fi Calling,
02:22:54 but it was a factor in the market, albeit a smaller one.
02:22:58 Q. At a minimum, the other three major carriers, T-Mobile,
02:23:04 Sprint, and AT&T were either launching or in the process of
02:23:08 launching at this time, correct?
02:23:10 A. That's what the slide infers, yes.
02:23:13 Q. Do you have any belief -- reason to believe that they
02:23:16 were not being truthful when they said that capital
02:23:19 avoidance was expected over the five years for the public
02:23:22 and enterprise in-building?
02:23:24 A. I'm not saying that they weren't being truthful. I'm
02:23:27 saying that I think this is not a true statement that
02:23:30 Verizon would avoid a billion -- would or ever did avoid a
02:23:34 billion dollars in capital.
02:23:35 Q. But you weren't involved at that time, correct?
02:23:37 A. But I wasn't involved at that time.
02:23:39 Q. And whoever it is that drafted this was, correct?
02:23:43 A. Well, whoever drafted this was involved in creating
02:23:47 this presentation to present someone who would make
02:23:51 business decisions. I don't think the person who drafted
02:23:56 this was -- would have been directly involved in the
02:24:00 allocation of CapEx to our network build.
02:24:02 Q. Are you aware of any responses to this document that
02:24:04 said, no, there's no way we're going to save 1 billion in
02:24:09 capital avoidance over five years?

02:24:11 A. I'm not. But conversely, I'm also not aware of us saving a billion dollars in capital over the next five years. In fact, our network capital expenditure was very high through this period and continued to be very high throughout.
02:24:24 Q. In the middle section there customer demand slash -- sorry -- customer experience/demand, it references customer requests for Wi-Fi Calling. Do you see that?
02:24:34 A. I see that.
02:24:34 Q. Do you believe that this document was accurate when it suggests that customers were requesting Wi-Fi Calling?
02:24:42 A. I have no reason to doubt that. We have a hundred-plus million customers back then. I'm sure customers were requesting all manner of things, including this.
02:24:52 Q. So, Mr. Blair, we were discussing previously -- I believe you testified that you don't understand why Verizon would have wanted to push people to a Wi-Fi network when you couldn't charge them for it and you didn't control it. Is that generally what we were talking about a few minutes ago?
02:25:07 A. I said that seems to me to be at odds with our business strategy as I understand it and our --
02:25:14 Q. So --
02:25:15 A. -- monetization strategy.
02:25:18 Q. So one reason that Verizon might want to do that

02:25:20 despite that disagreement with the monetization strategy
02:25:23 would be because of the risk of churn, correct?
02:25:32 A. Not really to any significant extent.
02:25:36 Q. Well, the person who drafted this presentation who was
02:25:39 involved at the time of the launch stated that the churn
02:25:45 risk without Voice over Wi-Fi was .01 percent which would
02:25:49 result in 34 million of annual revenue loss, correct?
02:25:52 A. That's what -- the case that the person trying to --
02:25:56 who wrote this slide was obviously trying to make to a
02:25:58 senior executive.
02:25:59 Q. And do you have any reason to believe that they weren't
02:26:01 being truthful in that statement?
02:26:03 A. I have no reason to believe they weren't being
02:26:08 truthful, but I certainly believe that they were motivated
02:26:11 to come up with reasons as to why this would be a good
02:26:14 idea.
02:26:15 Q. And ultimately, those reasons resulted in the launching
02:26:18 of Wi-Fi Calling, right?
02:26:19 A. I don't think this slide reflects the reasons why we
02:26:24 launched Wi-Fi Calling. As I said, I think primarily we
02:26:28 launched it because we -- because Apple was encouraging us
02:26:32 to. But, again, I don't know that for sure. I wasn't in
02:26:39 the room.
02:26:39 Q. Are you allowed to say no to Apple?
02:26:42 A. Of course. But in general, they're our close partner,

02:26:46 and we try and come to consensus with them.
02:26:49 Q. Why is that?
02:26:52 A. Because the dominant consumer demand in this country
02:26:57 now, as it was to a slightly lesser extent but still
02:27:03 significant then, is for iPhones versus other handset
02:27:06 brands. They're a key supplier for us.
02:27:10 Q. It states, now with the numbers, 11 percent of Verizon
02:27:16 customers likely to switch to another carrier for Wi-Fi
02:27:19 Calling.
02:27:19 Do you see that?
02:27:20 A. I do see that.
02:27:21 Q. It also states that 37 percent of Verizon customers who
02:27:26 find the feature appealing up 27 percent the previous year.
02:27:31 I assume that means from the previous year.
02:27:33 Do you see that?
02:27:35 A. I see that, yes.
02:27:36 Q. Okay. And then, finally, 34 percent of Verizon's
02:27:40 customers who find the feature useful up 20 percent from
02:27:43 the previous year.
02:27:44 Do you see that?
02:27:45 A. Yeah.
02:27:47 Q. Okay. Do you know what those numbers were based on?
02:27:50 A. I mean, the slide tells me it's based on research
02:27:55 carried out by -- GfK is a research company, so I assume
02:27:59 it's from this piece of research that's footnoted here.

02:28:03 Q. Okay. Any reason to doubt that their data would have been accurate?
02:28:07 A. Well, all market research data is accurate only up to a point, but I have no particular reason to doubt that they conducted this survey appropriately.
02:28:19 Q. Let's take that document down and bring up the document -- the native version of the document bearing Bates No. VZ_ASPEN_000824891.
02:28:42 Well, specifically it says in the second paragraph there: In order to inform Voice over Wi-Fi product development and potential launch efforts, Verizon would like to better understand consumers' attitudes and perceptions towards the service.
02:28:52 Do you see that?
02:28:52 A. I see that.
02:28:54 Q. Okay. And then it lists several areas that it's interested in with respect to that fact -- that topic, correct?
02:29:04 A. Correct.
02:29:06 Q. Okay.
02:29:06 A. And what I said before, that we still do studies such as this, I mean we do studies that measure these sort of things about different feature sets. We -- to my knowledge, we've done no more research on -- on this particular Voice over Wi-Fi area, at least I'm --

02:29:21 Q. Okay. So with respect to the general customers, are you surprised that it's only a 46 to 50-percent split as to whether they would prefer a mobile network or Wi-Fi?
02:29:37 A. I'm not surprised. It speaks to my general sense that this was a -- I think I said earlier, a solution in search of a problem for most customers. People weren't particularly interested in this.
02:29:52 Q. 48 percent of Verizon's customers preferring Wi-Fi doesn't suggest to you that customers aren't interested?
02:30:01 A. Not strongly, no. As I say, I see research -- or at least modern versions of this research, I'd view this personally, based on my professional experience, as a fairly lukewarm performance.
02:30:14 Q. So here, still on Slide 9, it states: The vast majority of likely users say the service will add at least some value to their current plan.
02:30:24 Do you see that?
02:30:26 A. I see that statement. I'm not entirely sure I understand which colored segment of the charts they're referring to here.
02:30:37 Q. Do you have any reason to believe -- to disagree with that statement?
02:30:43 A. As I say, I -- it's unclear to me exactly what data point in the pie chart supports that statement, so I'm a little skeptical about it.

02:30:53 In fact -- actually, sorry, if we can go back to that. Now I can read it more clearly. I don't think the data on this slide substantiates that. I think that is a gloss that has been added by the person writing this slide that talks about perhaps some other data. But that statement is some other data elsewhere in the survey. The data is not supported by these graphs.

02:31:16 Q. All right. So let's turn to Slide 10. This slide states -- the subheading -- again, a conclusions slide, but the subheading here is: What is the impact of a Voice over Wi-Fi offering on the Verizon brand?

02:31:33 Do you see that?

02:31:34 A. Yeah.

02:31:35 Q. My question is just specific to why is whomever is putting this survey together wanting to assess the impact of a Voice over Wi-Fi offering on the Verizon brand? Why would that be something they would explore? It's not about the results. It's about the inquiry.

02:31:50 A. Well, in general, we want to make sure that we're listening to our customers and understanding if things that we're considering are motivating to them. But the real question we're asking is are people willing to pay for the service? Does it drive additional value we can monetize? We're not a charity. We -- you know, we're a business.

02:32:13 And what, for me, is interesting, not necessarily

02:32:17 in this deck, but in the aggregate of what we did, is we
02:32:21 didn't end up charging for this service at all. If it
02:32:25 really did have strongly positive effects on the value that
02:32:31 our customers have of our plans, we would have monetized
02:32:35 that, and we didn't.
02:32:36 Q. So every single new service that Verizon offers that's
02:32:42 valuable comes with some additional revenue stream? Is
02:32:46 that what you're saying?
02:32:47 A. That's not what I'm saying. But I'm saying in general,
02:32:51 if something is highly appealing to customers, it's
02:32:56 something they're willing to pay for. We ultimately
02:32:59 determined people were not willing to pay for this, I would
02:33:04 say, based on relatively anodyne performance in research.
02:33:12 And I look at these results, and I don't see a compelling
02:33:15 case for why this is a particularly hugely -- a service or
02:33:20 solution that should be prioritized. I would imagine if --
02:33:25 that other -- other things right now, the things that we
02:33:28 ended up marketing aggressively towards consumers were much
02:33:32 more appealing to this -- than this.
02:33:34 Q. Well, there's two separate questions there, right? One
02:33:36 is do you implement it? Is it -- does is serve Verizon's
02:33:41 business interests? And the other, is it something that
02:33:42 you market to customers, right? Those are two separate
02:33:43 questions.
02:33:43 A. Those are.

02:33:44 Q. Okay. And it was implemented, correct?
02:33:48 A. It was implemented, yes.
02:33:50 Q. So at least there was enough interest or value or need
02:33:57 for this service to be a part of Verizon's offerings that
02:34:00 the management made the decision to implement the service,
02:34:03 correct?
02:34:03 A. Yes. But I would say not based exclusively or even
02:34:08 predominantly on customer demand but based on relationship
02:34:12 factors with Apple and a desire not to be the one carrier
02:34:17 that didn't have this.
02:34:17 Q. And if Verizon charged separately for the use of Wi-Fi
02:34:23 Calling on its network, it would be the only one that was
02:34:26 doing that, correct, of the major carriers?
02:34:31 A. I mean, it's incomprehensible to me that we would
02:34:36 charge for it, but in a pure hypothetical, yes.
02:34:39 Q. So on this slide, does the data indicate that Verizon's
02:34:43 marketing team concluded the value of its calling plans
02:34:46 improves with the inclusion of Voice over Wi-Fi?
02:34:51 A. The slide shows that the person who wrote this slide
02:34:54 wanted to make that point. I don't -- you know, this slide
02:34:58 would have been presented in a meeting. I don't have
02:35:02 minutes of that meeting. I don't know how it was received.
02:35:04 It's indicative that that point was being made by the
02:35:07 person who wrote this document.
02:35:09 Q. Based on the survey data, correct?

02:35:11 A. Based on the survey data, yes.
02:35:14 Q. And you don't have any direct knowledge of anyone disagreeing that this was an accurate portrayal of customers' beliefs, correct?
02:35:25 A. No. I mean, I obviously was not working at Verizon at the time. But, you know, again, I come back to -- I look at this and I don't see a particularly strong business case. The international travellers and callers, yeah, there's some demand there. This is something that means something to them. But, to be clear, what they're wanting to avoid is paying roaming -- essentially roaming call charges because that is a monetary outlay. It doesn't -- this doesn't say to me that general customers -- and, you know, let's remember, this study itself could not find an adequate sample of general customers who expressed problems with their network. This doesn't say that there's really much demand there at all.
02:36:07 You know, these numbers -- you know, people have to pick one of the five boxes, and the proportions they're picking them in is what I would expect for a product that's not particularly appealing.
02:36:15 Q. What percentage of Verizon's general customers did Voice over Wi-Fi add some or significant value to their plans for?
02:36:22 A. I mean, 12 percent is significant value. 52 percent is

02:36:28 some value. But, again, you know, 25 years' experience of reading surveys like this, some value doesn't really mean very much. 12 -- the 12 percent significant value, okay. One in 10 people claim this is -- this is of value to them. I wouldn't attach too -- I don't think that 52 percent is particularly significant in saying there's huge demand for this.

02:36:54 Q. So 59 percent of them said they would use it if they had poor 4G/LTE service at home but had Wi-Fi access, correct?

02:37:04 A. Correct. But that's not a determination that they actually do have poor 4G service.

02:37:09 Q. And 35 percent said they would use Wi-Fi Calling if they had poor 4G/LTE service at work but had Wi-Fi access, correct?

02:37:18 A. That's what the slide says, yes.

02:37:23 Q. And then, finally, 34 percent of that group said they would likely use it to make 4G/LTE wireless calls, but they prefer to make their calls using Voice over Wi-Fi; is that correct?

02:37:39 A. That's -- yeah, that's what the slide did say.

02:37:43 Q. Do you see that this states that it is a December 4, 2015 press release from the Verizon Wireless archives?

02:37:51 A. Yeah. This looks like an archival press release to me.

02:37:55 Q. The specific feature of Advanced Calling that's being

02:37:59 called out here is Wi-Fi Calling, correct?
02:38:02 A. It's the new news that's being added to a pre-existing
02:38:06 product, yes.
02:38:07 Q. And, specifically, it says: Wi-Fi Calling provides an
02:38:09 alternative for those who wish to use Wi-Fi in the home,
02:38:12 office, or while traveling.
02:38:13 Correct?
02:38:16 A. Yeah, I see that sentence.
02:38:19 Q. This was a public statement that Verizon made?
02:38:25 A. It was one of many press releases that we issued then
02:38:28 and we continue to issue now. Yeah.
02:38:30 Q. And then it goes on to describe how you -- how you
02:38:34 implement it on your phone, right?
02:38:37 A. Well, how you would implement it on a couple of
02:38:44 particular handset models.
02:38:46 Q. The only ones that had it at this point, correct?
02:38:48 A. I think it's reasonable to infer that, although it's
02:38:55 not entirely sure that -- in this that it's only those
02:38:59 models, but that would seem to be the indication.
02:39:01 Q. Mr. Blair, this is a document that's been marked as
02:39:06 Exhibit 8, and I'm -- there's an email at the beginning,
02:39:09 but it predates your time at Verizon.
02:39:12 Okay. The text following Positioning reads: The
02:39:17 best network just got better with HD Voice. Join America's
02:39:21 largest Wi-Fi -- wireless HD Voice network to make calls

over Wi-Fi, take video calls, talk and surf at the same time and experience calls so clear you'd swear you're chatting face-to-face. Best part, now it comes ready to use when you buy select smartphones.

Did I pretty much, other than the one glitch, read that correctly?

A. You read -- read the words as they're on the slide. Yeah.

Q. And then immediately above that, it says: Top key selling features. And, again, this is talking about Advanced Calling or HD Voice, the package, correct?

A. The overall package, yes.

Q. And it says HD Voice, simultaneous voice and data, Wi-Fi Calling in-building and around the world from any known hotspot and video calling, right?

A. Yeah. So sort of four key features.

(Videoclip ends.)

THE COURT: Does that complete the testimony of this witness?

MS. DUPRIEST: It does, Your Honor.

THE COURT: All right. Very good.

Ladies and gentlemen of the jury, I think now is a good time for us to take our afternoon break before the next witness's testimony.

As a reminder, don't discuss the case with anyone,

02:40:34 including among yourselves. Don't permit it to be 02:40:37 discussed in your presence. Don't do any independent 02:40:40 research or investigation into anything related to the 02:40:43 case. And finally don't post anything about your 02:40:45 involvement in this matter as a juror on any social media 02:40:49 website or app.

02:40:49 I do have a couple of issues I need to discuss 02:40:53 with the attorneys. We'll aim to keep our break to 15 02:40:57 minutes. It might take just a few minutes longer than 02:41:00 that, but we'll get you back into the courtroom and resume 02:41:03 the proceedings just as quickly as we can.

02:41:06 COURT SECURITY OFFICER: All rise.

02:41:08 (Jury out.)

02:41:09 THE COURT: Okay. Be seated.

02:41:38 With respect to the Plaintiff's objections to the 02:41:44 slides of Mr. Faber, let me suggest this. I don't think 02:41:48 copies of those slides were provided to us. If you would 02:41:51 provide me with a copy of those slides and let me look at 02:41:54 those, Mr. Williams, over the break, when we come back, we 02:41:59 will discuss them briefly before we resume. Do you have a 02:42:03 paper copy you can hand up?

02:42:08 MR. WILLIAMS: We'll bring it to you, Your Honor.

02:42:10 THE COURT: All right. Very good.

02:42:11 Mr. Anderson comes to the rescue.

02:42:13 MR. ANDERSON: Making sure I don't have any notes

02:42:18 on that. I might need that back.
02:42:20 THE COURT: What's that?
02:42:21 MR. DACUS: I might need that back.
02:42:23 THE COURT: I'll give it back to you.
02:42:24 Okay. And I know -- I know the particular slides
02:42:27 there are objections to, so I'll take a look at those and
02:42:29 hear your argument when we come back.
02:42:32 (Recess.)
02:57:37 COURT SECURITY OFFICER: All.
02:57:38 THE COURT: Please be seated.
02:57:39 Mr. Williams.
02:57:40 MR. WILLIAMS: Thank you, Your Honor. Jace
02:57:49 Williams with Aspen Networks, the Plaintiff.
02:57:52 This is my second time in your courtroom.
02:57:55 THE COURT: Yes, it's nice to see you.
02:57:57 MR. WILLIAMS: Happy to be back.
02:57:58 So I'll try and streamline this because I know we
02:58:02 want to get the jury back in the room.
02:58:05 Aspen's objections are pretty straightforward.
02:58:08 Verizon disclosed Mr. Faber as an expert witness -- excuse
02:58:11 me, not an expert witness, a 30(b)(6) corporate
02:58:14 representative. Mr. Faber is not an expert witness under
02:58:17 Rule 26(a)(2)(B), but several of his slides, as you've
02:58:22 probably seen in our briefing and as you reviewed, are
02:58:26 either -- they either contain expert opinions or are

02:58:30 designated to be -- they're designed to elicit expert
02:58:34 opinions from Mr. Faber.
02:58:35 Aspen's understanding up to this point in the case
02:58:38 has been that this will be the job of Verizon's technical
02:58:41 witness, Dr. Mahon. But our main concern at this point is
02:58:44 we want to make sure that Mr. Faber isn't going to get up
02:58:48 and testify according to these slides as they're currently
02:58:50 constructed and offer things that are expert opinions is
02:58:55 our position. And I have some examples if you'd like to
02:58:57 see them.
02:58:58 THE COURT: I'm familiar enough with them. Why
02:59:02 don't we hear from Mr. Anderson.
02:59:03 Mr. Anderson, I'll hand you back your -- your
02:59:09 slides. I have a copy now.
02:59:13 To the extent, Mr. Williams, you want to provide
02:59:15 examples in your reply, that's certainly okay.
02:59:18 MR. ANDERSON: Thank you, Your Honor. I'll try to
02:59:19 just make this short.
02:59:20 Every single bit of Mr. Faber's testimony, every
02:59:24 single bit of it will be based upon his personal factual
02:59:28 knowledge from working at Verizon for 26 years and working
02:59:32 on this product for 13 -- 11 years, every single thing.
02:59:37 And not only that, to kind of cut to the chase
02:59:40 here, I will lay a foundation for all of those things and
02:59:47 that it is based upon his personal knowledge on what he has

02:59:50 done. He's not offering --

02:59:52 THE COURT: Is he offering --

02:59:54 MR. ANDERSON: He's not talking about the opinion.

02:59:56 THE COURT: -- opinions? Opinion testimony?

02:59:57 MR. ANDERSON: No, no. He's talking -- every
02:59:59 single thing will be about factual things he's done. He
03:00:03 performed some tests. Factually, he's the person that
03:00:06 performed them. He extracted data from those tests.
03:00:10 Factually, he's the person that did that.

03:00:12 Every -- and most of the materials -- and I could
03:00:14 go through all these but I won't in the interest of time --
03:00:17 almost all of the questions I'm going to ask him are things
03:00:21 that touch on the topics they deposed him on, including the
03:00:24 tests.

03:00:25 THE COURT: Okay. So, Mr. Williams, I'm going to
03:00:26 overrule the objection. To the extent that you believe
03:00:33 Mr. Anderson or the witness is somehow straying across the
03:00:37 line from -- from fact testimony to opinion testimony, I'll
03:00:43 expect you to object at that point, and we can have a
03:00:46 sidebar about it.

03:00:48 The fact that a witness's testimony is based on
03:00:52 technical information or specialized knowledge doesn't make
03:00:56 it opinion testimony. So as long as he's testifying to the
03:00:59 facts, what he saw or did or knows, and it's not opinion
03:01:05 testimony, then I think that's acceptable.

03:01:08 MR. WILLIAMS: Thank you, Your Honor.
03:01:10 THE COURT: Thank you, Mr. Williams.
03:01:11 All right. Anything else we need to discuss
03:01:15 before we have the jury brought back to the courtroom?
03:01:18 MR. HERMAN: Not from Aspen, Your Honor.
03:01:22 MR. DACUS: Not from Verizon, Your Honor.
03:01:24 THE COURT: All right. Mr. Savage, if you would,
03:01:26 have the jury brought back to the courtroom.
03:02:09 COURT SECURITY OFFICER: All rise for the jury.
03:02:11 (Jury in.)
03:02:11 THE COURT: Please be seated.
03:02:38 The Plaintiff may call its next witness.
03:02:41 MR. HERMAN: Thank you, Your Honor.
03:02:43 Aspen calls Mr. Justin Blok.
03:03:02 (Witness sworn.)
03:03:19 JUSTIN BLOK, PLAINTIFF'S WITNESS, SWORN
03:03:19
03:03:19 DIRECT EXAMINATION
03:03:19 BY MR. HERMAN:
03:03:19 Q. Good afternoon, Mr. Blok.
03:03:20 A. Good afternoon.
03:03:21 Q. Could you please introduce yourself to the jury?
03:03:23 A. Yes, my name is Justin Blok. I am a partner and a
03:03:27 managing director in the forensic and litigation practice
03:03:30 at Whitley Penn. I'm born and raised in Texas. I grew up
03:03:34 in a very small town in Central Texas, Lexington. When I

03:03:39 tell people that, most people know it, the home of Snow's BBQ now, and the 90 year old pitmaster Tootsie. But for me that's where I grew up. I went to middle school, high school there. I met my wife there in the sixth grade. We have three girls, ages 16, 18, and 26, and I actually have a granddaughter that turns 2 in July.

03:04:04 Q. When you say Lexington is a small town, how small are we talking?

03:04:09 A. About 1500 people. My graduation class was, I believe, 49.

03:04:14 Q. Did you play any sports when you were growing up?

03:04:18 A. In a town like Lexington, you can pretty much play everything. So I did.

03:04:24 Q. Were you particularly good at any of the sports?

03:04:27 A. I'd like to think I was. I was pretty good at baseball and basketball.

03:04:31 Q. With respect to baseball, did you end up trying to play that in college?

03:04:36 A. I did. I walked on at Baylor University.

03:04:39 Q. Great. You mentioned you worked -- you're a partner and a managing director at Whitley Penn. What does -- what kind of work does Whitley Penn do?

03:04:48 A. So Whitley Penn is a midsized accounting firm based primarily in Texas. We have one very small office in Hobbs, New Mexico. But it offers a variety of financial

and accounting services.
Q. Thank you.
Did you prepare some slides to help the jury go through your -- so you could go through the testimony and explain to the jury what you're doing?
A. Yes, I did.
MR. HERMAN: Let's go ahead and call those up.
Q. (By Mr. Herman) Let's start, if it's okay with you, and discuss your educational background and training and experience that qualifies you to testify in this courtroom as an expert.
Go ahead and explain that, please.
A. Yes. So I received my undergraduate degree in both finance and risk management from Baylor University. I then went on to earn my master -- my MBA from the University of Houston and my master of accounting from the University of North Carolina.
Q. And what did you do after school?
A. Well, after graduating from Baylor, I moved to Houston and I started working for Arthur Andersen in their excise tax department. So when you buy a gallon of gas, some portion of that amount goes to the government every month, and so companies like BP and Exxon they have to submit tax returns not once a year but every month. And so I was submitting those returns.

03:06:10 And about three years of submitting tax returns, I
03:06:14 realized I did not want to file tax returns for my career.
03:06:19 I really wanted to work with clients in a different -- you
03:06:21 know, in a variety of ways. So I decided to change my
03:06:24 career at that point, and I joined a company called CRA
03:06:30 International which was a large consulting firm. And
03:06:32 that's where I started my career in litigation consulting
03:06:35 and working on cases such as this.
03:06:38 Since that time, I've worked on hundreds of
03:06:40 engagements involving patent infringement and other types
03:06:43 of litigation.
03:06:44 Q. And do you hold any certifications?
03:06:46 A. I do. I'm a Certified Fraud Examiner and a Certified
03:06:51 Licensing Professional, which is a certification focused on
03:06:55 licensing and commercialization of intellectual property.
03:06:57 Q. And on this slide, PDX-403, I see at the bottom it says
03:07:05 IAM 1000, what's that?
03:07:05 A. That's the IAM Patent 1000, which is a designation by
03:07:10 IAM media which is an international IP research firm and I
03:07:14 was designated as a top expert in the calculation of patent
03:07:17 infringement damages.
03:07:18 Q. Do you ever get a chance to speak or lecture on patent
03:07:23 damages topics?
03:07:23 A. I do. Every year, I guest lecture at the University of
03:07:28 Houston Law Center in both the fall and the spring covering

03:07:31 a different -- a variety of damages topics. I've been
03:07:35 doing that for at least 15 years. But I've also been asked
03:07:38 to guest lecture at the Baylor University School of Law and
03:07:42 the South Texas College of Law, again, covering a variety
03:07:45 of damages topics.
03:07:46 Q. So how many years have you been engaged in the kind of
03:07:50 research and consulting work that is the basis for the
03:07:52 opinions that you're going to share with the jury today?
03:07:54 A. About 23 years.
03:07:56 Q. And how many times have you testified in a court like
03:07:59 this?
03:08:00 A. Probably around 30 times.
03:08:04 Q. Have you ever had the opportunity to testify in
03:08:06 Marshall, Texas?
03:08:06 A. Yes, I have.
03:08:07 Q. About how many times?
03:08:08 A. Probably six or seven.
03:08:09 Q. And how are you being compensated, Mr. Blok?
03:08:12 A. My firm is being compensated based upon my hourly rate.
03:08:16 Q. Is your compensation -- I got to ask this question. Is
03:08:20 your compensation determined by the outcome of this case in
03:08:23 any way?
03:08:23 A. No, it is not.
03:08:28 Q. Thank you.
03:08:28 MR. HERMAN: Your Honor, at this time, Aspen

03:08:30 offers Mr. Blok as an expert on the valuation of intellectual property and the calculation of patent infringement damages.

03:08:36 THE COURT: Any objection?

03:08:36 MR. DACUS: No objection, Your Honor.

03:08:38 THE COURT: Very well.

03:08:39 Q. (By Mr. Herman) So, Mr. Blok, what were you tasked to do with respect to this engagement?

03:08:46 A. I was asked to look at a variety of documents that have been provided by the parties in this case and ultimately determine the damages that are due to Aspen as a result of Verizon's infringement of the '554 patent.

03:08:59 Q. What materials did you consider and analyze in reaching your conclusions in this case?

03:09:05 A. So what you see on the screen is a summary of the types of materials that I reviewed and analyzed. I started my review with just a basic understanding of what the '554 patent teaches. I'm not a technical expert, but I did review the patent.

03:09:21 I also reviewed various legal filings that were provided by both of the parties. I reviewed some financial information, some presentations that we'll walk through today.

03:09:31 I also reviewed various depositions, some of which you've already seen some transcripts. I perform my own

03:09:39 independent research while I also talk about some public
03:09:41 information that I found that helped form my opinions. And
03:09:44 I reviewed various expert reports filed by, you know, other
03:09:48 experts in this case.
03:09:50 Q. Did you also have an opportunity to interview anyone in
03:09:54 forming your opinions in this matter?
03:09:55 A. Yes, I did interview Dr. Rubin, Mr. Minor, and
03:10:00 Mr. Bhaskaran, Aspen's CEO.
03:10:02 Q. Did you discuss the '554 patent with Dr. Rubin?
03:10:06 A. Yes, I did.
03:10:08 Q. So generally, what is your understanding of the
03:10:11 technology covered by the '554 patent?
03:10:14 A. Generally, I understand that the '554 patent enables
03:10:18 the seamless and uninterrupted transmission of voice and
03:10:23 video calls by switching between Wi-Fi and cellular
03:10:26 networks based upon an assessment of the quality of that
03:10:29 network at the time of the call.
03:10:29 Q. Have you been in the -- been present in the courtroom
03:10:35 since the start of this trial?
03:10:36 A. I have.
03:10:36 Q. So you were in the courtroom when Dr. Rubin discussed
03:10:40 the teachings of the '554 patent in detail?
03:10:43 A. Yes, I was.
03:10:43 Q. Was Dr. Rubin's testimony about the '554 patent
03:10:49 consistent with what he told you before you filed your

03:10:51 report?
03:10:52 A. Yes, it was.
03:10:53 Q. And did you rely on Dr. Rubin's description of the '554
03:10:58 patent when you formed your opinions?
03:10:59 A. Yes, I did.
03:11:00 Q. Mr. Blok, what is your understanding of Verizon's
03:11:07 alleged infringement of the '554 patent in this matter?
03:11:12 A. Yes, I understand that Verizon's Wi-Fi Calling Service
03:11:16 is accused of infringing the '554 patent.
03:11:19 Q. Can any Verizon customer make use of Wi-Fi Calling?
03:11:23 A. Yes. I understand that Wi-Fi Calling is available to
03:11:27 all Verizon customers as long as they have a smartphone or
03:11:31 HD Voice activated.
03:11:33 Q. During opening statement, did you hear Verizon's
03:11:37 attorney talk about Wi-Fi Calling being turned off by
03:11:41 default?
03:11:42 A. I did.
03:11:43 Q. Did it sound to you like Verizon was suggesting that
03:11:46 Wi-Fi Calling is not valuable because it's not enabled by
03:11:50 default?
03:11:51 A. That's the way I interpreted it.
03:11:53 Q. Do you have an understanding as to why Wi-Fi Calling is
03:11:57 turned off by default?
03:11:58 A. Yeah. My general understanding, it has nothing to do
03:12:02 with value. It's really a requirement to adhere to the

03:12:06 emergency services. So when you're using Wi-Fi and Wi-Fi Calling, they have to be able to find you in an emergency. So you -- as a customer, you have to opt in to certain terms and conditions, and you have to verify your location.

Q. Does Verizon provide instructions to its customers regarding how to activate Wi-Fi Calling on their device if it's not activated already?

A. Yes, they do. And so --

Q. Go ahead. Thank you. No, no.

A. So what you see on the screen is a summary of the different steps. It's a pretty simple process. The first -- first two bullets are really you have to be a Verizon customer. You have to be on their network. You have to, again, have a smartphone with HD Voice activated. And I believe that all phones, at least as of 2017, came with HD Voice already activated.

So really as I just mentioned, you as a customer -- if you want to use Wi-Fi Calling, you have to opt in to the Wi-Fi Calling terms and conditions. And then you have to verify your location so they can find you in an emergency.

Q. Great. Thank you.

So what are the types of damages that Aspen can recover as a result of Verizon's alleged infringement of the '554 patent?

03:13:22 A. So patent infringement damages are governed by 35 U.S.C. Section 284 that says if there's a finding of infringement, then the claimant is due no less than what we call a reasonable royalty for use made of the invention.
03:13:37 Q. And is that what you did in this case?
03:13:39 A. Yes, it is.
03:13:40 Q. Can you explain what a reasonable royalty is to the jury?
03:13:46 A. Yes. So we've already heard that a patent is a type of asset, like a boat. We've seen land, you know, and fences. So somebody that owns a patent has similar rights to somebody that owns a physical asset. And so if you think about the illustration on the screen, if somebody has a house and somebody wants to rent that house, you have to go to the owner, and you have to execute a lease agreement and pay rent. That's -- so very similar as it relates to patents. If you have a patent and somebody wants to use that patented invention, they have to go to the owner of the patent, and they have to execute a license agreement and pay rent.
03:14:23 And in this context, we refer to that rent as a royalty.
03:14:26 Q. And based on your analysis, what did you determine to be a reasonable -- to be the reasonable royalty owed to Aspen due to Verizon's infringement of the '554 patent?

03:14:38 A. And we'll walk through this in detail, but ultimately I determined that the reasonable royalty would be approximately $226.3 million.
03:14:47 Q. I see at the bottom of this slide it says: Discounted as of December 2015.
03:14:53 What's the importance or significance of that -- of that on the screen?
03:15:02 A. Yes. And we'll talk about this in more detail again, the concept of a hypothetical negotiation. But that would take place in December of 2015.
03:15:10 But the benefits that we're going to talk about that are realized by Verizon are realized over a period of time. So it's important to understand what the parties would have come to an agreement in that December of 2015 time period.
03:15:20 Q. So is there a framework or a set of factors that you consider when determining the reasonable royalty owed to Aspen?
03:15:29 A. Yes. The federal courts have identified certain factors that should be considered when determining a reasonable royalty. We often refer to those as the Georgia-Pacific factors, after a well known case, Georgia-Pacific v. U.S. Plywood, that identified 15 factors that should be considered when determining a reasonable royalty.

03:15:48 Q. And did you prepare a slide for the jury to go through those 15 factors?
03:15:52 A. I did.
03:15:53 Q. Okay. Let's take a look at that.
03:15:55 Did you consider each of these factors in your analysis of a reasonable royalty in this case, Mr. Blok?
03:16:03 A. Yes, I did.
03:16:04 Q. And it looks like you've put this into buckets. Can you explain why you did that with the 15 different factors?
03:16:10 A. Yes. So although there's 15 factors, there's some overlap between those factors. So I find it's easier to go through them in these five buckets. It's more -- it's quicker to go through, instead of going through each of them individually.
03:16:24 Q. If it's okay with you, I want to start with the last bucket, if you will, the experts and negotiation. And right -- 14 and 15. And the 15 says hypothetical negotiation.
03:16:35 Can you explain what a hypothetical negotiation is?
03:16:37 A. Yeah. So this is a good place to start to understand what we're going to be talking about, the hypothetical negotiation. We're here because Aspen and Verizon did not negotiate a license. And so what the courts have said is we have to create this hypothetical construct that assumes

03:16:57 Aspen and Verizon would have actually sat down and
03:16:59 negotiated a license at the date of first infringement.
03:17:03 Q. And you already indicated that that hypothetical
03:17:06 negotiation would be in December 2015, right?
03:17:08 A. Yes.
03:17:10 Q. Is there any dispute between the parties to this case
03:17:13 about that date?
03:17:14 A. No, myself and Verizon's damages expert, Mr. Ellis,
03:17:20 both agree on that date.
03:17:21 Q. Are there any assumptions about validity and
03:17:25 infringement that you're supposed to make as part of this
03:17:28 hypothetical negotiation?
03:17:29 A. Yes. So the hypothetical negotiation assumes that the
03:17:34 '554 patent is valid and infringed. And so although that's
03:17:37 a question in the courtroom that we've heard discussed at
03:17:40 length, that's not an issue for the hypothetical
03:17:42 negotiation. I have to assume that the patent is valid and
03:17:45 infringed.
03:17:45 Q. And at this hypothetical negotiation in December of
03:17:49 2015, would the parties have been discussing other patents,
03:17:52 or would it just be the '554 patent?
03:17:53 A. No, it would have been focused solely on the '554
03:17:57 patent.
03:17:57 Q. Can you explain to the jury how the hypothetical
03:18:02 negotiation differs from a real-world negotiation for a

license to a patent?
A. So the hypothetical negotiation, just a couple more factors that are considered. The parties are willing parties, right? So in -- in a hypothetical negotiation, they're both willing to come together. They're going to execute an agreement.
In a real-world negotiation that's not always the case, right? Parties may not come to an agreement and they can get up and they can walk away. That doesn't happen in a hypothetical negotiation.
Another factor is the parties have perfect information in the hypothetical negotiation. There's no secrets between the parties. We know sales. We know extent of use. The documents that we're going to walk through, the parties would have known about those.
A real-world negotiation obviously there's not perfect information. We don't always know all the information of both sides.
Q. All right. Let's shift gears back to the Georgia-Pacific factors. What's the next factor or factors that you considered?
A. And as you'll notice on the screen, the Georgia-Pacific factors are not necessarily in order. I think it's good to start with Georgia-Pacific Factors 9 and 10. This relates to what the '554 patent teaches, what are the benefits.

03:19:22 That's really where I started my analysis.
03:19:24 Q. And did you discuss the benefits of the '554 patent
03:19:29 with Aspen's technical expert, Dr. Rubin?
03:19:32 A. I did.
03:19:32 Q. And what did he tell you regarding the technology
03:19:35 covered by the '554 patent?
03:19:36 A. Yeah, again, I -- I understand that the '554 patent
03:19:40 enables this seamless and uninterrupted switching between
03:19:45 Wi-Fi and cellular networks.
03:19:46 Q. What relevance does this have to Verizon's customers?
03:19:52 A. Well, I think that you'll see there's been a lot --
03:19:58 they've already seen some documents. Around this time of
03:20:01 the hypothetical negotiation, how to reach certain
03:20:05 customers in buildings, in their homes, in their offices
03:20:10 was a topic with all of the carriers. It was an issue.
03:20:13 And I understand through voir dire, some members
03:20:15 of the jury might have had these same issues. I haven't.
03:20:19 In Lexington, if I'm in my house, I have no cell coverage.
03:20:23 But it's not just in rural areas. I do not have coverage
03:20:26 in my office in Houston, Texas.
03:20:28 And so this in-building coverage was an issue, and
03:20:33 we'll see, and as you've already seen, Wi-Fi Calling was
03:20:37 the solution that all the carriers were really looking at
03:20:41 to solve that problem.
03:20:42 Q. I see a reference on your slide to design-arounds or

03:20:46 non-infringing alternatives.
03:20:47 Could you please explain to the jury what a
03:20:50 design-around or non-infringing alternative is?
03:20:52 A. So what we're looking for here is did -- at the time of
03:20:57 the hypothetical negotiation, did Verizon have an
03:20:59 alternative that they could have switched to and
03:21:02 implemented that would have still provided the same or
03:21:05 similar benefits as the '554 patent.
03:21:09 Q. Were you in the courtroom when Dr. Rubin talked about
03:21:12 non-infringing alternatives?
03:21:13 A. I was.
03:21:15 Q. According to Dr. Rubin, at the time of the hypothetical
03:21:20 negotiation in December of 2015, could Verizon have
03:21:23 implemented a design-around that would have provided the
03:21:26 same or without infringing the '554 patent?
03:21:31 A. According to Dr. Rubin, he's not aware of any
03:21:34 alternative designs that Verizon could have implemented and
03:21:37 still received the same benefits as the '554 patent.
03:21:40 Q. And how is that relevant to your analysis?
03:21:43 A. Well, it's relevant because it gives you an indication
03:21:46 of how Verizon would have entered this hypothetical
03:21:48 negotiation. They really only had a few options. They
03:21:52 either do not take a license to the '554 patent and they
03:21:57 remove this technology from their Wi-Fi Calling Service,
03:22:01 and so not being able to provide those same benefits to its

customers, or we've heard a lot about network towers and the infrastructure. They would have to spend significantly more in building out their network to try to reach those customers in buildings in their offices. Or they can take a license to the '554 patent and implement the technology as they did.
Q. If Verizon removed the infringing capabilities, would it still be able to realize the benefits of the invention of the '554 patent?
A. No, it would not.
Q. You were in the courtroom earlier when Mr. Minor just gave his testimony?
A. I was.
Q. And you heard about the types of cost savings that a mobile carrier could realize from implementing Voice over Wi-Fi?
A. Yes, I did.
Q. Do you remember the primary categories of cost savings that Mr. Minor identified?
A. Yes. Mr. Minor grouped them into three primary buckets. You had the infrastructure, the cell towers. You also had spectrum and backhaul.
Q. And have you seen evidence that Verizon itself recognized those cost avoidance opportunities associated with Wi-Fi Calling?

03:23:18 A. Yes, I've come across several documents where Verizon
03:23:22 is discussing this cost avoidance, save cost from
03:23:25 implementation of Wi-Fi Calling.
03:23:27 MR. HERMAN: Let's go to the next slide.
03:23:29 Q. (By Mr. Herman) I think the jury's already seen this
03:23:32 slide quite a few times. But is this an example of a
03:23:35 Verizon document that identifies cost avoidance
03:23:39 attributable -- attributable to Wi-Fi Calling?
03:23:43 A. Yes, we have seen this a few times. This is one of the
03:23:46 documents that I came across where Verizon is specifically
03:23:48 identifying over the first five years they could save over
03:23:52 a billion dollars with the implementation of Wi-Fi Calling.
03:23:57 They're specifically discussing Wi-Fi Calling in-building,
03:24:01 and so, yes, this is one of the documents that I came
03:24:04 across.
03:24:04 Q. And I see it says "Draft" on that -- on that first
03:24:10 page.
03:24:11 Is the fact that this has draft on it, did that
03:24:14 have any impact on your analysis?
03:24:16 A. I mean, ultimately, it did not have an impact on my
03:24:22 analysis because I did see other documents that also use
03:24:25 the same billion-dollar estimate as far as cost avoidance.
03:24:29 Q. So have you seen any evidence that Verizon leadership
03:24:33 was actually aware of or considered this indication of
03:24:38 value of Wi-Fi Calling?

A. Yes. So we heard Mr. Kondratiuk's deposition testimony earlier where he was discussing another presentation from November of 2015 where they specifically were -- also has reference to the $1 billion in cost savings, and he was -- he confirmed that this was a presentation that was shared with leadership.
Q. So your understanding based on the evidence you've reviewed is that $1 billion of capital avoidance from 2015 to 2020, that estimate, was presented to Verizon leadership?
A. That is my understanding, yes.
Q. Great.
Apart from Verizon's presentations, did you also see evidence that the wireless industry as a whole more broadly recognized those benefits?
A. Yeah, so this is an industry presentation that was actually provided by Verizon in this case, but it's discussing exactly what we just talked about. There was a portion of Verizon -- not only Verizon's customer base but other carriers' customer base that were having a problem with indoor poor voice quality inside their homes, inside their offices.
The presentation, if you look at the box on the left, is specifically identifying 10 to 20 percent of subscribers that have no-to-poor voice coverage at home.

03:26:11 But this is specifically talking about Voice over Wi-Fi
03:26:14 being the solution to that problem and then talking about
03:26:19 Voice over Wi-Fi improving coverage.
03:26:21 We've heard about churn. It would help to reduce
03:26:24 churn. Increase capacity at a lower CapEx. When we talk
03:26:29 about lower CapEx, they're talking about how much money
03:26:32 they spend in developing their network.
03:26:34 Q. Go back to churn for a second if you don't mind.
03:26:38 What is churn?
03:26:39 A. So churn is a metric that all of the carriers pay close
03:26:44 attention to for obvious reasons. It relates to the -- a
03:26:49 subscriber that leaves a certain carrier may go to another
03:26:52 carrier.
03:26:52 Q. So did Verizon face an increase in risk of churn if it
03:26:59 did not have Wi-Fi Calling?
03:27:00 A. So this is the same presentation that we just saw a
03:27:03 second ago that also identified churn risk without Voice
03:27:11 over Wi-Fi. And this slide is specifically noting that
03:27:13 even a .01 percent churn increase could result in 34.4
03:27:21 million in annual revenue loss.
03:27:23 Q. Is this loss of revenue due to customer churn part of
03:27:28 the cost avoidance we were talking about earlier, or is
03:27:31 this revenue loss in addition to cost avoidance?
03:27:34 A. So churn -- revenue loss for churn is a completely
03:27:39 separate bucket. It would be in addition to the capital

cost savings.
Q. So is it fair to say that Verizon was concerned about losing customers?
A. Yes, it was.
Q. I see on the screen you have PTX-172. What does that tell you as you're doing this analysis?
A. Yes. And we just saw this slide a little bit earlier today. This is a presentation from September of 2014 -- again, right around the time that all of the carriers were talking about implementing Wi-Fi Calling and the importance of Wi-Fi Calling.
And Verizon was clearly noting that its competitors were implementing Wi-Fi Calling. And Verizon noted that it would lose its communications leadership status if it didn't provide this service to its customers.
Q. Thank you, Mr. Blok.
Let's go back to some of the other Georgia-Pacific factors. The next bucket you have here is commercial success and extent of use.
What have you included in this bucket?
A. So the second bucket here relates to Georgia-Pacific Factors 6, 8, 11, and 13. And really what we're looking at here is the commercial success of Wi-Fi Calling, the benefit that Verizon has realized from the introduction of Wi-Fi Calling. What portion of that benefit is directly

03:28:57 attributable to the '554 patent.
03:29:02 Q. And based on your review of the information provided by Verizon, is it your opinion that Wi-Fi Calling has been commercially successful?
03:29:09 A. I do believe it has been commercially successful.
03:29:12 Q. And the other thing here is extent of use. Have you reviewed any information about Verizon's extent of use made of the invention?
03:29:20 A. Yes, I have.
03:29:21 Q. Does Verizon charge its customers for the use of Wi-Fi Calling?
03:29:29 A. So we saw, I guess, a little bit on this today in one of the depositions that we reviewed. Verizon doesn't charge separately for Wi-Fi Calling. Like other carriers, the Wi-Fi Calling Service is bundled in the service that you and I pay for. We pay one lump-sum fee every month, and that service is included.
03:29:50 Q. Is it your understanding that it's common for carriers like Verizon to bundle a variety of features and functionalities under a single price point as part of their wireless plan?
03:30:04 A. Yes, it is very common today.
03:30:06 Q. And does that mean to you, Mr. Blok, that Verizon realized no value from offering Wi-Fi Calling to its customers?

03:30:14 A. No, not at all. And we've seen various documents already that support that.
03:30:19 Q. Let's go ahead and look at some of the evidence that you've seen that Verizon customers saw value in Wi-Fi Calling. I see on the screen here we have PTX-174?
03:30:29 A. Yes. So this is an April 2014 presentation. We've seen this pie graph a couple of times, I believe. Ultimately, this was a survey that was conducted of Verizon customers to gauge their interest in Wi-Fi Calling -- adding Wi-Fi Calling to their calling plan. And 64 percent of customers saw some or significant value in adding Wi-Fi Calling to their plan.
03:30:53 Q. Has Verizon itself expressed how Wi-Fi Calling can be beneficial to its customers?
03:31:01 A. Yes. So what's on the screen is another document. I'm not sure that we've seen this document yet. But this is in January of 2016, so shortly after Verizon introduced Wi-Fi Calling. And this is a presentation to Verizon customer service reps. And what Verizon is telling its customer service reps is that Wi-Fi Calling is the perfect solution for places where you don't have a strong cellular signal but you do have Wi-Fi. So they're wanting their customer service reps to tell their customers this.
03:31:35 Q. And this is PTX-156.
03:31:38 What did Verizon say about poor call quality on

03:31:42 new devices?
03:31:44 A. And so another benefit that Verizon was noting was if a
03:31:49 customer buys a new device and they take it home and it
03:31:52 doesn't work the way that they thought it would, what do we
03:31:56 do as customers? We take it back.
03:31:59 And so they're trying to address that issue with
03:32:01 their customer service reps by telling them, look, if they
03:32:05 have poor coverage at home, tell them to enable Wi-Fi
03:32:08 Calling, right? That may prevent them from bringing the
03:32:11 phone back, because every time a customer brings a phone
03:32:15 back, that's a decrease in profits to Verizon.
03:32:17 Q. And at the bottom of that box, it says: Addresses
03:32:21 device returns. Is that what you're referring to when you
03:32:23 say the customers might bring their phone back?
03:32:25 A. Yes.
03:32:26 Q. And would device returns have an impact on Verizon's
03:32:30 revenues and profits?
03:32:32 A. Yes, it would.
03:32:34 Q. Did Verizon produce any information regarding the
03:32:42 actual use made of Wi-Fi Calling by its customers?
03:32:47 A. Yes. So we've seen -- I was able -- I did come across
03:32:51 some information that Verizon produced. And you see a
03:32:54 summary in the graph on the -- or the table on the screen.
03:32:59 This is a summary of Wi-Fi Calling in minutes of use, or
03:33:03 MOU is what we refer to it as.

03:33:09 And as noted between the period of December 2017 and December 2025, there's been over 360.6 billion minutes of use for Wi-Fi Calling.
03:33:21 Q. You touched on this briefly earlier, but what is the significance of December 2017 as your starting point rather than the date of the hypothetical negotiation in December 2015?
03:33:34 A. Yeah. So I understand by law Aspen can only collect damages starting in December of 2017. So I limited my analysis to that same time period.
03:33:45 Q. Does the data Verizon produced tell you anything more about the extent of the use of Wi-Fi Calling beyond the total number of minutes?
03:33:55 A. Yes. So as you can see in the chart, minutes of use of Wi-Fi Calling has increased significantly since December of 2017. But you also -- I came across documents that also discuss the percent of devices that have Wi-Fi Calling enabled, and that has increased significantly, as well, from 8.9 percent in December of 2017 to almost 40 percent in May of 2025.
03:34:22 Q. Did Verizon produce any information regarding the revenues or profits it has allocated to Wi-Fi Calling as part of its broader wireless -- wireless plans?
03:34:35 A. No, it did not.
03:34:37 Q. Did Verizon produce any information regarding the

03:34:40 actual cost savings it enjoyed from introducing Wi-Fi
03:34:44 Calling?
03:34:44 A. No, it did not.
03:34:46 Q. So how, then, did you further analyze the economic
03:34:50 value of Wi-Fi Calling to Verizon?
03:34:53 A. So this goes back to the public research that -- that I
03:34:57 mentioned. In my review of information that was publicly
03:35:01 available, I came across a 2017 ACG Research report that
03:35:05 was focused strictly on the financial benefits that
03:35:09 carriers realize from implementing Wi-Fi Calling.
03:35:12 Q. So what was the subject matter of that ACG Research
03:35:16 paper?
03:35:16 A. So it was -- again, it was focused on the challenges
03:35:20 that mobile service subscribers have reducing the cost of
03:35:24 delivering voice services but also while increasing
03:35:29 coverage. So, again, it's really focused on Voice over
03:35:32 Wi-Fi or Wi-Fi Calling in those financial benefits that
03:35:35 carriers realize.
03:35:36 Q. Did the 2017 ACG Research paper come to any conclusions
03:35:43 regarding the economic advantages of Voice over Wi-Fi to
03:35:47 the carriers?
03:35:48 A. Yes, so as you see in the box at the bottom, ultimately
03:35:52 based upon ACG's research, they determined that the
03:35:55 implementation of Voice over Wi-Fi resulted in a cost
03:35:59 savings of 1 cent per minute for voice calls.

03:36:05 Q. Do you have an understanding as to how ACG Research came to estimate cost savings of 1 cent per minute?
03:36:12 A. Generally, yes. So carriers like Verizon, they have these large simulation models and all of the carriers have these models. And what they do is they emulate their system, their network. And they can use these simulation models to determine what the financial impact would be by introducing new -- you know, new services or new technologies into their system.
03:36:38 And I understand ACG worked with one of those carriers. They did not identify the carrier -- carrier that they worked with. But they did work with a carrier and use their actual simulation model and ultimately looking at two different environments. One, just a network without Wi-Fi Calling compared to introducing Wi-Fi Calling. And based upon that analysis and looking at those -- that simulation model, they ultimately determined that the cost savings was about 1 cent per minute.
03:37:08 Q. And did you find that data point to be a reasonable proxy for the type of cost savings that Verizon enjoyed from introducing Wi-Fi Calling?
03:37:18 A. Yes. So I think, although they did not identify the specific carrier that they were working with, as Mr. Minor discussed earlier, the cost that these carriers incur as far as building out their network are substantially

03:37:37 similar. The cost of a tower is similar across all of the
03:37:40 carriers.
03:37:41 So I did find this as a good proxy for the cost
03:37:44 savings that Verizon has realized.
03:37:46 Q. And is this the type of third-party study that experts
03:37:48 like you routinely consider in forming opinions?
03:37:54 A. Yes.
03:37:54 Q. Have you seen any indications in the record that
03:37:58 corroborate ACG's estimated cost savings of 1 cent per
03:38:03 minute of use?
03:38:04 A. Yes. So we've already seen some metrics that also give
03:38:08 us an indication of Verizon's estimated cost savings, and
03:38:14 I'll do it again. We'll bring up the slide that I
03:38:18 discussed earlier that identifies the cost savings for the
03:38:21 first five years. And based upon the date of this
03:38:26 presentation, year five is 2020, and in 2020, Verizon was
03:38:31 estimating cost savings would be about $394 million.
03:38:36 During this same period -- well, if you look at
03:38:39 the actual minutes of use for 2020, it's about 35.1 billion
03:38:46 minutes of use. And so if you take that 394 million in
03:38:51 cost savings divided by the minutes of use, you get about
03:38:54 1.1 cent per minute of use.
03:38:56 Q. And that is consistent with the findings of the 2017
03:39:01 ACG Research paper, isn't it?
03:39:03 A. Yes, it is.

03:39:03 Q. How would the findings of the 2017 ACG Research paper impact the hypothetical negotiation between Aspen and Verizon?
03:39:13 A. Well, it's definitely a factor that the parties would have considered. They would have considered the benefits that Verizon realizes from implementing the '554 patent.
03:39:22 Q. Is this 1 cent per minute the amount the parties would have attributed to Verizon's infringement of the '554 patent alone?
03:39:31 A. No. As you -- you heard Mr. Minor testify to, Wi-Fi Calling did include other features and functionalities. So even though the '554 patent was important to the implementation of Wi-Fi Calling for Verizon, there's still other features and functionalities that have to be taken out of the analysis, and we heard that referred to as apportionment.
03:39:55 Q. And how did you further apportion this amount to reflect the economic value of the '554 patent?
03:40:01 A. So I did rely upon the analysis of Mr. Minor, that he discussed in detail. He told me that that apportionment was about 30 to 35 percent of the cost savings realized by Verizon as directly attributable to the '554 patent.
03:40:18 So I ultimately used the lower end of the range that Mr. Minor provided, and I used an apportionment factor of 30 percent.

03:40:24 Q. And based on that as a starting point, where did you go from there?
03:40:30 A. So using that 1-cent per minute of use as a starting point for the benefit for Wi-Fi Calling and Mr. Minor's apportionment analysis that 30 percent of that benefit is directly attributable to the '554 patent, that results in a benefit of about a third of a cent that's directly attributable, per minute of use, that's attributable to the '554 patent.
03:40:54 Q. Given an apportionment factor of 30 percent, what did you determine to be the cost savings that are solely attributable to the '554 patent to be?
03:41:08 A. About a third of a cent.
03:41:10 Q. And does this amount account for other non-patented technologies that contributed to Wi-Fi Calling such that no additional apportionment is necessary?
03:41:20 A. So as Mr. Minor discussed, he went through a pretty rigorous analysis and ultimately removed those additional features and functionalities from -- from his opinion. So no further apportionment would be necessary.
03:41:34 Q. All right. The next category of Georgia-Pacific factors focuses on the relationships of the -- the relationship of the parties. What would the commercial relationship of Aspen and Verizon have been around the time of the hypothetical negotiation?

03:41:51 A. So we've heard around this period of time that Aspen was still trying to develop and release products, but I'm not aware of any of those products that would have been competing against Verizon.
So ultimately, the relationship between the parties would have been that of an inventor and a promoter, where Aspen is inventing the technology identified in the '554 patent, and Verizon would be the one that's actually commercializing that invention, putting it in its Wi-Fi Calling Service.
Q. Within the Georgia-Pacific factors, there's another bucket, which you've called Licensing Characteristics. Can you explain to the jury what's included here?
A. Yeah. So this includes Georgia-Pacific Factors 1, 2, 3, 7, and 12, and really what we're looking at here are market comparables. There are other licenses that have actually been executed -- executed that provide an indication of value of the '554 patent.
Q. How does an analysis of the licensing bucket fit into determining reasonable royalties?
A. Yeah. So a common valuation approach that's used in valuing intellectual property is called the market approach. I like to use the example that's on the screen because a lot of us have come across this example. If you're buying and selling a house, how does that appraiser

03:43:11 value that house? They look for what they call market
03:43:15 comps, right? So they're looking for other houses in the
03:43:17 area that provide an indication of value of that property
03:43:20 they're trying to appraise.
03:43:23 Q. So explain in more detail this specific example that
03:43:29 you have on the screen. And I guess this is like a
03:43:32 real-world example that you're showing the jury?
03:43:34 A. Yes. And so what's at the top is called the target
03:43:38 asset. Maybe that's the house that the appraiser is trying
03:43:39 to value. In doing so, the appraiser may come across
03:43:43 Property A and B and try and assess the value. This is a
03:43:46 very simple example, but obviously you would not use
03:43:50 Property A. There's no house. You may use Property B,
03:43:55 though. It has a pool. It's one story. It looks like it
03:43:58 could be a similar size. So you may have to do some
03:44:03 adjustments, but you may use Property B as an indication of
03:44:06 value.
03:44:07 The same is true with evaluating licenses as it
03:44:10 relates to intellectual property. You have to be careful
03:44:12 in looking at licenses and ultimately determine whether or
03:44:14 not they're comparable. You have to look at the factors
03:44:17 that were considered when they were negotiating those
03:44:19 licenses and see if they're comparable to the hypothetical
03:44:22 negotiation.
03:44:22 Q. So in this case, did you have the opportunity to review

03:44:26 any license agreements?
03:44:28 A. Yes. I reviewed license agreements provided by both
03:44:31 Aspen and Verizon in this case.
03:44:33 Q. And did you find any of those agreements to be relevant
03:44:37 to your determination?
03:44:38 A. Ultimately, it was my opinion that none of the
03:44:42 agreements that I reviewed provide an indication of value
03:44:45 of the '554 patent.
03:44:45 Q. What was the Aspen agreement, and why did you find it
03:44:49 not relevant?
03:44:50 A. So in April of 2013, Aspen and Ack3 entered into a
03:44:59 license agreement. It did include a license to the '554
03:45:02 patent, but it was really focused on source code. And so
03:45:06 Ack3 wanted a license to use Aspen's source code.
03:45:09 They were going to put it into products that were
03:45:11 going to be sold outside of the U.S. So they were not even
03:45:14 looking to sell products in the U.S. So they really didn't
03:45:16 even need a license to the '554 patent.
03:45:20 But also, Ack3 was co-founded by Mr. Bhaskaran,
03:45:25 Aspen's CEO. So essentially, he was negotiating the
03:45:29 license on both sides. So it wasn't an arm's length
03:45:33 transaction. It wasn't focused on the value of the '554
03:45:35 patent.
03:45:35 Q. And when you're looking at that, do you also look at
03:45:38 the parties involved? Like, would you compare whether Ack3

03:45:42 and Verizon have some similar characteristics?
03:45:44 A. Yes. So, again, the relationship between Aspen and
03:45:47 Ack3 would have been very different than the relationship
03:45:50 between Aspen and Verizon.
03:45:51 Q. Did Verizon's damages expert agree with you that the
03:45:57 Aspen/Ack3 agreement was not relevant?
03:46:00 A. Ultimately, Mr. Ellis also determined that this
03:46:05 agreement was not relevant.
03:46:06 Q. So let's talk about the agreements produced by Verizon.
03:46:09 Do you and Mr. Ellis agree on the relevancy of the
03:46:13 agreements produced by them?
03:46:15 A. No, we do not.
03:46:16 Q. And why is that?
03:46:18 A. Well, ultimately, I came to the conclusion that neither
03:46:24 of these agreements is -- provides an indication of value
03:46:27 of the '554 patent. Both of these agreements were executed
03:46:32 in settlement of litigation. So there were similar cases
03:46:37 such as this. Verizon had been sued for patent
03:46:41 infringement. And during that process, they had come
03:46:43 together and actually executed a license.
03:46:47 Verizon had somebody that -- that -- sorry -- that
03:46:51 testified about some of these -- about these agreements but
03:46:54 really didn't have any additional information about the
03:46:56 agreements. So all we know and all we can use to compare
03:46:59 this to the hypothetical negotiation is what's in the

agreement. And both of these agreements state that it's not reflective of a reasonable royalty, which is what we're trying to assess here in this case.
Q. Let's -- should we look at the KAIFI agreement -- KAIFI/Verizon agreement as an example?
A. Yes. So there's similar language in both agreements, but instead of going through both of them, we can look just at the KAIFI agreement. And what I was referring to, if you look in -- at 7.2, in this agreement, both parties, including Verizon, agreed and acknowledge that this agreement does not reflect what the parties would consider a reasonable royalty arising out of the hypothetical negotiation. That's the hypothetical negotiation that we're talking about. The parties are agreeing that what Verizon paid doesn't reflect that reasonable royalty. It's a very different consideration.
And in this agreement, the parties go on to discuss why it's different, right? The consideration that Verizon agreed to reflects a compromise of the lawsuit. It relates to litigation uncertainty. Again, validity and infringement were issues that were considered. Verizon was contesting the validity and infringement of those patents they were alleged to infringe.
They're also discussing patentability issues, post-trial, appellate uncertainties, legal fees. Cases

03:48:34 like this are expensive. And so the parties do take that
03:48:38 into account.
03:48:39 None of these factors would be present in a
03:48:41 hypothetical negotiation. And so what this tells us is
03:48:44 these settlement agreements were focused on litigation
03:48:46 considerations. They were not focused on the value of the
03:48:49 '554 patent.
03:48:49 Q. So you ultimately determined that neither of the two
03:48:52 agreements Verizon produced in this matter would play a
03:48:56 role in the hypothetical negotiation between Aspen and
03:48:59 Verizon?
03:48:59 A. Ultimately, I determined that neither of these
03:49:02 agreements would provide an indication of value of the '554
03:49:05 patent.
03:49:05 Q. And outside of that, did you or Verizon's damages
03:49:09 expert identify any agreements in the public domain that
03:49:14 might be comparable to the hypothetical license in this
03:49:17 matter?
03:49:17 A. No, neither of us identified any other licenses that
03:49:22 may be available publicly that would provide an indication
03:49:24 of value.
03:49:26 Q. Great.
03:49:26 Let's go to the last bucket -- last
03:49:29 Georgia-Pacific bucket, which is where we started this
03:49:31 afternoon. Can you explain this?

03:49:33 A. Yeah, so this is where we started, but Georgia-Pacific factor 14 deals with the -- or looks at the opinions of other experts. As I had mentioned already, I did rely upon the opinions of Dr. Rubin and Mr. Minor. And then we're back to the hypothetical negotiation.
03:49:50 Q. On several occasions today, you've mentioned that you've relied on Dr. Rubin and Mr. Minor. Is it fair to say that you're relying on them for all the technical matters relating to this case?
03:50:05 A. Yes.
03:50:07 Q. And have we covered all the Georgia-Pacific factors other than the actual hypothetical negotiation?
03:50:12 A. Yes, we have.
03:50:14 Q. All the factors we've been discussing here today would have been considered by Aspen and Verizon at the time of this negotiation, correct?
03:50:22 A. That is correct.
03:50:22 Q. And have you prepared a slide summarizing those key points that would have been considered at the hypothetical negotiation?
03:50:29 A. Yes, I did.
03:50:32 Q. Can you please walk us through that, please?
03:50:34 A. So we've talked about these in detail, so I'll run through them really quickly.
03:50:40 The hypothetical negotiation assumes the '554

03:50:42 patent is valid and infringed.

03:50:44 It's my understanding that there are no
03:50:48 alternatives that Verizon could have switched to that would
03:50:51 have provided the same or similar benefits as the '554
03:50:54 patent without infringing the '554 patent.

03:50:55 The relationship between the parties would have
03:51:00 been that of an inventor and a promotor.

03:51:04 I understand from Dr. Rubin that the teachings of
03:51:06 the '554 patent provide a significant improvement over the
03:51:10 prior art and were very important in the successful
03:51:13 implementation of Wi-Fi Calling.

03:51:14 I understand that the -- it's my opinion that the
03:51:19 accused service has been commercially successful. We saw
03:51:23 that there's been over 360.6 billion minutes of use of
03:51:29 Wi-Fi Calling since December of 2017.

03:51:31 We talked about the cost savings and the estimated
03:51:34 cost savings of Verizon of 1 cent per minute of use for
03:51:40 Wi-Fi Calling. And based on Mr. Minor, approximately 30
03:51:44 percent of that benefit is directly attributable to the
03:51:46 teachings of the '554 patent.

03:51:47 And ultimately, we just talked about some
03:51:53 licenses. I did not find any of those licenses to -- to be
03:51:56 relevant in this case. And so it is my opinion that Aspen
03:52:00 and Verizon would have primarily focused on that benefit
03:52:04 that Verizon was realizing of about a third of a cent that

03:52:07 can be directly attributable to the '554 patent.
03:52:10 Q. And then did you do something with that 3 cents -- or
03:52:17 .003 in apportioned cost savings?
03:52:20 A. Yes, so that's -- that's kind of a starting point.
03:52:23 That's the benefit that you can attribute to the '554
03:52:26 patent, but that's not what we refer to as a royalty.
03:52:30 Right? That's the benefit that Verizon is receiving.
03:52:33 But the next step is if you're in a negotiation
03:52:37 and you're looking at a benefit, how are you going to split
03:52:39 it between the parties? So the next step was, well, how
03:52:43 much of that benefit should be shared with Aspen?
03:52:44 Q. Were there any particular metrics you considered in
03:52:50 assessing how the parties would have split this benefit?
03:52:54 A. Yeah, so I first started with the Georgia-Pacific
03:52:56 factors, and through my assessment of those factors, I
03:53:00 ultimately determined that Aspen and Verizon would have had
03:53:02 similar leverage at the hypothetical negotiation, and if
03:53:05 the parties have similar leverage, that gives an indication
03:53:09 that, well, maybe they should share that benefit equally.
03:53:12 Q. And what did you do next?
03:53:13 A. I also considered another ratio. We refer to this as
03:53:19 the CapEx/OPEX ratio. Meaning capital expenditures
03:53:27 associated with building out their network, so the money
03:53:27 that Verizon is spending to build out their network.
03:53:30 First is their total expenses for their

03:53:32 operations. So not only building out their network but commercializing their services, offering their services to their customers.

So this metric gives an indication of how much Verizon in the normal course of business allocates their financial resources to acquiring technologies, developing technologies for the network versus commercializing those technologies.

Q. So based on these factors, what did you determine the appropriate split to be?

A. I ultimately used Verizon's average CapEx-to-OpEx ratio to split this benefit. Verizon's shown historically to be willing to pay 30 percent of its financial resources to acquire and build out its network. And so that gives an indication of how Verizon would have entered the hypothetical negotiation and been willing to share at least 30 percent with Aspen.

Q. So regarding the form of the royalty, what options would have been available to the parties?

A. So a royalty can come in different forms, but it's primarily a running royalty or a lump-sum royalty. A running royalty meaning that the party pays a certain amount over time based upon whether they're selling a product or minutes of use or whatever the metric may be, the licensee would pay an amount over time.

A lump-sum royalty, as I explained a little bit earlier, is looking at, okay, at the hypothetical negotiation, there would be one payment made by Verizon, and it would cover the entire term of the license.

Q. And so did you -- did you have to make a decision between the lump sum and the reasonable royalty in this case?

A. Yes. So ultimately, it was my opinion that a lump-sum royalty would be most appropriate.

Q. And all told, what did you determine that lump-sum reasonable royalty owed to Aspen to be?

A. So taking the benefit of about a third of a cent that's attributable to the '554 patent, splitting that benefit with Aspen where Aspen would receive about 30.5 percent of that benefit, ultimately determined that the benefit that Aspen would receive would be about a 10th of a cent. And if you apply that to the minutes of use of approximately 360.6 billion, you ultimately arrive of a lump-sum royalty of about $330.2 billion. But that is undiscounted.

Q. So did you take a next step then and apply this -- some sort of discount?

A. Yes. So as I started to explain earlier, kind of the last step in this is we've looked at this benefit that -- that would have been shared with Aspen over a period of time. Well, what is that -- what is that number as of

03:56:16 December of 2015? And so in order to do that, we apply a discount rate in order to see what that -- what this number that Aspen would have realized, what that value is as of December of 2015.
03:56:31 Q. Did you prepare a slide for the jury to explain this concept of discounting and present value as it relates to the lump sum owed to Aspen at the time of the hypothetical negotiation?
03:56:41 A. I did.
03:56:43 Q. So please explain discounting for the jury.
03:56:47 A. So this is a hard concept to explain. So I like to start with compounding. It's something that most of us have heard about. Our parents tell us when we're young, to put money in a bank account and it's going to grow over time, right? Well, that's compounding. If you have $100,000 in an account today, it earns 7 percent, in five years it's going to being worth a little over $140,000.
03:57:13 Discounting is the opposite. So discounting is we know a future value, and we're trying to determine, well, what's that value as of today? And so if you have $140,000 in value five years from now, well, that's worth $100,000 today.
03:57:30 Q. So what discount rate did you use to calculate the present discounted value of the lump sum that would have been paid by Verizon to Aspen?

03:57:40 A. So ultimately, I used a discount rate of 5.5 percent,
03:57:45 which is Verizon's historical weighted average cost of
03:57:49 capital, which is a common metric that's used to discount a
03:57:55 benefit such as this.
03:57:56 And the weighted average cost of capital is
03:57:59 essentially Verizon's cost to finance their operations.
03:58:01 And it includes the risk of their operations is built into
03:58:06 that discount rate, some amount of an expected return. And
03:58:10 so it's common to use a weighted average cost of capital as
03:58:13 a discount rate.
03:58:14 Q. And based on these assumptions, what did you determine
03:58:18 to be the lump-sum reasonable royalty that would have been
03:58:21 paid by Verizon to Aspen at the time of the hypothetical
03:58:27 negotiation?
03:58:27 A. Ultimately, I determined the amount as of December 2015
03:58:32 was approximately $226.3 million.
03:58:36 Q. And to confirm, Mr. Blok, this royalty is based solely
03:58:39 on the estimated cost savings enjoyed by Verizon and does
03:58:44 not include any economic benefits it may have realized
03:58:48 attributable to, for example, a reduction in churn or an
03:58:53 increase in revenues; is that correct?
03:58:55 A. Correct.
03:58:55 Q. You said you were here for the testimony of Mr. Minor
03:59:04 earlier?
03:59:05 A. Yes, I was.

03:59:06 Q. And did you hear Mr. Dacus pose some questions to
03:59:14 Mr. Minor that addressed the percentage of Wi-Fi calls that
03:59:18 have a handover?
03:59:19 A. Yes, I did.
03:59:21 Q. And I wrote it down, so I want to get it specific.
03:59:24 He said: For those folks who get on Wi-Fi Calling
03:59:28 as their initial call, we may see years and years of data
03:59:34 where less than 1 percent of those people ever switch to
03:59:40 the cell network.
03:59:42 And he was posing those questions to Mr. Minor.
03:59:46 Do you agree with the premise of that question that
03:59:48 Mr. Dacus posed?
03:59:49 A. No, I do not.
03:59:50 Q. And have you reviewed data and information in this case
03:59:54 that leads you to believe that that data is incorrect?
03:59:56 A. Yes, I have.
04:00:00 Q. Okay. I'm going to put up on the --
04:00:02 MR. HERMAN: Can I have the document camera,
04:00:04 please?
04:00:04 Q. (By Mr. Herman) So first I'm putting up -- and this is
04:00:07 an attachment from Mr. Ellis's report. So this is
04:00:10 Verizon's expert; is that right?
04:00:12 A. Correct.
04:00:13 Q. Okay. Can you explain to the jury what this first
04:00:16 attachment, which is Attachment 8.1, is?

04:00:19 A. Yes.
04:00:20 MR. DACUS: Your Honor, we object. This is outside the scope of his report.
04:00:24 MR. HERMAN: Your Honor, may I approach?
04:00:25 THE COURT: Yes.
04:00:37 MR. DACUS: Barry, will you ask them to take that down?
04:00:43 MR. HERMAN: Sorry. Can you take that down?
04:00:44 (Bench conference.)
04:00:48 MR. HERMAN: So, Your Honor, Mr. Dacus, in our view, completely misrepresented the number of calls that go through a handover. This information was in Mr. Ellis's rebuttal report.
04:00:58 THE COURT: Okay.
04:00:59 MR. HERMAN: And so obviously, you know, damages reports, Mr. Blok went first and Mr. Ellis went second.
04:01:05 THE COURT: Sure.
04:01:05 MR. HERMAN: So he couldn't have --
04:01:08 THE COURT: Right.
04:01:08 MR. HERMAN: -- expressed an opinion about this. But in open court in front of the whole jury, he said to Mr. Minor -- Mr. Dacus said to Mr. Minor that there was a 1 percent of calls for several years.
04:01:20 THE COURT: Right.
04:01:20 MR. HERMAN: We believe that is blatantly wrong,

04:01:23 and I want Mr. Blok to explain to the jury that that's
04:01:25 wrong.
04:01:27 THE COURT: Mr. Dacus.
04:01:28 MR. DACUS: It's not in his report, Your Honor.
04:01:30 And if that's in Mr. Ellis's report, they can cross-examine
04:01:33 him on it. It's not in his report.
04:01:35 MR. HERMAN: They haven't even indicated that
04:01:38 they're calling Mr. Ellis, Your Honor.
04:01:39 THE COURT: Well, is it anywhere in his report? I
04:01:42 mean, is there --
04:01:42 MR. HERMAN: Of course, he's talked about -- so
04:01:44 the $360 billion -- of minutes of use, the 3.6 billion,
04:01:49 that's all in here.
04:01:50 THE COURT: Okay.
04:01:50 MR. HERMAN: So these numbers are in here. We
04:01:53 didn't have access to Verizon's information about how many
04:01:56 calls went into a handover until their rebuttal report.
04:01:59 THE COURT: Right.
04:02:00 MR. HERMAN: So there was no way for Mr. Blok to
04:02:03 be able to testify about this.
04:02:04 THE COURT: Right. Right.
04:02:05 MR. HERMAN: And if he didn't misrepresent it,
04:02:07 then I wouldn't be asking you to let my damages expert take
04:02:10 care of it. But this is -- Your Honor, I can show you the
04:02:14 numbers. Estimated calls with network handover as a

04:02:16 percent of total calls touching Wi-Fi, it's 15.4 percent.
04:02:22 And he told Mr. Minor several times that it was 1 percent.

04:02:26 THE COURT: Right. And you could have, of course,
04:02:29 you know, used this document with Mr. Minor. Why did you
04:02:33 not do this?

04:02:34 MR. HERMAN: Mr. Minor hasn't seen -- I don't know
04:02:36 that he's seen Mr. Ellis's report. He's not an economics
04:02:39 expert. He's an apportionment expert. This is a serious
04:02:42 matter of fairness, Your Honor.

04:02:43 THE COURT: No, I agree.

04:02:45 MR. DACUS: Just to be clear, Your Honor, it's
04:02:47 apples and oranges. My 1 percent is not what they're
04:02:50 talking about here. I'm actually going to clear it up.

04:02:53 THE COURT: What does he know about this document?

04:02:55 MR. HERMAN: He knows everything about the
04:02:56 document. He obviously reviewed Mr. Ellis's rebuttal
04:02:58 report as he was preparing to testify.

04:03:00 THE COURT: All right. I'm going to give him some
04:03:03 latitude.

04:03:05 MR. DACUS: Okay.

04:03:06 MR. HERMAN: Thank you, Your Honor.

04:03:07 (Bench conference concluded.)

04:03:13 Q. (By Mr. Herman) All right. I'm putting back up,
04:03:15 Mr. Blok, the -- and this is Attachment 8.0 from
04:03:22 Mr. Ellis's -- oh, excuse me, I want to start with the

04:03:26 first one.
04:03:28 So I'm putting up Attachment 8.1 from
04:03:31 Mr. Ellis's -- who is Verizon's damages expert, can you
04:03:35 explain to the jury what this is?
04:03:37 A. Yes. So what Mr. Ellis was doing with this document
04:03:41 is, is taking the Wi-Fi calls with a handover as a percent
04:03:46 of all calls, all LTE calls, not just Wi-Fi calls. And
04:03:52 based upon his analysis about 1.6 percent during this
04:03:57 11-month period, not years and years, just 11 months, about
04:04:01 1.6 percent of Wi-Fi calls with a handover as compared to
04:04:08 all LTE calls.
04:04:11 Q. And now I'm going to put up for you to take a look
04:04:21 at --
04:04:22 MR. HERMAN: Ah, thank you. Maybe I did.
04:04:24 Q. (By Mr. Herman) Now, this is Attachment 8.0 from
04:04:27 Mr. Ellis's report, right?
04:04:28 A. Yes, it is.
04:04:28 Q. And can you explain for the jury what is in this
04:04:34 attachment to Mr. Ellis's expert report?
04:04:38 A. So the first thing to point out is, is this is the only
04:04:42 data that Verizon provided. So there were 11 months of
04:04:45 data that Verizon gave us for Wi-Fi calls with handover.
04:04:50 Not years and years of data. We had 11 months of data.
04:04:54 Second, this is Mr. Ellis's calculation of total
04:05:00 Wi-Fi calls, what percentage of those calls are -- are

04:05:04 included in handover. So what Mr. Dacus was referring to
04:05:09 earlier, that percentage of Wi-Fi calls that may have a
04:05:14 handover, it's being calculated by their own expert to be
04:05:17 15 -- over 15 percent. Not 1 percent.
04:05:20 Q. So just so we're clear, when Mr. Dacus questioned
04:05:26 Mr. Minor and said: For those folks who get on Wi-Fi
04:05:30 Calling as their initial call, we may see years and years
04:05:34 of data where less than 1 percent of those people ever
04:05:38 switch to the cell network, correct?
04:05:40 Do you have an understanding as to whether that is
04:05:44 accurate based on -- on this document and the facts that
04:05:47 you've learned throughout this case?
04:05:48 A. No, it is not accurate.
04:05:50 Q. And so what percentage of calls, according to Verizon,
04:05:56 at least as of -- in the July '24 time frame to May '25,
04:06:02 what percent of calls that start on Wi-Fi experience a
04:06:06 handover?
04:06:07 A. A little over 15 percent during that 11-month period.
04:06:13 Q. Thank you, Mr. Blok.
04:06:14 I just want to summarize your opinion, and then
04:06:21 I'm going to let Verizon's counsel ask you some questions.
04:06:25 MR. HERMAN: If we can put back up Slide 51.
04:06:28 Q. (By Mr. Herman) Well, you know the number, just go
04:06:40 ahead and say it. What's the amount of damages that you
04:06:44 believe Aspen is owed due to Verizon's infringement of the

04:06:48 '554 patent?
04:06:48 A. Ultimately, I determined that a reasonable royalty
04:06:51 would be approximately $226.3 million.
04:06:54 Q. Great. Thank you, sir.
04:06:56 MR. HERMAN: I pass the witness.
04:07:25 THE WITNESS: Thank you.
04:07:26 THE COURT: Whenever you're ready.
04:07:28 MR. DACUS: Thank you, Your Honor.
04:07:29 CROSS-EXAMINATION
04:07:30 BY MR. DACUS:
04:07:30 Q. Good afternoon, Mr. Blok.
04:07:31 A. Good afternoon.
04:07:32 Q. I'd like to ask you some questions about your work and
04:07:34 opinions in this case, if that's okay?
04:07:36 A. Okay.
04:07:37 Q. And I'm going to kind of start at the beginning, but I
04:07:40 want to -- before I do, I want to make sure that we're on
04:07:43 the same page.
04:07:44 You just showed this jury some documents that
04:07:49 Mr. Ellis did that showed only 15 percent of the folks
04:07:54 actually switch over between Wi-Fi and cell, correct?
04:07:59 A. Wi-Fi calls that have a handover, yes.
04:08:01 Q. Right. But you know there were -- there's direct
04:08:04 documents in this case directly from Verizon that show that
04:08:07 same information, correct?

04:08:10 A. I'm not sure what you mean by that.
04:08:11 Q. Are you telling me you didn't look at them?
04:08:14 A. I'm telling you I'm not sure what you're referring to. Are you saying -- are you referring to the underlying documents that Mr. Ellis was summarizing?
04:08:21 Q. There are documents produced directly from Verizon to you, sir, that show up in your expert report that you reviewed that show the percentage of folks that start out on Wi-Fi and switch over to cell, correct?
04:08:35 A. There are documents, yes.
04:08:36 Q. And you know that those documents show in those same months that you were just showing that the number of percentage of people who do it is less than 1 percent, correct?
04:08:45 A. I do not believe that's correct.
04:08:47 Q. Okay. We're going to get to that.
04:08:55 Let's -- let's kind of go from the top here. You are not here, sir, to tell this jury that Verizon infringes, correct?
04:09:02 A. No, I'm not.
04:09:03 Q. You're not here to tell this jury that this patent is valid, fair?
04:09:08 A. No, I'm not.
04:09:09 Q. I think if I understood you correctly in your calculation of damages, you just assumed that there was

04:09:17 infringement and that the patent was valid, fair?
04:09:19 A. I have to assume that, yes.
04:09:20 Q. Okay. You agree -- or you understand that Verizon says
04:09:25 it doesn't use this '554 patent because we don't have this
04:09:29 issue with changing IP addresses, so we don't infringe.
04:09:34 You understand that?
04:09:34 A. I understand that is their position.
04:09:36 Q. And if the jury finds that we don't infringe or if the
04:09:39 jury finds that this patent is ultimately invalid, you
04:09:43 agree damages are zero?
04:09:45 A. Ultimately, if the jury decides that the patent is not
04:09:48 infringed or invalid, there would be no damages.
04:09:51 Q. Okay. Now, you're here providing testimony on what you
04:10:03 on behalf of Aspen say is a reasonable royalty, fair?
04:10:11 A. I'm providing opinions, what my opinions are based upon
04:10:15 my independent analysis of what I believe damages are.
04:10:17 Q. Okay. You got paid by Aspen to do it, right?
04:10:20 A. My firm did.
04:10:23 Q. Okay. You were here -- just like I asked Mr. Minor,
04:10:28 you were here when the judge read the preliminary jury
04:10:31 instructions to the jury, correct?
04:10:32 A. I was.
04:10:32 Q. You heard the judge say that they have to assess the
04:10:36 credibility of all witnesses, and in particular for
04:10:40 experts, they've got to look at their experience, correct?

04:10:42 A. That is correct.
04:10:43 Q. And one thing that the jury should look at with respect
04:10:50 to experts is whether or not those folks are, for lack of a
04:10:55 better term, sort of beholden to Plaintiff's side or
04:11:01 Defense side, correct?
04:11:02 A. That could be a factor that they consider.
04:11:04 Q. Okay. One of the things that the Court requires an
04:11:08 expert to do is actually submit a CV that identifies all
04:11:14 your cases that you've testified in in the last five years
04:11:18 or so, correct?
04:11:22 A. That is correct.
04:11:23 Q. And it's true, sir, we'll start at a high level. You
04:11:27 will admit that you are called upon and retained much more
04:11:31 often by Plaintiffs seeking money than you are Defendants,
04:11:31 correct?
04:11:34 A. I am called more often by Plaintiffs than Defendants.
04:11:37 Q. Right. We say that's because you're willing to offer
04:11:42 damages numbers that are unreasonable and overreached, you
04:11:48 understand that?
04:11:48 A. That may be your opinion. It's not mine.
04:11:51 Q. Understood. The CV or resume that you attached
04:11:54 actually lists all the cases that you've participated in in
04:11:57 the last five years, fair?
04:11:59 A. No, that is not fair.
04:12:01 Q. The ones that you have testified in, fair?

04:12:03 A. That's correct.
04:12:04 Q. And I went through that thing and looked at the patent cases that you've testified in in the past five years, because I can identify that, correct?
04:12:12 A. As of December of 2025, that is correct.
04:12:17 Q. Right. So what it showed is that you've testified in 73 patent cases and that 67 of those 73 were testified on behalf of Plaintiffs, correct?
04:12:27 A. I do not recall the numbers.
04:12:29 Q. Certainly wouldn't surprise you that 90 percent of your work in the last five years have been on behalf of folks asking for money, fair?
04:12:36 A. I think that would surprise me, yes.
04:12:39 Q. You wouldn't deny that that's the truth based on your resume though, would you, sir?
04:12:44 A. I have not run those statistics, so absent knowing those statistics, I wouldn't agree or disagree.
04:12:51 Q. Let's talk about your opinions in this case, yours and Aspen's. You're asking for $226 million lump-sum royalty, true?
04:13:02 A. Approximately, yes.
04:13:03 Q. The law requires, I think you put it up and showed the law, requires that that royalty be reasonable, fair?
04:13:10 A. That is correct.
04:13:11 Q. And you agree reasonable is an important requirement,

04:13:14 true?
04:13:14 A. I believe it's a reasonable royalty.
04:13:15 Q. Ultimately, the jury should only award what is
04:13:19 reasonable, fair?
04:13:19 A. I think it's ultimately up to the jury to decide what
04:13:22 is reasonable.
04:13:23 Q. I agree. But ultimately, what they decide should be a
04:13:26 reasonable royalty, fair?
04:13:27 A. I agree with that.
04:13:28 Q. And they should follow the law, do you agree with that,
04:13:32 the law that the judge gives them?
04:13:33 A. I agree with that, as well.
04:13:35 Q. The Plaintiff, Aspen, has the burden of proof on
04:13:40 damages, true?
04:13:40 A. That is correct.
04:13:41 Q. Now, you mentioned in your direct testimony that
04:13:46 there's this thing called the market approach. You
04:13:48 remember that?
04:13:49 A. I do.
04:13:49 Q. And you said that it was -- I wrote it down: a
04:13:53 commonly accepted way to determine a reasonable royalty.
04:13:55 Correct?
04:13:56 A. It is one of three methods that are used to assess a
04:14:01 royalty.
04:14:01 Q. Now, your calculation here did not use the market

04:14:04 approach to calculate the royalty, correct?
04:14:06 A. I considered the market approach, but ultimately did
04:14:09 not find any licenses to be relevant.
04:14:11 Q. And I think you said, and I just want to confirm -- I
04:14:16 mean, this market approach is based on the premise that the
04:14:18 value of an asset can be determined by looking at other or
04:14:21 similar transactions, fair?
04:14:22 A. That is fair.
04:14:23 Q. I've heard you, and I think you basically said it and
04:14:26 showed a picture, it's very similar to using comps when you
04:14:29 want to buy a house or a piece of property, true?
04:14:31 A. Correct.
04:14:32 Q. Same -- same concept?
04:14:35 A. Yes.
04:14:36 Q. That's applicable in patent law and a perfectly
04:14:41 commonly acceptable way to determine a reasonable royalty,
04:14:44 fair?
04:14:44 A. The market approach is a common method in determining a
04:14:48 reasonable royalty.
04:14:49 Q. Okay. Now, we know, sir -- and as part of that market
04:14:58 approach, what you can go do is look at sort of real-world
04:15:05 transactions, real-world transactions that happen in order
04:15:08 to use the market approach, fair?
04:15:10 A. As long as, again, they're comparable to the
04:15:13 hypothetical negotiation, that is a factor to be

considered.

Q. It's true here, sir -- I mean, we have real-world market evidence and information available to this jury regarding the value of this patent, fair?

A. Not that it's comparable to the hypothetical negotiation, no.

Q. Okay. Well, let's talk about that.

You agree that oftentimes what jurors sitting there want to know is what do third parties, not Verizon, not Mr. Blok on behalf of Aspen, what do third parties who don't have a dog in this fight, what do they think about the value of this technology? That'd be a reasonable question for a juror to ask, correct?

A. That would be a factor to consider, yes.

Q. And we have real-world information in this case that you did not tell this jury about, true?

A. No, I disagree.

Q. Okay. By the way, do you agree that in assessing damages, jurors should use their common sense?

A. I think jurors can use whatever factors they -- they deem necessary.

Q. Okay. Let's talk about this third-party evidence. We know and you know because you've been in the court the entire week, correct?

A. I have.

04:16:27 Q. You know that Aspen made and sold products using this '554 technology from 2006 to 2010, correct? You heard Mr. Chin say that?
04:16:41 A. That is correct. I don't remember the timing, but they did sell products.
04:16:45 Q. Multiple years, correct?
04:16:46 A. Correct.
04:16:46 Q. Aspen 365 box, I think, is what it was called, correct?
04:16:50 A. I believe that is correct.
04:16:52 Q. And you know, sir, that the marketplace said they were not successful, correct?
04:16:55 A. Ultimately, Aspen was not able to sell those products.
04:17:00 Q. Okay. So that -- that's not Verizon saying that this patented technology is not valuable or important or useful, that's third parties in the marketplace, correct?
04:17:14 A. That has nothing to do with value or -- or the way you are trying to characterize it, so I would disagree.
04:17:21 Q. If somebody has an important needed and useful product, you would agree, sir, that usually customers and consumers buy it, fair?
04:17:30 A. Not necessarily. And I think you know well that companies that are startups have a hard time competing with larger companies like Ericsson and Cisco and others, I believe, that were already discussed.
04:17:43 Q. Let's be clear on what Aspen's story is. Have you been

04:17:46 here all week?
04:17:47 A. I have been here all week.
04:17:49 Q. Aspen's story is we had this invention, no one in the
04:17:54 world ever had it then or since, and we put it in a
04:17:58 product. That's their story, right?
04:18:00 A. Generally.
04:18:02 Q. So they're not competing against the Ericssons of the
04:18:07 world. They claim they have the one and only solution, and
04:18:10 yet nobody -- relatively nobody is beating a path to their
04:18:14 door to buy this product. That's all a true statement,
04:18:19 correct, sir?
04:18:19 A. I believe Mr. Chin testified to this --
04:18:21 Q. Okay.
04:18:21 A. -- that there were other factors that went into not
04:18:24 being successful.
04:18:25 Q. There is no doubt, sir, that Mr. Chin, for lack of a
04:18:29 better term, had other excuses. But you and I can agree at
04:18:33 the end of the day, they were unsuccessful in selling the
04:18:38 product that included this technology? That's a true
04:18:40 statement, correct?
04:18:40 A. As a startup, they were not able to sell the 365
04:18:45 product long-term.
04:18:46 Q. Okay. Let's follow on to that a little bit.
04:18:49 This '554 patent was issued in 2011, correct?
04:18:52 A. I thought it was 2008. I may be wrong.

Q. I think they applied in 2008, to be fair to you, Mr. Blok.
A. Okay.
Q. It was actually issued in 2011.
A. Okay.
Q. Is that fair?
A. That sounds right.
Q. Okay. So what that means is we all know patents are public, right?
A. Yes, they are.
Q. That's the purpose of a patent, so you can teach the public how to do something, fair?
A. Correct.
Q. So at a minimum, this patent has been out in the public since 2011, a decade and a half, true?
A. Correct.
Q. And you know because you talked to Mr. Bhaskaran, as you said, and I'm sure you read his deposition in this case. Since 2011, Aspen has been basically in the business of trying to license their patent because they're not making products, true?
A. My understanding is they are willing to license, but they are still trying to make products.
Q. And that's folks who own a patent. That's one way they can make money is by licensing the right to the patent to

04:19:53 other people in the marketplace, true?
04:19:55 A. I would agree with that.
04:19:57 Q. And you know, I assume, that's exactly what
04:20:02 Mr. Bhaskaran has been trying to do with this patent since
04:20:06 2011, correct?
04:20:07 A. I'm not sure of his activity, but I know he's willing
04:20:09 to license.
04:20:11 Q. Okay. And you know, sir, that no unrelated third party
04:20:17 has taken a license to this patent in a decade and a half,
04:20:17 correct?
04:20:23 A. There have not been any other licenses other than the
04:20:25 one with Ack3.
04:20:27 Q. Right. So if you and I are trying to answer the jury's
04:20:31 question, what do third parties, not Verizon, not Justin
04:20:34 Blok, what do third parties, what do people in the
04:20:37 marketplace think? We know that no one has taken a license
04:20:42 to this patent, true?
04:20:43 A. We know that there have not been any additional
04:20:47 licenses. I don't think that we know why.
04:20:50 Q. We know there aren't any, true?
04:20:53 A. I will agree with that.
04:20:55 Q. I mean, you were here for opening statement?
04:21:03 A. I was.
04:21:04 Q. I mean, the Aspen's lawyer described this as visionary
04:21:09 and revolutionary and ultimately extremely important. You

04:21:12 remember all that?
04:21:13 A. I do.
04:21:14 Q. Ultimately no one else has beat a path to these folks's door to take a license to what they claim is so valuable, correct?
04:21:22 A. Which is not necessarily uncommon.
04:21:24 Q. You've done this a lot. You told us about that, right?
04:21:33 A. I have.
04:21:34 Q. You've represented a lot of Plaintiffs, correct?
04:21:37 A. And Defendants, yes.
04:21:38 Q. And you've seen a lot of times when folks have a patent that truly is something novel and valuable, you've seen that articles in technology journals get written, correct?
04:21:49 A. Sometimes.
04:21:49 Q. Awards get given, correct?
04:21:51 A. Sometimes.
04:21:51 Q. You hadn't seen any of that in this case, have you, sir?
04:21:54 A. I have not seen any awards.
04:22:00 MR. DACUS: Your Honor, may I use the flip chart?
04:22:02 THE COURT: Of course.
04:22:02 MR. DACUS: To -- may I write at it? I'll keep my voice up.
04:22:09 THE COURT: You may. If you will keep your voice up.

04:22:14 MR. DACUS: And I will accept reminders if I do not.
04:22:17
04:22:36 THE COURT: I tell you what, Mr. Dacus.
04:22:36 MR. DACUS: Yes, sir.
04:22:38 THE COURT: Could you put it on the other side of the podium?
04:22:42
04:22:43 MR. DACUS: I'd be happy to, Your Honor.
04:22:45 THE COURT: It will put you closer to the microphone.
04:22:47
04:23:14 Q. (By Mr. Dacus) What I would like to do, Mr. Blok, is sort of continue our conversation about this market approach. Does that sound fair?
04:23:19
04:23:22
04:23:27 A. Okay.
04:23:27 Q. And, you know, one thing that folks who are buying a house or maybe an appraiser who is looking at a piece of property might do is they might put all the comps compared to what you call the target asset on a single piece of paper or maybe an Excel spreadsheet just so they can eyeball it all in one place. That makes sense?
04:23:32
04:23:35
04:23:41
04:23:44
04:23:47
04:23:50 THE COURT: Mr. Herman, you can -- you're welcome to come around if you --
04:23:52
04:23:53 MR. HERMAN: Thank you, Your Honor.
04:23:54 THE COURT: -- if you want to.
04:23:55 Mr. Dacus, it really would be better if you got closer to the mic and pulled the board closer to yourself.
04:23:59

04:24:03 MR. DACUS: Okay. I'm happy to do anything the Court tells me.
04:24:06 THE COURT: Just pull it toward yourself. There you go. Much better.
04:24:12 MR. DACUS: Thank you very much, Your Honor.
04:24:12 Q. (By Mr. Dacus) So that's what I'd like to do here, Mr. Blok, is just create a chart based on this market approach. Does that sound fair?
04:24:20 A. Yes.
04:24:21 Q. Okay. So let's just start with what you and Aspen say is a reasonable royalty in this case, okay?
04:24:28 A. Okay.
04:24:28 Q. So the licensee here would be Verizon, correct?
04:24:31 A. Yes.
04:24:32 Q. And the number of patents that this jury is considering is just one, the '554 patent, correct?
04:24:41 A. That is correct.
04:24:43 Q. And the jury is just determining the value of a royalty for the United States as opposed to the entire world, correct?
04:24:52 A. That is correct.
04:24:53 Q. So here I'll just write U.S., and the amount that you and Aspen say is reasonable is $226 million, correct?
04:25:06 A. That is correct.
04:25:08 Q. So, of course, the question is, under the market

04:25:11 approach, is that actually a reasonable amount, fair?
04:25:15 A. That's an assessment.
04:25:22 Q. Okay.
04:25:22 A. I believe that that is reasonable based upon the
04:25:24 information that I presented.
04:25:25 Q. Okay. Now, you told us that Aspen actually had a
04:25:28 license agreement with this company called Ack3, correct?
04:25:31 A. Correct.
04:25:31 Q. That license, sir, was actually for two patents,
04:25:31 correct?
04:25:45 A. It was actually for source code that also included two
04:25:48 patents because of the source code.
04:25:51 Q. Let's be really clear, sir. In that agreement, there
04:25:55 is an option to license on a fully paid-up basis two
04:26:01 patents, correct?
04:26:02 A. It's a technology license with the option of the patent
04:26:06 license.
04:26:08 Q. Okay. For two patents, correct?
04:26:11 A. Correct.
04:26:12 Q. That license was worldwide. That option for that
04:26:18 license was for worldwide, correct?
04:26:21 A. Both of the patents are U.S. patents. You can only
04:26:24 have coverage within the U.S.
04:26:26 Q. The license was for worldwide; is that true or false?
04:26:29 A. There's only U.S. protection, so if you want to put

04:26:33 worldwide because maybe the agreement says worldwide, but I
04:26:37 think we both know that they were both U.S. patents.
04:26:40 Q. I'll tell you what, I'll just go with you, U.S.
04:26:49 And you know, sir, that for a fully paid-up
04:26:52 license for this very patent, the amount was $600,000,
04:26:52 correct?
04:26:55 A. I believe that is right.
04:26:56 Q. For the very patent that this jury is assessing a
04:27:07 reasonable royalty on, these folks at Aspen entered into an
04:27:10 agreement where you could have a fully paid up right to use
04:27:14 the '554 patent for as long as you want, make as many
04:27:18 products as you want for $600,000. That's all true,
04:27:18 correct?
04:27:25 A. That's what the Ack3 license said.
04:27:27 Q. Now, there's another market approach, a data point.
04:27:35 And it's this offer from this company called Iceberg. Do
04:27:40 you remember that?
04:27:40 A. I do.
04:27:41 Q. Okay. You didn't talk to the jury about that, correct?
04:27:44 A. That's an offer.
04:27:45 Q. Right.
04:27:46 A. Not a license.
04:27:46 Q. Correct. We're going to talk about it.
04:27:49 So there was an email from this company Iceberg
04:27:52 offering to potentially license the '554 patent, among

04:27:59 others, correct?
04:28:00 A. I believe that is correct.
04:28:01 Q. That was for a worldwide license, correct?
04:28:12 A. I think it's the same two U.S. patents.
04:28:15 Q. So you want to call it U.S. instead of worldwide?
04:28:17 A. You do not have worldwide protection on U.S. patents.
04:28:21 Q. And you know, sir -- we can look at it if we need to --
04:28:25 that Mr. Bhaskaran, the CEO of Aspen, said that he would be
04:28:30 willing to license this '554 patent for $1.5 million,
04:28:30 correct?
04:28:39 A. I do not recall offhand. I recall that there was an
04:28:43 initial offer to potentially have conversations, but I do
04:28:47 not recall the amount.
04:28:53 Q. Let me just ask this to see if we need to short-cut it.
04:28:57 Do you dispute that he offered to license the '554 for $1.5
04:29:03 million?
04:29:04 A. No, I just do not recall.
04:29:09 Q. You know that Mr. Ellis is going to testify later on
04:29:12 our behalf, correct?
04:29:13 A. I'm not sure if he is or not.
04:29:15 Q. Okay. And then I want to talk to you about one more
04:29:21 data point that we have here, and it's a license between
04:29:23 Verizon and that company you mentioned KAIFI. You're
04:29:26 familiar with that license agreement, correct?
04:29:29 A. I am.

04:29:30 MR. DACUS: And, Your Honor, I need to seal the courtroom to talk about the terms of this license. So anyone who's not under the protective order and non-Verizon folks, I'd need to seal.

04:29:40 THE COURT: All right. Very well. The courtroom will need to be sealed at this time. If you are not an exempted person, for purposes of the protective order, please excuse yourself at this time.

04:29:54 MR. HERMAN: Your Honor, can I ask a clarifying question?

04:29:58 THE COURT: Yes.

04:29:59 MR. HERMAN: Does that include Mr. Chin?

04:30:00 THE COURT: Mr. Chin?

04:30:00 MR. DACUS: Regrettably, I think he needs to leave, Your Honor.

04:30:04 THE COURT: Mr. Chin, if you would. Thank you.

04:30:09 (Courtroom sealed.)

04:30:09 (Sealed Portion No. 1 saved in separate sealed transcript.)

04:36:08 (Courtroom unsealed.)

04:36:35 MR. DACUS: Are we okay to proceed, Your Honor?

04:36:36 THE COURT: Yes.

04:36:37 MR. DACUS: Thank you.

04:36:37 Q. (By Mr. Dacus) By the way, sir, this patent that -- this '728 patent that dealt with the switching between

04:36:49 Wi-Fi networks and cellular, did you look enough to know
04:36:52 that that's actually in 2001, a 2001 patent?
04:36:58 A. I do not remember the date of the patent.
04:37:00 Q. I want to switch gears a little bit, Mr. Blok, and
04:37:05 actually talk about the calculation that you did, does that
04:37:10 sound fair?
04:37:10 A. Okay.
04:37:12 Q. Now, you agree, sir, here that these patent claims that
04:37:15 are at issue are what we call method claims, correct?
04:37:18 A. I would agree.
04:37:19 Q. And that may not have significance to the jury so I
04:37:24 want to make sure I ask you about it. Some claims are what
04:37:27 we call apparatus claims, right?
04:37:28 A. Correct.
04:37:29 Q. And others are method claims, they describe a specific
04:37:31 method or process, fair?
04:37:32 A. That's fair.
04:37:34 Q. All right. You understand and agree that each step of
04:37:42 the method, each step of the method described in the patent
04:37:44 claim has to be performed in order to infringe, correct?
04:37:49 A. I would agree with that.
04:37:50 Q. And in this case, as we've all seen, these method
04:37:55 claims relate to handing over or switching between network
04:37:59 paths, here Wi-Fi and cellular, correct?
04:38:02 A. That is my understanding.

04:38:03 Q. So you understand and agree to infringe that you have to have this switch or handover, correct?
04:38:12 A. That is correct.
04:38:12 Q. In fact, you've been in the courtroom when both Dr. Rubin and Mr. Minor confirmed that, correct?
04:38:26 A. That is my understanding, yes.
04:38:31 Q. Okay. Now, it's true, sir, that in your calculation that you did, you did not calculate your damages based solely on the actual number of Verizon Wi-Fi calls that actually switch or handover, correct?
04:38:53 A. I determined a lump-sum royalty that was based upon the benefit that Verizon received from implementing the '554 patent.
04:39:00 Q. Well, let's look and see what you did.
04:39:03 MR. DACUS: Do you have the ability, Mr. Duval, to pull up Exhibit 4.1? Mr. Blok's report.
04:39:15 Q. (By Mr. Dacus) This is a calculation or part of the calculation from your expert report that you produced in this case, correct, sir?
04:39:30 A. That is correct.
04:39:31 Q. This is the basis for the $226 million that you told the jury is reasonable, correct?
04:39:38 A. It's part of the calculation, yes.
04:39:40 Q. Okay. Now, part of that calculation is -- and this was actually part of the calculation you showed the jury -- is

04:39:46 you took the total MOU, which is minutes of use, on Verizon
04:39:53 Wi-Fi Calling, correct?
04:39:55 A. I did use minutes of use for Voice over Wi-Fi.
04:40:00 Q. And you got those minutes of use -- I mean, you got
04:40:04 that from Verizon's documents, correct?
04:40:05 A. I did.
04:40:07 Q. Okay. What you did not do, sir, is you did not take
04:40:13 those minutes of use and try to determine how many of those
04:40:16 minutes of use actually had a handover or a switch to sell,
04:40:21 did you, sir?
04:40:22 A. It was not necessary.
04:40:24 Q. So the answer is you did not do it?
04:40:31 A. Sorry.
04:40:33 I started with total Voice over Wi-Fi minutes of
04:40:35 use because that is what the ACG report was focused on.
04:40:40 And that's why it's appropriate to then apportion from
04:40:43 there to make sure that the analysis is still focused on
04:40:46 the '554 patent.
04:40:47 Q. Sir, the only -- you would agree that Aspen is only
04:40:53 entitled to damages, if any, based on actual infringement,
04:40:53 correct?
04:40:58 A. Based upon the benefit that Verizon has realized from
04:41:02 implementing the patented functionality.
04:41:04 Q. And you agree, sir, that there is no actual
04:41:06 infringement unless a switch occurs, correct?

A. My understanding is that there needs to be a switch to infringe the '554 patent.
Q. So within those 360 billion minutes, you have no idea how many of those minutes there was actually a switch or not. That's a true statement, correct?
A. I do not believe that Verizon has given us that data, no.
Q. You don't believe Verizon has given you data from which you could determine the number of minutes or the percentage of minutes whether a switch actually occurred?
A. They give us 11 months of data, which we saw a little bit earlier.
MR. DACUS: Can you pull up JTX-6, Mr. Duval?
Q. (By Mr. Dacus) Do you recognize this information, Mr. Blok?
A. Yes, this is the 11 months of data I was referring to.
Q. Okay.
MR. DACUS: Can you go to the first tab, please, Mr. Duval? It says MOU. Can you scroll all the way to the top?
Q. (By Mr. Dacus) Now, this information from Verizon shows the number of Wi-Fi minutes of use, correct?
A. Column C identifies Wi-Fi minutes of use.
Q. Right. That's what I was intending to indicate if my marking was unclear.

04:42:59 A. Yes.
04:42:59 Q. Okay. So you had that bit of information, correct?
04:43:03 A. Wi-Fi minutes of use, yes.
04:43:04 Q. And that's what you used to make your calculation was
04:43:07 total Wi-Fi minutes of use, fair?
04:43:09 A. That is where I started my analysis.
04:43:12 MR. DACUS: Now, can you go to this tab that says
04:43:15 Handover Data, Mr. Duval?
04:43:19 Q. (By Mr. Dacus) And, again, this is all information
04:43:21 that you had, correct, Mr. Blok?
04:43:23 A. I did.
04:43:24 Q. When you did your calculation, correct? Is that fair?
04:43:29 A. Actually, I do think that I had this spreadsheet prior
04:43:39 to issuing my report.
04:43:40 Q. Right. And so what this spreadsheet shows in this
04:43:44 Column D right here is the percentage of voice calls that
04:43:51 switch from Wi-Fi to LTE, which is cellular, correct?
04:43:56 A. That is Wi-Fi to LTE, yes.
04:43:59 Q. That's -- LTE is cellular, correct?
04:44:03 A. Correct.
04:44:03 Q. And what this information shows is what percentage --
04:44:07 or less than what percentage switch from Wi-Fi to LTE.
04:44:15 A. I'm sorry, can you ask that again?
04:44:17 Q. Sure. What does this show -- let me just do a better
04:44:21 job.

04:44:22 You would agree, sir, that for every one of these months the percentage of calls that switch from Wi-Fi to LTE is less than 1 percent, correct?
04:44:33 A. The percent of voice calls, I would agree with that.
04:44:36 Q. Right. So when I said earlier to Mr. Minor, and I said to you earlier that there are months where the calls are on Wi-Fi, switch over to LTE, the Verizon data says it's less than 1 percent for every one of those months, true, sir?
04:45:02 A. Again, I think you said years. We didn't have years of data. I do not recall how the percentage -- this percentage was calculated. The number of Wi-Fi calls with the handover as compared to total LTE calls was less than -- or about 1 percent.
04:45:22 Q. Sir, let's be crystal clear right here. Does that sound fair?
04:45:25 A. I think we probably should.
04:45:27 Q. The Verizon data, which I assume you don't dispute, shows that the percentage of calls switched from Wi-Fi to cellular is less than 1 percent. That is a true statement?
04:45:44 A. As a percent of total SIP calls for this Wi-Fi to LTE.
04:46:07 Q. And let's don't be confused when it says -- like right here, .84, that's not 84 percent. That's .008 if we wrote it in decimal form, correct?
04:46:19 A. That's .84 percent.
04:46:22 Q. Right. Less than 1 percent, correct?

04:46:26 A. The column you're pointing to says .84 percent.
04:46:30 Q. There's a reason I'm being precise here, Mr. Blok. You
04:46:34 remember your lawyer and you about 30 minutes ago said that
04:46:38 what I said to the jury wasn't accurate. Do you remember
04:46:43 that?
04:46:43 A. I still do not believe it is accurate.
04:46:44 Q. This information right here shows that less than
04:46:46 1 percent of the Wi-Fi calls for these 11 months, switch to
04:46:51 cellular. That's -- that's what it shows in black and
04:46:54 white, correct?
04:46:55 A. What you are pointing to is .84 percent.
04:46:59 Q. And I think you made some comment like, oh, that's only
04:47:02 11 months. Are you telling me that you have some
04:47:05 indication or information or evidence to present to this
04:47:07 jury that these percentages would be substantially
04:47:10 different in previous years?
04:47:13 A. What I'm saying is, is we do not know one way or the
04:47:16 other. So if you're presenting as if we had years of data,
04:47:21 that's not true. And so Verizon produced these 11 months
04:47:26 of data, that is correct.
04:47:29 Q. You remember you showed the jury this information to
04:47:32 say, oh, the percentage of Wi-Fi calls has increased over
04:47:40 time. You remember that information?
04:47:41 A. It was not pointing to this 11 months of data, no.
04:47:46 Q. I guess the point is, sir, this is at a time late in

04:47:50 Wi-Fi Calling where according to you, it's become very popular and yet still, still less than 1 percent of the calls are doing this switch-over, correct?
04:48:01 A. I do not believe it's less than 1 percent.
04:48:03 Q. You don't believe .84 percent is less than 1 percent?
04:48:08 A. Not of Wi-Fi calls.
04:48:09 Q. What we do know, sir, is in your calculation, you took 100 percent of the minutes of use, whether there was a switch or not, and you multiplied it to get 226 million, true?
04:48:32 A. I started my analysis with total minutes of use because that is the accused product that Verizon offers. That's also consistent with the ACG report that I utilized. So I had to start with total minutes of use and then apportion from there. So I agree that I started there.
04:48:50 Q. Sir, your ultimate calculation -- and we can pull it up if we need to -- included 360 billion minutes of use, correct?
04:48:59 A. I apportioned the 1-cent rate that was per minute of use for Wi-Fi down.
04:49:05 Q. Did you understand me to ask you about rate, Mr. Blok? I'm asking you -- there's two variables in your equation, is there not, sir?
04:49:14 A. There's more than two variables.
04:49:17 Q. Well, you took the minutes of use and then you

04:49:22 multiplied them by .0009, or whatever the number is, to get
04:49:27 the $226 million, correct?
04:49:32 A. I actually apportioned it down. So there's multiple
04:49:36 factors that you're ignoring intentionally or
04:49:39 unintentionally, I don't know. But I started with total
04:49:42 minutes of use. And if you pull up my exhibit that shows
04:49:45 you apply that 1 cent to get 3.6 billion in total savings,
04:49:51 you then apportion down from there. So I started with
04:49:56 total minutes of use and then apportioned my analysis to
04:50:01 only the benefit that is attributed to the '554 patent.
04:50:04 MR. DACUS: Can we have the document camera?
04:50:06 Q. (By Mr. Dacus) This is the calculation that you showed
04:50:08 the jury just a few minutes ago, is it not, Mr. Blok?
04:50:11 A. That is the slide that I showed, yes.
04:50:14 Q. And the total minutes of use that you used in your
04:50:21 calculation is 360 billion, correct?
04:50:24 A. This is the way that I showed it to the jury, yes.
04:50:26 Q. And that's the total minutes regardless, without even
04:50:30 looking at whether or not there was switching or not,
04:50:30 correct?
04:50:34 A. Again, because I apportioned the rate that started at
04:50:38 total Wi-Fi Calling minutes of use down to just the value
04:50:44 that's attributed to the '554 patent.
04:50:46 Q. I assume you and I can agree, sir, based on where we
04:50:49 started this conversation based on method claims and you

04:50:52 have to show actual use, we can agree that not all of -- in fact, very little of that 360 billion actually did this switching that's required, true?

A. I think that there is a percentage of calls that have handover. My analysis is not based upon a running royalty analysis. It's based upon the benefit that Verizon is realizing from the '554 patent, and that is what I presented.

MR. DACUS: Can we pull up Exhibit 4.0 of Mr. Blok's report, please, Mr. Duval?

Q. (By Mr. Dacus) This is -- this is one of the supporting calculations that you had in your report, right, Mr. Blok?

A. That is correct.

Q. And this 30 percent that you used right here in your calculation, that's Mr. Minor's apportionment, fair?

A. That is correct.

Q. And it's also true, sir, you did not do anything to validate Mr. Minor's 30-percent number, correct?

A. I did rely upon Mr. Minor and his analysis for that 30 percent.

MR. DACUS: We can take that down, Mr. Duval. Thank you.

Q. (By Mr. Dacus) Another part of your calculation was this ACG paper that you referred to; is that fair?

04:52:27 A. That is correct.
04:52:28 Q. Okay. That's where you get this -- you start with this
04:52:31 1-cent number, right?
04:52:32 A. Correct.
04:52:33 Q. I want to make sure the jury has all the facts related
04:52:37 to that paper, does that sound fair?
04:52:38 A. Okay.
04:52:39 Q. Okay. Someone on your team found this paper on the
04:52:44 Internet, true?
04:52:46 A. That is correct.
04:52:48 Q. Okay. The guidance that you gave your team was, quote,
04:52:53 find publicly available information on the benefits
04:52:56 provided to wireless carriers related to Wi-Fi Calling,
04:52:56 correct?
04:53:01 A. That was the direction that I provided, yes.
04:53:04 Q. And they gave you that paper, fair?
04:53:06 A. That is one of the documents that they provided.
04:53:09 Q. Now, you agree, sir, you saw Mr. Minor's testimony.
04:53:12 You saw Mr. Chin's testimony. The '554 patent did not
04:53:17 create or invent Wi-Fi Calling, correct?
04:53:22 A. Well, I think that that's been a key theme of yours
04:53:25 that I think is kind of confusing to be honest.
04:53:28 Q. It's not my theme. Were you here when Mr. Chin -- I
04:53:31 asked him, sir, did y'all invent Wi-Fi Calling?
04:53:34 And he said -- he said: None of it.

04:53:37 Were you here when he said that?
04:53:38 A. I agree that Wi-Fi Calling was not invented by the '554
04:53:44 patent.
04:53:44 Q. This paper that you relied on, you know, I presume,
04:53:57 sir, that it was actually written by this company called
04:54:00 Affirmed Networks, right?
04:54:01 A. Affirmed Networks was part of the article.
04:54:03 Q. They sponsored it, correct?
04:54:07 A. I believe that is correct. It was a white paper that
04:54:10 presented certain ACG information.
04:54:13 Q. Affirmed Networks is actually a company that was trying
04:54:17 to sell some equipment in the telecom industry, fair?
04:54:20 A. I believe that they were trying to sell virtualized
04:54:25 networks.
04:54:25 Q. Right. And you would agree with me that Affirmed
04:54:29 Networks basically used this paper as an advertisement to
04:54:31 try to sell some of their products, true?
04:54:35 A. No, not necessarily, I mean, it's a white paper. White
04:54:38 papers are meant to be informative. I've seen this same
04:54:40 information provided by ACG in other articles.
04:54:43 Q. I guess factually you and I can agree that ACG
04:54:50 sponsored the paper, fair?
04:54:51 A. They performed the research, yes.
04:54:53 Q. Yep. ACG sells products, correct?
04:54:57 A. ACG sells research.

04:54:59 Q. And -- well, I'm sorry, Affirmed Networks sells products, correct?
04:55:07 A. Affirmed Networks sells products, yes.
04:55:08 Q. And so Affirmed Networks who sponsored the paper had some incentive to make these numbers turn out so that somebody would want to buy their product, you and I can agree on that, fair?
04:55:23 A. I think they have an incentive to provide information on the Voice over Wi-Fi solution and the impact that it can have on a business.
04:55:29 Q. And I think you said to the jury this related to some telephone carrier, but you have no idea which one, true?
04:55:36 A. One of the mobile operators.
04:55:39 Q. Right. You don't know if it was a small mobile operator, a large mobile operator, or anything in between, do you, sir?
04:55:45 A. Well, I think we do.
04:55:47 Q. Okay.
04:55:47 A. The article identifies, I believe, seven different carriers, four of the major carriers in the U.S., and three from overseas, and they're all major carriers. They're not little carriers.
04:56:01 Q. You certainly wouldn't say that this paper applied to Verizon or the research was done on Verizon's network, would you?

A. I'm not sure if it was or not.
Q. Okay.
MR. DACUS: Mr. Duval, can you pull that paper up? It's PTX-57. And can you go to Page 4, please? Scroll on down, please. Right there.
Q. (By Mr. Dacus) You see right here, Mr. Blok? So this is from the paper that you relied on, correct?
A. Yes, it is.
Q. And you see where it says the appeal of Voice over Wi-Fi lies in its economics? You see that?
A. Yes.
Q. And then right down here it says: By doing so, the Wi-Fi First saves the mobile network operator available radio sources, while also improving the user experience.
You see that?
A. I do.
Q. And so this whole paper was based on this thing called Wi-Fi First, correct?
A. I'm not sure what you mean by the entire paper.
Q. The premise of the paper was you have a Wi-Fi phone that the -- that the mobile operator or the carrier has the network for, and that network, when you use your phone, it defaults to Wi-Fi as opposed to cellular, correct?
A. It's looking at a cellular phone that looks at the quality of the Wi-Fi network prior to cellular, I would

04:57:49 agree with that.
04:57:50 Q. Right. If Wi-Fi is available and it's better, that
04:57:54 phone goes to Wi-Fi, correct?
04:57:57 A. If it's better than cellular, that is correct.
04:57:59 Q. That's the basis of this paper, fair?
04:58:02 A. That is fair.
04:58:03 Q. And you know it's 180 degrees opposite at Verizon,
04:58:03 correct?
04:58:09 A. No. And we covered this topic in my deposition. And
04:58:12 one of the confusing parts about it is either way, it's
04:58:17 looking at the quality of the path, and it's picking the --
04:58:22 the path with the greatest call quality.
04:58:25 So if you start at Wi-Fi First and cellular is
04:58:30 better, it's switching to cellular. If it starts at
04:58:32 cellular and Wi-Fi is better, then it's switching to Wi-Fi.
04:58:34 Either way there's a switch or it's determined based upon
04:58:40 on the network path or the quality of the path.
04:58:42 Q. You would agree, sir, that Verizon is a cellular
04:58:46 path-preferred company, correct?
04:58:47 A. I would agree with that.
04:58:48 Q. Okay. Different from a Wi-Fi First, correct?
04:58:54 A. I would agree with that.
04:58:55 Q. That's all the questions I have for you, Mr. Blok.
04:59:05 MR. DACUS: I pass the witness, Your Honor.
04:59:07 THE COURT: All right. Redirect?

04:59:16 MR. DACUS: I can take this down if I need to, Your Honor.
04:59:20 THE COURT: Yeah, please do.
04:59:33 MR. HERMAN: Your Honor, may I proceed?
04:59:34 THE COURT: You may, yes.

04:59:37 REDIRECT-EXAMINATION

04:59:37 BY MR. HERMAN:
04:59:37 Q. Mr. Blok, there's clearly some confusion about the number of calls that have a handover. First, I want to show you JX-6, which this is what Mr. Dacus --
04:59:57 MR. HERMAN: Can I have the document camera, please?
05:00:02 Q. (By Mr. Herman) This is what Mr. Dacus showed you on direct (sic), and he showed you the percent of voice calls from Wi-Fi to LTE in the middle, right?
05:00:08 A. Yes, he did.
05:00:10 Q. Okay. Can you go over to the far right column and read the percent of voice calls from LTE to Wi-Fi?
05:00:24 A. Yes.
05:00:25 Q. And what is that?
05:00:26 A. Well, that's showing -- so the first column that Mr. Dacus was focused on was just Wi-Fi to LTE. But there's another column that shows that there's a handover from LTE to Wi-Fi. Either way, there's a handoff.
05:00:38 Q. And did -- did he ask any questions about the percent

of voice calls that go from LTE to Wi-Fi?
A. No, he did not.
Q. And do you have an understanding as he was talking about infringement versus damages -- but for infringement, do you have an understanding as to whether percentage of voice calls going from LTE to Wi-Fi would also qualify as infringement?
A. That is my understanding.
Q. And so if you -- just adding up these two columns, it's what?
A. It's over 5 percent.
Q. And let's be clear, this is Verizon data, right? I mean, you didn't -- you couldn't go into Verizon and say, tell me how many handovers occurred.
A. Correct.
Q. So they produced the data to you, right?
A. Yes.
Q. All right. So I'm going to show you another document from Mr. Ellis's report. I mean, this is actually a page from his report. And you see in Paragraph 115 he estimates that about 2 percent of calls that touch the LTE network involved a network handover and an estimated 15 percent of calls that touched the Wi-Fi network involved a handover.
Do you see that?
A. Yes.

05:01:55 Q. And can you read -- read for the jury what I've
05:01:58 highlighted down in Note 243 about some of the assumptions
05:02:03 that were made by Mr. Ellis when he was trying to figure
05:02:09 out how many handovers actually occurred.
05:02:15 A. So he had an interview with Mr. Faber and discussed
05:02:19 this issue, and ultimately he states: I understand total
05:02:23 calls with a network handover and that it would be
05:02:27 reasonable to adjust the data upward by 10 to 15 percent to
05:02:32 estimate the total number of calls with a network handover.
05:02:36 Q. So when you weren't exactly sure whether you had gotten
05:02:40 all the information from Verizon when Mr. Dacus was asking
05:02:44 you those questions, were you actually referring to maybe
05:02:47 some of the assumptions that Mr. Ellis made when he gave
05:02:52 his opinion on the number of handovers?
05:02:54 A. That is correct. This conversation with Mr. Faber
05:02:57 occurred after my report was issued.
05:03:01 Q. All right. And so that's Paragraph 115 in Mr. Ellis's
05:03:05 report.
05:03:06 Let's look at Paragraph 56.
05:03:10 And here, can you tell the jury -- this is
05:03:13 Verizon's own expert, right? He is telling -- submitting
05:03:17 in an expert report what percent of calls have a handover.
05:03:22 And what did he conclude?
05:03:23 A. That from July 2024 to May 2025, an estimated 2 percent
05:03:29 of calls that touch the LTE network involved a network

handover, and an estimated 15 percent of calls that touched the Wi-Fi network involved a network handover.
Q. And last, let's look at Paragraph 296. Again, this is from Mr. Ellis's report. What about he say about the estimate on the number of calls that touched the Wi-Fi network that involved a network handover?
A. That during the period of July 2024 to May 2025, an estimated 15 percent of calls that touched the Wi-Fi network involved a network handover.
Q. So what do you think the right number is? Is it 1 percent or 15 percent, Mr. Blok?
A. 15 percent.
Q. Thank you.
I want to go back and I want to have you answer some questions about the chart that Mr. Dacus created to go through saying what he said were comparable licenses.
MR. HERMAN: Thank you.
Q. (By Mr. Herman) All right. You've already given a lot of testimony about your opinion as to what Verizon owes to Aspen in this case in your opinion, right?
A. Yes.
Q. So let's go to the Ack3 license. Why did you determine that the Ack3 license had no comparability to the situation that was -- that would have faced Aspen and Verizon when they were -- if they were entering into a hypothetical

05:05:12 negotiation?
05:05:12 A. Yeah, so, again, the Ack3 license with Aspen was really
05:05:17 focused on source code. Ack3 was wanting to implement this
05:05:20 source code into product that would be sold outside of the
05:05:24 U.S. They were not interested in a license to the patents.
05:05:28 Again, the same party was negotiating, Mr. Bhaskaran. He
05:05:33 was the co-founder of Ack3. He was the CEO of Aspen at the
05:05:37 time. And so this is not an arm's length transaction.
05:05:40 So it's not comparable to the hypothetical
05:05:44 negotiation.
05:05:44 Q. Is there evidence in the record as to whether Ack3 used
05:05:49 the patents that were part of this license?
05:05:53 A. Yes. Ack3 never used the '554 patent, and ultimately,
05:06:00 I believe, that the -- at least the patent side of the --
05:06:04 the patent option was terminated.
05:06:07 Q. Do you have an understanding as to the relative size of
05:06:11 Ack3 versus Verizon?
05:06:14 A. I'm not even sure they're comparable.
05:06:17 Q. So let's talk about -- so should you have used Ack3 to
05:06:23 compare and figure out what the parties would have used at
05:06:27 the hypothetical negotiation?
05:06:28 A. No, not at all.
05:06:29 Q. And did Mr. Ellis say that the Ack3 was a comparable
05:06:34 license?
05:06:34 A. No, he did not.

05:06:36 Q. So even their own expert didn't try to argue, did he,
05:06:39 that Ack3 was similar to the situation facing Aspen and
05:06:43 Verizon in December of 2015?
05:06:46 A. That is correct.
05:06:46 Q. Let's move to Iceberg. Do you have an understanding of
05:06:51 when the Iceberg licensing discussions took place?
05:06:54 A. I do not recall the date.
05:06:56 Q. Would it surprise you that it predates the introduction
05:07:00 of Voice over Wi-Fi with handovers?
05:07:01 A. No, it would not.
05:07:03 Q. And I think you said on cross-examination that the
05:07:07 Iceberg was an offer. It was never consummated, right?
05:07:13 A. That is correct.
05:07:13 Q. I mean, as a damages expert, do you typically use
05:07:16 offers to license but that don't actually result in a -- in
05:07:21 an agreement, or do you like to use actual license
05:07:25 agreements?
05:07:25 A. No, offers -- many times we see offers in these types
05:07:30 of cases. There's -- usually there's an initial
05:07:34 discussion, and if I remember correctly, this was kind of
05:07:37 an entry level -- I'm not even going to talk to you unless
05:07:42 we're at least talking, you know, more than $1.5 million.
05:07:48 So that's why you have to look at the actual agreement.
05:07:50 Here we didn't have an actual agreement between these
05:07:52 parties.

05:07:53 Q. And do you have an understanding as to whether Mr. Ellis agreed that the Iceberg offer to license provided limited guidance? Does that sound familiar to you?
05:08:06 A. I believe that was his determination.
05:08:08 Q. Now, with respect to KAIFI, you've already explained why from an economic perspective you don't think that's comparable, right?
05:08:17 A. Correct.
05:08:18 Q. But from a technical perspective, what did you do?
05:08:21 A. I relied upon Dr. Rubin. Dr. Rubin looked at the patents that were licensed in this agreement and ultimately determined based upon his review that it was not technologically comparable to the '554 patent.
05:08:32 Q. And you were here when Dr. Rubin testified yesterday, correct?
05:08:36 A. Yes, I was.
05:08:36 Q. Okay. And so you heard Dr. Rubin say that neither of the Verizon licenses, either the EON or the KAIFI licenses were relevant from a technical to -- from a technical viewpoint to the '554 patent, did you hear that?
05:08:53 A. Correct.
05:08:53 Q. Do you remember whether Verizon's counsel cross-examined Dr. Rubin about that at all?
05:09:00 A. I do not remember them asking him any questions about that.

05:09:04 Q. Do you find it strange that Verizon's counsel would cross you about the technical comparability about the KAIFI license but he didn't cross-examine Dr. Rubin about the technical comparison?

05:09:17 A. I would have expected him to ask questions of Dr. Rubin. I'm not a technical expert, and it's in my report that I relied upon Dr. Rubin for my understanding.

05:09:30 MR. HERMAN: I have no further questions, Your Honor. I pass the witness.

05:09:33 THE COURT: All right. Recross?

05:09:35 MR. DACUS: Yes, Your Honor.

05:09:36 RECROSS-EXAMINATION

05:09:47 BY MR. DACUS:

05:09:47 Q. So on this percentage of calls that actually switched, you took 360 billion, every minute of use, correct?

05:10:00 A. And then apportioned down to the benefit that's provided by the '554 patent.

05:10:04 Q. There's your calculation. 360 billion is part of the calculation, that's a true statement?

05:10:12 A. That was a starting point, yes.

05:10:14 Q. And so whether the number is 1 percent or whether the number is 15 percent, some percentage, significant percentage less than those 360 billion never switched. That's a true statement, correct?

05:10:33 A. If you're talking about just the minutes of use, I

would agree with that --
Q. That's exactly what I'm talking about. I'm talking about the minutes of use, and you know what I'm talking about, Mr. Blok. Of those 360 billion --
THE COURT: Hold on.
Were you finished with your answer?
THE WITNESS: No, I wasn't.
THE COURT: All right. Finish your answer.
A. If you're talking about the minutes of use, I would agree with that. But if you're trying to confuse that with my analysis in this case, no, I would disagree.
Q. (By Mr. Dacus) This is your calculation that's on the screen, is it not?
A. The minutes of use are one component of my calculation.
Q. Right. And for that component, you took 360 billion -- every minute of use during the applicable time period, correct?
A. Because I apportioned the benefit of the 1 cent down.
Q. You and I can agree, sir, that there's some very significant percentage of those minutes where no switch ever occurred. That's a true statement, correct?
A. Again, as I answered already, if we're talking about the minutes of use, I would agree with that.
Q. And your lawyer pointed to Mr. Ellis's report when he got up here. Do you remember that?

05:11:43 A. I do.
05:11:44 Q. And you -- you remember that Mr. Ellis actually made a
05:11:48 conserve -- some conservative assumptions in his
05:11:52 calculation of that 15 percent. You remember that?
05:11:54 A. I'm not sure I would call them conservative.
05:11:59 Q. Okay. Do you remember when you and I looked at the
05:12:05 actual data, it showed that the percentage of calls that
05:12:08 switched from Wi-Fi to LTE was less than 1 percent,
05:12:08 correct?
05:12:11 A. You were only looking at one column. You were not
05:12:14 looking at total handover.
05:12:15 Q. We're going to get to it. Can you answer my question
05:12:17 for now? The percentage of calls that started on Wi-Fi and
05:12:22 switched to LTE was less than 1 percent, correct?
05:12:25 A. I will agree that that's what that data shows.
05:12:27 Q. And now y'all want to make the -- you also want to say,
05:12:33 well, the calls that were on LTE that switched to Wi-Fi,
05:12:35 that's 5 percent, correct?
05:12:37 A. I'm not sure that that's what we are saying. That's
05:12:40 what Verizon's data is saying.
05:12:43 Q. Correct.
05:12:44 So Verizon's data, whether we're looking at going
05:12:48 from Wi-Fi to cellular or cellular to Wi-Fi, the most it
05:12:52 shows is that 5 percent of the time that switch that's
05:12:55 required for infringement happens, correct?

05:12:58 A. Over that 11-month period, and then there was an adjustment upward from there.
05:13:03 Q. Just a couple of questions about your testimony on these documents. Did I hear you say that these Ack3 people who took -- had an agreement to use this '554, they ultimately -- it wasn't valuable to them? They couldn't use it either?
05:13:31 A. I don't think that they were ever expecting to use it. If you look at Mr. Bhaskaran's testimony, they were never expecting to sell products in the U.S.
05:13:38 Q. By the way, Mr. Bhaskaran, you said he's the owner of Ack3 and the owner of Aspen, correct?
05:13:43 A. I said he was a co-founder of Ack3, and I think he was the CEO of Aspen.
05:13:47 Q. What that means is he has these things called fiduciary duties to both companies, correct?
05:13:54 A. To both companies.
05:13:55 Q. Right. He's got to act reasonably for Aspen and reasonably for Ack3, correct?
05:14:01 A. You could argue that. You're still negotiating against yourself.
05:14:04 Q. You're negotiating with duties to be reasonable to the investors of Aspen and the investors of Ack3, correct?
05:14:13 A. I'm not sure who the investors are. It may have just been Mr. Bhaskaran.

05:14:17 Q. Are you saying that Mr. Bhaskaran is the type of guy that he just throws those fiduciary duties in the air and does whatever, regardless of what his responsibilities and duties are?

05:14:27 A. I'm saying this is not an arm's length transaction. I also said it wasn't focused on the patented functionality.

05:14:34 Q. Okay. Let's talk about this Iceberg. You said this ultimately was not a consummated or completed agreement, correct?

05:14:43 A. That is correct.

05:14:44 Q. But one of the things we're trying to figure out in this negotiation -- this hypothetical negotiation is what is it that Aspen is willing to accept for this '554 patent, right? That's what we're trying --

05:14:57 A. I think there's many different factors.

05:14:58 Q. That's one of the questions the jury should be asking. What is it that Aspen and Mr. Bhaskaran were willing to accept for this '554 patent? That sounds like a reasonable question, doesn't it, sir?

05:15:08 A. Well, I think that it is a factor that can be considered.

05:15:13 Q. Right. And this agreement, this offer, as you called it, actually answers because this 1.5 million is what Mr. Bhaskaran and Aspen said they would accept for a fully paid-up license -- actually to purchase the '554 patent,

05:15:24 correct?
05:15:29 A. I think you're mischaracterizing Mr. Bhaskaran's
05:15:31 testimony.
05:15:32 Q. Are you going to be here for the whole trial?
05:15:35 A. I'm not sure yet.
05:15:37 Q. Okay. Because we're going to play his deposition.
05:15:41 Have you read his deposition?
05:15:43 A. I have.
05:15:43 Q. On this KAIFI agreement, you know that our technical
05:15:57 expert is actually going to testify in the next couple of
05:16:00 days, correct?
05:16:01 A. I believe that's correct.
05:16:02 Q. And you know he says that this '728 patent, the one
05:16:05 that I read the description of -- to you is comparable to
05:16:11 the '554 patent. You know that, right?
05:16:12 A. I believe that Verizon's technical expert is coming to
05:16:15 that conclusion.
05:16:16 Q. So when your lawyer said, well, why didn't they
05:16:19 cross-examine our guy about it, you remember that question?
05:16:21 A. I do.
05:16:22 Q. Because we're just going to put on our affirmative
05:16:25 evidence from our own witness, fair?
05:16:27 A. I'm not sure.
05:16:28 Q. Okay. That's all the questions I have.
05:16:31 MR. DACUS: I pass the witness.

05:16:33 THE COURT: Anything else, Mr. Herman?

05:16:35 MR. HERMAN: Your Honor, in the interest of letting the jury go home, I'm going to go ahead and close the examination of Mr. Blok.

05:16:41 THE COURT: All right. You may step down, Mr. Blok.

05:16:43 MR. DACUS: Your Honor, I'm happy to move this if the Court wants me to.

05:16:47 THE COURT: I'm sorry.

05:16:48 MR. DACUS: I'm happy to move this if the Court wants me to.

05:16:51 THE COURT: No, it's fine for now.

05:16:54 All right. Ladies and gentlemen of the jury, I think this is a good stopping place for the day. Thank you for your attention and your focus during the testimony. We will recess now, and I'll ask you to be back at 8:45 in the morning so that we can start promptly here in the courtroom at 9:00 o'clock.

05:17:13 As a reminder don't discuss the case with anyone. Don't allow it to be discussed in your presence. Don't reach or form any conclusions about the case until all of the evidence has been presented and I have instructed you on the law. Don't do any independent research or investigation into any matter that is associated with the case. And finally, don't post anything about your

05:17:36 involvement as a juror in this case on any social media
05:17:40 website or app.
05:17:41 We'll see you all back at 8:45 in the morning.
05:17:45 Have a nice evening.
05:17:46 COURT SECURITY OFFICER: All rise.
05:17:48 (Jury out.)
05:18:11 THE COURT: Okay. Please be seated.
05:18:12 I meant to ask you all if you wanted to move your
05:18:16 exhibits into evidence in front of the jury. If you do, we
05:18:22 can do that first thing in the morning. Otherwise, you can
05:18:25 do it now.
05:18:26 MR. HERMAN: I think it makes sense, because I
05:18:28 think we're going to close our case first thing in the
05:18:30 morning, I think in conjunction with that we can read in
05:18:33 the exhibits if that's okay with Your Honor.
05:18:35 THE COURT: That's fine. That's fine, sure.
05:18:37 MR. HERMAN: It'll be quick.
05:18:38 THE COURT: Okay. Good enough.
05:18:40 What else do we need to resolve before we adjourn
05:18:42 today? Anything?
05:18:45 MR. HERMAN: Nothing from Aspen, Your Honor.
05:18:47 MR. DACUS: Nothing from us, Your Honor.
05:18:49 THE COURT: Okay. All right.
05:18:50 Mr. Dacus?
05:18:53 MR. DACUS: Just to make sure though, on the Rule

05:18:54 50 procedure for the Court, our expectation is to do that at the close of evidence rather than the close of the Plaintiff's case.

THE COURT: Unless there's some objection by the Plaintiff, I guess since the Defendant's making the request, that would be my preference, that we wait until all of the evidence has come in. I think we -- we have all tried cases here together this year. My preference would be the parties discuss the timing of that exactly and the form of it, so to speak.

So if you want to do it briefly orally, I am okay with that. If you would prefer to do it in writing, I am okay with that, as well. I would -- unless there's some unique reason we shouldn't do it this way, I would prefer that you all visit about it and decide which way you want to do it, and both of you do it that way.

MR. DACUS: We'll be happy to confer on it, Your Honor.

THE COURT: Is that fair enough?

MR. HERMAN: It's fair enough.

THE COURT: All right. Very good. See you all in the morning.

MR. HERMAN: Thank you, Your Honor.

COURT SECURITY OFFICER: All rise.

(Court adjourned at 5:20 p.m.)

CERTIFICATION

I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.

/S/ Shelly Holmes
SHELLY HOLMES, CSR, TCRR
CERTIFIED SHORTHAND REPORTER
State of Texas No.: 7804
Expiration Date: 10/31/2027

6/16/2026
Date