IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

| | | |
|---|---|---|
| ASPEN NETWORKS, INC., PLAINTIFF, | )( | CIVIL ACTION NO. 2:23-CV-557-RWS |
| VS. | )( | MARSHALL, TEXAS |
| CELLCO PARTNERSHIP D/B/A VERIZON WIRELESS, DEFENDANT. | )( | JUNE 17, 2026 8:35 A.M. |

---

TRANSCRIPT OF JURY TRIAL

BEFORE THE HONORABLE ROBERT W. SCHROEDER III,

UNITED STATES DISTRICT JUDGE, AND A JURY

VOLUME 4, PAGES 821 THROUGH 1116

---

FOR THE PLAINTIFF:

Mr. Barry J. Herman
Ms. Julie Giardina
Womble Bond Dickinson (US) LLP
100 Light Street
26th Floor
Baltimore, MD 21202

Mr. Preston H. Heard
Ms. Christine H. Dupriest
Mr. John G. Perry
Mr. Jace D. Williams
Womble Bond Dickinson (US) LLP
1331 Spring Street NW
Suite 1400
Atlanta, GA 30309

Mr. Fabio E. Marino
Womble Bond Dickinson (US) LLP
1279 Oakmead Parkway
Suite 200
Sunnyvale, CA 94085

FOR THE PLAINTIFF: Mr. Eric H. Findlay
Findlay Craft, PC
7270 Crosswater Avenue
Suite B
Tyler, TX 75703

FOR THE DEFENDANT: Mr. Deron R. Dacus
The Dacus Firm, PC
821 ESE Loop 323
Suite 430
Tyler, TX 75701

Mr. Kevin P. Anderson
Ms. Elissa Sanford
Duane Morris LLP
901 New York Avenue NW
Suite 700 East
Washington, DC 20001

Mr. Matthew C. Gaudet
Mr. Glenn D. Richeson
Mr. John R. Gibson
Mr. Matthew S. Yungwirth
Duane Morris LLP
1075 Peachtree Street NE
Suite 1700
Atlanta, GA 30309

Mr. Aleksander J. Goranin
Mr. John Hillman
Mr. Robert M. Palumbos
Ms. Brianna M. Vinci
Duane Morris LLP
30 South 17th Street
Philadelphia, PA 19103

Ms. Holly E. Engelmann
Duane Morris LLP
Terrace 7
2801 Via Fortuna
Suite 200
Austin, TX 78746

COURT REPORTER: Ms. Shelly Holmes, CSR, TCRR
Official Court Reporter
Honorable Robert W. Schroeder III
United States District Judge
Eastern District of Texas
Texarkana Division
500 North State Line Avenue
Texarkana, TX 75501
shelly_holmes@txed.uscourts.gov

(Proceedings recorded by mechanical stenography, transcript produced on a CAT system.)

P R O C E E D I N G S

08:35:15

08:35:15 COURT SECURITY OFFICER: All rise.

08:35:16 THE COURT: Good morning, everyone.

08:35:18 Just a few issues to discuss. I know there has -- 08:35:20 I think an issue with this -- this one minor issue with 08:35:26 respect to some slides which we can address in just a 08:35:29 moment.

08:35:29 Let me first compliment the parties for their work 08:35:34 on the jury instructions. You all made very significant 08:35:37 progress on those. There are a few remaining issues that 08:35:44 I'll need to decide. And I think the thing to do is if I 08:35:47 could hear from the parties about that not now but at the 08:35:51 end of the day today after we've finished with the 08:35:55 testimony and the jury has gone home for the day, we'll 08:36:00 just do a short charge conference. I don't think it will 08:36:03 take very long. But, again, I do appreciate the parties 08:36:08 working together on the -- on the instructions so well 08:36:16 to -- to minimize the areas of disagreement.

08:36:20 I know the parties want to read -- or the 08:36:23 Plaintiff wants to read in exhibits. We can also do that 08:36:27 in just a moment.

08:36:28 I know there was also an issue raised late 08:36:34 yesterday about the testimony of Mr. Ellis. Have the 08:36:41 parties worked some agreement out about Mr. Ellis's

08:36:44 testimony?

08:36:45 MR. FINDLAY: Subject to the Court's approval, we
08:36:47 have, Your Honor. I don't need to hash the back and forth
08:36:50 necessarily, but the agreement was -- and we thought with
08:36:54 timing, it would work out, that Mr. Ellis will go up today.
08:36:56 We won't object to that. He'll be cross-examined tomorrow.
08:36:59 And the way we've mapped it out is we don't think that's
08:37:03 going to, you know, leave any time hanging, if you will.

08:37:06 THE COURT: Okay.

08:37:06 MR. FINDLAY: We believe Mr. Ellis may be put on
08:37:09 direct today, we might finish his direct today, but if that
08:37:13 happens, we're pretty confident that's going to be very
08:37:15 late in the day and then we would break, with your
08:37:18 permission, and do the cross --

08:37:19 THE COURT: Sure. So if the timing works out, we
08:37:23 would conclude the day with his direct testimony, and you
08:37:25 all would begin your cross first thing in the morning.

08:37:27 MR. FINDLAY: Correct. The only caveat I would
08:37:30 put in there -- if somehow something dramatically changes
08:37:35 and we were left at 3:00 o'clock, for instance, and
08:37:38 Mr. Ellis is off the stand, we would have -- I don't want
08:37:41 to snatch, you know, the feet from the jaws of victory --
08:37:45 we would -- we would have a bit of an issue which we would
08:37:49 have to get into as to why Mr. Ellis was disclosed, in our
08:37:50 view, late, the prejudice that suffered to us, et cetera,

08:37:53 but I just don't think it's going to be an issue, Judge.

08:37:58 THE COURT: All right. Anything from the
08:37:59 Defendant on that?

08:38:01 MR. DACUS: No.

08:38:02 MR. FINDLAY: Thank you, Your Honor.

08:38:02 THE COURT: Good. Okay. So I anticipate what
08:38:03 will happen is when the jury gets in the courtroom this
08:38:06 morning, the Plaintiffs will rest their case-in-chief; is
08:38:09 that correct?

08:38:11 MR. HERMAN: Yes, Your Honor.

08:38:12 THE COURT: Okay. And the parties yesterday told
08:38:15 me they were going to discuss some mechanism for dealing
08:38:20 with Rule 50 motions. Have you all done that?

08:38:23 MR. DACUS: We have, Your Honor. And we've --
08:38:26 we've agreed that we will both file in writing. My only
08:38:31 question to the Court is timing. We will do what the Court
08:38:36 prefers. If the Court prefers to receive those this
08:38:39 evening, for example, we'll file them this evening. If the
08:38:43 Court is fine with receiving them first thing tomorrow
08:38:47 morning, we will file them tomorrow morning.

08:38:49 THE COURT: Certainly fine with me for you to file
08:38:51 them tomorrow.

08:38:52 MR. DACUS: Okay.

08:38:52 THE COURT: Does that work for the Plaintiffs, as
08:38:54 well?

08:38:54 MR. HERMAN: Yes, it does, Your Honor.
08:38:55 THE COURT: Okay. Good.
08:38:57 MR. DACUS: Thank you, Your Honor.
08:38:57 THE COURT: Okay. So you all want to take up the issue about the slides that remain in dispute. I think there's an objection by Aspen.
08:39:17 MR. HEARD: Yes, Your Honor. And happy to report one of those has been resolved, even since my email to Mr. Hopkins this morning. So Dr. Mahon's slide, DD6, has been resolved, so no objection there. That was withdrawn.
08:39:31 So it's just these two slides in Dr. van der Weide -- he's the validity expert for the Defendant. He's got these two slides with some testimony from Mr. Chin and Mr. Mavunkel. And the issue -- if I could have the document camera? Zoom out.
08:39:55 So that -- there's one line on the next page, but this is the sum total of Dr. van der Weide's opinions with respect to written description in his report. All three named inventors were deposed and questioned at length about what's disclosed in the '554 patent. Dr. van der Weide only relied on Mr. Bhaskaran. That was all that's disclosed in the report.
08:40:19 But now he's purporting in these demonstratives to talk about what Mr. Mavunkel and Mr. Chin say and even some of that is not, you know, quote, new testimony. It's

08:40:29 proposed or supposed impeachment of Mr. Mavunkel from his
08:40:33 deposition and existed back when his report was originally
08:40:36 issued. So this is just a Rule 26 issue outside the scope
08:40:40 of his report, and he shouldn't be able to present these
08:40:43 slides.

08:40:43 THE COURT: Okay. Let me hear from Mr. Gaudet.
08:40:50 Mr. Gaudet, I mispronounced your name yesterday, my
08:40:53 apologies.

08:40:54 MR. GAUDET: No, Your Honor, not a problem at all.

08:40:56 The -- just one quick background point, and then
08:41:01 I'll show you where the testimony fits in.

08:41:04 There's no dispute that the opinion Dr. van der
08:41:09 Weide is offering is precisely on the issue that Mr. Chin
08:41:15 and Mr. Mavunkel testified on. So there's no issue here in
08:41:19 terms of is this -- you know, is this the right opinion, is
08:41:22 this relevant to the opinion? It's -- it's the question of
08:41:24 whether or not that claim term "maintaining the signal" --
08:41:29 "the SIP signaling sequence," whatever the phrase is, is
08:41:33 supported, and in particular, how, right? Does the patent
08:41:37 show you how?

08:41:38 And if you -- so if you -- and actually what I'll
08:41:42 do is I'll take us to where we were as of the pretrial
08:41:47 conference.

08:41:49 This testimony existed -- sorry, this is -- I'm
08:41:53 going to unclip this. This was -- what I'm about to put up

08:41:57 here is from Mr. Bhaskaran. This testimony existed, and so
08:42:02 this was -- and this is -- this is Slide 10 immediately
08:42:07 before the two slides we're talking about. So this was
08:42:10 quoted in Dr. van der Weide's report, and we're going to
08:42:14 play this for the jury, and that sets it up, okay?
08:42:17 At the pretrial conference, the Court heard
08:42:21 argument on a summary judgment motion on written
08:42:24 description on exactly this issue. And at the pretrial
08:42:27 conference, one of the things Aspen said is we're going to
08:42:30 have Mr. Chin come to trial and affirmatively testify on
08:42:36 precisely this issue, this very issue.
08:42:39 And that's what he did. He came to trial, and he
08:42:41 gave the testimony. And I'm now going to -- I'm just going
08:42:46 to reverse the order of the two disputed slides. He gave
08:42:49 this testimony. Okay? And every single bit of this is his
08:42:52 testimony on direct on precisely this issue which obviously
08:42:56 did not exist at the time that Dr. van der Weide did his
08:43:00 report. It didn't exist at the time he was deposed. It is
08:43:03 what Aspen said they were going to do at the pretrial
08:43:05 conference. And all I'm going to do is put precisely what
08:43:08 he said -- now, it's kind of ironic. Sometimes, you know,
08:43:13 a lawyer in my position would just characterize the
08:43:16 testimony and hear an objection, put the actual testimony
08:43:18 in front.
08:43:18 THE COURT: So you're -- it's Verizon's position

08:43:20 this is not a new opinion?

08:43:22 MR. GAUDET: There's nothing new whatsoever about
08:43:24 it, and I think that's completely undisputed.

08:43:27 THE COURT: What you're saying is the testimony
08:43:29 that was previously given in this trial supports opinions
08:43:31 that have been previously disclosed by Verizon?

08:43:34 MR. GAUDET: That's a hundred percent right.

08:43:34 THE COURT: Okay.

08:43:39 MR. GAUDET: Exactly. And the only other point I
08:43:40 would add to that, Your Honor, is when I flip it over,
08:43:43 two-thirds of this page is what Mr. Mavunkel did on direct.
08:43:45 It is certainly true that I included something that I did
08:43:48 on cross, but what I did on cross is to round out what he
08:43:52 offered in direct that didn't exist at the time. But, Your
08:43:56 Honor, you put it better than I did. Thank you.

08:43:58 THE COURT: All right. Mr. Heard, anything else?

08:44:02 MR. HEARD: Yes, Your Honor. Just the concern
08:44:04 that the -- what Verizon is attempting to do is to turn and
08:44:09 present written description in more slides than they had
08:44:13 sentences in his expert report and to make it into more of
08:44:17 a theory than was actually disclosed. And the fact that
08:44:19 Mr. Mavunkel and Mr. Chin were -- sat for depositions and
08:44:22 were fully questioned about all of these issues about the
08:44:24 patent and what was described, and Dr. van der Weide did
08:44:28 not choose to rely on them in his report, we don't think

08:44:32 it's appropriate for him to -- especially to include them in demonstratives here as if this is some opinion that has been rendered and included for -- since the issuance of his report.

THE COURT: So, Mr. Heard, I appreciate your -- your argument. I think that I'm going to overrule the objection. To the extent the opinions are consistent with everything that's previously been disclosed and they're not new opinions, I will allow that. If I understand Mr. Gaudet correctly, all the witness is going to testify to is this is one additional data point in support of his opinion that was, you know, trial testimony that occurred, you know, two days ago.

So I'll overrule the objection.

MR. HEARD: Thank you, Your Honor. I think that concludes -- nothing else to cover? I'm trying to get a nod of approval.

MR. HERMAN: That's fine on that. We need to read in the exhibits. I don't know if you have anything else.

THE COURT: All right. You want to do that now?

MR. HERMAN: If you don't mind, Your Honor.

THE COURT: Not at all, Mr. Herman.

MR. HERMAN: And I apologize, I told you that I was going to read it in front of the jury before we closed and then I realized it was so long that the jury might fall

08:45:48 asleep.

08:45:49 THE COURT: That's fine. That's fine, Mr. Herman.

08:45:51 MR. HERMAN: So -- and this includes the exhibits
08:45:57 that -- so this is all the exhibits in our case-in-chief,
08:46:00 including the ones that Verizon submitted.

08:46:04 THE COURT: Okay. Very good.

08:46:05 MR. HERMAN: All right. PTX-007, PTX-008,
08:46:11 PTX-020, PTX-021, PTX-022, PTX-035, PTX-078, PTX-081,
08:46:24 PTX-085, PTX-086, PTX-087, PTX-090, PTX-091, PTX-094,
08:46:38 PTX-098, PTX-115, PTX-127, PTX-141, PTX-142, PTX-147,
08:46:51 PTX-159, PTX-182, PTX-199, PTX-201, PTX-202, JTX-001,
08:47:05 JTX-002, JTX-003, VDTX-27, VDTX-31, VDTX-228, PTX-057,
08:47:24 PTX-082, PTX-118, PTX-153, PTX-156, PTX-164, PTX-166,
08:47:34 PTX-172, PTX-174, VDTX-233, VDTX-011, VDTX-019, VDTX-234,
08:47:50 JTX-005, and JTX-006.

08:47:58 THE COURT: All right. Thank you, Mr. Herman.
08:47:59 And let me ask Verizon's counsel, I think all of
08:48:02 these were used without objection; is that correct?

08:48:04 MR. DACUS: That's correct.

08:48:05 THE COURT: All right. They will all be admitted
08:48:07 and received into evidence.

08:48:08 MR. HERMAN: Thank you very much, Your Honor.

08:48:09 THE COURT: All right. Anything else from the
08:48:15 Plaintiff this morning?

08:48:16 MR. HERMAN: No, Your Honor.

08:48:17 THE COURT: Anything from the Defendant this
08:48:20 morning?
08:48:20 MR. DACUS: No, Your Honor.
08:48:21 THE COURT: I think we're still waiting on two
08:48:25 jurors, so we will just take a short recess. And when both
08:48:30 are here we'll start.
08:48:32 COURT SECURITY OFFICER: All rise.
08:48:33 (Recess.)
08:48:33 COURT SECURITY OFFICER:
08:49:57 All rise.
08:56:52 THE COURT: Okay. All of our jurors are here. Is
08:56:55 there anything else we need to discuss before we have the
08:56:58 jury brought up to the courtroom?
08:57:01 MR. HERMAN: No, Your Honor.
08:57:02 MR. DACUS: No, Your Honor.
08:59:23 THE COURT: Very well. Mr. Savage.
08:59:23 COURT SECURITY OFFICER: All rise for the jury.
08:59:27 (Jury in.)
08:59:42 THE COURT: Please be seated.
08:59:43 Good morning, ladies and gentlemen of the jury.
08:59:45 Welcome back. I hope you all had a nice evening.
08:59:48 When the day finished yesterday, the Plaintiff had
08:59:53 completed its -- the testimony of the witness, Mr. Blok.
08:59:59 At this time, the Plaintiff may call its next
09:00:02 witness.

MR. HERMAN: Thank you, Your Honor.

Subject to any rebuttal, Plaintiff rests its case.

THE COURT: All right. Thank you, Mr. Herman.

MR. HERMAN: Thank you.

THE COURT: Ladies and gentlemen of the jury, you've heard that the Plaintiff has rested its case. You will recall from my description both on Friday and then again on Monday morning what remains in the case is subject to some legal discussions that the attorneys and I will have outside of your presence. The Defendant will put its case-in-chief on, and then the Plaintiff will have an opportunity, if it chooses, to call any rebuttal witnesses necessary. And then after that, I will instruct you on the law that you will be required to follow in your deliberations, and the parties will present their closing arguments to you. And then after all of that, your deliberations will begin.

So at this time, the Defendant may call its first witness.

MR. ANDERSON: Good morning, Your Honor. My name is Kevin Anderson. And Verizon calls Mr. Bob Faber.

THE COURT: All right.

MR. ANDERSON: And while he's walking up, may we hand out the binders, Your Honor?

THE COURT: Of course.

MR. ANDERSON: Thank you, Your Honor.

THE COURT: Mr. Faber, if you would raise your right hand to be sworn.

(Witness sworn.)

THE COURT: Whenever you're ready.

MR. ANDERSON: Okay. Thank you.

ROBERT FABER, DEFENDANT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. ANDERSON:

Q. Mr. Faber, can you please introduce yourself to the jury?

A. My name is Robert Peter Faber, Junior.

Q. Okay. And who do you work for?

A. Verizon Wireless.

Q. Where do you live?

A. I'm sorry?

Q. Where do you live?

A. Suburbs of Rochester, New York.

Q. Okay. Do you have a family?

A. Yes, I have a wife of 18 years and an eight year old son.

Q. Okay. Now, we saw you last Friday in court here. Before you came to court last Friday, had you ever been in a courtroom?

A. Just once before.

09:02:15 Q. And why were you in that courtroom previously?
09:02:19 A. That was to finalize the adoption of my son.
09:02:22 Q. Okay. And just to get your kind of interesting fact out of the way, where were you when you found out about the opportunity to adopt your son?
09:02:34 A. So my wife and I had been waiting for four years since we had filed the adoption paperwork, and we were at the top of the list, but for various reasons we just didn't work out. And we wanted to travel. It was our 10-year anniversary, so we decided to do a road trip to Colorado. We were living in Colorado at the time.
09:02:55 And we first stopped at the Sand Dunes National Park. If you're not familiar with it, it's pretty much a desert surrounded by mountains. And we were at the top of the dunes, and my phone rang. There is not a cell tower 20 miles away. Like, my phone shouldn't have rang. And the adoption agency said we have somebody for you. It's a perfect fit, but you need to be back today. We're eight hours from Denver. So we hiked down Sand Dunes as quickly as possible as we could. It was a little -- like, running on sand, it doesn't work too well. So we got back. He was only three days old, and we were in legal limbo for about four months until the court that day.
09:03:39 Q. Okay. That was a pretty good day in court for your family?

09:03:41 A. Absolutely.
09:03:42 Q. Okay. How long have you worked for Verizon?
09:03:45 A. Since 2000.
09:03:47 Q. Now, are you the first person in your family to work
09:03:50 for Verizon?
09:03:51 A. No. Through a quirk in life, my father and I both
09:04:02 wound up working for the same company. My father was a
09:04:05 lineman for Verizon's former companies from 1976 to 2008.
09:04:09 Q. Okay. Before you came to Verizon in -- in 2000, did
09:04:15 you have a college degree?
09:04:16 A. I was still working in college. I have a bachelor's in
09:04:23 computer engineering. Actually I graduated in 2002. And
09:04:26 part of my degree, which is a five-year program, required
09:04:29 one year of internship. So I began the internship at that
09:04:35 time at Verizon.
09:04:36 Q. Okay. So you were working your way through college at
09:04:39 Verizon?
09:04:39 A. Yes.
09:04:39 Q. Okay. Now, during -- since 2000, I know people may be
09:04:48 familiar with commercials that talk about 5G networks and
09:04:52 the different carriers, but since you worked at Verizon
09:04:59 starting in 2000, what different generations of network
09:05:02 have you worked on?
09:05:02 A. I have primarily worked on late -- it was 2G. I've
09:05:07 worked on all of the third generation technology. I've

09:05:09 worked on the fourth generation technology. And I'm
09:05:12 currently work on the fifth generation technology.
09:05:14 Q. And what -- what was your college degree in?
09:05:18 A. Computer engineering.
09:05:19 Q. And do you have any other degrees?
09:05:21 A. I have a master's in business administration from
09:05:24 University of -- University of Colorado, Denver.
09:05:29 Q. Okay. And while you've been at Verizon, have you
09:05:33 worked on the technology and the network the entire time?
09:05:39 A. Yes, I've been working on our network technology the
09:05:42 last 26 years.
09:05:43 Q. Okay. Now, relevant to this case, and the issues that
09:05:47 you've seen over the last couple of days, what is your
09:05:51 current responsibility at Verizon?
09:05:52 A. My current responsibility with respect to this case is
09:05:57 being a technical lead for Voice over Wi-Fi.
09:06:00 Q. And when you say technical lead, what do you mean?
09:06:05 A. I understand every bit and byte of how this product
09:06:10 works. I have spent over 12 years working this product.
09:06:14 And I am -- I know this product inside and out.
09:06:18 Q. And since -- when did you become the technical lead?
09:06:21 A. Approximately 2016.
09:06:22 Q. Okay. Now, is one of your responsibilities
09:06:31 troubleshooting?
09:06:31 A. Yes.

09:06:32 Q. Can you explain what troubleshooting is?
09:06:35 A. So troubleshooting is when you make a call, does it drop? Does -- do you have poor audio? How do we go about making sure that experience doesn't happen again? So we work through whatever the problem is, and if we have to make changes, we make changes.
09:06:52 Q. Okay. And is one of your responsibilities monitoring metrics?
09:06:56 A. Yes. So metrics are the numbers we receive from our system. Does the call drop? Does the call succeed? Can you make the call? Is the audio garbled?
09:07:08 Q. And is one of your responsibilities monitoring system performance?
09:07:12 A. Yes. And overall, just making sure the system works. Does it communicate okay with the rest of the network? Do the phones in your pocket, do they communicate with it properly?
09:07:24 Q. So in order to do all these responsibilities, do you have personal factual knowledge about the operation of the product?
09:07:30 A. Yes.
09:07:31 Q. Okay. Now, we've seen here so far in the trial some things called call traces. Are you familiar with doing call traces in Verizon's network?
09:07:44 A. Yes.

Q. And how frequently would you analyze call traces in your daily work?
A. Almost daily.
Q. Okay. So over the last 10 years, thousands of times. Would that be fair?
A. That's fair.
Q. Okay. So why are you the person here to speak on behalf of Verizon?
A. It's important for the jury to hear the technical -- how the technical operation of this product works.
Q. Okay. And relevant to your work at Verizon, are you an inventor on any patents?
A. Yes, I have two patents.
Q. And what are those two -- let's start with the first one. What's the first patent related to?
A. The first patent relates to how we measure how long the INVITE that we talked about, the SIP INVITE, leaves our network, goes to the device in your pocket, and responds back to our network.
Q. Okay. So you've seen the SIP INVITEs talked about here. Your patent relates to the measurement of those SIP INVITEs?
A. Yes.
Q. Okay. And your second patent, what does your second patent relate to?

09:08:55 A. The second patent has to do with a method of troubleshooting of our call flows that we use in general.
09:09:01 Q. Okay. Let's talk a little bit about the actual product itself.
09:09:07 Is Wi-Fi Calling enabled by default?
09:09:12 A. No.
09:09:13 Q. Okay. How and why do you have to do activities to enable Wi-Fi Calling?
09:09:21 A. To enable Wi-Fi Calling, you need to go into your device in settings. It's typically under cellular, and you have to enable Wi-Fi Calling. But for that to work, you need to provide an emergency address. This cannot be provided by Verizon. This needs to be provided by the user.
09:09:39 Q. Okay. And if I'm using a Verizon phone and it's -- it's using Voice over Wi-Fi, is there any indication on the phone of the use of that service?
09:09:51 A. Yes. Depending upon the manufacturer, you may see VZW Wi-Fi or you may see Wi-Fi with a phone above it I think on the Samsung devices.
09:10:03 Q. Okay. And I know people may be familiar with using apps like WhatsApp or FaceTime to make calls. Is that what we're talking about here when we're talking about Verizon's Wi-Fi Calling?
09:10:18 A. No.

09:10:19 Q. Okay. Is -- is Wi-Fi Calling important at Verizon?
09:10:27 A. It's important to the international users we talked
09:10:32 about to make calls back to the U.S., and it's also
09:10:36 important for your business scenarios or your deep-in
09:10:40 concrete buildings where a cellular signal does not reach.
09:10:44 Q. Okay. And has Verizon ever charged for Wi-Fi Calling?
09:10:48 A. No.
09:10:48 Q. Okay. So what I'd like to do now is --
09:10:53 MR. ANDERSON: If we can bring up Slide 3 in
09:10:57 Mr. Faber's presentation.
09:10:59 Q. (By Mr. Anderson) Mr. Faber, do you recognize this as
09:11:01 a slide from your deposition?
09:11:02 A. Yes.
09:11:02 Q. Okay. And based upon your years and years of
09:11:06 experience with the product, are you -- are you personally
09:11:10 familiar with the components and the operation of the
09:11:14 product?
09:11:15 A. Yes.
09:11:15 Q. Okay. Now, what I'd like you to do is we're going to
09:11:20 use this diagram to explain a call. But first, let's start
09:11:25 from the beginning, and we see these things down here
09:11:30 called VoLTE devices down here. There's actually just one.
09:11:33 What is that?
09:11:34 A. This is the device that -- your smartphone that's in
09:11:38 your pocket right now.

09:11:39 Q. Okay. And what happens when -- when a person turns on
09:11:48 their phone?
09:11:49 A. If you are on the cellular network, so say in this
09:11:53 building, you turn your phone on, the device is going to
09:11:57 what we call attach to the network. Now, this is my phone
09:12:02 number. I'm attaching to the cellular network.
09:12:06 Q. Okay. And once it attaches to the network, what does
09:12:11 it do to be able to make -- send and receive calls?
09:12:17 A. There are a lot of messages, but the important message
09:12:22 is you're going to get an IPv6 address back from this P-GW
09:12:28 right here.
09:12:29 Q. Okay. And can you show that going back to the phone?
09:12:32 A. Yes. So you're going to get a voice IPv6 address, and
09:12:42 it's going to pass back to this device called the serving
09:12:47 gateway, SGW, back to the eNodeB which we talked about
09:12:53 previously as a cell site, and then through the air back to
09:12:56 your VoLTE device.
09:12:57 Q. Okay. And this IP address or -- you said IPv6. Is
09:13:04 that a form of an address, IP address?
09:13:07 A. Yes.
09:13:08 Q. Okay. And this IP address that gets sent back to the
09:13:13 phone, is it the same IP address that would be used for
09:13:17 cellular and Wi-Fi Calling?
09:13:19 A. Yes.
09:13:19 Q. Always?

09:13:20 A. Yes.
09:13:20 Q. And to be clear, this IP address that Verizon assigns
09:13:27 the phone, is that an IP address that comes from Verizon's
09:13:33 pool of assigned IP addresses?
09:13:36 A. Yes. It is a globally routable IPv6 address.
09:13:40 Q. Okay. And it's one address; is that correct?
09:13:42 A. One address.
09:13:43 Q. Okay. Now, what I'd like you to do -- and, of course,
09:13:47 in these thousands of call traces that you've reviewed,
09:13:52 you've seen call traces showing what happens when a person
09:13:55 makes a phone call; is that correct?
09:13:57 A. Yes.
09:13:57 Q. Okay. So let me clear this.
09:13:58 What I'd like you to do is a person is over
09:14:06 there -- right here on their phone, and they dial in a
09:14:10 phone number. Can you tell me what happens?
09:14:12 A. Sure. So let's say we are calling Walmart. You're on
09:14:20 your phone and you're going to dial Walmart's phone number,
09:14:23 and you're going to press send. When that occurs, your
09:14:27 device is going to send out a SIP INVITE. We've talked
09:14:31 about that. That's going to go over-the-air interface to
09:14:35 the cell site through the SGW, through the P-GW, and it's
09:14:41 going to come up here to what we call the CSCF. That is
09:14:47 where that link stops.
09:14:49 From there, it's going to come over here to what

09:14:55 we call a session router. That's -- okay. And from there,
09:15:05 it's going to go to a device called the session -- session
09:15:14 border controller. Just SBC. And from there, we're going
09:15:19 to hand it off to our partners at Verizon business for all
09:15:24 landline calls. So think at a house or the store you're
09:15:28 calling customer service.
09:15:29 Now, what's important is each one of these that
09:15:33 I'm drawing a line through, these are different Call-IDs.
09:15:39 So you have a Call-ID for, great simplification, A.
09:15:49 Call-ID here will be B. And then from the SBC to Verizon
09:15:56 business will be Call-ID C.
09:16:02 Q. Okay. And once it goes to Verizon business, it goes
09:16:08 out of Verizon, would that be fair to say?
09:16:10 A. Yes.
09:16:11 Q. Okay. And we're not going to ask you about that.
09:16:13 But once that INVITE has been sent out, what is
09:16:21 Verizon's network expecting to receive?
09:16:23 A. We are expecting what's called a 200 OK. And this is a
09:16:27 positive response from the other phone.
09:16:33 Q. Okay. And where -- can you just kind of -- I know
09:16:37 we've got a lot of drawing up there. I'll go ahead and --
09:16:42 well, can you show me the path that the 200 OK would use?
09:16:53 And I think I've changed it to blue, I hope.
09:16:55 A. Okay. So it's going to come back into our network.
09:16:59 Q. That's all right. Go ahead. Just do it in red.

09:17:01 A. Okay. There's blue.
09:17:03 All right. It's going to come back into our network, the same exact path. So from Verizon business to the SBC and then up to the SBC through the session router to the CSCF. And then from there, a separate INVITE with the Call-ID of A will come back to the VoLTE device.
09:17:26 Q. Okay. Great.
09:17:27 Now, I'm going to clear this.
09:17:30 At this point, do both sides -- both phones have the information they need to communicate?
09:17:37 A. Yes.
09:17:38 Q. And that includes IP addresses?
09:17:41 A. Yes.
09:17:42 Q. And that would include also, like, protocols that you're going to talk -- talk with, like, how good your voice is?
09:17:49 A. Yes.
09:17:53 Q. Okay. Now, after the phone receives the 200 OK, what happens?
09:18:06 A. Once the phone receives that 200 OK, it's going to begin sending what we've talked about, the RTP messaging. This is our voice talking right now on both sides from the VoLTE device to the landline and the landline and back.
09:18:22 Q. And can you show the path that the RTP packets would take?

09:18:27 A. Sure. So you talk on your phone, and it's going to go pretty much the same path through the eNodeB to the SGW to the P-GW, and it's going to go out this way through that session border control we talked about a few minutes ago and then hand it off to Verizon business.

09:18:58 Q. Okay. Now, so far, everything we've talked about, is any of that related to Wi-Fi Calling?

09:19:04 A. None at all.

09:19:05 Q. So this is just all the cellular that you've been explaining?

09:19:07 A. Yes.

09:19:10 Q. Okay. Now, let's talk a little bit about Wi-Fi Calling.

09:19:16 One of the questions people might have is if I could already make calls using cellular, why did Verizon put forward Wi-Fi Calling?

09:19:27 A. For the -- as I said previously, for the international callers who want to call back to the United States. And we talk about the basement scenario where you have Wi-Fi coverage but our cellular system just does not reach there.

09:19:47 Q. Okay. And let's -- let's talk about that scenario. The building or the basement scenario.

09:19:56 Now, in order to do Wi-Fi Calling before it starts any -- anything to do with Wi-Fi Calling, does the phone have to already be attached to the Wi-Fi network?

09:20:04 A. Yes. It needs to already be attached to a known Wi-Fi.
09:20:09 Q. Okay. So let's say that in this situation, we'll show
09:20:13 the Wi-Fi Calling. I move my phone, and I go down into my
09:20:17 basement. Can you explain what the phone -- what decisions
09:20:22 the phone would make and how -- what it would do with those
09:20:26 decisions?
09:20:27 A. So if you're in your house, we saw some thresholds --
09:20:35 some cellular thresholds, and we are -- Verizon, a
09:20:41 cellular-preferred network. So even though your Wi-Fi may
09:20:45 be extremely strong, if you still have good cellular
09:20:48 coverage, it's not going to make a Wi-Fi call.
09:20:52 However, if the cellular coverage is weak and you
09:20:56 have strong Wi-Fi, the call will transition to the Wi-Fi
09:21:00 Calling network.
09:21:00 Q. Okay. And if the -- if the phone transitions to the
09:21:06 Wi-Fi network, can you explain the messages and the
09:21:15 exchange of information here that would allow the phone to
09:21:21 speak to Verizon's network?
09:21:23 A. Sure. So when the device decides it's time to switch
09:21:30 to Voice over Wi-Fi, assuming you already have a call set
09:21:34 up, the device is going to try to find the closest ePDG,
09:21:42 this guy. His purpose is to take an untrusted network, the
09:21:50 Internet, and allow this untrusted traffic onto our
09:21:57 network. However, to do that, we have to set up this
09:22:02 encrypted tunnel that was discussed yesterday.

09:22:06 Q. Okay. And does this tunnel -- what flows in this
09:22:11 tunnel?
09:22:12 A. The SIP and RTP messaging that -- for your phone call.
09:22:15 Q. And why -- why do you do this encrypted tunnel at
09:22:21 Verizon?
09:22:21 A. For privacy reasons, so no one else can listen to your
09:22:24 call.
09:22:25 Q. Okay. And this tunnel, what are the -- what are the
09:22:28 endpoints in the tunnel?
09:22:30 A. The endpoints of the tunnel are your device right here
09:22:35 and the ePDG.
09:22:35 Q. Okay. And within the tunnel, for example, over-the-air
09:22:43 to the Wi-Fi router, can anybody view those packets?
09:22:48 A. No.
09:22:49 Q. Okay. And the Wi-Fi router itself, can it look at the
09:22:56 SIP and RTP packets?
09:22:58 A. No.
09:22:58 Q. And on the Internet, can anybody look at it?
09:23:00 A. No.
09:23:01 Q. Okay. And if they can't look at it -- for example, the
09:23:05 Wi-Fi router -- it's not like it's changing anything about
09:23:08 the SIP and RTP packets, is it?
09:23:10 A. That's correct.
09:23:11 Q. Okay. Actually I'll just leave that up.
09:23:19 Once the -- the tunnel is established between the

09:23:24 UE and the ePDG, what happens then?
09:23:28 A. Once the tunnel is established, we are going to have what we call a Create Session Request message. This message is from the ePDG up to the P-GW.
09:23:45 Q. And what impact -- what does the Create Session Request message do?
09:23:52 A. This message is telling the packet gateway I want to hand over from LTE to Wi-Fi.
09:24:01 Q. Okay.
09:24:07 MR. ANDERSON: And let's -- let's pull up an example of that. If you could pull up the cover page of VDTX-218.
09:24:16 Q. (By Mr. Anderson) Mr. Faber, do you recognize VDTX -- this exhibit here?
09:24:27 A. Yes.
09:24:27 Q. And what is it?
09:24:28 A. These are the technical -- highly technical documents that explain every little message flow for all possible scenarios of Wi-Fi Calling.
09:24:40 Q. And is this a document that you rely on and consult when you're debugging problems in the network?
09:24:49 A. Yes, this is the documents we refer to that we use to make sure the system operates as expected.
09:25:00 Q. Okay.
09:25:01 MR. ANDERSON: Can we turn to Page 116? And I'd

09:25:09 like you, if you could, Mr. Duval, blow up Message 13
09:25:13 there.
09:25:14 Q. (By Mr. Anderson) Now, Mr. Faber, you mentioned a
09:25:17 Create Session Request. Is that what this -- this is?
09:25:20 A. Yes.
09:25:20 Q. Okay. And you were asked about this at your
09:25:25 deposition, right? You talked about it?
09:25:26 A. Yes.
09:25:27 Q. And what did you tell Aspen?
09:25:29 A. That the Create Session Request performs the handover.
09:25:33 Q. That's -- is that the message that actually causes the
09:25:38 switch between the two networks?
09:25:40 A. Yes.
09:25:41 Q. Okay. And is there anything in the Create Session
09:25:47 Request that -- that indicates that it's doing a handover
09:25:51 in the message itself?
09:25:52 A. Yes. This indication flag right here, handover equals
09:25:57 1, tells the packet gateway I am handing over.
09:26:02 Q. Now, we've seen lots of different confusing messages,
09:26:06 and I just want this to be very clear. Is the Create
09:26:14 Session Request message any form of SIP message?
09:26:15 A. The Create Session Request is not a SIP message.
09:26:21 Q. Okay. And to make sure that's clear, can you just --
09:26:23 in the upper right, like, write the word "SIP"?
09:26:32 Okay. And just so it's clear in everybody's mind,

09:26:35 can you put a big cross through that?
09:26:37 And this is the -- this is the message that causes
09:26:43 the switch in Verizon's system, right?
09:26:45 A. That's correct.
09:26:46 Q. Okay. And -- and you said it's not SIP. What protocol
09:26:52 is this?
09:26:52 A. The protocol is technically called GTP Version 2.
09:26:58 Q. Okay. That's a -- that's a -- that's a handful of an
09:27:02 acronym. At a high level, can you just explain what GTP
09:27:06 Version 2 is?
09:27:07 A. It is the communication protocol that is used in the 4G
09:27:13 evolved packet core that we've talked about in the previous
09:27:17 diagrams.
09:27:19 Q. Okay. And, again, does GTP V2 have anything at all to
09:27:24 do with SIP?
09:27:25 A. No.
09:27:26 Q. Okay.
09:27:30 MR. ANDERSON: Can we go back to Slide 3?
09:27:40 Q. (By Mr. Anderson) Great. Okay. Mr. Faber, I had to
09:27:43 delete it. Can you draw the little tunnel between the ePDG
09:27:47 and the P-GW again?
09:27:51 Okay. And after the Create Session Request is
09:28:01 received, are there any -- and the network switches, are
09:28:05 there any SIP messages that get sent?
09:28:10 A. Repeat the question.

09:28:15 Q. Sure. You've done the Create Session Request message and look at the call phone in a minute, but are there any SIP messages that get sent by the phone after you've switched networks, sir?
09:28:31 A. Yes, there is a SIP Re-Register.
09:28:35 Q. And what -- where does that get sent?
09:28:37 A. So that will get sent -- that will get sent from the VoLTE device through ePDG to the packet gateway to the CSCF, and it terminates right here.
09:28:56 Q. Okay. And to be clear, this SIP Re-Register message doesn't go out -- go outside of Verizon like the SIP INVITE did, correct?
09:29:04 A. It does not.
09:29:05 Q. Okay.
09:29:10 MR. ANDERSON: And if we could -- could go back to Exhibit VDTX-218. And let's go to Page 114.
09:29:30 Q. (By Mr. Anderson) It's very difficult to read, but if we scroll down a little bit, is this the SIP Re-Register that you're talking about there?
09:29:41 A. Yes.
09:29:41 Q. Okay.
09:29:47 MR. ANDERSON: So let's go down -- let's go down to Page 119 of this document and let's scroll down. Can you keep scrolling down? Yeah, and keep -- actually maybe it's further down on that page. Next page, 120. Oh, I'm

09:30:09 so sorry. Page 118. Okay. And at the bottom.
09:30:17 Q. (By Mr. Anderson) Okay. Now, is this the SIP Re-Register message that the phone sends?
09:30:23 A. Yes.
09:30:24 Q. Okay. And when it says here in the Verizon call flow documents that this is sent -- once it's -- it successfully identifies it has changed access network, the "it" refers to the phone; is that correct?
09:30:39 A. Yes.
09:30:40 Q. Okay. So SIP Re-Registration is sent after the call has been switched by the other command that we looked at, correct?
09:30:52 A. Yes.
09:30:52 Q. Okay. Is there anything in the SIP Re-Registration message description here that indicates which IP address it is using -- it is sending?
09:31:05 A. Yes, it's using the same exact IP address that was assigned on LTE.
09:31:10 Q. And is that this language here, the IP -- assigned IP address is unchanged?
09:31:15 A. Yes.
09:31:16 Q. Okay. So there's no doubt that Verizon's phone doesn't switch IP addresses, correct?
09:31:22 A. That's correct.
09:31:22 Q. Okay. Now, if a -- if a Verizon phone had a bug in it

09:31:35 and -- and tried to use a different IP address between the
09:31:40 cellular and Wi-Fi network, would it work?
09:31:43 A. No, the call would drop immediately.
09:31:46 Q. Okay.
09:31:48 MR. ANDERSON: Now, if we could pull back up Slide
09:31:51 3?
09:31:53 Q. (By Mr. Anderson) There's this concept -- well,
09:31:55 there's a concept called IP continuity. Are you familiar
09:31:59 with it?
09:32:00 A. Yes.
09:32:00 Q. And does Verizon implement IP continuity?
09:32:04 A. Yes.
09:32:05 Q. Okay. And when -- when you see this -- this little
09:32:09 bubble here that says P-GW is the anchor point between
09:32:14 Wi-Fi and LTE networks, what -- what does that mean?
09:32:17 A. The anchor point is he -- this packet gateway, he
09:32:23 controls your IP address. He's controlling your IP address
09:32:26 if you're on LTE and Wi-Fi.
09:32:30 Q. Okay. Now, just to clear something up, we saw the SIP
09:32:35 Re-Registration message go through the packet gateway.
09:32:38 Does the packet gateway process it in any fashion
09:32:40 whatsoever?
09:32:40 A. No.
09:32:41 Q. Okay.
09:32:46 MR. ANDERSON: And Mr. Duval, if you could pull up

09:32:52 the transcript from yesterday, maybe the day before,
09:32:55 Page 438, Lines 12 through 20.
09:32:59 Q. (By Mr. Anderson) Now, this is Dr. Rubin, and he's
09:33:06 saying that the Re-Register message is telling the network
09:33:10 to go ahead and switch from one access to another access.
09:33:16 Do you see that?
09:33:17 A. Yes.
09:33:18 Q. Is that --
09:33:19 MR. FINDLAY: Your Honor, objection.
09:33:21 Q. (By Mr. Anderson) -- accurate description --
09:33:23 THE COURT: Get your question out.
09:33:25 Q. (By Mr. Anderson) Is that an accurate description of
09:33:27 the way that the Verizon network operates?
09:33:31 A. No.
09:33:31 MR. FINDLAY: May we approach?
09:33:33 THE COURT: You may.
09:33:34 (Bench conference.)
09:33:42 MR. FINDLAY: I think he's walking into MIL No. 2,
09:33:46 no testimony from a fact witness that characterizes or
09:33:49 critiques expert opinions. Agreed MIL -- no testimony from
09:33:57 fact witnesses that characterizes or critiques expert
09:34:00 opinions, however, parties may ask the witnesses about the
09:34:04 facts underlying the expert's opinions. I guess if that's
09:34:07 what --
09:34:07 THE COURT: I'm sorry, you're going to have to get

09:34:09 a little closer. It sounds like to me maybe that's okay.
09:34:14 MR. ANDERSON: I'm asking him about the specific
09:34:17 fact of how the Verizon network operates.
09:34:20 MR. FINDLAY: I don't think he's allowed to say --
09:34:25 what this was trying to avoid is just this. Their
09:34:28 expert --
09:34:28 THE COURT: So I would say --
09:34:29 MR. FINDLAY: Their Verizon guy saying what he
09:34:33 said is wrong.
09:34:33 THE COURT: As long as the question goes to the
09:34:35 facts and not what -- what Dr. Rubin said or whether he
09:34:39 agrees or disagrees with Dr. Rubin.
09:34:41 MR. ANDERSON: Sure.
09:34:41 THE COURT: Just go to the facts.
09:34:43 MR. ANDERSON: I'm not. I'm going to ask him
09:34:47 factually is this accurate.
09:34:49 MR. FINDLAY: That's - you're eliciting criticism
09:34:51 of him. If you just want to elicit Dr. Rubin said this, I
09:34:56 don't have an objection with that. The testimony is what
09:34:58 it is. But if you ask him any suggestion of an opinion
09:35:01 about that that's a violation --
09:35:03 THE COURT: It's not. It says what it says,
09:35:05 Mr. Findlay. Parties may ask fact witnesses about the
09:35:08 facts underlying expert opinions.
09:35:09 MR. FINDLAY: Yes.

09:35:11 THE COURT: So if you will withdraw your question and rephrase it so that you're not criticizing what Dr. Rubin said or didn't say, but the facts underlying --

09:35:21 MR. ANDERSON: What I'm going to say, just so I don't cause another -- I'm going to say factually is this accurate? Does Verizon's network operate like this?

09:35:30 THE COURT: Well, I want you to withdraw the question first.

09:35:33 MR. ANDERSON: I'll withdraw the question. And say factually, does Verizon's network operate like this.

09:35:38 THE COURT: I think that does it, Mr. Findlay.

09:35:40 MR. FINDLAY: You think that's -- okay.

09:35:42 THE COURT: I mean, I don't know what the parties intended by that, but at least reading off your chart --

09:35:47 MR. FINDLAY: But just for the record, Your Honor, I would think that's critiquing his opinion, that's critiquing Mr. Rubin.

09:35:55 THE COURT: Well, as long as -- I mean, I'll go back and look at the MIL itself and what the order said if you want me to do that. But at least based on what your chart says, the MIL order said the parties may ask fact witnesses about the facts that underlie an expert opinion. And you're talking about Dr. Rubin's expert opinion, and this question goes to what the facts are. And this is a fact witness.

09:36:22 MR. ANDERSON: Okay.
09:36:24 (Bench conference concluded.)
09:36:32 MR. ANDERSON: Okay. Can we put that back up on
09:36:34 the screen?
09:36:38 Q. (By Mr. Anderson) I'll withdraw that question, that
09:36:40 particular question and ask you a clearer one.
09:36:46 Factually is this an accurate description of
09:36:48 Verizon's network?
09:36:50 A. No, it is not.
09:36:51 Q. Okay. And by the time, as we saw before, that the
09:36:59 Re-Register message is sent by the phone, has the network
09:37:04 already switched?
09:37:05 A. Yes.
09:37:06 Q. Okay.
09:37:08 MR. ANDERSON: We can take this down.
09:37:09 Q. (By Mr. Anderson) Now, earlier in the day, we were
09:37:20 talking about the type of call tracing -- call traces that
09:37:27 you've done thousands of times; is that correct?
09:37:29 A. Yes.
09:37:30 Q. Okay.
09:37:32 MR. ANDERSON: And if we could pull back up
09:37:33 Slide 3 we've been looking at.
09:37:37 Q. (By Mr. Anderson) Okay. So in Verizon's network, what
09:37:43 do you do -- can you explain the process of capturing these
09:37:47 call traces?

09:37:48 A. Sure. So in our network, we have what we call taps in
09:37:54 many places, but for simplicity, we have a tap here. So we
09:37:59 can see what's going across the wire here, here, here, many
09:38:07 more, but just for simplicity. And they all go back into a
09:38:17 tool we call Iris.
09:38:21 And what Iris does is it correlates all these
09:38:24 different interfaces, all these messages, all these
09:38:27 protocols together. And what we can do is we can make a
09:38:35 test, enter a phone number, so my phone number, and enter a
09:38:39 time, and it will generate all the messages that occurred
09:38:41 on all these network links in one correlation.
09:38:44 Q. Okay. And did you yourself personally perform any call
09:38:51 traces to assist the jury in this case?
09:38:53 A. Yes, I did.
09:38:54 Q. Now, we've mentioned you have thousands or you do this
09:38:59 very frequently. Why did you not just use any of the other
09:39:03 call traces that you already had?
09:39:05 A. Because Verizon respects its customers' privacy, and it
09:39:14 was best that I chose a scenario for this case.
09:39:16 Q. Okay. And so you're not really allowed to use your
09:39:21 customers' data to show this, correct?
09:39:23 A. Absolutely not.
09:39:25 Q. Okay. And also when you're doing these call traces, do
09:39:30 you -- do you have to set up a specific test to be able to
09:39:34 find the information you're -- you're seeking to look at?

09:39:39 A. Yes.
09:39:40 Q. Okay. And is that what you did for your call traces?
09:39:43 A. Yes.
09:39:45 Q. Okay. So which model of phones did you use for your
09:39:54 call traces?
09:39:54 A. I used an iPhone 16 and a Samsung S24.
09:39:58 Q. And how did you get those?
09:39:59 A. I have them as part of my test devices for my job.
09:40:03 Q. Okay. So you're using those on a regular basis as part
09:40:06 of your job?
09:40:06 A. Yes.
09:40:08 Q. Okay. Now, at a high level, starting with the iPhone,
09:40:18 can you describe how you set up your test case and what you
09:40:23 did?
09:40:23 A. Sure. I'm fortunate in my house to have poor cellular
09:40:31 coverage. However, I know that I do have cellular coverage
09:40:35 on my first and second floor. However, my basement, I have
09:40:38 no cellular coverage. So it's easy for me to start a call
09:40:45 when I'm on cellular, let it sit there for a few minutes,
09:40:49 walk downstairs, let it sit there for a few minutes.
09:40:54 Definitely will switch when I'm going downstairs. And I
09:40:57 did that for both the iPhone and the Samsung.
09:41:02 The second case I did was moving from Wi-Fi to
09:41:05 cellular. In the basement, I start my call on Wi-Fi, move
09:41:11 upstairs, the call switches, and now I'm on LTE. Let it

09:41:16 sit there for a few minutes, and I press end.
09:41:19 Q. Okay. And is this sort of call tracing testing just to
09:41:25 confirm and the analysis of it, that's something you do
09:41:27 routinely for the last 10 years?
09:41:29 A. Yes.
09:41:31 Q. Okay. Once you've done your test, and the network --
09:41:37 sorry, I took it away, the Iris thing has captured the
09:41:41 data, what do you do to analyze the data?
09:41:47 A. So as I mentioned earlier, you put in the phone number
09:41:50 and the time. It correlates it, and I download it into a
09:41:54 piece of software called Wireshark that we've talked about
09:41:57 previously.
09:41:59 Q. Okay. And does -- is Wireshark you used -- something
09:42:06 routinely over the last 10 years?
09:42:08 A. Absolutely.
09:42:10 MR. ANDERSON: Okay. If we could pull up Slide
09:42:13 18.
09:42:14 Q. (By Mr. Anderson) Okay. It's pretty dense.
09:42:25 MR. ANDERSON: What I'd like you to do, Mr. Duval,
09:42:27 if you could just maybe blow up these portions of the
09:42:30 screen a little bit.
09:42:32 Q. (By Mr. Anderson) All right. Mr. Faber, can you
09:42:35 explain what we're seeing here?
09:42:36 A. Yes. Blown up -- can you clear that?
09:42:44 Okay. So we talked about the INVITE. In this

09:42:50 case, this phone number -- when we make our test calls, we
09:42:55 have to call something that's always talking, because if
09:42:59 you're just calling our phone, you can't hear anything.
09:43:02 You don't know if it's garbled. So this number is a number
09:43:04 I use. It's called BBC Radio. If you're familiar with the
09:43:08 BBC from the U.K., they have a phone number you can call
09:43:10 and it just listens. That's all I'm caring about. I just
09:43:11 want to hear talking nonstop. So that's what that phone
09:43:16 number is.
09:43:17 So it begins to play. So I have the INVITE, and
09:43:20 this is the 200 OK. That's a bad color. So the INVITE
09:43:29 goes out right here, and we see the 200 OK return. And we
09:43:40 have these UPDATE messages that come through every so
09:43:43 often. Those are to check to make sure the phone is still
09:43:46 there. And then we have this REGISTER right here. And as
09:43:53 I mentioned, we have many, many taps that's correlating.
09:43:57 Messages do get reported twice. That's why you see
09:44:00 duplicates of the same message. And we talked about Wi-Fi.
09:44:05 That's what this access-type is. We talked about Wi-Fi is
09:44:09 IEEE 802.11 standard.
09:44:14 Now, we've already switched in between this UPDATE
09:44:17 and this REGISTER. And you can see this access-type
09:44:21 changes. This now says 3GPP-E-UTRAN-FDD. That is very
09:44:31 technical gobbledygook. But what that's saying is that is
09:44:37 the technical name for LTE.

09:44:39 So we have 200 OK for the REGISTER, and then down here at the BYE is when the call is ended on LTE.
09:44:48 Q. Okay. And did you -- did you prepare a -- well, let me just ask you. The fact that it's -- this indicates Wi-Fi, as you said, and this indicates cellular, which direction was this?
09:45:06 A. This was Wi-Fi to LTE.
09:45:08 Q. Okay. And did you yourself personally create any simplified version excerpt of this information in this call trace to show the jury?
09:45:28 A. Yes.
09:45:30 Q. Okay.
09:45:30 MR. ANDERSON: Can we turn to Slide 12?
09:45:32 Q. (By Mr. Anderson) Okay. And is this the simplified version that you presented?
09:45:43 A. Yes.
09:45:43 Q. And what are the -- what are the two columns?
09:45:46 A. Sure. We've been talking about SIP sequence numbers in this case. This is what those numbers are, right? We see 1, 2, 3, 5, 6, 4, 5, 2. And these are the SIP messages that we just saw on the previous screen. So we have INVITE, UPDATE, REGISTER, UPDATE more, and BYE.
09:46:12 Q. Okay. And did you -- did you create -- or did you capture call traces of your other tests for the iPhone, the one that went from LTE to Wi-Fi?

09:46:25 A. Yes.
09:46:27 Q. Okay.
09:46:27 MR. ANDERSON: And can we turn to Slide 20?
09:46:31 Q. (By Mr. Anderson) And we won't -- we won't go through this again, but is -- is that -- is that your capture of the iPhone 16 from cellular to Wi-Fi?
09:46:40 A. Yes.
09:46:41 Q. Okay. And did you create a simplified version of this chart?
09:46:46 A. Yes.
09:46:47 Q. Okay.
09:46:48 MR. ANDERSON: And can we go to Slide 17?
09:47:01 Q. (By Mr. Anderson) And is this your simplified version?
09:47:05 A. Yes.
09:47:05 Q. Okay. And I see down here this -- this indication. What do you -- what are you conveying with that?
09:47:13 A. So we have the SIP sequence numbers here, you know, 1, 2, 3, then we change 55, 56, then we go back to 4 and 2.
09:47:23 Q. Okay. And is this REGISTER message, as we talked about, is that the point at which the network has already changed?
09:47:30 A. The phone has already switched before that REGISTER message.
09:47:33 Q. Okay. Now, did you present -- did you prepare a similar presentation for the Samsung phone when it switches

09:47:45 from LTE to Wi-Fi?
09:47:46 A. Yes.
09:47:48 Q. Okay.
09:47:48 MR. ANDERSON: Can we go to Slide 19?
09:47:50 Q. (By Mr. Anderson) And, again, I'm not going to ask you to blow this out, but is that the information that you captured when it goes from LTE to Wi-Fi?
09:48:01 A. Yes.
09:48:01 Q. Okay. And did you prepare a simplified version of this, as well?
09:48:07 A. Yes.
09:48:07 Q. Okay.
09:48:21 MR. ANDERSON: Can we go to Slide 13?
09:48:23 Q. (By Mr. Anderson) And is this the simplified version for the jury of the -- the SIP messages that were getting sent for this call?
09:48:30 A. Yes.
09:48:32 Q. Okay. And, finally, the last test case, did you -- did you capture a call trace for the handover for the Samsung phone from Wi-Fi to LTE?
09:48:45 A. Yes.
09:48:47 Q. Okay.
09:48:49 MR. ANDERSON: And can we go to Slide 22?
09:48:51 Q. (By Mr. Anderson) And is this the -- the capture for the Samsung phone from Wi-Fi to LTE -- LTE?

09:49:00 A. Yes.
09:49:00 Q. And did you prepare a simplified version excerpt of this for the jury of this particular call trace?
09:49:12 A. Yes.
09:49:13 MR. ANDERSON: Can we go to Slide 15?
09:49:15 Q. (By Mr. Anderson) Okay. And is this the simplified version of the Samsung phone -- of the SIP messages being sent for a call on the Samsung device that switches from Wi-Fi to LTE?
09:49:31 A. Yes.
09:49:32 Q. Okay. Now, one of the things I just wanted to ask you about is when it does this switch, and when you do it -- when you use it daily, what -- is the switch noticeable to you?
09:49:52 A. Yes.
09:49:53 Q. And describe that a little bit.
09:49:56 A. When you're switching, the packet gateway for maybe -- it can be up to several seconds sometimes. There's a point in time where data has to -- let's call it be in sync with your -- between LTE, Wi-Fi, and the packet gateway. Those packets are going the wrong way for a couple milliseconds, possibly a second. So there is sometimes an audio gap you will hear. Or it may not be a gap but the audio may be distorted because packets are out of order, packets are delayed. So when the -- you hear it in your earpiece,

09:50:41 those packets can't be put back properly.
09:50:44 Q. Okay. And just to be clear, in Verizon's network, does
09:50:52 one phone ever send a SIP RE-INVITE to effectuate the
09:51:01 change in networks?
09:51:02 A. Never.
09:51:03 Q. Okay. I'd like to go -- well, as part of these call
09:51:10 traces that you did, which we see the SIP messages, did
09:51:14 you -- did you also capture the RTP messages?
09:51:18 A. Yes.
09:51:19 Q. Okay.
09:51:21 MR. ANDERSON: And if we could go to Slide 26.
09:51:26 Q. (By Mr. Anderson) And is this a -- what is this?
09:51:29 A. These are the actual packets of my voice talking in a
09:51:36 very simplified format.
09:51:39 Q. Okay.
09:51:39 MR. ANDERSON: And, Mr. Duval, if you could blow
09:51:41 up No. 60 here and this top one here. Just those two. Are
09:51:49 you able to? Okay. Okay. Yeah, that's good.
09:51:52 Q. (By Mr. Anderson) Now, at the top, I see numbers 58 to
09:51:59 62. Was that before or after the switch?
09:52:01 A. This was before.
09:52:02 Q. Okay. And then I see down here numbers in the 47,000s.
09:52:09 Was that before or after the switch?
09:52:10 A. That was after.
09:52:16 Q. Okay. And then I see this destination right here.

09:52:20 MR. ANDERSON: And Mr. Duval, can you strike it down -- or move it over so we can see that. Yep, okay. Let me clear that.
09:52:29 Q. (By Mr. Anderson) This destination, what is that?
09:52:31 A. This is the IP address of the phone in your pocket.
09:52:36 Q. Okay. And I see up here before the switch, what is this?
09:52:38 A. That is the phone number that -- sorry, the IP address of the device before the switch.
09:52:46 Q. Okay. And are those the same IP address?
09:52:49 A. Yes.
09:52:51 Q. Okay.
09:52:56 MR. ANDERSON: So what I'd like to do, if we could go back to Slide 4.
09:53:00 Q. (By Mr. Anderson) Now, Slide 4 here, I see the same IP address, you know, on the cellular network and the same IP address on the Wi-Fi network. That is the same address this phone has been using. And we've seen this -- we've all seen this diagram before.
09:53:19 Is this an accurate depiction of the consistency or the reuse of the same IP address for the Wi-Fi and cellular?
09:53:31 A. Yes.
09:53:32 Q. Okay. Okay. Just leave this up here.
09:53:44 Now, you were here during various testimony about

09:53:49 something called Network Address Translation or NAT, do you
09:53:53 see that?
09:53:54 A. Yes.
09:53:54 Q. Okay. Do you -- do you understand as part of your
09:53:58 daily work and your education what -- what NAT is?
09:54:01 A. Yes.
09:54:03 Q. Okay. So if you could draw --
09:54:08 MR. ANDERSON: Let's go back to Slide 3.
09:54:12 Q. (By Mr. Anderson) Okay. So can you draw a circle
09:54:20 around everything here that is part of Verizon -- Verizon's
09:54:25 processing?
09:54:35 Okay. And just to be clear, the phone is attached
09:54:37 to Verizon's network, correct?
09:54:40 A. Yes.
09:54:40 Q. Okay. And when a phone attaches to Verizon's network,
09:54:44 how many base stations can it communicate with?
09:54:47 A. One.
09:54:48 Q. And only one?
09:54:49 A. Only one.
09:54:49 Q. Okay. Can you expand your circle out to include the --
09:54:55 the Wi-Fi -- or the phone?
09:55:00 Okay. Now, in all of this that we see here, the
09:55:03 blue, that is the Verizon network, does Verizon do any form
09:55:09 of Network Address Translation on voice calls?
09:55:13 A. Verizon does not perform any NAT on voice calls.

09:55:17 Q. Okay. And why -- why is that?
09:55:18 A. IPv4 is an older technology. It's not reliable. And NAT can be problematic for voice calls.
09:55:29 Q. Okay. And I looked down here and I see -- let me just have you circle the Wi-Fi access point.
09:55:45 Now, is -- where would this be? Is that Verizon?
09:55:49 A. No, this would be in one's, customer's home -- your home Wi-Fi.
09:55:55 Q. And can some Wi-Fi access point perform NAT?
09:56:00 A. Some can, yes.
09:56:01 Q. Okay. Now, we talked earlier about the tunnel between the device and the ePDG. Can you draw that tunnel back in there?
09:56:15 Oh, I'm sorry. Can you redraw it? Okay.
09:56:24 And so the access point can't see anything in that tunnel, correct?
09:56:28 A. It cannot see anything in that tunnel.
09:56:30 Q. Okay. And so even if the access point is performing a NAT, it is not performing a NAT on the RTP messages, correct?
09:56:41 A. That's correct.
09:56:41 Q. And it's not performing a NAT on the SIP messages, correct?
09:56:45 A. That's correct.
09:56:45 Q. Okay. Now, we just touched on it briefly. You have

09:57:00 your phone, and it's talking to a base station. In Verizon's LTE network, how many base stations can a phone talk to?
09:57:09 A. Just one.
09:57:11 Q. Okay. And before it tries to talk to a different base station, what happens?
09:57:17 A. It has to scan for it.
09:57:18 Q. It scans. And then before it tries to set that up -- is there ever a time where the phone is communicating or could communicate with two base stations?
09:57:32 A. No.
09:57:37 Q. Okay.
09:57:43 MR. ANDERSON: And let's just look at something. Can you pull up VDTX-218? Okay. And if we'd go to Page 130. And I'd like to -- let's blow this message up here. Can you blow that up?
09:58:11 Q. (By Mr. Anderson) Okay. Mr. Faber, is this the message that initiates the handover from Wi-Fi to cellular?
09:58:20 A. Yes.
09:58:20 Q. And can you explain to the jury -- there's this thing called S1-U eNB F-TEID. Can you explain what that is?
09:58:31 A. Sure. So S -- excuse me. S1-U is a technical name for the LTE interface, so LTE. ENodeB, we've talked about. That's the base station. F-TEID stands for tunnel endpoint ID. Every eNodeB has an IP address and a tunnel endpoint

09:58:58 ID.

09:58:59 This, in translation, is literally saying you send
09:59:03 data to this eNodeB only and only this eNodeB.

09:59:06 Q. Okay. And so there's only one option to switch to; is
09:59:10 that correct?

09:59:10 A. That's correct.

09:59:11 Q. Okay. Now, you've sat here and seen testing performed
09:59:24 by other people; is that correct?

09:59:26 A. Yes, sir.

09:59:26 Q. And you saw SIP RE-INVITE messages in those testing,
09:59:31 correct?

09:59:31 A. Yes.

09:59:32 Q. Does Verizon's phone, as part of Wi-Fi Calling, send
09:59:40 SIP RE-INVITE messages?

09:59:42 A. It does not.

09:59:42 Q. Okay. And I'm not going to bring it up here, but
09:59:45 yesterday, we were asked about whether -- you were asked --
09:59:50 someone was asked about whether a particular type of
09:59:54 Call-ID could be used in -- in Verizon's network. Do you
09:59:59 remember that?

09:59:59 A. Yes.

10:00:00 Q. And that particular Call-ID that was shown on the
10:00:04 screen there, was that one that could ever be used in
10:00:09 Verizon's network?

10:00:10 A. No.

10:00:10 Q. Okay. Now, we've heard a bit about the term "cellular preferred," and you mentioned it earlier today. Can you -- can you explain to the jury again what that means?
10:00:23 A. Sure. So cellular preferred is what Verizon uses. The idea is with cellular preferred, we want to control the customer experience as much as possible. Verizon has staked its claim. Verizon has the best network. We want to keep that call on cellular. But we understand that with Wi-Fi, it provides coverage in places where we can't reach.
10:00:50 As much as possible -- until you reach certain thresholds that were shown earlier, your call will stay on cellular as much as possible. And what I mean by that is if my Wi-Fi point is right here, I have a very strong Wi-Fi signal. However, if the tower is outside and has a good signal, your phone call is still going to go across the cellular network.
10:01:18 Q. Okay. And we've seen -- you know, late yesterday, we saw a paper that was talking about Wi-Fi First or Wi-Fi preferred. Do you know what that is as part of your normal work at Verizon?
10:01:32 A. Yes. So we are not Wi-Fi preferred. So think about the opposite. So you make the call, the Wi-Fi access point is right here, that call will go across the Wi-Fi network first. Even if you have good cellular coverage, it's going to choose the Wi-Fi first.

10:01:50 Q. So that paper that we saw about Wi-Fi First, is that factually accurately describing Verizon's network?
10:01:59 A. No.
10:02:00 Q. Okay. Now, we've also seen some terminology from some various documents, and this came up yesterday, as well, too.
10:02:09 If -- and in the context of Wi-Fi Calling, based on your, you know, 11, 12 years of working on it, do you know what the phrase "public and enterprise in-building coverage" means?
10:02:28 A. Yes. So public is -- I believe the example is AT&T Stadium, which is ironic to be saying that. You're not moving in those buildings. You are standing there. You're not handing over. The idea is there's a lot of people, you can't get all the capacity you need, so we have Wi-Fi in those.
10:02:49 Enterprise is large public buildings, college campuses, places where there's not much mobility but there's a high amount of people.
10:03:02 Q. And are those the sort of places where there's any of the handovers that we've been talking about occurring?
10:03:04 A. Handovers is minimized.
10:03:06 Q. Okay. I think we also saw -- well, I'll just rephrase that.
10:03:15 Does -- does Verizon pay for its customers to have

10:03:20 Wi-Fi in their -- their home? They buy the routers.
10:03:25 A. No.
10:03:25 Q. Okay. Yesterday we saw some -- some data about
10:03:30 handovers. Do you recall that?
10:03:31 A. Yes.
10:03:32 Q. And -- and you were asked about those at your
10:03:34 deposition, right?
10:03:35 A. Yes.
10:03:39 Q. Okay. Did you pull that handover data?
10:03:42 A. Yes.
10:03:42 Q. Okay. And are those the type of metrics that you would
10:03:47 analyze in the course of your last 10 years?
10:03:50 A. Yes.
10:03:52 Q. Okay. And that -- that handover data, I don't remember
10:03:55 the exact months, but it went from sometime in 2024 to
10:04:00 sometime in 2025. Do you remember that?
10:04:02 A. Yes.
10:04:02 Q. Okay. Can you explain why there was only a year there?
10:04:08 A. Sure. The tool Iris I mentioned earlier, we only keep
10:04:12 that data for 12 months, and then it rolls off.
10:04:15 Q. Okay. And there were some questions and answers about
10:04:19 how that data would look if you -- if you looked
10:04:26 retrospectively. And you, of course, have been monitoring
10:04:28 these sort of metrics for 10 years, correct?
10:04:30 A. Yes.

10:04:30 Q. Okay. And what would that data look like if we looked at it retrospectively before 2024?
10:04:37 A. It would look very similar. However, during COVID, what we call a call model, what people were doing in their lives completely changed. You never left your house, right? So there was no handoffs. So we saw -- the usage that we saw in a different presentation yesterday, actually increased around 2021 -- 2020, sorry, and it's been decreasing ever since. But overall the amount of handovers outside of those two years, COVID, those two years prior has been consistent.
10:05:09 Q. Okay. Mr. Faber, when did Verizon first learn of Aspen's patent?
10:05:21 A. When we got sued.
10:05:22 Q. Okay. During the 11 years that you personally worked on the Wi-Fi Calling product, have you ever heard of Aspen or its patent we've seen?
10:05:31 A. No.
10:05:32 Q. Okay. Does Verizon respect patents?
10:05:33 A. Absolutely.
10:05:34 Q. And what is Verizon's position on whether it infringes this patent or not?
10:05:42 A. We do not infringe.
10:05:44 MR. ANDERSON: I'll pass the witness, Your Honor.
10:05:47 THE COURT: Cross-examination?

10:05:50 MR. FINDLAY: Yes, Your Honor. Thank you.
10:06:09 Pass out some binders, Your Honor?
10:06:13 THE COURT: Of course, yes, uh-huh.
10:06:35 MR. FINDLAY: May I proceed, Your Honor?
10:06:36 THE COURT: You may, yes.
10:06:37 MR. FINDLAY: Thank you.

10:06:38 CROSS-EXAMINATION

10:06:39 BY MR. FINDLAY:
10:06:39 Q. Good morning, Mr. Faber.
10:06:40 A. Good morning.
10:06:41 MR. FINDLAY: And good morning, ladies and
10:06:42 gentlemen of the jury.
10:06:43 Q. (By Mr. Findlay) You and I didn't meet before this
10:06:45 trial, but we've introduced ourselves, I think, on Friday
10:06:48 of last week, right?
10:06:50 A. That's correct.
10:06:50 Q. And then we bumped into each other a bunch of times in
10:06:55 the courtroom here, fair?
10:06:55 A. Yes.
10:06:56 Q. You understand the drill, you've been here all -- for
10:06:58 the whole trial. I represent Aspen. I'm going to ask you
10:07:01 a number of questions; is that fair?
10:07:05 A. That's fair.
10:07:05 Q. And you're here, are you not, as what we call the
10:07:09 corporate representative on behalf of Verizon, correct?

10:07:10 A. That's correct.
10:07:11 Q. Which kind of means your testimony is the corporation's testimony for these purposes; is that fair?
10:07:16 A. That's fair.
10:07:17 Q. Okay. I want to start with the last question you were asked and answered about infringement.
10:07:22 I understand that you know a lot obviously about Verizon's system, fair?
10:07:28 A. That's very fair.
10:07:30 Q. You would agree, though, that you were not here as an expert opinion -- as an expert witness to give an opinion on infringement, correct?
10:07:39 A. That's correct.
10:07:40 Q. And you haven't been hired, you haven't submitted a report to say anything one way or the other about whether or not there's infringement in this case, correct?
10:07:47 A. That's correct.
10:07:48 Q. And the same question with respect to validity. You're not offering any opinions to this jury about the validity or invalidity of the '554 patent, correct?
10:07:58 A. That's correct.
10:07:59 Q. Okay. And also obviously nothing on -- with respect to damages, right?
10:08:03 A. That's correct.
10:08:03 Q. I'd like to go back to this issue of handovers that you

10:08:12 were talking with your lawyer about towards the end of your
10:08:16 testimony that we talked a lot about yesterday, all right?
10:08:22 Can we start with this, you can track with respect
10:08:28 to Verizon how many customers are set up to do Wi-Fi
10:08:32 Calling; is that fair?
10:08:33 A. Yes.
10:08:36 Q. I think you testified during your deposition that you
10:08:38 have metrics, and there's a metric called Active
10:08:42 Subscribers that can tell you how many people could -- how
10:08:46 many Verizon customers could use Wi-Fi Calling on your
10:08:48 network; is that fair?
10:08:50 A. I do not agree with that.
10:08:51 Q. Okay. Would you agree with me -- and if not, we'll
10:08:57 pull up the document -- would you agree with me that as of
10:09:02 May 9, 2025, the number of users who could use Voice over
10:09:08 Wi-Fi was about 50.8 million?
10:09:10 A. Repeat that question.
10:09:12 Q. Sure. Would you agree with me that as of May 2025, the
10:09:17 number of users who could use Voice over Wi-Fi was about
10:09:21 50.8 million; is that true?
10:09:26 A. The number of users who could use Voice over Wi-Fi was
10:09:29 50 million, correct.
10:09:32 Q. Correct. And that's 50 million of your customers or
10:09:34 your subscribers, fair?
10:09:35 A. Fair.

10:09:38 Q. Okay. And I think the last time I looked at your website, it said you had 146.8 million subscribers. Does that sound about right?
10:09:46 A. Yes.
10:09:47 Q. So roughly speaking, about a third of your customers can use Voice over Wi-Fi; is that fair?
10:09:54 A. I'd go higher than a third, but fair.
10:09:56 Q. Okay. But it's a lot of people, correct?
10:09:57 A. Yes.
10:09:58 Q. 50 million is more than the entire population of the state of Texas, correct? I'll represent to you it is.
10:10:04 A. Okay. Thank you.
10:10:06 Q. Okay. And we certainly know from yesterday, all the data that we looked at, that Verizon tracks volume over Wi-Fi, correct?
10:10:20 A. Can you describe volume?
10:10:21 Q. Sure. Isn't it true that Verizon tracks call volume -- call volume for Wi-Fi. That is tracked, correct?
10:10:29 A. Could you expand on what you mean by volume?
10:10:35 Q. Is call volume over Wi-Fi tracked by Verizon?
10:10:38 A. We do attempts, completions, and minutes of use.
10:10:44 Q. I can show you your deposition.
10:10:46 A. Okay.
10:10:46 Q. We asked you at your deposition: Is call volume for Wi-Fi tracked?

And you said: Yes.

Is that accurate?

A. That's accurate.

Q. Okay. And I think you indicated in your deposition, as well, that those trackings, you update those like every five minutes or so; is that right?

A. So the metrics update every five minutes, that's what we're talking.

Q. Now, going back a couple of days and getting back to this number of handover issues, you were in the courtroom when your lawyer cross-examined Mr. Chin, correct?

A. Yes.

Q. I want to show you some of that testimony and then ask you some questions about it.

MR. FINDLAY: Can we pull up, Ms. Hopkins, at trial transcript 6/15/26, 294:12 to 23?

Q. (By Mr. Findlay) And -- so these are questions that your lawyer was asking Mr. Chin when he was on the stand. And he asked, you know: What Aspen accuses is the situation where Verizon's Wi-Fi Calling switches to its cell network.

Do you see that?

A. Yes.

Q. Or vice versa, when someone is on the cell network and it switches back to Wi-Fi.

10:11:57 Do you see that?
10:11:58 A. Yes.
10:11:59 Q. And then your lawyer asked him: First of all, you
10:12:05 know -- and basically was trying to get Mr. Chin to
10:12:08 acknowledge that those switches, whether from cell to Wi-Fi
10:12:13 or Wi-Fi to cell, happen in a very, very limited
10:12:17 circumstance. Do you see that?
10:12:17 A. Yep.
10:12:21 Q. Okay. Do you agree that those switches, whether it's
10:12:23 cell to Wi-Fi or whether it's Wi-Fi back to cell happen in
10:12:30 just very, very limited circumstances? Do you agree with
10:12:35 that characterization?
10:12:36 A. I would have to understand what very, very limited
10:12:42 circumstances means.
10:12:43 Q. So you can't answer my question?
10:12:45 A. I can't agree with that.
10:12:50 Q. Okay. You can't agree with my -- you can't answer my
10:12:52 question or you agree or don't agree with the statement
10:12:55 your lawyer was suggesting to Mr. Chin?
10:12:57 A. I don't know what he was suggesting to Mr. Chin.
10:12:58 Q. Fair enough.
10:13:02 MR. FINDLAY: Can we go to JTX-6, please?
10:13:06 Q. (By Mr. Findlay) We looked at this document a bunch
10:13:07 yesterday. Do you remember this, sir?
10:13:10 A. Yes.

10:13:10 Q. And I think based upon your testimony, and I think you talked about this in your deposition, too, but your testimony with Mr. Anderson, you pulled a lot of this data. This came from you or you getting it from Verizon's system. Did I hear you correctly?
10:13:25 A. Absolutely.
10:13:28 Q. Okay.
10:13:28 MR. FINDLAY: And if we can focus on Column D, please, Ms. Hopkins.
10:13:34 Q. (By Mr. Findlay) And you remember during the examination -- during the cross-examination of our damages expert, Mr. Blok, you remember your lawyer talking extensively about these .84 percent of the calls were Wi-Fi to LTE, et cetera?
10:13:45 A. Yes.
10:13:45 Q. Remember you all that back and forth?
10:13:49 A. Uh-huh.
10:13:49 Q. And then when Mr. Herman got back up, he pointed out that if we go to Column G, you see the percentage of LTE to Wi-Fi handovers was higher, around 5 percent; is that fair?
10:14:01 A. Yes.
10:14:02 Q. Okay.
10:14:03 MR. FINDLAY: If we could take that down just for a second, please. And then if I could have the ELMO.
10:14:16 Q. (By Mr. Findlay) And then we also, do you remember,

looked at this document, correct?
A. It was up very briefly.
Q. Okay. Well, we'll put it up there.
And since it was up there briefly, I will -- I will test you and we can compare if you want. These are basically the same numbers that we see in JTX-6. Do you recognize that in terms of the numbers of calls and whatnot?
A. I'll trust you with that.
Q. It is -- I've looked at it. It's really about the same numbers.
A. Okay.
Q. And you'll notice that -- well, do you understand that this was an attachment or an exhibit to your damages expert's report. Do you understand that?
A. I do now.
Q. Okay. Mr. Ellis, who is in the courtroom and I think will testify tomorrow, he submitted his report in this case. Do you understand that?
A. Yes.
Q. And his report was basically what he thinks the damages number should be if -- if the patent is infringed. Do you understand that?
A. Yes.
Q. You paid him to do that, correct?

10:15:11 A. I did not pay him.
10:15:13 Q. Well, Verizon paid him.
10:15:14 A. Verizon did, I'm sorry.
10:15:15 Q. Right. But you're here on -- that's what I mean by
10:15:19 you're here on behalf of Verizon.
10:15:20 A. Yes.
10:15:21 Q. I hope they did not make you write a check. That would
10:15:24 not be fair.
10:15:25 But you understand that Verizon hired him, paid
10:15:28 him to come up with his opinion, right?
10:15:28 A. Yes.
10:15:28 Q. And these are one of the documents that he attached to
10:15:31 his report that he submitted, fair?
10:15:35 A. Yes, yeah.
10:15:35 Q. So -- and if we look down here, he tells us where he
10:15:41 got the information from. And it was from Verizon_Aspen,
10:15:46 that's the Bates number indication, and so that handover
10:15:50 data is information from Verizon, right?
10:15:52 A. Absolutely.
10:15:53 Q. And then he looked at your deposition transcript that
10:15:57 was taken on August 12th, '25, do you see that?
10:16:01 A. Uh-huh.
10:16:01 Q. And then you actually had an interview with Mr. Ellis.
10:16:04 So you've spoken with him personally?
10:16:06 A. Yes.

10:16:06 Q. Okay. And then he concluded a different percentage. He said estimated calls with network handover as percentage of total calls and his percentage was up to about 15 percent. Do you see that?
10:16:19 A. Yes.
10:16:20 Q. Okay. But up until now, Mr. Faber, I don't think we've talked about what those percentages mean in terms of how many times this is actually happening, have we?
10:16:32 A. Not to me.
10:16:35 Q. Okay. Is it all right with you if we do that?
10:16:37 A. Yeah.
10:16:38 Q. Okay. So if we clear that off, if we look in the first column here, this is calls that were starting on LTE and terminating on Wi-Fi. Did I read that correctly?
10:16:52 A. And that -- does that match Column A in the spreadsheet?
10:16:59 Q. I don't know. I'm just asking about this document right here. And what I'm saying is that column says calls starting on LTE and terminating on Wi-Fi, correct?
10:17:12 A. That's what the title says.
10:17:13 Q. Okay. And then it shows this time frame we've been talking about, July '24 to May '25, correct?
10:17:20 A. Yes.
10:17:20 Q. And you've testified that's the only -- apparently you said that's the only data you could provide, correct?

10:17:25 A. Yes.
10:17:26 Q. Okay. And it says in July of 2024, there were 134
10:17:32 million times that somebody had a handover situation on
10:17:36 your -- on your network going from LTE to Wi-Fi, correct?
10:17:40 A. Yes.
10:17:40 Q. And if we scroll all the way down and we add that up,
10:17:45 we see for that total 11-month period only, the numbers
10:17:49 were 1.28 billion times that that happened, correct?
10:17:53 A. Assuming this sum works properly, yes.
10:17:58 Q. I didn't do the math. But I think it's probably pretty
10:18:03 accurate. Mr. Ellis did and I'm sure your damages expert
10:18:06 knows how to add correctly.
10:18:07 So $1.29 billion, correct?
10:18:10 A. Not dollars.
10:18:11 Q. I mean 1.2 billion times that handover happened?
10:18:14 A. Yes.
10:18:14 Q. All right. And then if we do this one, calls starting
10:18:19 on Wi-Fi and terminating, we see the same sort of numbers,
10:18:25 comes up with 2.3 billion times that happened over an
10:18:31 11-month period, correct?
10:18:32 A. Yes.
10:18:33 Q. So if you do that simple math, we're talking about this
10:18:37 is happening -- when I say this, I want to be clear, calls
10:18:40 are getting handed over from either LTE to Wi-Fi or Wi-Fi
10:18:44 to LTE, that's happening 3 to 4 billion times in an

10:18:49 11-month period, fair?
10:18:53 A. Yeah.
10:18:53 Q. And this is the only data -- I'm not fussing at you because apparently you said it doesn't exist, but this is the only data that Verizon provided us with, this sort of information, correct?
10:19:04 A. Yes.
10:19:04 Q. We don't have anything going back earlier than July of '24, correct?
10:19:10 A. That's correct.
10:19:18 MR. FINDLAY: And so we can take -- or if I could have the system back, Ms. Hopkins, and if we can put back some trial testimony.
10:19:26 Q. (By Mr. Findlay) I want to ask you about another thing your lawyer said yesterday at the end of the questioning of Mr. Blok.
10:19:32 MR. FINDLAY: Trial transcript 616:26, please.
10:19:38 Q. (By Mr. Findlay) Towards the end of the examination of Mr. Blok yesterday, your lawyer was asking him, and we were talking about this -- the different percentages of these handovers, do you recall that?
10:19:49 A. Yes.
10:19:49 Q. And what he said: So Verizon's data, whether we're looking at going from Wi-Fi to cellular or cellular to Wi-Fi, the most it shows is that 5 percent of the time that

switch --

And it's that switch that is infringement, you understand that's our theory, right?

A. That's your theory.

Q. Okay. Only 5 percent of the time that's happening is what he was asking, do you see that question?

A. Yes.

Q. But the data that we just looked at, the raw numbers, what that tells us is that under infringement, if there is infringement, the '554 patent is being infringed 3 to 4 billion times a year by your own admission with these numbers of how many times these switch-overs are happening, isn't that fair?

A. I can't agree with that.

Q. Well, you can agree that the switch-over numbers that we just talked about are between 3 to 4 billion within an 11-month period, we agreed on that, right?

A. No.

Q. Do you -- are you now disagreeing with the numbers that were in your own chart?

A. No, I'm not disagreeing with the numbers in my own chart.

Q. Okay. So I just want to make sure the record is clear, I don't want to argue with you.

A. Okay.

10:20:59 Q. We know from the data that you provided for that
10:21:04 11-month period, there were 3 to 4 billion times that these
10:21:09 switch-overs happened, either cell to Wi-Fi or Wi-Fi to
10:21:12 cell, fair?
10:21:13 A. That's correct.
10:21:14 Q. And you understand that handover is what we accuse of
10:21:20 infringing the '554 patent, correct?
10:21:22 A. I can't agree with that.
10:21:24 Q. I'm just saying it's what we claim is infringement. I
10:21:27 know you don't think we infringe. I understand that. You
10:21:30 work for Verizon. I'm saying you understand that's our
10:21:32 theory of infringement. When that happens, we think the
10:21:35 '554 patent is being infringed, correct?
10:21:37 A. I can't agree with that.
10:21:39 Q. Okay. Fair enough.
10:21:41 Let me change gears.
10:21:53 Towards the end of your lawyer's questioning just
10:22:05 a little bit ago, he asked you had you ever heard of -- I
10:22:11 think he asked you have you ever heard of Aspen or the '554
10:22:15 patent or Mr. Chin, those sorts of questions, before this
10:22:18 lawsuit. Do you recall that question?
10:22:19 A. Yes.
10:22:20 Q. And I think you said, no, you hadn't, correct?
10:22:22 A. That's correct.
10:22:22 Q. And were you here for your lawyer's cross-examination

10:22:26 of Dr. Rubin a couple days ago?
10:22:28 A. Yes.
10:22:29 Q. And do you remember how he kind of asked Dr. Rubin some of the same questions? He said, well, Dr. Rubin, did you know about Mr. Chin before you got involved in this lawsuit or did you know about the '554 patent, those sorts of questions. Do you remember that?
10:22:46 A. Yes.
10:22:46 Q. Okay. And what -- what those questions were really intended for and what the question to you is really intended is just try to suggest that they didn't know about them. Somebody didn't know about Mr. Chin or his patent, and, therefore, it's really not important, right? That was the gist of what they're trying to get at by asking those questions; is that fair, sir?
10:23:10 A. I'm not understanding your question.
10:23:12 Q. Okay. Well, AT&T is your largest competitor; is that right?
10:23:21 A. I don't know how you would define that, but they are a competitor.
10:23:25 Q. It's you, AT&T, and T-Mo; is that fair? T-Mobile?
10:23:28 A. That's fair, yes.
10:23:29 Q. Okay. All right. Would it surprise you to know that back in 2013, AT&T knew about Mr. Chin and his '554 patent?
10:23:39 A. I don't know.

10:23:45 MR. FINDLAY: Can I have the ELMO back, please?
10:23:48 And, Your Honor, may I grab a highlighter from --
10:23:51 THE COURT: Yes, of course.
10:23:53 MR. FINDLAY: Thank you.
10:23:54 Q. (By Mr. Findlay) Can you see that, Mr. Faber?
10:24:03 A. Yes.
10:24:04 Q. Obviously, you can see this is a United States patent, correct?
10:24:08 A. Yes.
10:24:08 Q. And it's entitled: Method and System For Efficient -- for -- Method and System For Efficient Management of a Communication System.
10:24:21 Do you see that?
10:24:22 A. Yes.
10:24:22 Q. And its applicant is AT&T, and you've got some inventors from AT&T there. Do you see that?
10:24:30 A. Yes.
10:24:30 Q. And it was filed on November 20, 2013, which is about five years after the '554 patent was filed. Does that sound about right with your recollection?
10:24:45 A. Yes.
10:24:45 Q. And then it was granted October 3rd, 2017. You see that?
10:24:50 A. Yes.
10:24:50 Q. And you yourself said I think you have two patents?

10:24:54 A. Yes.
10:24:54 Q. Did you participate at all in that -- what the jury's heard is called that patent prosecution process?
10:24:59 A. No.
10:25:00 Q. Okay. But you understand that part of that process -- I assume lawyers at Verizon did that?
10:25:05 A. Yes.
10:25:05 Q. I assume you understand a part of that process, what your lawyers at Verizon would have done was to submit to the PTO, the Patent and Trademark Office, any other important inventions that were related to the field and that sort of thing, correct?
10:25:20 A. Yes.
10:25:20 Q. And you understand they have an obligation to do that?
10:25:26 A. Yes.
10:25:26 Q. But if you look here, we see these References Cited. And if you look at one of the references, I'll represent to you the AT&T folks gave to the Patent and Trademark Office, was Mr. Chin's '554 patent, wasn't it?
10:25:42 A. That is what that says, yes.
10:25:44 Q. Okay. So one of your competitors certainly did, back in 2013, over 10 years ago, knew of Mr. Chin and his '554 patent, correct?
10:25:57 A. According to what you just showed me, yes.
10:25:59 Q. Okay. Can I talk to you a little bit about your

10:26:03 history with Verizon?
10:26:04 A. Absolutely.
10:26:05 Q. You said you'd been there for 26 years --
10:26:07 A. Yes.
10:26:09 Q. -- correct? And some of these similar questions were asked of our folks. You're being paid to be here today,
10:26:13 correct?
10:26:17 A. It's part of my compensation.
10:26:18 Q. You're paid a salary, I presume?
10:26:21 A. Yes.
10:26:21 Q. I don't want to know how much it is, but I would assume after 26 years, it's -- it should be pretty respectable,
10:26:28 fair?
10:26:28 A. I hope so.
10:26:29 Q. Similarly, you heard my folks were asked these questions. I assume you own stock in -- stock in Verizon?
10:26:36 A. Stock grants.
10:26:37 Q. Stock grants. Okay. Because Verizon is publicly traded?
10:26:40 A. Yes.
10:26:41 Q. Okay. And I would hope, again, after 26 years, there's a decent little nest egg there; is that fair?
10:26:48 A. 401(k).
10:26:50 Q. Okay. But it's fair to say you had some financial interest in Verizon --

10:26:54 A. Yes.
10:26:54 Q. -- correct? And you've spent -- you don't look like you're -- it looks like you've spent more than half of your life at Verizon; is that fair?
10:27:05 A. That is absolutely true.
10:27:08 Q. Okay. All right. And we know -- a couple other questions on Wi-Fi Calling. We know when Verizon launched this back at the end of 2015, I think you told us that one of the main reasons -- one of the whys that you were talking to your lawyer about was keeping up with the competition, correct?
10:27:24 A. Yes.
10:27:24 Q. Okay. On that call trace that you did, you were connecting to Verizon's network on an IPv6; is that correct?
10:27:40 A. From my phone?
10:27:41 Q. Yes.
10:27:42 A. Yes.
10:27:42 Q. Isn't it true that most of the time, like my home router most likely and most folks' routers still have a private IPv4 address?
10:27:57 A. I can't agree with that.
10:27:58 Q. Would you agree that IPv4 -- IPv4 is still much more prevalent that 6 is?
10:28:04 A. No.

10:28:04 Q. Okay. I think you talked about how -- or you claimed that the phone can only talk to one base station at a time. Was that your testimony?
10:28:13 A. Yes.
10:28:13 Q. Would you agree, however, that the phone scans for multiple base stations?
10:28:19 A. Yes.
10:28:20 Q. Okay. And would you also agree, with respect to IPv4 addresses, that the Internet standards give out private addresses at that 192.168 address, correct?
10:28:41 A. I cannot agree with that.
10:28:45 Q. Okay.
10:28:48 MR. FINDLAY: May I have the ELMO again briefly?
10:28:59 Q. (By Mr. Findlay) Can you tell the jury what we're looking at, Mr. Faber?
10:29:03 A. Address Allocation For Private Internets.
10:29:05 Q. Okay. And can you explain to them what -- this is an Internet standard from RCF Editor. Can you explain to the jury what that is?
10:29:13 A. Yep. So these are private Internets, and the question was is it 192.168. But what you didn't ask --
10:29:21 Q. I just wanted you to identify what this was.
10:29:24 A. Yep.
10:29:25 Q. Okay. And if we go to the second page, the top says Best Current Practice, you see that?

10:29:37 A. Yep.
10:29:37 Q. And it says private address space?
10:29:40 A. Yes.
10:29:40 Q. The Internet Assigned Numbers Authority has reserved the following three blocks of IP address space for private Internets. You see that?
10:29:50 A. Yes.
10:29:50 Q. And this is what I was referring to, and said provides 192.168. You see that?
10:29:55 A. Yes.
10:29:56 Q. Okay. You disagree with --
10:29:59 A. I don't disagree.
10:30:00 Q. Okay. Thank you.
10:30:09 You said I think to one of your lawyer's questions that Verizon respects intellectual property. Do you recall that?
10:30:16 A. Yes.
10:30:18 Q. Okay. Would you agree with me that saying you respect intellectual property means you have to respect other people's intellectual property, as well?
10:30:25 A. Yes.
10:30:25 Q. And, obviously, you would agree with me that a small company's intellectual property or a small company's patents are just as valuable as a large company's patents in IP, correct?

10:30:36 A. Absolutely.
10:30:36 Q. What sort of -- let me ask you this. What sort of written policy does Verizon have with respect to respecting other people's intellectual property?
10:30:51 A. I don't know.
10:30:51 Q. Does -- let me ask it this way, then. Does Verizon have any sort of written policy to respect other people's intellectual property?
10:31:02 A. I don't know.
10:31:02 Q. You've been there 26 years, correct?
10:31:05 A. Yes.
10:31:06 Q. You're the corporate representative here, correct?
10:31:08 A. Yes.
10:31:08 Q. You understand you're the only one from Verizon that we get to talk to during this trial?
10:31:13 A. Yes.
10:31:14 Q. You don't know the answer to whether or not Verizon has any sort of written official policy respecting intellectual property?
10:31:21 A. I do not know.
10:31:22 Q. Did you ask anybody that question before you came here? I don't want to -- I don't want to ask what you talked to your lawyers about, but was there anybody at Verizon you went to talk to to investigate that issue?
10:31:32 A. No.

10:31:33 Q. You talked about this AT&T Stadium we heard about again.
10:31:46 A. Sure.
10:31:46 Q. Place of many sorrows over the years for us Cowboy fans. But, nonetheless, you talked about how that is an area where it's public. Just meaning that once you're in there, once you've got 80,000 screaming fans in there, there isn't a lot of handover going on, correct?
10:32:03 A. Yes.
10:32:03 Q. But you'd agree with me when -- when you've got the 80,000 fans and we're in the parking lot on our cells and we're heading into the stadium, if we're hooked up for Wi-Fi Calling, there's a lot of handovers going on because we're leaving the cell area. And as we venture further into Jerry Jones's world, the cell coverage gets worse and worse and eventually Wi-Fi kicks up and we're on Wi-Fi, fair?
10:32:31 A. That's fair.
10:32:32 Q. And the same thing when we all leave -- hopefully we're happy, but when we all leave and go back to our cars, we're going to switch back to cell, most likely?
10:32:37 A. Yeah.
10:32:38 Q. Okay. We looked at some of the -- some of Verizon's technical documents during your deposition -- during your examination. Recall that?

10:32:54 A. Yes.
10:32:54 Q. And then during the course of the trial, the jury has seen a lot of documents about Wi-Fi Calling and when Verizon started to consider Wi-Fi Calling. Would you agree?
10:33:04 A. Yes.
10:33:05 Q. They've seen a lot of documents. Documents which talked about things like somebody at Verizon thought going with Wi-Fi Calling would reduce churn. You remember seeing those?
10:33:16 A. Yes.
10:33:17 Q. Somebody at Verizon thought that adopting Wi-Fi Calling would save money in terms of cost allocation and capital expenditures. Do you remember that?
10:33:26 A. Yes.
10:33:27 Q. Those documents -- I think you'll agree with me, those documents were all written by Verizon folks long before this lawsuit came up, right?
10:33:37 A. Yes.
10:33:37 Q. They were written before y'all were accused of infringement of the '554 patent, right?
10:33:43 A. Yes.
10:33:43 Q. They were written before anybody at Verizon had any sort of dog in this fight, so to speak, fair?
10:33:50 A. Yes.

10:33:50 Q. Okay.

10:33:52 MR. FINDLAY: Your Honor, that's all I have. I
10:33:54 pass the witness.

10:33:55 Mr. Faber, thank you. Nice to meet you.

10:33:58 THE WITNESS: Thank you.

10:33:58 THE COURT: Thank you, Mr. Findlay.

10:33:59 Mr. Anderson, how much do you have?

10:34:06 MR. ANDERSON: Mr. Faber, going to be another
10:34:08 happy day in court for you, we're done. I have no more
10:34:12 questions.

10:34:12 THE COURT: Very good. Thank you, Mr. Anderson.

10:34:12 You may step down.

10:34:14 Ladies and gentlemen of the jury, I think now is a
10:34:15 good time for our morning break. We'll be in recess about
10:34:19 15 minutes.

10:34:20 Don't discuss the case among yourselves. Don't
10:34:24 permit it to be discussed in your presence. Don't do any
10:34:26 independent research or investigation into any matter
10:34:31 regarding the case, and don't post anything about your
10:34:33 involvement as a juror in this case on any social media
10:34:37 website or app.

10:34:38 We'll see you in about 15 minutes.

10:34:43 COURT SECURITY OFFICER: All rise.

10:35:01 (Jury out.)

10:50:28 (Recess.)

THE COURT: If you'd have the jury brought to the courtroom.

COURT SECURITY OFFICER: All rise for the jury.

(Jury in.)

THE COURT: Please be seated.

Verizon may call its next witness.

MR. DACUS: Thank you, Your Honor.

Your Honor, Verizon calls Mr. Sajit Bhaskaran by video deposition. Mr. Bhaskaran is Aspen's founder, CEO, and an inventor of the '554 asserted patent. For the Court's records, the time allocation is 32 minutes, 33 seconds for Verizon, and 7 minutes, 9 seconds, for Aspen, Your Honor.

Thank you.

THE COURT: Thank you, Mr. Dacus.

SAJIT BHASKARAN, DEFENDANT'S WITNESS, SWORN

TESTIMONY BY VIDEOTAPE DEPOSITION

(Videoclip played.)

Q. Can you please state your full name for the record?
A. I am Sajit Bhaskaran.
Q. You're the CEO of Aspen, correct?
A. Correct.
Q. How long have you been the CEO of Aspen?
A. Off and on since the founding of the company.
Q. And when was the company founded?

10:53:40 A. Sometime in January of 2000.
10:53:42 Q. As the CEO of Aspen, you have a financial interest in
10:53:47 the outcome of this lawsuit, correct?
10:53:48 A. Yes.
10:53:49 Q. If Aspen receives a damages award in this case, then
10:53:57 any benefits to Aspen would also benefit you as Aspen's
10:54:01 CEO, correct?
10:54:04 A. Correct. As a founder, yes.
10:54:05 Q. Outside of any financial interest you would receive as
10:54:12 Aspen's CEO or as a shareholder of Aspen, do you have any
10:54:15 other financial interests in the outcome of this lawsuit?
10:54:18 A. No.
10:54:18 Q. You have Exhibit 4 opened?
10:54:24 A. Yes.
10:54:25 Q. Is it -- does this look like the PowerPoint that would
10:54:28 have been attached to your email that we just looked at in
10:54:31 Exhibit 3?
10:54:32 A. It's possible. Okay. I don't recall it specifically,
10:54:34 but that's what it looks like.
10:54:36 Q. Do you recognize this slide deck at all?
10:54:38 A. I don't remember this.
10:54:39 Q. But does this look like a slide deck that would have
10:54:43 been prepared by Aspen in the ordinary course of business?
10:54:47 A. It -- it -- it's possible, yes.
10:54:49 Q. What does it mean when you say you were focused on

10:54:52 applications?
10:54:52 A. We were focused -- so to answer that, like, routers
10:55:01 specifically were -- were focused on switching network
10:55:06 paths, you know, relatively unaware of the kind of
10:55:09 applications that were running. So we were focused on
10:55:15 building devices that were very aware of the applications.
10:55:22 Q. And when you say routers were focused on switching
10:55:26 networks and were relatively unaware of the kind of
10:55:30 applications that were running, you're referring to routers
10:55:33 before you formed Aspen, correct?
10:55:38 A. Correct.
10:55:38 Q. So those routers could already switch network paths,
10:55:42 right?
10:55:42 A. Correct.
10:55:44 Q. And this is when Jim Summers became the CEO, correct?
10:55:51 A. Sometime in that 2001 time frame, looks like it, yes.
10:55:56 Q. And at that time, Aspen was targeting multi-home
10:55:59 without BGP complexity, correct?
10:56:03 A. That's correct.
10:56:04 Q. What does that mean, multi-home without BGP complexity?
10:56:09 A. Very simply, multi-homing is the connection of multiple
10:56:17 Internet Service Providers to a -- a single network in
10:56:19 order to achieve fault tolerance.
10:56:22 Q. All the Defendants in this lawsuit would be more
10:56:26 accurately characterized as large enterprises, correct?

A. I would -- we would always classify them as large carriers. We would not really classify them as enterprises.
Q. What's your distinction between enterprises and carriers?
A. Well, carriers provide like a telecom, telecommunication service, and it's just a totally different complex environment. When we use the word enterprises and -- the kind of customers that we sold to were businesses. In some cases they were very small businesses, and in some cases they were fairly large. They -- they could have thousands of customers -- thousands of users, people who used the network.
Q. So you're saying that telecom companies are in a totally different complex environment than the enterprises that Aspen was targeting with its products?
A. That's fair to say. The -- the telecom service business was a very special different business. So we -- we targeted just ordinary companies that were doing different things, not providing telecom services.
Q. Let's go to the next slide titled 2006 and VoIP.
Do you see that?
A. Yes.
Q. At this point Aspen focused on the targeted hosted VoIP service market, correct?

10:58:09 A. Yes, that's correct.
10:58:10 Q. In January 2008, Aspen laid off Dan Berger, correct?
10:58:14 A. Correct.
10:58:14 Q. And we already discussed that was a performance-based decision, correct?
10:58:19 A. Primarily, yes.
10:58:20 Q. And the reason was because Aspen wasn't materializing the revenue that it expected, correct?
10:58:29 A. Primarily.
10:58:29 Q. Can you just go to the last page. It's titled 2011?
10:58:33 A. Yes. Slide 15?
10:58:37 Q. Yes. And so the No Call Drop patent with fundamental claims was awarded in 2011. Do you see that?
10:58:45 A. Yes.
10:58:45 Q. And that's referring to the '554 patent asserted in this case, correct?
10:58:48 A. Yes.
10:58:48 Q. And after that, it says: Continuation patent for cellular handoff claims filed.
10:58:56 Do you know what that refers to?
10:58:58 A. I know that we had an intention to file a continuation. That's what it's referring to.
10:59:09 Q. And you didn't file that continuation; is that correct?
10:59:13 A. If I recall sometime later we realized that there was some misunderstanding or it -- it was -- it was -- the

10:59:25 continuation that I had discussed was never filed.
10:59:28 Q. Is there any importance to the listing of inventors in
10:59:34 the '554 patent?
10:59:34 A. I -- I was sensitive to the ordering because, yeah,
10:59:41 Mr. -- Mr. Chin contributed the most to this, and I was
10:59:50 No. 2, and Robin Mavunkel was No. 3. That was a summation
10:59:56 I made.
10:59:56 Q. So SIP was a standard protocol at the time of the '554
11:00:00 patent, correct?
11:00:02 A. Correct.
11:00:02 Q. And RTP was also a standard protocol at the time of the
11:00:06 '554 patent, correct?
11:00:07 A. Correct.
11:00:07 Q. You didn't invent using SIP with Voice over IP, right?
11:00:15 A. Could you repeat the question?
11:00:16 Q. You did not invent using SIP with Voice over IP,
11:00:16 correct?
11:00:27 A. Correct.
11:00:27 Q. You did not invent using SIP with Voice over Wi-Fi,
11:00:27 correct?
11:00:32 A. Correct.
11:00:32 Q. You didn't invent using RTP with Voice over IP,
11:00:32 correct?
11:00:38 A. Correct.
11:00:39 Q. You did not invent using RTP with Voice over Wi-Fi,

11:00:39 correct?
11:00:44 A. Correct.
11:00:44 Q. So NAT was a technology that practitioners of ordinary skill in the art would have been familiar with prior to the '554 patent, correct?
11:00:53 A. That's correct.
11:00:53 Q. So prior art devices before the '554 patent could use SIP, RTP, and NAT, correct?
11:01:02 A. Correct.
11:01:02 Q. So can you look at the part of the table that's on Column 5?
11:01:22 ATTORNEY: Next page.
11:01:25 THE WITNESS: Next page.
11:01:27 A. Okay.
11:01:27 Q. So No. 150 here evaluates if there's an alternate path available. Do you see that?
11:01:34 A. Yes.
11:01:34 Q. And then No. 160 says that it selects the SIP server, sends a RE-INVITE and updates the sequence number. Do you see that?
11:01:43 A. Yes.
11:01:44 Q. Is No. 160 an example of a handover in the context of the '554 patent?
11:01:48 A. I think so.
11:01:49 Q. And in the detailed description of Step 160, the last

11:02:01 sentence says: The SIP signaling sequence number must be
11:02:05 maintained between the SIP device and the server.
11:02:08 Do you see that?
11:02:09 A. Let me -- let me read it.
11:02:16 Yes, I see that, yes.
11:02:18 Q. And I guess my point is the only embodiment that you're
11:02:21 pretty sure is in there is specific to maintaining the SIP
11:02:26 signaling sequence number, correct?
11:02:28 A. Correct.
11:02:28 Q. And looking at 160 here, this just says: Maintaining
11:02:36 the SIP signaling sequence number.
11:02:39 Correct?
11:02:39 A. 160 -- update sequence number, let's see. Six -- yes.
11:02:50 That's -- that's what it states here, yes.
11:02:51 Q. So the '554 patent isn't explaining how to maintain the
11:02:56 SIP signaling sequence number, it's just saying the SIP
11:02:58 signaling sequence number must be maintained, correct?
11:03:02 A. I'm reading it. It says: The SIP signaling sequence
11:03:05 number must be maintained between the SIP device and the
11:03:09 server. That's correct.
11:03:12 Q. So it doesn't say how to maintain it. It just says it
11:03:15 must be maintained, correct?
11:03:16 A. I mean, that's what I'm reading. It -- it -- it
11:03:20 doesn't say anything more. It says: The SIP signaling
11:03:24 sequence number must be maintained between the SIP device

11:03:26 and the server. Correct.
11:03:29 Q. Sir, can you please answer the question that's asked? 11:03:32 Can you do that?
11:03:33 A. I'm trying to.
11:03:34 Q. Okay. 160 here merely says: The SIP signaling 11:03:41 sequence number must be maintained.
11:03:44 So Step 210 in this flowchart on Column 5 of the 11:03:51 '554 patent is referring to a handover in the context of 11:03:53 the '554 patent, correct?
11:03:55 A. Yes. That's what it looks like. Yes.
11:03:57 Q. And the detailed description says: The state involving 11:04:02 the SIP signaling sequence number, often referred to as the 11:04:07 Cseq value, must be maintained throughout the dialog.
11:04:10 Do you see that?
11:04:11 A. Yes. Correct.
11:04:12 Q. So, again, that's just saying it must be maintained. 11:04:16 It's not explaining how to maintain that Cseq value in that 11:04:19 sentence, correct?
11:04:20 A. That's correct.
11:04:20 Q. And so then continuing on, the next sentence says: For 11:04:25 a new transaction, this number must monotonically increase. 11:04:31 For retransmit of an old transaction, it must remain the 11:04:38 same.
11:04:39 Do you see that?
11:04:40 A. I see that.

11:04:40 Q. And so that is explaining what must happen to the Cseq
11:04:45 value in the context of a handover in the '554 patent,
11:04:45 correct?
11:04:48 A. For -- for this specific embodiment, correct, yes.
11:04:50 Q. Is Step 210 just reflecting what the SIP protocol
11:04:55 requires?
11:04:55 A. I think it's both, really. I don't recall the actual
11:05:02 language in the SIP protocol documentation, but this part
11:05:06 is commonly understood by -- by people in our field that --
11:05:12 that build products implementing the SIP protocol.
11:05:16 Q. I'm just trying to understand. Are you saying that
11:05:25 this is common knowledge before the '554 patent, regardless
11:05:33 of what's actually in the SIP protocol?
11:05:35 A. Okay. I'll just repeat myself, that it was -- for
11:05:41 practitioners of the SIP and RTP protocols, it was common
11:05:45 knowledge that you needed to use the Cseq number precisely
11:05:51 and increment it at the appropriate times so that the other
11:05:58 side verifies the integrity of the transaction and accepts
11:06:03 it. Otherwise, it rejects the -- and the whole thing can
11:06:08 break, right? So you have to be sensitive to that.
11:06:10 Q. The first claim there starts with the number 1. Do you
11:06:14 see that?
11:06:15 A. Yes.
11:06:15 Q. Did Aspen invent the limitation stating: Transmitting
11:06:18 data between a source and destination over a first network

11:06:23 path made up of one or more network links, where at least
11:06:27 one of the network links is to a Local Area Network that is
11:06:30 remote from the transmission source?
11:06:36 Was that new as of the '554 patent?
11:06:38 A. No.
11:06:46 Q. So that's something that is not new to the '554 patent
11:06:49 itself?
11:06:50 A. That's correct.
11:06:50 Q. Okay. Let's look at the next limitation. And same
11:06:56 idea. So I'll read it, and you tell me if that's something
11:07:00 that's new to the '554 patent itself.
11:07:01 Switching the transmission from the first network
11:07:05 path to one of a plurality of alternative network paths.
11:07:09 Is that something that was invented in the '554
11:07:12 patent?
11:07:12 A. Let me read that again. So switching the transmission
11:07:20 from the first network path to -- yeah, that's not -- yeah,
11:07:23 you're correct.
11:07:25 Q. Looking at the phrase "said transmission uses the Real
11:07:31 Time Protocol," that is not something that Aspen invented
11:07:34 in the '554 patent, correct?
11:07:35 A. Correct.
11:07:35 Q. Said transmission uses the Session Initiation Protocol,
11:07:38 SIP, that is also something that Aspen did not invent in
11:07:43 the '554 patent, correct?

11:07:43 A. Correct.
11:07:43 Q. I'll ask this question. You tell me what your answer
11:07:49 is.
11:07:51 The SIP signaling sequence of the transmission is
11:07:54 maintained after said switching from the first network path
11:07:57 to the one of a plurality of alternative network paths.
11:08:02 Is that something that was invented in the '554
11:08:06 patent?
11:08:06 A. Yes.
11:08:08 Q. Okay. So that part was inventive in the claim that
11:08:14 we're reviewing for the '554 patent, correct?
11:08:16 A. Yes.
11:08:17 Q. Even though you testified a moment ago that it was
11:08:22 common knowledge for how to maintain the SIP signaling
11:08:26 sequence generally?
11:08:27 A. That's not what I said. I said it was common knowledge
11:08:34 among practitioners in the art that you need to track the
11:08:39 state of the protocol within a dialog and keep track of it,
11:08:43 so that whenever you send a SIP packet to the next SIP
11:08:47 server, it has to match what that server is expecting.
11:08:49 That's what I said.
11:08:53 Q. Let's take a step back. We skipped over one of these
11:08:56 limitations.
11:08:57 Wherein said transmission is not disrupted as a
11:09:01 result of said switch to one of a plurality of alternative

11:09:04 network paths.
11:09:04 Do you see that?
11:09:06 A. Yes.
11:09:06 Q. My question is just focusing on that limitation --
11:09:09 A. Okay.
11:09:10 Q. -- is that something new that was added by the
11:09:14 invention of the '554 patent?
11:09:15 A. No.
11:09:15 Q. I guess what I'm trying to understand is of Claim 1,
11:09:20 what specifically is new that is added by the '554 patent?
11:09:22 A. In -- in a broad sense, I will say it's the -- the
11:09:30 logical end of all of these elements. You know, it -- that
11:09:36 captures the invention. That -- before our invention, it
11:09:42 was just common that all these NAT devices, like firewalls,
11:09:46 typically, they're performing NAT. And if you tried to do
11:09:55 a -- a switchover from one path to another, you typically
11:10:00 broke the calls.
11:10:02 So we -- we found a solution that included -- that
11:10:05 included all these elements, and that's what's novel.
11:10:08 Q. You -- we also talked about the SIP signaling sequence
11:10:12 of the transmission being maintained, but it was known in
11:10:17 the prior art that you needed to maintain the SIP signaling
11:10:21 sequence, correct?
11:10:29 A. It was known that as a general rule, in implementing
11:10:32 the SIP protocol, you have to maintain the correct sequence

11:10:36 number, increasing it at appropriate times or choosing not
11:10:40 to increase it at appropriate times. That was known.
11:10:44 Q. So you said --
11:10:45 A. I'm -- I'm -- I'm just trying to give you a clear
11:10:48 answer to your question.
11:10:49 Q. Yeah. But you said if a practitioner had been taught
11:10:54 this invention, and that's not the question we've been
11:10:56 talking about.
11:10:56 The '554 patent doesn't go into the details of how
11:11:01 to maintain the SIP signaling sequence because that was
11:11:05 known by practitioners in the art before the '554 patent,
11:11:09 correct?
11:11:09 A. Correct.
11:11:10 Q. And you see this is an email from Dan Berger to you
11:11:17 dated October 11th, 2007?
11:11:19 A. Yes.
11:11:20 Q. And the subject is product feedback from hosted VoIP
11:11:23 provider?
11:11:24 A. Yes.
11:11:27 Q. And Dan is forwarding an email to you and basically
11:11:30 saying that VoIP NAT technologies has completed their
11:11:34 evaluation of the 365 VoIP device. Do you see that?
11:11:40 A. I see that.
11:11:41 Q. Mr. Russ Purinton writes to Mr. Berger on October 10th,
11:11:49 2007: Unfortunately we found the 365 lacks many other

11:11:54 features that we currently have with the Edgewater devices.
11:11:58 Do you see that?
11:11:59 A. Yes.
11:11:59 Q. And so after evaluating Aspen's products, VoIPnet
11:12:04 Technologies decided not to use them because the Edgewater
11:12:07 products were superior. Do you agree?
11:12:10 A. I don't agree with the word "superior." I agree with
11:12:15 the customer's statement that these features were important
11:12:20 to them. And the Aspen box did not have those features the
11:12:26 way he had studied the Aspen box. So we respected his
11:12:32 decision.
11:12:33 Q. And so the real point is after evaluating Aspen's
11:12:36 products, VoIPnet Technologies chose not to proceed further
11:12:42 with Aspen's products, correct?
11:12:45 A. Correct.
11:12:45 Q. Okay. I'm uploading Exhibit 10 to the chat. Can you
11:12:51 let me know when you have that?
11:12:53 A. Okay. I have it.
11:12:54 Q. This is an email chain between you and Dan Berger in
11:13:01 September of 2007, correct?
11:13:02 A. That's September -- yes. That's what it looks like,
11:13:10 yes.
11:13:11 Q. Do you recall reading this email before today?
11:13:13 A. No.
11:13:14 Q. Mr. Berger is identifying to you that an Edgewater

11:13:18 device is offered for around $649.50, correct?
11:13:22 A. Correct.
11:13:22 Q. So Aspen's products were offered for a significantly
11:13:26 higher price than the competitor Edgewater products,
11:13:26 correct?
11:13:33 A. Correct.
11:13:33 Q. And yet, third parties who evaluated your product
11:13:36 versus the Edgewater device found that your product lacked
11:13:40 many features that that cheaper competitor product had,
11:13:40 correct?
11:13:44 A. Some features.
11:13:45 Q. The features that we just talked about in the prior --
11:13:53 A. Correct. Correct. On the prior -- the prior email
11:13:56 showed, I think, four or five different feature sets. And
11:13:59 that's accurate.
11:14:00 Q. And on the second page, it has two tables. Do you see
11:14:05 those?
11:14:06 A. I see -- yeah. I see two tables on the second page.
11:14:18 Q. And in these tables, it's essentially providing
11:14:22 feedback from people who looked at Aspen's technology and
11:14:26 are trying to provide feedback to Aspen about its
11:14:32 technology; is that fair?
11:14:33 A. I think that's what it looks like, yes.
11:14:35 Q. And here, again, we're looking at third parties who are
11:14:39 evaluating Aspen's IP, and, again, they're deciding not to

11:14:43 invest in Aspen in part because they don't find Aspen's IP
11:14:46 particularly persuasive; is that correct?
11:14:50 A. In this subset of venture capital investors, that's --
11:14:54 that's -- that's correct. That's what is reflected here.
11:14:57 Q. Okay. I'm uploading Exhibit 14 to the chat. Can you
11:15:02 let me know when you have that?
11:15:04 A. Okay. I have it.
11:15:05 Q. And this is a March 27, 2008 email from the CTO Aspen
11:15:13 account to yourself as well as John Yu, Kenneth Crocker,
11:15:21 Manu Bhaskaran, Abhijit Dass, and Ken Crocker again. Do
11:15:26 you see that?
11:15:27 A. Yes.
11:15:28 Q. And in this email, you're informing the board that Bill
11:15:31 Chin had resigned from Aspen as an employee, correct?
11:15:35 A. Correct.
11:15:35 Q. And in this email you say: Sajit informed the board of
11:15:44 his view that of necessity due to lack of an investment
11:15:47 pipeline from the venture community and our slow pace of
11:15:52 sales, that we need to start thinking of transitioning the
11:15:54 company to a pure licensing company.
11:15:57 Do you see that?
11:15:57 A. I see that.
11:15:58 Q. So is it fair to say that Aspen was not succeeding in
11:16:02 the market so it decided to focus on monetizing its IP?
11:16:06 A. It's fair to say that we needed -- we needed revenue.

11:16:10 And because we had difficulty raising venture money, we had difficulty funding new products from cash flow, that the other attractive option was to go into licensing our source code.
11:16:27 Q. So, again, Aspen wasn't able to compete with its products in the market, so it focused on monetizing its IP instead, correct?
11:16:39 A. That's a -- that's fair.
11:16:40 Q. So it was a big deal to Aspen that Bill Chin resigned, correct?
11:16:45 A. Yes. Yes.
11:16:46 Q. That meant that Aspen couldn't develop new VoIP features without his assistance, right?
11:16:57 A. Anything that was major would have required getting him back full-time, something we could not afford to do. So that's the reality that's been reflected here.
11:17:08 Q. If Aspen lacked the ability to make major changes to its software, that is a big deal for it as a company, considering that Aspen valued its source code as its most valuable IP, correct?
11:17:22 A. It's a big deal, yes.
11:17:23 Q. Exhibit 16 is a technology and patent license agreement, effective as of March 31st, 2011; is that correct?
11:17:32 A. Yes.

11:17:32 Q. And this is a license agreement between Aspen and Ack3, correct?
11:17:46 A. That's correct.
11:17:47 Q. So let me ask the question again. I just want a clean answer.
11:17:54 Aspen expected to receive at least $60,000 a year as part of the Ack3 license, correct?
11:18:02 A. Correct.
11:18:02 Q. And of that $60,000, $15,000 was to the practice of U.S. Patent 8,009,554, the '554 patent asserted in this case, correct?
11:18:22 A. Correct.
11:18:22 Q. I'm uploading Exhibit 17 to the chat. Let me know when you have that open.
11:18:29 A. Yes, I have it open. Yes.
11:18:30 Q. This is an email chain between you and Peter Snow that extends into April of 2013, correct?
11:18:37 A. Yes.
11:18:37 Q. The subject line states: Iceberg, interest in Aspen Networks patents.
11:18:44 Do you see that?
11:18:44 A. Yes.
11:18:45 Q. Okay. So you would agree you're asking Mr. Snow to make a proposal, correct?
11:18:49 A. Yeah. That -- that's -- that's -- that's true, yeah.

Q. So Mr. Snow is essentially saying that each of these two patents, the '037 and the '554 patent, would be valued at mid/high six figures each, and you're responding by saying that you would expect at least $1.5 million for each?
A. That's what it -- that's what it says, yes. Correct.
Q. You never actually entered into a deal with Iceberg Capital Partners, did you?
A. No.
Q. And what caused you to form that belief? What made you think there was infringement?
A. That was the time when the public announcements were made about Wi-Fi Calling by the respective carriers.
Q. And it's true, isn't it, that Aspen, in the 2007/2008 time frame, was not focused on cellular calls?
A. That's correct.
Q. And you mention as part of forming your belief about the carriers' Wi-Fi Calling infringing the '554 patent, that the use of ordinary Wi-Fi routers helped sort of indicate infringement to you?
A. Yes.
Q. Can you explain why that's the case?
A. Because the -- most common deployment of a home or a small business Wi-Fi router/firewall is to implement it with NAT, Network Address Translation.

11:20:20 Q. And --
11:20:22 A. So -- so the typical topologies would involve a NAT device at each end. If -- if I'm in my home and you're in your home and I make a call to you, there are -- there's a NAT firewall at each of those locations.
11:20:36 Q. And was the use of NAT firewalls common in the 2007 time frame?
11:20:43 A. Most - most likely. I -- again, it's such a long time ago. They -- NAT firewalls in the home and small business, I forget when they started the use, but they have been used for a long time. I -- yeah.
11:21:07 Q. And so if others in the industry around the same time as -- as your invention of the '554 patent were considering the problem of switching network paths for Voice over IP, would they need to address Network Address Translation?
11:21:24 A. During the time frame of our invention?
11:21:31 Q. Yes, sir.
11:21:32 A. Yes. So we were -- as far as I'm concerned and -- and -- aware, we were in the specific market for small business adoption of Voice over IP. They -- we were the first company that tried to switch over in a NAT environment.
11:21:55 So all the other VoIP that existed at that time, other than the small business -- in the large businesses, it was mostly like Cisco equipment that had large

11:22:10 enterprise networks, and they were just doing IP routing.
11:22:15 Q. And how is IP routing different than Network Address
11:22:18 Translation?
11:22:18 A. It's different because no network addresses are
11:22:24 translated. So as -- a source to a destination, it just
11:22:37 uses the IP address to do the routing.
11:22:40 Q. Do you know that during the patent application process,
11:22:41 there's a series of back and forths between the applicant
11:22:44 and the Patent Office regarding the invention?
11:22:47 A. Yes. Again, it was done through our attorneys.
11:22:52 Q. My question to you is: None of your claims that you
11:22:57 originally submitted to the Patent Office say anything
11:22:59 about Network Address Translation, true?
11:23:00 A. Oh -- so I'm reading the first claim, and it has no
11:23:09 mention. I'm reading the second. There's no mention.
11:23:16 Third, no mention. The fourth, no mention.
11:23:26 Yeah, so I -- I -- I read through it, scan. And
11:23:36 there's only one claim in here which I don't see the word
11:23:39 "NAT" at all.
11:23:40 Q. Right. So if you thought you invented the idea of
11:23:43 using SIP with a -- switching network paths in the context
11:23:51 of NAT, why didn't you claim that in your original
11:23:54 application?
11:23:55 A. So, again, these were drafted by our attorney, and they
11:24:04 dealt with the Patent Office. So I think our instructions

were always, like, hey, this is our invention, and we believe NAT was a very difficult problem to solve.

So I -- I can't speak for why the attorney -- I think sometimes the attorney will try to get as broad a claim as possible. Maybe that -- that was why the attorney did that. But we disclosed our invention in a great deal of detail. And we did -- we did explain in our invention that the background is very difficult to solve -- just to make these network switchovers when there's a NAT involved.

Q. Were you involved in drafting the claims we see here in Exhibit 18?

A. I doubt it.

Q. Do you know whether Mr. Chin or Mr. Mavunkel were involved in drafting the claims we see here in exhibit --

A. Not at all. I dealt with the attorneys, but I basically just wrote the spec and gave it to them --

Q. Okay.

A. -- which was common for me. With -- with all my patents, I write a spec, and I give it to the attorneys.

Q. And in reviewing, did it not strike you that there was no claim element related to the use of Network Address Translation?

A. I mean, when I look at it now, this is such a long time ago, and I -- it is what it is, right? So I can't remember what conversations I would have had with -- with my

11:25:39 attorney who was doing the work.
11:25:40 Q. And you don't remember being surprised about the lack
11:25:43 of Network Address Translation in these original claims?
11:25:46 A. Again, in -- in all my experience doing this with
11:25:52 attorneys, they will draft claims that they feel are broad
11:25:56 enough. Sometimes they'll draft claims that are very
11:26:01 broad, even though we as the inventors may initially tell
11:26:06 them that, oh, this is what we did. That's very common.
11:26:12 Q. Well, so do you think you were the first to invent
11:26:15 what's described here in Exhibit 18?
11:26:18 A. Well, that's 21 claims. I just kind of went through
11:26:28 them. The -- so some of the claims include the SIP and the
11:26:46 sequence number, the maintenance of the sequence number.
11:26:50 Those -- those are all important, you know. So I -- it's
11:26:57 too broad a question. You're asking about 21 claims,
11:27:01 right?
11:27:03 Again, I -- I think these were modified in the
11:27:06 whole process, iterative process.
11:27:11 Q. At a high level, this original Claim 1 requires
11:27:15 transmitting data from a source to a destination over one
11:27:22 network path, switching the transmission to an alternative
11:27:26 network path, and not disrupting a transmission as part of
11:27:31 that switch.
11:27:32 Do you agree with that?
11:27:34 A. Yes.

11:27:36 Q. Did you believe at the time this claim was filed that you were first to come up with that idea?
11:27:43 A. I really cannot remember.
11:27:44 Q. Sitting here today, do you believe you were the first to come up with the idea reflected here?
11:27:54 A. In hindsight, sitting here today, no.
11:27:59 Q. You agree that others had already disclosed the idea of switching transmissions from one network path to another, right?
11:28:08 A. Correct.
11:28:12 Q. And do you recognize Exhibit 22?
11:28:15 A. It looks like an email I sent to Mr. Bill Chin and John Yu.
11:28:21 Q. And you see the email was sent August 17th, 2016?
11:28:38 A. That's correct, yeah. 17th of August, yeah, 2016, okay.
11:28:44 Q. And can you describe for the jury what you're telling Mr. Chin and Mr. Yu in this email?
11:28:49 A. From the RFC on SIP -- valid SIP was first formulated by a UAC must at a minimum contain the following header fields: Two -- two from Cseq, Call-ID, and Max-Forwards and Via; all of these -- the valid SIP request formulated by a UAC must at a minimum contain the following header fields: Two from Cseq, Call-ID, Max-Forwards, and Via; all of these header fields are mandatory on all SIP requests.

11:29:23 So I'm saying to Mr. Chin, since Cseq is mandatory, I'm sure all the software inventors out there are maintaining the SIP Cseq value when they send out the RE-INVITE. So...
11:29:36 Q. And do you have any other reason to believe carriers are using the '554 invention besides this RE-INVITE message?
11:29:51 A. I -- I -- the RE-INVITE is the specific embodiment that we disclosed in -- in our current application. I'm not a total expert on SIP, because it's a very rich protocol, and there are a lot of different commands.
11:30:13 There may be other SIP commands that are also used to accomplish the same effect possibly. So -- but in all of those cases, it is required that both sides in the SIP communication track and maintain the state of the dialog and maintain the signaling sequence of SIP.
11:30:43 Q. And so this email explains that Aspen would provide $7 million of IP to the new company that would be formed, ALTOS Mobility, in exchange for a convertible debt note issued by that spin-off company to Aspen, correct?
11:31:02 A. That's -- I think that's what it says.
11:31:04 Q. And of that $7 million, Aspen's source code comprises $6 million?
11:31:11 A. Yes.
11:31:12 Q. And Aspen would also grant a right to use the issued

11:31:19 Aspen patents, including No Call Drop, with a value of
11:31:23 $500,000. Do you see that?
11:31:25 A. I believe I saw that somewhere. That's above -- yeah.
11:31:38 I see that.
11:31:39 Q. And so this contemplates providing a non-sublicensable
11:31:47 right to use the '554 patent in perpetuity for a value of
11:31:54 $500,000, correct?
11:31:56 A. That's correct.
11:31:57 Q. Do you recall a similar one-time transfer fee that was
11:32:02 contained in the Ack3 license?
11:32:04 A. Yes.
11:32:04 Q. And that one-time transfer fee in the Ack3 license
11:32:15 would have granted Ack3 a perpetual license to the '554
11:32:20 patent for $600,000, correct?
11:32:26 A. Not complete. I think there was a 3.8 million for what
11:32:31 they were primarily interested in, which was the source
11:32:36 code. They had built product -- a base product that
11:32:41 depended on that source code. And if they wanted to
11:32:44 continue, they needed the source code license to be active.
11:32:46 Q. And of that $3.8 million one-time transfer fee,
11:32:51 $600,000 of it was a perpetual license to the '554 patent,
11:32:51 correct?
11:32:55 A. I believe there was a breakdown that that's as exactly
11:32:59 as you describe.
11:33:01 Q. And so the perpetual license in the Ack3 license was

valued at $600,000, but here it's valued at $500,000, right?

A. Correct.

(Videoclip ends.)

MR. DACUS: That concludes -- that concludes the video depo, Your Honor.

THE COURT: All right. Verizon may call its next witness.

MR. ANDERSON: Yes, Your Honor. Kevin Anderson again. Verizon calls Dr. Mark Mahon.

THE COURT: All right.

MR. ANDERSON: And while we're doing that, can we hand out his --

THE COURT: Of course.

(Witness sworn.)

MARK MAHON, PH.D., DEFENDANT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. ANDERSON:

Q. Good morning, Doctor.

A. Good morning, sir.

Q. Can you please introduce yourself to the jury?

A. Yes, my name is Mark Mahon.

Q. And, Dr. Mahon, what sort of testimony are you here to present?

A. I'm going to talk about the technology involved in this

11:34:46 case, specifically cellular and Wi-Fi technology, the
11:34:51 Verizon products, the accused products, as well as the
11:34:54 Aspen products, and the differences between those two.
11:34:56 Q. Okay. Where do you live?
11:35:00 A. I live in State College, Pennsylvania, which is in the
11:35:02 middle of nowhere is usually how people describe it. It's
11:35:07 where Penn State University is, and I grew up in
11:35:09 Pennsylvania.
11:35:10 Q. Do you have a family?
11:35:12 A. I do. My wife and I have been together for about 44
11:35:16 years. We started dating -- dating in high school. I grew
11:35:20 up -- we were both from northeastern Pennsylvania, and
11:35:24 that's an anthracite coal region, if you're familiar. I
11:35:27 worked my way through college. And right after college, we
11:35:30 got married, so we've been married almost 38 years at this
11:35:33 point in time.
11:35:34 Q. Great. Now, you know I've spoken to you several times
11:35:38 when you've been with your grandkids. Can you tell us
11:35:41 about them?
11:35:42 A. Yes. I have two grown daughters. One is 32, and one
11:35:45 is 30. And I have five grandchildren. The oldest just
11:35:50 turned five this past Sunday.
11:35:52 Q. Okay.
11:35:54 MR. ANDERSON: And can we bring up Slide 4?
11:35:56 Q. (By Mr. Anderson) Can you -- can you give us a little

bit about your education. Just in case you forgot, we prepared this slide. But can you tell the jury a little about your education and teaching background?

A. Yes. I have a Master of Science in electrical engineering, a Ph.D. in acoustics from Penn State University. And I was research faculty from -- for 25 years at something called the Applied Research Lab at Penn State University. And then I switched over from doing primarily research and a little bit of teaching to now I do primarily teaching and I guide graduate and undergraduate student research as part of that.

Q. Do you publish any scientific papers?

A. Yes. We just submitted another one on bilinear reinforcement learning with resource allocation and cloud edge computing last week, but, yes.

Q. Okay.

MR. ANDERSON: Can we turn to Slide 5?

Q. (By Mr. Anderson) Can you explain a little bit to the jury about your experience in telecommunications?

A. Yes. So right out of college, my first job was a project engineer for the CIA. And as part of that work, I worked on collection of wireless and computer network signals for basically trying to catch people spying on us overseas. That work was classified.

And then right after that, I went to the Applied

Research Lab at Penn State University, and I started working on, again, classified programs either at the, you know, secret or top secret level. And I did that for 25 years.

But as part of that work, it was mainly focused on wireless signals, including cellular signals, the Wi-Fi, and various other protocols, as well as in air and underwater wireless signals.

Q. Okay. You ever testified in court previously?

A. Yes, I have. I've testified six times in court -- District Court.

Q. And what role did you have? I know we've seen a distinction between fact and expert witness. What role did you have in your previous testimony?

A. I've been hired as an expert witness in cases similar to this.

Q. Okay. And did all -- did all of those cases involve telecommunications?

A. Yes, they involved telecommunications, as well as voice technology, so far.

Q. Okay. And you ever testify in a case with Verizon as a Defendant?

A. Not for Verizon as a Defendant, no.

Q. Okay. But -- but Verizon's hired you in previous cases; is that true?

11:38:40 A. Yes, approximately five or six times.
11:38:44 Q. Okay. And for this case, with Verizon's Wi-Fi Calling, this case isn't your first rodeo, is it, with that?
11:38:54 A. It is not.
11:38:54 Q. Okay. Can you explain to the jury a little bit about previous work you've done with Verizon on Wi-Fi Calling?
11:39:00 A. Yes. For example, there's a case called KAIFI. That involved very similar technology that we're talking about in this case, and I was hired by Verizon.
11:39:12 I filed reports -- expert reports in that case, and we went right up to the point of trial. I was deposed in that case also, and then it settled.
11:39:21 Q. Okay. And can you just -- at a high level, what was the KAIFI patent about?
11:39:27 A. Very similar technology. It involved switching from wireless to cellular networks and cellular networks to wireless networks. It involved the transmission of voice and data, just like we have in this case.
11:39:39 Q. And do you recall when the KAIFI patent was filed?
11:39:42 A. The KAIFI patent was filed, I believe, six years before the '554.
11:39:48 Q. Okay. In the course of working on the KAIFI case, did you review a lot of materials that -- of the nature that we've seen here at trial?
11:39:59 A. Yes, very similar materials, such as the Verizon

11:40:02 architecture and other documents associated in that case that are very similar in this case. So I'm very familiar with the technology.

MR. ANDERSON: Your Honor, at this time, we tender Dr. Mahon as an expert in the field of telecommunications, cellular, and wireless technologies.

THE COURT: Any objection?

MR. HEARD: No objection.

THE COURT: Very well.

MR. ANDERSON: Okay. If we can go to Slide 9. Go to Slide 9.

Q. (By Mr. Anderson) At a -- at a high level, Dr. Mahon, can you explain what you're here to testify about?

A. Well, I'm going to testify about Verizon -- whether Verizon infringes the products. And, you know, my analysis is that they do not infringe, as well as patent licenses taken by Verizon and talk about the technological comparability of those licenses to the '555 -- '554 patent. And then I also did an incremental benefits analysis to determine basically what -- compared to the invention, what additional benefit would the Verizon products derive from that.

Q. Great.

MR. ANDERSON: And can we go back to Slide 8, the previously slide?

Q. (By Mr. Anderson) What sort of materials -- I'm sure this looks familiar, but what sort of materials did you consider?
A. Well, just like all other experts, I'm consuming all the documents submitted in this case by both sides, as well as the court documents, claim construction orders, patent histories, the expert reports from Aspen and my side, as well as deposition testimony provided by fact witnesses in this case, conversations with -- I have had with Verizon personnel, and then lots of different public information that I used.
Q. Now, in coming to your opinions, did you consider the problem or problems that the '554 patent was -- was trying to solve?
A. Yes, I did.
MR. ANDERSON: And can we bring up the patent, which is JTX-1? And may we go to Figure 7?
Q. (By Mr. Anderson) Okay. And was Figure 7 one of the portions of the '554 patent that you considered in understanding what the problem is?
A. Yes, it was.
Q. And -- and can you describe what problem is -- is referenced in Figure 7?
A. Yes. If you look at the title, you see that it's labeled SIP and RTP Control in Prior Art. So this is

11:43:03 saying, hey, here's the setup as it exists at that point in
11:43:06 time of when they're filing the patent. And they're saying
11:43:09 SIP and RTP are in the prior art, right? It's known. And
11:43:14 then this slide shows you what they thought the problem was
11:43:19 at that point in time.
11:43:20 Q. Okay. And I'd like you to focus on this language right
11:43:24 down here talking about -- I'm sorry -- talking about the
11:43:41 problem they were trying to solve when a move occurs. And
11:43:47 explain what you understand a move to mean.
11:43:50 A. Well, as we've heard many times so far, when a call is
11:43:54 set up and in this case the context is in the prior art
11:43:58 it's using a NAT device, you have a path between the phone
11:44:03 and the SIP server. And when you go to change that path to
11:44:09 another path, the problem is the call could break because
11:44:13 you're changing the IP address associated with the phone as
11:44:17 part of that path.
11:44:19 Q. Okay. And when you say changing the IP address, is
11:44:23 that -- how does that relate to the term new IP address in
11:44:27 the problem here?
11:44:28 A. Well, given the context, again, of the prior art, you
11:44:32 have a NAT device that is providing the IP address for the
11:44:38 SIP signaling going to the server that the phone is trying
11:44:42 to contact. That NAT device has -- is changing its public
11:44:47 IP address to another one. And so, therefore, the stream
11:44:52 coming out of the device is represented by a new IP

11:44:56 address.

11:44:56 And as it states here, the problem is, is that the SIP server doesn't recognize that IP address, so it starts to drop the packets. So that's the new IP address.

11:45:07 Q. Okay.

11:45:09 MR. ANDERSON: And if we could bring up Slide 10. I'm sorry -- yes, Slide 10, yes, thank you.

11:45:24 Q. (By Mr. Anderson) Dr. Mahon, what's on Slide 10?

11:45:27 A. Well, those little blue clouds are the Internet Service Providers. They're the entities, the corporations that provide you with a public IP address. So they own address spaces. Each one of those three have separate spaces addresses that only they could use, and they're different between the three.

11:45:45 Q. Okay.

11:45:49 MR. ANDERSON: And if we switch back to JTX-1, the patent, and we can pull up the language in Column 5 at 51 to 54. So we want -- can you pull out this language right here. Great.

11:46:18 Q. (By Mr. Anderson) And when it says globally routable IP addresses belonging to the 3 access Internet Service Providers, can you explain what that means, globally routable, belonging?

11:46:34 A. Yes. When I say public IP addresses owned by each one of those three ISP providers, those blue clouds, that

public IP address is globally unique, nobody else can have it, IP address that you use for routing packets. If you don't have a globally unique IP address going through the Internet, you cannot route that packet. And that's what it's referring to here in 961, 962, and 963 are ISP 1, ISP 2, and ISP 3 links.

MR. ANDERSON: Okay. And can we put Slide 10 back up, please?

Q. (By Mr. Anderson) And is this visually depicting in these -- these areas the three different ISPs?

A. Yes. Each one of those names EarthLink, AOL, Spectrum are the ISP providers, and then the orange boxes represent the globally unique, routable IP address.

Q. Great. And for this example of Figure 9, I know there may be multiple solutions for this, but what was the solution that the inventors had for this problem in Figure 9?

MR. ANDERSON: And what I'll ask the court -- or I'll ask you to do is bring up Column 7, Line 41 to 50 of the patent.

Q. (By Mr. Anderson) Okay. Dr. Mahon, can you explain what -- what's being said here, maybe highlight the language that you're talking about there.

A. Sure. So we saw in Figure 7 the problem statement at the time in the prior art. Figure 9 shows us the proposed

11:48:28 solution and -- which is the problem was a new IP address.
11:48:34 And in this citation, it's providing you the solution to
11:48:37 that, which is it's saying that the call -- for a call to
11:48:46 not break, the SIP RE-INVITE message of steps, oops, 160
11:48:50 needs to be sent to the same IP server that handles the
11:48:56 original call for the INVITE.
11:48:57 Q. Great. And when it sends -- when it -- when the
11:49:00 passage is discussing the IP address parameters for the
11:49:05 move can be conveyed and the RE-INVITE message, what is
11:49:09 that saying?
11:49:09 A. That's saying the RE-INVITE message is being used to
11:49:13 provide this new information, the new IP address, as well
11:49:18 as the information that it cites here, this C sequence to
11:49:27 the SIP server to allow the connection to stay connected
11:49:29 when it does switch over to that new globally routable IP
11:49:34 address.
11:49:34 Q. Now, I see you referenced in this, it says: See Step
11:49:40 160 in Figure 4.
11:49:41 MR. ANDERSON: Can you pull up Figure 4,
11:49:43 Mr. Duval? And blow out 1 -- Step 160.
11:49:52 Q. (By Mr. Anderson) And what is this Step 160
11:49:55 describing?
11:49:56 A. So -- so we saw Figure 7, the problem, Figure 9, the
11:50:01 solution, and this is one example that the patent says is a
11:50:06 way to implement the solution.

Here it says you're going to select the SIP server and send out the RE-INVITE request, then do an update of the C sequence.
Q. Okay.
MR. ANDERSON: And can we go to Column 5 where it describes Box 160? Yeah, can you blow that out right about there?
Q. (By Mr. Anderson) Okay. Dr. Mahon, can you explain what the solution in 160 was -- was describing?
A. Yes. So here we see, again, the same callout that you just saw, select the SIP server, send the RE-INVITE. And then on the right here, you see a description. So what it's saying is, is that you're going to send a SIP RE-INVITE request out, and that request will contain the IP address and other information that the -- the new link, RTP stream, will use. And it also mentions the SIP signaling sequence number.
Q. Great. And other than this solution that we see here, are -- you've read the whole patent, the '554 patent?
A. Yes, I have.
Q. Okay. Were you aware of any other solution that the inventors put forth for the problem they identified other than sending the SIP RE-INVITE with the new IP address?
A. No, I'm not.
Q. Okay. And you've looked at Verizon's system

11:51:35 extensively, right?
11:51:36 A. Yes.
11:51:37 Q. Wi-Fi Calling? Sorry.
11:51:40 A. Sorry. Yes, I have.
11:51:41 Q. Okay. And does Verizon's system have the problem of
11:51:48 multiple changing IP addresses?
11:51:51 A. No. And as we just heard Mr. Faber present to you, is
11:51:56 that they cut the Gordian knot here. They found a solution
11:52:03 that has no requirements associated with the invention put
11:52:08 forward within the '554 patent.
11:52:09 Q. And does Verizon's system implement the only solution
11:52:12 provided in the '554 which was the SIP RE-INVITE?
11:52:15 A. No, it does not.
11:52:17 MR. ANDERSON: Your Honor, at this time, I'm
11:52:19 getting close to a change in module if Your Honor wanted to
11:52:22 break for lunch or I'm happy to keep going.
11:52:25 THE COURT: Okay. I think that probably makes
11:52:27 good sense, Mr. Anderson.
11:52:28 Let's go ahead and recess for lunch at this time.
11:52:31 Ladies and gentlemen of the jury, you're lunch
11:52:34 should be there or will be there shortly, and we will aim
11:52:38 to reconvene here in the courtroom in about an hour's time.
11:52:44 COURT SECURITY OFFICER: All rise.
11:52:45 (Jury out.)
11:52:46 THE COURT: You may step down.

11:53:10 MR. ANDERSON: Your Honor, I have one question so I don't get myself in trouble. It's my understanding that the Court's procedure is that until the point at which I pass him for cross-examination, he is not sequestered; is that correct?

11:53:24 THE COURT: I think that's the position we've taken so far, but I -- but we've not broken at this point during the day.

11:53:30 So do the Plaintiffs have a view about this?

11:53:32 MR. HEARD: No objection, Your Honor. That's fine.

11:53:34 THE COURT: All right. Fair enough.

11:53:36 Mr. Anderson --

11:53:36 MR. ANDERSON: Thank you, Your Honor.

11:53:36 THE COURT: -- you're off the --

11:53:37 MR. ANDERSON: I just didn't want to get in trouble.

11:53:39 THE COURT: -- you're off the hook, at least temporarily.

11:53:43 MR. ANDERSON: Okay. Thank you. Thank you.

12:55:22 (Jury out.)

12:55:22 COURT SECURITY OFFICER: All rise.

12:55:24 THE COURT: All right. Mr. Savage, if you would have the jury brought in.

01:04:33 COURT SECURITY OFFICER: All rise for the jury.

01:04:43 (Jury in.)
01:04:43 THE COURT: Please be seated.
01:05:07 Mr. Anderson, whenever you're ready, you may continue.
01:05:11 MR. ANDERSON: Thank you, Your Honor.
01:05:14 Can we pull up Slide 43, please?
01:05:17 Q. (By Mr. Anderson) Dr. Mahon, let's just work our way down through the claims.
01:05:25 Do you recall the testimony about this element that requires switching from the first network path to one of a plurality of alternative network paths?
01:05:37 A. I do.
01:05:37 Q. Okay. And what are your conclusions regarding whether Verizon does that?
01:05:41 A. My conclusion is Verizon does not do this.
01:05:45 Q. Okay.
01:05:45 MR. ANDERSON: Can we go to Slide 44? And if we can just blow out this highlighted language a little bit?
01:05:56 Q. (By Mr. Anderson) So, Dr. Mahon, how many paths does this claim language require?
01:06:03 A. This claim language, as you can clearly read, requires a first path and a plurality of alternative paths. So this claim language requires three paths.
01:06:17 Q. Okay.
01:06:18 MR. ANDERSON: And can we go to Slide 10?

Q. (By Mr. Anderson) And this is Figure 9 from the patent. Is this an example of three alternative paths?
A. This is an example of three paths, a first path and two alternatives, which would be the plurality.
Q. Okay. And can you just draw on here what the three paths would be?
A. So, for example, if the first path was this path and then we would have the opportunity for multiple second paths. So we could have -- whoops, I thought I changed the color -- an alternative path, and this one could be an alternative path.
Q. Okay. And does Verizon have three -- two alternative network paths?
A. No, Verizon only has one alternative path in their LTE network. That is the cell tower.
MR. ANDERSON: Okay. If we could pull up Slide 46. Can you highlight the base station or the cell tower there?
A. Yes. So this right here, the eNodeB, is the LTE base station. That's the one alternative path.
Q. (By Mr. Anderson) And do you agree with Mr. Faber this morning when he said that Verizon's phones can connect to one and only one base station?
A. Yes.
Q. Okay. Is that a feature of LTE?

01:07:56 A. Yes. It's a requirement of LTE, the way the protocols are written.
01:08:02 Q. Okay. So -- and to be clear, I know this case has mentioned switching from Wi-Fi to LTE and also switching from LTE to Wi-Fi. Were you here during Dr. Rubin's testimony?
01:08:17 A. Yes, I was.
01:08:19 Q. Did he present any theory of the plurality of alternative network paths when switching from LTE to Wi-Fi?
01:08:28 A. No, he provided no theories for going from the cellular to the Wi-Fi access.
01:08:37 Q. Okay. And do you agree that there is no plurality of alternative network paths from going to -- from cellular to Wi-Fi access?
01:08:45 A. Yes.
01:08:47 Q. Okay.
01:08:48 MR. ANDERSON: And if we could go to the next slide.
01:08:51 Q. (By Mr. Anderson) Just to reiterate your conclusion, does Verizon meet this claim element regarding the switching to the one of the plurality of alternative network paths?
01:09:02 A. No, Verizon does not practice this claim element.
01:09:06 Q. Okay. And if Verizon doesn't practice one element, is there infringement of the patent?

01:09:12 A. No, that's enough.
01:09:13 Q. Okay. And is this element in all of the claims?
01:09:15 A. Yes.
01:09:16 Q. Okay. So is your -- what is your conclusion regarding
01:09:20 infringement as to all of the claims?
01:09:21 A. Well, then all the claims would not be infringed or
01:09:25 practiced by Verizon.
01:09:33 Q. Okay.
01:09:34 MR. ANDERSON: Can we go to Slide 11, please?
01:09:37 Q. (By Mr. Anderson) Okay. We've heard lots about
01:09:40 maintaining continuity in the SIP signaling sequence. What
01:09:44 is your conclusion as to whether Verizon's Wi-Fi Calling
01:09:48 product meets this claim limitation?
01:09:50 A. Verizon's product does not meet this claim limitation
01:09:56 for reasons that we've heard and articulated already so far
01:09:59 in this case.
01:10:01 Q. Okay.
01:10:01 MR. ANDERSON: Can we go to Slide 12?
01:10:04 Q. (By Mr. Anderson) And did the Court provide guidance
01:10:07 on the meaning of this term?
01:10:10 A. Yes. So we have the term over here on the left, and
01:10:14 then we have the Court's construction over here on the
01:10:17 right of how to interpret that and guide people such as
01:10:22 myself, an expert, to understand the claim language.
01:10:25 Q. And when you see the term "SIP" used in the

01:10:32 transmission, what is that referencing?
01:10:33 A. That's referencing the RTP packets that are being
01:10:39 transmitted to carry the voice, for example.
01:10:41 Q. Okay. And is the transmission the entire call?
01:10:44 A. It is the entire call from the source to the recipient.
01:10:48 Q. And from start to beginning (sic)?
01:10:50 A. From start -- along the entire path which is the
01:10:55 transmission.
01:10:55 Q. Okay. Great.
01:10:56 Now, if we could just bring up -- now, you did a
01:11:06 responsive report to Dr. Rubin; is that correct?
01:11:08 A. That is correct, sir.
01:11:09 Q. And so you reviewed his report and relied upon it to
01:11:13 understand at least his view of the technology?
01:11:17 A. I did, yes.
01:11:19 Q. Okay.
01:11:19 MR. ANDERSON: Can we pull up Dr. Rubin's report,
01:11:23 Appendix C at Page 62? His report. Page 62, I think,
01:11:50 yeah. Page 62, I think, yeah. 62 of the appendix, I'm
01:12:12 sorry. If you could scroll down from the Appendix C.
01:12:20 Okay. Keep going down. Okay. There.
01:12:22 Q. (By Mr. Anderson) Okay. And Dr. Mahon, we can see
01:12:26 this is for this element, and I want to direct your
01:12:29 attention to the highlighted language. Do you see what
01:12:34 Dr. Rubin said?

01:12:41 A. Yes, I do.
01:12:42 Q. And do you see that in his opinion you have to maintain all SIP commands, all SIP commands after the switch-over, including but not limited to the BYE command. Do you see that?
01:12:58 A. Yes, I do.
01:12:59 Q. Okay. And so when we're talking about the transmission, we're talking about all the SIP commands up to the BYE command; is that correct?
01:13:07 A. That is correct. It would be inclusive of all the SIP commands as part of that transmission.
01:13:19 Q. Okay.
01:13:19 MR. ANDERSON: Now, let me just pull up Slide 15.
01:13:23 Q. (By Mr. Anderson) We've seen this Re-Register, which was what Dr. Rubin referenced. And in your opinion, does the SIP Re-Registration message meet the claim element?
01:13:40 A. No, it does not.
01:13:41 Q. Okay. And is the SIP Re-Registration message sent before or after the switch?
01:13:49 A. It's sent after the switch has taken place.
01:13:52 Q. Okay.
01:13:52 MR. ANDERSON: And so if we could pull up from the trial transcript Page 438, Line 12 to 20. Great.
01:14:06 Q. (By Mr. Anderson) And do you see how Dr. Rubin was referencing the Re-Register message, and then he said when

01:14:12 it gets sent out, go ahead and arrange for the switching?
01:14:16 Do you see that?
01:14:17 A. Yes, I do.
01:14:18 Q. Is that in your understanding an accurate description
01:14:21 of Verizon's system?
01:14:22 A. No, based on my analysis of all the evidence presented
01:14:27 by Verizon, that that is not a correct assessment.
01:14:35 Q. Okay.
01:14:35 MR. ANDERSON: Let's go to Slide 18.
01:14:38 Q. (By Mr. Anderson) Now, Dr. Mahon, did you -- you were
01:14:42 here for Mr. Faber, correct?
01:14:43 A. Yes, I was.
01:14:44 Q. Okay. And did you see the -- the test results that he
01:14:47 presented?
01:14:47 A. Yes, I did.
01:14:49 Q. And did you rely upon those in -- in arriving at your
01:14:56 opinion of non-infringement?
01:14:57 A. That was a component of my analysis, so I took a look
01:15:02 at his captures and what he found from performing his tests
01:15:07 on the Verizon network and did my analysis, and that was
01:15:10 part of it.
01:15:10 Q. Okay. And we have here what was the -- the test
01:15:14 results for the iPhone 16 Wi-Fi to LTE, correct?
01:15:19 A. Correct.
01:15:19 Q. Okay.

01:15:19 MR. ANDERSON: Mr. Duval, can you put up the claim construction that we're -- we're facing here? Okay. All righty. Perfect.

01:15:31 Q. (By Mr. Anderson) So you see we're -- we're guided by this, in the transmission, the SIP used in the transmission.

01:15:37 Now, are all of these messages the SIP used in the transmission?

01:15:41 A. Yes, the entirety of what you see here are SIPs used in the transmission.

01:15:47 Q. Okay. And on the left-hand side, do we see the signaling sequence?

01:15:52 A. Yes. So up here on the left, you see -- one second, sorry. You see the SIP sequence number listed on the left.

01:16:03 Q. Okay. And in your opinion, does this listing of the SIP used in the transmission show that Verizon is maintaining continuity in the signaling sequence of the SIP?

01:16:18 A. No. If you -- you look down this column, you see the abrupt changes from 1, 2, 3 to 5 to 6, down to 4, up to 5, and then down to 2 again.

01:16:31 Q. Okay. Great.

01:16:32 MR. ANDERSON: Can we go to Slide 19? And -- and let's take a look at Slide 19.

01:16:45 Q. (By Mr. Anderson) It's the Samsung S24 test that

01:16:47 Mr. Faber did from LTE to Wi-Fi.
01:16:49 And does the test results here for the Samsung S24
01:16:59 indicate that Verizon is maintaining continuity in the
01:17:03 signaling sequence of the SIP used in the transmission?
01:17:05 A. No. Again, on the column on the left, you can see that
01:17:10 the numbers associated with the SIP packets are not
01:17:16 maintaining continuity.
01:17:19 Q. Okay.
01:17:19 MR. ANDERSON: Can we go to Slide 20? And can we
01:17:30 bring up the -- the language of the construction?
01:17:32 Q. (By Mr. Anderson) For Slide 20, Mr. Faber helpfully
01:17:40 gave a second LTE to Wi-Fi call. In this second testing,
01:17:46 did -- did -- did the test results -- what did the test
01:17:51 results indicate about whether Verizon is meeting the
01:17:54 maintaining continuity limitation?
01:17:57 A. This is consistent with the other sets we just saw. So
01:18:00 for the iPhone and the two Samsungs, the Verizon system did
01:18:05 not maintain continuity of the SIP signaling sequence.
01:18:08 Q. Okay.
01:18:08 MR. ANDERSON: And can we go to Slide 21?
01:18:19 Q. (By Mr. Anderson) And what are your conclusions
01:18:21 about -- and Slide 21 is Mr. Faber's testing of the Samsung
01:18:30 device switching from Wi-Fi to LTE?
01:18:32 A. Correct. And you see here the exact same behavior
01:18:37 across multiple devices.

Q. Okay.
MR. ANDERSON: And if we can go to Slide 23.
Q. (By Mr. Anderson) And this is the iPhone 16 -- I guess we can't see it, but the iPhone 16 switch from LTE to Wi-Fi.
What are your conclusions about whether -- whether this test shows infringement or not?
A. Well, it is Wi-Fi to LTE, and you can see that the signaling sequence is not maintained. It's going up and down.
Q. Okay.
MR. ANDERSON: Can we turn to Slide -- I don't think this is Slide 23. Yeah, can we turn to Slide 23? Okay. 23? Yeah, great.
Q. (By Mr. Anderson) And this is the iPhone, LTE to Wi-Fi, and I know Dr. Rubin didn't put forward a theory on this, but in your test analysis, what does this show regarding the -- whether Verizon meets this claim limitation?
A. Well, we've been going from the cell tower to the Wi-Fi connection. You can see the SIP signaling sequence is not maintaining continuity.
Q. Okay. And did you personally review the call traces that Mr. Faber generated?
A. Yes. I looked at his PCAP files very carefully and

went through all of them to see if what he had performed and characterized was accurate with respect to the hard data.
Q. Okay. And with the slides that we've just looked at, we had indicated a switch-over in each of those right before the REGISTER command. Is that accurate with respect to your opinion?
A. Yes, this is consistent with both the documentation that we have in Verizon, as well as the discussions I've had with Verizon personnel, and then with the PCAP captures.
Q. Okay. Great. Now, if we can --
MR. ANDERSON: I'd like to switch back to Slide 13.
Q. (By Mr. Anderson) If Verizon -- well, let me start this way. In all of Mr. Faber's testing, did you ever see any SIP RE-INVITEs occur when the network was switched?
A. No, there were no RE-INVITE messages, which I talked about earlier as required, do not show up at all.
Q. And for the SIP Re-Register messages that do show up, are those sent from one phone to the other?
A. That is -- Mr. Faber had testified that is sent from the phone to the network.
Q. And it doesn't go to the other phone, correct?
A. No, it doesn't go through to the other phone.

01:21:32 Q. Okay. So in Verizon's system when -- when the phone switches from the one path to the second path, does -- does Verizon's phone send a -- a SIP message from the switching phone all the way to the other phone?
01:21:50 A. No, it does not send a message -- SIP message as required by the claim element from across -- the transmission across the path. It does not happen.
01:22:02 Q. Okay. And you heard Mr. Faber talk about IP continuity?
01:22:06 A. Yes, I did.
01:22:06 Q. Can you explain -- can you explain -- I know Mr. Faber did -- a little bit about IP continuity and how Verizon uses it, in particular?
01:22:16 A. Yes. So here we see in green, we see when you first connect to a Verizon cell network, you're given an IPv6, the long IP address. So your phone receives that address, and the network identifies you with that address.
01:22:34 And then if you do a switch, that same address is used, IP continuity before and after the switch, to be able to recognize you in the system and be able to perform that switch.
01:22:48 So that's the way they cut that Gordian knot and say, you know, we don't have a problem here because we just use one IP address all the way across.
01:22:58 Q. Okay. And in your analysis, does SIP have anything to

01:23:01 do with the -- keeping the call going as you switch between
01:23:08 the two different paths?
01:23:10 A. No.
01:23:11 Q. Okay. Now, to be clear, which of these components
01:23:20 actually makes the decision to switch between the two
01:23:24 paths?
01:23:24 A. Well, there's software running on your phone that makes
01:23:28 the decision. They -- it's the only device that knows what
01:23:32 the signal is like for you sitting in your house or in a
01:23:37 courtroom or walking down the street. So it's the only
01:23:39 thing that can make the decision to do the switch.
01:23:41 Q. Okay.
01:23:43 MR. ANDERSON: Can we pull up Slide 137 from
01:23:45 Dr. Rubin's demonstratives? Great.
01:24:20 Q. (By Mr. Anderson) You recognize this as Dr. Rubin's
01:24:23 presentation of his test -- call trace testing; is that
01:24:26 correct?
01:24:26 A. Yes, I do.
01:24:27 Q. Okay. Did you analyze the traces that Dr. Rubin
01:24:31 provided?
01:24:31 A. Yes, I did.
01:24:33 Q. Start with the most important thing. In all of those
01:24:37 traces, every single thing, did you look at all the IP
01:24:40 addresses?
01:24:40 A. Yes, I did.

01:24:41 Q. In everything that Dr. Rubin provided, was there a single IP address corresponding to anywhere in the Verizon network over here?
01:24:55 A. Absolutely not.
01:24:57 Q. Okay. So to be clear, the evidence that was given to you by Dr. Rubin included only addresses that are Aspen's, correct?
01:25:08 A. Correct.
01:25:08 Q. Okay. So just looking at the documentary evidence, there's no documentary evidence that this -- his testing involved any Verizon equipment; is that true?
01:25:20 A. That's correct. There's nothing for -- that I could see to evaluate and say that there was evidence of Verizon connectivity, and I did not see any IP address associated with Verizon.
01:25:33 Q. Okay. Now, in your report, did you attempt to determine what IP addresses were in Dr. Rubin's call traces?
01:25:53 A. Yes, I did. It's called who is or What is Your IP Address. You can do a look up and depending upon the address, you can get a hit and tell you exactly who is associated with that -- or who owns that IP address.
01:26:06 Q. Okay.
01:26:07 MR. ANDERSON: Okay. So I'd like to do, if we could, can we take this slide and kind of put it to one

01:26:14 side and then on the other side put Dr. Mahon's Slide 35.
01:26:27 Q. (By Mr. Anderson) Okay. And we see here there's kind
01:26:29 of this 208 address. Do you see that?
01:26:32 A. Yes.
01:26:33 Q. Okay.
01:26:35 MR. ANDERSON: And can you put up Dr. Mahon's
01:26:38 Slide 37?
01:26:39 Q. (By Mr. Anderson) And -- and is this -- what is --
01:26:50 what are you showing here? What is this Whois? What does
01:26:55 it do?
01:26:56 A. So this is the lookup I was talking about. So you call
01:27:02 lookup for this IP address, and then what you'll see down
01:27:05 here is it gives you and tells you who that IP address is
01:27:08 associated with, and as it indicates it's Nextiva
01:27:13 Incorporated.
01:27:15 Q. Great. Okay. And we saw a bunch of -- well, did you
01:27:21 see addresses starting with 192.168 in Dr. Rubin's testing?
01:27:26 A. Yes, I did.
01:27:27 Q. And -- and would those be everything over here in their
01:27:30 private network?
01:27:31 A. Yeah, that's -- those are private addresses that are
01:27:34 reused millions of times across the world. They're not
01:27:38 public addresses that can be routed globally. So yes, I
01:27:43 did.
01:27:43 MR. ANDERSON: Can we pull up Slide 36 in

01:27:59 Dr. Mahon's report? Yeah. Slide 36. Yeah.
01:28:06 Q. (By Mr. Anderson) Okay. And, Dr. Mahon, we can see this is one of the SIP INVITEs that Dr. Rubin relied on; is that correct?
01:28:14 A. That's correct.
01:28:15 Q. Okay. And you talked about this in your report, didn't you?
01:28:18 A. I sure did, yes.
01:28:19 Q. Okay. Good. And I want to ask you about this -- this IP address here, this 45.29 do you see that?
01:28:28 A. Yes, I do.
01:28:29 Q. Okay. And what does it mean for something to be in the contact field of a SIP message?
01:28:35 A. Well, that is where the SIP message is going to. So that's what this -- who's going to receive this SIP message.
01:28:43 Q. Okay. And that is the actual entity or the software or the hardware, whatever it is, the server that will process the SIP message, correct?
01:28:54 A. That's correct.
01:28:54 Q. Okay. Can we keep that 45.29 in mind.
01:29:01 MR. ANDERSON: Can we turn to your Slide 39?
01:29:06 Q. (By Mr. Anderson) Okay. Did you do a Whois on Slide 39?
01:29:11 A. Yes, I did. And you can see down here, you know, I did

01:29:15 the Whois, and that is associated with AT&T, not Verizon.
01:29:20 Q. Okay. So we know somewhere in Dr. Rubin's testing it's
01:29:26 talking to an AT&T SIP server, correct?
01:29:29 A. That is correct.
01:29:29 Q. Okay.
01:29:30 MR. ANDERSON: Can we go back to Slide 137 of
01:29:32 Dr. Rubin's report -- I'm sorry, Slide 137 of Dr. Rubin's
01:29:52 demonstratives.
01:29:53 Q. (By Mr. Anderson) Okay. So we know -- we know there's
01:29:56 this AT&T thing somewhere, right?
01:29:58 A. Yes.
01:29:59 Q. Okay. Did Dr. Rubin's report say anything about an
01:30:05 AT&T server sitting in his testing?
01:30:08 A. No. There was no mention of it at all.
01:30:11 Q. Okay. Oh, and we don't know where it is or what it's
01:30:16 doing, do we?
01:30:17 A. Correct. All we know is that's the recipient for those
01:30:22 packets that have that address.
01:30:25 Q. Okay. Now I want to talk about Dr. -- Dr. Rubin said
01:30:29 it was a Verizon mobile device over here. Is there
01:30:34 anything -- any IP addresses that would indicate in his
01:30:39 testing that there was actually a Verizon mobile device
01:30:46 involved in his testing?
01:30:47 A. No, because there's no IP address associated with
01:30:51 Verizon in any of the captures.

01:30:53 Q. And did -- did Dr. Rubin's report show any form of,
01:31:01 like -- well, let me step back.
01:31:03 Dr. Rubin's report had -- had photos of these
01:31:05 things, right?
01:31:06 A. Yes, he did.
01:31:08 Q. Okay. And did he have a photo of the Verizon phone?
01:31:13 A. No, that was -- that was left out. You know, one of
01:31:17 the things you would expect when you do an experiment or a
01:31:20 test is to kind of document as much as possible. And I was
01:31:24 a little surprised not to see what phone type, the model of
01:31:27 the phone, the software running on the phone. Those kind
01:31:30 of elements were not present in the report.
01:31:33 Q. Okay. And as Mr. Faber said, you can actually look at
01:31:38 the phone and tell when it's a Verizon phone on Voice over
01:31:41 Wi-Fi, can't you?
01:31:42 A. Yes, you can.
01:31:53 Q. Okay.
01:31:54 MR. ANDERSON: Now, let's go back to Slide 36,
01:31:57 Dr. Mahon's Slide 36.
01:32:00 Q. (By Mr. Anderson) Now, Dr. Mahon, I think -- I think I
01:32:03 heard Dr. Rubin say that the SIP message said that it was
01:32:06 from a Verizon phone. Do you see that there?
01:32:10 A. I did hear him say that, yes.
01:32:12 Q. And is that saying it's from a Verizon phone?
01:32:15 A. No, that's just the label that's put in the SIP packet

01:32:19 to transmit the packet.
01:32:20 Q. Okay. So based upon your analysis of Dr. Rubin's
01:32:31 testing, did he -- did he show anything that could be used
01:32:37 to document that this was actually a Verizon phone?
01:32:40 A. No, there was nothing that I evaluated from Dr. Rubin
01:32:46 that would point directly to any packet coming from a
01:32:51 Verizon device or node.
01:32:54 Q. Okay.
01:32:54 MR. ANDERSON: Can we go to Slide 41?
01:32:56 Q. (By Mr. Anderson) And are these the SIP messages in
01:33:04 Dr. Rubin's testing?
01:33:05 A. These are a set from his testimony, yes.
01:33:08 Q. Okay. And I see it starts up here -- starts up here
01:33:15 and ends down here, correct?
01:33:16 A. That's correct.
01:33:16 Q. And I see all these SIP RE-INVITEs in there, correct?
01:33:22 A. Correct.
01:33:22 Q. Okay. Are those SIP RE-INVITEs generated ever by
01:33:30 Verizon?
01:33:30 A. No. You can see all the addresses included in these
01:33:33 messages are associated with non-Verizon entities.
01:33:36 Q. Okay. And Dr. Rubin said between the 22nd point and
01:33:42 the 42nd point -- do you see these 20 and 40 right here at
01:33:50 this time?
01:33:50 A. Yes, I do.

01:33:52 Q. He testified that the phone switched over at that time; is that correct?
01:33:55
01:33:55 A. I did hear him say that, yes.
01:33:57 Q. Okay. Do you see any SIP message coming from the
01:33:59 Verizon phone during that 20 to 42nd time?
01:34:06 A. No. There's no evidence here to show you that there's
01:34:09 a SIP packet coming from a Verizon phone.
01:34:09 Q. And does that confirm your previous statement that
01:34:12 Verizon phones do not send SIP messages to the other phone
01:34:16 when they do a switch-over?
01:34:18 A. Yes, that's consistent with all the evidence that I've
01:34:21 seen in this case. I'm not surprised that you do not see
01:34:23 it.
01:34:24 Q. Even if you ignore every other single problem that
01:34:29 you've identified here today with Dr. Rubin's report, does
01:34:36 this set of SIPs that are used in the transmission meet the
01:34:46 Court's requirement for continuity?
01:34:51 A. No, it does not because, again, you see the, you know,
01:34:56 change in continuity here.
01:34:58 Q. Okay.
01:35:03 MR. ANDERSON: Now, I want to just go to Slide 47.
01:35:11 Q. (By Mr. Anderson) Ultimately, what is your conclusion
01:35:16 about whether Verizon's Wi-Fi Calling meet --
01:35:22 MR. ANDERSON: I'm sorry, can we go to Slide 46 --
01:35:30 Slide 42, sorry. 42, yeah, my fault.

01:35:34 Q. (By Mr. Anderson) Ultimately, what is your conclusion about whether Verizon's Wi-Fi Calling meets the maintaining continuity claim element?
01:35:42 A. It does not meet it. It doesn't need to send a SIP message to do anything, so it does not meet it.
01:35:48 Q. And is that claim element found in all of the claims that are asserted in this case?
01:35:53 A. Well, this, too, is found in every single claim element, so Verizon does not infringe, based on multiple reasons.
01:35:59 Q. Okay.
01:36:05 MR. ANDERSON: Can we go to Slide 48?
01:36:07 Q. (By Mr. Anderson) We're working our way through the claim.
01:36:16 MR. ANDERSON: And let's just go to the next slide, Slide 49.
01:36:21 Q. (By Mr. Anderson) We see highlighted here the claim element regarding the Network Address Translation or NAT that is required by the claim. Do you see that?
01:36:33 A. Correct, yes.
01:36:34 Q. Can you explain what your under -- well, first of all, I'll just say does -- did Aspen get a claim for performing any form of NAT?
01:36:44 A. No. As we saw in the prosecution history, it was denied. But the answer is, no, they did not.

01:36:52 Q. And can you explain what this means, the performed on said transmission, in context with the other elements requiring the transmission to contain audio or video data?
01:37:07 A. Yeah. So you have your call set up, and your transmission is sending the voice data, for example. And that's in RTP stream of packets. So this requirement is saying that you have to perform NAT on those RTP packets, the audio that's being sent, in order to meet this claim element.
01:37:28 Q. Okay.
01:37:46 MR. ANDERSON: Can we pull up Slide 51?
01:37:50 Q. (By Mr. Anderson) Okay. Here -- now, we saw Mr. Faber earlier today identify these components as being in the Verizon network, correct?
01:38:05 A. Correct. This diagram is -- everything circled is a Verizon element.
01:38:09 Q. Okay. And can any of these Verizon elements perform NAT on the transmission for voice?
01:38:18 A. No, none of these elements can perform NAT on the voice transmission.
01:38:25 Q. Okay. Let's look down here on this -- well, do you recall when Mr. Faber talked about a tunnel between a phone and the ePDG?
01:38:35 A. Yes, I do.
01:38:37 Q. Can you draw that tunnel on there?

01:38:38 A. Yes. The tunnel, as Mr. Faber drew, is between the Voice over LTE and the ePDG.
01:38:45
01:38:48 Q. Okay. And I think we heard both Mr. Minor and Dr. Rubin talk about how strongly that was encrypted to protect. Is that consist with your understanding?
01:38:54
01:38:57
01:39:00 A. Yes, that's very consistent with a person of ordinary skill in the art would understand when you're encrypting, you're protecting data very tightly. It's -- the whole purpose is so nobody can steal your data.
01:39:05
01:39:08
01:39:11
01:39:14 Q. Okay. So this -- this thing that's in the middle, the Wi-Fi access point, now, those can in the abstract perform a form of NAT, correct?
01:39:18
01:39:25
01:39:27 A. Yeah, your access point can perform NAT.
01:39:30 Q. Okay. But with Verizon's implementation, where it has protected the packets entirely across the access point, can the access point even -- even see those RTP and SIP packets?
01:39:36
01:39:42
01:39:46
01:39:46 A. No. The encryption happens at your phone before it crosses past the access point. So the packets -- the RTP packets are protected. The access point cannot perform NAT on the packet itself. It's inside the protected encrypted tunnel.
01:39:50
01:39:59
01:40:02
01:40:06
01:40:06 Q. So is Verizon's system designed to -- to prevent exactly the type of NAT that is called for by the claims?
01:40:11
01:40:14 A. Yes, exactly, because if I wanted to steal some of your

01:40:20 data from your house, I could listen to your transmissions
01:40:22 and try to pull out that data you're sending, but it's
01:40:26 encrypted. So the same thing is happening with your access
01:40:30 point. Your access point cannot get into those packets.
01:40:42 MR. ANDERSON: I'm going to switch back to Slide
01:40:45 49.
01:40:46 Q. (By Mr. Anderson) And to be clear, the claim has a
01:40:52 specialized form of NAT, correct?
01:40:55 A. Very specialized form of NAT. It's on the RTP packets,
01:41:00 which are the voice and data.
01:41:01 Q. And the access point can't even access those, correct?
01:41:06 Can't even see them?
01:41:07 A. Correct.
01:41:08 Q. And did you hear Dr. Rubin's theory on -- on NAT when
01:41:13 he was here?
01:41:14 A. I did.
01:41:14 Q. And did he say that it was -- it was the access point?
01:41:18 A. He did, yes.
01:41:20 Q. And is that consistent with how Verizon's system with
01:41:24 its encrypted tunnel works?
01:41:27 A. No.
01:41:27 Q. Okay.
01:41:32 MR. ANDERSON: Can we go to Slide 52?
01:41:39 Q. (By Mr. Anderson) What is your conclusion regarding
01:41:41 whether Verizon meets this claim element?

01:41:44 A. It does not meet that claim element because the NAT cannot be performed on the claimed transmission, which is the RTP stream.
01:41:52 Q. Great. And because -- is this claim element in all the claims?
01:41:58 A. Yes, it is.
01:41:59 Q. And what does the fact that it doesn't meet this element and it's in all the claims lead you to -- to conclude?
01:42:05 A. Well, this is a third reason that none of the claims can be infringed by Verizon.
01:42:11 Q. Okay. And to be clear, any one of these reasons is sufficient to find non-infringement, correct?
01:42:16 A. Standing alone, any one of those three standing alone is sufficient to reach a conclusion of non-infringement.
01:42:23 Q. Okay.
01:42:23 MR. ANDERSON: Can we go to Slide 60?
01:42:26 Q. (By Mr. Anderson) I'm going to switch -- going to switch topics a little bit --
01:42:32 A. Okay.
01:42:32 Q. -- and move away from the non-infringement analysis to whether certain patents are technologically comparable, okay, Doctor?
01:42:44 A. Okay.
01:42:46 MR. ANDERSON: Can we go to Slide 61?

01:42:48 Q. (By Mr. Anderson) What is your conclusion regarding -- what is your conclusion regarding the KAIFI patent as to whether it's technologically comparable to the '554?
01:43:07 A. So the patent you see here is a patent I evaluated -- I mentioned a previous Verizon case. I also evaluated this patent for this case. We're calling it, you know, the KAIFI patent because they were the -- they were the owners of the patent. And that patent covers switching between a Wi-Fi and a cellular network and a cellular network and a Wi-Fi network, so it covers switching.
01:43:33 However, the claims are broader. The '554 covers voice and video. This one covers voice and data, which is -- which would include web browsing, email, et cetera, texting.
01:43:52 Q. Okay. And when was the KAIFI patent filed?
01:43:55 A. Six years before the '554.
01:43:58 Q. Okay.
01:43:58 MR. ANDERSON: Can we go to the next slide, please?
01:44:01 Q. (By Mr. Anderson) And we've heard discussions in this case about Wi-Fi and cellular. Did the -- did the KAIFI patent describe Wi-Fi?
01:44:14 A. It did. So Wi-Fi standard came out in '99. These frequencies are defined by the Wi-Fi standard as the ISM band. It means unlicensed band. And it was well known

01:44:30 that these frequencies were associated with the 802.11
01:44:36 protocol, which is the Wi-Fi protocol.
01:44:39 Q. Okay. And did the KAIFI patent talk about a -- an
01:44:43 outdoor network or a cellular network?
01:44:44 A. It does. It mentions an indoor network, which these
01:44:48 frequencies are listed, the Wi-Fi, as well as Bluetooth it
01:44:53 mentions. And then it mentions outdoor networks, which
01:44:56 are -- all these down here are cellular networks listed.
01:45:04 Q. And did the KAIFI patent mention VoIP?
01:45:05 A. Yes, it does.
01:45:07 Q. And at the time -- back at the time, what protocols
01:45:11 would VoIP have included?
01:45:14 A. That would have included SIP and RTP, which were known
01:45:17 at the time.
01:45:18 Q. Great.
01:45:18 MR. ANDERSON: Can we turn to Slide 64?
01:45:20 Q. (By Mr. Anderson) Okay. And, Dr. Mahon, just to cut
01:45:29 this short, I want to focus you on this down here. This is
01:45:34 a passage from the KAIFI patent.
01:45:36 Can you explain what is shown in this passage from
01:45:43 KAIFI patent at 2 -- Column 2, Lines 17 to 26?
01:45:48 A. Yeah, it's talking about the object of the present
01:45:50 invention. And it's talking specifically about switching
01:45:53 here -- right in here. So it's talking about the switching
01:45:57 between networks. And it talks about, you know, a wired

01:46:05 LAN and a mobile data communications terminal. And if it's
01:46:08 located indoors, you can obviously obtain Internet access
01:46:13 through a wireless LAN, or an outdoor wireless Internet
01:46:21 network, which would be a cell network.
01:46:23 Q. Okay. And were you here during the opening where
01:46:27 Aspen's counsel was talking about the products at issue in
01:46:31 this case, starting inside -- I think he had a diagram
01:46:35 where you walk outside and you switch to -- to a cellular
01:46:39 network?
01:46:39 A. I did, yes.
01:46:40 Q. And is -- is that what KAIFI is describing here,
01:46:44 walking from an indoor network outdoors and connecting to a
01:46:48 cellular network?
01:46:49 A. Yes, those are the specific disclosures within the
01:46:53 patent.
01:46:53 Q. Okay. And based upon your analysis of KAIFI, is it
01:46:57 technologically comparable to the '554 patent?
01:46:59 A. Yes. It's technologically comparable. It -- same area
01:47:06 of technology, and it deals with the same specific
01:47:10 challenges associated with that technology.
01:47:12 Q. Great.
01:47:14 MR. ANDERSON: Can we turn to Slide 71?
01:47:16 Q. (By Mr. Anderson) Now, there was a second patent that
01:47:23 you assessed from a company called EON. Can you describe
01:47:28 what the EON patent disclosed?

01:47:30 A. Yeah, again, this one is associated with having
01:47:35 devices, that is phones, being able to switch between
01:47:38 different types of networks and cellular networks.
01:47:42 MR. ANDERSON: And, boy, I don't know if,
01:47:45 Mr. Duval, there's any way to blow up this portion to see
01:47:48 what the date of the EON patent was. Possibly not. Yeah,
01:47:53 okay. Great. Good job.
01:47:56 Q. (By Mr. Anderson) Do you see that the EON patent was
01:47:58 filed in 1994?
01:48:00 A. Yes, I do.
01:48:01 Q. And what are your conclusions about the EON patent?
01:48:03 A. Well, it certainly predates the '555 -- '554 by almost
01:48:09 13 years. And it discloses, again, similar technology as
01:48:13 disclosed in the '555 -- '554, so it's technologically
01:48:19 comparable.
01:48:20 Q. Okay.
01:48:28 MR. ANDERSON: Now, let's go to Slide 76.
01:48:31 Q. (By Mr. Anderson) Now, we've seen, and I'll reiterate,
01:48:34 back and forth about all the things KAIFI had -- all the
01:48:37 things Aspen had to add to its claims during prosecution.
01:48:44 Do you recall that discussion?
01:48:45 A. I do.
01:48:45 Q. And you did an analysis yourself of the prosecution
01:48:48 history; is that correct?
01:48:48 A. Yes, I did.

01:48:49 Q. And we've kind of heard some testimony about, well, gosh, all you have to do to meet the claim elements is just follow the rules of SIP. Is that consistent with the prosecution history?
01:49:02 A. No. The rules of SIP are the SIP protocol, and just to remind you, the Patent Office rejected the claims that only disclosed SIP, the rules. So it has to be something beyond that.
01:49:18 Q. Okay. And I think we saw testimony from Aspen's inventor and -- and CEO, Mr. Bhaskaran, this morning. Did you see where he said everybody already knew how to follow the rules of SIP?
01:49:32 A. Yeah, that's consistent with what I've been saying and what others have said.
01:49:36 Q. Okay.
01:49:37 MR. ANDERSON: Can we go to the next slide, 77?
01:49:42 Q. (By Mr. Anderson) Now, you were asked to perform an incremental benefits analysis. Can you explain what that is?
01:49:49 A. Yes. So my job here was to look at the asserted claim and look at the claim, what's recited in the claim, to determine what was conventional, that is, already existed in the prior art. And then what the claim adds to the prior art to add value to what's contained within the claim element or the claim itself.

01:50:12 Q. And to cut to the chase, what was your conclusion regarding what the '554 patent, the incremental benefit over the known and conventional technology?
01:50:26 A. Well, as you've heard, the known and conventional technology stacked up really high. What's disclosed in the patent claim, the asserted claims, does not add anything to that. It's very minimal, if any, miniscule to the point of vanishing measurement.
01:50:45 Q. Okay.
01:50:45 MR. ANDERSON: If we could turn to Slide 79.
01:50:49 Q. (By Mr. Anderson) And over here on the left we have this book by Mr. Stallings. Can you explain what that book is?
01:50:55 A. Yeah, so William Stallings is a prolific person in the area of telecommunications. I use his textbooks in like wireless communications and securities class, for example. But -- so his textbook is well known, and it talks about data and computer and wireless communications.
01:51:15 Q. Okay. And over here -- and Mr. Stallings, this book, do you actually have a copy of this exact edition?
01:51:22 A. Yes, I do.
01:51:23 Q. Okay. And what is he showing over here regarding whether network communications and Internet Protocol were known and conventional before the '554 patent?
01:51:33 A. Well, not surprisingly, the Internet was well underway,

01:51:40 so he was disclosing that the Internet was well known.
01:51:42 MR. ANDERSON: Okay. And if we could go to Slide 81.
01:51:45 Q. (By Mr. Anderson) What's Mr. Stallings disclosing about -- in Slide 81?
01:51:51 A. Well, again, this is the 802.11 architecture, which is Wi-Fi, and so he's basically -- has a pull-out here right from the Wi-Fi standards. It was known.
01:52:02 Q. Okay.
01:52:02 A. The standards were published already at that time.
01:52:05 MR. ANDERSON: Can we go to Slide 84?
01:52:07 Q. (By Mr. Anderson) This is Figure 7 from the patent. And what does the fact that it's talking about SIP and RTP and NAT/PAT being in the prior art indicate to you about whether those concepts were known and conventional?
01:52:25 A. The patent itself was saying, hey, this was known. So that's consistent.
01:52:30 Q. Okay. So as we're working our way down the claim elements here, I'd like to turn you to Slide 99, and this is in the context of the -- the switching element.
01:52:42 Can you tell the jury what UMA is?
01:52:47 A. Yeah, UMA stands for Unlicensed Mobile Access, like it says up top, and it was the protocol that was put together by several companies, five or six or seven. And what they wanted to do is they wanted to have your cell phone -- and

01:53:03 at that time you typically had the clamshell flip phone
01:53:06 with the little stub antenna on the side, and they wanted
01:53:07 you to be able to switch to Wi-Fi or wireless networks, as
01:53:12 well as use your cell. So they were trying to solve the
01:53:15 exact issue that we're talking about.
01:53:20 Q. And I see down here in the -- there's a date down here.
01:53:24 Can you tell me what that represents -- what date that is,
01:53:27 what it represents?
01:53:27 A. Yeah, that -- 2006, so the consortium got together to
01:53:31 put this protocol together about 2004. And by 2006, they
01:53:31 were publishing it and people were starting to build
01:53:38 products to implement UMA.
01:53:39 Q. Okay.
01:53:40 MR. ANDERSON: Can we turn to Slide 101?
01:53:43 Q. (By Mr. Anderson) What do the highlight -- the
01:53:49 highlighted passages on Slide 101 inform you?
01:53:52 A. Well, again, we're talking about unlicensed, which is
01:53:55 Wi-Fi, and we're talking about seamless delivery of voice
01:53:59 and data. Again, broader than the '554, seamless
01:54:05 transitions while roaming and handover from cellular to
01:54:09 unlicensed Wi-Fi.
01:54:10 Q. Okay. And we saw with the KAIFI patent, it also taught
01:54:16 roaming, transitions, switching between cellular and Wi-Fi,
01:54:21 correct?
01:54:21 A. Yes.

01:54:21 Q. And so what was your conclusion regarding the incremental benefit of the switching element?
01:54:26 A. Zero.
01:54:27 Q. Okay.
01:54:31 MR. ANDERSON: Can we turn to Slide 104?
01:54:34 Q. (By Mr. Anderson) Did you read the reports of Mr. Blok, Mr. Minor, and Dr. Rubin?
01:54:40 A. Yes, I did.
01:54:43 Q. And did you see anywhere in there where they -- they tried to -- to identify the specific improvement of the '554 patent over technology that was known and conventional in the art?
01:54:57 A. No, there was no isolation of a specific element within that claim that said, hey, this is the incremental improvement over the prior art.
01:55:07 Q. And -- and no attempt to value any sort of incremental benefit?
01:55:11 A. Not that I saw, no.
01:55:14 MR. ANDERSON: I'll pass the witness, Your Honor.
01:55:16 THE COURT: Cross-examination?
01:55:21 MR. HEARD: Yes, Your Honor. Oh, thank you. Your Honor, may we pass out some cross binders?
01:55:50 THE COURT: Yes, of course.
01:55:51 MR. HEARD: They don't wait for --
01:55:56 Thank you, sir.

CROSS-EXAMINATION

BY MR. HEARD:
Q. Good afternoon, Dr. Mahon.
A. Good afternoon, sir.
Q. How are you? Good to see you in person. We've met by video before; is that right?
A. Indeed. Same here.
Q. I've got a number of questions to ask you. You've seen how that's gone, and you've done this a number of times, right?
A. That's correct.
Q. And as you said, you're being paid by Verizon to be here to testify, right?
A. Yes, I am.
Q. Now, Dr. Mahon, before this case, you said you had been retained by Verizon in patent cases, what, five or six times?
A. Yes, as part of joint defense groups, typically, but, yes, including specifically just for a Verizon case.
Q. Okay. And you have no opinions to offer the jury today on the validity of the '554 patent, correct?
A. No, that's not what my analysis contained.
Q. And how many patents do you have to your name, sir?
A. Good question. Having worked for the Applied Research Lab for 25 years, which is a trusted agent for the

Government, the answer is zero because we had to sign a contract that said we will not get any personal gain from the research work we were doing specifically for the Government.
Q. So the answer is zero?
A. Zero.
Q. And you've never been involved then in the prosecution of a patent that you have filed for with the PTO?
A. That's correct.
Q. And, Dr. Mahon, isn't it true that you have not held a job as an employee in the telecommunications industry for the carriers?
A. Not for the carriers, no.
Q. And by carriers, I mean telecom companies like Verizon and AT&T, T-Mobile, and the like?
A. That's correct.
Q. But these same big telecom companies come to you in patent cases like this to offer opinions; is that right?
A. Yes. Utilizing my research experience with such matters, yes.
Q. And you created a slide. I don't think you presented it because -- in the interest of time perhaps, but if we put it up, DD3.7, this was a slide that you prepared; is that right?
A. That's correct.

01:58:05 Q. And this is a list of, you know, some of the companies that you -- have retained you to offer expert services?
01:58:13 A. Yes. We see infrastructure companies here, handset companies, as well as the network providers.
01:58:19 Q. And you -- so you said five -- five or six times. I'm not trying to get it wrong. Five times before this for Verizon --
01:58:27 A. Yes.
01:58:28 Q. -- roughly? And does seven times sound right for Samsung?
01:58:32 A. If you count current engagements, that's probably correct.
01:58:38 Q. Have you testified at trial for Samsung quite recently?
01:58:41 A. Yes, I did.
01:58:42 Q. And Amazon, you've served as an expert in a patent case; is that right?
01:58:48 A. I believe three times would be my recollection.
01:58:51 Q. And then T-Mobile, another six times?
01:58:55 A. I don't think T-Mobile is that high. Maybe three times.
01:58:58 Q. Maybe three other times? And then Nokia and Ericsson, quite a few times -- over 10 or 12 times?
01:59:04 A. Yes, sir.
01:59:06 Q. So -- at any given time, you may have five or six of these expert witness engagements going on at one time; is

01:59:14 that right?
01:59:14 A. If you count IPRs as part of that, that's probably
01:59:18 correct.
01:59:18 Q. And by IPRs you mean it's a patent matter in front of
01:59:22 the Patent Office; is that right?
01:59:24 A. That's correct.
01:59:24 Q. And you offer testimony on behalf of either a patent
01:59:28 holder or someone attempting to invalidate a patent and say
01:59:32 it should never have granted?
01:59:34 A. On both sides, Defendant and Plaintiff, yes.
01:59:36 Q. But Verizon really values your expert witness work; is
01:59:46 that right, Dr. Mahon?
01:59:46 A. I hope so, yes.
01:59:49 Q. You're so valued to Verizon that when you called to
01:59:51 complain about coverage, they sent linemen to your house
01:59:54 and climbed up and fixed the antenna, pointed it to your
01:59:59 house to get better coverage, right?
02:00:00 A. Yeah, in 2001, I was transitioning from the university
02:00:05 to trying to set up my own company in state college. And
02:00:07 I'm in the middle of nowhere, so I was getting really poor
02:00:10 cell coverage, and I called them up. And sure enough they
02:00:14 sent someone shimmying up that tree for the three houses
02:00:17 sitting out there to improve the cell coverage.
02:00:20 Q. That is impressive. I'm a loyal Verizon customer and
02:00:23 so are three of my kids. But I don't know that I've gotten

02:00:24 that kind of service before.
02:00:26 There's no dispute today, Dr. Mahon, that
02:00:29 Verizon's VoWiFi service that we've been discussing uses
02:00:33 the SIP protocol; is that right?
02:00:34 A. That's correct.
02:00:35 Q. There's no dispute that the VoWiFi service uses the RTP
02:00:40 protocol, right?
02:00:41 A. That's correct.
02:00:42 Q. And at your deposition, you testified that you believe
02:00:46 Verizon aims to provide customers with a reliable network
02:00:49 and service; is that right?
02:00:52 A. I hope so.
02:00:53 Q. In fact, you don't think it makes much sense if Verizon
02:00:57 would want -- they would want any type of disruption,
02:01:00 including call drops; is that right?
02:01:02 A. As a design goal, correct.
02:01:05 Q. And you would agree that Verizon's VoWiFi service
02:01:10 sounds like an obvious one, uses mobile devices; is that
02:01:10 fair?
02:01:14 A. Yes, it does.
02:01:15 Q. And that Verizon Services uses audio and video data on
02:01:19 the transmissions?
02:01:19 A. Not the transmissions within the claim element, but
02:01:23 definitely on transmissions in general.
02:01:25 Q. So the Verizon VoWiFi service has audio and video data

that runs through the network; is that fair?
A. Yes.
Q. And Verizon's VoWiFi service has control protocols like RTCP to govern the transfer of those RTP media packets; is that fair?
A. Yeah, those are well known protocols.
Q. And you've been in here; you've heard a lot about the switching from Wi-Fi to LTE, and we'll talk about some of those tests that you've looked at. You don't dispute that the transmissions on Verizon's VoWiFi service are able to switch between VoWiFi and LTE and vice versa, right?
A. Again, outside of the switching that's disclosed in the claim element, I do not dispute that.
Q. And when accessing a radio access network, a cell connection, there are multiple base station access links; is that fair?
A. No, I disagree.
Q. Would you agree that when a user is on a phone and it's connecting to radio access network, that it scans for the best connection?
A. Yes, it's looking for a signal.
Q. And then how about when searching -- when a user is on the phone and needs the Wi-Fi signal, is there the possibility to scan for multiple APs, multiple access points?

02:02:48 A. Depends on the setup on your phone, but if you have
02:02:53 a -- if you're in your house and you've connected to your
02:02:55 access point in your house, that will be in there, and it
02:02:58 will be connected.
02:02:59 Q. In fact, just sitting here in the courtroom --
02:03:05 MR. HEARD: Ms. Hopkins, if you could please share
02:03:08 your screen right now and show the jury.
02:03:11 Q. (By Mr. Heard) How many Wi-Fi links are available in
02:03:13 this courtroom?
02:03:13 A. Well, those are definitely Wi-Fi signals that are
02:03:17 coming into the courtroom that I can see.
02:03:19 Q. More than one?
02:03:20 A. There is more than one there, yes.
02:03:22 Q. And if we walk outside the courtroom, there are
02:03:25 multiple Wi-Fi hotspots, connections in Marshall, such as
02:03:30 Connect Marshall free Wi-Fi, right?
02:03:32 A. Yeah, I did see the sign.
02:03:34 Q. Now, let's talk a little bit about the call traces that
02:03:40 Mr. Faber performed. I want to start there and then maybe
02:03:42 talk about Dr. Rubin's test; is that fair?
02:03:47 A. Okay.
02:03:47 Q. So Mr. Faber, as he testified, he performed those tests
02:03:50 on his own, right?
02:03:51 A. That's correct.
02:03:51 Q. You didn't ask him to do those?

02:03:53 A. I did have conversations with him afterwards.
02:03:57 Q. After the fact, after the tests were performed?
02:04:01 A. Correct.
02:04:01 Q. And so you didn't talk with him to discuss setup or how
02:04:06 the test would be performed?
02:04:08 A. I did not, no.
02:04:09 Q. And you didn't meet with him beforehand to talk about
02:04:14 the tests?
02:04:15 A. I don't have a specific recollection, no.
02:04:19 Q. I think you said the first time you talked to him about
02:04:23 the tests were after they were done and the test results
02:04:26 were handed to you; is that right?
02:04:27 A. That's consistent with my memory, yes.
02:04:28 Q. And at the time of your deposition, Mr. Faber was the
02:04:35 only employee at Verizon that you had spoken with about
02:04:38 this case, do you recall that?
02:04:40 A. I think that's correct, yes.
02:04:44 Q. And you don't believe that any other individuals were
02:04:48 present at the testing that Mr. Faber performed?
02:04:50 A. No, as I said, I had a conversation with him. He
02:04:55 described what he did, and there was no other person
02:04:58 indicated.
02:04:59 Q. And at your deposition, you said you didn't know one
02:05:03 way or another if there might be other people in the house
02:05:05 on different devices, right?

02:05:06 A. I did not ask him that question, so I was not aware.
02:05:11 Q. And sitting here today, can you confirm whether anyone was in the house or not?
02:05:15 A. I did not ask him that question.
02:05:17 Q. Now, let's talk a little bit about the actual devices used. Mr. Faber conducted the calls -- traces from his own personal cell phone, right?
02:05:31 A. Yes.
02:05:31 Q. Multiple devices, right?
02:05:32 A. I'm sorry?
02:05:33 Q. Multiple devices. He had an iPhone and a Samsung --
02:05:37 A. I see. Yes, he did.
02:05:39 Q. Now, do you know what device was on the other side of the transmission?
02:05:43 A. Well, he mentioned it was an endpoint for a BBC Radio broadcast.
02:05:52 Q. Do you know whether -- what type of device? You don't know whether that was a mobile phone or a SIP-enabled phone? Do you know anything about that device on the other end?
02:06:02 A. I do not recall evaluating any evidence associated with that.
02:06:05 Q. Now, Mr. Faber's call traces were recorded with Wireshark, right?
02:06:13 A. That's correct.

02:06:14 Q. And you're familiar with Wireshark, the program?
02:06:18 A. Yes, we use it in my classes -- my communication or
02:06:23 networks classes every semester.
02:06:24 Q. And this Wireshark module was located in Verizon's core
02:06:28 network, right?
02:06:29 A. Yes. As he testified today, he had several taps
02:06:32 running.
02:06:33 Q. Now, you're aware that under the SIP protocol -- you're
02:06:37 familiar with the SIP protocol?
02:06:38 A. Yes, sir.
02:06:39 Q. And under the -- do you agree that the Verizon VoWiFi
02:06:44 service adheres to the SIP protocol?
02:06:47 A. To my understanding, yes.
02:06:50 Q. And you're aware that under the SIP protocol, REGISTER
02:06:54 or RE-REGISTER messages -- transactions are assigned Cseq
02:06:59 numbers independently of dialog-based SIP messages like
02:07:05 INVITE, BYE, or UPDATE messages, right?
02:07:06 A. That sounds correct, yes.
02:07:08 Q. And that's set forth right in RFC 3261, right?
02:07:13 A. That's correct.
02:07:13 Q. In fact, for purposes of SIP maintenance, SIP REGISTER
02:07:17 messages are often categorized as out-of-dialog messages;
02:07:19 is that right?
02:07:19 A. For that purpose, yes.
02:07:22 Q. And I think you testified to this on direct, but I just

want to be really clear, the REGISTER, those SIP REGISTER messages, those don't go all way from source to destination, right?
A. That's correct.
Q. Now, as you also mentioned on direct, you were looking for, under the claim, the SIP maintenance from end-to-end, right?
A. Based on the claim elements in the plain and ordinary meaning, yes.
Q. So we're looking, all of us, and the jury needs to hear evidence, that the SIP signaling sequence was maintained between the source and the destination following the switch; is that right?
A. Well, that's what Dr. Rubin has asserted, yes.
Q. And we're looking -- in the context of the claim, we're looking in one direction. A dialog goes from -- a transmission can go from source to destination; is that right?
A. Well, it says between source and destination along the path. That's all it says.
Q. But you would agree with me that there are messages sent from source to the destination phone, and then there are messages that come back in the other direction, right?
A. Yes, there's bi-directional communications.
Q. Right. So oftentimes we refer to different dialogs.

There might be messages that need to get sent to other devices, a SIP server, other parts of the network, right?
A. Well, it depends upon the context, but, yes.
Q. But we want to look at the SIP maintenance -- maintaining SIP continuity is -- I think you said under the Court's claim construction, from the source to the destination following a switch in network path, right?
A. Well, that's what's being asserted, so that's what we need to analyze.
Q. And would you agree that Wireshark is a pretty powerful program, allows you to do a lot of things?
A. Well, the nice thing, it's open source, so it's free, and, yes, it is a pretty handy tool.
Q. And you agree you can filter packets on Wireshark to focus on, you know, messages of interest, like SIP messages?
A. Yeah. Instead of looking at thousands, you can narrow it down to look at specific packets.
MR. HEARD: So let's pull up, if we could, and share the screen. Ms. Hopkins is going to bring up Wireshark and look at the PCAP file that you provided or that Mr. Faber ran and captured and then provided for your analysis.
Q. (By Mr. Heard) Is this one of those files?
A. Yes, I recognize the Bates number.

02:09:59 Q. And so you're referring to the upper left, and this is a trial exhibit, VDTX-1. Do you see that?
02:10:07 A. Yes.
02:10:12 Q. And this is one of the files you relied on and just spoke about in direct, right?
02:10:18 A. Yes.
02:10:19 Q. Now, I'm going to take a look. Just bear with me as we go through some of these. But Packet 1, you see the source that starts in 2600 in that Source column right there that's being highlighted?
02:10:34 A. Yes, I do.
02:10:35 Q. And do you know what source -- what that address correlates to?
02:10:38 A. That source is an IPv6, and I'd have to explode the -- the detail down below to remind myself.
02:10:54 Q. So if we look in the "to" field, so in the Session Initiation Protocol field that's been expanded, do you see an INVITE being sent to a telephone number?
02:11:10 A. That is listed in the header "To Field," that 605 telephone number, that is correct.
02:11:20 Q. And what does the 605 number correspond to?
02:11:22 A. That number, to my recollection, is Mr. Faber's telephone number.
02:11:29 Q. And then what does the 303 number right above it, the "from" number correlate to?

02:11:35 A. That would be the originator, which my understanding would be something that would be carrying the BBS data flow.

02:11:45 Q. So at your deposition, you -- similar testimony, you also thought the 605 number was Mr. Faber's, but would you be surprised to learn it's the 303 number?

02:11:59 A. Yeah, I'm dyslexic sometimes, so, yes, that may be correct.

02:12:03 Q. So you do have an understanding that the 303 number in the from field is Mr. Faber's cell phone number?

02:12:11 A. That is probably correct, and now that you say that I do believe I refreshed my memory at some point in the last couple of months that that is the case.

02:12:19 Q. You just didn't remember today that that one was his, right?

02:12:22 A. No, I haven't been focusing on that, but correct.

02:12:25 Q. And then the 605 number, now, do you have an understanding that that's the BBC line?

02:12:30 A. Yes, that would be consistent.

02:12:33 Q. Okay. So this is -- essentially this is Mr. Faber ringing up, calling the BBC line, Step 1, right?

02:12:40 A. Correct.

02:12:42 Q. Okay. So placing the call, INVITE message goes out. You would agree that is a SIP INVITE message in packet 1?

02:12:50 A. Yes, it is, to establish the call.

02:12:52 Q. Now, let's -- we'll agree that we can filter by SIP
02:12:58 messages, as Ms. Hopkins has just done in the green bar; is
02:13:03 that right?
02:13:03 A. Please, yes.
02:13:04 Q. That helps get rid of some of the clutter?
02:13:06 A. Yes, it does.
02:13:07 Q. So now we're just looking at SIP messages, right?
02:13:10 A. That's correct.
02:13:13 MR. HEARD: So let's go to packet No. 9142. There
02:13:21 it is on the screen.
02:13:22 Q. (By Mr. Heard) And what do we see here? Would you
02:13:24 agree we see a No. 2, Cseq number, a new UPDATE message, a
02:13:31 SIP UPDATE message being sent?
02:13:34 A. Yes.
02:13:35 Q. And then if you look at 9145, also an UPDATE message,
02:13:41 SIP UPDATE message with a Cseq value of 2; is that right?
02:13:45 A. That is correct.
02:13:46 Q. And now just to make sure we're looking at the right
02:13:48 thing, we've got the same source in this packet, 2600
02:13:52 starting in that source column, so we know we're looking at
02:13:56 Mr. Faber's phone going to the BBC, right?
02:13:59 A. The endpoint, correct.
02:14:03 Q. And then look in packet 18153, just the next one down,
02:14:11 we have an UPDATE message being sent, a SIP message; is
02:14:15 that right?

02:14:15 A. That is correct.
02:14:19 Q. And in 18155, next packet, same thing, SIP message, SIP
02:14:24 UPDATE, right?
02:14:24 A. Yes, Mr. Faber had explained that you get multiples,
02:14:29 yes, copies.
02:14:29 Q. Exactly. Sometimes you have those duplicate. But if
02:14:32 you look, one of those had a source coming from the other
02:14:38 end, right, the one before. And now 18155, we're back to
02:14:42 Mr. Faber being the source of the SIP message; is that
02:14:45 right?
02:14:45 A. That is correct.
02:14:46 Q. So now we know 18155, we're looking at the right
02:14:50 direction, we're looking at Mr. Faber going to the BBC with
02:14:53 a SIP number of 3, right?
02:14:54 A. That's the direction that that packet is going, yes.
02:14:57 Q. And now, if you look down into the -- we haven't
02:15:06 focused on this, but you talked about, you looked at some
02:15:09 instances where we had Wi-Fi to LTE handover and LTE to
02:15:12 Wi-Fi. Can you tell which -- which one we're looking at
02:15:16 here?
02:15:17 A. Yes, if you look down -- down here, you'll see that the
02:15:22 access network is 802.11.
02:15:25 Q. Which means we're on Wi-Fi?
02:15:30 A. Yes.
02:15:31 Q. So this is a call that Mr. Faber started in his

02:15:33 basement or when he had Wi-Fi access to begin the call?
02:15:37 A. Correct.
02:15:38 Q. And at this point, there's been no switch, no handover to the LTE. Hasn't walked outside yet apparently, right?
02:15:46 A. That's correct.
02:15:47 Q. Okay. Now, you point to -- and you presented some simplified graphs of this. You pointed to packet 26036, the next one we see, right?
02:16:01 A. Yes.
02:16:04 Q. And that one is a REGISTER message, right?
02:16:09 A. Yes, it is.
02:16:10 Q. An out of dialog message that doesn't go all the way to the end destination, right?
02:16:15 A. That's correct.
02:16:18 Q. Doesn't have the same Call-ID associated with the established call between Mr. Faber and the BBC line, right?
02:16:26 A. That's correct.
02:16:27 Q. But we can actually do that because Wireshark's powerful, we can filter to just make sure we're seeing the messages that make it from end-to-end. And so if Ms. Hopkins can apply that Call-ID filter there in the message header, there is no 26036 because that was a SIP REGISTER message that doesn't go end-to-end.
02:16:52 So really the next packet in this test that Mr. Faber captured, that you analyzed, is 28415. And that

02:17:03 is a SIP UPDATE message with a Cseq value of 4, is it not?
02:17:08 A. It's a SIP UPDATE which is being shown.
02:17:12 Q. With a Cseq value of 4; is that right?
02:17:15 A. That's correct.
02:17:15 Q. And the next message we have, if we still just -- we
02:17:22 want to be really clear about this and make sure we're
02:17:25 looking at the right thing from the right vantage point.
02:17:28 The next packet that's a SIP message that goes from
02:17:31 Mr. Faber's phone is at 28419, one more down, right there,
02:17:38 you see the source is 2600?
02:17:40 A. Yes, that UPDATE message is just for that Call-ID which
02:17:44 Mr. Faber described and explained how the Call-IDs are
02:17:46 associated with the multiple links.
02:17:48 Q. And so for this associated Call-ID, the call that
02:17:51 Mr. Faber performed to the BBC to demonstrate what
02:17:55 happened, capture the packets on Verizon's network, we have
02:17:59 an active call that has successfully handed over -- well,
02:18:03 let me establish that first.
02:18:05 You would agree if we go down to the P Access
02:18:11 Network Info, and I'll clear the screen here -- right there
02:18:15 at the bottom. We've now transitioned over to LTE; is that
02:18:19 right?
02:18:19 A. That's correct.
02:18:19 Q. And so we've had a successful handover. We have a SIP
02:18:23 status UPDATE message with a Cseq value of 4 sent from

02:18:30 Mr. Faber's phone to the other end; is that right?
02:18:31 A. Yes, it's coming from Mr. Faber's phone.
02:18:33 Q. And you would agree with me that 1, 2, 3, 4 to this
02:18:44 point is in order, as called for by the SIP protocol,
02:18:47 right?
02:18:47 A. It's consistent with the well-known SIP protocol.
02:18:51 Q. Okay. Now, we filtered it out here, but RTP packets,
02:19:04 the media, what's actually carrying the BBC's voice
02:19:08 speaking back to Mr. Faber, those are in here, too, right?
02:19:10 A. That was the adaptable multi-rate reference that was in
02:19:15 this packet description here under the protocol.
02:19:18 Q. Right. And if we back up a bit --
02:19:25 MR. HEARD: And you can take that down. Thank
02:19:31 you, Ms. Hopkins.
02:19:31 Q. (By Mr. Heard) The RTP packets are -- you're familiar
02:19:33 with the application layers?
02:19:34 A. Yes.
02:19:34 Q. 1 through 7 usually?
02:19:36 A. Five layers actually in implementation, but, yes.
02:19:41 Q. Where, typically, do the RTP packets -- what layer are
02:19:44 they on?
02:19:45 A. So in the TCP/IP protocol stack, you have five layers.
02:19:52 At the top is your application layer, and below that you
02:19:55 have something called the transport layer. And that's
02:19:57 where these transport protocols come into play.

02:20:00 Q. And so what layer, then -- explain which number -- numeric layer where you're saying the RTP packets are on?
02:20:12 A. So you number the layers from the bottom. So physical Layers 1, the radio link layer -- or the link layer is 2, and then you go up to the network layer, you go up to the transport layer, and then the top is your application layer. So the transport layer would be Layer 4 in the 5-layer protocol model.
02:20:32 Q. Okay. And where is the IP address? What layer is the IP address?
02:20:39 A. That's down at the network layer, which is below the transport layer.
02:20:44 Q. A layer below?
02:20:48 A. Yes. You go from -- your packet goes from your application layer, so if you're talking audio, the packets are sent to the transport layer, and then they're sent down to the network layer.
02:20:59 Q. And then what layer would we find SIP messages?
02:21:02 A. Well, SIP messages would be on a user agent running at the application layer.
02:21:07 Q. And so it doesn't make any sense for NAT to be performed on RTP packets, does it?
02:21:21 A. Well, the IP security tunnel is implemented before the packets get down to where -- the network layer where IP address would come into a play so...

02:21:37 Q. But -- so your testimony is, if I understand correctly, the IPv6 address that Verizon uses is then put inside another, let's say, an envelope or inside the IPsec tunnel that is delivered then to the router?

02:21:54 A. It's part of the RTP stream, so that IPv6 is associated with the RTP packets. Those are encrypted. And based on the IPsec protocol, then that flows through the rest of the stack layer and out.

02:22:11 Q. So the -- there are RTP packets that arrive in a Wi-Fi call from the Verizon network, from the ePDG down to the Wi-Fi access point to the router, right?

02:22:22 A. Correct.

02:22:22 Q. The RTP packets are inside or encapsulated, right?

02:22:27 A. In a secure tunnel, yes.

02:22:30 Q. And when it hits that -- that Wi-Fi access router, what does the router see? What address do they see?

02:22:37 A. So what the router sees is the -- its address. So that -- those RTP streams inside that secure tunnel, and it's receiving that information through that tunnel. And it's passing it to the endpoint device, whatever the endpoint device IP address is in the local -- the local network.

02:22:59 Q. So that will be performed at that Wi-Fi access point router, and there are RTP packets inside that -- that encapsulated -- encapsulation?

02:23:13 A. You can think of it as if you're sitting in your car
02:23:16 and going through a car wash, you know, the car is being
02:23:19 washed on the outside but you're not. That's similar to
02:23:24 the RTP packets sitting inside that car.
02:23:25 Q. So it is happening -- the car wash is running?
02:23:28 A. Sure.
02:23:29 Q. And it's also like, and I've heard you and others
02:23:33 explain it this way, having an addressed envelope that's
02:23:36 then placed inside another envelope; is that right? You
02:23:40 don't see -- the Wi-Fi access point does not see the
02:23:45 address on the internal envelope; is that --
02:23:47 A. That's correct. It's encapsulated so that means that
02:23:51 you can't see it. It's encrypted. It has to go through
02:23:54 decryption to be able to figure out what's in that stream.
02:23:57 Q. So if you're USPS and you're handed an envelope, handed
02:24:00 a letter to deliver, there might be some letter on the
02:24:02 inside that's a secret address to someone else for security
02:24:06 reasons. But I am going to deliver it as USPS to the
02:24:10 address on the outside, correct?
02:24:12 A. That's correct.
02:24:12 Q. And IPv6 addresses, we talked about in your deposition,
02:24:19 are not used everywhere, right?
02:24:21 A. In the U.S., they're used about 60 -- roughly 60
02:24:26 percent of installations and upwards of 70 to 90 percent in
02:24:30 telecom networks.

02:24:31 Q. And what was that percentage in 2017?
02:24:34 A. It was probably -- I'd have to look. It's probably
02:24:40 around 20 to 30 percent, maybe 35. I'd have to look at a
02:24:45 chart. I do show that chart of update of IPv6 in my
02:24:52 classes.
02:24:52 Q. Much less than it is today, right? The uptake -- there
02:24:53 has been an increasing adoption over time of IPv6; is that
02:24:53 fair?
02:24:56 A. That's fair.
02:24:57 Q. But in the mid-2010s, 2015, '16, '17 time frame when
02:25:04 Verizon's VoWiFi was launched, it was not ubiquitous,
02:25:10 right?
02:25:10 A. That's correct. In 2004, that's when we started
02:25:13 realizing that, hey, we're out of IP addresses. And then
02:25:13 the move to IPv6 started to gain ground.
02:25:17 Q. But even if -- and there's a number of groups like
02:25:20 Cisco that makes routers. And Google and Akamai, all these
02:25:24 tech companies, they track that IPv6 adoption, don't they?
02:25:28 A. Yes. And those are the track -- tracking numbers I
02:25:32 show in my classes, yes.
02:25:33 Q. Right. And so if they showed lower than around 10 or
02:25:38 20 percent in the mid-2010s, that wouldn't surprise you?
02:25:41 A. I'd have to go back and look to make sure, but that's
02:25:44 probably correct.
02:25:45 Q. And, in fact, if any of us went down to -- to Walmart

02:25:49 in Marshall to buy a router for our home today, most likely
02:25:53 we're going to come across IPv4 options. Wouldn't you
02:26:01 agree?
02:26:01 A. I don't know that that's -- would be true.
02:26:03 Q. Would it surprise you if I visited Walmart this week
02:26:08 and asked to buy an IP router, that IPv4 were the only
02:26:10 options I could find?
02:26:10 A. I would not be surprised but I -- well, I would say I
02:26:15 would be surprised but that may be true.
02:26:23 MR. HEARD: Now, let's pull up PTX-89, please.
02:26:29 Q. (By Mr. Heard) This is -- there's a number of Wi-Fi
02:26:31 call flow documents. I think you reviewed a number of
02:26:34 them, including this one?
02:26:36 A. Certainly I reviewed a ton, and this does look
02:26:40 familiar.
02:26:40 Q. And you believe Verizon has talked about internally in
02:26:47 its documentation the need for IPv4 support?
02:26:50 A. Well, certainly over the need to support IPv4 just for
02:26:55 legacy purposes, but I do recall seeing it mentioned here
02:26:58 and there.
02:27:00 MR. HEARD: If we go to Page 9 of this Verizon
02:27:02 document. Thank you.
02:27:07 Q. (By Mr. Heard) Do you see on your screen this is --
02:27:10 there's IPv6 mentioned? That's obviously the way that, as
02:27:13 we heard from Mr. Faber, the direction that Verizon has

02:27:19 gone, right?
02:27:20 A. Correct.
02:27:20 Q. But clearly a recognition that we must account for IPv4
02:27:24 and IPv6 addresses, right?
02:27:25 A. Yes, it does.
02:27:28 Q. And is it possible to go from IPv4 to an IPv6 address
02:27:34 without NAT?
02:27:35 A. So there is a -- they're tunnelling protocols that are
02:27:40 established when you're sending a -- for example, an IPv6
02:27:43 packet through an IPv4 router. They take that packet, they
02:27:47 encapsulate it in an old style IPv4 packet and send on its
02:27:54 merry way. Those were showing up in routers for many
02:27:57 years. Certainly at this point, they were showing up.
02:27:59 Q. And NAT can occur to the outer part of that
02:28:03 encapsulation?
02:28:04 A. If it was -- if it was not originated as an IPv6,
02:28:09 certainly, or if there was NAT in the middle of that IPv4
02:28:14 legacy tunnel, then, sure, it could be performed.
02:28:17 Q. And there's reference to the dual stack capabilities,
02:28:21 that's the ability for that IPv4 and IPv6 capability,
02:28:26 right?
02:28:26 A. Yes, so they would -- basically you can handle both
02:28:29 addresses because if you sell equipment you want it to last
02:28:32 a long time until IPv4 is completely gone away.
02:28:36 Q. And Mr. Faber used a dual stack in his home for the

02:28:41 call trace testing, right?
02:28:43 A. Yes.
02:28:48 Q. You heard the testimony that when attempting to access the Verizon network through a Wi-Fi access point on a call that a device will search for the closest ePDG? Did you hear Mr. Faber talk about that?
02:29:08 A. I did.
02:29:12 Q. So there are multiple ePDGs?
02:29:14 A. Well, they're distributed spatially to handle various loads, requests coming in.
02:29:19 Q. But if they're -- if we're searching for the closest, there has to be one closer than another, correct?
02:29:28 A. My understanding is when your request goes out from your device, say, hey, I want a Wi-Fi connection and I'm on a cellular call, it's going to tell you -- you're going to get a response to say use this ePDG.
02:29:43 MR. HEARD: Your Honor, I'm about to shift into another module if this would be a good time for --
02:29:49 THE COURT: Yeah, that will be fine. We can take our afternoon break at this time, ladies and gentlemen. We'll be in recess about 10 minutes.
02:29:57 COURT SECURITY OFFICER: All rise.
02:29:58 (Jury out.)
02:43:44 (Recess.)
02:43:46 COURT SECURITY OFFICER: All rise.

02:43:47 THE COURT: Mr. Savage, if you would have the jury brought up.
02:43:50 COURT SECURITY OFFICER: All rise for the jury.
02:45:36 (Jury in.)
02:45:37 THE COURT: Please be seated.
02:45:47 Whenever you're ready, Mr. Heard.
02:45:54 MR. HEARD: Thank you, Your Honor.
02:45:56 Q. (By Mr. Heard) Dr. Mahon, you made a couple of comments about Dr. Rubin's call trace test, do you recall that on your direct examination?
02:46:03 A. Yes, I do.
02:46:04 MR. HEARD: Can we bring up a slide that you prepared, DD3.106.
02:46:10 Q. (By Mr. Heard) And I don't think you presented this one, but is this a slide that you prepared?
02:46:13 A. Yes.
02:46:15 Q. And it was in relation to showing the setup of Dr. Rubin's call trace setup?
02:46:21 A. What he asserted was a setup.
02:46:25 Q. Okay. So you dispute now that -- that the phone was a Verizon phone placing a call on the Verizon network?
02:46:32 A. No, I'm saying there's a lack of evidence of what the phone was and that there's any evidence that it was connected through a Verizon network.
02:46:42 Q. And I was frankly surprised when I heard you say that.

02:46:46 You were in the courtroom when Dr. Rubin testified, am I right?
A. Yes, I was.
Q. And you saw the actual equipment that was used in testing be brought up, right?
A. I sure did.
Q. Including PTX-201A, the Verizon cell phone used in the testing that I'm holding, right?
A. I'll take your description for that as correct. I couldn't see it from my vantage point.
Q. Well, and it was made available for inspection to your attorneys and experts. You could have come to look at it and determine whether or not it's actually a Verizon phone, could you not?
A. Sure. I could have done that. Yes, I didn't realize it was available for me to look at.
Q. And so this is now in evidence. The jury can look for themselves, but if we were to go on and look at the phone, would you be surprised if it was actually a Verizon phone placing calls on a Verizon network?
A. No.
Q. But you didn't want to go investigate that to determine whether that was, in fact, the case?
A. Well, quite frankly, that's still immaterial of the hard evidence that he presented to show anything other than

02:47:49 his statement that he had an iPhone connected to a Verizon network in terms of the data that he presented.
02:47:56 Q. You think it is immaterial whether he actually used the Verizon network or not?
02:48:01 A. In terms of my analysis, based on the hard evidence.
02:48:07 Q. Let's look at the patent that you talked about, so the '554 patent.
02:48:11 MR. HEARD: Let's bring that up, JTX-1, and go to Column 5, please.
02:48:16 Q. (By Mr. Heard) I just want to ask you just a few questions because you talked about this flow diagram at the top of Column 5.
02:48:25 MR. HEARD: If we scroll up -- sorry, Ms. Hopkins, I gave no direction on this at all.
02:48:31 Q. (By Mr. Heard) But you were asked about that No. 160, so the second number right there; is that right? When Mr. Anderson asked you some questions, you talked about this?
02:48:40 A. Yes.
02:48:47 Q. You talked about this is part of the -- the SIP process, a SIP INVITE, and I think you point -- you really highlighted the RE-INVITE language, right?
02:48:57 A. I did point to the RE-INVITE language consistent with Figure 4 and Figure 7 disclosures.
02:49:05 Q. Now, that Step 160 is before any switch occurs, is it

02:49:12 not?
02:49:12 A. It says specifically that if you don't send that SIP INVITE, the switch is not going to occur because you flow out of that box.
02:49:23 Q. So this is before the switch, correct?
02:49:25 A. Correct.
02:49:26 Q. And if we go to Claim 1, this is the entirety of Claim 1; am I right?
02:49:35 A. Yes.
02:49:35 Q. Does it state anywhere in this claim that a SIP RE-INVITE message must be sent to initiate a switch?
02:49:45 A. Well, in the last claim element, as the Court has construed, that you have to maintain the continuity of the SIP signaling sequence of said transmission.
02:49:55 And the only place that maintain is mentioned within the spec and also the disclosures of how you -- an example of how you can implement the invention is that Figure 4 flowchart. As well as the words show up in that graph that you just highlighted there, the table.
02:50:16 Q. So -- and we'll go back to the flowchart in just a second. But just will you confirm for us that the words "send SIP RE-INVITE message" does not appear in Claim 1?
02:50:28 A. Certainly.
02:50:29 Q. And you were pointing out the last claim limitation, the SIP signaling sequence for the transmission is

02:50:34 maintained, and specifically the claim says is maintained
02:50:38 when relative to the switching?
02:50:40 A. Well, after said switching, it says, yes.
02:50:44 Q. Okay.
02:50:47 MR. HEARD: And so let's go back to the flowchart,
02:50:50 please. Sorry, again, Ms. Hopkins. Column 5 -- Column 5
02:50:55 and we'll go down to the bottom of this, this time --
02:50:59 sorry, the whole flowchart. And we'll go down and look at
02:51:03 Step -- the bottom, 210 -- Step 210.
02:51:09 Q. (By Mr. Heard) Now, is this talking about attempting
02:51:12 to move and then the dialog with the SIP server must be
02:51:16 completed before the RTP stream can be moved. Do you see
02:51:19 that?
02:51:19 A. Yes, I do.
02:51:20 Q. And then it says: The state involving the SIP
02:51:23 signaling sequence number must be maintained through the --
02:51:26 throughout the dialog.
02:51:27 Do you see that?
02:51:29 A. I do.
02:51:29 Q. And that tracks the claim language, does it not?
02:51:32 A. Well, if you, again, look at what we just looked at in
02:51:36 160, what's in the claim language and what's in 210, it
02:51:40 makes complete sense based on what's disclosed as a problem
02:51:44 in Figure 7, the solution in Figure 4, as well as the
02:51:48 solution in Figure 9 that if you do not send the SIP

02:51:52 INVITE -- RE-INVITE with the IP address, you don't flow
02:51:55 down to where you can -- to adjust the sequence value to be
02:52:01 consistent, according to 210.
02:52:04 Q. So in your view, when you read Claim 1, you say I need
02:52:08 to have a SIP -- SIP RE-INVITE message sent to initiate the
02:52:11 switch?
02:52:12 A. Well, I read it in the context of what's disclosed in
02:52:16 the claim in light of the patent specification and the
02:52:19 claim construction, and that's my analysis.
02:52:21 Q. You talked a little bit about the EON and KAIFI
02:52:26 licenses that you opine are technically comparable. Do you
02:52:31 recall that?
02:52:31 A. Yes, I do.
02:52:33 Q. Let's start with the EON patent. I think it's Dinkins
02:52:38 patent; is that right?
02:52:39 A. That is correct.
02:52:40 Q. That one was from the late '90s; is that right?
02:52:43 A. I think '94 was on the face.
02:52:46 Q. Okay.
02:52:47 A. Something like that.
02:52:48 Q. That predated the SIP protocol?
02:52:50 A. It did, yes.
02:52:51 Q. And SIP would not have been part of that EON/Dinkins
02:52:55 disclosure, right?
02:52:56 A. But voice -- for example, in the mid-'90s, I was

02:52:59 working on voice transmissions under proprietary protocols,
02:53:02 but, no, it does not mention SIP.
02:53:04 Q. And then the EON patent is not based on sending RTP --
02:53:10 using RTP for media transport, right?
02:53:12 A. That's correct.
02:53:13 Q. And there's no mention of Network Address Translation
02:53:18 in the Dinkins patent, right?
02:53:20 A. Not that I can recall.
02:53:21 Q. And the KAIFI patent, you spent more time there. You
02:53:27 served as an expert in the case that involved that patent,
02:53:30 right?
02:53:30 A. Yes, I did.
02:53:31 Q. And that dealt with the Cho '728 patent; is that right?
02:53:40 A. That's correct.
02:53:41 Q. And you would agree that the -- that SIP -- the acronym
02:53:45 SIP does not appear in the KAIFI patent -- in the Cho
02:53:51 patent, right?
02:53:52 A. I don't recall. I know it mentions voice. I don't
02:53:55 recall SIP being -- an acronym being in it.
02:53:57 Q. In your deposition do you recall spending some time to
02:54:01 look through it and confirm for me that SIP did not show up
02:54:05 in the patent?
02:54:07 A. I don't, but I'll believe you.
02:54:09 Q. Would you like your recollection refreshed or --
02:54:11 A. No, that's fine. I take it at your word.

02:54:13 Q. Would you agree that RTP doesn't show up in the Cho reference as well?
02:54:18 A. It just mentions voice and data which to a POSITA would encompass video.
02:54:24 Q. But it's from an earlier time, it's back in the circuit switch environment, right?
02:54:28 A. Certainly, yes.
02:54:29 Q. And the acronym NAT or Network Address Translation doesn't appear in the Cho patent, right?
02:54:33 A. That's correct.
02:54:33 Q. And nor does PAT, Port Address Translation, that's not in there?
02:54:40 A. No, PAT is basically a solution they came up with for a problem associated with NAT. So no.
02:54:47 Q. I want to bring up the slide -- your Slide DD3.71, please. And apologize for the markings on the screen. But I was interested in this language that you had here, your explanation, second bullet point where you said: Claims are broader because KAIFI covers voice and data.
02:55:12 And I think you talked about that on direct, correct?
02:55:15 A. I did, yes.
02:55:16 Q. But, again, you're not offering an opinion on invalidity or saying that the Cho patent invalidates the '554 patent, right?

02:55:22 A. No, I just used it as a very close comparison to exactly what the '554 is addressing.
02:55:28 Q. And you're not saying that the -- the Cho '728 patent should have been presented to the Patent Office and used as a reason to reject the '554 patent, are you?
02:55:39 A. I didn't do any analysis like that.
02:55:41 Q. And you were here when Mr. Blok testified about the economic factors that were around this license agreement?
02:55:49 A. I did hear him testify.
02:55:52 Q. And you're not offering any opinions with respect to economic comparability of this license agreement, right?
02:56:00 A. No, just technical comparability.
02:56:02 Q. But you do know because you have personal knowledge of being involved in the case that that dispute ended in a settlement, right?
02:56:11 A. That's my understanding, yes.
02:56:13 Q. And it didn't make it to trial. They settled out of court, right?
02:56:19 A. We settled right before trial.
02:56:20 Q. And Verizon took a license in the -- under the shroud of litigation, right?
02:56:29 A. They took a license is what I was told, yes.
02:56:32 Q. Now, you were serving as an expert for Verizon in that case, right?
02:56:39 A. That's correct.

02:56:39 Q. And you took the -- you and Verizon both made the argument that the '728 Cho patent had little value, right?
02:56:51 A. I did a technical analysis on Cho versus, again, what it was disclosing.
02:56:55 Q. And you on behalf of Verizon also argued you didn't infringe the Cho patent, right?
02:57:01 A. Well, based on my analysis, it certainly did not.
02:57:05 Q. And so because in your view it did not infringe, right?
02:57:10 A. Correct.
02:57:10 Q. And that position apparently has remained unchanged despite the settlement and Verizon taking a license, right?
02:57:19 A. That'd be correct.
02:57:19 (Courtroom sealed per order of the Court.)
02:57:19 (Sealed Portion No. 2 saved in separate sealed transcript.)
02:58:03 (Courtroom unsealed per order of the Court.)
02:58:03 Q. (By Mr. Heard) Now, Dr. Mahon, you talked at length about the incremental value of the '554 patent. Do you recall that?
02:58:09 A. Yes, I did.
02:58:11 Q. And in the slides that were disclosed to us, you spent quite a bit of real estate talking about all that came before the '554 patent; is that fair?
02:58:21 A. Well, I did have slides directed to the conventional elements associated with the asserted claims.

02:58:28 Q. And we went through -- you went through some of them. You talked about Stallings and kind of the advent of the Internet, right?
02:58:35 A. I mentioned Stallings's textbook, and then, yeah, the Internet going way back before that.
02:58:41 Q. And then the UMA, you talked about the UMA as well?
02:58:43 A. Correct.
02:58:44 Q. And about a consortium that put that together for unlicensed access, right?
02:58:49 A. Correct.
02:58:49 Q. Now, just to be clear, you're not an economist, right?
02:58:56 A. That's correct.
02:58:56 Q. Or an expert in patent valuation?
02:59:00 A. No, I am not.
02:59:02 Q. Or a licensing professional?
02:59:03 A. I am not.
02:59:04 Q. And you haven't been involved in discussions on how to value certain features within the carriers that they intend to offer on their network; is that fair?
02:59:17 A. That's fair.
02:59:18 Q. And you haven't been part of the 3GPP standards setting body, right?
02:59:23 A. I have not attended any 3GPP meetings.
02:59:28 Q. And you've not submitted any contributions to those standard setting meetings, right?

02:59:33 A. Not directly, no.
02:59:34 Q. But you would agree that patents, even incremental
02:59:37 patents, can have some value, right?
02:59:39 A. That's what the analysis was supposed to determine,
02:59:43 what is the incremental value.
02:59:46 Q. And just to confirm again, despite all the discussion
02:59:49 of Stallings and UMA and kind of the industry and what was
02:59:52 out there, you're not offering any opinion to the jury
02:59:55 today about the validity of the '554 patent, right?
02:59:57 A. I am not.
02:59:58 Q. That's for another Verizon expert to address?
03:00:01 A. That's correct.
03:00:01 Q. Thank you, Dr. Mahon.
03:00:17 THE COURT: Redirect, Mr. Anderson?
03:00:20 MR. ANDERSON: Yes, Your Honor. Thank you.
03:00:22 REDIRECT-EXAMINATION
03:00:22 BY MR. ANDERSON:
03:00:24 Q. So, Dr. Mahon --
03:00:26 MR. ANDERSON: If we could bring up -- let's bring
03:00:31 up Slide 18 from Dr. Mahon's set.
03:00:35 Q. (By Mr. Anderson) Okay. So, Dr. Mahon, do you
03:00:46 remember when counsel did this thing with Wireshark and
03:00:52 they showed you -- they did some fancy filtering and
03:00:55 removed some things out of there, and they showed you the 1
03:00:58 and they showed you the 2, and they showed you the 3, and

03:01:03 then they skipped down to the 4 and they skipped down -- I
03:01:11 think they stopped at the 4. Do you remember that?
03:01:13 A. Yes.
03:01:13 Q. They did that fancy. Now, what are the -- here in the
03:01:17 5 and 6, what are those?
03:01:19 A. Those are indicative of the REGISTER message that the
03:01:23 phone has to send -- or that the phone does send to the
03:01:26 network.
03:01:26 Q. And that's the SIP Re-Register message?
03:01:31 A. Correct.
03:01:31 Q. And that's actually the only thing that Dr. Rubin
03:01:35 pointed to for this claim element, isn't it?
03:01:37 A. Yes, it is.
03:01:38 Q. Okay.
03:01:39 MR. ANDERSON: Can we bring up Slide 14?
03:01:42 Q. (By Mr. Anderson) Now, this was in the opening. This
03:01:51 is an excerpt from Dr. Rubin's report, and do you see where
03:01:56 he said you got to use the SIP Re-Registration command? Do
03:02:01 you see that?
03:02:01 A. Yes, I do.
03:02:03 Q. Okay. And so Dr. Rubin said you got to use the SIP
03:02:07 Re-Registration command; is that correct?
03:02:09 A. Correct.
03:02:10 Q. And do you know why counsel decided to show you
03:02:12 something where they excluded the SIP Re-Registration

03:02:15 command? Does that make any sense?
03:02:17 A. Associated with the sequence numbers.
03:02:19 Q. Okay. And in the analysis here, is it -- is the SIP Re-Registration command part of the call and the handover of the call?
03:02:34 A. No, it's not involved in the handover at all, as I've discussed and as Mr. Faber discussed.
03:02:39 Q. Okay. But in Verizon's call flows is the SIP Re-Registration command the one SIP message that has to be sent?
03:02:48 A. Yes.
03:02:49 Q. Okay. So Dr. Rubin and Verizon and you all agree that the SIP Re-Registration command is part of the call, correct?
03:03:02 A. Oh, yes, it's definitely part of the call.
03:03:04 Q. Okay.
03:03:05 MR. ANDERSON: Can we go back to Slide 18?
03:03:11 Q. (By Mr. Anderson) Now, again, I'm going to mention they did 1, 2, 3, and they stopped at 4.
03:03:17 Now, we're going to pull up a part of Dr. Rubin's report. I think we showed it before. But they -- they didn't continue on down to the BYE. Okay. This is perfect. Page 62, this is, again, Dr. Rubin.
03:03:34 And what does Dr. Rubin say about including the BYE command in doing the analysis of this element?

03:03:43 A. You have to do the analysis all the way through the BYE
03:03:47 command, which is at the bottom of those tables.
03:03:49 Q. And that's what Dr. Rubin said, isn't it?
03:03:52 A. That's -- those are his words, yes.
03:03:54 Q. But -- but counsel stopped before they got to the BYE
03:03:57 command, didn't they?
03:03:58 A. That's correct.
03:03:59 Q. Okay.
03:04:00 MR. ANDERSON: Let's go back to Slide 18.
03:04:02 Q. (By Mr. Anderson) So even if I ignore the REGISTER,
03:04:13 which you shouldn't, right, you and Dr. Rubin and Verizon
03:04:16 all say the REGISTER is part of the call. But I go down
03:04:20 and consider the 2 down here, is this maintaining the
03:04:23 continuity as required by the Court's claim construction?
03:04:25 A. No. Again, as I talked about before, you see the
03:04:29 numbers going up and down through here, and then
03:04:32 obviously -- whoops -- the change from 5 to 2 there is just
03:04:36 one example of the numbers not being -- maintaining
03:04:40 continuity.
03:04:40 Q. Okay.
03:04:41 MR. ANDERSON: Can we bring up PTX-89, which was
03:04:43 used in your cross-examination?
03:04:48 Q. (By Mr. Anderson) Now, I want to highlight this -- the
03:04:53 date of this. They used this and asked you questions about
03:04:57 it. Does a document with date 2011, is that a reliable

03:05:05 indication of the operation of Verizon's product that
03:05:08 started in 2015 or '16?
03:05:11 A. Well, it predates it. And as Mr. Faber has testified
03:05:17 and I've read in documents in the case, they're updating
03:05:19 their network all the time, so, no.
03:05:21 Q. Okay. And in this case --
03:05:24 MR. ANDERSON: If we could bring up VDTX-218.
03:05:34 Q. (By Mr. Anderson) You and Dr. Rubin relied on this
03:05:40 2023 version of the call flows to accurately describe the
03:05:44 system, correct?
03:05:45 A. Yes. That was the most recent one that was referenced,
03:05:49 yes.
03:05:49 Q. Okay. And so given that you had available to the --
03:05:53 the 2023 version, would it make sense to even go back to
03:05:58 the 2011 version to understand how Verizon's product
03:06:00 worked?
03:06:01 A. No. The 2011 was referenced at some point in time, I
03:06:05 recall, but, no, the 2023 suffices and would be more
03:06:10 accurate.
03:06:15 Q. Okay. Now, you were shown the little -- they put up a
03:06:19 whole bunch of Wi-Fi networks there. You know, they did
03:06:23 the little thing with their computer and saw the Wi-Fi
03:06:27 networks. Are those the networks that the devices actually
03:06:30 attached to?
03:06:30 A. No.

03:06:32 Q. Okay. And how many of those networks could the device be attached to?
03:06:35 A. You can attach to one.
03:06:37 Q. Okay. And so at the point it's switching, when I go to do the switching element --
03:06:43 MR. ANDERSON: And if we could bring up Claim 1 of the PTX-1 -- JTX-1 -- I'm sorry, JTX-1.
03:06:53 Q. (By Mr. Anderson) Okay. And at the point where I'm able to switch the transmission to the first network path to a plurality of alternative network paths, are all those other things out there that I haven't connected to the -- all the different Wi-Fis that exist out there, are they plurality of alternative network paths that I could switch to at that point?
03:07:15 A. No. If you're not connected to it, you can't switch to it. As we've seen in all the call flow documents of how Verizon implements their network, again, you need to be able to access and connect to it, and so therefore you only have two paths.
03:07:31 Q. Okay. And they asked you about, I think, scanning for base stations. Do you recall that?
03:07:35 A. Yes.
03:07:35 Q. Okay. And when the phone is scanning for base stations, am I communicating with those base stations, a communication path to the base station?

03:07:43 A. No, you're not connected to any base stations.
03:07:46 Q. Okay. So does that scanning show a plurality of alternative network paths that I could switch to to send the transmission?
03:07:54 A. No, because, again, you need to be connected, and in an LTE protocol you can only be connected to one base station at a time.
03:08:04 Q. Now, if I tried to switch to the transmission, to one of those things I'm scanning for out there, the call would drop, wouldn't it?
03:08:15 A. Yes. According to the protocol you would have to work through the current base station.
03:08:17 Q. Okay. And so this element requiring the transmission to not be disrupted wouldn't be met if I considered one of those scanning -- base stations that I'm scanning for, correct?
03:08:27 A. Correct. Essentially it would be the equivalent of turning off your phone and turning it back on.
03:08:32 Q. Okay.
03:08:43 MR. ANDERSON: Can we pull up -- well, let's just leave this here.
03:08:48 Q. (By Mr. Anderson) You were asked a bunch of questions about Figure 4 and No. 160, trying to talk about before and after there.
03:08:59 Is there any embodiment -- any teaching at all in

03:09:06 the '554 patent that does not use the SIP RE-INVITE command
03:09:10 sent from phone to phone?
03:09:13 A. No, if you read patent stem to stern, there's nothing
03:09:17 other than the SIP RE-INVITE.
03:09:20 MR. ANDERSON: I'll pass the witness, Your Honor.
03:09:22 THE COURT: Recross?
03:09:23 MR. HEARD: Briefly. Thank you, Your Honor. I'll
03:09:31 be quick about it.

03:09:32 RECROSS-EXAMINATION

03:09:33 BY MR. HEARD:
03:09:33 Q. Dr. Mahon -- I'll clear the screen here. The SIP --
03:09:39 again, you're familiar with the SIP protocol?
03:09:41 A. Yes, sir.
03:09:41 Q. And it's entirely consistent with the SIP protocol to
03:09:44 have a BYE message of 2 that corresponds to that initial
03:09:48 INVITE of 1, is it not?
03:09:49 A. Well, it's certainly -- it's consistent to have a BYE
03:09:52 message sent.
03:09:52 Q. And so -- and you said that the Verizon VoWiFi service
03:09:57 it complies with the SIP protocol, right?
03:10:00 A. Yes, in my response to Mr. Anderson with respect to the
03:10:05 assertions put forward by Aspen about the continuity.
03:10:10 Q. And then the 2011 document, you understand the date of
03:10:15 the hypothetical negotiation in this case, you heard
03:10:17 Mr. Blok talk about a 2015 date, a date of first

03:10:20 infringement?
03:10:20 A. I do seem to recall that time frame. I'm not an economics person, so I don't necessarily tune in very tightly, but yes.
03:10:32 Q. And then the date of actual first infringement for consideration in the case is in the 2017 time frame, you heard that?
03:10:39 A. Yes, that's correct.
03:10:40 Q. So that middle of 2010's era and what was happening, the reality of IPv4 and IPv6, it matters in this case, does it not?
03:10:46 A. It matters in the build-out in terms of what was Verizon doing and where were they going to go, but that's just within that context.
03:10:54 Q. And you heard some of that testimony yesterday from Mr. Kondratiuk and others that talked about the build-out, the build-out of the VoWiFi in that era, right?
03:11:05 A. Yeah, when I use that word, it's not in the context of what they were discussing. It's in the context of -- from an engineering perspective of, oh, how do we build this thing.
03:11:16 Q. And I'm curious, is your testimony with respect to how Verizon's VoWiFi service operates. When you lay out those SIP messages and you walked through what you just did with Mr. Anderson saying they're out of order, is it complying

with the SIP standard or is it not?
A. Well, it's implementing SIP standard. Everything there is, again, conventional, so yes.
Q. Which the patent talked about maintaining continuity in accordance with the SIP standard, right?
A. Well, again, my analysis was based on the Court's construction, what's disclosed in the patent, what was asserted, and I stand by my statement that there is no SIP continuity as asserted.
Q. Does -- and just to be clear, does the claim require SIP, a SIP message to actually effectuate the switch?
A. There is no other mechanism disclosed in the patent other than sending a SIP RE-INVITE.
Q. That is the only way that you read the claim?
A. No, it's the only thing that's disclosed. There's no description other than in that table associated with what it means to maintain, and that you have all these standard protocols that you follow. So I just had to go based on that.
Q. But I think you confirmed for me that that language of sending the SIP RE-INVITE does not appear in the claim, correct?
A. Well, the word "INVITE" does not appear in the claim, correct.
Q. Okay. Thank you.

THE COURT: Mr. Anderson?

MR. ANDERSON: One more question.

REDIRECT-EXAMINATION

BY MR. ANDERSON:

Q. He just asked you about that 2011 document, the IPv4 or IPv6. Is it true that Verizon's VoLTE and Voice over Wi-Fi service at issue here has always from the start used IPv6?

A. Yes.

MR. ANDERSON: Pass the witness, Your Honor.

MR. HEARD: Nothing, Your Honor.

THE COURT: You may step down.

THE WITNESS: Thank you, Your Honor.

THE COURT: Verizon may call its next witness.

MR. GAUDET: Thank you, Your Honor. Verizon calls Dr. Daniel van der Weide.

May we pass up some binders?

THE COURT: Yes.

MR. GAUDET: Thank you.

(Witness sworn.)

MR. GAUDET: May I proceed, Your Honor?

THE COURT: Whenever you're ready.

MR. GAUDET: Thank you.

DANIEL VAN DER WEIDE, PH.D., DEFENDANT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. GAUDET:

03:14:17 Q. Good afternoon, could you introduce yourself to the jury, Dr. van der Weide?
03:14:21 A. Sure. My name is Dan van der Weide. I am a professor of electrical and computer engineering at the University of Wisconsin in Madison. I live there in Madison with my wife and three adult children.
03:14:29 Q. Dr. van der Weide, I believe you just heard sort of the confirmation that Dr. Mahon was testifying about the issue of infringement and why Verizon believes that we don't infringe, and there is a reference to the fact that there would be another witness -- another expert that would present on the issue of invalidity.
03:14:49 Are you that person?
03:14:51 A. I am.
03:14:52 Q. Okay. And just so we're all on the same page, the word "invalid" or "invalidity," it's probably not something you hear a lot outside of the patent context, but that's not valid. So the patent's, you know -- patent shouldn't have issued. Is that -- is that a fair way of thinking about this?
03:15:12 A. That's my understanding.
03:15:13 Q. Okay.
03:15:18 MR. GAUDET: So let's go ahead and pull up a set of slides. There we go.
03:15:23 Q. (By Mr. Gaudet) Dr. van der Weide, if you could, we're

03:15:28 going to walk the jury through your background sort of in summary form, but let's -- let's start in the upper left. And if you would, just tell the jury about your experience at the University of Wisconsin?

A. Yeah, I started my career actually at the University of Delaware where I was assistant and associate professor for four years, and then was recruited in the fall of 1999 to Madison. I've been there ever since as associate full and now Grainger Institute of Engineering professor there. And I do a lot of work, both teaching and research, in wireless communications, networking, and antennas, as well as medical devices. And I actually got my start out of college at the University of Iowa. My first full-time job was at Motorola, which is down in the lower left-hand corner there.

Q. So let's -- let's switch to that. If you would, tell the jury a little bit about your time at Motorola, when that was, and any significant events that might relate to the subject matter of this case.

A. Yeah, I remember being recruited in 1987. Motorola at that time was a very prominent provider of cellular connectivity and cellular phones, both infrastructure and the mobile devices themselves.

So I moved from Iowa City to Schaumburg, Illinois, and immediately started working on the cellular subscriber

03:16:58 side of things -- in other words, the mobile handset. You
03:17:02 might remember those sort of brick-sized phones with the
03:17:05 little black antenna sticking out of those, and those were
03:17:06 the state of the art at the time.
03:17:07 Q. So back then at that point in the late 1980s, what made
03:17:12 a cell phone a cell phone? As that was sort of -- what was
03:17:16 kind of the defining characteristic of a cell phone versus
03:17:19 some other kind of a phone?
03:17:20 A. It's a great question. Motorola was a pioneer in
03:17:25 developing cellular technology, and its first installation
03:17:29 was really in the Chicago area. But prior to cellular,
03:17:32 there were still radio telephones. In fact, my uncle was a
03:17:36 life insurance salesman and drove around talking to people
03:17:40 all the time, had one of those earlier phones with a big
03:17:43 antenna on the back of his Lincoln Continental. But he
03:17:47 paid a lot of money for that phone because there were only
03:17:50 a handful of people who could use the radio resources with
03:17:53 that kind of technology.
03:17:56 So cellular enabled much lower-power transceivers,
03:18:01 handhelds, and things like that with correspondingly higher
03:18:06 density of base stations. So there would be these
03:18:09 handovers from one cell tower to the next to the next. So
03:18:12 that enabled reuse of those radio resources, and more
03:18:16 people could share in the benefits. And that's really what
03:18:18 cellular is all about.

03:18:19 So handover is just essential to cellular technology.
03:18:24 Q. If we then move up to the upper right, there's a reference to the IEEE there. And it says IEEE Fellow. And I think another one of the witnesses earlier had that same distinction. But just to remind us all, what is -- what is an IEEE Fellow?
03:18:42 A. Fellow grade is awarded to one-tenth of 1 percent of the IEEE membership. It's the largest professional organization in the world, as far as I'm informed. So every year -- it's a very competitive process, and I was fortunate enough to be elected Fellow for some of the work I've done in high frequencies and medical devices.
03:19:04 Q. And is the IEEE -- I forget the acronym off the top of my head, is that that same group that issued the 802.11 Wi-Fi standard?
03:19:16 A. It is. They -- they issue many standards. And, in fact, I'm part of a standards working group right now, the P1765, which is meant to measure signal quality over the air.
03:19:29 Q. Okay. And then finally at the bottom right of the screen, just tell us a little bit about any of the companies that you've cofounded or worked with that might be relevant to this case.
03:19:40 A. Sure. I've cofounded several companies. Some have

been acquired by major companies themselves. I would highlight in this example ThroughPuter, which is an entity that works with and patents smart network interface cards.
Q. We will now go to the next slide.
If you would, summarize just the general topics of some of the patents and publications that you've got through your career.
A. Well, I have a number of patents, both U.S. and international. I'm a named inventor on several issued patents and patent applications. And I've even prosecuted one of them myself early in my career and then I decided to let the lawyers do that. Also, because I have students in the research group, we publish at conferences and in journals over -- in a variety of topics. Over my career, I've had the opportunity to make several presentations and get peer-reviewed publications like this.
Q. Terrific.
And in your position at the University of Wisconsin, and we've heard about Qualcomm in this case, does the University of Wisconsin have sort of a special connection almost to Qualcomm that you've been a part of in any way?
A. Yeah, it's my understanding that UW graduates occupy the majority of the managerial positions at Qualcomm. At least that was the case; I'm not sure if it still is. I

certainly have had students go be hired by Qualcomm. I myself have been hired by Qualcomm as a consultant.

And even right across the hall from my office on campus is the James H. Thompson Laboratory of Electronics. Jim Thompson until very recently was the chief technology officer of Qualcomm, and he is a proud Badger.

MR. GAUDET: If we could we'll go to the ELMO just for a second.

Q. (By Mr. Gaudet) I've got just a page here from the testimony yesterday. I believe this was from Mr. Minor who said, quote, Qualcomm is a lot like the Microsoft of the cellular world. They're a large, important company.

Were you here when he said that?

A. I was.

Q. And do you agree with that sentiment?

A. Absolutely. I don't think there's anyone who would disagree with that sentiment. They have walls of patents when you walk into their headquarters. They're a very, very innovative company with a very strong IP portfolio. And they -- they build and sell many of the modems that go into most people's cell phones.

Q. When you say modems, are those at this point just sort of small computer chips?

A. Yeah, that's a specialized computer chip that handles a great deal of the communications and signal processing

within the phone.
Q. So as a practical matter, would many of us, in the phones that we've got in this courtroom, all of which are surely turned off, have those Qualcomm chips in there?
A. Yeah, you very likely have a Qualcomm Snapdragon in your phone, especially if you have one of the more high-end models.
Q. Terrific.
MR. GAUDET: Let's go ahead and go back to the slide presentation.
With that, Your Honor, we tender Dr. van der Weide as an expert in the field of telecommunications, cellular and wireless technologies.
THE COURT: Any objection?
MR. HERMAN: No objection.
THE COURT: Very well.
MR. GAUDET: Thank you.
Q. (By Mr. Gaudet) I think we covered this already at the very beginning, but is it fair to say your assignment in this case was to review the patent and offer an opinion on whether the patent is valid or not, particularly in view of how the Plaintiff is sort of asserting its patent in this case?
A. That's fair. As I'll show, I analyzed the asserted claims under two different analyses, written description

and then obviousness in view of one of ordinary skill in the art.

Q. So I've got here just a slide of -- summarizing some of the evidence you analyzed. Why don't you just kind of walk us through these four points, and, again, just kind of an overview of what you looked at?

A. Well, of course the main piece of evidence here is the '554 patent itself. And I also reviewed its file history or prosecution history, the back and forth between the examiner and the inventors or applicants. I read the testimony of the three inventors who are pictured here, looked at an abundance of prior art, that's publications that were available to one of ordinary skill in the art prior to the invention of the '554 patent. And I've reviewed Dr. Rubin's reports, deposition. And, of course, I've been here in the courtroom listening to testimony.

Q. Terrific.

Now, I've got on the screen here the standard, the burden of proof for Verizon to prove that Aspen's patent is not valid. And you understand that standard is clear and convincing evidence?

A. That's my understanding.

Q. And so you got to be clear, right? And you got to be convincing?

Up to the task?

03:25:09 A. That's right.
03:25:10 Q. Okay. Let's go through and see what we've got.
03:25:14 Tell the jury, if you would, are these the two issues that we are going to address in terms of the reasons that the patent might not be valid?
03:25:23 A. Yes, as I said earlier, there's two different issues or analyses that I performed. And one of them has to do with written description, and I'll go into my understanding of the law about that. But the essence is that there's a bargain between a patentee and the public about the patentee, as Judge Schroeder explained, needs to disclose how to practice the invention to one of ordinary skill in the art so that one of ordinary skill in the art can read the patent and practice the claimed invention. That description and how that's done needs to be found in the specification.
03:26:08 And then there's another way in which I analyzed the potential invalidity of the patent and drew some conclusions. And that is that the combination of the SIP standard or RFC, that I'll explain in a bit, and the '377 patent, that I'll explain, as well, rendered obvious all the asserted claims of the '554 patent to one of ordinary skill in the art at the time of the invention.
03:26:37 Q. And we're going to break that down a little bit. You used a word that I think we've used a few times. And,

again, I just want to be sure we're all on the same page. You mentioned the patent's specification. If you were to -- and, of course, the jury all has a copy of the patent. But if you have the patent -- when you say the specification, it is in essence sort of everything all the way until you get up to the claims. And sometimes the claims count and sometimes they don't, but the point is you read through the patent, and you got to learn what's in the patent. Is that kind of a fair way of layman's terms translating that word "specification"?

A. Yeah, I would agree with that. I mean, the patent needs to speak for itself and it needs to disclose to one of ordinary skill in the art how to practice the claimed invention.

Q. Okay. So the first issue we're talking about is -- is -- is -- is written description. And, of course, Judge Schroeder will give the jury an instruction on what that means. And so there are kind of two points that I wanted to cover here.

The first is, this is a snippet of what that instruction likely will be, based on the parties' submissions, but just tell the jury a little bit about what kind of the test is here that's up on the screen.

A. Well, I've highlighted my understanding of the law here, but the essence that I've highlighted in yellow is

03:28:06 that Verizon must show by clear and convincing evidence
03:28:10 that the specification itself, the written description,
03:28:16 that was not sufficient to describe the full scope of the
03:28:22 invention and the full scope of the claims that are being
03:28:24 asserted here.
03:28:25 Q. And that's sort of one way to put it. And even to my
03:28:29 lawyer ears, there's a lot of kind of, you know, legal
03:28:33 sounding concepts. But here's another phrase in that
03:28:38 instruction, and maybe that one is a little more
03:28:40 straightforward. Tell the jury about this.
03:28:43 A. Well, this is a little bit more layperson friendly, a
03:28:49 mere wish or plan or just saying that, hey, we solved the
03:28:53 problem without actually solving the problem or teaching
03:28:55 one of skill how to solve the problem, that's not
03:28:58 sufficient. That's not sufficient written description,
03:29:00 according to the law.
03:29:02 Q. So you used the word "bargain." When it comes to this
03:29:07 issue of written description, what exactly is the bargain
03:29:12 that an inventor has made with the U.S. Government or with
03:29:16 the public to get a patent? Just tell us a little bit more
03:29:20 about that.
03:29:21 A. Well, you may recall from the very opening
03:29:25 instructions, I heard Judge Schroeder talk about the
03:29:29 Constitution and the fact that the founding fathers already
03:29:35 built into the Constitution this notion of protecting

03:29:39 intellectual property. In order to do that, there's a bargain. The bargain essentially -- I'm not a lawyer -- but the bargain is essentially I, as an inventor, will fully disclose with adequate written description and many other requirements my invention to the Government.

And the Government decides whether I can protect that invention through numbered claims that are described in a patent, and -- and then the Government allows me to, for example, protect that -- that invention for a period. Today I believe it's 20 years.

And the exchange is then after that patent expires, the invention goes into the public domain. In other words, anybody can practice it without having to pay a license. So there's a deal. There's a quid pro quo there. I disclose the invention adequately, the Government gives me the right to exclude others from practicing it -- in other words, I sort of get a lease on the land, so to speak, that lasts for a defined period of time. And then after that time, the land goes to public land, becomes a park or something like that.

Q. Okay. And so to kind of sum this up, is it okay to come to court and assert that the scope or the breadth of your patented claim is more than what you actually taught the public how to use? That word "how," is that okay?

A. That falls outside of the requirement of written

03:31:18 description. In other words, there needs to be clear, as it's called, metes and bounds of a claim, and those have to be supported by the specification, the written description. So --

03:31:30 Q. Okay.

03:31:31 A. -- claim scope can't be broader than what's supported in the written description.

03:31:35 Q. And if you say it is, then you've broken your patent and it's invalid; is that fair?

03:31:41 A. That is one of the analyses that I performed.

03:31:45 Q. Okay. Now, I've got here -- we've got it here up on the slide, the claim language and it -- focusing down on that last element, you see the SIP signaling sequence of the transmission is maintained. Do you see that?

03:31:54 A. I do.

03:31:55 Q. And is that the focus of this analysis we're doing about the "how"? Did they teach how? Does that seem fair?

03:32:03 A. That's correct.

03:32:03 Q. Okay. Now, there's another part of this. Based on all your -- being here and hearing all the testimony, what's your understanding about the role of this claim element -- this last highlighted part and what's supposed to have been new? I mean, the new thing about this patent? What's your understanding about that?

03:32:23 A. Well, I have heard testimony throughout this proceeding

that has repeatedly indicated that the inventors originally applied for Claim 1 that had -- that was much shorter than this. And the examiner, Patent Office, rejected the claim.

They had to add further restrictions or elements that narrow the scope of the claim in order to get it through the examiner is one way to put it, and this was the final narrowing element.

Q. So if this is the new thing, if this is the contribution to the public, does that sort of put the spotlight on the "how" question on this element?

A. Absolutely, yeah.

Q. Okay. So let's take a look at that "how" question now.

So this is the testimony from Mr. Bhaskaran, the CEO, one of the inventors. Were you here when that was played this morning?

A. Yes, I was.

Q. Okay. And question: The '554 patent doesn't go into the details of how to maintain the SIP signaling sequence because that was known by practitioners in the art before the '554 patent, correct?

And he said: Correct.

Did you see that?

A. Yes.

Q. Okay. Based on your understanding, is that good enough? Can you say this is the reason I'm getting my

03:33:53 patent? All right. What are you teaching me? Oh,
03:33:55 nothing. People already know it. Is that -- is that okay?
03:34:00 A. That does not comport with my understanding of novelty.
03:34:04 Q. And then were you also -- we also asked: So the '554
03:34:11 patent isn't explaining how to maintain the SIP signaling
03:34:15 sequence number. It's just saying the SIP signaling
03:34:19 sequence number must be maintained, correct?
03:34:21 And the answer is -- I'm reading it. It says:
03:34:25 The SIP signaling sequence number must be maintained
03:34:28 between the SIP device and the server. That's correct.
03:34:31 Do you see that?
03:34:32 A. Yes.
03:34:32 Q. We talked about clear and convincing. When the CEO of
03:34:38 the Plaintiff, who is a named inventor, says point blank,
03:34:42 it doesn't explain how, does it get much more clear and
03:34:46 convincing than that?
03:34:47 A. I agree.
03:34:48 Q. All right. Two other people testified about this.
03:34:54 Mr. Chin, recall, testified about what he thought the "how"
03:34:59 was, how it was taught. And I'm going to -- rather than
03:35:03 reading every bit of this, what I'm going to do here is
03:35:06 kind of highlight a little bit.
03:35:07 The question -- and this was all on his direct
03:35:10 examination. Were you here for that, as well?
03:35:13 A. I was.

03:35:13 Q. Okay. Asked to walk the jury through what's happening in this Figure 4 flowchart in the patent.
03:35:20 You recall that?
03:35:21 A. Yes.
03:35:21 Q. And what he said was: We're sending a second one. It's called a RE-INVITE to actually move the call from one path to another, and we're also going to update that sequence number.
03:35:41 So his answer to "how" was what?
03:35:48 A. By sending a SIP RE-INVITE, which is a well known established command.
03:35:53 Q. So in terms of then the how you go about doing that, he pointed to this Figure 5. Do you recall that?
03:36:00 A. I do.
03:36:03 Q. Okay. And so he says this RE-INVITE here, right, anybody who knows how to write software can look at this and understand how to turn this diagram into that code. You see that?
03:36:15 A. Yes.
03:36:16 Q. Okay. So I want us to make two points here. The first one is if you give this 100 percent credit, and say, all right, we'll give you every bit of this. We'll say you taught the public how, how to send a RE-INVITE, right, to actually move the call, okay?
03:36:39 And then you come to court and you say, oh, but

03:36:42 that's not required. If you do it any other way, you
03:36:45 infringe my patent. What have you done to your claim?
03:36:48 MR. HERMAN: Objection, Your Honor. It misstates
03:36:51 your claim construction.
03:36:55 THE COURT: It's definitely leading.
03:36:56 MR. GAUDET: I'll give you that one. I'll give
03:36:58 you that one.
03:36:59 THE COURT: How about rephrase it?
03:37:00 MR. GAUDET: Let me try again. Let me try again.
03:37:03 Thank you, Your Honor.
03:37:04 Q. (By Mr. Gaudet) What's your under -- is your
03:37:06 understanding of their infringement theory that Verizon
03:37:08 actually sends a RE-INVITE to -- to make the switch or that
03:37:16 the claim can be satisfied somehow even if that doesn't
03:37:20 happen, what's your understanding of their infringement
03:37:24 theory?
03:37:24 MR. HERMAN: Same objection, Your Honor.
03:37:25 THE COURT: What's the objection there?
03:37:26 MR. HERMAN: The word RE-INVITE isn't in the claim
03:37:29 and it's certainly not in your claim construction, and
03:37:31 that's not what you determined that the claim term means.
03:37:36 MR. GAUDET: Your Honor, our -- the entire point
03:37:39 is that if they argue and assert a scope of the claim that
03:37:45 is broader than what they have taught in the specification,
03:37:48 they've invalidated their patent. This isn't about

03:37:51 infringement, this is about validity.

03:37:53 THE COURT: All right. Well, let me --

03:37:54 MR. HERMAN: Your Honor, if they had that position, they should have asked for you to construe it that way during claim construction. They did not.

03:38:01 MR. GAUDET: He's fundamentally wrong about the law there. This is not an infringement issue.

03:38:07 THE COURT: All right. Let's move along.

03:38:09 MR. GAUDET: Absolutely.

03:38:09 Q. (By Mr. Gaudet) Sir, is it your understanding that they are -- they are in this case taking the position one way or the other that their claim scope can cover something beyond just sending a RE-INVITE?

03:38:23 MR. HERMAN: Your Honor, same objection.

03:38:24 THE COURT: I'm going to sustain the objection.

03:38:27 Move along, Mr. Gaudet.

03:38:29 MR. GAUDET: Absolutely. Absolutely.

03:38:31 Q. (By Mr. Gaudet) Let's talk about what Mr. Mavunkel said.

03:38:42 Okay. So after Mr. Chin said that anyone who knows how to write software could write software, we asked -- they asked on direct Mr. Mavunkel about that, right?

03:39:00 Do you have an understanding of whether the software that Mr. Chin wrote is described in the patent?

03:39:07 And I'm actually going to clear this because this was from the prior one.
03:39:12 And he said: Yes, sir.
03:39:19 Is it described?
03:39:20 The invention is described.
03:39:22 Well, how -- is there a description of the software Mr. Chin wrote in the patent?
03:39:27 He said: There's a description on how to write the software.
03:39:31 Okay. Figure 4. And this is also a way you use to communicate to other programs, how?
03:39:42 Yes, the combination of 4 and 5 is how you would write the software.
03:39:47 Do you recall that?
03:39:48 A. I do.
03:39:48 Q. And then do you recall on cross-examination I asked him a question, and then admittedly I fumbled around to try to find my binder and where the answer was, but then this was the answer.
03:39:59 The question was: Is it accurate to say you don't know how, how the SIP signaling sequence is maintained?
03:40:07 And your answer was: Correct.
03:40:09 That was your testimony, right?
03:40:11 And he said: In the context of the software, yes.
03:40:15 Do you see that?

03:40:17 A. I do.
03:40:17 Q. Can you reconcile what he just said with what Mr. Chin said?
03:40:21 A. I -- I can't. I haven't been able to determine from -- from any of the inventors' testimony the answer to how to maintain the SIP sequence beyond the RE-INVITE.
03:40:39 Q. Terrific.
03:40:40 Bottom line on this one, bottom line, from what you have seen in the courtroom and based on the allegations and the evidence, do you believe that Aspen has satisfied its end of the bargain to teach the public how to make and use, you know, the full scope of the invention that they're claiming in front of the jury?
03:41:07 A. No.
03:41:08 Q. Okay. Let's switch topics. We're halfway there.
03:41:16 The next topic up here, we've got the '377 patent and SIP were before Aspen's patent, which is the '55 -- '554 patent is obvious.
03:41:30 Kind of an easier way to think about this is that whether or not the '554 patent was really new, is that kind of, again, a layman's way of kind of thinking about this?
03:41:41 A. That's one way you could look at it.
03:41:43 Q. Okay. And what is your conclusion in that regard?
03:41:46 A. Well, I, again, performed a careful analysis of the disclosure of the '554 patent's claims in light of the

03:41:56 specification. In other words, how one of ordinary skill in the art would read and understand the scope of those claims as being asserted by Aspen. And then I looked to the '377 patent -- that I'll explain in a little more detail -- in combination with this Session Initiation Protocol language and standard.

03:42:19 And in my opinion, I found that one of ordinary skill in the art at the time of the '554 patent's purported invention would have seen -- regarded the asserted claims of the '554 patent here in this courtroom as being obvious.

03:42:38 Q. Okay. And if something is obvious, is it then not valid?

03:42:41 A. That's correct. My understanding is it's not valid.

03:42:44 Q. Okay. We've got three prior art references up on the screen here -- or three documents, I should say, referenced here. Are these the three documents that you are considering in this analysis?

03:42:55 A. That's right. So VDTX-46 is the original SIP RFC request for comments, Document 3261. We've heard that one before.

03:43:10 VDTX-31 is the 3665 request for comments. It basically just references or incorporates the 3261 by reference -- in other words, it's an explainer. It doesn't -- it's based on or rooted in the 3261.

03:43:29 And on the right-hand side it's VDTX-45 which is

03:43:33 the 8,467,377 patent to Qualcomm.
03:43:43 Q. Okay. And the inventor's name there, it's spelled K-o-t-t-i-l-i-n-g-a-l. Often technical folks, patent lawyers refer to patents by an inventor name or a number so we all know what we're talking about. I'll refer to this as the Qualcomm '377 patent, but that's the document you're talking about; is that fair?
03:44:05 A. That's correct.
03:44:06 Q. Okay. Now, this now has a slide of that second SIP standard you just referred to, RFC 3665. This is the one the jury has not yet seen. Can you just identify what this is?
03:44:21 A. Well, I'm just highlighting language from its abstract. It says: This document gives examples of Session Initiation Protocol, SIP, call flows.
03:44:31 So as I said previously, it's rooted in RFC 3261, as I've highlighted down below there, but it's just giving examples.
03:44:40 Q. And that reference down there to RFC 3261, that's literally a reference to the original RFC -- the original SIP document?
03:44:51 A. That's correct.
03:44:51 Q. Okay.
03:44:52 MR. GAUDET: Your Honor, we move VDTX-46 into evidence.

03:44:58 THE COURT: Any objection?
03:44:58 MR. HERMAN: No objection.
03:44:59 THE COURT: It'll be received.
03:45:01 MR. GAUDET: Thank you, Your Honor.
03:45:02 Q. (By Mr. Gaudet) The second -- or the other document that's now new to the jury, this is the cover of the Qualcomm patent; is that right?
03:45:10 A. Yes.
03:45:11 Q. Okay. And do you see the date there on the Qualcomm patent that's displayed on the bottom?
03:45:19 A. Yeah. It was filed August 24, 2005.
03:45:23 MR. GAUDET: Your Honor, we move VDTX-45 into evidence.
03:45:26 THE COURT: Any objection?
03:45:27 MR. HERMAN: No objection.
03:45:27 THE COURT: It'll be received.
03:45:29 MR. GAUDET: Thank you, Your Honor.
03:45:30 Q. (By Mr. Gaudet) So let's kind of work our way just through just the title of this patent, right? And I'll read -- well, actually I won't read the whole thing because that would be kind of pointless in the first instance.
03:45:47 We'll go through just phrase-by-phrase. It's got VoIP in it. What does that tell you?
03:45:51 A. We've heard that acronym before, Voice over IP.
03:45:55 Q. And it talks about quality of service. What does that

03:45:58 tell you?
03:45:59 A. Quality of service is a technical term that people in my industry use, and it's really just a measure of how -- the quality of a link. You know, we've heard scratchy phone calls that are really hard to understand and ones that are, like, crystal clear. So the quality of service, I think, is something that we're all familiar with.
03:46:22 Q. Then it talks about mobile devices having multiple interfaces. What's that all about?
03:46:27 A. Well, the first part, mobile devices, I think we're all familiar with handheld phones. Having multiple interfaces would be multiple air interfaces, such as Wi-Fi and cellular interface.
03:46:41 Q. Then there's -- a first word here is interleaving. Do you see that?
03:46:48 A. Yes.
03:46:49 Q. And that's a word that probably we don't use a whole lot just in ordinary discussions. What's interleaving? What's that -- what's that mean?
03:47:00 A. Well, I can take my two hands and interleave my fingerers like this. Or, you know, when you're shuffling a deck of cards, that's literally interleaving the cards with each other. So going back and forth maybe between two stacks of things or two -- two different streams, for example.

03:47:17 Q. So in the context of having, for example, a cellular connection and a Wi-Fi connection, what does interleaving mean?
03:47:28 A. Well, as the patent explains -- the Qualcomm patent explains, the idea is that it can set up two connections, two wireless connections, two network paths, and switch back and forth between them depending on the quality of service that's instantly available. So that confers certain benefits.
03:47:51 Q. Now, when it comes to switching, we've heard a lot about switching. Is interleaving a -- how would you characterize the sophistication level of interleaving?
03:48:01 A. Well, it's higher than just mere switching. I mean, this really involves being able to go back and forth as -- as rapidly as the technology would allow, for example, to expand the bandwidth of the connection, for example, or optimize the quality of service by just going back and forth. And so it would be almost like maybe you -- you know, you've been in a traffic jam, and I think we've all seen people sort of weaving in and out trying to advance throughout the traffic jam. They're kind of interleaving in a way, trying to optimize the speed at which they're traveling.
03:48:43 Q. The next slide here, Slide 17, we've got a figure from the patent, Figure 10, and some descriptive -- and a

03:48:54 portion of the specification from -- of the patent from
03:48:57 Column 1:51 to 61 of the Qualcomm patent in 2005.
03:49:02 And what I'll do is just sort of highlight
03:49:06 portions of this sort of one at a time, if that sounds
03:49:14 okay?
03:49:15 A. Sure.
03:49:15 Q. So I've highlighted the phrase "cellular telephone" up
03:49:20 top, the thing that looks like a cellular telephone in the
03:49:24 picture, and the words SIP proxy. Can you tell us about
03:49:27 that?
03:49:27 A. Well, the specification here of the Qualcomm patent
03:49:32 states that it uses a mobile communication device, for
03:49:35 example, a cellular telephone, and then illustrates that
03:49:39 highlighted here in yellow. And then it's also using SIP
03:49:43 as it's clearly indicating at least in Figure 10 with these
03:49:47 two proxies that are essentially specialized computers that
03:49:53 can understand and pass SIP messages back and forth.
03:49:56 Q. So then in the Qualcomm 2005 patent, I've now
03:50:01 highlighted in blue up top the language "wireless LAN" and
03:50:08 then "wireless LAN may, for example, be in accordance with
03:50:13 IEEE 802.11."
03:50:16 Do you see that?
03:50:17 A. I do.
03:50:17 Q. Is that the really formal way of saying Wi-Fi?
03:50:20 A. Yeah, those are synonymous. When you hear Wi-Fi,

03:50:24 that's really formally IEEE 802.11.
03:50:29 Q. And then what does the blue path there in the figure
03:50:31 show?
03:50:32 A. Well, the blue path in Figure 10 from the Qualcomm
03:50:34 patent indicates that the mobile phone on the left is
03:50:39 communicating through one wireless interface through a
03:50:44 router, which is No. 3 there, and through a LAN, Local Area
03:50:49 Network, to the Internet and ultimately through a SIP proxy
03:50:55 No. 2 to another LAN and ultimately to an IP phone on the
03:51:00 right, which is labeled Party B.
03:51:04 Q. I've now highlighted in green in the 2005 Qualcomm
03:51:10 patent language that says: A cellular telephone network.
03:51:16 The cellular telephone network may, for example, be a CDMA,
03:51:22 Code Division Multiple Access telephone network.
03:51:24 And there's a green path in now Figure 10 again of
03:51:29 the Qualcomm -- this is all the Qualcomm 2005 patent.
03:51:31 Tell us about what that is.
03:51:33 A. Well, first of all, CDMA is a Qualcomm invention.
03:51:38 People didn't think it would work, and they proved that
03:51:41 it -- that it did work. And that ultimately became the
03:51:44 basis for the third generation cellular standards. So 3G
03:51:50 is CDMA.
03:51:52 So it's not surprising that Qualcomm would be
03:51:54 using that in one of its inventions here. But that's the
03:51:57 other air interface illustrated in Figure 10, and so we see

that the mobile phone is also connected to the cellular telephone network. And that network path then goes through SIP proxy No. 3 and then on to that same Party B's phone.
Q. Terrific.
Now, I have -- although the size changed a little bit on this next slide because we've got a different snippet of the specification language. Again, all this is from the Qualcomm 2005 patent, and then the same highlighted figure from the Qualcomm 2005 patent down below.
And what's highlighted in pink there, and this is in the background of the patent, it says: The conventional approach is to start using the interface with better coverage and start sending Real Time Traffic like RTP using the better interface.
What is that telling you about what the conventional approach already was even before the Qualcomm 2005 patent?
A. Well, this is teaching one of ordinary skill in the art who is reading the specification and trying to understand the Qualcomm '377 patent, is teaching that fictitious individual that, hey, it's already known that it's conventional and frankly I would argue common sense that you would start using an interface with better coverage, perhaps better quality of service.

03:53:41 And then we've heard a lot about RTP or Real Time
03:53:43 Protocol, those are the packets of your actual voice that
03:53:46 get sent through the network. So this is just establishing
03:53:49 sort of table stakes that this is already well known.
03:53:52 Q. So this -- just the basic idea of switching from a cell
03:54:00 call to a Wi-Fi call or vice versa in a network like this,
03:54:06 what is this saying the status of that was in 2005?
03:54:10 A. It's characterizing it as conventional.
03:54:14 Q. Okay. And to be clear about this, when -- with Aspen's
03:54:17 patent, I mean, the Patent Office -- they considered this
03:54:22 and SIP, in other words, this stuff was on the table, is
03:54:25 that fair?
03:54:26 A. Yes.
03:54:26 Q. Okay. And I want to keep sort of building through to
03:54:33 understand all this.
03:54:37 We are going to go to now sort of a deeper dive,
03:54:40 if you will, because we need to -- we'll do it much more
03:54:44 quickly, but we have to at least talk about each one of the
03:54:48 claim elements.
03:54:49 But one question before we do that, as you're
03:54:58 considering whether or not the -- the stuff that came
03:55:03 before, the prior art, would invalidate the claims, all
03:55:06 right, can you have in mind sort of the way that the
03:55:11 Plaintiff is asserting their patent in -- in the case, in
03:55:15 the litigation?

03:55:16 A. Yeah, that's my understanding.
03:55:17 Q. Okay. So, again, you've been here the whole time, right?
03:55:21 A. I have.
03:55:21 Q. Okay. So having in mind sort of when Aspen is saying, well, Verizon, if you do XY&Z it infringes our patent and then you look and say, well, hold on, XY&Z was already known, does that mean you agree that Verizon is infringing Aspen's patent in any way?
03:55:38 A. No, that's just essentially what's good for the goose is good for the gander. In other words, if something is being asserted for -- for infringement, then you have to take that same scope and definition and apply it to see whether there was prior art that would have invalidated that scope.
03:55:59 Q. Terrific.
03:56:00 A. That just makes sense.
03:56:01 Q. So with that understanding, these are -- this is the claim that we've been -- that we've been focused on. We will start with -- it's Claim Element -- it's the top one -- we don't actually -- I think we might have somehow deleted that [a] that's supposed to be up there at some point in the revisions, but it's highlighted, the top element. And what I want to do is I'm just going to sort of focus on -- call our attention to two elements, right?

03:56:36 Reliability of a transmission. That's going between a
03:56:39 source and destination.
03:56:40 Do you see that?
03:56:41 A. I do.
03:56:42 Q. Okay. And now I've got on the screen again that same
03:56:48 kind of introductory slide we did to the Qualcomm '377
03:56:52 patent up here, language from the Qualcomm patent, picture
03:56:55 from the Qualcomm patent. Does this show -- does this
03:56:58 address those issues from the claim element we just saw?
03:57:01 A. Well, it does. You know, the description is a mobile
03:57:08 communication device for communication with a wireless LAN,
03:57:12 a cellular telephone network, and it describes those
03:57:18 networks as examples of 802.11 or Wi-Fi, and CDMA or 3G.
03:57:22 Q. Okay. And now that we've kind of come to this first
03:57:26 instance and we're actually looking at claim language, I
03:57:30 want to now kind of revisit the point we just made about,
03:57:36 you know, having in mind what the Plaintiff is saying their
03:57:38 patent covers.
03:57:43 Now, this image from the 2005 Broadcom patent,
03:57:47 does that kind of look like some of the images that the
03:57:49 Plaintiff has used from Verizon documents later to try to
03:57:54 show infringement in this case?
03:57:55 A. I think the question said Broadcom and I think --
03:57:55 Q. Hold on -
03:58:02 A. -- but outside --

03:58:02 THE COURT: Wait a second. You can speak and you can speak. You may not speak on top of each other. Both of you will end up in trouble, okay? That's your last warning.

03:58:20 A. May I have the question again, please?

03:58:23 Q. (By Mr. Gaudet) Yes, Dr. van der Weide. The question is simply this -- the figure here, does this figure resemble, you know, the type of system that we saw -- Aspen using a figure from Verizon's system to say it infringes Aspen's patent?

03:58:45 A. I recall seeing a really similar figure from the Verizon documents.

03:58:51 Q. Okay. And what is the date on the figure here?

03:58:57 A. Well, this figure is -- is dated 2005.

03:59:05 Q. Okay. We'll move to the next element.

03:59:12 Is it okay if I put a check on this one?

03:59:15 A. Yes.

03:59:16 Q. Okay. The next element is switching the transmission from the first network path to one of a plurality of alternative network paths.

03:59:27 You see that?

03:59:28 A. I do.

03:59:28 Q. I have up on the screen now from the Qualcomm '377 patent, language that at the top is from 1:54 to 61 in the patent, and at the bottom, 16:8 to 14. Do you see that?

A. Yes.
Q. Okay. If you could, tell the jury your opinion about whether or not this language addresses the claim element we just saw.
A. Well, I've highlighted, especially from the lower section, the example from the Qualcomm '377 patent specification that says that the second novel aspect is that it's over three or more air interfaces. So it's already contemplating a large number of air interfaces here already in this very early date.
Q. Is it appropriate to put a check on this box?
A. Yes, because as I understand it from the Court's interpretation, one of a plurality of alternative network paths includes the original and then at least two others for a total of three. And that's what we just saw.
Q. The next claim element here has -- there's, again, two parts that I'm going to highlight. There's the transmission is not disrupted as a result of said switch, and then the Network Address Translation portion.
And I'll show you one slide for the first and a different slide for the second.
This is now addressing the -- the first of those two. If you could, explain to the jury how this informs your opinion.
A. Yeah, I cited to a particular section of the

specification from the '377 Qualcomm patent, again, that teaches one of skill in the art that data payloads of the media stream, that's what's being communicated between the two phones, are, therefore, seamlessly switched from the first active session to the second active session without the call being perceptively broken. I thought that was very meaningful language in view of what I've heard and read in the '554 patent.

Q. Now -- now we've got a different bit of language up and an emphasis from Figure 9 on what's called the -- it's a LAN access point there. If you could, describe to the jury, then, the correlation between what this shows and then what you understand Aspen to be saying satisfies their patent.

A. Sure. Well, back in the 2005 time frame, when this patent was applied for, in my opinion, one of skill in the art seeing this LAN access point, that would be one of those Wi-Fi routers that you could go to Walmart and buy, for example. It's got an antenna, it's labeled No. 3. And back at that time, the notion of doing Network Address Translation or NAT was I think well-established by then.

And so one of skill seeing this would understand that the LAN access point would be representative of the capability of doing NAT or indeed Port Address Translation, PAT. And so in my opinion that would have rendered that

04:03:41 element obvious to one of skill in the art.
04:03:43 Q. Now, were you here when Dr. Mahon on the infringement
04:03:49 issue opined that the current LTE Verizon system wouldn't
04:03:59 satisfy this element because traffic is encrypted through
04:04:03 that wireless access point. I think I got that right --
04:04:11 but does that sound --
04:04:11 A. Yes, I was. There's an IP security, or for short,
04:04:16 IPsec tunnel that's set up that essentially encapsulates
04:04:20 the Real Time Protocol packets that are traveling back and
04:04:25 forth so you can't inspect them, other than when they are
04:04:25 finally decrypted at either end. So that's -- that's well
04:04:31 known.
04:04:31 Q. From your review, does -- does that reason why Verizon
04:04:38 would not infringe the patent, is that also applicable to
04:04:44 the Qualcomm 2000 -- sorry, let me try that again.
04:04:46 That reason you just explained for why Verizon
04:04:52 would not infringe Aspen's patent, is that equally
04:04:55 applicable or not, in your opinion, to the Qualcomm patent?
04:04:58 MR. HERMAN: Objection, Your Honor. I believe
04:05:00 he's asking him for a non-infringement opinion. That's the
04:05:02 way I just heard it.
04:05:05 THE COURT: Can you rephrase your question?
04:05:07 MR. GAUDET: Sure.
04:05:08 Q. (By Mr. Gaudet) Is there encryption in the Qualcomm
04:05:10 patent?

04:05:10 A. No, there's no encryption shown here, and so, therefore, one of skill would understand that with this LAN access point, as I previously described, especially in the 2005 time frame, that would call to mind a capability like NAT or -- and/or PAT.
04:05:29 Q. In your mind then would that make the Qualcomm 2005 patent then closer to Aspen's patent under Aspen's theory?
04:05:41 A. Oh, absolutely.
04:05:42 Q. Okay. Is it appropriate then again with Aspen's theory in mind to check the box there?
04:05:55 A. Yes.
04:05:56 Q. These next two refer to Real Time Protocol, RTP, and Session Initiation Protocol, SIP, do you see that?
04:06:04 A. Yes.
04:06:04 Q. Okay. We'll talk about those.
04:06:08 I've got language at 2:25-41 and 1:62 to 2:5 up on the screen here. If you could, just tell the jury what this means to you.
04:06:21 A. Well, I've highlighted a couple of sections from the Qualcomm '377 patent specification that explicitly call out the use of SIP and also RTP that's the actual communication of those packets of your voice. So as we heard a few days ago SIP is a control language, and so it's like the traffic cop that, you know, sets up the actual RTP stream that happens so these two exist on different planes is what it's

04:06:57 called. But that's already really well known by this time, and so the Qualcomm '377 patent uses both.

Q. Is it appropriate to check these two elements?

A. Yes.

Q. Okay. The final element, this is the SIP signaling sequence element, do you see this?

A. I do.

Q. Okay. And I now have up on the screen a screenshot from the SIP RFC 3665 document. If you would, tell the jury how this informs your opinion.

A. Well, again, I have used the combination of the Qualcomm '377 patent and the SIP RFC documents to inform my opinion about how one of ordinary skill in the art would have understood the claims of the -- the asserted claims of the Aspen patent in view of this combination.

So here, this is one example in the RFC 3665, that's the -- sort of explainer or examples document of SIP. And it's clear we're just showing a communication between Alice and Bob, those are the usual endpoints of a communication or a transmission. And you see the different SIP commands here, INVITE, Trying, Ringing, OK, and then Two-way RTP Media Established on the first half of that diagram.

And then I've highlighted that Bob changes the IP address. So Bob changes his IP address. Well, as we've

heard throughout the -- the week, if that happens, then the packets that Alice is trying to send need to be readdressed. We need to know where to send them. And so this SIP command called INVITE essentially readdresses where those go. That's the whole idea.

That enables this change of IP address, and then we go through -- there's a New RTP Media Stream based on that change of address, and then there's a BYE and OK. That's just standard opening and closing of a SIP session.

Q. I've now got up on the screen an excerpt on Page 73 from the SIP standard, the RFC 3261. And if you could, just address this slide to the jury.

A. Yes. So I've highlighted from the original RFC 3261 document, the one that defines SIP, that the requests within a dialog, we've heard about dialog, they must contain strictly monotonically increasing and contiguous Cseq sequence numbers increasing by one in each direction.

I think we've all heard a lot of testimony about that, and so this is strictly within the standard. This is what the standard says to do.

MR. GAUDET: Now, I'll ask Mr. Duval to take us back to Slide 10 because if I clicked through it would make us dizzy. Here we go.

Q. (By Mr. Gaudet) This was the testimony of Mr. Bhaskaran that we looked at. Do you see that?

A. Yes.
Q. Okay. If you could, just address whether there is a sort of a dilemma, if you will, between saying that something is new and then saying that the way that it is satisfied is by, you know, what you would already know.
A. Well, yeah, reading Mr. Bhaskaran's testimony where -- in essence he's just saying that the SIP signaling sequence number must be maintained between the SIP device and the server, that's just restating what the SIP standard does.
So it's hard -- in my opinion, it would be hard for one of ordinary skill in the art to reconcile that that simultaneously practicing the well-established standard and yet somehow novel.
Q. And so I guess the bottom line from this is can -- can Aspen have it both ways?
A. Not in my opinion.
Q. Okay. And actually, let's --
MR. GAUDET: I'll ask Mr. Duval to now take us back to Slide 36.
Q. (By Mr. Gaudet) So in light of the way that Aspen has presented its case, would the prior art then render this last element obvious?
A. Yes.
Q. Is it fair then to check this one, as well?
A. Yes.

04:12:22 Q. So there are two other bits of claim language that appear in some of the other claims, and without going through and sort of checking this, I'll just do it in substance.

04:12:36 One of them is a stream quality event. So the analysis you just went through, does it address a stream quality event?

04:12:45 A. Well, a stream quality event could be an interruption of a stream, for example, some hiccup or something like that that could then prompt a system to change from one path to another path. So that would be one -- one example.

04:13:08 Q. And is that addressed in the Qualcomm 2005 patent?

04:13:12 A. Yes.

04:13:13 Q. Okay. The other bit of language you haven't talked about so far is Port Address Translation. Same question, does the -- what you talked about so far, does that cover Port Address Translation?

04:13:27 A. Yeah, I briefly described it when I was talking about the wireless LAN that -- that one of skill would expect that that would do NAT or Network Address Translation, and PAT is very closely related to NAT, and so they're often spoken about in the same sentence. So one of skill would expect PAT to be available there as well.

04:13:49 Q. So with that, would that now cover all of the elements of all of the asserted claims, keeping in mind Aspen's sort

of theory of its case?
A. Yeah, I agree with that.
MR. GAUDET: Your Honor, thank you for the midstream warning, and I pass the witness.
THE COURT: All right. Very good.
You all were much improved after that, Mr. Gaudet.
MR. GAUDET: I'll tell my wife that that worked very well. She'd appreciate that.
MR. HERMAN: Your Honor, can Ms. Ney approach with some binders?
THE COURT: Of course, yes.
MR. HERMAN: Thank you.
Your Honor, may I proceed?
THE COURT: Whenever you're ready.

CROSS-EXAMINATION

BY MR. HERMAN:
Q. Dr. van der Weide, good afternoon.
A. Good afternoon.
Q. I apologize. I have not introduced myself to you yet this week. And there's been a lot of things happening, and then I saw on the screen when you put that you taught at the University of Delaware, I grew up in Newark, Delaware. So you were a Blue Hen for at least a part of your life; is that fair?
A. That's fair. I have really fond memories of Newark

while I was there. And, parenthetically, I think we both know it's not Newark, it's Newark.
Q. Correct. I've corrected a lot of people in my time. So we have a Blue Hen, and Mr. Mavunkel is a Banana Slug. So we've got some good mascots going on here.
And you've already said this, but you're here -- are you okay if I ask you some questions about the testimony you just did with your counsel, is that okay?
A. Oh, absolutely.
Q. You're here testifying on behalf of Verizon as an expert on patent validity, correct -- or invalidity?
A. That's correct.
Q. And you've been here for the entire trial?
A. Yes.
Q. And you heard Verizon's counsel question our damages expert, Mr. Blok, and said that one thing that the jury should look at with respect to experts is whether or not those folks are, for lack of a better term, sort of beholden to Plaintiff's side or Defense side? Do you remember hearing that?
A. I don't recall those words precisely, but I'll take that as a representation.
Q. I could show you the transcript if you'd like it, but -- and he also explained -- this is when Verizon's counsel was cross-examining Mr. Blok -- that one of the

things that the Court requires an expert to do is to submit a CV or a resume that includes all the cases that you've testified over the last five years. Is that your understanding?
A. Yes.
Q. And you did that, correct?
A. Yes, I did.
Q. And I have -- I have your expert report right here. It is pretty thick. I've got it marked for a couple of things. But at the back of this, you've got your CV. And that's in your binder, if you want to take a look at it.
And before we get to your CV, Dr. van der Weide, you agree with me that Verizon's counsel's questions to Mr. Blok would also apply to technical experts, right? So, in other words, if an expert is beholden to an industry, in this case the telecommunications industry, that's something that the jury should consider when they're determining credibility and other things about the witnesses. Would you agree with that?
A. As I said before, what's good for the goose is good for the gander.
Q. That's a great term. I actually agree with that.
MR. HERMAN: Can we call up the first slide?
Q. (By Mr. Herman) So I went through last night and put together -- I went through your CV, and you've got four

04:18:04 pages of patent litigation testimony in the last five or so years. And if you see, I've highlighted certain ones and --

04:18:17 MR. HERMAN: Ms. Hopkins can you turn to the next two so the jury can see it.

04:18:21 Q. (By Mr. Herman) And so what I've done is I've counted the number of cases over the last five or so years where you've been an expert for a telecommunications company. Does 15 sound about right? I've also included Apple, understanding that's a little bit of a different -- but about 15 cases on behalf -- where you've been an expert for a telecommunications company. Does that sound accurate?

04:18:49 A. I could agree with that.

04:18:51 Q. And for some of them -- if you go back to the first page, some of them you're retained by multiple -- like in the second one listed there, AT&T, Ericsson, and Nokia, correct?

04:19:04 A. That's right. That's usually indicative of a joint defense group or that multiple -- similar parties are being sued at the same time.

04:19:15 Q. And you've also been retained by several large companies that aren't necessarily in this telecommunications space, but, like, Medtronic, LG, NXP, Infineon, and Intel. These are large, large companies, correct?

04:19:32 A. The ones named, I would agree.
04:19:35 Q. Yeah. But then there's one -- I had to look it up
04:19:39 because I wasn't sure. You were with a -- you -- you
04:19:44 were -- it says here you're representing a company called
04:19:47 ThroughPuter. Is that how you pronounce it?
04:19:51 A. ThroughPuter.
04:19:52 Q. ThroughPuter. Thank you.
04:19:53 I had not heard of that company. That's clearly
04:19:56 not a big company. That's the only company -- that's a
04:20:01 startup company, isn't it?
04:20:03 A. ThroughPuter is a startup.
04:20:05 Q. And it does cloud-based optimization techniques?
04:20:09 A. Among other things.
04:20:10 Q. It turns out you're an advisor for ThroughPuter --
04:20:16 Puter, aren't you?
04:20:17 A. I am.
04:20:18 Q. And you're also a shareholder?
04:20:20 A. Yes, that's correct.
04:20:20 Q. So fair to say that in that case you had a vested
04:20:27 interest in making sure ThroughPuter was successful?
04:20:29 A. I was designated as the corporate witness in that
04:20:32 matter.
04:20:32 Q. Okay. But other than that one case, you basically make
04:20:39 a good part of your living by providing expert testimony
04:20:43 and consulting services for large telecommunications

companies and other companies; is that fair?
A. I'm not sure I sign up to the good part of my living part of the question, but I certainly represent that I've done this work.
Q. And you're getting paid by Verizon's counsel to be here today?
A. Oh, yeah.
Q. Or by Verizon? I don't think Mr. Dacus is writing you a check. So are you getting paid by Verizon?
A. That's my understanding.
Q. Yeah. And about $850 an hour?
A. That's correct.
Q. Okay. Thank you.
MR. HERMAN: Your Honor, I'm going to just get my bottle of water real quick, if that's okay.
THE COURT: Of course. Of course.
MR. HERMAN: So Ms. Hopkins, can we go ahead and pull up Dr. van der Weide's Demonstrative DD5.14?
Q. (By Mr. Herman) And you went through this slide, Dr. van der Weide, with your counsel on direct, and I just want to confirm that there's only three references, VDTX-46, VDTX-31, and VDTX-45 that you are asserting against the claims of the '554 patent?
A. Well, I consider the SIP protocol references to be one reference.

04:22:21 Q. Okay. So it's really --
04:22:23 A. It's a combination.
04:22:24 Q. Okay. So we're talking about two references then, correct?
04:22:30 A. I would agree with that.
04:22:31 Q. Okay. And you understand when I say you, you are Verizon's invalidity expert, so when I'm asking you questions about what you're asserting against the claims, I'm really also talking about what Verizon as a company is asserting against the claims; is that fair?
04:22:53 A. I think in this matter, I can agree with that.
04:22:55 Q. Thank you.
04:22:56 So let's talk about VDTX-46 and 31. That's the SIP standard, correct?
04:23:03 A. I'll accept that, yes.
04:23:06 Q. And you heard Mr. Chin and Mr. Mavunkel, the inventors of the '554 patent, testify on Monday? You were here in the courtroom?
04:23:19 A. Yes, I was.
04:23:19 Q. And you heard Verizon's counsel question Mr. Chin and Mr. Mavunkel about the SIP standard, correct?
04:23:27 A. I recall the -- the -- in broad strokes what the questions and the testimony were, but I -- I don't have a specific recollection of individual questions.
04:23:42 Q. That's very fair. And I'm not trying to make this a

04:23:44 memory test by any stretch.

04:23:47 MR. HERMAN: So go ahead and pull up Day 2
04:23:50 transcript, 289:3 through 5.

04:23:56 Q. (By Mr. Herman) Here's where Verizon's counsel was
04:23:58 questioning Mr. Chin about the SIP standard. And he said,
04:24:03 you know, so six years before this patent, the SIP standard
04:24:06 had been created. Do you recall that?

04:24:08 A. Yes, I do.

04:24:15 Q. Okay. Well, now I want to talk about the RTP standard.

04:24:18 Now, I'll put up on the screen Verizon's counsel
04:24:21 questioned Mr. Chin about the RTP standard. You see that?

04:24:25 A. I do.

04:24:26 Q. Is it fair to say that Verizon's counsel was implying
04:24:31 that the RTP standard somehow invalidates the claims of the
04:24:36 '554 patent?

04:24:36 A. I heard the word "imply" in the question. I'm not sure
04:24:47 I evaluated the implications.

04:24:50 Q. Well, look at the question, it's right there on the
04:24:53 screen. This is from Day 2 transcript at 290. It says:
04:24:57 But to be truthful, this RTP standard was something that
04:25:01 others in the industry had done long before this '554
04:25:05 patent, fair?

04:25:07 A. Oh, that's what it says in the question, yes.

04:25:10 Q. You don't view that as an implication that somehow the
04:25:12 RTP -- the RTP standard somehow invalidates the claims of

04:25:18 the '554 patent?
04:25:18 A. I'm sorry, I don't really understand the question.
04:25:28 Q. What was the purpose in your view -- I mean, you're sitting here as an expert viewing the testimony. What was the purpose of Verizon's counsel asking Mr. Chin how long -- or getting him to admit that the RTP standard had been around for a long time?
04:25:45 A. I didn't consult with Verizon's counsel about this line of questioning. So the question goes to what was the purpose of it, not -- I wasn't the person asking the question. So I can't really comment.
04:26:00 Q. Okay. That's fair.
04:26:04 MR. HERMAN: You can take that down.
04:26:07 Q. (By Mr. Herman) So you were here when they asked the inventors about -- and Dr. Rubin about the Wi-Fi standard?
04:26:12 A. I have a general recollection of that line of questioning.
04:26:17 Q. And the Wi-Fi standard is not being asserted as prior art, is it?
04:26:22 A. I don't recall it being admitted into evidence. It's certainly been discussed as something that was known to one of skill in the art prior to the application that became the '554 invention.
04:26:40 Q. Dr. van der Weide, you have just told this jury that the claims of the '554 patent are invalid based on two

04:26:45 references, the Qualcomm '377 patent and the SIP standard,
04:26:51 correct?
04:26:51 A. That's correct.
04:26:51 Q. Okay. You have not asserted that the Wi-Fi standard is
04:26:55 a piece of prior art that should somehow invalidate the
04:26:59 claims of the '554 patent; is that correct?
04:27:00 A. I don't recall that standard being introduced into
04:27:07 evidence nor cited -- used in my arguments.
04:27:14 Q. Well, we just -- we just went over. I mean, there's
04:27:19 only two references, it's the SIP standard and it's that
04:27:22 Qualcomm '377 patent. That does not include as a stand
04:27:26 alone document the Wi-Fi standard, correct?
04:27:29 A. I agree with that.
04:27:30 Q. Okay.
04:27:31 MR. HERMAN: And if you can put up the transcript
04:27:33 at 476:13 to 20.
04:27:36 Q. (By Mr. Herman) Do you remember when Verizon's counsel
04:27:38 questioned Dr. Rubin about Centrino, the Intel chip from
04:27:43 2003?
04:27:44 A. I do recall that.
04:27:46 Q. You're not asserting the Intel Centrino chip as prior
04:27:51 art against the claims of the '554 patent, are you?
04:27:53 A. No.
04:27:58 Q. And then do you remember Mr. Mavunkel was asked several
04:28:01 questions about Vonage? Do you remember that?

04:28:04 A. Yes.
04:28:08 Q. Fair to say that you're not asserting the Vonage product against -- or any sort of Vonage reference against the claims of the '554 patent?
04:28:15 A. I am not.
04:28:18 Q. Do you remember Mr. Mavunkel being questioned about Skype?
04:28:26 A. I do.
04:28:26 Q. Fair to say that you're not asserting Skype against the '554 patent?
04:28:33 A. Yeah, that's another IP phone, soft phone. No, that's correct.
04:28:39 Q. How about do you remember Dr. Rubin was questioned about an offering by T-Mobile in 2006? Do you recall that testimony?
04:28:50 A. I do.
04:28:50 Q. Is it fair to say that you're not asserting the T-Mobile service as prior art against the '554 patent?
04:29:00 A. No, not here.
04:29:04 Q. You're not -- okay. Thank you.
04:29:07 MR. HERMAN: Can we turn to -- actually, strike that.
04:29:14 Q. (By Mr. Herman) As a general proposition, Dr. van der Weide, if Patent A is broader than Patent B, does that mean that Patent A covers more than Patent B?

04:29:30 A. That's a very, very broad question. I tend to think a little bit more specifically in terms of what is the scope of a certain claim, which is like the property boundaries that we have heard about as an analogy. So it's a little difficult to answer in that -- in that very abstract sense. If you could make it a more explicit, I'd appreciate that.
04:30:09 Q. Sure. So if Patent A covers the transmission of voice and data packets and Patent B only covers voice packets, is Patent A broader than Patent B?
04:30:23 A. Again, I usually do some careful analysis before just answering hypotheticals like that on the fly because -- especially because with voice -- Voice over IP is data. I mean, you're literally digitizing the voice so it becomes a data packet that is -- okay. So it's treated generally as a real-time packet. And often, you know, transmitted using UDP, so best effort as opposed to TCP.
04:31:00 But, you know, there are a lot of subtleties there that I'd probably want to analyze a little more carefully before making just such a broad -- responding to a broad hypothetical.
04:31:12 Q. So you can't answer the question if Patent A is broader than Patent B, it will invalidate Patent B? That's just too much of a hypothetical for you?
04:31:22 A. Well, I try to do a really careful analysis, and I understand that -- that, you know, the analysis of

04:31:33 obviousness, for example, is different from, for example, written description. Those are -- those are different kinds of analyses. So there's a lot of detail there that I'd want to be careful about.

04:31:46 Q. And the reason I ask is Dr. Mahon went on the stand during his infringement analysis and talked about the KAIFI patent. Were you here when he was talking about that?

04:31:57 A. Yes.

04:31:57 Q. And he said on direct that the KAIFI patent is much broader than the '554 patent and covers more. You recall that testimony?

04:32:07 A. I do.

04:32:12 Q. And he also testified that the KAIFI patent was issued six years before the '554 patent. Do you recall that?

04:32:19 A. Yes, I do.

04:32:20 Q. You have not asserted the KAIFI patent against the claims of the '554 patent, have you?

04:32:28 A. No.

04:32:28 Q. So even though Mr. -- Dr. Mahon just testified that it is technically very comparable to the claims of the '554 patent and is, in fact, broader than the '554 patent and issued six years before the '554 patent, you, Dr. van der Weide, have not asserted the KAIFI patent as prior art against the claims of the '554 patent; is that fair?

04:32:55 A. That's fair.

04:32:56 Q. Thank you. So let's turn to the SIP standards.
04:33:09 Actually before we do, I have --
04:33:12 MR. HERMAN: If you can put up DD5.33 for me.
04:33:19 That's from Dr. van der Weide's presentation.
04:33:20 Q. (By Mr. Herman) You'll agree with me, Dr. van der
04:33:23 Weide, that it was this slide where you stopped talking
04:33:30 about the Qualcomm '377 patent and then started talking
04:33:36 about the SIP standard; is that fair?
04:33:38 A. Broadly speaking. My opinion more precisely is that
04:33:44 one of skill reading the Qualcomm patent and its abundant
04:33:49 citations to the SIP standard would have understood that
04:33:52 the combination rendered obvious this claim. And I was
04:33:56 just citing more specifically into the SIP standard for
04:33:58 that final Element [f].
04:34:01 Q. And my question was not very well-worded, so I
04:34:04 apologize.
04:34:05 All I meant to ask you was you're not claiming or
04:34:08 asserting that the Qualcomm '377 patent satisfies Claim
04:34:12 1[f], the SIP signaling sequence that the jury's heard so
04:34:16 much about; is that fair?
04:34:19 A. Well, I found more specific evidence of the signaling
04:34:28 sequence being maintained in the example that I cited from
04:34:30 the SIP standard, which in my opinion one of skill would
04:34:35 have understood in reading the '377 Qualcomm patent.
04:34:41 Q. Well, let's be clear about this because this is

04:34:42 important. You're not asserting anticipation of Claim 1 of
04:34:45 the '554 patent, correct?
04:34:51 A. Not here, yes.
04:34:53 Q. If -- if you were -- and I didn't hear any evidence
04:34:57 from you on direct that the Qualcomm '377 patent practices
04:35:04 Claim 1[f]. Would you agree with me on that?
04:35:07 A. I didn't use it here as an anticipation reference,
04:35:10 that's correct.
04:35:10 Q. So you're not saying that everything was in the
04:35:13 Qualcomm '377 patent that's in Claim 1 of the '554, because
04:35:18 you had to go outside that patent and go to the SIP
04:35:20 standards in order to show that that last element was met;
04:35:20 is that fair?
04:35:26 A. Well, what I chose to present to the jury today was the
04:35:29 combination, indeed.
04:35:31 Q. Yeah, you can -- if you don't mind, you can limit
04:35:34 your -- I'm interested in what you presented to the jury.
04:35:37 So you didn't present to the jury any argument
04:35:40 that the Qualcomm '377 patent practices Claim 1[f], which
04:35:47 is the SIP signaling sequence; is that fair?
04:35:56 A. Standing on its own, no.
04:35:57 Q. So will you agree with me, Dr. van der Weide, that if
04:36:04 the jury doesn't agree that the SIP standard satisfies the
04:36:08 last claim element, that you have not shown that all the
04:36:11 elements of Claim 1 of the '554 patent are in the prior

art?
A. I understand it's the jury's job to be the finder of fact here.
Q. No, my question is about what you've done. If -- if -- if the jury disagrees with you that the SIP standard discloses Claim Element 1[f], they can't find invalidity under prior art of the '554 patent because you haven't shown all the claim elements are met; is that fair?
A. I'm not the finder of fact here. So I'm not sure I agree.
Q. You don't agree that if the jury says, yes, we've looked at the SIP standard, and we don't believe that it shows SIP signaling sequence of the transmission is maintained after said switching, that they can find -- they can't find invalidity under obviousness because you haven't shown all the claim elements have been met?
A. I don't agree.
Q. You don't agree.
So you believe that the jury doesn't have to find that all the claim limitations are found in the prior art in order to invalidate the claims?
MR. GAUDET: Your Honor, my only objection is the phrasing in terms of what the jury can and can't do. I object to the question.
THE COURT: What's the objection exactly?

04:37:48 MR. GAUDET: Oh, just the objection is to the phrasing of the questions in terms of things the jury can and can't do. That was all. If he could rephrase.
04:37:59 Q. (By Mr. Herman) Fine. I mean, you just mentioned the finders of fact. You understand the jury is going to make a determination as to whether the claims are obvious, correct? That's what you've asked them to do?
04:38:08 A. That's my understanding.
04:38:12 Q. Can there be a finding of obviousness if you haven't proved that all of the claim elements are found in the prior art?
04:38:28 A. I'm not a lawyer, but I'll accept that as a representation.
04:38:33 Q. Well, I can show you in your report, you have the standards for obviousness and invalidity, don't you, Dr. van der Weide, in your report?
04:38:42 A. I do.
04:38:44 Q. And this is important. Do you -- as the technical expert who is saying that the claims of the '554 patent are invalid, that's what you're doing here today, correct?
04:38:54 A. I'm offering my opinion.
04:38:57 Q. And I'm asking you if your opinion -- your opinion is that the Qualcomm '377 patent has all of the limitations except for the last one; is that fair?
04:39:11 A. I'm not sure that's entirely fair.

04:39:14 Q. And so with respect to Claim 1[f], you're relying on
04:39:20 the SIP standard to show that that's -- that claim term is
04:39:23 met; is that fair?
04:39:25 A. In combination with what's disclosed in the Qualcomm
04:39:29 '377 patent, yes.
04:39:30 Q. Dr. van der Weide, I can move on if you -- I'm just --
04:39:33 I'm trying to find out what are you saying meets Claim
04:39:38 Limitation 1[f], the SIP signaling sequence? Is it the SIP
04:39:41 standard?
04:39:41 A. In combination with the '377, yes.
04:39:44 Q. So the SIP standard in combination with the Qualcomm --
04:39:47 the Qualcomm '377 is what satisfies 1[f]?
04:39:51 A. In my opinion that renders obvious the -- the claim
04:39:56 element. Yes, that's been my testimony.
04:39:59 Q. Okay. Let's move on.
04:40:03 Now, you said on direct that the Patent Office had
04:40:06 already considered the SIP standard when it was examining
04:40:10 this patent, correct?
04:40:11 A. I believe so. In fact, I -- could well be that the
04:40:19 standard was cited by the examiner or appears on the face
04:40:23 of the patent.
04:40:24 Q. And you also said on direct that the Qualcomm '377
04:40:30 patent was considered by the Patent Office, correct?
04:40:36 A. I agree with that.
04:40:37 Q. So the two references that you're relying on were both

04:40:42 considered by the examiner or the Patent Office when
04:40:46 deciding whether to issue the claims of the '554 patent; is
04:40:46 that fair?
04:40:55 A. At various times, I guess I would agree.
04:40:58 Q. I'm sorry, could you repeat that? I didn't hear it.
04:41:02 A. I said at various times, I would agree.
04:41:04 Q. Okay. Thank you.
04:41:07 Now, you heard Mr. Chin testify earlier this week
04:41:10 about how he learned about SIP, did you -- didn't you?
04:41:14 A. I have a recollection of his testimony.
04:41:18 MR. HERMAN: If we can call up 247:22 to 248:9.
04:41:26 Q. (By Mr. Herman) As I promised you, I'm not going to
04:41:29 make this a memory test for you, Dr. van der Weide.
04:41:31 So here's where Mr. Chin was -- and he said that
04:41:33 he read the SIP standard five times, and it was really
04:41:36 difficult. So then he got a book on SIP, and even then it
04:41:42 was still difficult. But then he said the only real way to
04:41:46 understand how SIP works as an engineer is to write
04:41:49 software to actually observe how it works.
04:41:51 Do you see that?
04:41:52 A. I do.
04:41:53 Q. So one of the references that you're asserting as prior
04:42:00 art against the claims of the '554 patent and the same
04:42:03 reference, which was considered by the Patent Office in
04:42:09 examining the patent, was what Mr. Chin was studying for

04:42:16 all that time to try to figure out how to come up with what he thought was an invention; is that fair?
04:42:23 A. Well, I see his testimony.
04:42:26 Q. Do you have any reason to doubt that he read the SIP standard five times and read a book on SIP and then spent several weeks writing software to actually observe how it works?
04:42:40 A. I have no reason to doubt his testimony.
04:42:42 Q. Thank you.
04:42:43 And Mr. Chin testified that after reviewing the SIP standard, that it did not address how to switch one call from one network path to another.
04:42:56 Do you recall that testimony?
04:42:57 A. I don't have a specific recollection of that testimony.
04:43:05 MR. HERMAN: Go ahead and call up 248:12 to 14, please.
04:43:10 Q. (By Mr. Herman) Do you see that on the screen?
04:43:12 A. I do.
04:43:14 MR. HERMAN: And we could call up the next clip.
04:43:18 Q. (By Mr. Herman) Mr. Chin also testified that the SIP standard did not identify switching a call from one network path to another as a problem, correct?
04:43:26 A. I see his testimony.
04:43:31 Q. But you've testified and given an opinion, Dr. van der Weide, that not only did the SIP standard identify that

04:43:41 problem, it actually solved the problem; is that fair?
04:43:52 A. I'm just struggling to recollect where I might have
04:43:56 said those precise words.
04:43:59 Q. That's fair.
04:44:00 You have in your binder your expert report, and I
04:44:04 will also put this on --
04:44:09 MR. HERMAN: Can I have the document camera,
04:44:13 please? Thank you.
04:44:13 Q. (By Mr. Herman) So this is Paragraph 151 of your
04:44:18 report. Are you with me?
04:44:25 A. I am.
04:44:26 Q. And it says: Well before the priority date of the
04:44:30 claimed invention, SIP identified the problem the '554
04:44:34 patent purports to address, as well as the solution the
04:44:40 '554 patent purports to offer.
04:44:41 You see that?
04:44:42 A. I do.
04:44:42 Q. So does that refresh your recollection -- is that your
04:44:46 opinion today?
04:44:46 A. It is.
04:44:47 Q. So even after hearing Mr. Chin testify that he spent
04:44:53 all this time reviewing the SIP standards and then spent
04:44:57 weeks drafting code and then figured out the solution to
04:45:03 the problem, you think that Mr. Chin should have looked at
04:45:06 the SIP standard a little closer.

04:45:08 And he would have seen that this was a problem
04:45:10 that was identified there and a solution that had already
04:45:14 been come up with; is that fair?
04:45:16 A. I disagree.
04:45:20 Q. So you do agree that Mr. Chin -- there was a problem of
04:45:25 switching between network paths without dropping a call and
04:45:29 that he solved that problem?
04:45:31 A. Mr. Chin may have solved a particular problem that was
04:45:39 facing Aspen. I could agree with that.
04:45:44 Q. Well, I mean, we just read your expert report,
04:45:49 Paragraph 151. I'll put it back up.
04:46:01 You state here: SIP identified the problem the
04:46:08 '554 patent purports to address, as well as the solution
04:46:11 the '554 patent purports to offer.
04:46:14 Is that your testimony?
04:46:15 A. Yes.
04:46:16 Q. So obviously you can't agree with Mr. Chin that he said
04:46:21 he -- he found the problem and then solved it. You're
04:46:25 saying that his testimony is not credible, yes or no?
04:46:29 A. I disagree.
04:46:30 Q. Okay. I just have a couple of short questions about
04:46:53 the Qualcomm '377 patent.
04:46:55 Do you recall in that patent that it uses
04:47:00 something -- a message called spawn SIP?
04:47:04 A. Yes.

Q. Spawn is not a message recognized by the SIP protocol, is it?
A. It is, in my opinion, to one of skill a -- the patent explains that it's a variant of RE-INVITE.
Q. Let me be more precise. If you go to the SIP standard, will you find the word "SIP spawn" or "spawn"?
A. No.
Q. Okay. Thank you.
Now, briefly, before we turn to your written description argument, you understand that secondary considerations of non-obviousness are a factor in your analysis?
A. Yes.
Q. And for the jury, that just means that if Verizon wants to combine references and argue that the claims of the patent would have been obvious to a person of ordinary skill in the art, Aspen can come back and ask the jury to consider some things that were, like, happening in the marketplace to combat that. And that's to combat what we call impermissible hindsight bias. Did I state that accurately?
A. I've had the law explained to me by lawyers, and that's my recollection.
Q. Okay. I'm not -- I'm certainly not trying to -- I couldn't do what you do. Maybe you could do what I do, but

04:48:39 I've had a lot of training. So I'm not trying to catch you
04:48:39 on that.
04:48:40 Just trying to explain to the jury that secondary
04:48:41 considerations is something Aspen can come back with to say
04:48:45 even if -- if Dr. van der Weide can show that all the claim
04:48:48 elements are in the prior art, it still might not be
04:48:51 obvious; is that fair?
04:48:53 A. That would be my general recollection.
04:48:55 Q. And one of those secondary considerations is called
04:48:59 commercial success, right?
04:49:01 A. I believe so.
04:49:03 Q. And commercial success, to your understanding, means
04:49:09 that the patented invention has achieved significant sales
04:49:14 or market adoption; is that fair?
04:49:18 A. I think that's one way of looking at it.
04:49:20 Q. And that applies not just to what the patentee has but
04:49:25 you can look out on the marketplace and see if there's a
04:49:30 product or a service that practices the patent. That can
04:49:34 be used to show commercial success; is that fair?
04:49:40 A. That could be. I don't recall being asked to analyze
04:49:42 that.
04:49:43 Q. So in this case, commercial success could be
04:49:48 demonstrated not only by Aspen's own product but also by
04:49:53 the success of any product or service that practices the
04:49:59 '554 patent, couldn't it?

04:49:59 A. Again, they could be. I don't recall being asked to analyze that.
04:50:06 Q. And you've been here all week. You've heard about the success of Verizon's Wi-Fi Calling Service, haven't you?
04:50:14 A. I've certainly heard about Verizon's Wi-Fi Calling.
04:50:20 Q. And you've heard testimony about hundreds of billions of minutes of Wi-Fi calls carried over Verizon's network?
04:50:28 A. I don't recall the exact numbers. I've certainly heard reference to minutes.
04:50:35 Q. And you've heard about the reduction in customer churn attributable to Verizon's Voice over Wi-Fi Calling?
04:50:47 A. I've heard assertions from witnesses.
04:50:49 Q. And you've also heard about the importance of the seamless handover capability of Verizon's Voice over Wi-Fi network?
04:50:57 A. I don't have a specific recollection of that actually.
04:51:00 Q. Okay. That's fair.
04:51:01 Now, your report is long, 392 pages. Does that sound right?
04:51:13 A. I won't dispute that one.
04:51:15 Q. And I'm giving -- I'm not even including the appendix at the back because there's even more. But do you recall how many paragraphs in your report deal with secondary considerations?
04:51:26 A. I don't. I can certainly look it up.

04:51:32 Q. Like I said, this is not a memory test. I'm going to go ahead and put this up on the screen for you.
04:51:38 That's Paragraph 180 (sic), one paragraph, three sentences. That's the extent of your opinion on secondary considerations. Do you see that?
04:51:55 A. I do.
04:51:56 Q. And you didn't perform any commercial analysis of the economic impact of the switching capability described in the '554 patent, did you?
04:52:14 A. I don't recall being asked to perform a commercial analysis.
04:52:21 Q. And at your deposition when you were asked whether you had done that, you actually testified exactly as you just said, so I apologize. You said I've not been asked to do that; is that fair?
04:52:32 A. I think that's fair.
04:52:33 Q. And you testified that you hadn't seen any customer surveys or studies addressing the importance of the handover feature to customers, correct?
04:52:45 A. I don't recall having seen any of those.
04:52:46 Q. Yes. So will you agree with me that -- and I'm not asking you to agree with me that Verizon Voice over Wi-Fi infringes, I know you haven't given an opinion on that.
04:53:01 But your counsel asked you a lot of questions about the interplay between how you look at things for

04:53:07 infringement and how you look at things for invalidity, fair.
A. That's fair.
Q. And so I can ask you something similar, if that's okay.
If the jury finds that the Verizon Voice over Wi-Fi infringes the claims of the '554 patent, that would also have an impact on the secondary considerations of non-obviousness because we could look to the success of Verizon Voice over Wi-Fi to show commercial success of the claims of the '554 patent; is that fair?
A. I haven't been asked to analyze that. So I would want to give that a careful analysis.
Q. Well, I mean, you did talk about secondary considerations in your report, correct? I just showed you Paragraph 180 (sic)?
A. More precisely, my Paragraph 180 (sic) says I am unaware of any evidence of secondary considerations that would support a finding of non-obviousness for the '554 patent. And I reserve my right to respond to any evidence and allegations which Plaintiff attempts to raise in support of the '554 patent. So I'm just stating that I hadn't seen any evidence.
Q. Well, I -- I just gave you the chance to respond. I'm telling you that we think Verizon Voice over Wi-Fi infringes the claims of the '554 patent, and if it does, we

believe that's evidence of commercial success. Do you agree?
A. I don't agree.
Q. Okay. We're going to move on.
Now, you testified that your opinion that the '554 patent is invalid because it lacks written description, correct?
A. That was one of the analyses I performed.
Q. And you did not assert today in front of the jury that the claims are invalid for lack of enablement; is that fair?
A. That's fair.
Q. Okay. And with respect to the written description assertion that you're making, that only relates to the last limitation, the one we've been talking about quite a bit, 1[f], the SIP signaling sequence is maintained; is that fair?
A. That's -- that's what I focused on in my presentation.
Q. Well, to be clear, that's what you focused on. That's the only argument you made about lack of written description; is that fair?
A. I'd say that's fair.
Q. So I'm going to go back to your expert report. And you can turn to Page 366.
MR. HERMAN: I'll put this on the screen so the

04:56:17 jury can see it.
04:56:23 Q. (By Mr. Herman) So Paragraph 366 (sic), it's entitled Lack of Written Description and Non-Enablement for the Full Scope of "the SIP signaling sequence of the transmission is maintained."
04:56:37 Do you see that?
04:56:38 A. I do.
04:56:41 Q. And we just discussed you're not arguing or asserting non-enablement anymore. You're just referring to lack of written description in your arguments to the jury; is that fair?
04:56:50 A. That's fair.
04:56:51 Q. Okay. And then if we go to the next page at the end of Paragraph 1038, that's the entirety of your arguments on written description for that claim limitation; is that fair?
04:57:21 A. I think that adequately captures my argument.
04:57:26 Q. So you literally put in your expert report, I can't really fit it on here, but one paragraph out of well over -- out of well over a thousand as to why the SIP signaling sequence is maintained limitation is invalid for lack of written description?
04:58:05 THE COURT: Is that a question?
04:58:07 MR. HERMAN: Yes, sorry.
04:58:09 Q. (By Mr. Herman) I was waiting for your answer, Dr. van

der Weide. I'll repeat the question. My apologies.
Out of the 392 pages of your expert report that you submitted in this matter, you have one paragraph explaining why the SIP signaling sequence is maintained limitation is invalid for written description; is that fair?
A. Oh, that's fair in view of responding to the Bhaskaran deposition testimony that I had. I had the opportunity to hear testimony from other witnesses here at trial, which I cited to in -- in my testimony.
Q. Understood. And I appreciate that.
MR. HERMAN: Let's go ahead and bring up that testimony. So DD5.12.
Q. (By Mr. Herman) So you put this up for the jury, and your argument, correct me if I'm wrong, is that this testimony is consistent with your opinion that the inventors of the '554 patent didn't have or teach how to practice the claims of the '554 patent?
A. I'd say that's a fair summary.
Q. So when Mr. Chin walked the jury through Figure 4, the flowchart, and then walked them through Figure 5, the really complex diagram, he called it -- it's called a state machine -- and then was asked: Anybody who knows how to write software can look at this and understand how to turn this diagram into code.

05:00:00 Do you see that?
05:00:01 A. I do see that.
05:00:03 Q. And it's your testimony that that means that he was
05:00:06 telling the jury that he didn't know what he invented and
05:00:10 hadn't put the public on notice of what he invented; is
05:00:17 that correct? Yes or no?
05:00:20 A. Can I have the question rephrased, please?
05:00:22 Q. It's your testimony that when Mr. Chin told the jury
05:00:27 that he could look at Figure 4 and Figure 5 and understand
05:00:31 how to turn this diagram into code, that you disagree with
05:00:34 that?
05:00:35 A. In my opinion, one of skill in the art is not informed
05:00:42 by the specification, that there's any other means than the
05:00:52 SIP INVITE or RE-INVITE to accomplish this.
05:00:55 Q. Dr. van der Weide, putting aside the SIP INVITE or the
05:01:08 SIP RE-INVITE, Dr. -- I mean, excuse me, Mr. Chin told the
05:01:12 jury that if you look at Figure 4 and Figure 5 -- and he's
05:01:16 a software developer -- he said he could write the code.
05:01:19 Do you recall that?
05:01:20 A. I do.
05:01:20 Q. And Mr. Mavunkel, you went through his testimony, he
05:01:25 said he looked at Figure 4 and Figure 5, and he could write
05:01:28 the code. Do you recall that?
05:01:30 A. No, I don't.
05:01:31 Q. Okay. But you just disagree with the inventors of the

'554 patent on that point?
A. I don't recall Mr. Mavunkel's testimony being according to the characterization of the question.
Q. Sure. We can put it back up.
MR. HERMAN: Can we put up DD5.11?
Q. (By Mr. Herman) This is your slide, isn't it?
A. It is.
Q. And doesn't Mr. Mavunkel say at the bottom of the -- of the top portion: Yes, the combination of Figure 4 and Figure 5 is how you would write the software?
A. That is the answer he gave.
Q. Right. And you disagree with that, correct?
A. I don't disagree with his -- the answer that he gave.
Q. So you agree that someone looking at Figure 4 and Figure 5 of the '554 patent that had some software experience would be able to look at that and then write the software, correct?
A. I agree that person might be able to write some software, but that's not the same as the inventive element of Claim 1.
Q. I'll take it. Thank you.
MR. HERMAN: No further questions.
THE COURT: Redirect?
MR. GAUDET: Thank you, Your Honor.
REDIRECT-EXAMINATION

BY MR. GAUDET:
Q. Dr. van der Weide, having heard all of the questions and challenges presented by Aspen, do you stand by the testimony you gave on direct and all the opinions you offered to this jury?
A. Absolutely.
MR. GAUDET: Your Honor, I'm happy to say we're not going to risk our improved grade any further. I pass the witness.
THE COURT: Any --
MR. HERMAN: No further questions, Your Honor. Thank you.
THE COURT: You may step down.
THE WITNESS: Thank you.
THE COURT: Let me see counsel at the bench.
(Bench conference.)
THE COURT: You guys are calling Mr. Ellis. How long do you expect -- how long do you expect the direct to be?
MR. DACUS: 30 to 35 minutes.
THE COURT: You all -- I mean, we can -- we can go ahead and knock out 30 minutes and send him home.
MR. GAUDET: I'm sorry --
THE COURT: This is off the record.
(Off-the-record discussion.)

05:04:21 THE COURT: We're back on the record.

05:04:22 I can tell you, if we start him today, he's going to be under the Rule tonight.

05:04:27 MR. DACUS: Understood.

05:04:28 THE COURT: So I would like to go ahead and get 30 minutes done. You got 30 minutes.

05:04:33 MR. DACUS: We're happy to do that.

05:04:35 MR. GAUDET: Thank you, Your Honor.

05:04:36 (Bench conference concluded.)

05:04:38 THE COURT: Verizon may call its next witness.

05:04:41 MR. GORANIN: Your Honor, Verizon calls Mr. Doug Ellis. And with permission, Your Honor, we'll pass out the binders.

05:04:50 THE COURT: Okay.

05:05:06 (Witness sworn.)

05:05:17 THE COURT: You may proceed.

05:05:17 MR. GORANIN: Good afternoon. Quick introduction. Alex Goranin for Verizon.

05:05:18 DOUG ELLIS, DEFENDANT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. GORANIN:

Q. So good afternoon, Mr. Ellis.

A. Good afternoon.

05:05:27 Q. Could you introduce yourself to the jury, please?

05:05:27 A. Sure. I'm Doug Ellis. I live in Houston. I work for

05:05:30 a consulting firm called HKA.
05:05:33 Q. And what do you do for a living?
05:05:35 A. Mostly determine damages in cases like this.
05:05:40 Q. And how many --
05:05:43 A. I've done this --
05:05:44 Q. Please.
05:05:46 A. I've done this over 25 years. I've worked on over 400
05:05:50 cases.
05:05:50 Q. And what have you been asked to do in this case?
05:05:53 A. I've been asked to determine damages in this case if
05:05:58 the jury finds validity and infringement of the patent.
05:06:04 And I've also been asked to address the report of Mr. Blok.
05:06:07 Q. And did you prepare some slides to help with your
05:06:11 testimony today?
05:06:12 A. I did.
05:06:13 MR. GORANIN: Mr. Duval, could we get them up?
05:06:18 Q. (By Mr. Goranin) Yeah. And if you could, please tell
05:06:21 the jury about your education and qualifications.
05:06:23 A. Sure. I have an undergraduate degree in finance from
05:06:29 BYU. I went to law school and worked three years and went
05:06:33 to MBA school at the University of Pennsylvania.
05:06:37 Q. And have you received any professional certifications?
05:06:40 A. Yes, I'm a CLP like Mr. Blok.
05:06:43 Q. What's that?
05:06:43 A. Certified Licensing Professional. That -- it's a

05:06:48 certification that is based on experience, knowledge,
05:06:54 proficiency, and commercialization and licensing of
05:06:58 intellectual property.
05:06:59 Q. Have you taught any courses on IP valuation or damages?
05:07:03 A. Yes. Continuing education courses at law firms. I've
05:07:08 also been on panels, and I've taught at conferences.
05:07:11 Q. And do you typically provide damages analysis and
05:07:14 testimony on behalf of Plaintiffs, Defendants or a mix of
05:07:18 both?
05:07:18 A. It's a mix of both, it's almost exactly 50/50.
05:07:21 Q. Is your firm being compensated for your time here
05:07:23 today?
05:07:24 A. Yes.
05:07:24 Q. And I'll ask you the same question Aspen's counsel
05:07:29 asked Mr. Blok, does that compensation depend in any way on
05:07:33 the outcome of these proceedings?
05:07:35 A. No, it does not.
05:07:36 MR. GORANIN: Your Honor, at this time I would
05:07:37 like to tender Mr. Ellis as an expert in patent licensing,
05:07:42 patent valuation, and reasonable royalty damages.
05:07:42 THE COURT: Any objection?
05:07:44 MR. FINDLAY: No objection.
05:07:45 THE COURT: Very well.
05:07:46 Q. (By Mr. Goranin) Okay. Could you please explain your
05:07:49 assignment in this case, Mr. Ellis?

A. Sure. You can -- as you can see here, my job is to determine a reasonable royalty in the event that the jury finds the patent is valid and infringed and then again like I said respond to Aspen's damages expert, Mr. Blok.
Q. And what did you consider as part of your assignment?
A. First of all, I looked at -- I tried to look at everything Mr. Blok looked at. In addition to that, I interviewed Mr. Faber, also the technical experts for Verizon.
I reviewed deposition testimony, other expert reports in the case, financial data from both sides, hundreds of documents, additional documents produced by Verizon and Aspen, and I did independent research.
Q. Okay. So let's talk high level about your opinions before we get into the details. First, to set some context, are you offering any opinion about whether Verizon should pay Aspen anything in damages?
A. No, I'm not. Again, if the jury finds the patent is not valid or infringed, damages never even come up.
Q. Okay. And on the assumption -- on the assumption that the patent is infringed and valid, on those assumptions, what is your damages opinion in that particular scenario?
A. In that case, damages -- they're not being shown here -- but they would be -- there we go -- 11.8 million -- no more than 11.8 million for a fully paid-up license as a

reasonable royalty.
Q. And why did you put "no more than" in the slide there, sir?
A. Because it could be less.
Q. And then do you also have a response to Mr. Blok's opinion?
A. Yes.
Q. And what is that?
A. My -- my view is that Mr. Blok's opinion of 226.3 million is not reasonable in part because he grabs money associated with Voice over Wi-Fi Calling that both sides agree does not infringe.
Q. And what do you mean by that last part, sir?
A. What I mean is he reaches in and grabs Wi-Fi-only calling and charges a royalty for it.
Q. Why shouldn't a royalty in this case cover more than just the handover or switching scenario we've been discussing?
A. Right. So we heard in opening statements that the patent owner is entitled to be compensated for their invention, and we saw fence lines and things like that.
I agree with that if Verizon owes a royalty in this case, they should pay for the use of the '554 patent and nothing more.
Q. Okay. In contrast to Mr. Blok, what did you value in

05:10:53 your reasonable royalty analysis?
05:10:54 A. It's written here, but it's basically I valued -- I
05:11:01 tried to value the '554 patent which I understand is one
05:11:05 way of switching network paths.
05:11:08 Q. Okay. And Mr. Ellis, now, could you explain to the
05:11:12 jury how what you valued compares to your understanding of
05:11:17 what Mr. Blok valued? And I think you wanted to use the
05:11:20 electronic screen.
05:11:22 A. Sure. I'll give it a shot.
05:11:24 Q. Wait a minute for Mr. Duval.
05:11:33 MR. GORANIN: He's ready to draw?
05:11:35 THE TECHNICIAN: Yes.
05:11:38 MR. GORANIN: Okay.
05:11:50 A. Okay. What I'm trying to draw here is Voice over
05:12:04 Wi-Fi. So that would be all of Verizon's Voice over Wi-Fi
05:12:08 Calling. Inside of that is switching, and that's about 15
05:12:27 percent of all Voice over Wi-Fi, and that's switching.
05:12:33 I'll just put an SW there.
05:12:37 And then we have the '554 patent. And so the way
05:12:53 I think about this is, my understanding is, both sides
05:12:57 agree that the '554 patent did not invent Voice over Wi-Fi.
05:13:05 The '554 patent did not invent switching, but it is found
05:13:10 somewhere inside this 15 percent because it's one way to
05:13:14 switch. So the right way to look at this is to focus on
05:13:18 switching.

05:13:25 This is intended to be 30 percent. My understanding is that's what Mr. Blok valued. He took 100 percent of switching plus another 15 percent of Voice over Wi-Fi, which is not part of the patent.

05:13:48 Q. (By Mr. Goranin) And could you just remind the jury where Mr. Blok got that 30 percent from?

05:13:53 A. That would be the 30 percent I'm referring to is from Mr. Minor.

05:13:57 Q. Okay.

05:14:00 MR. GORANIN: So Mr. Duval, if we could get the slides back up.

05:14:03 Q. (By Mr. Goranin) Mr. Ellis, let's now talk about the hypothetical negotiation. We heard some about it from Mr. Blok. Could you just remind us of the key assumptions of the hypothetical negotiation?

05:14:12 A. Sure. Mr. Blok explained this, and I agree with him. These are two willing parties, kind of look back in time, and we -- it's a thought process where you say at the December 2015 or shortly before Voice over Wi-Fi is offered to the public, the parties sit down and work out a license to the '554 patent.

05:14:40 They're both willing. They're both reasonable. So there's no crazy requests. And they both have knowledge of everything -- like there's no secrets. Each side knows the other side's information.

05:14:55 Q. Okay. Now, tell us more about the specific process you used to get to your reasonable royalty number.
05:15:00 A. Sure. So, again, this is the same approach that Mr. Blok took. I presented it in a slightly different way. I used three traditional valuation approaches, the market approach, the income approach, and the cost approach to come up with data points that would then form a preliminary benchmark. Then I would consider other adjustments to those numbers, including considering the case -- the Georgia-Pacific case that involves 15 factors.
05:15:37 MR. GORANIN: And if we could hit the next slide.
05:15:40 Q. (By Mr. Goranin) Is this a fair summary, just as a reminder, of the Georgia-Pacific factors that you, as well as Mr. Blok, used?
05:15:49 A. Yeah, these are shorthand, but this is a list of all 15 of the factors that I considered.
05:15:53 Q. Okay. And then let's talk now about the market approach, and just remind us of -- in the market approach, what you're looking for?
05:16:00 A. Sure. So the market approach is looking for comparable transactions to what you're trying to do, the hypothetical license in this case. And Mr. Blok brought this up, too. And it's like buying or renting a house. You might look at what that same house rented for earlier or what similar homes and neighbors paid or rent for in their houses.

They're all going to be different in some way, and you try to account for those differences to figure out what's a fair price to pay.
Q. And in this case, what did you -- what did you look for as comparables instead of houses?
A. So this is a license agreement we're looking at. So I'm looking at license agreements as comparables.
Q. Okay.
MR. GORANIN: Your Honor, we're going to get into some confidential numbers and some license agreements, so I'm going to need to go on the sealed record.
THE COURT: All right. The courtroom will be sealed at this time. For anyone not subject to the protective order, you'll need to excuse yourself at this time. Thank you.
(Courtroom sealed.)
(Sealed Portion No. 3 saved in separate sealed transcript.)
(Courtroom unsealed.)
THE COURT: You'll need to remind me, Mr. Goranin, to -- am I pronouncing that correctly?
MR. GORANIN: Good enough for me, sir.
THE COURT: Well, you can tell me later. Goranin, I think.
So this is a good breaking point, ladies and

05:29:53 gentlemen of the jury. When we start back in the morning, 05:29:54 we will have the witness on the stand and hopefully get his 05:29:59 direct testimony wrapped up relatively quickly. And then 05:30:03 any cross-examination the Plaintiff wishes to complete and 05:30:10 finish with this witness. And then any other witness, of 05:30:14 course, that the Defendant intends to call and any rebuttal 05:30:21 witness the Plaintiffs wish to call.

05:30:23 I do expect we will get this case to you tomorrow 05:30:28 with final jury instructions and closing arguments and 05:30:32 deliberations hopefully early afternoon.

05:30:35 So I think we are all on track to -- to get that 05:30:40 done.

05:30:40 So have a pleasant evening. Don't forget the 05:30:43 three rules. Don't discuss the case with anyone. Don't 05:30:46 allow it to be discussed in your presence. Don't do any 05:30:49 independent research or investigation into anything related 05:30:53 to the case. And don't post anything about your 05:30:55 involvement as a juror on any social media website or app.

05:30:59 I'll ask you to be back no later than 8:45 so that 05:31:04 we can start promptly in the courtroom at 9:00 o'clock in 05:31:07 the morning.

05:31:07 Have a good evening.

05:31:10 COURT SECURITY OFFICER: All rise.

05:31:13 (Jury out.)

05:31:29 THE COURT: You can step down.

Okay. You all be seated quickly.

Let me tell you what my intention is with respect to jury instructions. There really are only about four disputes. And I think we can work through those relatively quickly.

Contrary to my normal practice, I let everybody go who is not dealing with jury instructions because we kind of do it in two parts. We do an informal conference, and then the following day, after we have circulated the final instructions, the parties will have an opportunity to put any remaining objections on the record at that point. I think we can do this in one part tonight.

So we're going to take a very short restroom break. And when we come back, I'm going to ask all counsel to stay here in the courtroom through the duration of the proceedings, and we'll get this wrapped up as quickly as we can.

Any thoughts about that or concerns from either party?

MR. ANDERSON: Your Honor, can, like, our witnesses and --

THE COURT: Witnesses may leave. Counsel who are inside the bar have to stay.

(Recess.)

COURT SECURITY OFFICER: All rise.

05:41:53 THE COURT: Okay. Be seated.

05:41:55 MR. DACUS: Your Honor, I don't know -- if we had five minutes, we might be in a situation where we tell Your Honor that we don't have any more disputes. If you don't want to hear that --

05:42:07 MS. DUPRIEST: I agree, Your Honor.

05:42:09 THE COURT: I'm all ears. I was just going to say at the outset, there is nothing make or break in the remaining disputes here. I just -- there really isn't. And I can rule, but if y'all want to work it out, I think that's very advisable.

05:42:24 MR. DACUS: I think if we have 5 minutes, we could do it.

05:42:30 THE COURT: You got it.

05:42:48 MR. DACUS: Thank you.

05:42:48 (Recess.)

05:48:27 (Jury out.)

05:48:28 COURT SECURITY OFFICER: All rise.

05:48:28 THE COURT: All right. Be seated.

05:48:30 Do the parties have good news to report?

05:48:33 MR. DACUS: Yes, Your Honor.

05:48:35 MR. ANDERSON: Sure, Your Honor, yeah. I think we've got agreement on all of the disputes in what we submitted. There's a few new things that they had one additional instruction they're going to add. I think the

plan is we will email the agreement.

THE COURT: Okay.

MR. ANDERSON: The only other issue --

THE COURT: This evening?

MR. ANDERSON: Yes.

MS. DUPRIEST: Within about a half-hour, Your Honor.

THE COURT: Okay. That's fine.

MR. ANDERSON: And if there's any other thing that crops up, we can be here at 8:30, and we won't have --

THE COURT: Good. Okay. Good.

MR. ANDERSON: The only other thing that I think is agreed upon is Your Honor made a construction of the plurality thing during court, and we want that to be included in the -- in the list of constructions that's in the juror notebooks.

THE COURT: Sure. Of course.

MR. ANDERSON: And -- and with any -- any final instructions. So I think that's it.

THE COURT: Okay. Good. So you all email Mr. Hopkins when you have that ready.

And, I mean, I've had -- I don't know, 70 trials. I don't know that I've ever had jury instructions completely agreed, so congratulations to you all. Wow. That's great.

05:49:42 Well, it's -- it is, I will say, some indication of the -- you know, in recognition of y'all's work here the way you all have, you know, dealt with each other professionally and cooperatively without the -- throughout the course of the trial. So it's been -- it's been a real pleasure to try the case with you.

05:50:12 Who knows what's -- what will happen tomorrow, of course, but you all have worked well together, so...

05:50:18 So you will get that to Mr. Hopkins tonight. To the extent there are any disputes, if you would make it clear in whatever transmission you send to Mr. Hopkins what the dispute is and what the parties' positions are on that dispute, and we'll get that dealt with as quickly as possible.

05:50:40 We'll finish with Mr. Ellis in the morning. I don't know what you expect the remaining direct to be, 15, 20 minutes maybe?

05:50:53 MR. GORANIN: We're two-thirds of the way through the outline.

05:50:57 THE COURT: Two-thirds.

05:50:58 MR. GORANIN: So we've got one-third left.

05:51:02 THE COURT: Pretty short -- did I lose Mr. Findlay?

05:51:03 MR. FINDLAY: No, right here. Should not be a long, less than 30 minutes.

THE COURT: Pretty short. Okay. And will the defense rest after Mr. Ellis?

MR. ANDERSON: We will.

THE COURT: And y'all obviously -- I don't know if you are considering --

MR. HERMAN: That's why I'm standing up here, Your Honor. I was going to let you know since I already let Verizon know that we will not be putting on a rebuttal case.

THE COURT: Okay. Good.

MR. HERMAN: So I didn't know whether you wanted to know that before you let the jury go or not but I figured you wanted them to come in --

THE COURT: No, that's fine.

MR. HERMAN: Can you give us a sense of the timing tomorrow, so let's just say, it sounds like Mr. Ellis will be off the stand no later than 10:00.

THE COURT: I think that's right.

MR. HERMAN: And then jury instructions will take, I don't know, about an hour?

THE COURT: They take about an hour. It doesn't matter if they're 10 pages long or 82 pages long. It takes about an hour.

MR. HERMAN: So would you then give -- maybe take the lunch break at 11:00 or a little after 11:00 so that we

05:51:54 could then close after 11:00 because what I don't want to have happen is, you know, me give my opening --

05:51:57 THE COURT: Oh, that will not happen.

05:51:59 MR. HERMAN: Okay.

05:51:59 THE COURT: What might happen is I might do instructions before lunch. You know, if we're done by 10:00 and we can -- assuming there are no last-minute jury instruction verdict form issues, and we're done by 10:00 and we can get a short break and we can come back and start instructions, say, you know, no later than 10:30, that would put us to 11:30, we would take a lunch break maybe then and come back and y'all would do your -- do your closings.

05:52:39 I will not separate the closings.

05:52:41 MR. HERMAN: Okay. Thank you, Your Honor.

05:52:42 THE COURT: Yeah. Any questions about closings in general, though? You're welcome to split your time however you want to do it. I don't know if different lawyers are going to argue. You're welcome to do that.

05:52:54 The only real requirement I have is that Plaintiff has to fully open, and the Plaintiff can't reserve more than one-third of its time for rebuttal.

05:53:07 So any -- any time you -- I've given you 45 minutes, I think, for closing.

05:53:14 MR. HERMAN: Correct.

05:53:15 THE COURT: So for the Plaintiff, any time you use less than 30 minutes, you're basically giving up.

05:53:21 MR. HERMAN: Understood, Your Honor.

05:53:22 THE COURT: Okay. Any other questions about that?

05:53:25 All right. Good. Thanks -- thanks to all of you, and we'll see you -- we'll be here ready to go on the record at 8:30 to the extent that there's anything we need to discuss.

05:53:37 Thanks.

05:53:42 (Court adjourned 5:53 p.m.)

CERTIFICATION

I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.

/S/ Shelly Holmes ______________ 6/17/2026

SHELLY HOLMES, CSR, TCRR — Date
CERTIFIED SHORTHAND REPORTER
State of Texas No.: 7804
Expiration Date: 10/31/2027