IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

| | | |
|---|---|---|
| ASPEN NETWORKS, INC., | )( | |
| PLAINTIFF, | )( | CIVIL ACTION NO. |
| | )( | 2:23-CV-557-RWS |
| VS. | )( | MARSHALL, TEXAS |
| | )( | |
| CELLCO PARTNERSHIP D/B/A | )( | |
| VERIZON WIRELESS, | )( | JUNE 18, 2026 |
| DEFENDANT. | )( | 8:54 A.M. |

---

TRANSCRIPT OF JURY TRIAL

BEFORE THE HONORABLE ROBERT W. SCHROEDER III,

UNITED STATES DISTRICT JUDGE, AND A JURY

VOLUME 5, PAGES 1117 THROUGH 1274

---

FOR THE PLAINTIFF:

Mr. Barry J. Herman
Ms. Julie Giardina
Womble Bond Dickinson (US) LLP
100 Light Street
26th Floor
Baltimore, MD 21202

Mr. Preston H. Heard
Ms. Christine H. Dupriest
Mr. John G. Perry
Mr. Jace D. Williams
Womble Bond Dickinson (US) LLP
1331 Spring Street NW
Suite 1400
Atlanta, GA 30309

Mr. Fabio E. Marino
Womble Bond Dickinson (US) LLP
1279 Oakmead Parkway
Suite 200
Sunnyvale, CA 94085

FOR THE PLAINTIFF: Mr. Eric H. Findlay
Findlay Craft, PC
7270 Crosswater Avenue
Suite B
Tyler, TX 75703

FOR THE DEFENDANT: Mr. Deron R. Dacus
The Dacus Firm, PC
821 ESE Loop 323
Suite 430
Tyler, TX 75701

Mr. Kevin P. Anderson
Ms. Elissa Sanford
Duane Morris LLP
901 New York Avenue NW
Suite 700 East
Washington, DC 20001

Mr. Matthew C. Gaudet
Mr. Glenn D. Richeson
Mr. John R. Gibson
Mr. Matthew S. Yungwirth
Duane Morris LLP
1075 Peachtree Street NE
Suite 1700
Atlanta, GA 30309

Mr. Aleksander J. Goranin
Mr. John Hillman
Mr. Robert M. Palumbos
Ms. Brianna M. Vinci
Duane Morris LLP
30 South 17th Street
Philadelphia, PA 19103

Ms. Holly E. Engelmann
Duane Morris LLP
Terrace 7
2801 Via Fortuna
Suite 200
Austin, TX 78746

COURT REPORTER: Ms. Shelly Holmes, CSR, TCRR
Official Court Reporter
Honorable Robert W. Schroeder III
United States District Judge
Eastern District of Texas
Texarkana Division
500 North State Line Avenue
Texarkana, TX 75501
shelly_holmes@txed.uscourts.gov

(Proceedings recorded by mechanical stenography, transcript produced on a CAT system.)

P R O C E E D I N G S

08:54:36 (Jury out.)

08:54:36 COURT SECURITY OFFICER: All rise.

08:54:38 THE COURT: Good morning. Please be seated.

08:54:43 Okay. We received the parties' proposed final jury instructions and verdict form. Thank you very much. We have modified them only in the sense we changed the caption at the top and we removed the footnotes with the references to cases and the -- the source of the -- the source of the instruction.

08:55:16 And we will distribute copies of those shortly. I'll give you a chance to look at them and make sure there's not any typo or anything like that. But you already have received them. Okay. Good.

08:55:30 Have you had a chance to look at them, both sides?

08:55:36 MR. HERMAN: I've looked at the verdict form, and it looks great, Your Honor. I'll have somebody go through the instructions right now.

08:55:43 THE COURT: Okay. Just look for typos and things like that. But in terms of substance, Mr. Herman, can you confirm on the record for me that the Plaintiff agrees to the instructions and the verdict form?

08:55:55 MR. HERMAN: Yes, Your Honor.

08:55:55 THE COURT: All right. Thanks.

08:55:56 And Mr. Dacus, for the Defendant, does Verizon agree to the final instructions and the verdict form?

08:56:03 MR. DACUS: We do, Your Honor. Thank you.

08:56:04 THE COURT: Excellent. Okay. Good.

08:56:07 Okay. Mr. Savage --

08:56:12 MR. ANDERSON: Your Honor.

08:56:13 THE COURT: Yes, sir, Mr. Anderson.

08:56:14 MR. ANDERSON: May we read the exhibits? Both sides have exhibits to read into the record without being --

08:56:17 THE COURT: Would you like to do that now?

08:56:20 MR. ANDERSON: If we could.

08:56:21 THE COURT: Sure, yeah.

08:56:22 MR. ANDERSON: Okay. I just --

08:56:25 THE COURT: Yeah. Should be just the Defendants.

08:56:28 MR. RICHESON: Good morning, Your Honor.

08:56:29 THE COURT: Good morning.

08:56:30 MR. RICHESON: My name is Glenn Richeson. I'm with Verizon.

08:56:34 THE COURT: Nice to see you, Mr. Richeson.

08:56:36 MR. RICHESON: I have a series of exhibits. I provided the court reporter with the list. Do you prefer if I read them one-by-one or the whole list?

08:56:43 THE COURT: You can read them -- you can read the whole list.

08:56:47 MR. RICHESON: Okay. Thank you, Your Honor.

08:56:48 At this time I move to admit VDTX-008, VDTX-013, VDTX-014, VDTX-045, VDTX-046, VDTX-081, VDTX-081.0001, VDTX-081.0002, VDTX-081.0003, VDTX-081.0004, VDTX-081.0005, VDTX-082.0001, VDTX-082.0002, VDTX-083.0001, VDTX-083.0002, VDTX-083.0003, VDTX-083.0004, VDTX-084.0001, VDTX-084.0002, VDTX-099, VDTX-175, VDTX-215, VDTX-217, VDTX-218, VDTX-227, VDTX-230, VDTX-231, VDTX-232, PTX-089, and JTX-004.

08:58:56 THE COURT: All right. And I believe all of those were used without objection; is that correct?

08:59:01 MR. HERMAN: Correct, Your Honor.

08:59:03 THE COURT: All right. Good. Those will be received.

08:59:06 Thank you, Mr. Richeson.

08:59:09 All right.

08:59:11 MR. GORANIN: Your Honor, would you like Mr. Ellis back in the box?

08:59:14 THE COURT: I would, unless there's anything else we need to discuss.

08:59:17 Mr. Ellis, if you'd come up.

08:59:19 Mr. Savage, are all our jurors here?

08:59:23 COURT SECURITY OFFICER: Yes, sir.

08:59:23 THE COURT: All right. Let's have them brought to the courtroom.

08:59:30 COURT SECURITY OFFICER: All rise for the jury.

08:59:37 (Jury in.)

08:59:39 THE COURT: Please be seated.

09:00:00 Good morning, ladies and gentlemen of the jury. 09:00:03 Welcome back. Hope you all had a pleasant evening.

09:00:08 When we concluded the day yesterday, the Defendant 09:00:11 was still in its direct examination of the witness.

09:00:15 At this time, you may continue.

09:00:17 MR. GORANIN: Thank you, Your Honor.

09:00:18 Q. (By Mr. Goranin) Welcome back, Mr. Ellis.

09:00:19 A. Thank you.

09:00:20 Q. In our last episode, we took the jury through your 09:00:23 three approaches and adjustments at a conceptional level, 09:00:29 market, income, cost, and then adjustments, remember that?

09:00:32 A. Yes.

09:00:33 Q. And we took them through the market?

09:00:34 A. Yes.

09:00:34 Q. Today we're going to start with income.

09:00:38 A. Okay.

09:00:39 Q. And could you before we put the slides up just at a 09:00:42 high level remind the jury of what you look for -- what one 09:00:46 looks for outside of this case in an income approach. 09:00:50 What's the exercise?

09:00:51 A. Sure. In the income approach, you're looking at -- 09:00:53 you're trying to isolate what's the monetary benefit to -- 09:01:02 to the use of the patent.

09:01:03 Q. Okay.
09:01:04 A. So does the patent allow the company to make more
09:01:07 profits or what does that look like.
09:01:11 Q. Okay.
09:01:14 MR. GORANIN: And, Mr. Duval, if we could bring up
09:01:16 the first slide of your income approach.
09:01:18 Q. (By Mr. Goranin) We have a little time on this. I
09:01:20 want to dwell here for a minute.
09:01:24 First of all, Mr. Ellis, where does this slide
09:01:28 that we see on the left-hand side here, churn and revenue
09:01:30 risk come from?
09:01:31 A. It comes from a Verizon Wireless slide deck from a few
09:01:35 months -- four or five months before Voice over Wi-Fi was
09:01:39 introduced.
09:01:41 Q. And is this the same slide deck Mr. Blok showed the
09:01:44 jury during his testimony?
09:01:45 A. Yes.
09:01:45 Q. In fact, he showed them this particular slide, right?
09:01:48 A. I believe so.
09:01:49 Q. And you've heard the concepts of churn and all of that.
09:01:52 I'm going to ask you in a minute to take your time and walk
09:01:55 the jury through the -- the calculation that you did on the
09:01:58 right-hand side there.
09:01:59 But first, I kind of want to orient them to the
09:02:05 two boxes there on the slide, churn risk without VoWiFi and

09:02:12 voice revenue risk with VoWiFi.

09:02:15 Could you just explain conceptually those two
09:02:21 boxes?

09:02:21 A. Sure. So it's a little hard to understand at first,
09:02:25 but what they're measuring here is they're saying if we
09:02:29 don't offer Voice over Wi-Fi, there's a risk we could lose
09:02:38 some customers. .01 percent of customers is their
09:02:43 estimate. And they don't know because they haven't done it
09:02:46 yet. And they said that translate, that churn, the loss of
09:02:49 customers would work out to about 34.4 million in annual
09:02:53 revenue lost from customers. Lost if they don't offer
09:02:57 Voice over Wi-Fi.

09:02:58 Q. And then what about the box below?

09:03:00 A. The box below is the flip side of the same coin. They
09:03:05 say, well, if we do offer Voice over Wi-Fi, it's going to
09:03:10 cost us. We're going to lose. So basically they're going
09:03:14 to offer Voice over Wi-Fi, it's going to be free.

09:03:18 So right now, before that, customers are paying
09:03:21 for different services, and so they're going to lose some
09:03:25 of that revenue stream by offering Voice over Wi-Fi. So
09:03:31 they estimate they're going to lose about $28 million a
09:03:36 year -- 28.7, if they do offer it. So they lose 34 if they
09:03:40 don't; they lose 28 if they do.

09:03:43 Q. Okay. And just maybe to put it in some real world
09:03:48 terms, even though this is called the income approach, are

09:03:50 there any dollars in the door actually coming in in terms
09:03:56 of revenue?
09:03:56 A. No, they didn't charge for the service. And so the
09:03:59 monthly bill to the customer never changed from before they
09:04:03 offered it until after.
09:04:04 Q. Okay. So now, could you walk us through the
09:04:07 calculation you did on the right-hand side?
09:04:09 A. Sure. So I took the 34.4 million that they would lose
09:04:14 without Voice over Wi-Fi, and I netted that against the
09:04:18 loss with Voice over Wi-Fi. So there's a net savings, if
09:04:26 they offer Voice over Wi-Fi, of $5.7 million a year.
09:04:31 Q. And why do you call it a net savings?
09:04:34 A. Because the loss without Voice over Wi-Fi is greater
09:04:37 than the loss with. So when they do offer it, the loss is
09:04:42 just going to be smaller.
09:04:43 Q. And did Mr. Blok do this calculation?
09:04:47 A. I didn't see that.
09:04:49 Q. Okay. Did you do any further calculation with respect
09:04:52 to this income approach?
09:04:54 A. Yes, I did.
09:04:55 Q. Can you -- again, feel free to take your time. Just
09:05:01 walk the jury top to bottom in terms of what you did
09:05:04 further and why.
09:05:05 A. Sure. So the 5.7 million is for all of Voice over
09:05:08 Wi-Fi, and the patent is not for all of Voice over Wi-Fi.

It's for a piece of switching. So what I had to do is make some adjustments.

So I -- we talked yesterday. I did a calculation. We know that of all Voice over Wi-Fi, only 15.4 percent involves a handover. So I isolated it down to the piece that actually uses the patent or is accused of using the patent.

Then I made another adjustment because this KAIFI '728 patent was also alleged to be -- to handle switching on the same product. So it was accusing Voice over Wi-Fi and specifically Verizon's way of switching.

Aspen is saying the same thing, and I looked at the technical analysis which says the '728 patent is actually technically worth more than the '554 patent. But I treated them as equal, and I took half and assigned that to the '554.

Then the top number, 5.7, is revenue, not profit. So you have to convert that down to the bottom line for Verizon. It's 33.8 percent profit margin. And then I made another adjustment -- this makes the number larger. Because the 5.7 million is just one year, I calculated and looked at all of the years of the life of the patent that would be in the license. And so you take that number and multiply by 13. And the answer at the end of the day is the total expected averted loss of profits is 1.9 million.

09:07:04 Q. And is this 1.9 million a perfectly valid data point
09:07:08 someone could consider in valuing the '554 patent?
09:07:10 A. Yes, it's a data point that informs me -- it gives me
09:07:15 some information about what a reasonable royalty should be.
09:07:20 Q. Okay. Was this calculation also relevant to your cost
09:07:23 approach?
09:07:23 A. Yes.
09:07:24 Q. Please explain.
09:07:25 A. Sure. So, again, we're looking back at the
09:07:29 hypothetical negotiation. These guys are sitting at the
09:07:34 table negotiating in 2015, and Verizon's -- you know,
09:07:41 thinking about what would they do if -- in this case now we
09:07:48 have hindsight. So if Aspen were to make an unreasonable
09:07:54 request, they want $225 million, what is Verizon's
09:08:00 response? Well, part of their response might be -- and
09:08:05 this is something they might consider -- is, hey, we could
09:08:08 just offer Voice over Wi-Fi, like, just Wi-Fi Calling
09:08:13 without switching because that has nothing to do with the
09:08:17 patent, and then figure things out later.
09:08:18 And so that takes care of 85 percent of all Voice
09:08:23 over Wi-Fi use. So in that instance, they would have no
09:08:27 handover, but they would still offer Voice over Wi-Fi
09:08:31 Calling. And Sprint did that in 2015.
09:08:34 You would still have some customers that wouldn't
09:08:36 be unhappy. They would want switching. And so I included

09:08:40 that entire switching loss in there. And so that's a $1.9
09:08:46 million number.
09:08:47 Q. Okay. And let's put those income approach and cost
09:08:52 approach numbers on your tracker.
09:08:55 And then how did you consider these three
09:09:01 approaches relative to one another?
09:09:02 A. So this gave me a number of data points for me to look
09:09:09 at and figure out, okay, what -- what's kind of a range
09:09:13 that I should look at for a reasonable royalty. And this
09:09:15 is before making adjustments to the two license agreements,
09:09:21 which I need to do. And then I'll note that I didn't
09:09:26 actually use the Aspen -- three Aspen data points from at
09:09:33 least the numbers, but they -- they did inform me about the
09:09:37 reasonable royalty, but I didn't use that -- those numbers
09:09:39 to anchor my royalty.
09:09:41 Q. Okay. Did you pick one of the data points for further
09:09:46 adjustment?
09:09:46 A. Sure. So we'll talk about this in a minute, but -- but
09:09:51 when I was done analyzing everything, there was a clear
09:09:57 winner by far, if you're looking at comparable licenses,
09:10:01 and it was the KAIFI license.
09:10:07 MR. GORANIN: And, Your Honor, I'm going to need
09:10:09 to go on the sealed record a bit.
09:10:11 THE COURT: All right. We will seal the courtroom
09:10:13 at this time.

(Courtroom sealed.)

(Sealed Portion No. 4 saved in separate sealed transcript.)

(Courtroom unsealed.)

Q. (By Mr. Goranin) All right. Mr. Ellis, as a final topic, let's talk about your response to Mr. Blok's opinion.

First, to set the stage, could you just remind us of how Mr. Blok got to his $226.3 million number we see here on the tracker on the left?

A. Sure. As I understand it, he looked at all Wi-Fi Calling minutes, multiplied by 1 cent that he got from a white paper, and then used the 30 percent apportionment from Mr. Minor. And then he shared that between Aspen and Verizon.

Q. Okay. And did you have problems with all three of these inputs?

A. Yes.

Q. Okay. Let's talk about the first one.

What was your issue with the all Wi-Fi Calling minutes?

A. Sure. And I said this earlier, it's the wrong starting point. Everybody agrees Wi-Fi Calling is not infringing. So why did -- why start there? I think the better place to start would have been switching, which is where the '554

patent actually is used and the only place it's used. So that's where I would have started.

Q. Okay. How about the second input, that 1-cent figure we heard about?

A. That 1 cent -- yeah, so this is a picture of the ACG Research. It's that white paper. And a white paper is just something -- it's a paper that's -- Affirmed Networks paid the folks at ACG Research to write. But there's a lot of information. As an independent expert, I can't check that work. They don't show us the model. They don't even tell us the -- all the assumptions that they make. They don't describe the methodology. They talk about telecom operator, but they don't say who. I don't know who that is.

But the biggest problem is the one at the bottom, and it says Wi-Fi first strategy. They're saying, hey, it's so -- you can do a lot, you can save a lot. There's a big benefit to a Wi-Fi first strategy. And that means having your phone as soon as I take it from the store, I get my new phone, Wi-Fi is on and it's going -- my calls and everything are going to use Wi-Fi as opposed to the cellular network. It's always first.

We know that Verizon is the opposite of that. When you come -- leave the store with your phone, it will not use Wi-Fi. It's not even turned on. It's not even --

09:22:14 it's not going to work until you go manually turn it on. So you're all LTE when you walk away from the store. With Verizon, it's very different.

09:22:26 Q. Great.

09:22:27 And then, finally, what opinions did you have with respect to the 30-percent apportionment figure Mr. Blok applied that he received from Mr. Minor?

09:22:39 A. Yeah, I talked about that a little bit yesterday. And I'm not a technical expert, and I don't have a comment on that. But what I do have is common sense. And I -- even I can see that a 30-percent apportionment doesn't really work if only 15 percent of the calls actually use the patent.

09:23:02 Something is wrong with that. It's not really an apportionment. It's a multiplier. And so to me that would raise a red flag. And I would really question that and go back to the technical expert and say, well, how can you claim more than 100 percent of the entire switching, and we know that the '554 is only one way to switch.

09:23:27 Q. Now, we -- we heard from Mr. Blok and Mr. Minor over the past few days a lot about these capital expenditures or network build-out savings. Do you believe that method is an appropriate way of going about valuing a hypothetical license to the '554 patent?

09:23:46 A. Not in this case. The reason for that, and I looked at this as did Mr. Blok, but the reason for this is I kind

09:23:55 of -- I looked at all these -- you see all these
09:23:59 presentations and documents that were produced, and most of
09:24:01 that's behind the scenes. Things that you and I never see.
09:24:05 And then I also looked at what happens in the real world,
09:24:09 like what did they actually do?

09:24:12 And I can tell from investor calls, which big
09:24:16 companies do, they do calls with stock analysts and things
09:24:20 like that. On investor calls before they introduced Voice
09:24:24 over Wi-Fi, they said, hey, we're going to introduce this,
09:24:28 but it's going to be default off. So -- meaning we're
09:24:32 going to emphasize our network. We've been building this
09:24:36 out all these years. We're the leader. We're not taking
09:24:40 our foot off the gas. We're going to keep investing on
09:24:43 building infrastructure. We want to stay No. 1. And
09:24:46 that's why they've received 35 times in a row best network.
09:24:51 They just never took their foot off the gas.

09:24:54 And so that's the main reason, I believe.

09:24:58 Q. Okay. Now, finally, Mr. Ellis, with all due respect
09:25:01 for your work and your time, I know you had to assume
09:25:06 infringement and validity as part of the exercise --

09:25:09 A. Sure.

09:25:09 Q. -- but if this jury finds that Verizon does not
09:25:13 infringe, does it even get to your opinions?

09:25:15 A. No, it does not.

09:25:16 Q. And if the jury finds that this patent is invalid, does

09:25:18 it even get to your opinions?
09:25:19 A. No.
09:25:20 Q. Okay. Thank you for your time, Mr. Ellis.
09:25:23 MR. GORANIN: Pass the witness.
09:25:25 THE COURT: Cross-examination?
09:25:27 MR. FINDLAY: Thank you, Your Honor.
09:25:47 May we approach, Your Honor?
09:25:50 THE COURT: You may, yes.
09:26:11 MR. FINDLAY: May I proceed, Your Honor?
09:26:12 THE COURT: You may, yes.
09:26:13 MR. FINDLAY: Thank you.
09:26:13 CROSS-EXAMINATION
09:26:14 BY MR. FINDLAY:
09:26:14 Q. Good morning, Mr. Ellis.
09:26:16 A. Good morning.
09:26:16 MR. FINDLAY: Good morning, ladies and gentlemen.
09:26:18 Q. (By Mr. Findlay) You and I have never met before, I
09:26:20 don't believe?
09:26:20 A. I met you this week, but, yes.
09:26:22 Q. Other than that, correct.
09:26:23 And you understand the drill, as we say. I'm
09:26:25 going to ask you some questions about your testimony and
09:26:28 your work in this case; is that fair?
09:26:30 A. I expect so.
09:26:32 Q. Okay. It is nice to meet you.

09:26:35 I want to start, if I could, kind of where we did with some of the other experts in just talking a little bit about your background and your experience in cases like this; is that fair?
09:26:46 A. Sure.
09:26:46 Q. Okay. I'll go ahead and put on the ELMO -- or the document camera, if I could.
09:26:55 This is a copy of your CV; is that right?
09:26:58 A. It's one page of it, yes.
09:27:00 Q. Yes, one page. I'll represent to you that it's stapled there, and this is the entire CV that you attached to the expert report that you served in this case on behalf of Verizon, fair?
09:27:11 A. That's what was attached, yes --
09:27:14 Q. Okay.
09:27:15 A. -- I believe.
09:27:15 Q. And is it okay if we go through some of the cases here that you indicate you've given testimony on?
09:27:21 A. Sure.
09:27:22 Q. Okay. And obviously what I was most focused on is a patent case, because this is a patent case, fair?
09:27:27 A. Yep.
09:27:28 Q. So, for instance, in your CV, you indicate that you gave testimony -- and this first one is a patent case, I think, Palo Alto Networks case by deposition. Do you see

09:27:42 that?
09:27:42 A. Yes.
09:27:42 Q. And then you correct me if I'm wrong, but the rest of
09:27:46 these cases on the first page, at least, I don't think are
09:27:50 patent cases; is that fair?
09:27:53 A. I believe you're right.
09:27:54 Q. Okay. And so if we flip to Page No. 2, we see it says:
09:28:05 Testimony continued.
09:28:05 Do you see that?
09:28:07 A. Yes.
09:28:07 Q. And the first one that I found that is a patent case
09:28:11 where you -- where you indicate you testified at trial is
09:28:15 the third one down here, this Omnitracs, XRS/Platform case.
09:28:33 Do you see that?
09:28:33 A. I see that.
09:28:34 Q. And that's one you indicate testimony at trial is what
09:28:37 it says, correct?
09:28:37 A. Yeah, I did not testify at trial in that case.
09:28:40 Q. That was going to be my question, because as I think
09:28:44 you know, these cases here, this was a case -- the
09:28:49 Omnitracs case was a case in the Southern District of
09:28:54 California, right?
09:28:54 A. Yeah.
09:28:55 Q. Okay. And it's -- most of it's public, except apart
09:28:57 from when we seal the courtroom, you can go to the docket

09:28:58 and you can look up and you can see things that happened in
09:29:01 the case, correct?
09:29:02 A. Yeah.
09:29:02 Q. Any member of the public can do that, correct?
09:29:05 A. Yes.
09:29:05 Q. I -- just out of curiosity, because you were giving
09:29:09 testimony in this case, I looked that up, and that case did
09:29:15 go to trial and the Court filed this witness list. Do you
09:29:18 see that?
09:29:18 A. I do. I was there.
09:29:21 Q. So you were at that case?
09:29:24 A. I was at that trial, yes.
09:29:27 Q. So despite the fact that your CV says you testified at
09:29:31 trial, we know that you did not testify at trial at that
09:29:39 case but one of your associates did; isn't that true?
09:29:42 A. Well can we go back to my CV?
09:29:44 Q. Sure.
09:29:50 A. So I agree I wouldn't put trial there, but I put my
09:29:53 testimony in parentheses in every single one of these.
09:29:56 Trial is not in parentheses. So --
09:30:00 Q. That's --
09:30:01 A. -- I just want to point that out. But, no, I didn't
09:30:05 testify at trial, but what I did do is in parentheses in
09:30:09 all of these.
09:30:09 Q. You weren't trying to suggest -- to embellish your

record just a little bit by suggesting that you testified in trial -- at trial in that case?
A. No, I'm not trying to embellish at all.
Q. Let me ask you this. Before you got on the stand here yesterday, how many times have you testified in federal court in front of a jury in a patent litigation case?
A. I want to say three times.
Q. Three times?
A. Yes.
MR. FINDLAY: Your Honor, may I use the flip chart?
THE COURT: Yes.
Q. (By Mr. Findlay) I'm going to switch gears a little bit, Mr. Ellis.
MR. GORANIN: Your Honor, may I move to a different position?
THE COURT: Of course.
MR. GORANIN: Where would it be best?
THE COURT: Wherever you wish to go, Mr. Savage will give you --
Q. (By Mr. Findlay) Can you see that all right, Mr. Ellis?
A. Yes, now I can.
Q. I'm going to try to recreate that circle diagram that you created yesterday during your direct examination. Do

09:31:21 you remember that?
09:31:21 A. Yes.
09:31:21 Q. Okay. I'm going to -- you started with a big circle, and you represented this as all of Wi-Fi Calling; is that correct?
09:31:33 A. Yeah, I put Voice over Wi-Fi.
09:31:35 Q. Voice over Wi-Fi.
09:31:40 And then the next thing you did was make a circle for the 15.4 percent of Voice over Wi-Fi which involves switching or handovers?
09:31:49 A. That's right. I tried to make it about 15 percent. It's hard to do, but --
09:31:54 Q. It is kind of hard to do.
09:31:57 A. Yeah, go ahead and just write 15 percent, and that should work.
09:32:01 Q. Is that kind of fair?
09:32:02 A. Sure.
09:32:02 Q. I think actually in your testimony today, you said that's 15.4 percent, correct?
09:32:09 A. If you're carrying it out, yes.
09:32:11 Q. Okay. And we know the '554 patent is somewhere within there, correct?
09:32:20 A. Somewhere inside that circle, yes.
09:32:22 Q. That's what I said, somewhere within there.
09:32:24 And then I think you kind of did a little more and

09:32:31 put 30 percent, something like that. Do you remember? And
09:32:35 that was representing Mr. Blok's opinion?
09:32:39 A. That represented the apportionment --
09:32:42 Q. Correct.
09:32:42 A. -- that was done, yes. And I think that looks like a
09:32:46 lot less than 30 percent.
09:32:48 Q. Okay. Well, I'm not trying to -- okay. Let's go --
09:32:52 that better or you tell me.
09:32:54 A. You still got a little ways to go, but that's fine.
09:32:56 You wrote it down, it's fine. We get it --
09:32:58 Q. I'm not trying to --
09:32:58 A. We get it --
09:32:59 Q. -- mislead you, am I, sir? I'm using the same figures
09:33:02 you gave yesterday.
09:33:04 A. No, you're a better drawer than I am.
09:33:06 Q. All right. And part of the issue that you have with
09:33:09 Mr. Blok, and I think I just heard you say, is you're
09:33:12 criticizing Mr. Blok in part because he started beyond the
09:33:16 15.4 percent, correct?
09:33:20 A. I would say he started and ended beyond 15.4 percent.
09:33:25 Q. But just -- we'll is go chronologically. I'm trying to
09:33:29 make -- find areas that we can agree on.
09:33:32 A. Yeah.
09:33:32 Q. And I think what you said is you think he should just
09:33:34 being looking in here and not looking anyplace else with

Wi-Fi Calling?

A. You shouldn't be grabbing stuff that's not covered by the patent is -- -

THE COURT: Mr. Ellis and Mr. Findlay, let me remind you all both not to speak over the top of each other.

MR. FINDLAY: Apologies.

THE WITNESS: Thank you.

Q. (By Mr. Findlay) Would you repeat your last answer?

A. Yes. Yes, you shouldn't be grabbing stuff that is not covered by the patent.

Q. Okay. But isn't it true that the value associated with this, 15.4 percent of the handover and switches that occurs, isn't it true that that -- that aspect adds value to all of Wi-Fi Calling. You don't agree with that?

A. You're saying switching generally?

Q. Yes.

A. Not the '554 patent, but switching generally?

Q. No, I'm saying the '554 patent, which in this case we allege covers handovers and switching, I'm saying that functionality, even when it's only happening 15.4 percent of the time, adds great value to the whole pie of Voice over Wi-Fi. Do you agree or disagree with that statement?

A. It adds no value to calls that never switch, so, no, I don't see how it adds value to those.

09:34:50 Q. Okay. In your report, you indicated that back in 2007,
09:34:55 T-Mobile launched the first Wi-Fi Calling, you remember
09:34:58 that?
09:34:59 A. Yes.
09:34:59 Q. Okay. That's in your report, correct?
09:35:01 A. Yes.
09:35:02 Q. And then we know that in 2010, they discontinued that
09:35:08 service, correct?
09:35:10 A. Yeah, I learned a lot more about that since then.
09:35:13 Q. Sir --
09:35:14 A. They discontinued --
09:35:16 Q. Sir --
09:35:17 A. -- the paid service.
09:35:18 Q. I'd ask that you answer my question, sir. It's a
09:35:21 simple question. You stated in your report, I'm quoting
09:35:24 from your report. It's Footnote 102 -- or 101: T-Mobile
09:35:28 discontinued its original Voice over Wi-Fi services around
09:35:32 2010.
09:35:32 Correct?
09:35:33 A. I agree they -- it was a paid service that they then
09:35:37 offered for free.
09:35:38 Q. That's what you said in your report, correct, sir?
09:35:41 A. I did.
09:35:41 Q. All right. And then we know also that they relaunched
09:35:46 Voice over Wi-Fi in 2014, correct?

A. They launched a new version in 2014, but they did offer something between then.
Q. They launched a new version, and that new version included seamless handovers of LTE to Wi-Fi calls nationwide, correct, sir?
A. Yes --
Q. Yes or no, sir?
A. Yes, both versions did.
Q. Thank you. So in effect -- but the first version, its ability for handovers was extremely limited, you know that, sir?
A. I don't know that. They actually advertise it as seamless switching. And it lasted four years, and people paid for it.
Q. Let me show you what you cited in your report.
This was an article that you cited in your report when you talked about the fact that T-Mobile had relaunched Wi-Fi Calling. Do you remember that?
A. Yeah.
Q. Okay.
A. Well, it's been a while since I've seen this, but I remember saying it in my report.
Q. And it was September '14. You see that?
A. Yes.
Q. And it talked about T-Mobile announcing its Voice over

Wi-Fi Calling Service, with a few upgrades. Most notably, the service which now works on iPhones in addition to Android, supports seamless handovers. That's what T-Mobile was saying and that's what you put in your report, correct?
A. Yes, I agree.
Q. So you don't think that this adds inherent value to the whole pie of Voice over Wi-Fi?
A. It adds the 15 percent that it is, yes.
Q. But not --
A. So --
Q. But your testimony is you don't think it adds anything beyond that; is that fair?
A. I think it doesn't add anything to calls that never use it -- that never switch.
Q. Would you agree with me, sir, that there are lots of products and services that we buy and we use in life that have great value to us even if we don't use them all the time? Would you agree with that as a general concept in life?
A. Sometimes yes, sometimes no.
Q. Were you here for opening statements?
A. Yes, I was.
Q. Did you hear Mr. Herman talk about that in the analogy of windshield wipers? Do you recall that statement in opening statements?

A. I heard that analogy.
Q. Okay. Did that make any headway with you?
A. A little bit. He was talking about, oh, do you have windshield wipers or not, and I was thinking, well, it's really more about did you use this brand or that brand of wiper. You still have a wiper.
Q. We have -- we all have windshield wipers on our car, correct, sir?
A. That's right.
Q. Okay. And there are days and days will go by where we don't typically use the windshield washer -- the windshield wipers, correct?
A. That's right.
Q. A day like last week, you remember that -- was it Wednesday or Thursday but -- or earlier -- a gully washer we had?
THE COURT: Monday.
MR. FINDLAY: Monday. Thank you. Time just flies by, Judge.
Q. (By Mr. Findlay) Monday, that gully washer we had, you remember that?
A. Yes, my shoes were not happy.
Q. Windshield wipers were worth a fortune on that day, weren't they, sir?
A. They were worth the same that day, but they were more

valuable to the person using it and trying to drive.

Q. Right. They were much more valuable, correct?

A. They were valuable on that day to the -- when they're being used. When they're not being used, they're still valuable, but they're -- they're just not being used.

Q. My point is, sir, isn't this what the seamless switching and calling -- and we know that happens 15.4 percent of the time by your own numbers, correct?

A. Yeah.

Q. And we know that equates -- we saw it in the attachments to your report. We know that that equates to billions of times a year that's happening, correct? In your attachments, I think it was 8.0 --

A. Yes. Well, and for the data, we -- for the most recent data, yes. But in early years, no.

Q. For the only data Verizon produced in that 11-month period, there was somewhere between 3 and 4 billion instances of those handovers in that period of time, correct, sir?

A. Yes.

Q. Okay. So isn't this a classic case of that phrase everybody knows, better to have it and not need it than need it and not have it?

A. It depends.

Q. Verizon -- the folks here at Verizon, don't you think

09:40:33 they know darn well that, yes, not every customer needs switching and handovers all the time? But, boy, those customers, when they need it, they better have it, otherwise, they're going to wave goodbye to Verizon, and they're going to walk down into the T-Mobile or the AT&T store. Isn't that true, based on the evidence you've seen in this case?

09:40:58 A. I disagree with that characterization of it.

09:41:01 Q. Can we move on to the KAIFI agreement?

09:41:05 A. Sure.

09:41:06 Q. You indicated just in your testimony a second ago that in your analysis, the KAIFI agreement was the clear winner by far in terms of the importance of your evaluation; is that fair?

09:41:23 A. Yeah, it's not even close. That's right.

09:41:25 Q. Not even close.

09:41:26 And in order to use the KAIFI agreement in your analysis, under the law, you had to find that the KAIFI agreement was what we call technically comparable or similar, correct?

09:41:41 A. That's correct.

09:41:42 Q. And you just testified that you're not a technical expert, correct?

09:41:48 A. That's right. I don't -- I don't have to find it by law, but I do need to evaluate it. And since I'm not a

technical guy, in every case I rely on a technical expert. I'm just not that guy.

Q. And in this case, for the KAIFI agreement and in order for it to be technically comparable, you relied on Verizon's expert, Dr. Mahon, correct?

A. I wouldn't phrase it that way, but I did rely on his testimony for technical comparability, yes.

Q. In your report, you relied on his testimony, what he told you for the technical comparability of the KAIFI agreement, yes or no, sir?

A. Yes, as I do in every case.

Q. There was nobody else that you relied upon for that determination in your report, correct, sir?

A. Just the technical expert.

Q. Dr. Mahon, correct, sir?

A. Yes.

Q. Were you here yesterday for Dr. Mahon's cross-examination?

A. Yes.

Q. Okay. We learned during that cross-examination that Dr. Mahon is hired over and over again by Verizon; isn't that true, sir?

A. Yes.

Q. And we even learned that Dr. Mahon was actually the technical expert on that KAIFI case. Remember him

09:43:03 testifying to that?
09:43:04 A. I did.
09:43:05 Q. Did you know that fact before yesterday?
09:43:09 A. I don't remember if I did or if I didn't know that.
09:43:12 Q. Because I looked at your report. Nowhere in your
09:43:15 report did you mention that by the way, this same Dr. Mahon
09:43:19 happened to be a technical expert in that exact KAIFI case.
09:43:23 So you didn't know that before yesterday?
09:43:25 A. I don't remember if I did or if I didn't.
09:43:28 Q. And we heard that -- we were laughing about it a little
09:43:33 bit, but we heard that Dr. Mahon has such a relationship
09:43:36 with Verizon, that when he can't get a good cell signal,
09:43:40 they'll send guys to scurry up the tower near his house and
09:43:44 adjust the antennas, didn't we?
09:43:46 A. I'm not sure I would characterize it that way. When I
09:43:52 had a problem, they sent people to my house. And this is
09:43:55 the first time I've worked for them.
09:43:56 Q. Well -- never mind.
09:43:57 The fact that the person telling you about the
09:44:00 technical comparability has worked all that much for
09:44:03 Verizon didn't cause you some concern? Didn't make you
09:44:08 hesitate about thinking am I really getting the straight
09:44:11 story here?
09:44:12 A. No. This guy's whole career is telecommunications.
09:44:18 There's only so many companies out there. That's his

specialty.
Q. You call yourself an independent expert, correct?
A. That's correct.
Q. You said that two times in your direct testimony so far. I counted. Correct?
A. I'll take that.
Q. Okay. And the fact that the information you're getting on the technical comparability comes from somebody that works over and over again for Verizon or companies just like Verizon doesn't cause you any concern. Is that your testimony? Sir, it's a simple yes or no. Is that your testimony?
A. I don't feel concerned at all.
Q. All right. Let's turn now, if we could, to some of the language in the KAIFI agreement; is that all right?
A. Sure.
Q. I think you had a slide up on it yesterday, but I didn't see any of that language again today. We know the KAIFI agreement was a settlement of litigation, correct?
A. That's right. Settlement and patent license agreement is what it's called.
Q. It was six and a half years -- six years after the hypothetical negotiation, correct?
A. That's right. It makes it a great data point.
MR. FINDLAY: Your Honor, I'd object to

non-responsive. I'm doing the best I can to make yes or no questions.

THE COURT: I will sustain that.

And Mr. Ellis, I'm not fussing at you, but this will go much more smoothly if you'll just listen carefully to Mr. Findlay's question. If you can answer it with a yes or no, please do that. If you don't feel like you can give a yes or no, tell him that, and he can either ask a different question or rephrase that question, okay?

THE WITNESS: Thank you, Your Honor.

Q. (By Mr. Findlay) In the hypothetical negotiation, we can all agree that in that process, the reason why it's different than the real world is because when they sit down at the table, Verizon basically says, yes, we have to assume or we admit that the patent is infringed. That the patent is enforceable. And that the patent is valid, correct?

A. Yes.

Q. That is completely different than what the parties said in the agreement that settled the KAIFI litigation, correct?

A. I agree with that.

Q. Okay.

MR. FINDLAY: Can we put up JTX-5, Section 7.1, please, Ms. Hopkins?

09:46:40 Q. (By Mr. Findlay) This agreement -- and this is part of the KAIFI agreement, correct, sir?
09:46:44 A. Yes.
09:46:46 Q. Would you agree with me you didn't talk about this language in much detail with the jury yesterday or today; is that fair?
09:46:54 A. I believe I talked about it in the same detail as just about everything else.
09:46:57 MR. GORANIN: Your Honor, I'm sorry, but this needs to be on the sealed record.
09:47:02 MR. FINDLAY: I'm not going to get into the numbers. Do you still want to seal it? It's up to you.
09:47:07 MR. GORANIN: Out of precaution, that'd be best.
09:47:07 MR. FINDLAY: Absolutely.
09:47:13 MR. GORANIN: My apologies, Mr. Findlay.
09:47:16 MR. FINDLAY: No, not at all.
09:47:17 THE COURT: In light of that, let's seal the courtroom at this time.
09:47:20 (Courtroom sealed.)
09:47:20 (Sealed Portion No. 5 saved in separate sealed transcript.)
09:54:55 (Courtroom unsealed.)
09:54:58 MR. FINDLAY: May I continue, Your Honor?
09:55:01 Q. (By Mr. Findlay) Okay. But you agree that has limited input or limited relevance at all to your discussion here

09:55:07 today, correct?
09:55:07 A. Yeah, I tried to explain that. I didn't use the number. So -- but, yes, it had limited input because it was a related party transaction.
09:55:16 Q. It had limited input. You didn't use the number, but, boy, you sure wanted to show the jury the number, didn't you, Mr. Ellis?
09:55:24 A. I showed them everything.
09:55:26 Q. Likewise, with the Altos agreement, you remember you talked about that a little bit yesterday?
09:55:36 A. Sure.
09:55:37 Q. And you didn't consider that as having any real significance to your opinions in this case, correct?
09:55:44 A. I would describe it as having limited value, but it has value, yeah.
09:55:49 Q. And you didn't use that number in your calculations, did you, sir?
09:55:51 A. That's right.
09:55:52 Q. But you sure showed it to the jury, didn't you?
09:55:54 A. It was something I considered. I tried to show everything I considered.
09:55:57 Q. You talked a little bit about the Iceberg Capital interaction between the parties yesterday. Do you remember that?
09:56:04 A. Yes.

09:56:05 Q. This was just those emails that were sent to Ms. Bhaskaran -- Mr. Bhaskaran. Do you remember that?
09:56:11 A. To and from, yes.
09:56:13 Q. Yeah. You'd agree with me there was never any formal offer to sell made by Mr. Bhaskaran, correct?
09:56:19 A. I'm not aware of any.
09:56:21 Q. Okay. And those conversations with Iceberg happened back in early 2013; is that correct?
09:56:28 A. I don't remember exactly, but it sounds about right.
09:56:31 Q. That's about two and a half years before the hypothetical negotiation in December of '15. Can we agree on that?
09:56:38 A. Sure.
09:56:38 Q. And back then -- so in 2013 -- early 2013 when those Iceberg emails were going, would have been about two and a half years before Verizon launched its Voice over Wi-Fi services, correct?
09:56:53 A. That sounds about right.
09:56:54 Q. And AT&T didn't launch its Voice over Wi-Fi until about October '15, correct?
09:57:03 A. I don't recall.
09:57:04 Q. That sound about right to you?
09:57:06 A. Sure, if that's --
09:57:07 Q. So in early 2013, Aspen, my folks at Aspen would have no idea about the extent of use of the invention of the

09:57:19 '554 patent with respect to the Wi-Fi Calling that was
09:57:22 going to be offered down the road a couple years later by
09:57:25 Verizon and AT&T, isn't that fair?
09:57:27 A. I don't know if they did or didn't.
09:57:29 Q. But at the hypothetical negotiation, again, we know --
09:57:32 I think you said something to this effect, there are no
09:57:35 secrets between the parties at the hypothetical
09:57:37 negotiation, correct?
09:57:38 A. That's correct.
09:57:39 Q. All the cards on are on the table and they're face up,
09:57:39 correct?
09:57:43 A. Yes.
09:57:43 Q. At a hypothetical negotiation, Aspen would have known
09:57:50 how widely used Voice over Wi-Fi would become. And they
09:57:57 would have known about this 15.4 percent number that
09:58:00 represented switching and handovers. And they would have
09:58:02 known of the billions of times this happens every year at
09:58:05 the hypothetical negotiation, correct?
09:58:07 A. Yeah, they would know all that.
09:58:11 Q. Do you own a home?
09:58:13 A. Yes, I do.
09:58:13 Q. Okay. Will you -- I'm going to ask you kind of a
09:58:17 hypothetical, if you would, if you don't mind. If there's
09:58:20 something about it you don't like, you can tell me.
09:58:22 But say I have a house, and I decide -- my wife

09:58:25 and I decide we want to sell that house. And I fix it up, 09:58:28 and I put it on the market for $200,000. We're proud of 09:58:32 that house. And I have it on the market for a couple 09:58:34 months, and then for whatever reason, maybe I don't get any 09:58:38 bites. Maybe no one calls me. Whatever, I decide, you 09:58:42 know what, I'm going to take it off. I'm going to de-list 09:58:45 it. Take it off Zillow now.

09:58:47 Four years later, we're lucky as can be. We find 09:58:51 out there's oil on our property now. We actually -- we've 09:58:55 got the rights to the minerals, and there's oil on my 09:58:57 property.

09:58:58 A couple days after that happens, somebody gives 09:59:00 me a call, comes to the house with a cashier's check for 09:59:05 $200,000. Says, hey, I want to buy your house. You were 09:59:08 offering $200,000 three years ago. Am I going to sell it 09:59:14 to them at that point for $200,000, Mr. Ellis?

09:59:18 A. I don't know what you're going do.

09:59:20 Q. Come on. Am I going to sell it to them for $200,000?

09:59:24 A. You can sell it to them and keep the mineral rights. 09:59:27 You can do all kinds of things.

09:59:29 Q. I'm going to tell them respectfully, if you put three 09:59:33 more zeros after that $200,000, maybe we can talk, right?

09:59:37 A. You can do what you want.

09:59:39 Q. Mr. Ellis, I appreciate your time. I apologize for any 09:59:43 of the discord back and forth. Thank you very much.

MR. FINDLAY: I pass the witness, Your Honor.

THE COURT: Redirect, Mr. Goranin?

MR. GORANIN: It's Goranin.

THE COURT: Any redirect, Mr. Goranin?

MR. GORANIN: Thank you. Briefly.

REDIRECT-EXAMINATION

BY MR. GORANIN:

Q. Mr. Findlay asked you about the Iceberg transaction, if you remember, that Mr. Bhaskaran entered into. And he -- do you remember that -- that line of cross-examination?

A. Yes.

Q. And his suggestion was essentially that Mr. Bhaskaran at that time -- this was before the launch of Wi-Fi Calling; is that right?

A. Yes.

Q. Okay.

A. Well, for Verizon.

Q. For Verizon.

A. It was already out there for T-Mobile.

Q. And do you -- you were here in court all -- all week. And do you remember the email from August 2016 from Mr. Bhaskaran talking about that SIP INVITE and his suspicion that all the telco companies were infringing?

A. I remember seeing that talked about this week, yes.

Q. So as of 2016 according to that email, Mr. Bhaskaran

10:00:47 had a particular belief that the telco companies had
10:00:52 launched Wi-Fi Calling and were likely infringing the '554
10:00:57 patent; is that right?
10:00:57 MR. FINDLAY: Objection, leading, Your Honor.
10:00:58 THE COURT: I'll sustain it.
10:00:59 MR. GORANIN: I'll withdraw it.
10:01:01 THE COURT: I'll sustain it.
10:01:02 MR. GORANIN: Yeah, thank you.
10:01:03 Q. (By Mr. Goranin) Okay. Let's talk about the Altos
10:01:06 Mobility data point from Aspen.
10:01:07 A. Yes.
10:01:08 MR. GORANIN: And if we could bring up, Mr. Duval,
10:01:14 DTX-014.
10:01:18 Q. (By Mr. Goranin) And if you look at the -- the bottom
10:01:20 half of this page, do you see that -- is this -- is this
10:01:24 the email that you looked at and considered when discussing
10:01:29 the Altos Mobility data point?
10:01:31 A. It's part of it. I don't know that this is the part --
10:01:35 Q. Yeah, we'll go to the second page. But just for now,
10:01:38 could you tell the jury what the date of this is?
10:01:40 A. August 13th, 2017.
10:01:43 Q. And where does this fall relative to the launch by
10:01:47 Verizon of Wi-Fi Calling?
10:01:48 A. A couple years after.
10:01:50 Q. Okay.

MR. GORANIN: And then, Mr. Duval, if we could go to the second page, and then if you could move down to the bottom half, and then pop out the -- the section that's No. 2.

Q. (By Mr. Goranin) Mr. Ellis, is this the portion of the email that you relied on when you were discussing your Altos Mobility data point?

A. Yeah, the line I relied on is kind of cutoff there.

THE WITNESS: If you go just a little over. There you go.

Q. (By Mr. Goranin) Please, sir, could you just kind of explain the work that you did?

A. Sure. So this is an internal valuation. Again, it's a related company transaction, so I kind of weigh that in my analysis. But they're valuing their source code, which I understand they say uses the patent, at $6 million, and a license to the '554 patent, it's the No Call Drop, which I understand is the '554 patent, at 500,000.

MR. GORANIN: No further questions.

THE COURT: All right.

MR. GORANIN: Pass the witness.

THE COURT: Any recross, Mr. Findlay?

MR. FINDLAY: Nothing further, Your Honor.

THE COURT: All right. You may step down, sir.

THE WITNESS: Thank you.

THE COURT: All right. The Defendant may call its next witness.

MR. DACUS: Thank you, Your Honor. Verizon closes its evidence at this time.

THE COURT: All right. Thank you, Mr. Dacus.

MR. DACUS: Thank you.

THE COURT: Any additional exhibits to move into evidence by the Defendant?

MR. DACUS: No, Your Honor. Thank you.

THE COURT: All right. Very good.

Does the Plaintiff intend to call any rebuttal witnesses?

MR. HERMAN: No, Your Honor. Plaintiff rests.

THE COURT: All right. Any additional exhibits to move into evidence by the Plaintiff?

MR. HERMAN: No, Your Honor.

THE COURT: All right. So do both parties rest on their entire cases?

MR. DACUS: Yes, Your Honor, Verizon rests and closes.

MR. HERMAN: Yes, Aspen rests and closes.

THE COURT: All right. Thank you, gentlemen.

Ladies and gentlemen of the jury, what you've heard is the parties have announced that no additional evidence or testimony will be presented to you.

You'll recall from my previous discussions with you that what remains to be done in the case is the reading of the final jury instructions that will provide you with the instructions on the law that you must follow during your deliberations and the parties' closing arguments.

What I would suggest is that we take our morning break a little bit early, and when you come back in approximately 15 minutes, we will proceed to the reading of the final jury instructions. And then we'll see where we are when that is concluded. We may end up taking a slightly early lunch, and then as soon as we come back from lunch, the parties will present their closing arguments to you. I'll visit with the attorneys a little bit more about the preferred timing of that.

But in any event, at this time, let's go ahead and take our morning break, and we'll get you back into the courtroom in just a few minutes.

COURT SECURITY OFFICER: All rise.

(Jury out.)

THE COURT: All right. Please be seated.

MR. DACUS: Your Honor, do you mind if I move the easel?

THE COURT: Not at all, Mr. Dacus.

I'm just thinking about the timing a little bit here. Despite what I said to you yesterday, I'm not sure

10:05:54 that the reading of the instructions will take an hour.
10:05:58 They're about 30 pages long. It'll be a little bit less
10:06:06 than the hour.

10:06:07 Would the parties -- unless the parties have any
10:06:16 strong opinions about it, I think probably the thing to do
10:06:19 is as I just suggested we would do is come back, go through
10:06:23 instructions, maybe be finished by that somewhere in the
10:06:31 neighborhood of 11:15. And then if we can get their lunch
10:06:35 here a little earlier, have them go ahead and go to lunch
10:06:38 at 11:15, putting us starting closings sometime in the
10:06:45 neighborhood of noon or 12:15. How does that sound to the
10:06:50 parties?

10:06:50 MR. HERMAN: That's perfect, Your Honor.

10:06:50 THE COURT: Is that okay with you, Mr. Herman?

10:06:53 MR. HERMAN: It is.

10:06:53 THE COURT: Mr. Dacus, does that work for Verizon?

10:06:55 MR. DACUS: Absolutely.

10:06:56 THE COURT: All right. Let's take a short recess,
10:06:58 and we'll see if we can arrange for lunch to be here a
10:07:01 little bit early, and we'll proceed according to that
10:07:05 schedule.

10:07:05 Does either party wish to say anything else about
10:07:08 the motions for judgment as a matter of law? I know that
10:07:13 Verizon has filed on the docket theirs earlier this
10:07:15 morning. I don't yet know whether the Plaintiff has filed

10:07:17 theirs, but I expect it will be done soon; is that correct,
10:07:20 Mr. Herman?

10:07:20 MR. HERMAN: It will be done either before closing
10:07:23 starts or, yes, it'll be done before closing.

10:07:26 THE COURT: Okay. Unless the parties wish me to
10:07:29 say more than what we've already said about it, I'm going
10:07:31 to carry both of those motions as Rule 50(a) permits me to
10:07:36 do. And then we'll see what the verdict is, and, of
10:07:40 course, at that point, you know, the parties may wish to
10:07:45 file 50(b) motions.

10:07:47 Anything in addition either of you wish to say
10:07:50 about that?

10:07:50 MR. HERMAN: Not from Aspen, Your Honor.

10:07:52 MR. DACUS: No, Your Honor. With the Court's
10:07:54 acknowledgement that it's timely filed, we have nothing
10:07:56 further. Thank you.

10:07:57 THE COURT: Both will be timely filed. Thank you.

10:23:25 (Recess.)

10:23:26 COURT SECURITY OFFICER: All rise.

10:23:26 THE COURT: Okay. Anything from the parties
10:23:28 before we have the jury brought up?

10:23:30 MR. HERMAN: Not from Aspen, Your Honor.

10:23:33 MR. DACUS: Not from Verizon.

10:23:34 THE COURT: All right. Mr. Savage.

10:24:10 COURT SECURITY OFFICER: All rise for the jury.

10:24:18 (Jury in.)

10:24:19 THE COURT: Please be seated.

10:24:37 All right. Welcome back, ladies and gentlemen. I 10:24:46 think we have worked out kind of the timing for the 10:24:50 remainder of the morning and the early afternoon.

10:24:54 I am now going to go through the final jury 10:24:57 instructions with you, and then after that, we will break 10:25:00 for an early lunch. We've made arrangements for your lunch 10:25:04 to be here a little bit early, and then following lunch, 10:25:08 we'll come back and hear the parties' closing arguments. 10:25:13 And then you will return to the jury room for the final 10:25:16 time to begin your deliberations.

10:25:22 You have now heard all of the evidence in the 10:25:24 case, and I'm going to instruct you on the law that you 10:25:27 must apply during your deliberations. It is your duty to 10:25:30 follow what I instruct you the law is, regardless of any 10:25:34 opinion that you might have as to what the law ought to be.

10:25:39 Each of you will have a copy of these final jury 10:25:42 instructions that I am about to go over with you orally 10:25:45 when you get to the jury room, and you're going to have 10:25:50 these instructions for you during your deliberations.

10:25:55 You're welcome to take whatever notes you wish to 10:25:57 take now, as I'm going through them with you orally, but 10:26:03 you'll have your own copy when you start your 10:26:06 deliberations.

10:26:06 Please listen carefully as I go through them with you now orally.

10:26:12 You are the sole judges of the facts in this case. 10:26:17 If I've given you the impression during the trial that I 10:26:21 favor either party, you must disregard that impression. If 10:26:26 I have given you the impression during the trial that I 10:26:29 have any opinion at all about the facts of the case, you 10:26:34 must disregard that impression.

10:26:36 Do not consider any statement that I have made in 10:26:42 the course of the trial or make during these instructions 10:26:46 as any indication to you at all that I have any opinion 10:26:50 about the facts in the case.

10:26:52 After lunch, you will hear the closing arguments 10:26:56 from the attorneys, and I will remind you that statements 10:26:59 and arguments of the attorneys are not evidence, and they 10:27:04 are not instructions on the law. They are intended only to 10:27:09 assist you in understanding the evidence and the parties' 10:27:15 contentions.

10:27:16 It is important for you to distinguish between the 10:27:21 arguments of counsel and the evidence upon which those 10:27:25 arguments rest. Again, what the lawyers say or do is not 10:27:30 evidence. You may, however, consider their arguments in 10:27:36 light of the evidence that has been admitted and determine 10:27:41 whether the evidence that was admitted in the trial 10:27:45 supports the arguments made by the attorneys.

10:27:47 You must determine the facts from all of the testimony that you have heard and the other evidence that was submitted.

10:27:56 You are the judges of the facts. But in finding those facts, you must apply the law as I am instructing you now.

10:28:06 You are required by law to decide the case in a fair, impartial, and unbiased manner based entirely on the law and on the evidence that has been presented to you in the courtroom.

10:28:20 You may not be influenced by passion, prejudice, or sympathy you might have for the Plaintiff or the Defendant in arriving at your verdict.

10:28:33 A verdict form has been prepared for you, and you will take that verdict form with you to the jury room. And when you have reached a unanimous decision or agreement as to what the verdict should be, you will have your foreperson fill in the blanks on the verdict form reflecting those unanimous agreements. Then date it, sign it, and notify the Court Security Officer that you have reached a unanimous verdict.

10:29:04 You should answer each question on the verdict form from the facts as you find them to be. You should not decide who you think should win the case and then answer the questions in order to reach that result. Again, your

10:29:21 answers and your verdict must be unanimous.

10:29:24 The evidence that you are to consider consists of 10:29:30 the testimony of the witnesses, the documents, and the 10:29:34 other exhibits that were admitted into evidence, any fair 10:29:39 inferences and reasonable conclusions you can draw from the 10:29:43 facts and the circumstances that have been proven.

10:29:50 In determining whether any fact has been proven in 10:29:53 this case, you must -- you may, unless otherwise 10:29:56 instructed, consider the testimony of all of the witnesses, 10:30:01 regardless of who may have called them.

10:30:03 You may also consider all the exhibits received 10:30:06 and admitted into evidence, regardless of who may have 10:30:10 introduced them.

10:30:11 You, the jurors, are the sole judges of the 10:30:16 credibility of all witnesses and the weight and effect of 10:30:20 all of the evidence.

10:30:22 By my allowing testimony or other evidence to be 10:30:26 introduced over the objection of an attorney, I did not 10:30:31 indicate any opinion as to the weight or effect of such 10:30:34 evidence.

10:30:36 In deciding the facts in the case, you may have to 10:30:40 decide which testimony to believe and which testimony not 10:30:42 to believe. You alone are to determine the questions of 10:30:47 credibility or truthfulness of the witnesses.

10:30:51 In weighing the testimony of the witnesses, you

may consider a witness's manner and demeanor on the witness stand, any feelings or interests they may have in the case, any prejudice or bias about the case the witness may have, and the consistency or the inconsistency of their testimony considered in the light of the circumstances. Has the witness been -- has the witness been contradicted by other evidence? Has he or she made statements at other times and other places contrary to what he or she said here on the witness stand?

You must give the testimony of each witness the amount of credibility that you think it deserves.

You must also keep in mind, ladies and gentlemen, that a simple mistake does not necessarily mean that a witness is not telling the truth. You must consider whether any misstatement was an intentional falsehood or a simple lapse in memory and what significance should be attached to that testimony.

Unless I instruct you otherwise, you may properly determine that the testimony of a single witness may be sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary if, after considering all of the evidence, you believe that single witness.

The fact that a Plaintiff brought a lawsuit and is in here in court seeking damages creates no inference that

the Plaintiff is entitled to a judgment. Anyone may make a claim and file a lawsuit. The act of making a claim in a lawsuit by itself does not in any way tend to establish that claim and is not evidence.

Do not let bias, prejudice, or sympathy play any part in your deliberations. A corporation and all other persons are equal before the law and must be treated as equals in a court of justice.

As I told you at the outset, the attorneys in the case are acting as advocates for their competing parties and their competing claims, and they have a duty to object when they believe evidence is offered that should not be admitted under the rules of the Court. In that case, if I sustained an objection to a question that was addressed to a witness, you should disregard the question entirely and not draw any inference from its wording or speculate about what the witness would have said if I had permitted them to answer the question.

If, on the other hand, the objection was overruled, then you are to treat the answer to the question and the question itself just as if no objection had been made. That is, you should treat it like any other question and answer.

During the trial, I may not have let you hear the answers to some of the questions the lawyers asked. I may

10:34:04 also have ruled that you could not see some of the exhibits that the lawyers wanted you to see. And sometimes I may have ordered you to disregard things that you saw or heard.

You must completely ignore all of these things as I've instructed you to disregard or ignore. You should not speculate about what a witness might have said or what an exhibit might have shown. These things are not evidence, and you are bound by your oath not to let them influence your decision in any way.

At times during the trial, it was necessary for me to visit with the attorneys here at the bench or outside of your hearing when you were in the jury room. That happens because during a trial, there are sometimes things that come up that don't involve the jury, and you should not speculate about what was said during the discussions that took place outside of your presence.

Now, there are two types of evidence that may -- you may consider in properly finding the truth as to the facts in this case. The first is direct evidence, such as the testimony of an eyewitness about what the witness personally saw or heard or did.

The other is what we call indirect or circumstantial evidence, and that is evidence that results from the proof of a chain of circumstances that indicates the existence or nonexistence of certain other facts.

10:35:48 And as a general rule, the law makes no distinction between direct and circumstantial evidence, but it simply requires that you as the jury find the facts based on all of the evidence that has been presented, both direct and circumstantial, and it is up for you -- it is up to you to decide how much weight to give any of the evidence in the case.

10:36:14 The parties have stipulated or agreed to some facts in this case, and when that happens, that means that you must, unless you're otherwise instructed, accept those stipulations or agreements as evidence and regard those fact -- facts as having been proven. Those facts are not in dispute in this case.

10:36:41 Certain testimony has been presented through a deposition, and a deposition is the sworn recorded answers to questions that a witness was asked in advance of the trial. Under some circumstances, if a witness cannot be present to testify in person from the witness stand during the trial, that witness's testimony may be presented under oath in the form of a deposition. Before the trial, attorneys representing the parties questioned those witnesses under oath, and a court reporter was present and recorded their sworn testimony.

10:37:21 That deposition testimony is entitled to the very same consideration by you as testimony that's given by a

witness in person from the witness stand in open court. So you should judge the credibility and -- and the importance of deposition testimony to the best of your ability, just as if the witness had been here testifying during the trial.

While you should consider only the evidence in this case, you should understand that you are permitted to draw such reasonable inferences from the testimony and the exhibits as you feel are justified in the light of common experience. In other words, you may make deductions and reach conclusions that reason and common sense leads you to draw from the facts that have been established by the testimony and the evidence in the case.

However, you should not base your decisions on any evidence not presented by the parties in open court during the trial of this case, including your own experiences with any particular products or services that are an issue in this case.

You saw throughout the course of the trial the attorneys using slides and other visual aids. Sometimes those are referred to as demonstratives in the course of examining or presenting witnesses -- a witness. Demonstratives are a party's picture or model to describe something that is involved in the trial. If your recollection of the evidence differs from the

10:39:06 demonstrative, you should rely on your own recollection.

10:39:10 Demonstratives are not evidence, but witnesses' 10:39:15 testimony -- or a witness's testimony concerning a 10:39:21 demonstrative is evidence. The demonstratives will not be 10:39:23 available for you to view during your deliberations.

10:39:28 When -- when knowledge of a technical subject 10:39:33 matter may be helpful to the jury, a person who has some 10:39:36 special training or experience in that technical field, 10:39:39 someone called an expert witness, is permitted to state his 10:39:45 or her opinion on those technical matters to the jury. 10:39:49 However, you are not required to accept those opinions. As 10:39:53 with any other witness, it is solely up to you to decide 10:39:58 who you believe and who you don't believe and whether to 10:40:02 rely on their testimony.

10:40:04 In any legal action, facts must be proven by a 10:40:11 required amount of evidence that is known as the burden of 10:40:13 proof. The burden of proof in this case is on the 10:40:18 Plaintiff for some issues and on the Defendant for other 10:40:22 issues.

10:40:25 There are two burdens of proof that you will apply 10:40:29 in this case. They are the preponderance of the evidence 10:40:30 and clear and convincing evidence.

10:40:34 Plaintiff, Aspen, has the burden of proving patent 10:40:39 infringement by a preponderance of the evidence. Aspen 10:40:44 also has the burden of proving damages for any patent

10:40:49 infringement by a preponderance of the evidence.

10:40:52 A preponderance of the evidence means that the 10:40:55 fact that is to be proven is more likely true than not. 10:41:01 That is, that the evidence in favor of that fact being true 10:41:05 is sufficient to tip the scale, even if slightly, in its 10:41:10 favor.

10:41:10 The Defendant Verizon has the burden of proving 10:41:15 patent invalidity by clear and convincing evidence. Clear 10:41:20 and convincing evidence means evidence that produces in 10:41:25 your mind a firm belief as to the truth of the matter at 10:41:30 issue. Although proof to an absolute certainty is not 10:41:35 required, the clear and convincing evidence standard 10:41:38 requires a greater degree of persuasion than is necessary 10:41:43 for the preponderance of the evidence standard. If the 10:41:47 proof establishes in your mind an abiding conviction in the 10:41:52 truth of the matter, then the clear and convincing evidence 10:41:55 standard has been met.

10:41:57 Now, these two burdens of proof are not to be 10:42:02 confused with the burden of proof known as beyond a 10:42:08 reasonable doubt, which is the burden of proof that is 10:42:10 applied in a criminal case, not a civil case like this. 10:42:18 Beyond a reasonable doubt is a higher standard than both 10:42:20 the preponderance of the evidence and clear and convincing 10:42:24 evidence standards.

10:42:27 In determining whether any fact has been proven by

10:42:32 a preponderance of the evidence or by clear and convincing evidence you may, unless otherwise instructed, consider the stipulations, the testimony of all of the witnesses, regardless of who may have called them, and all of the evidence, including all of the exhibits that were received into evidence during trial, regardless of who may have produced them.

10:43:02 As I did at the start of the case, I am going to give you a summary of each side's contentions in this case. I will then provide you with more detailed instructions on what each side must prove to win on each of its contentions.

10:43:22 As I previously told you, this case concerns a United States patent that has been asserted by the Plaintiff Aspen. That patent is United States Patent No. 8,009,554, which you have consistently heard referred to throughout the patent (sic) as the '554, the '554 patent, the patent-in-suit, or the asserted patent.

10:43:52 The Plaintiff seeks money damages from the Defendant Verizon for allegedly infringing this patent by using a method that Aspen argues is covered by Claims 1, 2, 6, 15, 16, and 20 of the '554 patent. Again, these are the asserted claims of the patent-in-suit.

10:44:21 The method that is alleged to infringe is Verizon's Voice over Wi-Fi Calling Service.

Verizon denies that it has infringed the asserted claims of the patent and contends that those claims are invalid as obvious in view of prior art for lack of adequate written description and lack of enablement. Verizon also denies that Aspen is owed any money damages.

Your job is to decide whether or not Verizon has infringed the asserted claims and whether any of the asserted claims of the patent-in-suit are invalid. If you decide that any asserted claim of the patent has been infringed and is not invalid, you will then need to decide any money damages to be awarded to Aspen to compensate it for the infringement.

You've been provided with a copy of the patent that's in your notebooks. You may use it and refer to it during your deliberations.

I'm now going to explain to you how a patent -- how a claim defines what it covers.

A claim sets forth in words a set of requirements. Each claim sets forth its requirements in a single sentence. If a device satisfies each of these requirements in that sentence, then it is covered by and infringes the claim and there can be several claims in a patent. A claim may be narrower or broader than another claim by setting forth more or fewer requirements. The coverage of a patent is assessed on a claim-by-claim basis.

10:46:24 In patent law, the requirements of a claim are often referred to as claim elements or claim limitations. If a service meets all the requirements of a claim where it meets all of its claim limitations or all of its claim elements, then it is covered by the claim, and that service is said to fall within the scope of that claim. In other words, a claim covers a service where each of the claim elements or limitations is present in that service.

If a service is missing even one limitation or element of the claim, the service is not covered by that claim. If the service is not covered by the claim, the service does not infringe the claim.

At the beginning of the trial, I gave you some general information about patents and the patent system and a brief overview of the patent laws that are relevant to this case. I'm now going to give you more detailed instructions about the patent laws that relate to the case.

Before you decide many of the issues in the case, you'll need to understand the role of the patent claims. Those claims are the numbered sentences at the end of the patent, and -- and the claims are important because it is the words of the claims themselves that define what the patent covers.

The figures and the text in the rest of the patent provide a description and/or examples of the invention.

10:48:18 They provide context for the claims, but it is the claims
10:48:23 themselves that define the breadth of the patent's
10:48:26 coverage.

10:48:26 Each claim is effectively treated as if it were
10:48:31 its own separate patent, and each claim may cover more or
10:48:36 less than another claim. Therefore, what a patent covers
10:48:40 collectively depends on what each of its claims cover.

10:48:44 You will first need to understand what each claim
10:48:50 covers in order to decide whether or not there is
10:48:54 infringement of that claim and to decide whether or not the
10:48:56 claim is invalid. The first step is to understand the
10:49:01 meaning of the words used in the patent claim. For any
10:49:06 claim that I have not construed, that is, defined or
10:49:11 interpreted, the limitations of the asserted claim, you are
10:49:15 to use the plain and ordinary meaning of those terms as
10:49:22 understood by one of ordinary skill in the art, which is to
10:49:25 say in the field of technology of the patent at the time of
10:49:30 the alleged invention in light of the specification.

10:49:34 For claims that I have construed, you're going
10:49:38 to -- you'll see a chart in your notebooks that provide all
10:49:42 of my definitions. And as you can see, there are
10:49:49 definitions for the term "stream quality event," as used in
10:49:55 the '554 patent claims, means RTP stream quality drops
10:50:00 below or exceeds configured quality thresholds.

10:50:05 You will see that the term "SIP" or "S-I-P

signaling sequence of the transmission is maintained," as used in the '554 patent claims, means maintaining continuity in the signaling sequence of the SIP or S-I-P used in the transmission.

And then finally, the term "switching the transmission from the first network path to one of a plurality of alternative network paths requires at least three network paths."

The meanings of the words of a patent claim must be the same when deciding any -- any issue, including both infringement and validity.

Now, Claims 1 and 15 of the '554 patent use the word "comprising," and comprising means including but not limited to or containing but not limited to.

When comprising is used in the preamble, if you decide that an accused service includes all of the requirements of that claim, the claim is infringed. And this is true even if the accused service contains additional elements.

For example, if you take a claim that covers the invention of a table, if the claim recites a table comprising a tabletop, four legs, and glue that holds the legs and the tabletop together, the claim will cover any table that contains those structures, even if the table also contains other structures, such as wheels that go on

the end of the legs.

And that, of course, is a simple explanation of using the word "comprising" and what it means. But, in other words, it can have other features in addition to those that are covered by the patent.

The word "comprising" does not make the individual requirements within the asserted claim open-ended, however. To infringe, each limitation within an individual requirement must be included in the accused service.

This case involves two types of patent claims, independent claims and dependent claims. An independent claim sets forth all of the requirements that must be met in order to be covered by that claim. Thus, it is not necessary to look at any other claim to determine what an independent claim covers.

In this case, Claims 1 and 15 of the '554 patent are independent claims. Claims 2, 6, 16, and 20 of the patent are dependent claims.

A dependent claim does not itself recite all of the requirements of the claim but refers to another claim for some of its requirements. In that way, the claim depends on another claim. A dependent claim incorporates all of the requirements of the claim or claims to which it refers, or, stated alternatively, from which it depends.

The dependent claims then adds its own additional

10:53:48 requirements.

10:53:49 To determine what a dependent claim covers, it's
10:53:53 necessary to look at both the dependent claim and any other
10:53:57 claim or claims to which it refers. A service that meets
10:54:03 all of the requirements of both the dependent claim and the
10:54:05 claim to which it refers is covered by that dependent
10:54:10 claim.

10:54:10 Now, several times in my instructions I will refer
10:54:16 to a person of ordinary skill in the field of the invention
10:54:23 or the art, and it is up to you to decide the level of
10:54:26 ordinary skill in the field of the invention. In deciding
10:54:31 what the level of ordinary skill is, you should consider
10:54:34 all of the evidence that's been introduced at trial,
10:54:38 including but not limited to:

10:54:41 No. 1, the levels of education and experience of
10:54:47 the inventor and other persons who are actively working in
10:54:50 the field;

10:54:50 No. 2, the types of problems that are encountered
10:54:54 in the field;

10:54:55 No. 3, prior art solutions to those problems;

10:55:00 No. 4, the rapidity with which innovations are
10:55:05 made;

10:55:05 And, No. 5, the sophistication of the technology.

10:55:08 It is Aspen's contention that one of ordinary
10:55:13 skill in the art at the time of the claimed invention in

10:55:15 the '554 patent would have a bachelor's degree in electrical engineering or computer science and two years of experience, a master's degree in electrical engineering or computer science but having only one year of experience, or no formal education but experience in network service plan provisioning systems of at least four years.

It is Verizon's contention that one of ordinary skill in the art at the time of the claimed invention in the '554 patent would be an individual who would have been familiar with designing rules to implement policies for service plans for use of an access network and using those rules to provision network elements for policy enforcement, as demonstrated by the prior art references.

A person of ordinary skill in the art -- you may hear it referred to as a POSITA -- would have gained knowledge of these concepts through a mixture of training and work experience, such as having a bachelor's degree in electrical engineering or computer science and two years of experience, or by obtaining a master's degree in electrical engineering or computer science but having only one year of experience, or by having no formal education but experience in network service plan provisioning systems of at least four years.

I will now instruct you on infringement in more detail.

10:57:10 A patent owner has the right to stop others from using the invention covered by its patent claims in the United States during the life of the patent. If a person makes, uses, sells, or offers for sale within the United States what is covered by a patent claim without the patent owner's permission, that person is said to infringe the patent.

In reaching your decision on infringement, keep in mind that only the claims of a patent can be infringed. To determine whether there is infringement, you must compare the asserted patent claim to the accused service, and this is the only correct comparison, the language of the asserted claim compared to the accused service.

You must reach your decision as to each assertion of infringement based on my instructions, the legal requirements for infringement, and the evidence that has been presented to you by the parties.

I am now going to instruct you on the specific rules you must follow to determine whether Aspen has proven that Verizon infringed Claims 1, 2, 6, 15, 16, and 20 of the '554 patent by a preponderance of the evidence.

A patent can be directly infringed even if the alleged direct infringer did not know of the patent and without the direct infringer knowing that what it did was infringement of the claim.

In order to prove direct infringement by literal infringement, Aspen must prove by a preponderance of the evidence. That is, that it is more likely than not, that Verizon made, sold, offered for sale within the United States a service that meets all of the requirements of Claims 1, 2, 6, 7, 15 through 20 -- 15, 16, and 20 of the '554 patent and did so without the permission of the patent owner during the time the asserted patent was in force.

You must compare the service with each and every one of the requirements of a claim to determine whether all of the requirements of that claim are met.

To literally infringe a patent claim, an accused service must include each and every element of the claim. Thus, in determining whether Verizon infringed Claim 1, 2, 6, 15, 16, and 20 of the '554 patent, you must determine if the accused Verizon service contains each and every element recited in Claims 1, 2, 6, 15, 16, and 20 of the '554 patent.

So long as an accused service has each and every one of the claim requirements, infringement of that claim is shown even if the service contains additional features or elements not required by the claim.

The asserted claims are method claims. Method claims are not infringed by the use of a service merely capable of performing the claimed process. Infringement of

a method claim occurs only when use of an accused service actually results in performance of each and every step of a claimed method.

A claim requirement is met if it exists in an accused service just as described in the claim language, either as I have construed it and interpreted that language for you, or if I did not construe it or explain it to you, as it would have been understood by its plain and ordinary meaning to a person of ordinary skill in the art.

If an accused product or service omits any element recited in a claim, then you must find that particular product or service does not infringe that claim.

As long as an accused service meets each and every one of the claimed requirements, infringement of that claim is shown, even if the product or service contains additional features or elements not required by the claims.

A claim element is literally present if it exists in the accused service as it is described in the claim language, either as I've explained it to you, or if I did not explain it to you, according to its ordinary meaning as understood by one of ordinary skill in the art.

I'm now going to instruct you on the rules that you must follow in deciding whether or not Verizon has proven that the asserted claims of the patents -- of the patent-in-suit are invalid.

11:02:41 To prove that any claim of a patent is invalid, Verizon must persuade you by clear and convincing evidence, that is, you must be left with a clear conviction that the claim is invalid.

11:02:55 At times you're going to hear me refer to the prior art. And in order for someone to be entitled to a patent, the invention must actually be new or -- and not obvious over what came before, which is often referred to as the prior art.

11:03:12 Prior art is considered in determining whether the asserted claims of the patent are obvious. Prior art may include items or services that were publicly known or that would have been used or offered for sale or references, such as publications or patents, that disclose the claimed invention or the -- or the elements of the claimed invention.

11:03:40 Verizon contends that the following are prior art to the patent-in-suit: The SIP, or S-I-P, Standard, RFC 3261 and RFC 3665, and United States Patent No. 8,457,377.

11:04:04 You must determine whether the items and the references identified by Verizon are prior art that can considered in determining whether the asserted claims of the asserted patent are obvious.

11:04:19 Something is a prior art if it was publicly known to others in the United States before the invention date.

Even though an invention may not have been identically disclosed or described before it was made by an inventor in order to be patentable, the invention must also not have been obvious to a person of ordinary skill in the field of the technology of the patent at the time the invention was made.

Verizon may establish that a patent claim is invalid by proving by clear and convincing evidence that the claimed invention would have been obvious to persons having ordinary skill in the art at the time the invention was made in the relevant field of technology.

In determining whether a claimed invention is obvious, you must consider the level of ordinary skill in the relevant technology that someone would have had at the time the invention was made, the scope and content of the prior art, any differences between the prior art and the claimed invention, and, if present, so-called objective evidence or secondary considerations, which I am going to describe shortly. You should not use hindsight. You should only consider what was known at the time of the invention.

You should keep in mind that the existence of each and every element of the claimed invention in the prior art does not necessarily prove obviousness. Most, if not all, inventions rely on building blocks of prior art.

In considering whether a claimed invention is obvious, you should consider whether, at the time of the claimed invention, there was a reason that would have prompted a person having ordinary skill in the field of the invention to combine the known elements in a way the claimed invention does, taking into account such factors as the following:

No. 1, whether the claimed invention was merely the predictable result of using prior art elements according to their known functions;

2, whether the claimed invention provides an obvious solution to a known problem in the relevant field;

3, whether the prior art teaches or suggests the desirability of combining elements claimed in the invention;

4, whether the prior art teaches away from combining elements in the claimed invention;

5, whether it would have been obvious to try the combination of elements in the claimed invention, such as when there is a design need or a market pressure to solve a problem and there are a finite number of identifiable, predictable solutions;

And, 6, whether the change resulted more from design incentives or other market forces.

To find the claimed invention obvious, you must

11:07:42 find that the prior art provided a reasonable expectation of success. Obvious to try is not sufficient in unpredictable technologies.

In determining whether the claimed invention is obvious, you should take into any account any objective evidence. Sometimes this is referred to as a secondary consideration that may shed light on whether or not the claimed invention is obvious, such as the following:

A, whether any product or service practicing the claimed invention was commercially successful as a result of the merits of the claimed invention, rather than the result of design needs or market pressure or advertising or similar activities;

B, whether the claimed invention satisfied a long-felt need;

C, whether others had tried and failed to solve the problem solved by the claimed invention;

D, whether others invented the claimed invention at roughly the same time;

E, whether there were changes or related technology or market needs contemporaneous with the claimed invention;

F, whether the claimed invention achieved unexpected results;

G, whether others in the field praised the claimed

invention;

H, whether persons having ordinary skill in the art of the invention expressed surprise or disbelief regarding the claimed invention;

I, whether others sought or obtained rights to the patent from the patent owner;

And, J, whether the inventor proceeded contrary to accepted wisdom in the field.

These factors are relevant only if there is a connection or a nexus between the factors and the patented features of the invention. Aspen has the burden of establishing that connection or nexus.

Moreover, even if you conclude that some of the above indicators of objective evidence have been established, those factors should be considered along with all of the other evidence in the case in determining whether Verizon has proven that the claimed invention would have been obvious.

In support of obviousness, you may also consider whether others independently invented the claimed invention at roughly the same time as the date of the invention.

In determining whether the claimed invention was obvious, you should consider each claim separately, but understand that if a dependent claim is obvious, then the claims from which it depends are necessarily obvious, as

well.

In considering whether the claimed invention was obvious, you must first determine the scope and content of the prior art.

The scope and content of prior art for deciding whether the invention was obvious includes at least prior art in the same field as the claimed invention. It also includes prior art from different fields that a person of ordinary skill in the art would have considered when trying to solve the problem that is addressed by the invention.

Where Verizon is relying on prior art that was not considered by the PTO during examination, you may consider whether that prior art is significantly different and more relevant than the prior art that the PTO did consider.

If you decide that it is different and more relevant, you may weigh that prior art more heavily when considering whether the challenger has carried its clear and convincing burden of proving invalidity.

The patent law contains certain requirements for the part of the patent called the specification. The written description requirement is designed to ensure that the inventor was in possession of the full scope of claimed invention as of the patent's effective filing date.

Verizon contends that the asserted claims of the patent-in-suit are invalid because the specification of the

11:12:35 patent-in-suit does not contain an adequate written
11:12:38 description of the invention.

11:12:41 To succeed, Verizon must show by clear and
11:12:45 convincing evidence that a person having ordinary skill in
11:12:52 the field, reading the patent specification as of the
11:12:55 priority date, would not have recognized that it describes
11:12:59 the full scope of the invention as it is finally claimed in
11:13:04 the asserted claims of the patent-in-suit. If a patent
11:13:08 lacks adequate written description, it is invalid.

11:13:13 In deciding whether the patent satisfies this
11:13:16 written description requirement, you must consider the
11:13:21 description from the viewpoint of a person having ordinary
11:13:24 skill in the field of technology of the patent as of the
11:13:27 effective filing date. The specification must describe the
11:13:33 full scope of the claimed invention, including each element
11:13:37 thereof, either expressly or inherently.

11:13:41 A claimed element is disclosed inherently if a
11:13:45 person having ordinary skill in the field, as of the
11:13:48 effective date of the filing date, would have understood
11:13:52 that the element is necessarily present in what the
11:13:58 specification discloses.

11:14:00 It is not sufficient that the specification
11:14:02 discloses only enough to make the claimed invention obvious
11:14:07 to the person having ordinary skill.

11:14:10 The written description does not have to be in the

exact words of the claim. The requirement may be satisfied by any combination of the words, structures, figures, diagrams, formulas, et cetera, that are contained in the patent specification.

Adequate written description does not require either examples or an actual reduction to practice of the claimed invention.

However, a mere wish or plan for obtaining the claimed invention is not adequate written description. Rather, the level of disclosure required depends on a variety of factors, such as the existing knowledge in the particular field, the extent and content of the prior art, the maturity of the science or technology, and other considerations appropriate to the subject matter.

Now, I will instruct you about the measure of damages, but by instructing you on damages, I am not suggesting which party should win this case on any issue. If you find that Verizon infringed any claim of the patent-in-suit and that the asserted claim (sic) is valid, you must then consider whether any amount -- you must then consider what amount of damages to award to Aspen. If you find that Verizon has not infringed any claim of the patent, then Aspen is not entitled to any damages.

If you award damages, they must be adequate to compensate Aspen for any infringement you find. You should

11:16:11 not include any additional amount for the purpose of
11:16:15 punishing Verizon or for setting an example. Your damages
11:16:21 award, if you reach this issue, should put Aspen in
11:16:25 approximately the same financial position that it would
11:16:28 have been in had the infringement not occurred.

11:16:31 Aspen has the burden to establish the amount of
11:16:36 its damages by a preponderance of the evidence. In other
11:16:41 words, you should award only those damages that Aspen
11:16:45 establishes that it more likely than not has suffered.

11:16:49 While Aspen is not required to prove the amount of
11:16:52 its damages with mathematical precision, it must prove them
11:16:57 with reasonable certainty. You may not award damages that
11:17:00 are speculative, damages that are only possible, or damages
11:17:05 that are based on guesswork.

11:17:07 If you find that a patent claim is infringed and
11:17:14 not invalid, Aspen is entitled to at least a reasonable
11:17:20 royalty to compensate it for that infringement. A royalty
11:17:25 is a payment made by a patent -- made to a patent holder in
11:17:30 exchange for the right to make, use, sell, or offer to sell
11:17:34 the claimed invention.

11:17:39 A reasonable royalty is defined as the money
11:17:41 amount Aspen and Verizon would have agreed upon as a fee
11:17:47 for use of the invention at the time just prior to when the
11:17:53 infringement began. And you must be careful to ensure that
11:17:58 award is no more and no less than the value of the patented

invention.

In considering this hypothetical negotiation, you should focus on what the expectations of the patent holder and the alleged infringer would have been had they entered into an agreement at that time and had they acted reasonably in their negotiations.

In determining this, you must assume that both parties believed that the asserted claims were valid and infringed and that both parties were willing to enter into an agreement. The reasonable royalty you must -- the reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation and not simply be a royalty either party would have preferred.

Evidence of things that happened after the infringement first began can be considered in evaluating the reasonable royalty only to the extent that the evidence aids in assessing what royalty would have resulted from a hypothetical negotiation just prior to the first infringement.

In determining the reasonable royalty, you should consider all of the facts known and available to the parties at the time the infringement began. Some of the kinds of factors that you may consider in making your determination are:

1, the royalties received by the patentee for the

licensing of the '554 patent, proving or tending to prove an established royalty;

2, the rates paid by the licensee for the use of other patents comparable to the patent-in-suit;

3, the nature and scope of the license as exclusive or non-exclusive or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold;

4, the licensor's established policy and marketing program to maintain its patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly;

The third -- 5, the commercial relationship between the licensor and the licensee, such as whether they are competitors in the same territory, in the same line of business;

6, the effect of selling the patented specialty and promoting sales of other products of the licensee, that existing value of the invention to the licensor as a generator of sales of his non-patented items and the extent of such derivative or convoyed sales;

7, the duration of the patent and the term of the license;

8, the established profitability of the service made under the patent, its commercial success, and its

current popularity;

9, the utility and advantages of the patent property over the old modes or devices, if any, that have been used for working out similar results;

10, the nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor and the benefits to those who have used the invention;

11, the extent to which the infringer has made use of the invention and any evidence probative of the value of that use;

12, the portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions;

12 -- I'm sorry, 13, the portion of the realizable profit that should be credited to the invention, as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer;

14, the opinion testimony of qualified experts;

And, 15, the amount that a licensor and a licensee would have agreed upon at the time the infringement began if both had been reasonably and voluntarily trying to reach an agreement. That is, the amount which a prudent licensee

who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention would have been willing to pay as a royalty and yet be able to make a reasonable -- a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

No one factor is dispositive, and you can and should consider the evidence that has been presented to you in this case on each of these factors.

You have heard these factors -- you have heard these factors referred to during the trial as the Georgia-Pacific factors. And you may also consider any other factors which in your mind would have increased or decreased the royalty and Verizon would have been willing to pay and the patent owner would have been willing to accept with both acting as normally prudent business people.

Reasonable royalty awards can take the form of a lump-sum payment. A lump-sum payment is equal to an amount that the alleged infringer would have paid at the time of a hypothetical negotiation for a license covering all sales of a licensed service, both past and future.

When a lump sum is paid, the infringer pays a single price for a license covering both past and future

11:25:04 infringing sales.

11:25:04 Comparable license agreements are one factor that 11:25:11 may inform your decision as to the proper amount and form 11:25:13 of the reasonable royalty award similar to the way in which 11:25:18 the value of a house is determined relevant -- relative to 11:25:23 comparable houses sold in the same neighborhood.

11:25:29 Whether a license agreement is comparable to the 11:25:32 license under the hypothetical license scenario depends on 11:25:37 many factors, such as whether they involve comparable 11:25:41 technologies, comparable economic circumstances, comparable 11:25:44 structure, and comparable scope.

11:25:47 A license agreement need not be perfectly 11:25:50 comparable to a hypothetical license that would be 11:25:54 negotiated between the patent owner and the accused 11:25:58 infringer in order for you to consider it.

11:26:02 If there are differences between a license 11:26:04 agreement and a hypothetical license, you must take those 11:26:07 into account when you make your reasonable royalty 11:26:11 determination.

11:26:12 When determining if a license agreement is 11:26:16 comparable to the hypothetical license, you may consider 11:26:20 whether the license agreement is between parties to a 11:26:24 lawsuit and whether the license agreement reflects the 11:26:27 value of the patented technology or whether it was a 11:26:32 settlement that was influenced by a desire to avoid

future -- or further litigation.

The law requires that any damages awarded to Aspen correspond to the value of the alleged inventions as distinct from other unpatented features of the accused service or other market forces such as marketing or advertising or Aspen's size or market position. And this is particularly true where the accused service has multiple features and multiple components not covered by the patent or where the accused service works in conjunction with other non-patented items.

Therefore, if you decide to award damages, the amount you find as damages must be based on the value that is attributable to the patented technology.

If the unpatented features contribute to an accused service, you must apportion the value to exclude any value that is attributable to the unpatented features.

Aspen bears the burden to establish the amounts attributable to the patented features.

Now, I'm going to go over just a final word or two about -- oh, one other thing. You have heard evidence and argument concerning whether Verizon knew about the '554 patent before the lawsuit was filed, whether Aspen provided notice to Verizon before filing the suit, and the timing of this lawsuit. I do want to instruct you that Aspen had no obligation to provide Verizon with notice of the '554

11:28:51 patent or notice of the alleged infringement before filing 11:28:56 the lawsuit in order to prove direct infringement.

11:28:59 A party may directly infringe a patent even if it 11:29:04 did not know of the patent and even -- even if it did not 11:29:11 know that its conduct infringed the patent.

11:29:14 I am going to say a word or two about your 11:29:20 deliberations.

11:29:25 You must perform your duties as jurors without 11:29:30 bias or prejudice as to any party. The law does not permit 11:29:35 you to be controlled by sympathy or prejudice or bias or 11:29:41 public opinion.

11:29:44 Both parties in this case expect that you will 11:29:46 carefully and impartially consider all of the evidence, 11:29:51 follow the law as I have given it to you, and reach a just 11:29:57 verdict, regardless of the consequences.

11:29:59 You have heard all of the evidence in this case. 11:30:05 You've now heard my instructions on the law. And in a few 11:30:11 minutes, we'll break for lunch. And after that, we'll come 11:30:14 back, and you will hear the arguments of counsel.

11:30:19 Once all of the arguments have been presented to 11:30:24 you and you return to the jury room for the final time to 11:30:28 begin your deliberations, the first thing you should do is 11:30:33 select one of your members to act as a foreperson who will 11:30:40 guide your deliberations and speak for you here in the 11:30:44 courtroom.

11:30:46 Throughout the trial, I have given you instructions about not discussing anything about the case among yourselves. After the parties have presented their closing arguments to you, it will be proper for you to discuss the case among yourselves. And it will be your duty to do so in an effort to reach a unanimous decision to the questions that are on the verdict form.

11:31:18 You should answer the questions in the verdict form based on the facts as you find them from the evidence that's been submitted in the case, following all of the instructions that I have given you throughout the trial and just now. You should not decide who you think should win and then answer the questions accordingly.

11:31:42 And as I have said, your answers and your verdict must be unanimous.

11:31:51 You should consider and decide the case as a dispute between persons of equal standing in the community, of equal worth, and holding the same or similar stations in life. And that is true in patent cases between corporations and partnerships and individuals. The law recognizes no distinction among any type of party. All corporations and partnerships and other organizations stand equal before the law, regardless of size, regardless of who owns them, and they are to be treated as equals.

11:32:30 As I said earlier, when you go to the jury room to

begin your deliberations, each of you will have a copy of these written instructions, and if you wish during your deliberations, you can review any of the exhibits that have been admitted into evidence. We will provide those to you as a matter of course.

And as I said, the first thing you should do is select a foreperson to guide your deliberations and speak for you here in the courtroom.

If for any reason you recess during your deliberations, you should follow all of the instructions that I have previously given to you about your conduct during the trial. The foreperson, after the jury has reached a unanimous verdict, should fill in the question -- the answers to the questions on the verdict form. You should not reveal your answers until such time as I have discharged you or unless I direct you otherwise. You must never disclose to anyone, not even to me, any numerical division that you have on any question.

I will remind you that your notes you've taken over the course of the trial are only aids to your memory, and if your memory should actually differ from your notes, you should rely on your memory and not your notes. Your notes are not evidence, and your notes are not entitled to any greater weight than the recollection or the impression each juror has about the testimony.

If for any reason you need to communicate with me at any time during your deliberations, just give a written message on paper that will be provided to you to the Court Security Officer who will bring it to me. I will then respond to you as promptly as I can after consulting with the attorneys either by having you brought back into the courtroom so that I can address you orally as I am now or in writing.

I will give you further instructions after you have reached a verdict about your service in this case and whether or not you're required to talk to any about -- anyone about your involvement as a juror.

Okay. All right. With that, ladies and gentlemen, I'm going to ask Mr. Savage and Mr. Goecke to escort you back to the jury room for lunch. Once you've had your lunch, we'll get you back into the courtroom to hear the closing arguments of the parties.

Thank you.

COURT SECURITY OFFICER: All rise.

(Jury out.)

THE COURT: I suggest we aim for about 45 minutes. 45 minutes, you know...

MR. HERMAN: You want to say 12:30, Your Honor? It's 11 --

THE COURT: 12:30 will be fine.

11:36:04 MR. HERMAN: Perfect.

11:36:05 THE COURT: Is that okay with y'all?

11:36:09 MR. DACUS: (Nods head affirmatively.)

11:36:10 THE COURT: See you at 12:30.

11:36:15 (Recess.)

12:19:05 COURT SECURITY OFFICER: All rise.

12:25:59 THE COURT: All right. I did want to inform the 12:26:03 parties that we've replaced the previous claim construction 12:26:06 chart that was in the jurors' notebooks with the updated or 12:26:11 revised one but to include the term that was construed 12:26:19 during the course of the trial. At least two jurors had 12:26:24 written notes on the older version, and so we have left 12:26:28 those in those jurors' notebooks and just put the revised 12:26:33 claim chart on top of it. I will explain that to them, I 12:26:40 think, immediately before we start the closings. But I 12:26:43 just wanted to inform the parties of that.

12:26:45 Any questions or concerns about handling it that 12:26:47 way?

12:26:48 MR. HERMAN: Not from Aspen, Your Honor.

12:26:50 MR. DACUS: Not from Verizon.

12:26:51 THE COURT: Okay. Are the parties ready to have 12:26:52 the jury return to the courtroom?

12:26:55 MR. HERMAN: Aspen is, Your Honor.

12:26:58 MR. DACUS: Yes, Your Honor.

12:27:00 THE COURT: All right. Mr. Savage.

12:27:03 COURT SECURITY OFFICER: All rise for the jury.

12:31:11 (Jury in.)

12:31:12 THE COURT: Please be seated.

12:31:30 Welcome back, ladies and gentlemen of the jury.

12:31:36 As you know, we are about to hear from the counsel for the parties and their closings arguments to you.

12:31:48 I wanted to make sure you knew your binders have been -- your notebooks have been updated to include a revised claim construction chart. As you will remember earlier in the trial, I construed an additional term, and so you will see a revised chart that has been -- a change to include that additional construction.

12:32:22 A couple of you had made notes on the previous claim chart, and so we've left that chart in there so that you will have access to the -- to your notes. And on top of that, we've put the revised chart.

12:32:35 All right. With those comments, at this time, the parties will present their closing arguments to you, and we will begin with the Plaintiff.

12:32:46 Mr. Herman, whenever you're ready.

12:32:49 MR. HERMAN: Your Honor, could I get, please, 10 minutes and 2-minute warnings? Does that work for you?

12:32:56 THE COURT: Yes.

12:32:56 MR. HERMAN: If I go a little bit over, you'll just take it out of my rebuttal side.

THE COURT: And you intend to reserve 15 minutes; is that --

MR. HERMAN: Correct. Yes. Thank you, Your Honor.

THE COURT: Very good.

MR. HERMAN: Your Honor, may I proceed?

THE COURT: You may, yes.

MR. HERMAN: Thank you.

Ladies and gentlemen, let me start by thanking you so much for your service and the way you paid attention this week. It truly means a lot to Aspen, to Mr. Mavunkel, and certainly to Mr. Chin, and they're just appreciative that you gave them the chance to tell their story.

Let me remind you of where we began. In opening statement, I told you this case is about a bedrock principle of our country, the protection of innovation. I told you that Bill Chin and his co-inventors were true visionaries and solved a real problem, keeping calls from dropping when switching network paths between mobile and Wi-Fi. And that their invention would become even a bigger deal years later when the carriers moved to 4G and packet-switched networks and I told you to watch the credibility of Verizon and their lawyers.

Well, folks you've now seen all the evidence, and I think you saw exactly what I thought you would see. At

the end of opening statement on Friday, I told you that I expected to come up here during closing argument and ask you to find three things: That Verizon infringes, that the Patent Office did not make a mistake, and that you award damages to Aspen. And that's exactly what I'm asking you now.

I also told you I thought Verizon was going to run away from its own documents and create a bunch of excuses. Ladies and gentlemen, that's exactly what happened.

So you heard the claims are a fence. This defines what property Aspen owns. If someone like Verizon meets each of these claim elements, they're on Aspen's land.

Verizon told you in opening that Aspen was going to try to move the fence. Ladies and gentlemen, the opposite happened. Verizon and their attorneys repeatedly and consistently tried to insert words into the claims that are not there.

Before they presented their case to you, Verizon tried to trick Aspen's witnesses by changing the words of the claims. Look at what the Court instructed you on SIP sequence. This is in your binders. Verizon's the one who moved the fence line. They tried to make the claims require a RE-INVITE message, a SIP RE-INVITE when that word isn't in the claims. They tried to make the claims require a SIP INVITE message to be sent before the switch, which

12:35:45 isn't in the claims, and the list goes on.

12:35:49 You heard in final instruction 5 the law does not 12:35:52 allow this. You must interpret the claims using their 12:35:58 actual words and the Court's constructions.

12:36:02 Then despite repeatedly telling you that all of 12:36:07 the claim limitations were old, remember Aspen didn't 12:36:10 invent NAT, Aspen didn't invent RTP, Aspen didn't invent 12:36:15 switching, et cetera. They then tried to convince you that 12:36:17 they didn't practice more than half the claims of the '554 12:36:19 patent. They want to claim that this is all old and 12:36:22 industry standard, and yet they still made non-infringement 12:36:25 arguments.

12:36:25 In actuality, infringement is straightforward. 12:36:33 First, Dr. Rubin walked you through every single claim 12:36:37 element using the actual words of the claim and the Court's 12:36:40 constructions. He reviewed Verizon's own documents, 12:36:42 deposition testimony, and conducted his own call trace 12:36:47 testing. His conclusion was unequivocal. Every limitation 12:36:50 was met.

12:36:51 Before we get to the contested limitations, let's 12:36:54 start with -- excuse me -- with what is not in dispute. 12:36:58 These elements in green -- green are established. They've 12:37:02 been proven by Aspen's evidence and confirmed by Verizon's 12:37:06 own expert.

12:37:07 As for the remaining limitations, three of their

12:37:13 non-infringement arguments border on the absurd.

12:37:16 First, they argue they don't have a plurality of alternative paths, just one path on Wi-Fi and one path on cellular. All Mr. Heard had to do was to have Ms. Hopkins pull up her computer to show 13 different Wi-Fi connections to debunk that argument.

12:37:35 I think we can all agree that 13 connections is a plurality, more than one.

12:37:41 And, of course, you all know when you walk outside, your phone is going to scan to find the best signal from the cell tower. You heard it from Dr. Rubin, but you also heard Mr. Faber and Dr. Mahon admit it.

12:37:54 Second, Verizon argues that they don't do the switching. I told you in the opening that they might try to blame someone else. Well, they did, they blamed you, the customer. This UE is user equipment.

12:38:11 The jury instructions tell you to apply common sense. For anyone who uses Wi-Fi Calling, when you go from your home or office when you're on Wi-Fi and then get in your car and go on cellular, are you doing the switching? Are you speaking into your phone and saying, hey, I'm about to lose my Wi-Fi signal, I better change to cellular? Of course not. Verizon is doing it.

12:38:34 You saw repeatedly how the P-GW -- and you've seen this -- this is PTX-90 -- in Verizon's core network is the

anchor point for the switch. Those are Verizon's own words.

And you know what, ladies and gentlemen, Mr. Faber and Dr. Mahon agreed. Mr. Faber confirmed that the request that initiates the switch goes from ePDG to the P-GW in the core network.

Third, Verizon's argument that it does not do NAT is even more absurd. This is another one where they claim NAT is industry standard done repeatedly in home Wi-Fi routers, but then claim because they put the voice data into some secure tunnel, they don't do this. It's clever word play, but it's wrong.

Verizon knows NAT is performed throughout its network and with its customer base, which is why all these documents talk about handling it and why Verizon actually tracks NAT statistics.

Now, admittedly, the last one is harder, the SIP signaling sequence. But that's because of the smoke and mirrors Verizon used to try to confuse the parties' call trace testing and all of this irrelevant discussion of SIP RE-INVITEs and other SIP messages.

What do the claims actually require? Use of the SIP protocol and maintaining continuity in the signaling sequence of the SIP used in the transmission.

Now, the first point is easy. Everybody agrees

that Verizon's Voice over Wi-Fi uses the SIP protocol. As for the maintaining the SIP sequence, remember, Dr. Rubin testified if you don't follow SIP, the call will drop. And no one has testified in this trial to the contrary.

We proved Verizon does this limitation not only with our call trace testing, but we also proved it with Verizon's call trace testing.

First. Dr. Rubin walked you through Aspen's testing and explained in detail why it met this limitation. And when cross-examined and asked about the numbering sequence, he told Verizon's counsel: You just want to break the SIP rules. That's ridiculous.

Then we listened to Mr. Faber's factual details about Verizon's test. Mr. Faber has been with Verizon for more than half of his life. He lives and breathes Wi-Fi calling, but he is not Verizon's expert. He cannot apply the test to show infringement.

So we crossed Dr. Mahon on it. He's the infringement expert, and he clearly testified that we must look to the SIP messages that go from source to destination. But in the slides he presented to you, he left in messages that he admitted do not go to the other side.

Do you remember when we put up that Wireshark program to use what Verizon's attorney called fancy filters

12:41:42 to show just the SIP messages that go to the end?
12:41:45 Mr. Heard walked Dr. Mahon through it, and he had to admit
12:41:48 that it went 1, 2, 3, 4, directly in order. That is
12:41:56 maintaining the SIP sequence, and, of course, that's the
12:41:58 case, because the calls didn't drop.

12:42:00 So we've proved infringement of Claim 1.
12:42:03 Remember, it's by a preponderance of the evidence.

12:42:07 A brief word on the other claims. Dependent
12:42:11 Claims 2 and 16, they were about the stream quality events,
12:42:14 that one is simple. Dr. Rubin testified that when the
12:42:18 signal quality drops below Verizon's threshold, a handover
12:42:22 triggers for that device on the call, and Verizon's
12:42:26 documents confirmed it.

12:42:27 The remaining limitations are not contested. If
12:42:32 you find infringement of Claim 1, you should find
12:42:36 infringement of all the other claims.

12:42:38 Now, let's go to invalidity. They had two
12:42:43 arguments, ladies and gentlemen, obviousness and written
12:42:46 description.

12:42:46 To find in favor of Verizon, you have to believe
12:42:50 that Mr. Chin, Mr. Mavunkel, and Mr. Bhaskaran are
12:42:56 untruthful or incompetent. Mr. Chin and Mr. Mavunkel came
12:43:02 to this courtroom and explained in detail that awesome
12:43:06 moment when they realized they had done it.

12:43:08 They had switched from one path to another, and

12:43:10 the call didn't drop. They high-fived each other. They were incredibly excited, and you could get that excitement from Mr. Chin and Mr. Mavunkel on the stand. And they were aggressively, I would say, cross-examined by Verizon's counsel, and they both held up remarkably well.

So why do I say you have to believe that Mr. Chin and Mavunkel are incompetent. Well, to buy Verizon's obviousness argument, you have to believe that the SIP standard identified and solved the dropped call problem, that when Aspen identified this problem that happened to everyone in the VoIP space, they didn't have enough experience with SIP to understand. Really? They didn't understand?

Mr. Chin extensively reviewed the standard. He did some outside research. He read a book. And then he spent weeks writing code to try -- to figure out in detail how SIP worked. He's reading the SIP standard. He's reading it all the time, and he missed that they had already solved this problem?

Of course, they didn't solve the problem -- excuse me, they didn't even identify the problem, let alone solve it. And Dr. van der Weide on the stand had to admit that that wasn't the case.

You also have to believe that Mr. Chin and Mr. Mavunkel were untruthful to buy Verizon's written

description argument. They both got on the stand and explained to you that Figures 4 and 5 of the patent, you could look at those, and if you had software experience, you could write the code.

Mr. Chin walked you through the source code. It's all right there. He had it mostly completed by June of 2007. This is Exhibit PTX-35. Why wouldn't -- if they already had the source code, why wouldn't Aspen put it in the patent? Aspen knew the deal that our Constitution provides, that you can get a patent to prevent others from coming on to your property for 20 years, but in return, you have to tell the world what you invented and how to do it.

Why would Aspen risk that by trying to hide what it did? It makes no sense.

And also, remember, Dr. van der Weide had to admit on the stand that both of the references, the SIP standard and the Qualcomm '377 patent, were in front of the Patent Office while this patent was being examined.

Ladies and gentlemen, I submit that Verizon can't even come close to meeting its burden to show invalidity by clear and convincing evidence. In fact, there's almost no evidence of invalidity in this case.

I also want you to know that Verizon, as I said, ran from its documents. There's some key documents we think you should look at, and they're written here. And

12:46:14 I'll leave that up for a little bit. But you got to
12:46:17 remember the Court's instructions. He explained to you
12:46:20 that you are the judges of the credibility of all
12:46:25 witnesses. You should be the ones that considers whether a
12:46:29 witness has been contradicted by other evidence.

12:46:33 When you compare the credibility of the Verizon
12:46:36 witnesses with the Aspen witnesses, I would submit that
12:46:41 it's not a close call. Think about the demeanor of
12:46:44 Mr. Mavunkel and Mr. Chin and compare that to the fact
12:46:48 witnesses who appeared either live or by deposition from
12:46:51 Verizon.

12:46:52 Remember Mr. Kondratiuk? He's Verizon's senior
12:46:59 director of network infrastructure. He was there from the
12:47:05 inception of launch of -- inception through the launch of
12:47:07 Voice over Wi-Fi. When shown Verizon's own presentation
12:47:10 saying the company would lose its communications leadership
12:47:14 status without Wi-Fi Calling, what did he say? He walked
12:47:17 away from it.

12:47:18 Then Mr. Blair, Verizon's director of brand and
12:47:22 network strategy, told you Wi-Fi Calling was at odds with
12:47:26 our business strategy and implied that Verizon wasn't a
12:47:30 charity.

12:47:31 But when confronted with documents showing
12:47:34 customers were requesting Wi-Fi Calling, what did he say?
12:47:38 I have no reason to doubt that. I'm sure customers were

12:47:41 requesting all manners of things, including this.

12:47:44 Finally, Mr. Faber told you that as Verizon's 12:47:49 corporate representative, that he didn't know -- he didn't 12:47:54 know whether Verizon had a policy regarding the respect for 12:47:58 the intellectual property of others. And you can assume 12:48:02 they don't because they didn't produce anything. This 12:48:04 gentleman has been working for Verizon for 26 years. He 12:48:07 got up on the stand and said we have a policy of respecting 12:48:13 other people's intellectual property. Those are just 12:48:18 words.

12:48:18 The evidence in this case shows that they don't 12:48:20 respect intellectual property, and they don't respect 12:48:23 Mr. Chin's '554 patent.

12:48:24 Also, when you heard Mr. Dacus argue that Verizon 12:48:29 had no knowledge of the '554 patent before the litigation 12:48:32 began, think about their biggest competitor, AT&T. 12:48:38 Mr. Faber acknowledged that AT&T was well aware of the 12:48:42 patent -- of the '554 patent as early as 2013.

12:48:47 And Verizon's counsel, he told you in opening he 12:48:51 was running to these Verizon documents, not from them. But 12:48:55 then he stood in front of Mr. Minor and Mr. Blok multiple 12:48:59 times and told them that less than 1 percent of Wi-Fi calls 12:49:05 involved a handover.

12:49:06 You're going to hear more about that number, but 12:49:10 their own damages expert said that number was 15 percent.

12:49:14 Verizon's counsel tried to trick our witnesses and
12:49:18 say it was 1 percent. It wasn't.

12:49:22 We told you at the outset that we were going to
12:49:24 walk you through the value of Aspen's invention to Verizon
12:49:28 using Verizon's own documents and show you how incredibly
12:49:33 important it was for Verizon to have the capability of
12:49:37 seamless handover from 4G/LTE to Wi-Fi and vice versa. And
12:49:44 we did exactly that.

12:49:45 We showed you Verizon's own 2014 customer survey
12:49:50 which says over 64 percent of Verizon's customers said
12:49:54 Wi-Fi Calling would add value to their plan.

12:49:58 We showed you Verizon's 2015 internal
12:50:02 presentation, which identified customer requests for Wi-Fi
12:50:06 Calling as a specific justification for launching the
12:50:09 service and which projected capital avoidance of over $1
12:50:16 billion over the first five years.

12:50:18 Now, what did Verizon do with its own documents?
12:50:23 They ran. Mr. Kondratiuk, the Verizon witness who was
12:50:28 there when these decisions were made, tried to distance
12:50:32 himself. The billion-dollar cost estimate, he first blamed
12:50:36 it on marketing before admitting the numbers came from
12:50:38 network planning. Then he said, oh, it's a draft, but then
12:50:43 he had to admit that it was presented to Verizon leadership
12:50:47 in non-draft form.

12:50:50 The competitive pressure data, he denied there was

any, despite it being all over Verizon's documents.

The churn risk showing 34 million in annual revenue at stake, he couldn't even own his company's numbers.

If Wi-Fi Calling was so unimportant to Verizon's customers, why did Verizon market it as a top selling feature? Why did they run active selling marketing campaigns?

And Mr. Blair, he told you Wi-Fi Calling was just something they did because Apple asked them to, not because it was important, and then admitted in the same breath that Apple is such a dominant force, that Verizon can't say no to them.

Now, let me address Verizon's argument about the value of Wi-Fi Calling with handovers. Verizon's counsel stood up during cross, as I said, and told Mr. Minor that less than 1 percent of Wi-Fi calls ever experience a handover. But then what happened? We showed you the actual data from Verizon's own expert, his own Attachment 8.0 showed that over 15 percent of calls touching the Wi-Fi network involve a handover. Not 1 percent. 15 percent.

These are Verizon's expert's own numbers. Verizon's counsel wasn't showing our witnesses or you the whole picture. It was misleading and the data proves it.

But here's the thing, and this is important, even

12:52:27 if handovers just happened on 15 percent of the calls, the value is on having the capability. Yes, infringement only occurs when there's a handover, but the value of the '554 patent is not about individual infringing calls. It's about an infringing service, a service Verizon would not and did not offer without the ability to seamlessly hand over.

Mr. Findlay talked with Mr. Ellis this morning about windshield wipers, and then he demonstrated on the chart why Mr. Ellis's circle and splitting of the pie made no sense. The value is that this is -- the Voice over Wi-Fi Calling is there when you need it, and Verizon understood this better than anyone. That's why they refused to launch Wi-Fi Calling on their nationwide 4G network until they could offer it with seamless handovers.

In fact, Mr. Minor told you Verizon wouldn't touch it until that functionality was ready, and here he called it the holy grail.

So let's talk about the numbers. Mr. Blok walked you through his analysis carefully and methodically. He used the cost savings approach, grounded in a third-party research paper, the 2017 ACG Research report that found Wi-Fi Calling saves carriers 1 cent per minute of use. And that number isn't just some academic exercise. It is corroborated by Verizon's own data.

Look here on the screen, if you would, he did some math, and then he said if you take the 394 million in cost savings divided by the minutes of use, you get about 1.1 cent per minute of use.

Ladies and gentlemen, I expect Verizon to argue that this 2017 ACG paper isn't reliable. Mr. Blok testified that Verizon's own economic information is exactly in line with that 1 cent per minute.

From that 1-cent starting point, Mr. Minor applied a 30 percent apportionment, meaning only 30 percent of the value of Wi-Fi Calling is attributable to the '554 patent. Verizon tried very hard to get Mr. Minor to admit that he just made the number up, but Mr. Minor explained the top-down engineering process that he used to reach that number and the sources that went into it in detail.

They complained that he didn't look at books and articles. Ladies and gentlemen, there isn't a book or an article or something on the Internet that is going to tell anyone how much the '554 patent is worth to Verizon. That doesn't exist. He had to figure out how to do it. He spent a lot of time explaining to you how he did it. And that information is reliable.

Once the 30-percent apportionment is applied, that brings us to about one-third of a cent per minute. Then, Mr. Blok went further. He split that benefit between the

12:55:44 parties, and he didn't split it 50/50. He gave Aspen 30 percent and left Verizon with 70 percent based on Verizon's own CapEx-to-OpEx ratio. So now we're down to one-tenth of one cent per minute.

12:56:00 Ladies and gentlemen, with 360 billion minutes of use, when he discounted that back to 2015, that's 226.3 million.

12:56:13 Now, is 226 million a lot of money? Of course, it is. But consider this. Aspen is asking for one-tenth of 1 penny per minute of a service that Verizon itself projected would save billions of dollars over five years.

12:56:31 When you see that there were 360 billion Wi-Fi Calling minutes of use, it makes sense. One-tenth of a penny adds up when there are at least 50 million Verizon customers who utilize Voice over Wi-Fi.

12:56:49 And what does Verizon offer in response? You heard Mr. Ellis this morning. He says it's no more than 11.8 million, but he based that almost entirely on the KAIFI license that he admitted on cross was completely different than the situation here. Completely different, ladies and gentlemen. Their whole damages case is based on the KAIFI license.

12:57:18 Now, he has to show that it's economically comparable, and Mr. Findlay walked him through that. And he had to admit it's completely different.

12:57:26 But they also have to show -- and when I say completely different, I mean the issue is when Aspen and Verizon would sit down at this hypothetical negotiation, they had to make -- they have to make these -- there's rules. There's rules. None of those rules apply to the KAIFI license. It was because of a settlement. Invalidity and infringement were contested, all those things that Mr. Blok explained to you.

12:57:56 But also, Mr. Ellis has to rely on someone else to give him the technical comparability. He's not a technical expert. So there's Mr. Mahon, Verizon's technical damages expert. This is the expert the big carriers call when they get sued, Samsung, Amazon, T-Mobile, Nokia. He's testified for all of them. That's his business. That's his playbook. Tell Mr. Ellis the patent has no value. Tell them they don't infringe, and keep the bill as low as possible.

12:58:33 Ladies and gentlemen, that's not the way it works.

12:58:37 The reasonable royalty is ultimately your decision. The Judge's instructions make that clear. You can adjust the percentages. You can look at the factors differently. But what I ask you to do, do not ignore Verizon's own documents. Those documents were not written for this trial. They were written by Verizon's engineers and marketers and business folks years before this lawsuit

12:59:04 when they were trying to figure out whether to launch Voice over Wi-Fi Calling. And those documents tell a story that Verizon's witnesses and lawyers have spent this entire trial trying to untell.

12:59:17 So let's look at the verdict form.

12:59:20 THE COURT: Mr. Herman, you've used 20 minutes.

12:59:24 MR. HERMAN: Okay. Great. Thank you, Your Honor.

12:59:25 THE COURT: You've used 20 minutes.

12:59:31 Is that right? That's correct.

12:59:31 MR. HERMAN: Okay. Thank you, Your Honor.

12:59:32 So as I said at the outset and I said at the beginning of this case, I'm asking you to find three things, that there's infringement, that the Patent Office didn't make a mistake, and to award Aspen damages. I said in opening around $200 million, and it turns out the number is 226.3.

12:59:54 So when you get the verdict form and you go back and you consider all the evidence, and I really stress I want you to look at the Verizon documents. Walk through the claims. Ladies and gentlemen, every claim that Aspen has asserted has been infringed, Claims 1, 2, 6, 15, 16, and 20.

01:00:17 And when Verizon's counsel gets up, try to look through some of the smoke and mirrors and see do they really have a legitimate non-infringement argument. I

01:00:29 submit that the answer is no.

01:00:31 And then with respect to invalidity, ladies and 01:00:34 gentlemen, it's even worse for Verizon. The two references 01:00:39 that were in front of Dr. van der Weide were in front of 01:00:43 the examiner. They have to show invalidity by clear and 01:00:46 convincing evidence. They have to show that the trained 01:00:50 examiners at the United States Patent and Trademark Office 01:00:53 made a mistake in issuing the claims of the '554 patent.

01:00:57 And as I said, they have one other argument on 01:01:00 written description. And for that they have to show that 01:01:05 Mr. Chin and Mr. Mavunkel, when they got on the stand in 01:01:07 front of you and said, yes, Mr. Chin writes code, 01:01:12 Mr. Mavunkel writes code, they had to say if you look at 01:01:18 Figure 4 and you look at Figure 5, one of us -- one of us 01:01:23 software engineers could write the code.

01:01:24 The only way you can find that written description 01:01:27 argument to work is if you don't believe them.

01:01:29 And then with respect to damages, we asked -- 01:01:34 remember, this is a lump-sum payment, so what sum of money, 01:01:37 if paid today in cash, has Aspen proved by a preponderance 01:01:42 of the evidence would adequately compensate Aspen for 01:01:44 Verizon's infringement?

01:01:46 And it says to answer in dollars and cents.

01:01:49 And Aspen's respectfully asking you, based on all 01:01:52 the evidence that you've heard over this past four days, to

01:01:54 award it $226.3 million.

01:01:57 Now, you heard a lot from Verizon's counsel about 01:02:04 how the carriers weren't breaking down Aspen's door to 01:02:07 license this technology. So it must not be valuable. But 01:02:12 ladies and gentlemen, the opposite is true. Rather than 01:02:15 license the technology, Verizon just came on to Aspen's 01:02:20 property and took it.

01:02:22 This case is about protecting about innovation. 01:02:25 It's about the deal our patent system makes with its 01:02:27 inventors. Disclose your invention to the public and in 01:02:32 exchange you get 20 years of exclusive rights. Verizon 01:02:38 took Aspen's property without permission. You have the 01:02:41 power given to you by the Constitution and the Seventh 01:02:44 Amendment to make that right.

01:02:47 Verizon's lawyer gets to give his closing argument 01:02:49 now, and then I get the chance to come back and finish 01:02:52 things off. As you listen to him, remember what I told you 01:02:57 at the start. Watch the documents, not the lawyers. The 01:03:01 documents don't lie. The documents were created long 01:03:04 before this suit, and they tell you everything you need to 01:03:07 know.

01:03:15 THE COURT: Now, you have two minutes remaining.

01:03:17 MR. HERMAN: Thank you, Your Honor.

01:03:17 Ladies and gentlemen, I'm going to finish by being 01:03:23 a little blunt. What you saw from Verizon this week is a

01:03:28 playbook. A patent is a piece of property. In this country, no one tells you what you can do and what you can't do with your property. Their technical expert has been hired by the big carriers over and over. Samsung three to four times, Amazon three times, T-Mobile three to four times, Nokia and Ericsson, 10 times. That's the guy big companies call when they get sued for patent infringement. His job is always the same, tell the jury the patent isn't worth what the inventor says it is.

01:03:59 Verizon even tried to attack Aspen's character suggesting they're just a licensing company trying to make a buck. But you met Bill Chin. You met Robin Mavunkel. They are real engineers who built a real product and solved a real problem.

01:04:15 What did Verizon do when confronted with the merits? In my view, they authorized their lawyers to bully each Aspen inventor. They even bullied Dr. Rubin, a Princeton Ph.D. who has helped our Department of Defense and military and has been a professor at UCLA for over 50 years.

01:04:39 That's what these companies do. They throw lawyers at the problem and hope you'll get so confused by the technical jargon that you give up.

01:04:48 But I know you didn't give up. You've been listening so intently this whole week, and we so much

01:04:55 appreciate it.

01:04:56 MR. HERMAN: Thank you, Your Honor.

01:04:57 THE COURT: Thank you, Mr. Herman.

01:05:14 MR. DACUS: Your Honor, would you let me know when 01:05:17 I have 15 minutes and five minutes remaining?

01:05:21 THE COURT: I certainly will, yes.

01:05:24 MR. DACUS: And may I proceed, Your Honor?

01:05:25 THE COURT: You may.

01:05:26 MR. DACUS: Thank you.

01:05:26 Good afternoon. I want to start this afternoon 01:05:30 where I hope I've started with you each time I've had a 01:05:33 chance to talk with you, and that is to say on behalf of 01:05:43 Bob Faber, all the men and women who work at Verizon and on 01:05:44 behalf of myself a very sincere thank you for serving on 01:05:45 this jury.

01:05:46 We talked about in jury selection that when you 01:05:48 are falsely accused of doing something, all you really want 01:05:53 is someone to take the time and listen to your side of the 01:05:56 story. You've given Verizon your time and listened to the 01:06:01 facts and their side of the story, and I know they are 01:06:05 grateful to you for that.

01:06:07 When we first started on Monday, we talked about 01:06:10 the fact that this case is very important to Verizon. You 01:06:14 probably have a good understanding of that now. But it's 01:06:17 also important, at least from Verizon's perspective,

because it has broader implications and ramifications, including the true purpose in our Constitution, which is to promote the progress of science. That's the sole purpose behind our patent system.

And from Verizon's perspective, what's happened in this lawsuit, what's happened in this courtroom is not consistent with promoting the progress of science.

From our perspective, this is more of a last-ditch effort, you might say a Hail Mary, by Aspen and in particularly by its founder and owner, Sajit Bhaskaran, to take a patent, turn a patent that's about to expire, it's at the end of its life, a patent that not just Verizon but really no one in this industry or marketplace has seen to have any value or benefit and to come to the courthouse and try to find a gold mine.

Of course, the biggest chunk of that gold goes to Mr. Bhaskaran. That's not consistent with promoting the progress of science.

And as I said to you on Monday, there's some fundamental principles involved in this case that are absolutely essential to our patent system. The first is when you get a patent, whatever you receive from the Government, that's your boundary. That's your fence line, and you don't get to change it, no matter what the incentives are. Even if it's tens of millions of dollars,

01:07:47 whatever your patent claim is, that's what you get. No more, no less.

01:07:51 And when you get a patent, it actually needs to be new. So I want to focus just for a couple of minutes on this issue of I told you this was -- this was at play here, are these folks moving their fence line? Are they claiming now their patent covers something different than what their patent originally was?

01:08:11 What was their patent? Remember, this is Figure 9 from the patent. I won't belabor this because you know it well by now. These folks came up with an invention in 2008 -- by the way, at a time when Internet was much inferior to what it is now. I know some of you aren't old enough to really remember in 2008. But a lot of times businesses in particular, and even homes, had multiple Internet providers because the Internet was so inferior.

01:08:38 And so what these folks at Aspen did is they said, if you have VoIP, Voice over Internet Protocol, and you have multiple, at least three Internet service providers, we're going to make a product, that's this thing that they showed in Figure 9 down here that we've talked about, that would allow you to switch between Internet Service Providers on these hard-wired telephone VoIP lines.

01:09:08 The problem with that and the whole problem and solution of that patent, as you've now heard, was if you

01:09:14 change between Internet Service Providers, it changed IP
01:09:17 addresses such that this phone down here that was talking
01:09:20 to this phone up here no longer could talk because they
01:09:24 didn't know what IP address they were talking on.

01:09:26 That's what this patent was about. They filed
01:09:32 their application with the Patent Office. I'm not going to
01:09:35 prolong this because you know -- you know the story by now.
01:09:40 They told the Patent Office, hey, we found this way to make
01:09:43 this switching between these Internet Service Providers
01:09:46 without disruption. The Patent Office said a lot of people
01:09:49 have already done that. They rejected their application.
01:09:52 They said, well, we're going to do it over NAT. The Patent
01:09:56 Office said that's not new either.

01:09:58 So the folks at Aspen added this clause down here
01:10:02 that you're now very familiar with that requires a -- not
01:10:06 just SIP but a very specific type of SIP that requires
01:10:10 maintaining the sequence of that SIP transmission.

01:10:16 Think about what they claim now. Well, let me say
01:10:21 this before we talk about what they claim now. The fact
01:10:24 that these folks did not invent switching is admitted by
01:10:30 them.

01:10:31 Here's Mr. Chin.

01:10:35 Aspen did not invent the general concept of
01:10:37 switching or handovers between networks?

01:10:40 And he agreed.

01:10:42 It's the same for Mr. Mavunkel, except a little stronger.

01:10:46 We asked Mr. Mavunkel: You did not invent handing over a call from a Wi-Fi access network to a cellular access network?

01:10:54 He agrees.

01:10:55 That's what they accuse now, but he agrees.

01:10:58 You didn't invent handing over a call from a Wi-Fi access network to a cellular network even using SIP?

01:11:05 He agrees with that.

01:11:06 Dr. Rubin, the same thing. They all agree.

01:11:09 Now let's talk about what they accuse here. You know what their invention is. This whole issue is are they trying to change the boundaries? What they come to court now and say is, our patent covers switching between a Wi-Fi network and a cellular network. I asked Mr. Chin when he's on the stand: When you had this patent, when you were drafting this patent, when you had this idea, did you design this '554 patent with the concept of cellular networks in mind?

01:11:44 He said, no, he didn't. He did not.

01:11:46 It goes further and gets worse. Of course, Wi-Fi, as Mr. Chin admitted, had been around for the better part of a decade before this patent was filed. Yet when they filed this patent, the very patent they now claim covers

01:12:04 switching between Wi-Fi and cellular, the patent doesn't
01:12:07 reference Wi-Fi a single time, not a single time.

01:12:11 It's hard to imagine changing your boundaries more
01:12:17 than these folks are.

01:12:18 With that background and backdrop, I want to now
01:12:22 sort of -- not sort of, I want to dig into the details of
01:12:26 what you've seen as evidence. The first question you're
01:12:29 going to be asked when you go back to the jury room is
01:12:32 whether or not there's this infringement.

01:12:34 So you'll have to look at the claim, as you know.
01:12:40 I'm going to give you a roadmap of the evidence that you've
01:12:44 seen, and I'm going to present to you over the next few
01:12:47 minutes the three reasons that Verizon does not infringe
01:12:52 this patent.

01:12:54 By the way, these reasons are applicable to every
01:12:57 claim they assert, so if you find that any one of these is
01:13:00 factually correct, then Verizon does not infringe any of
01:13:04 the six claims that are asserted.

01:13:05 So let's -- let's start with this first issue,
01:13:13 whether or not Verizon's Wi-Fi switches to one of a
01:13:19 plurality of alternative network paths.

01:13:21 This is what the claim requires. You know this
01:13:23 claim is about switching, right, between two networks. The
01:13:29 Court, as he just told you, has told you exactly what this
01:13:34 claim means now. You have it in your notebook. You also,

01:13:38 for those of you who are notetakers, you can look on
01:13:43 Page 12 of your jury instructions when you go back there.

01:13:46 The Court says the term switching the transmission
01:13:48 from the first network path to one of a plurality of
01:13:54 alternative network paths requires at least three network
01:13:57 paths, three separate and distinct network paths over which
01:14:00 you can communicate.

01:14:01 I don't have to belabor this. You know this. In
01:14:04 Verizon's system, there is a cellular network path and
01:14:09 there is a Wi-Fi network path.

01:14:13 There's not three or more network paths over which
01:14:20 you can communicate. If you're on cellular, the green
01:14:24 line, you can only switch to Wi-Fi.

01:14:28 By the way, Dr. Rubin didn't even attempt to point
01:14:32 to multiple Wi-Fi networks if you're on cellular. He
01:14:36 didn't -- there's no evidence at all. I heard their
01:14:39 counsel say and I heard their lawyers say yesterday, oh,
01:14:42 there's -- there's multiple Wi-Fi accesses. That's not the
01:14:49 question. The question is, is there a separate network, as
01:14:54 the Court has told you, over which you can communicate.

01:14:57 Here there's only two. It's cellular or Wi-Fi.
01:15:01 When you're on Wi-Fi, Dr. Rubin said, oh, well, there's
01:15:05 multiple base stations in the cellular network, and that's
01:15:09 multiple paths.

01:15:11 And you know from Mr. Faber and you know from our

technical expert that in 4G cellular that's accused here, it can only communicate with one base station. There's not -- there's not multiple paths. There's either cellular or Wi-Fi, two paths, not three as the Court has now expressly instructed you are required.

The bottom line is Verizon does not infringe because there -- it does not switch between one of a plurality, meaning two or more, alternative paths.

There's a second reason Verizon doesn't infringe, and it's this -- what the patent requires is maintaining this continuity in the signaling sequence. We all know what a sequence is. Here it is in the claim. The Court's defined it for you. The Court has emphasized that this -- this maintenance must be a continuity in the signaling sequence. It must be in sequence.

Now, let's start at a high level here. Remember what this patent was about. Remember the problem that was being solved was a -- when you changed networks, there was a change of IP address between Internet Service Providers. You now know it's undisputed. Verizon does not have that problem. Verizon is an Internet Service Provider in and of itself. It assigns numbers. Whether your phone is on the cell network and switches to the Wi-Fi network or is on the Wi-Fi network, switches to the cell network, it has the same IP address.

01:16:49 And candidly, that's the reason, as you'll see, this continuity is not maintained. They don't need it. The problem and solution that the folks at Aspen had, Verizon doesn't need.

01:17:03 We're going to dig into the details, but there's some testimony that I want you to remember related to this particular issue.

01:17:11 So I asked Mr. Chin: If a network path is switched without sending any SIP message from one phone to the other, that would not use the '554 patent, correct?

01:17:24 And he said: Yeah, you got to send a SIP message.

01:17:28 So stand back and think about this. Remember what their invention was. Alice is talking to Bob, you change Internet Service Providers, and now Alice has to send this SIP message over to Bob and say, hey, I have a new IP address. And that message has to go all the way from one phone to another. That's how their invention worked. And that's what Mr. Chin explained.

01:17:53 And I want to pause on this slide for just a minute because I think the testimony is important. I might even say extraordinary.

01:18:01 So here's what I asked Mr. Chin: If a network path is switched without sending any SIP message from one phone to another, does that practice or use -- in other words, infringe -- the '554 patent?

01:18:16 And he said: No.

01:18:18 You got to have a SIP message that goes all the
01:18:20 way from Alice's phone all the way over to Bob's.

01:18:23 So then we had Dr. Rubin. Mr. Gaudet said: So
01:18:27 you agree with me that Verizon phones are able to switch
01:18:31 between Wi-Fi and cellular without -- without using any SIP
01:18:36 messaging to the other phone, correct?

01:18:38 He said: I don't know.

01:18:44 Think about that. This is the man who's supposed
01:18:47 to be proving infringement. He's supposed to be showing
01:18:51 you, because the patent requires it, that a SIP message
01:18:54 goes from one phone, Alice's, all the way over to Bob's.
01:18:59 And when pressed, he said: I don't know.

01:19:02 Remember he did this testing. He said I just know
01:19:06 that I didn't capture it, which means I didn't capture that
01:19:10 kind of message in my testing, which he didn't. We won't
01:19:14 discuss all of the problems with the testing, but one thing
01:19:17 we know is he didn't capture anything on the Verizon side
01:19:21 in his testing that actually he didn't do that
01:19:25 Mr. Bhaskaran commissioned Mr. Mavunkel to do.

01:19:28 But look at what he finally says. But it's
01:19:32 possible. It's not possible. That's what happens. We
01:19:38 switch without sending a SIP message from one phone to
01:19:40 another. I literally probably should just go sit down.
01:19:45 That -- that is, in just informal terms, game over.

01:19:51 It's their burden to show you that they -- that we send this message from Alice's phone all the way over to Bob's. And they don't do it because it doesn't happen.

01:20:01 What he points to is this thing called a Re-Register message. And remember that Mr. Faber said, Dr. Mahon said, that Re-Register message has nothing to do with us switching from Wi-Fi to cellular. In fact, that Re-Register message doesn't even happen until after the switch occurs.

01:20:23 And the testing proves that we don't maintain this continuity of sequence that the claim requires.

01:20:33 This is the summary -- remember Mr. Mahon showed you several of these summaries from the testing that Mr. Faber did. I'll just show you one example. You saw many of them.

01:20:45 You can see where the phone switches from Wi-Fi to cellular. So we go 1, 2, 3, then we skip to 5 -- not in sequence -- then to 6, then back to 4, 5, and then back to 2. Not in sequence. No infringement.

01:21:00 And then I was a little bit shocked to hear Aspen's lawyer say that there's smoke and mirrors from our side, because remember what happened from their side yesterday. Their lawyer got up here and said to Dr. Mahon, well, we're going to take out this REGISTER, these Re-Registers. Let's just take them out, and then things

are in sequence.

Take them out? That's the only thing your expert has pointed to. Your expert says that we're supposed to be looking at the Re-Register message, and the lawyer says, no, take them out.

Smoke and mirrors.

It gets worse. Remember when their lawyer was cross-examining Mr. Mahon yesterday. They stopped their analysis right here. They took out the REGISTER and they said, look, it's 1, 2, 3, 4. And then Mr. Anderson got back up there and said, wait, Dr. Rubin said -- your own expert said, you got to go all the way through the end of the transmission, the full call. You saw it, black and white. That's what their own expert says.

If you do that, even if you take out the REGISTERs, you're now going from 5 to 2. The thing is not in sequence. You don't need a Ph.D. to figure out that those numbers aren't in sequence.

All of that leads to the -- well, there's more. I almost forgot. This is Dr. Rubin's testing. I'm not going to discuss all the infirm ities in it even though none of these numbers relate to the Verizon network. Let's just assume it was valid testing.

This is from Dr. Rubin, Aspen's own expert. We got to look, according to Dr. Rubin, at all the sequence

01:22:48 numbers throughout the entire transmission. Are you
01:22:54 telling me that 29357 is the next number in sequence after
01:23:01 1? Are you telling me that 2 is the next number in
01:23:04 sequence after 29363? Smoke and mirrors. It's not.

01:23:11 That's a very long-winded way of saying that
01:23:13 Verizon doesn't infringe because it does not maintain
01:23:17 continuity in the signaling sequence of the SIP as the
01:23:22 claim requires. And there should be no surprise about
01:23:24 that. The problem these folks had they were solving,
01:23:28 Verizon doesn't have.

01:23:29 Now, let's talk about this Network Address
01:23:35 Translation. The patent claim requires it. Here you see
01:23:38 it in the claim. You can look at it when you go back in
01:23:41 the jury room. The transmission itself has to undergo a
01:23:46 Network Address Translation.

01:23:52 What Aspen says is that Network Address
01:23:54 Translation happens down here in your Wi-Fi access point or
01:23:59 your Wi-Fi router in your house. That's what they say.

01:24:02 Mr. Faber says, what are you talking about? At
01:24:07 Verizon, our number one concern is our customers's privacy
01:24:11 and protection of that privacy and the security of the
01:24:16 data.

01:24:16 Remember that the Verizon network doesn't start
01:24:18 until right here. So all the way from your phone to the
01:24:23 Verizon network, that thing is in a tunnel. All that

01:24:32 information is in a tunnel. There's no Network Address
01:24:35 Translation going on it by design.
01:24:37 The folks at Aspen may have designed their
01:24:40 patented invention to have Network Address Translation
01:24:42 occur, but it does not occur on the Verizon network by
01:24:47 design.
01:24:48 The upshot of that is pretty simple. This patent
01:24:56 required NAT; Verizon doesn't do it.
01:24:57 When you answer this question, if you find that
01:25:02 any, any of those three pieces of evidence are valid, and
01:25:08 I'd submit to you all three of them are, then the answer to
01:25:12 the question of whether or not Verizon infringes is no.
01:25:19 I'm not here to tell you what the answer is.
01:25:21 That's your decision. That's why I didn't write in an
01:25:24 answer. I'm certainly not presumptuous enough to tell you,
01:25:28 but you understand that from our standpoint, it's not just
01:25:31 a no but it's a resounding no.
01:25:33 I'm going to take a breath. Maybe you should take
01:25:37 a breath. A lot of information over the course of this
01:25:41 week and for me right now.
01:25:43 So we're going to switch gears and talk about the
01:25:45 second question that you're going to be asked when you go
01:25:47 back in the jury room, and that is this question of whether
01:25:51 or not this patent is actually valid.
01:25:55 Now, remember that -- that our founders, our

fathers in our Constitution, they actually put a big burden on juries. They want -- they put the burden on you to make sure that folks don't move their fence line after they get the patent. And they put the burden on you to make sure that the patent that was issued by the Patent Office is actually valid.

And they did that for a very good reason, because the Patent Office had very limited information when they made this decision to issue the patent. And they certainly didn't have all the testimony that we're about to talk about. And they didn't know that Aspen was going to claim that this patent covers a switch-over from Wi-Fi to cellular. How could they? How could the Patent Office know that? They got a patent where the word "Wi-Fi" never appears.

Think about that. You're a patent examiner. You're sitting there, you're looking at a patent that never says anything about Wi-Fi. Why would you think it covers a Wi-Fi to cellular switch-over? Well, we know now that that's what Aspen claims.

And by the way, I heard the Verizon lawyer -- I mean, the Aspen lawyer say this requires that Bill Chin was untruthful. No, it doesn't. Not at all. I firmly believe that Mr. Chin probably thought that he came up with something new. But by his own admission, he had never been

01:27:26 in this industry in this specific area in his professional
01:27:29 life.

01:27:31 So did he think he may have found something new?
01:27:35 Possibly. Probably. But that doesn't mean that he did.

01:27:38 So let's talk about it. The most fundamental
01:27:43 principle under a patent is, is your invention new? What
01:27:47 evidence do you have to reach that conclusion?

01:27:50 I want to go slow here. So this is Mr. Bhaskaran,
01:28:00 okay? Sajit Bhaskaran. We played his deposition in our
01:28:05 case, as you heard. That's a little unusual. Think about
01:28:10 who Mr. Bhaskaran is. He's the founder, the CEO, the
01:28:14 primary owner, the person who instigated this lawsuit, and
01:28:18 the person who stands to gain the most from this lawsuit.
01:28:22 And we played him in our case.

01:28:26 Now, we can't subpoena him. He's outside the
01:28:29 subpoena power. We couldn't force him to be here
01:28:31 personally. But remember what the Court said, deposition
01:28:35 testimony has the -- by video has the same force and effect
01:28:39 as if he took that stand.

01:28:42 Here's why that's important. Let's look at what
01:28:44 he said. We're on the issue of were these patent claims
01:28:49 new? And let me set the stage here. By the time
01:28:55 Mr. Bhaskaran gave his deposition, this lawsuit had been
01:28:57 going on for well over a year. He sort of knew the story.
01:29:02 We put forward what our non-infringement positions were, we

put forward why we think this patent wasn't new and was invalid. He kind of saw the writing on the wall by this time.

So we asked him under oath: Did you believe at this time that this claim -- this patent claim was filed that you were first to come up with that idea?

And what did he say?

I really cannot remember.

Think about that. Any time you ask a patent owner was your idea -- were you the first to come up with it, 100 percent of the time they should say absolutely because that's the fundamental basis. He says: I really can't remember.

We asked him: Sitting here today, do you believe you were the first to come up with the idea reflected here in this patent?

In hindsight sitting here today, no.

That's an inventor.

Do you agree that others had already disclosed the idea of switching transmissions from one network path to another, right?

Correct.

The patent is supposed to be new. It's the fundamental principle.

There's more. You know, and I don't need to

belabor the point. Everyone in the courtroom agrees that every bit of these patent claims, no matter which one you look at, all that stuff I just marked in blue was old. The Patent Office rejected it.

The only thing that was potentially new -- the only reason they got a patent, by Mr. Chin's own admission, is this very specific kind of SIP signaling sequence in that last limitation. That's the only thing that's even potentially new.

But you know what, we asked Mr. Bhaskaran about that very limitation. And I know all this happened in a video deposition. I know it's kind of hard to put all of this together. That's why I'm putting this up on the screen for you.

We asked him: Sir, the '554 patent does not go into the details of how to maintain the SIP signaling sequence because -- and here it is -- that was known by practitioners in the art before the '554 patent, correct?

Think about what that's saying. The only limitation that's even arguably new -- Mr. Bhaskaran, you now know, having been in this lawsuit for more than a year, when it says practitioners in the art, that's just people in the industry. You know this limitation wasn't new.

And what did he say: Correct.

The upshot of that is not a single part of this

01:31:50 patent was new. That means it's invalid.

01:31:55 It gets worse for them. It gets worse. What they 01:32:05 now claim that their patent covers is a switch-over or 01:32:11 handover between a cellular network and a Wi-Fi network.

01:32:15 Dr. van der Weide took the stand and showed you -- 01:32:19 went through every element of this Aspen patent and showed 01:32:23 you that this Qualcomm '377 patent has every element. It 01:32:30 really shouldn't be a surprise.

01:32:31 You remember, I asked Mr. Minor: Do you know who 01:32:36 Qualcomm is?

01:32:37 Mr. Minor said: Yeah, they're the Microsoft of 01:32:39 the telecommunications world. Pioneers in this world.

01:32:43 It should be no surprise to anyone that they have 01:32:48 a patent long before this '554 patent related to 01:32:54 switching -- not only switching over but switching over 01:32:58 using SIP. I'm sure you still have it in your mind. 01:33:04 Dr. van der Weide yesterday literally walking through every 01:33:06 part of this '554 patent and showing you that between the 01:33:12 Qualcomm '377 patent and the SIP standards, all of which 01:33:16 came before the '554, the '554 wasn't new, just like 01:33:23 Mr. Bhaskaran, the inventor and founder of Aspen, was 01:33:28 forced to admit in his deposition.

01:33:30 The upshot of that is this patent is not valid. 01:33:36 At least these claims. And let me be clear. It's not the 01:33:41 entirety of the patent that you're evaluating. You're just

01:33:44 evaluating these specific claims within the patent. And we
01:33:47 know unequivocally they weren't new.

01:33:51 Let me say something about the burden of proof.
01:33:55 This is -- the burden of proof is not beyond a reasonable
01:33:56 doubt. As the judge has said to you, it's much less. It's
01:34:02 just this clear and convincing. To be honest, if it was
01:34:13 beyond a reasonable doubt, I think we've met it.

01:34:14 We had their own inventor saying none of this was
01:34:17 new. But this just requires something to be clear and
01:34:20 convincing. I'm not sure how much clearer it can be. I'm
01:34:23 not sure how much more convincing it could be than to have
01:34:26 the inventor himself, Mr. Bhaskaran, admit that that last
01:34:31 element, the only thing that was possibly new, was not.
01:34:35 And have Mr. van der Weide walk you through every single
01:34:39 piece of that Qualcomm patent and show you they invented
01:34:43 switching over between cellular and Wi-Fi.

01:34:45 But the patent has another problem. There's this
01:34:49 promise that patent owners make to the Patent Office. And
01:34:54 that is if you're going to get a patent, you have to
01:34:59 describe in detail for the public how to do it.

01:35:04 I'll give you a simple example. I can't go get a
01:35:07 patent on how to go to the moon and get a valid patent
01:35:10 unless I describe to the public exactly how to go to the
01:35:13 moon. And that's what's going on here. You have to tell
01:35:17 the public how to do this stuff.

01:35:19 THE COURT: Mr. Dacus, you have 15 minutes remaining.

01:35:22 MR. DACUS: Thank you, Your Honor.

01:35:23 So the question is for this SIP signaling sequence, this alleged new part of the patent, did they explain -- did the patent owner, did the inventors explain how to do it. And, again, I don't need to point to Dr. van der Weide. I don't need to point to any of our testimony. I need look no further than the sworn testimony of Sajit Bhaskaran. And here's what he said.

01:35:51 The '554 patent does not go into details of how to maintain the SIP signaling sequence -- and we said because of a certain reason -- and he said correct.

01:36:06 Think about that. The written description requirement is that you describe the details of how to do what you claimed.

01:36:14 We said, does it describe the details?

01:36:16 He said no.

01:36:19 We gave him a second chance.

01:36:22 So the '554 patent is not explaining how to maintain -- remember that word "how" is important. That's what this description is all about, how to maintain the SIP signaling sequence number.

01:36:34 It's just saying the SIP signaling sequence number must be maintained, correct?

01:36:41 He said, let me read it. I'm reading it. It says the SIP signaling sequence number must be maintained between the SIP device and the server.

01:36:49 So since that's all it says, he says: That's correct.

01:36:55 We said: The patent doesn't explain how?

01:36:59 He said: That's right. It doesn't.

01:37:01 Yet the Court has just told you that's what the law requires. To get a valid patent, you have to describe it. You have to describe the how. I can't get a patent and say I want a patent on how to go to the moon and not tell somebody how to do it.

01:37:19 When you retire to the jury room, the second question you're going to be asked is whether or not we proved by clear and convincing evidence that these claims are invalid. And they are for two separate independent reasons. If you find either one of those, then these particular claims of this patent are invalid.

01:37:39 Let's switch gears. I want to talk about the money that these folks want. And I don't want to talk about the money because we don't think we owe them anything.

01:37:53 But I don't know if you remember in opening the very last thing I asked you to do was to please pay attention to the method and the process that these people

01:38:02 went through to get to this big quarter of a billion dollar
01:38:07 number. Because oftentimes in these types of lawsuits, if
01:38:11 you listen to the lengths they'll go to to get money,
01:38:14 you'll figure out what a lawsuit is really about.

01:38:18 Their lawyers told you in some, you know, pretty
01:38:20 strong words what they want you to believe this lawsuit is
01:38:23 about, but if you look at the way they get to the money,
01:38:27 you'll know a little bit more about it.

01:38:29 And here they have overreached -- not just once
01:38:35 but literally at every step.

01:38:39 Now, the Court just gave you some very important
01:38:42 instructions. I hope you never get to damages, but I do
01:38:45 think this tells you about the credibility of these folks'
01:38:50 claim. If you look on Page 27 of the jury instructions
01:38:52 when you go back there, what the Judge has said is if you
01:38:56 decide to award damages, the amount you find as damages
01:39:00 must be based on the value attributable to the patented
01:39:04 technology, the patented technology, which here, of course,
01:39:08 is just switching. It's just switching. That's the
01:39:11 patented technology.

01:39:11 There's a second instruction that I want you to
01:39:16 look at because it bears on their credibility. This is on
01:39:19 Page 17 of the jury instructions. So all of these claims
01:39:22 are method claims. The judge has told you method claims
01:39:27 are not infringed by the use of a service merely capable of

01:39:31 performing the claimed process.

01:39:33 So what that means here, just because you have a phone that's capable of switching, that's not infringement. Infringement of a method claim occurs only when use of an accused service actually results in performance. So here you have to actually be switching to have infringement and to recover damages.

01:39:54 Why is that important here? It's important here because what these Plaintiffs did is started off by valuing absolutely what the judge told you they cannot do. Remember what they did.

01:40:11 Starting with Mr. Minor, he valued Wi-Fi Calling. Remember what Bill Chin said. We didn't invent Wi-Fi Calling, none of it, not one bit of it. The judge has just told you, you can't value Wi-Fi Calling. You have to value the invention. The invention is the switch.

01:40:33 From that point forward, their entire damage model falls apart.

01:40:41 We also know they didn't invent any part of the cellular network or cell phone calling. By the way, I want to -- I want to address one thing. They've stood up twice now and said, well, what about this analogy where you need a windshield wiper? It's important only on some days, and that's how you ought to think about things.

01:41:08 No, the way you should think about things is the

01:41:10 way the judge instructed you, and the judge has instructed
01:41:13 you that you should only look at the patented invention,
01:41:19 and you should only count damages for actual use, not when
01:41:24 your windshield wipers are sitting still.

01:41:28 This is not -- you didn't raise your hand on
01:41:30 Monday and swear to follow the lawyers' analogies. You
01:41:36 rose your right hand and swore to follow the Court's
01:41:40 instructions.

01:41:41 This is what Mr. Minor did. Even though he was
01:41:46 valuing the complete wrong thing, I think this speaks to
01:41:49 the credibility of their entire claim. You know, he put
01:41:52 these percentages on the alleged proportion of Wi-Fi
01:41:59 Calling that the '554 covered, even though the inventor
01:42:04 himself said the '554 didn't cover any of it.

01:42:07 And when I asked Mr. Minor, well, how did you do
01:42:09 this? Did you consult anything? Can you present us with
01:42:13 any evidence? And I'm not being casual. Basically he
01:42:14 licked his finger and stuck it in the wind and said I'm
01:42:18 picking out a percentage, right?

01:42:20 I said: Can you present these people anything,
01:42:24 article, publication, textbook, anything? Nothing. Trials
01:42:29 are based on evidence.

01:42:31 But it gets worse. When he made these
01:42:34 calculations -- remember these numbers right here? This is
01:42:37 supposed to be the percentage that the '554 allegedly

contributes to Wi-Fi Calling. And he added those up and came up with the 75. And I said, well, wait, you should actually be advantaging those and not adding them up.

Because if we look at the inverse over here, this would be, like, 70, 75, and 80 percent that's attributable to stuff outside of the '554. And all that would add up to, like, 225 percent. We know the most it could be is a hundred percent. And we got really no answer, other than that's the way I did it.

But it gets worse. This is what their expert Mr. Blok did. He took every minute of use -- every minute of use and put it in his calculation. And we know -- you can look at the judge's instruction. Look at Page 17. We know the only minutes you should be counting are minutes where there is a call where there was switching going on. Even their two experts admit no switch, no infringement. Yet he counted every single minute, 360 billion of them.

And, look, let's clear the air on this. It doesn't matter if it's 15 percent, 5 percent, 1 percent, the fact is they made no deduction whatsoever to try to do what the judge's instructions tell them to do, and that is only count minutes of a call where a switch occurred. It's a complete disregard of the law.

And I -- you know, I feel compelled to say this. So if you -- when you go back there, if you will look at

Exhibit JTX-6 -- I already showed it to you -- but you'll see that's the Verizon data. And if you open the tab, I think it's the second tab in that spreadsheet, and you look, what percentage of time is there a switch-over when someone gets on Wi-Fi to cellular, it's less than 1 percent. I don't know why we keep talking about that. That's what the data shows. I showed it to you.

And if you go look in that same tab and the percentage of time that people switch from cellular to Wi-Fi, it's around 5 percent. Yet they took every single minute, 360 billion of them.

That's what I'm talking about when I say look at the method and the process these folks will get to to get to a quarter of a billion dollars.

THE COURT: Mr. Dacus, you have five minutes remaining.

MR. DACUS: Thank you, Your Honor.

They did every bit of this calculation, they did every bit of this calculation while ignoring what their own expert says is the common approach, the market approach, the market approach. No more complicated than house shopping. No more complicated than that.

Here's what all the data points show. Mr. Ellis had a much prettier graphic than I do. They want $226 million. They licensed this very patent for 600,000.

01:46:14 Mr. Bhaskaran offered it for 1.5 million. KAIFI, we took a license from a company called KAIFI that involved a certain aspect of switching between Wi-Fi and cellular for 9 and a half million. No appraiser worth his salt in the world would think that $226 million is reasonable when these are the comps. Nobody. Common sense.

01:46:41 I will -- I'll wind up here, and I'll leave this thing off because I just want to talk for a minute pretty plainly to you. What's going on in this lawsuit, what's going on in this courtroom, what's going on in this trial needs to stop. It needs to stop.

01:47:08 From Verizon's perspective, who is an owner of, as you've heard, thousands of patents, what's going on here is not about the progress of science. It's just not. And that's fundamental to our patent system and our Constitution.

01:47:26 In fact, what's going on here, this moving of the boundaries and moving of the fences on the patent that you own, it destroys our Constitutional patent system, and you're the protector of it. That's how it's set up. They've referenced the Seventh Amendment to the jury trial many times. They're right, you're the protector of it, you.

01:47:46 Aspen is basically a freight train at this point. They're running down this track of taking a patent, you

01:47:53 know what it was about, and trying to broaden it to cover 01:47:56 something that it wasn't. And that conduct can't happen. 01:48:00 It needs to stop.

01:48:04 Bob Faber can't stop it. Other men and women at 01:48:08 Verizon can't stop it. I can't stop it. And in our 01:48:15 system, a jury can stop it. Only folks who can. That's 01:48:18 what we hope you will do. That's what we hope you will do.

01:48:24 Whether you do it or not, the thanks from Verizon 01:48:27 remains. It's unconditional. You gave them a chance to 01:48:30 present you the facts, and we very much look forward to 01:48:34 receiving your verdict. And thank you again.

01:48:37 Thank you, Your Honor.

01:48:37 THE COURT: Plaintiff has a little more than 01:48:48 13 minutes remaining.

01:48:49 MR. HERMAN: Thank you, Your Honor. May I 01:48:58 proceed?

01:48:58 THE COURT: You may, yes.

01:49:00 MR. HERMAN: Ladies and gentlemen, put yourself in 01:49:02 my shoes. It is hard. This guy, this man, this Verizon 01:49:08 attorney is, for lack of a better word, slick. And he just 01:49:12 proved to you how slick he is when he just gave his closing 01:49:17 argument.

01:49:17 We can start with his misrepresentation of the 01:49:21 prosecution history.

01:49:23 If we can call up original application Claim 4.

01:49:30 Ladies and gentlemen, he told you that Aspen added
01:49:36 the SIP signaling sequence of the transmission is
01:49:39 maintained in -- during prosecution, that it wasn't there
01:49:44 in the original app. He told you it was added. It was
01:49:48 there. It's -- it was original application Claim 4. All
01:49:54 they did was move it up. That is incredibly common in
01:49:57 patent prosecution. Mr. Bhaskaran testified to it.
01:49:59 So to say that this wasn't in the original
01:50:04 application is just completely and utterly wrong.
01:50:08 He also tried to tell you that Mr. Chin didn't --
01:50:13 he tricked him in a deposition. There's a trick question.
01:50:17 Mr. Chin clearly didn't understand it. How do I know that?
01:50:20 You don't have to believe me. It's in the original claims.
01:50:23 The mobile application is in -- it's right here. This is
01:50:27 an original claim. It says, the method of Claim 5:
01:50:31 Wherein the source device is a mobile device.
01:50:34 It was filed with the original patent application,
01:50:37 ladies and gentlemen. So keep that in mind as we go to
01:50:41 infringement.
01:50:41 I cannot believe that he reiterated their argument
01:50:51 about plurality of alternative network paths. Ladies and
01:50:56 gentlemen, with your common sense, you go on your phone and
01:51:00 you go to connect to Wi-Fi. How many different Wi-Fi
01:51:05 connections do you normally get or possibilities? Several.
01:51:08 We showed you in the courtroom -- Mr. Heard showed

Dr. Mahon. He got 13, okay? Really? A plurality of alternative networks, we didn't show that? Why do they make all these extraneous arguments? It doesn't make sense.

He said the IP address doesn't change. And he said, you know, Verizon has its own network. So he wants you to believe -- and we disagree with this argument anyway. But he wants you to believe that you can't infringe if you're at home with a Verizon phone on a Verizon router.

But what if you go to the store? What if you go to a Starbucks? What if you go to work? What if you go to home? It might not be Verizon. That is smoke and mirrors. It's ridiculous. Please don't buy this.

What about the IPv6 thing? Do you guys remember that? Mr. Faber said: Oh, it's IPv6. That's different. It doesn't use NAT.

I showed you in my first part of the closing, they use NAT all the time. They track NAT. But do you remember when Mr. Heard was crossing Dr. Mahon and he had to admit that in 2017, IPv4 was by far the predominant part of that. So did Mr. Mavunkel. And Mr. Mavunkel actually testified most of the Internet is on IPv4.

Did they show you any documents that said that all these -- all these things are on IPv6? Absolutely not.

01:52:45 So this comes down -- for the infringement question, it really does come down to maintaining the SIP sequence.

01:52:55 So let's go to what I call the call trace deception. He did it again. He tried to confuse you about Dr. Rubin's call trace testing. Remember what they did. They showed you the sequence numbers from the call trace. It was 1 and then there was 29357, 358, all the way up to 363. And they tried to get him to say that's not a continuous sequence.

01:53:25 Dr. Rubin explained exactly why that was wrong. Two different conversations happening within the same call. The SIP standard requires that each dialog maintain its own sequence.

01:53:39 Do you know what Dr. Mahon's response was? He said he wasn't sure that Dr. Rubin used a Verizon network. And then Mr. Heard showed him this phone. And it says right here in the back, Verizon. Ladies and gentlemen, this phone was sitting in the courtroom all week -- actually back to last week. Dr. Mahon was here all week. He could have walked over and seen, oh, wow, this is a Verizon phone. But he didn't.

01:54:09 What did he do? He got on the stand without checking and said I'm not sure it's a -- I'm not sure he used the Verizon network.

01:54:17 Is that credible? And we can briefly go to invalidity. Ladies and gentlemen, this patent was issued by the United States Patent and Trademark Office, and everything Verizon's counsel just relied on was manipulating questions and manipulating answers that our inventors gave. That's all.

01:54:44 Let's look at what Dr. van der Weide said. So he first admitted that both of his references, the SIP standard and the Qualcomm '377 patent, were already before the Patent Office. So as I said on -- at the beginning, he's asking you to -- he actually used the words, ladies and gentlemen, "beyond a reasonable doubt," which first of all, is not at play here. That's for criminal proceedings.

01:55:10 But second of all, he said that the Patent Office got it wrong beyond a reasonable doubt.

01:55:14 Do you guys remember when Dr. van der Weide -- that's their expert -- when he was up on the stand, he had a 392-page report. He had one paragraph on written description. One.

01:55:31 And after all the admissions that Dr. van der Weide gave, do you remember what happened on redirect by his counsel -- by Verizon's counsel? He stood up and said one question. Do you stand by your testimony? Then he sat down. He didn't try to fix any of it. He didn't explain how the SIP standard teaches switching. He didn't

01:55:56 rehabilitate a single admission.

01:55:58 And I don't have time to go back through the 01:56:02 damages in a lot of detail, but I do want to go to what I 01:56:06 call the 1 percent deception.

01:56:11 Did Verizon's counsel get up and apologize to my 01:56:13 witnesses or apologize to you for pointing to that 1 01:56:17 percent number, which is wrong? No. Instead he doubled 01:56:23 down -- actually let's say he tripled down because he did 01:56:26 it so much during the examination of our expert damages 01:56:29 witnesses, and he just did it again. He said it doesn't 01:56:32 matter if it's 1 percent or 5 percent or 15 percent.

01:56:38 So let me ask you why, why would he question 01:56:43 Mr. Minor multiple times? I put some of them on the 01:56:49 screen, that less than 1 percent of Wi-Fi calls ever 01:56:53 experience a handover.

01:56:54 He just asked you to look at JTX-6. I encourage 01:57:01 you to. Remember he only showed Mr. Blok -- I don't even 01:57:04 remember if he showed Mr. Minor, but he only showed those 01:57:07 numbers that go from Wi-Fi to cellular. He just 01:57:12 admitted -- he just admitted again that you have to go to 01:57:15 the other column at the far right and you see it's 01:57:20 5 percent, and that's going from LTE to Wi-Fi.

01:57:27 And then he forgot to mention that, oh, I forgot, 01:57:29 it's 15 percent. His own damages expert took that data. 01:57:32 They only gave us 11 months' worth. He took that data and

01:57:39 said actually that data means that it's 15 percent. So why does that matter? I don't know. Why are you asking our damages experts questions about data that's false.

01:57:49 THE COURT: Mr. Herman, you have five minutes remaining.

01:57:52 MR. HERMAN: Thank you, Your Honor.

01:57:52 That's deception, ladies and gentlemen. Verizon chose to hire these lawyers to represent them, and they have to live with the consequences. If you agree with me, and listen, I did put on the verdict form that we do want you to find infringement. We do want you to find that the Patent Office didn't make a mistake. And we do want you to award $226 million in damages.

01:58:18 Who held up better on cross-examination, Mr. Blok, who had to deal with that 1-percent deception over and over and over again or Mr. Ellis who you just saw this morning who actually tried to argue with Mr. Findlay and say, yes, you have a $200,000 house. You try to sell it for 200,000, and no one wants to buy it so you take it off the market. And then you find out you have oil on your land four years later. Would the value of that house be the same? And Mr. Ellis said, I don't know. I couldn't answer that. He couldn't answer that?

01:59:01 Ladies and gentlemen, these men, this company, Aspen, was visionary. They came out with this product.

01:59:10 The product wasn't very successful, but they still owned the intellectual property. And they were visionaries.

And when the 4G revolution happened and Verizon had to catch up to T-Mobile and AT&T and they had to offer Voice over Wi-Fi Calling, they waited until they could do it seamlessly. That's the invention. They infringe it. And the damages is more than reasonable.

I know this is a tough case. I want you to weigh the testimony. I really want you to ask yourself who was more credible. Was it the Verizon witnesses who cannot explain their own documents? Was it the lawyer who told you 1 percent when the real number was 15 percent? Or was it Mr. Chin? Was it Dr. Rubin who walked you through every element, showed you his testing, and told you: Does that infringe, Dr. Rubin?

Definitely. I followed it element-by-element, and that proves it.

Ladies and gentlemen, I hope you found our legal team was credible. I hope you find that our witnesses were credible. We really believe in our case. We believe we've put on a great case for you. And so I'm going to just reiterate what I asked at the beginning of the week and what I asked at the beginning of my closing.

Verizon infringes Claims 1, 2, 6, 15, 16, and 20 of the '554 patent. The claims of this patent are clearly

not invalid. There's not even a remote chance that they have met their burden of clear and convincing evidence. And third, yes, we're asking you for $226.3 million. These gentlemen deserve it. Aspen deserves it. I really appreciate your time. Thank you.

THE COURT: Thank you, Mr. Herman.

Ladies and gentlemen of the jury, you've now heard the closing arguments of counsel for the parties, and it is time for you to return to the jury room to begin your deliberations in this matter.

The first thing you should do when you arrive is to select one among your number to serve as your foreperson who will guide your deliberations and speak for you in the courtroom.

Each of you will have a copy of the jury instructions that I previously went over with you, and there will be one verdict form for use by the foreperson filling in the answers to the questions, signing, and dating it on the last page.

As I told you earlier, if for any reason you need to communicate with me at any time during your deliberations, your foreperson should fill out the -- the paper there with a written message or a question to me, provide it to the Court Security Officer who will bring it directly to me. I will then either respond in writing or

02:02:23 by having you brought into the courtroom where I can
02:02:26 address you orally.

02:02:26 I will, of course, disclose to the attorneys in
02:02:30 the case what your question is and what my response is
02:02:34 before I answer your question.

02:02:36 So with those final comments, Mr. Savage and
02:02:41 Mr. Goecke, I would ask that you escort the jury to the
02:02:45 jury room.

02:02:45 We will await your verdict.

02:02:45 COURT SECURITY OFFICER: All rise.

02:02:47 (Jury out.)

02:02:48 THE COURT: Okay. Be seated.

02:03:12 Just brief comments. Feel free to leave the
02:03:18 courthouse if you want to. Don't get terribly far away.
02:03:21 Feel free to pack up whatever you want to pack up.

02:03:25 If each side would leave a cell number with
02:03:29 Ms. Combs so that we can reach you in the event of a note
02:03:33 from the jury or a note indicating they have reached a
02:03:36 verdict.

02:03:38 All right. Anything else from either side?

02:03:40 MR. HERMAN: Not from Aspen, Your Honor.

02:03:42 MR. DACUS: Not from us.

02:03:43 THE COURT: All right. Thank you both.

02:03:48 (Recess.)

05:10:57 (Jury out.)

05:11:01 COURT SECURITY OFFICER: All rise.

05:11:02 THE COURT: All right. We have received two notes from the jury.

05:11:42 The first note indicated that Teresa Coats, who I think was far back right, is our foreperson.

05:11:53 And the second note, timed at 4:58 p.m., initialed by Ms. Coats, indicates that the jury has reached a verdict.

05:12:03 Does either party have anything to discuss or raise with me before we have the jury brought to the courtroom?

05:12:11 MR. HERMAN: Not from Aspen, Your Honor.

05:12:13 MR. DACUS: Not from Verizon, Your Honor.

05:12:15 THE COURT: All right. Very well.

05:12:16 Mr. Savage, if you would have the jury brought to the courtroom.

05:12:21 COURT SECURITY OFFICER: All rise for the jury.

05:12:25 (Jury in.)

05:12:43 THE COURT: Please be seated.

05:13:06 Ms. Coats, I understand that you are our foreperson; is that correct?

05:13:12 THE FOREPERSON: Yes, sir.

05:13:13 THE COURT: All right. Ms. Coats, I just received a note from you timed at 4:58 p.m. indicating that the jury had reached a verdict; is that correct?

THE FOREPERSON: Yes, sir.

THE COURT: Is the verdict unanimous?

THE FOREPERSON: Yes, sir.

THE COURT: All right. I'm going to ask that you hand the verdict form to our Court Security Officer, Mr. Savage, who will hand it to Ms. Combs, who will hand it to me.

All right. I have reviewed the verdict form. It appears to be in order, and it is signed and dated by you, Ms. Coats.

I am going to hand the verdict form back to Ms. Combs at this time, and she is going to read it in just a minute.

And when she does that, I'm going to ask each of you on the jury to listen very carefully as she does because after she is finished, I'm going to ask each of you if this is, in fact, your verdict so that I can confirm it is unanimous, okay?

THE FOREPERSON: Yes, sir.

THE COURT: All right. Ms. Combs, if you would read the verdict, please?

COURTROOM DEPUTY: Question No. 1: Did Aspen prove by a preponderance of the evidence that Verizon directly infringes any of the following claims of the patent-in-suit?

For each claim, check yes in favor of Aspen or no in favor of Verizon.

Claim 1, yes is checked.

Claim 2, yes is checked.

Claim 6, yes is checked.

Claim 15, yes is checked.

Claim 16, yes is checked.

Claim 20, yes is checked.

Question No. 2: Did Verizon prove by clear and convincing evidence that any of the following claims of the patent-in-suit are invalid?

For each claim, check yes in favor of Verizon or no in favor of Aspen.

Claim 1, no is checked.

Claim 2, no is checked.

Claim 6, no is checked.

Claim 15, no is checked.

Claim 16, no is checked.

Claim 20, no is checked.

Question No. 3: What sum of money if paid today in cash has Aspen proved -- proven by a preponderance of the evidence would adequately compensate Aspen for Verizon's infringement. Answer in dollars and cents.

And it is $190 million.

THE COURT: All right. Thank you, Ms. Combs.

05:16:09 Ladies and gentlemen of the jury, let me poll you at this time and make sure that this is the unanimous verdict of all eight members of the jury. Will all of you who voted for the verdict, as Ms. Combs just read it, please stand at this time.

05:16:25 (Jury polled. )

05:16:30 THE COURT: All right. You may be seated.

05:16:32 And let the record reflect that all eight members of the jury immediately rose and stood in response to my request to poll the jury.

05:16:39 Does either party wish to see the verdict form?

05:16:44 MR. HERMAN: Aspen does not, Your Honor. Thank you.

05:16:47 MR. DACUS: No, Your Honor. Thank you.

05:16:48 THE COURT: All right. Does either party know of any reason the verdict should not be accepted?

05:16:53 MR. HERMAN: No, Your Honor.

05:16:54 MR. DACUS: No, Your Honor.

05:16:54 THE COURT: All right. Very well.

05:16:56 The verdict will be accepted and filed with the clerk of the court.

05:17:00 Ladies and gentlemen of the jury, this now completes the trial of the case, and your involvement in this matter is concluded.

05:17:10 From the very beginning, I instructed you

05:17:13 repeatedly about not discussing the case with anyone,
05:17:18 including among yourselves, until you retired to the jury
05:17:23 room at the end of the case to begin your deliberations and
05:17:26 then only to discuss it among yourselves.

05:17:34 I am now releasing you from all of those
05:17:38 obligations. You are free to talk about the case among
05:17:41 yourselves, your friends, your family, anybody you want to.
05:17:44 Likewise, you are just as free not to say a word about it
05:17:46 to anybody ever again. You're under no obligation to
05:17:48 discuss it with anyone one way or the other.

05:17:53 The second thing is I have a practice in my court.
05:17:58 I ask you to wait in the jury room for me once I have
05:18:03 excused you from the courtroom. I will need to visit with
05:18:08 the attorneys very briefly here before I come down to the
05:18:13 jury room. I'll visit -- I'd like to come down and talk to
05:18:18 you for a few minutes, not about the case, not about your
05:18:22 verdict or how you reached your verdict, but just about the
05:18:25 process we follow here in our court. And really it's more
05:18:30 than anything else just an opportunity for you to tell us
05:18:34 whether there's anything that we as a court can do to be a
05:18:38 better public facility, a better public agency, and to do a
05:18:43 better job for the public and for our jurors.

05:18:46 So if you wouldn't mind waiting for me for just a
05:18:49 few minutes while I visit briefly with the attorneys after
05:18:52 you have left the courtroom, I would -- I would deeply

05:18:56 appreciate it.

05:18:57 I do want to thank you on behalf of the Eastern District of Texas for your dedicated service as jurors in this case. I know how much that I and the parties and the attorneys involved in this case appreciate all of your time and your effort and the attention that you paid throughout the course of this trial.

05:19:22 This is an important case to both parties. They have been unable to resolve it without the assistance of a jury. And I say this regularly, and I believe it more and more in every trial that I have. I think there are three pillars to good citizenship in America. The first is being an active and informed voter. The second is answering the call of military service when your nation needs you. And the third, of course, is what you all have done this week, to be a -- to be a juror in a trial. And you all clearly responded to that call by serving as jurors in this case.

05:20:10 Our Constitution and our court system really depends on having active citizens who are willing to participate as jurors so that disputes like this one can be resolved. I cannot tell you how important this service is and how much the Court appreciates it.

05:20:31 So on behalf of the parties involved in this case, the lawyers involved in this case, and the United States District Court for the Eastern District of Texas, I do

thank you for your service in this matter.

So I'm going to ask Mr. Savage and Mr. Goecke to escort you back to the jury room. And if you will wait for me for just a few minutes down there, I'll be down as quickly as I can.

COURT SECURITY OFFICER: All rise.

(Jury out.)

THE COURT: All right. Be seated.

Let me suggest that the parties meet and confer sometime in the next seven days and agree on, if possible, a post-trial motion briefing schedule. I don't know -- I don't have any particular, you know, idea about what that schedule might look like or when -- when we might have a hearing. So you all see if you can come up with something that is reasonable. I don't want it to be too far out in the future, but, you know, opening briefs don't need to be due 10 days from now.

So I feel sure you all can come up with a schedule that -- that is reasonable. Will you all endeavor to do that sometime within the next seven days and get an agreed motion, if that's possible, filed on the docket?

MR. HERMAN: Yes, Your Honor.

MR. DACUS: Yes, Your Honor.

THE COURT: Okay. Let me just say finally, as I said late yesterday and I think again this morning, it's

been a pleasure to try this case with you all. You know, it was hard-fought on a number of different issues, but you all worked well together. You worked cooperatively, and as far as I could tell, extremely professionally. And that makes my job a lot easier. So I'm grateful to both sides and the lawyers involved in this case for your effort in that regard.

Does the Plaintiff have anything else before we adjourn?

MR. HERMAN: We do not, Your Honor. Thank you.

THE COURT: Thank you, Mr. Herman.

MR. DACUS: No, Your Honor. Thank you.

THE COURT: Thank you, Mr. Dacus.

Safe travels to all of y'all.

We'll be adjourned.

(Court concluded at 5:23 p.m.)

CERTIFICATION

I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.

/S/ Shelly Holmes
SHELLY HOLMES, CSR, TCRR
CERTIFIED SHORTHAND REPORTER
State of Texas No.: 7804
Expiration Date: 10/31/2027

6/18/2026
Date